Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISTY SNOW, individually and on behalf of others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>        Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE CASE ..................................................................................1

II.   JURISDICTION AND VENUE ........................................................................5

III.  PARTIES .........................................................................................................6

IV.   FACTS .............................................................................................................6

    A.    Algin's profits largely derive from its domination of the Aligner
        Market...................................................................................................6

    B.    The expiration of Align's Intellectual Property Exposed it to
        Competition ..........................................................................................9

    C.    Align implemented a closed system of scanners and aligners that
        would protect its monopolies in the respective markets..........................10

    D.    Align terminated its interoperability agreement with 3Shape,
        sacrificing short-term profits in order to gain long term profits from the
        anticompetitive effects of its refusal to deal.............................................11

    E.    Align signed exclusive dealing contracts with Dental Service
        Organizations to entrench its monopoly power.........................................15

    F.    Align's "Fusion Program" Tied Together iTero Links, iTero Prices and
        Invisalign Sales.........................................................................................16

    G.    Align's set of actions substantially foreclosed competition in the
        aligner and scanner markets. ....................................................................17

V.    INTERSTATE COMMERCE ............................................................................19

VI.   CLASS ACTION ALLEGATIONS ...................................................................19

VII.  RELEVANT MARKETS ...................................................................................23

VIII. ANTITRUST INJURY ......................................................................................25

IX.   CAUSES OF ACTION......................................................................................26

FIRST CLAIM FOR RELIEF  MONOPOLIZATION OF THE ALIGNER
        MARKET (15 U.S.C. §2).........................................................................26

SECOND CLAIM FOR RELIEF  MONOPOLIZATION OF THE SCANNER
        MARKET (15 U.S.C. §2).........................................................................27

THIRD CLAIM FOR RELIEF   (VIOLATIONS OF THE CARTWRIGHT ACT,
CAL. BUS. & PROF. CODE §§ 16700, *ET SEQ.*) ................................................................ 28

FOURTH CLAIM FOR RELIEF   (VIOLATIONS OF CALIFORNIA'S UNFAIR
COMPETITION LAW,  CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*) ........................ 30

FIFTH CLAIM FOR RELIEF   (VIOLATION OF STATE ANTITRUST AND
RESTRAINT OF TRADE LAWS) ...................................................................................... 31

X.        REQUEST FOR RELIEF ........................................................................................... 31

XI.       DEMAND FOR JURY TRIAL ................................................................................... 33

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased Invisalign Aligners for personal use sold by Align Technology, Inc. ("Align" or "Defendant) from at least March 15, 2015 until the present (Class Period).

## I.      NATURE OF THE CASE

1.      Aligners are orthodontic devices that, in essence, are a plastic form of dental braces. Over a course of treatment, a patient generally uses a successive series of aligners that slowly realign the teeth. Aligners possess several significant advantages over dental braces. Aligners, unlike braces, can be removed from the mouth for short periods of time, such as for eating, brushing, or flossing. Aligners, made out of clear plastic, are also more visually inconspicuous than dental braces that are usually made out of metal.

 

Braces                    Invisalign

2.      For decades, Align dominated the market for Aligners with its Invisalign products. Align controlled more than 80 percent of the market and earned consistent, durable profit margins. Align used its intellectual property to protect its dominant market position. Align frequently filed litigation, such as patent infringement lawsuits, against potential competitors in the aligner market who threatened Align's dominance.

CLASS ACTION COMPLAINT - 1
Case No.:
010976-11/1509838 V1

3.      However, by 2017, Align's intellectual property that had helped drive its market dominance had begun to expire. Align publicly acknowledged the risk that "[w]hen patents expire, we lose the protection and competitive advantages they provided to us, which could negatively impact . . . operating results."

4.      Align had been able to charge high prices and earn high profit margins on Invisalign because the product was protected by a thicket of hundreds of patents that Align wielded aggressively to protect its Aligner monopoly. As Align CEO Joe Hogan stated in 2017: We've been in business now for almost 20 years, and we've had so few competitors and people think it's because we have this great IP, it's true we have good intellectual property, but it took 15 years for people to really believe that you can move teeth with plastics[.] ... It gave us this period of time to really iterate and learn *without the outside influence of other competitors coming in.*[1]

5.      Faced with competition from the loss of patent exclusivity, Align implemented a anticompetitive scheme to willfully acquire and maintain its monopoly position. Align's scheme centered around its efforts to foreclose competition in the linked markets of (1) aligners; and (2) hand-held digital intraoral scanners ("scanners").

6.      Dental offices use scanners to take digital images of the jaws, teeth, and bite of a patient. These digital images are then used by aligner manufacturers to create individualized Aligners for patients. During the course of a treatment, patients will generally take regular scans and have a series of individual Aligners manufactured for their usage.

7.      Align sells a scanner product called the iTero. Align's primary competitor in the Scanner market is 3Shape, who sells a "Trios" scanner. Digital scanners make it more convenient and efficient for Dental Practices to order Aligners. Align has stated that "Invisalign doctors with an iTero scanner have notably higher utilization rates than non-iTero doctors" i.e. – Invisalign doctors with an iTero scanner order Invisalign Aligners at significantly higher levels than doctors without iTero scanners. Align itself has also emphasized that Dental Practices need a fast and accurate way to

---

[1] Michela Tindera, *Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents*, Forbes (April 25, 2017) (emphasis added).

CLASS ACTION COMPLAINT - 2
Case No.:
010976-11/1509838 V1

create digital scans that can be used to create Aligners and to transfer those scans to the Aligner manufacturer.

8.     Align's iTero and 3Shape's Trios are the two Scanners specifically designed for ordering Aligners. However, the two scanners have an obvious difference. Trios allows for dentists to order Aligners from a number of different Aligner manufacturers, thus encouraging competition in the market for aligners. By contrast, iTero is a closed system because it imposes substantial costs on dentists who attempt to use the iTero for ordering Aligners that are not manufactured by Align.

9.     As a result of this distinction, the spread of iTero's closed-system scanner across dentists drives sales towards Invisalign and excludes rival Aligner manufacturers. For example, in 2019, Invisalign stated that the "use of the iTero scanners for Invisalign case submission continues to grow and remains a positive catalyst for Invisalign ultilization" and that the "iTero scanner and services business has become an integral part of our business and is key to our end-to-end digital workflow."

10.     Align's anticompetitive scheme was designed to monopolize the Scanner and Aligner markets, creating a self-reinforcing cycle where Align's dominance of the Scanner market ensured continued dominance of the Aligner market. Align's scheme contained several key components: (1) the economically irrational, unilateral termination of Align's longstanding and profitable agreement with 3Shape that allowed the Trios Scanner to be used to order Invisalign ("Interoperability Agreement") – a termination that sacrificed short-term profits and only made sense because of the anticompetitive effects that it subsequently caused; (2) exclusive dealing contracts with two of the largest dental service organizations ("DSO") that effectively prevented DSO members from dealing with Align's competitors in the Scanner and Aligner markets, and (3) the Fusion program, which bundled iTero and Invisalign Aligner sales together, effectively preventing dentists from ordering either Aligners or Scanners from rivals.

11.     Align's scheme substantially foreclosed competition in the Aligner and Scanner markets. Align successfully tied Invisalign to iTero in order to monopolize both markets – with dentists that used iTero scanners effectively forced to use Invisalign because Align's terminated its interoperability agreement with its primary rival, 3Shape.

CLASS ACTION COMPLAINT - 3
Case No.:
010976-11/1509838 V1

1  12. A rival Aligner manufacturer looking to compete against Invisalign would have to

2  offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its

3  customers through this Scheme. Likewise, Align has foreclosed Trios, its only true rival in the

4  Scanner market. Because Align controls approximately 90 percent of the Aligner market, that has

5  effectively foreclosed the ability for a rival Scanner manufacturer to compete.

6  13. Invisalign Aligners are sold through dental offices. Full dental courses of treatment

7  using Invisalign Aligners are expensive, generally costing up to $8,000. The cost of Invisalign

8  Aligners are incorporated into the prices that dentists charge for Invisalign Aligner treatment. Dental

9  insurance, if it is available, generally only covers a minority portion of the overall Invisalign Aligner

10  treatment, generally capping benefits at 25-50% of the overall cost of the Invisalign Aligner

11  treatment. Therefore, Plaintiff consumer purchasers pay much or all of the cost of Invisalign Aligners

12  out-of-pocket.

13  14. Align itself recognizes that Plaintiff consumers pay much of the cost for Invisalign

14  Aligner treatment.  On its own website, Align describes various out-of-pocket payment options for

15  consumers purchasing Invisalign Aligners, including the usage of HSA or FSA spending accounts, or

16  monthly payment plans:

17



18
19

### Paying for Invisalign treatment with tax-free dollars using an FSA or HSA

20

21  **What is an FSA?**

22  A flexible savings account, or FSA, is an account you may be able to use to pay for certain medical, dental, and orthodontic costs, including Invisalign clear aligners. Your FSA is managed by your employer, and you pay money into the account throughout the year, usually through a deduction from your paycheck. You may set aside up to $2,600 annually. Not all employers offer an FSA.

**What is an HSA?**

A health savings account, or HSA, is a special savings account designed for people with a high-deductible health insurance plan. You put money into the account and can use it to cover certain medical, dental, and orthodontic costs, including Invisalign clear aligners. You may set aside up to $3,400 for an individual or $6,750 for a family annually. To open an HSA, you must meet IRS eligibility requirements.

23

24  **What is the advantage of an FSA or HSA?**

You don't pay taxes on the money you put in an FSA or HSA.

25  **How can I use my FSA or HSA to pay for Invisalign treatment?**

26  Before you begin your Invisalign treatment, talk to both your doctor's office and your benefits manager. You may be able to pay your doctor and be reimbursed from your FSA or HSA. Your benefits provider may also be able to pay your doctor directly.

27

28

CLASS ACTION COMPLAINT - 4
Case No.:
010976-11/1509838 V1



**Paying for your Invisalign treatment
with a monthly payment plan**

What is a monthly
payment plan?

A monthly payment plan is an arrangement between you and your doctor to spread the cost of your Invisalign clear aligners over the length of your treatment. Typically, doctors will request a down payment before treatment begins.

How can a monthly payment help
me?

Making small payments throughout the course of your Invisalign treatment rather than all at once can make it easier to plan your monthly budget.

How can I arrange a monthly
payment plan?

Many doctors offer flexible and affordable monthly payment plans. Before or during your consultation for Invisalign treatment, ask your doctor what options they offer.

15.     Align has specifically emphasized that it works to arrange third party financing programs for end user consumers to shoulder the high cost of Invisalign Aligners. For example, Align introduced a third party financing program where the cost of Invisalign Aligners would be specifically paid to Align. Invisalign's CEO, Joseph Hogan, explained the program as follows: "When consumers finance their treatment through us, Invisalign providers no longer pay Align. Instead they just receive payment for the treatment fee minus Align's lab fee. By changing the financial relationship between the patient, Align and the provider, Invisalign treatment becomes a revenue source for the provider." Align also specifically recognized that dentists otherwise passthrough the cost of Invisalign Aligners to patients, with Hogan stating that the new financing program "eliminates the need for [dentists] to pass on the high down payments to patients."

16.     Therefore, ultimately, whether they pay directly to Invisalign through financing or through payments for the cost of Invisalign Aligner treatment provided by dentists, it is Plaintiffs, consumer purchasers of Invisalign Aligners, who have paid the price for Align's anticompetitive scheme through supracompetitive prices on Invisalign Aligners.

## II.      JURISDICTION AND VENUE

17.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendant for violating Section 2 of the Sherman Act (15 U.S.C. § 2). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest,

costs, and attorneys' fees for the injury caused by Defendant's conduct in monopolizing the Aligner and Scanner markets. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

19.     This Court has personal jurisdiction over the Defendant, as it has corporate offices in the District, markets and distributes Aligners and Scanners in this District, had corporate headquarters in this District during the majority of the class period during which it engaged in anticompetitive acts, enters into contracts within this District, and otherwise transacts business within this District.

### III.     PARTIES

20.     Plaintiff Misty Snow purchased Invisalign Aligners in January 2019, during which time she was a resident of Oregon. Snow initially paid for the entire cost of Invisalign Aligners out-of-pocket through payments to her dental office. Snow was subsequently partially reimbursed by insurance for her purchase but was still individually responsible for paying the majority of the cost of the Invisalign Aligners. Plaintiff Snow purchased Invisalign Aligners at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

21.     Defendant Align Technology, Inc. is a Delaware corporation that had its corporate headquarters in San Jose, California for the majority of the class period until January 1, 2021. Defendant still maintains its primary research hub in San Jose, California. Upon information and belief, Defendant has corporate offices in the Northern District of California, has many Invisalign providers in the Northern District of California which are trained by Defendant to prescribe Invisalign and which purchase both iTero scannera and Invisalign Aligners from Defendant for usage on Plaintiffs.

### IV.     FACTS

**A.     Algin's profits largely derive from its domination of the Aligner Market**

22.     Align's largest source of revenue comes from its Invisalign brand Aligners, by far the dominant product in the Aligner market, with an approximately 90 percent share of the Aligner

market. Align earns well over a billion dollars per year selling Invisalign products at gross margins exceeding 75 percent. Its revenues and profits continue to grow year after year, and it continues to raise prices, despite the (largely unsuccessful) efforts of other companies to break into the Aligner market.

23.     Align also sells the iTero Scanner. Align acquired the iTero technology through a corporate acquisition and then integrated it with the Invisalign system. The iTero Scanner's integration with Invisalign, as well as Align's anticompetitive conduct described herein, have enabled iTero to become the dominant Scanner. Align now controls approximately 80 percent of the Scanner market, which earns Align hundreds of millions of dollars a year. An example of an iTero scanner is pictured below:



24.     The iTero Scanner is highly profitable, with profit margins above 60 percent. Align's only real competitor in the Scanner market is 3Shape, which sells the Trios Scanner. Trios, like iTero, is designed for ordering Aligners.

25.     Because of its dominance, Invisalign is a "must have" for Dental Practices that offer Aligner treatment to patients. When a patient seeks Invisalign treatment, that patient would visit a Dental Practice authorized by Align to prescribe the treatment. A dentist or staff member would then normally perform a scan of the patient's jaws, teeth, and bite using a Scanner, and the dentist would review the scan. If the dentist determines that Invisalign treatment is appropriate, the Dental Practice will then purchase a set of custom-made Invisalign Aligners directly from Defendant for that patient's treatment.

26.     Align knew that the use of digital Scanners, like iTero, would make it more likely that a Dental Practice would use Aligners—because of the Scanner's design and "digital workflow," because it provides a more accurate impression of a patient's jaws, teeth, and bite for the improved design of that patient's Aligners, and because once a Dental Practice makes a large investment in a digital Scanner, that practice would be more likely to order more Aligners as a way to pay for the Scanner. In addition, as described below, Dental Practices are able to access non-penalty pricing on Aligners as the number of Invisalign orders increases, thus making Scanners—and in particular ones that can be used to order Invisalign—a critical piece of a Dental Practice's business.

27.     The primary focus of Align is selling more Aligners at extremely high profit margins. As Align's Chief Executive Officer, Joe Hogan, stated in a July 2017 investor call, "[W]e're in the clear aligner business and anything that help us to sell more clear aligners directly . . . would be in our . . . range. So, that's why we have a scanner business. We have a scanner business not from a diversification standpoint. We have a scanner business because it allows us to sell more clear aligners."

28.     The bottom line was that more iTero Scanners meant more Invisalign orders for Align. As Joe Hogan told investors in an April 2018 call, "So yeah, [iTero] is another component of growth in the company overall. What's great is it's synergistic growth, right. You have equipment growth, but it really leads to the growth of our core product line which is Invisalign." And as Mr. Hogan reminded

Wall Street analysts when discussing Scanner sales in an October 2018 investor call: "[R]emember, it's just a wonderful footprint for us for future Invisalign business once we have those scanners in place."

29.     The fact that Scanners make it easier to order Aligners *could* have spelled trouble for Align's market dominance in the Aligner market *if* the two available Scanners (iTero and Trios) were able to send scans to any Aligner manufacturer. Then Dental Practices could have offered Invisalign and competing Aligners on equal footing, which would have engendered competition among Aligner manufacturers that would have lowered prices and/or improved quality or innovation. Indeed, Trios is such an "open" platform—as a technological matter, Trios can be used to order Aligners from a wide range of manufacturers. But Align has created a "closed" system for iTero, which limits the ability of Dental Practices to use it to order competing Aligners. And Align has imposed contractual commitments to limit access to Trios and competing Aligners and—after 3Shape refused Align's demand to send scans for Aligner orders only to Align—terminated the highly profitable Interoperability Agreement with 3Shape, all to create a bulwark to defend Invisalign from competition.

30.     Thus, for Align, monopolizing the Scanner market was not just about increasing price (and profits) in the Scanner market—which it did—but also about maintaining its monopoly power in the Aligner market, and thereby maintaining its supracompetitive prices and profits on Aligners.

**B.      The expiration of Align's Intellectual Property Exposed it to Competition**

31.     Defendant held hundreds of patents on its Aligner technology. These patents, along with other high barriers to entry, largely deterred entrants into the Aligner market. Align has aggressively wielded those patents as well, filing patent and trade proceedings against potential competitors in the Aligner market as necessary to maintain its monopoly position.

32.     The Invisalign brand has become synonymous with Aligners generally. As a result, Dental Practices engaged in the business of straightening teeth must carry Invisalign to satisfy the demands of customers. And as described below, for those Dental Practices who want to offer Invisalign, Align has essentially made it impossible to offer competing Aligners or to use Scanners that compete with Align's iTero.

33.     Align's monopoly started to come under threat in 2017 due to the expiration of many of its key patents, with additional key patents expiring by the end of 2019. Having enjoyed years of operating without "the outside influence of other competitors coming in," as patent expiry loomed, Align changed its message to investors from reliance on the patents to protect its monopoly, to concern that "[w]hen patents expires, we lose the protection and competitive advantages they provided to us, which could negatively impact . . . operating results." But instead of competing on the merits of its products and its pricing, Align responded to the emerging threat of competition by implementing the Scheme, described in detail below, to use its monopoly power in both the Aligner and Scanner markets to maintain and/or increase its monopoly power in each market and continue to charge supracompetitive prices for both Aligners and Scanners.

**C.     Align implemented a closed system of scanners and aligners that would protect its monopolies in the respective markets**

34.     One piece of the bulwark protecting Align's monopoly power is Align's "closed system" design of its Scanner and Aligner technology. For example, iTero is the only Scanner with integration into the Align treatment system, including Align's Invisalign Outcome Simulator. Because of the way iTero is integrated into the "digital workflow" a Dental Practice would use to order Invisalign, Align knew that placing its Scanners in Dental Practices was going to drive those Dental Practices to use Invisalign exclusively.

35.     Second, iTero is intentionally designed in such a way that it is expensive, inefficient, and impracticable to use it to order non-Invisalign Aligners. For example, iTero does not create scans in the standard file format used by other Aligner manufacturers, and thus, a Dental Practice wishing to order non-Invisalign Aligners using iTero scans must either undertake an expensive and time-consuming process of converting iTero scans to a format that can be used for other Aligners, or use silicone-based molds to create a cast of a patient's mouth and teeth, which is a messy, uncomfortable for the patient, time-consuming, and inefficient method. By contrast, 3Shape's Trios Scanner uses standard file formats and cloud technology to work with numerous Aligner brands, including Invisalign (prior to Align's termination of 3Shape's Interoperability Agreement). For this reason, Trios represented a breach in Align's bulwark protecting Invisalign from competition.

36.     Third, Align intentionally does not accept scans from any Scanner for Invisalign orders, but rather, only allows Invisalign orders from a limited group of authorized scanners. Until the termination of Align's Interoperability Agreement with 3Shape, discussed below, the Trios Scanner was one such authorized Scanner. Upon information and belief, Align has only allowed interoperability for scanners that are not designed for ordering Aligners, that do not compete with iTero in the Scanner market, and that do not represent a threat to Align's dominance of the Aligner market. According to 3Shape, at the Greater New York dental meeting in November 2017, Align executive Raphael Pascaud communicated to 3Shape that Align will no longer validate any non-iTero intraoral scanner for use with Invisalign. Given that Invisalign orders are highly profitable for Align, this decision by Align terminated a previously highly profitable course of conduct for Align for the sole reason of furthering Align's exclusionary conduct.

37.     Scanners are essential for Dental Practices to offer and sell Aligners (particularly Invisalign) to their patients, and Dental Practices typically do not purchase more than one Scanner due to the expense. In the case where a Dental Practice buys more than one Scanner, that practice nonetheless would tend to use only one *brand* of Scanner due to the cost of maintaining multiple software subscriptions and the time and expense to train personnel to use different Scanners and software programs. And like most such capital investments, a Scanner is meant to last several years.

38.     Thus, the iTero Scanner and Invisalign operate as a *de facto* product bundle by (a) making iTero the only viable option for Dental Practices seeking to sell the market-dominant Invisalign to their patients, and (b) preventing other Scanners from becoming established in the market that would allow dentists to order competing Aligners without undue burden. In order to cause the vast majority of Dental Practices to have long-term dependence on both the iTero Scanner and Invisalign Aligners, Align has engaged in the anticompetitive Scheme to entrench its monopoly power in the Aligner and Scanner markets.

**D.     Align terminated its interoperability agreement with 3Shape, sacrificing short-term profits in order to gain long term profits from the anticompetitive effects of its refusal to deal.**

39.     3Shape has been selling the Trios Scanner internationally since 2011, and in the United States since 2012. Unlike Align's iTero, the Trios can send scans to any manufacturer of

Aligners without any fees, delays, conversion process, or loss of image resolution. This was an advantage to Trios customers because it allowed for choice of Aligners and would have benefitted Dental Practices had other Aligner manufacturers been able to compete with Invisalign on the merits with lower prices and/or better quality for Aligners.

40.      Indeed, Align's then-Chief Operating Officer told industry analysts in an April 23, 2015 investor call (when its Aligner market dominance was protected by patents), such open systems:

> are better for our customers. No one wants to have to redesign, start over, buy multiple pieces of equipment if they can have greatest utility from a scanner... So, we believe what we hear from our customers is they don't want to be forced to buy a system from you for the pleasure of offering Invisalign to their patients and other therapies we may have down the road. So we feel actually very strongly . . . . There's no reason for us not to act in complementary ways because it's good for the customer. So in our minds, we don't need to own the channel. We don't need to have exclusivity. *In fact, we want probably more high-quality scanners that can make it easier to do Invisalign and other chair-side procedures that we have the unique capabilities to fulfill.*

41.      In December 2015, Align and 3Shape entered into the Interoperability Agreement, under which the parties worked together to build an interface so that dental professionals could send Trios scans into Align's Invisalign workflow. According to 3Shape, Align executive Raphael Pascaud testified in prior litigation that Align had entered into this Interoperability Agreement to increase Aligner sales, including from Dental Practices that were already using the Trios Scanner.

42.      But even as Align was preparing to enter into the Interoperability Agreement, according to 3Shape, Align was seeking to change the terms of its relationship with 3Shape by proposing an agreement whereby 3Shape would agree to make its Trios Scanners send scans *exclusively* to Align for Invisalign Aligners. Align also did not want 3Shape to promote or offer alternative software capable of staging treatments from non-Invisalign Aligners. Align knew that 3Shape's open system and popularity represented a breach in the bulwark it had erected around Invisalign, and thus, the purpose of this proposed exclusive arrangement was for Align to impair other Aligner manufacturers.

43.      3Shape refused to make the Trios exclusive to Align, as Align had asked. Instead, 3Shape sought to continue to allow the Trios to send scans to any Aligner manufacturer in the interests of open competition. 3Shape wanted to maintain 3Shape's relationships with other Aligner manufacturers, as well as to allow 3Shape to develop its own software to compete with Align. The

CLASS ACTION COMPLAINT - 12
Case No.:
010976-11/1509838 V1

1    Interoperability Agreement ultimately permitted 3Shape to provide scans to other Aligner

2    manufacturers as well as to continue to promote and offer its own software.

3      44. According to 3Shape, shortly after the Interoperability Agreement was signed, Align

4    began again to seek to change the terms. In a February 2016 meeting, attended by top Align executives,

5    Align made clear that as part of any further collaboration between the companies, 3Shape would need

6    to treat Invisalign as the "preferred partner" for Aligners. In a November 2016 meeting, Align asked

7    3Shape to enter into a joint venture that would allow Align to control Trios. 3Shape again refused.

8      45. According to 3Shape, throughout 2017, including at the International Dental Show in

9    March 2017, Align executive Raphael Pascaud continued to demand that 3Shape agree to the joint

10   venture that would exclude Invisalign competitors. During this time, 3Shape has alleged that it heard

11   from resellers and distributors that Align had threatened that it would end interoperability with Trios.

12     46. On December 20, 2017, Align announced that it would terminate the Interoperability

13   Agreement with 3Shape as of January 17, 2018, and the Trios would no longer be able to submit

14   scans for Invisalign.

15     47. After many Dental Practices and the American Association of Orthodontists

16   expressed dismay at the termination, Align extended the date of termination to January 31, 2018, and

17   then terminated the Interoperability Agreement on that date, making Trios Scanners no longer

18   capable of ordering Invisalign.

19     48. This termination represented a sacrifice of revenue for Align, and it was economically

20   irrational but for the market exclusion this profit sacrifice created. Indeed, according to 3Shape, Align

21   had profited from the interoperability agreement with 3Shape that allowed Trios users to order

22   Invisalign, and in fact received 40,000 Invisalign orders from Trios in the United States between

23   October 2016 and January 2018. Upon information and belief, at an estimated consumer price of

24   $3,000 to $8,000 per treatment with high profit margins, Align's termination of the interoperability

25   agreement represented a profit sacrifice of many millions of dollars.

26     49. Because Align has not blocked Trios users outside of the United States from ordering

27   its Aligners, there are approximately 23,000 Invisalign orders per month from those Trios users,

28   which is nearly 40 percent of all Invisalign global submissions to Align. Align sacrificed profits in the

CLASS ACTION COMPLAINT - 13
Case No.:
010976-11/1509838 V1

short run by refusing to allow the Trios or other potential Scanners to order Invisalign in the United States, and Align engaged in this conduct solely to make the iTero the only viable Scanner for dental professionals in the United States to purchase and use, which would allow it to enhance its monopoly power in the Scanner market, and would allow it to maintain its monopoly power in the Aligner market.

50.     Although the Interoperability Agreement extends beyond the United States, Align terminated interoperability only with respect to the United States. In the rest of the world, where Align has a materially lower Aligner market share, Align has continued to accept scans from the Trios scanner because it cannot effectively force customers to use iTero by threatening to withhold access to Invisalign, and because Align profits from interoperability there just as it did when Trios interoperability existed in the United States.

51.     Interoperability had also been a benefit to Dental Practices who had increased choice of Scanners and Aligners, and who would have benefitted from increased competition in the form of lower prices but for Align's conduct. Upon termination of the Interoperability Agreement, those Dental Practices with Trios Scanners were forced either to quit offering Invisalign to patients (and many of those patients were in the middle of multi-month treatment programs with Invisalign), to order a new Scanner (despite having spent thousands or tens of thousands of dollars on a Trios, which many Dental Practices find to be a superior Scanner), or to go back to using silicone-based molds. According to 3Shape, for American Dental Practices seeking to order Invisalign Aligners, termination of interoperability in the United States made the Trios "basically a paperweight," as one dental professional complained.

52.     In short, Align was willing to forego short-term profits on its Aligners (from Trios owners ordering Invisalign), and to sacrifice customer goodwill, in order to engage in the anticompetitive Scheme described herein and thereby further its dominance in the Aligner and Scanner markets. By gaining and/or maintaining its monopoly power in the Aligner and Scanner markets, and foreclosing competition in both markets, Align would profit far more than it lost by terminating the Interoperability Agreement, all at the expense of Align's customers.

1

**E.    Align signed exclusive dealing contracts with Dental Service Organizations to entrench its monopoly power.**

2

3        53.     Beginning in mid-2018, Align entered into multiyear contracts with at least two of the

4    nation's largest dental service organizations ("DSOs"), Heartland Dental and Aspen Dental, that

5    effectively exclude 3Shape from their members' dental offices. DSOs provide business support to

6    independent Dental Practices, including by managing purchasing contracts with suppliers. Align has

7    reported that DSOs are an important "strategic part of [Align's] overall strategy," are a "force

8    multiplier" for Align, and were a significant factor in Align's 2018 "[r]ecord Q4 volumes [of sales]."

9        54.     In line with its "Fusion Program," described below, Align dramatically dropped the

10   price of the iTero to major DSOs in exchange for multi-year Invisalign order commitments. Those

11   commitments could practically be achieved only if a DSO sent Aligner scans exclusively to Align, and

12   not to its Aligner competitors. As a result, sales of iTero scanners to DSOs increased dramatically, and

13   sales of Invisalign were accordingly higher than they would have been absent these agreements.

14       55.     On July 25, 2018, Align announced a multi-year deal with Heartland Dental, the

15   nation's largest DSO with more than 850 supported dental offices, to place iTero scanners in member

16   dental offices, under a timeline that would place iTero in 90 percent of supported offices nationwide

17   by the end of the year. As a result of the deal, Heartland Dental purchased 900 iTero scanners in

18   2018. The Heartland "endeavor represent[ed] the industry's single-largest scanner deployment." And

19   as with Align's overall efforts to use iTero to lock practices into Invisalign, Heartland's "front-

20   loading their businesses with iTero" will, in turn, "give them a very strong position in clear aligners."

21       56.     On July 25, 2018, Align announced that it had also secured a deal with Aspen Dental,

22   another of the nation's largest DSOs with nearly 700 locations, to equip all Aspen locations with

23   iTero scanners.

24       57.     3Shape has stated that it bid for the Aspen Dental contract, and its Trios scanner

25   scored the highest in Aspen Dental's evaluations, but Aspen Dental informed 3Shape that Aspen

26   Dental did not select the Trios scanner because Align did not permit the Trios to interoperate with

27   Invisalign. In other words, because of Align's dominant position in the Aligner market, Aspen

28   Dental was forced to select Align's less desirable iTero scanner.

CLASS ACTION COMPLAINT - 15
Case No.:
010976-11/1509838 V1

58.    These DSO contracts have enabled Align to rapidly increase its market share in the Scanner market and, because of Align's conduct as alleged herein, to use its increased monopoly power in the Scanner market to maintain and enhance its monopoly power in the Aligner market. Align reported an 84 percent growth in its scanner sales in North America in the first quarter of 2018. And in Q3 2018, Align saw "strong volume growth from the Dental Service Organizations (DSOs) channel which increased over 40% Y/Y in Q3."

**F.    Align's "Fusion Program" Tied Together iTero Links, iTero Prices and Invisalign Sales.**

59.    In late 2017, as patent expiry loomed, Align launched the Fusion Program, a bundled pricing mechanism for iTero that further entrenched its dominance in the Aligner and Scanner markets.

60.    Upon information and belief, under the Fusion Program, the price of the iTero Scanner depended on a Dental Practice's purchases of Invisalign. Failure to meet a minimum threshold of Invisalign cases each year for a three-year period resulted in substantial annual back-end penalties. Align set these targets in a manner that forced the Dental Practices either to stop sending cases to Align's Aligner competitors or trigger the substantial penalties.

61.    The penalties could total $10,000 over three years, or 30 percent or more of the cost of the iTero scanner. A Dental Practice that incurred these penalties would be at a substantial disadvantage to other Dental Practices that avoided these penalties. Given Align's dominant position in the market for Aligners, Dental Practices who wanted to offer Aligner treatment could not forego Invisalign orders entirely.

62.    The effect of Align bundling its Scanner with its market dominant Aligners is that Dental Practices are substantially foreclosed from ordering Aligners from Align's rivals. Indeed, according to 3Shape, experts have described the Fusion Program as "a not-so-subtle effort on the part of management to lock these customers in for a fairly long time, in our view, just as Clear Aligner competition is likely set to rise over the next 3-6+ months."

63.    Absent the bundled pricing, the Trios and iTero scanners were sold at similar list prices. In the bundle, however, the effective price of the iTero (when incorporating the incentives for effectively agreeing not to purchase Aligners from Align's competitors) was $10,000 cheaper (as

CLASS ACTION COMPLAINT - 16
Case No.:
010976-11/1509838 V1

reflected in the penalty provisions of the program). According to 3Shape, dropping the Trios price to offset the penalties on such sales would represent a loss of a third of the Trios Scanner revenue, yet Align could make up the lost revenue with the sales of just a few cases of Invisalign per iTero Scanner.

**G.  Align's set of actions substantially foreclosed competition in the aligner and scanner markets.**

64.     Align's Scheme has substantially foreclosed competition in both the Aligner and Scanner markets and has enabled Align to impose supracompetitive prices for Scanners and Aligners.

65.     Through this Scheme, Align ties Invisalign to iTero to maintain dominance in both the Aligner and Scanner markets. For example, because of the closed system architecture of Align's system, the Dental Practices using iTero Scanners are effectively forced to use Invisalign or incur the expense and difficulty of using iTero to order rival Aligners.

66.     A Dental Practice that wants to offer Invisalign must, for all practical purposes, purchase and use an iTero. Since the implementation of the Scheme, the only true Scanner option for these Dental Practices looking to offer Invisalign is the iTero.

67.     The DSO contracts themselves also represent long-term, exclusive commitments on the part of DSOs to deal only with Align for Aligners and Scanners. Likewise, the Fusion Program ties iTero discounts to such high levels of Aligner commitments over a number of years that those customers are essentially locked into using both the iTero and Invisalign exclusively. All of this is compounded by Align's "closed system" design and the termination of the Interoperability Agreement with 3Shape, which means that any Dental Practice who wants to offer the dominant Invisalign product must use only an iTero Scanner.

68.     A rival Aligner manufacturer looking to compete against Invisalign would have to offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its customers through this Scheme. Likewise, Align has foreclosed Trios, its only true rival in the Scanner market, and has, upon information and belief, not authorized interoperability for any other Scanner manufacturer. Because Align controls approximately 90 percent of the Aligner market, that has substantially foreclosed any ability for a rival Scanner manufacturer to compete.

CLASS ACTION COMPLAINT - 17
Case No.:
010976-11/1509838 V1

69.     As discussed above, Align's Scanner and Aligner monopolies are self-reinforcing. Align sought to use its substantial market power to eliminate competition from the Trios and other competing Scanners that are able to order Aligners from other manufacturers, and thereby make the iTero the only viable option for Dental Practices to purchase and use. Not only would that allow Align to enhance its monopoly power in the Scanner market, but that would also allow Align to prevent other Aligner manufacturers from becoming established and competing with Invisalign, allowing Defendant to enhance its monopoly power in the Aligner market.

70.     Indeed, these foreclosure effects and the harm to competition and consumers are not hypothetical. After the expiration of key patents, Align began to face the prospect of competition in the Aligner market from large companies with substantial experience in the dental field, such as Straumann, a global tooth replacement and orthodontics manufacturer who had purchased Align's largest (though still minimal) competitor ClearCorrect; Henry Schein, a worldwide distributor of medical and dental supplies that tried to introduce a competing Aligner product; and 3M, a global manufacturer who tried to introduce a competing Aligner product in May 2018. Yet despite the size and resources of the potentially competing Aligner manufacturers, none of them have been able to gain a foothold in the Aligner market, where Align has maintained an approximately 90 percent share. Indeed, according to 3Shape, Align's CEO insisted that it could "still jack price in the marketplace" notwithstanding potential competitors, and indeed, Align did increase prices in 2019. Thus, because of Align's Scheme, choice has been limited and prices have continued to be supracompetitive.

71.     Additionally, according to 3Shape, since Align has engaged in this Scheme, 3Shape's business has been injured. Its market share has dropped precipitously in the Scanner market and Align has gained that market share due to the Scheme. This has not only allowed Align to gain a monopoly in the Scanner market, but that Scanner market monopoly has enabled Align to maintain its monopoly in the Aligner market. As a result of the Scheme alleged herein, Defendant's sales of the iTero grew 84% in the first quarter of 2018 and rose by another 50% from the first quarter of 2018 to the third quarter. In 2017, Defendant had over an 80% market share in the market for Scanners in the United States.

CLASS ACTION COMPLAINT - 18
Case No.:
010976-11/1509838 V1

1    Were the Scanner market competitive, purchasers would have benefited from greater choice and lower

2    prices.

3         72.    Defendant intended to harm, and indeed its anticompetitive actions have harmed

4    competition in the Aligner and Scanner markets, resulting in higher prices, reduced competition, and

5    reduced product choice. This is the type of injury that the antitrust laws were intended to prevent and

6    is a direct and proximate result of Defendant's anticompetitive scheme, and therefore Defendant has

7    caused antitrust injury to the Class.

8                        **V.     INTERSTATE COMMERCE**

9         73.    The market for Aligners in the United States is a national market.

10        74.    Defendant has marketed its Invisalign Aligners to Dental Practices and patients in all

11   50 states.

12        75.    Defendant has sold its Invisalign Aligners to Dental Practices in all 50 states.

13        76.    Defendant has recruited and trained dental and orthodontic professionals to perform

14   scans for Invisalign patients in all 50 states, and there are dental and orthodontic professionals who

15   actively perform scans for Invisalign patients in all 50 states.

16        77.    The market for Scanners in the United States is a national market.

17        78.    Defendant has marketed and sold its iTero Scanner to Dental Practices in all 50 states.

18        79.    Defendant's business in Aligners and Scanners involves a continuous and

19   uninterrupted flow of commerce across state lines.

20        80.    Defendant's anticompetitive actions have had a substantial effect on interstate trade

21   and commerce in the markets for Aligners and Scanners.

22                     **VI.    CLASS ACTION ALLEGATIONS**

23        81.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on their

24   own behalf and on behalf of the following class (the "Class") for claims arising under Federal law:

25              All persons or entities in the United States that purchased, paid and/or
                provided reimbursement for some or all of the purchase price for
26              Invisalign Aligners acquired for personal use during the period
                beginning March 15, 2015 until such time as the anticompetitive
27              conduct alleged herein has ceased (the "Class Period"). This class
                excludes the Defendant; the officers, directors or employees of the
28              Defendant; and any subsidiary, affiliate or other entity in which

CLASS ACTION COMPLAINT - 19
Case No.:
010976-11/1509838 V1

Defendant has a controlling interest.  The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

82.     Plaintiffs also seek certification under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) of the following subclass ("Indirect Purchaser State Subclass"[2]) for claims arising under California law in addition to certification of the Class under Rule 23(b)(2) for purposes of injunctive relief:

All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign Aligners, while residing in Indirect Purchaser States, acquired for personal use during the period beginning March 15, 2015 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest.  The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

83.     The members of the Class are so numerous that joinder is impracticable. On information and belief, at least hundreds of thousands of individual consumers purchased Aligners for personal use during the Class Period.

84.     Common questions of law and fact exist as to all members of the Class. Such questions of law and fact common to the Class include, but are not limited to, the following:

a.     Whether Defendant terminated its agreement with 3Shape in order to maintain and/or enhance its monopoly power in the market for Aligners;

b.     Whether Defendant terminated its agreement with 3Shape in order to maintain and/or enhance its monopoly power in the market for Scanners;

c.     Whether Defendant's practice of allowing only its iTero Scanner to send scans directly to Defendant for Invisalign patients on commercially reasonable terms, and preventing

---

[2] The "Indirect Purchaser States" consist of Arizona, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, Tennessee, Utah, Virginia, and West Virginia. These states allow for indirect purchasers to recover damages under the respective antitrust laws of their jurisdictions.

1    3Shape's Trios Scanner and other potentially competing Scanners from doing so, constitutes a

2    violation of the antitrust laws;

3              d.      Whether Defendant's policy of requiring dentists who wish to prescribe

4    Invisalign Aligners, but who do not use Defendant's iTero Scanner or another approved scanner, to

5    create manual casts of patients' teeth from a silicone mold, involves imposing a burdensome and

6    inefficient alternative;

7              e.      Whether Defendant's refusal to accept, for Invisalign orders, the standard file

8    format used by other Aligner manufacturers, has legitimate medical or technical reasons or is

9    anticompetitive;

10             f.      Whether Defendant's contractual restrictions and penalties imposed on

11   customers for dealing with rivals are anticompetitive;

12             g.      Whether Defendant has substantial market power in the market for Aligners

13   sold in the United States;

14             h.      Whether Defendant has substantial market power in the market for Scanners

15   sold in the United States;

16             i.      Whether Defendant has substantially foreclosed competition in the markets for

17   Aligners and/or Scanners;

18             j.      Whether Defendant's Scheme has artificially raised prices and reduced

19   competition in the market for Aligners;

20             k.      Whether Defendant's Scheme has a legitimate pro-competitive justification;

21             l.      Whether the conduct alleged herein artificially maintained, preserved, or

22   enhanced Defendant's market power in the market for Aligners;

23             m.      Whether the conduct alleged herein artificially maintained, preserved, or

24   enhanced Defendant's market power in the market for Scanners;

25             n.      The operative time period and extent of Defendant's antitrust violations;

26             o.      Whether the conduct alleged herein caused damages to the members of the

27   Class in the form of overcharges paid for Invisalign Aligners, and the proper measure of such

28   overcharge damages; and

CLASS ACTION COMPLAINT - 21
Case No.:
010976-11/1509838 V1

p.     The appropriate injunctive and equitable relief for the Class.

85.     Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members. By advancing their claims, Plaintiffs will also advance the claims of all Class members, because Defendant participated in activity that caused all Class members to suffer similar injuries. Fed. R. Civ. P. 23(a)(3).

86.     Plaintiffs will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiffs' claims and those of absent Class or Subclass members that would make class certification inappropriate. Counsels for Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiffs' claims and those of absent Class members. Fed. R. Civ. P. 23(a)(4).

87.     A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3). The damages suffered by each Plaintiffs and Class member is relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and Class members to redress the wrongs done to them. Even if Plaintiffs and Class members could afford individual litigation, which is not the case, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

88.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

89.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.   RELEVANT MARKETS

90.     At all relevant times, Align had substantial market power in the market for Aligners. It had the power to maintain the price of Invisalign at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as Invisalign.

91.     To the extent Plaintiffs' claims require the definition of a relevant market for Aligners, the relevant product market is the market for custom-manufactured, transparent, removable dental aligners made from clear plastic or similar materials.

92.     To the extent Plaintiffs' claims require the definition of a relevant market for Aligners, the relevant geographic market is the United States. The Food and Drug Administration has to approve medical devices such as Aligners, and consumers in the United States cannot practically seek out alternative Aligners from other countries that have not been approved for sale and use in the United States. Therefore, the price of Aligners in other countries does not affect the market for Aligners in the United States.

93.     There are also high barriers to entry in the Aligner market, due in part to the cost of establishing and running manufacturing facilities and the cost of regulatory approval.

94.     At all relevant times, Align has had an approximately 90 percent share of the market for Aligners in the United States. Moreover, there are substantial barriers to entry for potential competitors in the Aligner market.

95.     Metal braces are not a reasonable substitute for Aligners. Aligners are used for patients with moderate tooth misalignment, or who cannot receive metal braces due to activities in which they are involved, such as certain sports. Metal braces are used for patients with severe tooth misalignment, for whom Aligners would not be sufficient for proper treatment. Metal braces are also far more uncomfortable, typically take a longer period for treatment to complete, require patients to avoid certain foods, and require repeated visits to an orthodontist.

96.     A small but significant and non-transitory artificial inflation of the price of Aligners would not cause any significant number of consumers to purchase other potentially substitutable products, including metal braces, instead, so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of metal braces would not cause any

CLASS ACTION COMPLAINT - 23
Case No.:
010976-11/1509838 V1

significant number of consumers to purchase Aligners instead, so as to make the artificial price inflation unprofitable.

97.     At all relevant times, Align had market power in the market for Scanners. It had the power to maintain the price of iTero Scanners at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as iTero Scanners.

98.     To the extent Plaintiffs' claims require the definition of a relevant market for Scanners, the relevant product market is the market for hand-held digital intra-oral scanners designed for ordering Aligners.

99.     To the extent Plaintiffs' claims require the definition of a relevant market for Scanners, the relevant geographic market is the United States. The Food and Drug Administration has to approve medical devices such as Scanners, and dental professionals in the United States cannot practically seek out alternative Scanners from other countries that have not been approved for sale and use in the United States. Therefore, the price of Scanners in other countries does not affect the market for Scanners in the United States.

100.     There are also high barriers to entry in the Scanner market, due in part to the cost of establishing and running manufacturing facilities and the cost of regulatory approval.

101.     At all relevant times, Align has had an approximately 80 percent share in the market for Scanners in the United States. Additionally, there are substantial barriers to entry for potential competitors in the Scanner market.

102.     3Shape's Trios and Defendant's iTero are part of the relevant market for Scanners.

103.     3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are designed to scan individual teeth for crowns and other localized dental restorative work, and they are not as suitable for performing a full-mouth scan for the customized design of a patient's Aligners, and they are thus not reasonable economic substitutes for Scanners.

104.     Accordingly, 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are not part of the relevant market for Scanners.

105.     Silicone molds are not adequate or reasonable substitutes for Scanners. They are unpleasant for patients, and they provide lower accuracy than Scanners.

CLASS ACTION COMPLAINT - 24
Case No.:
010976-11/1509838 V1

106.     A small but significant and non-transitory artificial inflation in the price of Scanners would not cause any significant number of consumers to purchase other potentially substitutable products, including 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners, instead, so as to make the artificial price inflation unprofitable.

## VIII.   ANTITRUST INJURY

107.     Defendant's anticompetitive behavior resulted in antitrust injury to Plaintiffs and other members of the proposed Class because it caused them to pay higher prices for Invisalign Aligners than they otherwise would have paid if not for Defendant's business practices.

108.     Plaintiffs purchased Invisalign Aligners as part of a course of treatment from dentist offices. Plaintiffs either paid for the cost of Invisalign Aligners directly, through financing arranged by Align or indirectly, through dentist offices. When purchased indirectly, Plaintiffs were paying for an Invisalign Aligner treatment whose sole product was the installation of Invisalign Aligners. Invisalign Aligners constitute a significant, material cost for Invisalign Aligner treatment provided by Dentists.

109.     The Aligner market is subject to vigorous price competition between dentist offices offering to provide the Invisalign Aligner treatment. As a result, increases in the prices of Invisalign Aligners will lead to corresponding price raises for the cost of Invisalign Aligner treatment provided by dentists.

110.     As a result, the inflated prices of Invisalign Aligners have been passed on to the Plaintiffs who purchased Invisalign Aligners indirectly from dentists.

111.     Economic theory teaches that the only situations in which precisely zero pass through occurs is when an industry faces a perfectly elastic demand for its product (i.e., the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic (i.e., if even a very large increase in price for a product was incapable of stimulating additional supply).[3] Therefore, at least a partial pass

---

[3] The usual hypothesis that is commonly examined in empirical pass through studies is whether pass through exceeds, falls short of or equals 100 percent.

CLASS ACTION COMPLAINT - 25
Case No.:
010976-11/1509838 V1

through of an increase in the costs of Invisalign Aligners onto the price of Invisalign Aligner

treatment – is the predicted outcome of successful monopolistic behavior.

112.    Thus, the extent to which input cost increases are passed through into output prices is

entirely an empirical issue, and it is an area in which methods of empirical analysis are well

established. Based on both theory and the published studies in this area, it is likely that the pass-

through rates of inflated costs on Invisalign Aligners will exceed 100 percent, a situation known as

"overshifting."

113.    Thus, Plaintiffs and other members of the proposed Class who purchased Invisalign

Aligners indirectly have been forced to pay supracompetitive prices for their Invisalign Aligner

treatments. These inflated prices have been passed on to them by direct purchasers, such as dental

offices.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Monopolization of the Aligner Market (15 U.S.C. §2)

114.    Plaintiffs repeat and reiterate each of the allegations contained in paragraphs above as

if fully set forth herein.

115.    The relevant product market is the Aligner market, and the relevant geographic

market is the United States.

116.    As more fully alleged above, Align has willfully and intentionally engaged in conduct

that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its

monopoly in the Aligner market and preventing its rivals from competing for Aligner sales.

117.    Defendant's actions were carried out willfully and with the specific intent to maintain

its monopoly power in the Aligner market through anticompetitive conduct and not through a

superior product, business acumen, or a historic accident.

118.    The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct

was to increase prices and harm competition in the Aligner market.

119.    There is no legitimate pro-competitive justification for Defendant's conduct, and even

if there were, there would be less restrictive alternatives to achieve them.

120.     As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period because they have paid more for Invisalign Aligner treatment than they otherwise would have paid in the absence of Defendant's unlawful conduct.

121.     These violations are continuing and will continue unless enjoined by this Court.

122.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendant, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**

**Monopolization of the Scanner Market (15 U.S.C. §2)**

123.     Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

124.     The relevant product market is the Scanner market, and the relevant geographic market is the United States.

125.     As a result of the scheme alleged herein, Defendant possesses monopoly power in the Scanner market, with a market share over 80%.

126.     As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the Scanner market and preventing its rivals from competing for Scanner sales.

127.     Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the Scanner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

128.     The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the Scanner market.

129.     There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

130.     As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period because they have paid more for Invisalign Aligner treatment than they otherwise would have paid in the absence of Defendant's unlawful conduct.

131.     These violations are continuing and will continue unless enjoined by this Court.

132.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendant, preventing and restraining the violations alleged herein.

## THIRD CLAIM FOR RELIEF

### (Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*)

133.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein. By reason of the foregoing, Defendant has violated California Business and Professions Code, §§ 16700, *et seq*. Plaintiffs on behalf of the Indirect Purchaser State Subclass allege as follows.

134.     Beginning at a time currently unknown to Plaintiffs, but at least as early as March 15, 2015 and continuing thereafter at least up to the present, Defendant engaged in a continuing unlawful conduct in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code. Defendant acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of, and monopolize markets for Aligner and Scanner Products at supra-competitive levels.

135.     The Cartwright Act applies to the anticompetitive, price-fixing, trade-restraining conduct of a single firm in certain circumstances when that firm by coercive conduct, imposes restraints to which distributors involuntarily adhere. If a "single trader" pressures customers into anticompetitive contract terms, including exclusive dealing arrangements or illegal tie-ins, an unlawful combination is established with the meaning of the Cartwright Act, irrespective of any monopoly or conspiracy. Stated differently, a "conspiracy" or "combination" within the meaning of

the Cartwright Act is formed where a trader uses coercive tactics to impose restraints on uncooperative businesses.

136.    In particular, Defendant has executed a scheme to pressure Dental Practices and Plaintiffs to pay unreasonable and supra-competitive prices for Scanners and Aligners. Defendant has also entered into exclusive dealing agreements with DSOs to further maintain its monopoly power in the Aligner and Scanner markets. All of these arrangements, individually and collectively, were unlawful combinations within the meaning of the Cartwright Act. On information and belief, the conspiracy and unlawful acts were conceived and implemented by Defendant executives located in the State of California.  The effect of these unlawful combinations was to exclude competitors from the Aligner and Scanner markets, reinforce and grow Defendant's dominance and ability to extract anticompetitive proftits and – fundamental to this action – cause the price of Invisalign Aligner treatments to rise to artificially high, supra-competitve levels.

137.    As a direct result of Defendant's unlawful conduct, Plaintiffs and the Class members were overcharged when they purchased Invisalign Aligners.

138.    Plaintiffs and other Class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

139.    Defendant's conduct violates the Cartwright Act. Defendant's violations are continuing and will continue unless enjoined by the Court.

140.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have been injured in their business and property in that they paid more for Invisalign Aligners than they otherwise would have paid in the absence of Defendant's unlawful conduct. As a result of Defendant's violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

**FOURTH CLAIM FOR RELIEF**

**(Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

141.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

142.     By reason of the foregoing, Defendant has violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* Plaintiffs on behalf of the Indirect Purchaser State Subclass allege as follows.

143.     Defendant has committed acts of unfair competition, as defined by section 17200, *et seq.*, by engaging in an anticompetitive scheme to monopolize the Aligner and Scanner markets. Defendant acquired and maintained monopoly over the Aligner and Scanner markets through anticompetitive conduct.

144.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violations of Section 2 of the Sherman Act; and (2) violations of the Cartwright Act.

145.     Defendant's acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

146.     Defendant's acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

147.     Defendant's conduct was carried out, effectuated, and perfected within the state of California. During most of the class period, Defendant maintained headquarters in California where their employees engaged in communications, meetings and other activities in furtherance of Defendant's monopolization scheme.

148.     By reason of the foregoing, the Class is entitled to application of California law to a nationwide class and are entitled to full restitution and/or disgorgement of all revenues, earnings,

profits, compensation, and benefits that may have been obtained by Defendant as result of such business acts and practices described above.

## FIFTH CLAIM FOR RELIEF

### (Violation of State Antitrust and Restraint of Trade Laws)

149.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein. The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

150.     Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

151.     Plaintiffs purchased Invisalign Aligners within the State of Oregon during the Class Period. But for Defendant's conduct set forth herein, the price of Aligners would have been lower, in an amount to be determined at trial.

152.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

153.     Defendant monopolized or attempted to monopolize the trade or commerce of Scanners and Aligners, in violation of Or. Rev. Stat. § 646.705, *et seq.*

154.     Plaintiffs and members of the Oregon Class were injured with respect to purchases of Aligners within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against Defendant as follows:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

C.      Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against Defendant in an amount to be trebled to the extent such laws permit;

D.      Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

F.      Plaintiffs and the members of the classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

1        H.      Plaintiffs and the members of the Classes have such other and further relief as the

2    case may require and the Court may deem just and proper.

3                          **XI.**     **DEMAND FOR JURY TRIAL**

4        Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly

5    triable to a jury in this case.

7    DATED this 3rd day of May, 2021.      Respectfully submitted,

8                                 HAGENS BERMAN SOBOL SHAPIRO LLP

9                               By _____*/s/ Rio S. Pierce*_____

10                                   RIO S. PIERCE
                                    715 Hearst Avenue, Suite 202

11                                   Berkeley, CA 94710
                                    Telephone: (510) 725-3000

12                                   Facsimile: ( 510) 725-3001
                                   Email: riop@hbsslaw.com

14                                Steve W. Berman (*pro hac vice* forthcoming)
                                   HAGENS BERMAN SOBOL SHAPIRO LLP

15                                1301 Second Avenue, Suite 2000
                                   Seattle, WA 98101

16                                Telephone: (206) 623-7292
                                   Facsimile:  (206) 623-0594

17                                Email: steve@hbsslaw.com

18                                *Counsel for Plaintiffs*