1  Steve W. Berman (*pro hac vice*)
2  Ted Wojcik (*pro hac vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP
3  1301 Second Avenue, Suite 2000
   Seattle, WA 98101
4  Telephone: (206) 623-7292
   Facsimile: (206) 623-0594
5  Email: steve@hbsslaw.com

6  Rio S. Pierce (SBN 298297)
7  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
8  Berkeley, CA 94710
   Telephone: (510) 725-3000
9  Facsimile: (510) 725-3001
   Email: riop@hbsslaw.com
10

11  *Attorneys for Plaintiffs*

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

15  MISTY SNOW, individually and on behalf of          No. 3:21-cv-03269-VC
    others similarly situated,
16
                              Plaintiff,               **FIRST AMENDED CLASS ACTION
17                                                     COMPLAINT**

18          v.

19  ALIGN TECHNOLOGY, INC.,

20                              Defendant.             **JURY TRIAL DEMANDED**

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

<u>Page</u>

2

I.  NATURE OF THE CASE .................................................................................................. 1

3

II.  JURISDICTION AND VENUE ........................................................................................ 6

4

III.  PARTIES ........................................................................................................................... 7

5

    A.  Plaintiffs ................................................................................................................ 7

6

        1.  Arizona – Celeste Hamilton ...................................................................... 7

7

        2.  California – Tiffani Churchill ..................................................................... 8

8

        3.  Connecticut – Kelley Stevens .................................................................... 8

9

        4.  Florida – Venus Alderman ......................................................................... 8

10

        5.  Illinois – Melissa Ryan .............................................................................. 8

11

        6.  Iowa – Marjorie Sandner ........................................................................... 9

12

        7.  Maryland – Katie Campbell ....................................................................... 9

13

        8.  Massachusetts – Jennifer Ezzio ................................................................. 9

14

        9.  Michigan – Angela Carnaghi .................................................................. 10

15

        10.  Minnesota – Adelaide Liedl .................................................................... 10

16

        11.  Nebraska – Justin Hansen ........................................................................ 10

17

        12.  Nevada – Cecelia Garay .......................................................................... 10

18

        13.  New York – Emily Vo .............................................................................. 11

19

        14.  North Carolina – Stephanie Rickenbaker ................................................ 11

20

        15.  Oregon – Misty Snow .............................................................................. 11

21

        16.  Tennessee – Wendy Rowland .................................................................. 12

22

    B.  Defendant ............................................................................................................ 12

23

    C.  Agents & Co-Conspirators .................................................................................. 12

24

IV.  FACTS ............................................................................................................................. 12

25

    A.  Align's profits largely derive from its domination of the aligner market ............... 12

26

    B.  The expiration of Align's intellectual property exposed it to
       competition ......................................................................................................... 18

27

28

C.      Align implemented a closed system of scanners and aligners that would protect its monopolies in the respective markets.............................18

D.      Align terminated its interoperability agreement with 3Shape, sacrificing short-term profits in order to gain long term profits from the anticompetitive effects of its refusal to deal.................................22

E.      Align signed exclusive dealing contracts with dental service organizations to entrench its monopoly power.........................25

F.      Align's "Fusion Program" tied together iTero links, iTero prices and Invisalign sales. .........................................29

G.      At the same time it was monopolizing the scanner market, Align entered into a market allocation agreement with direct-to-consumer competitor Smile Direct Club, foreclosing competition in Align's primary sub-market of aligners sold through dentists. .........................30

H.      Align's set of actions substantially foreclosed competition in the aligner and scanner markets. ...........................35

V.      INTERSTATE COMMERCE .........................................37

VI.     CLASS ACTION ALLEGATIONS ....................................37

VII.    RELEVANT MARKETS .............................................43

A.      The aligner market.............................................43

B.      The market for hand-held digital intra-oral scanners ...............46

VIII.   ANTITRUST INJURY ..............................................51

A.      Inflated prices of Invisalign aligners were passed on to consumers .........51

IX.     CAUSES OF ACTION.............................................54

FIRST CLAIM FOR RELIEF: VIOLATION OF SECTION 2 OF THE SHERMAN ACT 15 U.S.C. §2 FOR MONOPOLIZATION OF THE ALIGNER MARKET  (ON BEHALF OF THE NATIONWIDE CLASS) ...........................54

SECOND CLAIM FOR RELIEF:     VIOLATION OF SECTION 2 OF THE SHERMAN ACT 15 U.S.C. §2 FOR MONOPOLIZATION OF THE SCANNER MARKET  (ON BEHALF OF THE NATIONWIDE CLASS) .................55

THIRD CLAIM FOR RELIEF: VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,  ARIZ. REV. STAT. § 44-1401, *ET SEQ*.  (ON BEHALF OF THE ARIZONA CLASS) ...........................................56

FOURTH CLAIM FOR RELIEF: VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE §§ 16700, *ET SEQ.* (ON BEHALF OF THE STATUTORY RIGHT OF ACTION CLASS) ...................................................................57

FIFTH CLAIM FOR RELIEF: VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.* (ON BEHALF OF THE CALIFORNIA CLASS) ...............................................................58

SIXTH CLAIM FOR RELIEF: VIOLATION OF THE CONNECTICUT ANTITRUST ACT CONN. GEN. STAT § 35-24, *ET SEQ.* (ON BEHALF OF THE CONNECTICUT CLASS) ...........................................................................59

SEVENTH CLAIM FOR RELIEF: VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ.* (ON BEHALF OF THE FLORIDA CLASS) ...............................................60

EIGHTH CLAIM FOR RELIEF: VIOLATION OF THE ILLINOIS ANTITRUST ACT 740 ILL. COMP. STAT. ANN. 10/3(1), ET SEQ. (ON BEHALF OF THE ILLINOIS CLASS)..................................................................................62

NINTH CLAIM FOR RELIEF: VIOLATION OF THE IOWA COMPETITION LAW IOWA CODE § 553.1, *ET SEQ.* (ON BEHALF OF THE IOWA CLASS) ...............................................................................................................62

TENTH CLAIM FOR RELIEF: VIOLATION OF THE MARYLAND ANTITRUST ACT, ANN. COM. LAW § 11-201, *ET SEQ.* (ON BEHALF OF THE MARYLAND CLASS) ...............................................................................63

ELEVENTH CLAIM FOR RELIEF: VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSETTS CLASS) ...........................................64

TWELFTH CLAIM FOR RELIEF: VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT MICH. COMP. LAWS § 445.771, *ET SEQ.* (ON BEHALF OF THE MICHIGAN CLASS) .......................................................65

THIRTEENTH CLAIM FOR RELIEF: VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. § 325D.49, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)......................................................................66

FOURTEENTH CLAIM FOR RELIEF: VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. § 59-1602, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS) ...................................................67

FIFTEENTH CLAIM FOR RELIEF: VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS) ...................................................................68

SIXTEENTH CLAIM FOR RELIEF: VIOLATION OF SECTION 340 OF  THE
NEW YORK GENERAL BUSINESS LAW  (ON BEHALF OF THE NEW
YORK CLASS)..............................................................................................69

SEVENTEENTH CLAIM FOR RELIEF: VIOLATION OF THE NORTH
CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.*
(ON BEHALF OF THE NORTH CAROLINA CLASS) ...............................70

EIGHTEENTH CLAIM FOR RELIEF: VIOLATION OF THE OREGON
ANTITRUST LAW,  OR. REV. STAT. § 646.705, *ET SEQ.*  (ON BEHALF
OF THE OREGON CLASS)........................................................................70

NINETEENTH CLAIM FOR RELIEF: VIOLATION OF THE TENNESSEE
TRADE PRACTICES ACT,  TENN. CODE, § 47-25-101, *ET SEQ.*  (ON
BEHALF OF THE TENNESSEE CLASS) ...................................................71

X.      REQUEST FOR RELIEF....................................................................72

XI.     DEMAND FOR JURY TRIAL ............................................................74

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Invisalign-brand aligners acquired for personal use during the period beginning May 4, 2017 ("Class Period"), and sold by Align Technology, Inc. ("Align" or "Defendant).

## I.    NATURE OF THE CASE

1.    Aligners are orthodontic devices that, in essence, are a plastic form of dental braces. Over a course of treatment, a patient generally uses a successive series of aligners that slowly realign the teeth. Aligners possess several significant advantages over dental braces. Aligners, unlike braces, can be removed from the mouth for short periods of time, such as for eating, brushing, or flossing. Aligners, made out of clear plastic, are also more visually inconspicuous than dental braces that are usually made out of metal.

 

2.    For decades, Align dominated the market for aligners with its Invisalign products. Align controlled more than 90 percent of the market and earned consistent, durable profit margins. Align used its intellectual property to protect its dominant market position. Align frequently filed litigation, such as patent infringement lawsuits, against potential competitors in the aligner market who threatened Align's dominance.

FIRST AM. CLASS ACTION COMPLAINT         -1-
Case No.:
010976-11/1584318 V1

3.      However, by 2017, Align's intellectual property that had helped drive its market dominance had begun to expire.  Align publicly acknowledged the risk that "[w]hen patents expire, we lose the protection and competitive advantages they provided to us, which could negatively impact . . . operating results."

4.      Align had been able to charge high prices and earn high profit margins on Invisalign because the product was protected by a thicket of hundreds of patents that Align wielded aggressively to protect its aligner monopoly.  As Align CEO Joe Hogan stated in 2017: "We've been in business now for almost 20 years, and we've had so few competitors and people think it's because we have this great IP, it's true we have good intellectual property, but it took 15 years for people to really believe that you can move teeth with plastics[.]. . . It gave us this period of time to really iterate and learn *without the outside influence of other competitors coming in*."[1]

5.      Meanwhile, clear aligners are ascendent in the world of dentistry.  According to one source, they result in fewer errors than traditional braces and can be used to treat between 50-70% of patients who need teeth correction.  Competitors have taken note of this market opportunity: since 2017, a number of major companies—including Straumann, Henry Schein, and 3Shape—have entered the clear aligner market, which was estimated to be worth nearly $3 billion in 2019.  In fact, in late 2020, the multinational dental company Dentsply Sirona announced that it would exit the traditional orthodontic business altogether (i.e., the market for wire brackets) and focus on the digital aligner business instead—specifically, its "SureSmile" brand of clear aligners and "Primescan" brand of oral scanners.[2]

6.      Faced with competition from the loss of patent exclusivity, Align implemented an anticompetitive scheme to willfully acquire and maintain its monopoly position.  Align's Scheme centered around its efforts to foreclose competition in the linked markets of (1) aligners; and (2) hand-held digital intraoral scanners ("scanners").

---

[1] Michela Tindera, *Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents*, Forbes (April 25, 2017) (emphasis added).

[2] *See* Jeremy Booth, *Dentsply Sirona reshuffles as pandemic cuts sales in half*, Dental Tribune (August 12, 2020), *available at* https://am.dental-tribune.com/c/dentsply-sirona/news/dentsply-sirona-reshuffles-as-pandemic-cuts-sales-in-half/.

7.      Dental offices use scanners to take digital images of the jaws, teeth, and bite of a patient.  These digital images are then used by aligner manufacturers to create individualized aligners for patients.  During the course of a treatment, patients will generally take regular scans and have a series of individual aligners manufactured for their usage.

8.      Align sells a scanner product called the iTero.  Align's primary competitor in the scanner market is 3Shape, which sells its own scanner, the "Trios."  Digital scanners make it more convenient and efficient for dental practices to order aligners.  Align has stated that "Invisalign doctors with an iTero scanner have notably higher utilization rates than non-iTero doctors," i.e., Invisalign doctors with an iTero scanner order Invisalign aligners at significantly higher levels than doctors without iTero scanners.  Align itself has also emphasized that dental practices need a fast and accurate way to create digital scans that can be used to create aligners and to transfer those scans to the aligner manufacturer.

9.      Align's iTero and 3Shape's Trios are the two primary scanners specifically designed for ordering aligners.[3]  However, the two scanners have an obvious difference.  Trios allows for dentists to order aligners from a number of different aligner manufacturers, thus encouraging competition in the market for aligners.  By contrast, iTero is a closed system because it imposes substantial costs on dentists who attempt to use the iTero for ordering aligners that are not manufactured by Align.

10.     As a result of this distinction, the spread of iTero's closed-system scanner across dentists drives sales towards Invisalign and excludes rival aligner manufacturers.  For example, in 2019, Invisalign stated that the "use of the iTero scanners for Invisalign case submission continues to grow and remains a positive catalyst for Invisalign utilization" and that the "iTero scanner and services business has become an integral part of our business and is key to our end-to-end digital workflow."

---

[3] As discussed in more detail below, while the company Sirona has recently launched its own intraoral scanner and clear aligner brands, it has yet to gain any significant share of either market. Furthermore, Sirona has so far allowed the use of Trios scanners to order its clear aligners, despite competing with Trios in the scanner market.

11.     Align's anticompetitive scheme was designed to monopolize the scanner and aligner markets, creating a self-reinforcing cycle where Align's dominance of the scanner market ensured continued dominance of the aligner market.  Align's scheme contained several key components: (1) the economically irrational, unilateral termination of Align's longstanding and profitable agreement with 3Shape that allowed the Trios scanner to be used to order Invisalign (hereafter the "Interoperability Agreement")—a termination that sacrificed short-term profits and only made sense because of its later anticompetitive effects; (2) exclusive dealing contracts with two of the largest dental service organizations ("DSO") that effectively prevented DSO members from dealing with Align's competitors in the scanner and aligner markets; and (3) the "Fusion" program, which bundled iTero and Invisalign aligner sales together, effectively preventing dentists from ordering either aligners or scanners from rivals.

12.     Align's scheme substantially foreclosed competition in the aligner and scanner markets.  Align successfully tied Invisalign to iTero in order to monopolize both markets—with dentists that used iTero scanners effectively forced to use Invisalign because Align terminated its interoperability agreement with its primary rival, 3Shape.

13.     A rival aligner manufacturer looking to compete against Invisalign would have to offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its customers through this scheme.  Likewise, Align has foreclosed Trios, its only true rival in the scanner market.  Because Align controls approximately 90 percent of the aligner market, that has effectively foreclosed the ability for a rival scanner manufacturer to compete.

14.     Meanwhile, in furtherance of its overall scheme to monopolize the aligner market, Align has engaged in additional anticompetitive conduct by preventing an emerging competitor from infringing on Align's dominant position in the most profitable submarket: aligners sold through dental offices.  Specifically, as described in Section IV.G, *infra*, in July 2016, Align entered into an agreement with then-nascent competitor Smile Direct Club ("SDC")—which primarily sells clear aligners directly to consumers—pursuant to which SDC was restricted from selling its aligners to

dentists while Align was restricted from selling its aligners to consumers.[4]  The practical effect of this agreement was to foreclose any threat to Align's highly lucrative business of selling aligners to dentists and thus further Align's monopolization of this product market

15.     Invisalign aligners are sold through dental offices.  Full dental courses of treatment using Invisalign aligners are expensive, generally costing up to $8,000.  The costs of Invisalign aligners are incorporated into the prices that dentists charge for Invisalign aligner treatment.  Dental insurance, if it is available, generally only covers a minority portion of the overall Invisalign aligner treatment, generally capping benefits at 25-50% of the overall cost of the Invisalign aligner treatment.  Therefore, Plaintiff consumer purchasers pay much or all of the cost of Invisalign aligners out-of-pocket.

16.     Align itself recognizes that Plaintiff consumers pay much of the cost for Invisalign aligner treatment.  On its own website, Align describes various out-of-pocket payment options for consumers purchasing Invisalign aligners, including the usage of HSA or FSA spending accounts, or monthly payment plans:



**Paying for Invisalign treatment with tax-free dollars using an FSA or HSA**

**What is an FSA?**

A flexible savings account, or FSA, is an account you may be able to use to pay for certain medical, dental, and orthodontic costs, including Invisalign clear aligners. Your FSA is managed by your employer, and you pay money into the account throughout the year, usually through a deduction from your paycheck. You may set aside up to $2,600 annually. Not all employers offer an FSA.

**What is an HSA?**

A health savings account, or HSA, is a special savings account designed for people with a high-deductible health insurance plan. You put money into the account and can use it to cover certain medical, dental, and orthodontic costs, including Invisalign clear aligners. You may set aside up to $3,400 for an individual or $6,750 for a family annually. To open an HSA, you must meet IRS eligibility requirements.

**What is the advantage of an FSA or HSA?**

You don't pay taxes on the money you put in an FSA and HSA.

**How can I use my FSA or HSA to pay for Invisalign treatment?**

Before you begin your Invisalign treatment, talk to both your doctor's office and your benefits manager. You may be able to pay your doctor and be reimbursed from your FSA or HSA. Your benefits provider may also be able to pay your doctor directly.

---

[4] *See SDC Fin., LLC v. Align Tech., Inc.*, No. 1-19-1989, 2021 WL 465293 at *1 (Ill. App. Ct. Feb. 9, 2021).  A separate portion of the Operating Agreement also entitled other members to purchase a breaching member's interests in SDC for a price equal to the capital account of the breaching member as of the last day of the month preceding the breach plus the interest rate.  *Id.*

1
2
3
4
5
6
7
8
9



**Paying for your Invisalign treatment
with a monthly payment plan**

What is a monthly
payment plan?

A monthly payment plan is an arrangement between you and your doctor to
spread the cost of your Invisalign clear aligners over the length of your
treatment. Typically, doctors will request a down payment before treatment
begins.

How can a monthly payment help
me?

Making small payments throughout the course of your Invisalign treatment
rather than all at once can make it easier to plan your monthly budget.

How can I arrange a monthly
payment plan?

Many doctors offer flexible and affordable monthly payment plans. Before or
during your consultation for Invisalign treatment, ask your doctor what options
they offer.

10   17.   Align has specifically emphasized that it works to arrange third party financing

11   programs for end user consumers to shoulder the high cost of Invisalign aligners.  For example,

12   Align introduced a third-party financing program where the cost of Invisalign aligners would be

13   specifically paid to Align.  Invisalign's CEO, Joseph Hogan, explained the program as follows:

14   "When consumers finance their treatment through us, Invisalign providers no longer pay

15   Align.  Instead, they just receive payment for the treatment fee minus Align's lab fee.  By changing

16   the financial relationship between the patient, Align and the provider, Invisalign treatment becomes a

17   revenue source for the provider."  Align also specifically recognized that dentists otherwise

18   passthrough the cost of Invisalign aligners to patients, with Hogan stating that the new financing

19   program "eliminates the need for [dentists] to pass on the high down payments to patients."

20   18.   Therefore, ultimately, whether they pay directly to Invisalign through financing or

21   through payments for the cost of Invisalign aligner treatment provided by dentists, it is Plaintiffs,

22   consumer purchasers of Invisalign aligners, who have paid the price for Align's anticompetitive

23   scheme through supracompetitive prices on Invisalign aligners.

## II.     JURISDICTION AND VENUE

25   19.   Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to

26   secure injunctive relief against Defendant for violating Section 2 of the Sherman Act (15 U.S.C. § 2).

27   Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or

28   compensatory damages, double and treble damages as permitted, pre- and post-judgment interest,

FIRST AM. CLASS ACTION COMPLAINT          -6-
Case No.:
010976-11/1584318 V1

costs, and attorneys' fees for the injury caused by Defendant's conduct in monopolizing the aligner and scanner markets.  Plaintiffs seek damages in excess of $5,000,000.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

20.     This Court also has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq*., which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

22.     This Court has personal jurisdiction over the Defendant, as it has corporate offices in the District, markets and distributes aligners and scanners in this District, had corporate headquarters in this District during the majority of the class period during which it engaged in anticompetitive acts, enters into contracts within this District, and otherwise transacts business within this District.

## III.     PARTIES

A.     **Plaintiffs**

1.     **Arizona – Celeste Hamilton**

23.     Plaintiff Celeste Hamilton purchased Invisalign aligners in June 2021.  At the time of her purchase, continuing into the present, Plaintiff Hamilton was and is a resident of Mesa, Arizona. Plaintiff Hamilton paid approximately $4,000 for the aligners and financed the purchase with her credit card.  Plaintiff Hamilton also received dental scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Hamilton purchased Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

1

### 2. California – Tiffani Churchill

2

24.     Plaintiff Tiffani Churchill purchased Invisalign aligners in June 2019 for both of her

3

children.  At the time of her purchase, continuing into the present, Plaintiff Churchill was and is a

4

resident of Laguna Beach, California.  A portion of the cost was paid for by insurance, but Plaintiff

5

Churchill was still individually responsible for paying the majority of the cost of Invisalign aligners.

6

Plaintiff Churchill's children also received dental scans as part of the treatment in receiving

7

Invisalign aligners.  Plaintiff Churchill purchased Invisalign aligners at prices that were artificially

8

inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

9

### 3. Connecticut – Kelley Stevens

10

25.     Plaintiff Kelley Stevens purchased Invisalign aligners in February 2019.  At the time

11

of her purchase, continuing into the present, Plaintiff Stevens was and is a resident of North Haven,

12

Connecticut.  Plaintiff Stevens paid approximately $6,000 for the aligners and financed the purchase

13

through her orthodontist.  Plaintiff Stevens received dental scans as part of the treatment in receiving

14

Invisalign Aligners.  Plaintiff Stevens purchased Invisalign aligners at prices that were artificially

15

inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

16

### 4. Florida – Venus Alderman

17

26.     Plaintiff Venus Alderman purchased Invisalign aligners in December 2019.  At the

18

time of her purchase, continuing into the present, Plaintiff Alderman was and is a resident of Sun

19

City Center, Florida.  Plaintiff Alderman paid approximately $4,000 for the aligners and financed the

20

purchase using Dental First Financing offered by Aspen Dental.  Plaintiff Alderman also received

21

dental scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Alderman purchased

22

Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive

23

scheme, and thereby suffered antitrust injury.

24

### 5. Illinois – Melissa Ryan

25

27.     Plaintiff Melissa Ryan purchased Invisalign aligners in November 2020.  At the time

26

of her purchase, continuing into the present, Plaintiff Ryan was and is a resident of Inverness,

27

Illinois.  Plaintiff Ryan paid approximately $4,000 for the aligners and financed the purchase through

28

her orthodontist.  Plaintiff Ryan received dental scans as part of the treatment in receiving Invisalign

1    Aligners.  Plaintiff Ryan purchased Invisalign aligners at prices that were artificially inflated because

2    of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

3                **6.      Iowa – Marjorie Sandner**

4                28.      Plaintiff Marjorie Sandner purchased Invisalign Aligners for her minor son in June

5    2017.  Plaintiff Sandner paid $6,997 for Invisalign for her son and financed the purchase through

6    Stork Orthodontics.  At the time of her purchase, continuing into the present, Plaintiff Sandner was

7    and is a resident of Pleasant Hill, Iowa.  Plaintiff Sandner's minor son received dental scans as part

8    of the treatment in receiving Invisalign aligners.  Plaintiff Sandner purchased Invisalign aligners at

9    prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby

10   suffered antitrust injury.

11               **7.      Maryland – Katie Campbell**

12               29.      Plaintiff Katie Campbell purchased Invisalign aligners in July 2019.  At the time of

13   her purchase, continuing into the present, Campbell was and is a resident of Lusby, Maryland.

14   Plaintiff Campbell paid approximately $6,000 for the aligners.  She paid half of the cost up front and

15   financed the rest through her orthodontist.  Plaintiff Campbell also received dental scans as part of

16   the treatment in receiving Invisalign aligners.  Plaintiff Campbell purchased Invisalign aligners at

17   prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby

18   suffered antitrust injury.

19               **8.      Massachusetts – Jennifer Ezzio**

20               30.      Plaintiff Jennifer Ezzio purchased Invisalign aligners in July 2019.  At the time of her

21   purchase, continuing into the present, Plaintiff Ezzio was and is a resident of Pepperell,

22   Massachusetts.  Plaintiff Ezzio paid $2000.00 immediately, then paid $313.00 each month (with a

23   final payment of $310), ultimately paying a total of $5,440.00 for her aligners.  Plaintiff Ezzio

24   received financing through OrthoBanc LLC.   Plaintiff Ezzio also received dental scans as part of her

25   treatment in receiving Invisalign aligners.  Plaintiff Ezzio purchased Invisalign aligners at prices that

26   were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered

27   antitrust injury.

28

1

**9.      Michigan – Angela Carnaghi**

2          31.      Plaintiff Angela Carnaghi purchased Invisalign aligners in August 2020.  At the time

3   of her purchase, continuing into the present, Plaintiff Carnaghi was and is a resident of Grosse

4   Pointe, Michigan.  Plaintiff Carnaghi paid approximately $5,000 for the aligners.  A portion of the

5   cost was paid for by insurance, but Plaintiff Carnaghi was still individually responsible for paying

6   the majority of the cost of Invisalign aligners.  Plaintiff Carnaghi also received dental scans as part of

7   the treatment in receiving Invisalign aligners.  Plaintiff Carnaghi purchased Invisalign aligners at

8   prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby

9   suffered antitrust injury.

10         **10.      Minnesota – Adelaide Liedl**

11         32.      Plaintiff Adelaide Liedl began making payments for Invisalign aligners in January

12  2017.  At the time of her purchase, continuing into the present, Liedl was and is a resident of Eden

13  Prairie, Minnesota.  Liedl was quoted $6320 for the aligners.  Her orthodontist applied a $500

14  coupon and insurance paid $1500.  For the remaining $4320, Liedl put $2200 down and paid

15  remaining $2120 over 17 months.  Liedl received dental scans as part of the treatment in receiving

16  Invisalign aligners.  Plaintiff Liedl purchased Invisalign aligners at prices that were artificially

17  inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

18         **11.      Nebraska – Justin Hansen**

19         33.      Plaintiff Justin Hansen purchased Invisalign aligners in December 2020.  At the time

20  of his purchase, continuing into the present, Plaintiff Hansen was and is a resident of Lincoln,

21  Nebraska.  Plaintiff Hansen paid approximately $5000 for the aligners and financed the purchase

22  through his orthodontist's office.  Hansen received dental scans as part of the treatment in receiving

23  Invisalign aligners.  Plaintiff Hansen purchased Invisalign aligners at prices that were artificially

24  inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

25         **12.      Nevada – Cecelia Garay**

26         34.      Plaintiff Cecelia Garay purchased Invisalign aligners in December 2019.  At the time

27  of her purchase, continuing into the present, Plaintiff Garay was and is a resident of North Las

28  Vegas, Nevada.  Plaintiff Garay paid approximately $5750 for the aligners and financed the purchase

through OrthoBank LLC, paying $136 a month for 36 months.  Plaintiff Garay received dental scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Garay purchased Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

**13.    New York – Emily Vo**

35.    Plaintiff Emily Vo purchased Invisalign aligners for her son in July 2019.  At the time of her purchase, continuing into the present, Plaintiff Vo was and is a resident of Jamaica, New York.  Plaintiff Vo paid approximately $6000 for the aligners.  A portion of the cost was paid for by insurance, but Plaintiff Vo was still individually responsible for paying the majority of the cost of Invisalign aligners.  Plaintiff Vo's son received dental scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Vo purchased Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

**14.    North Carolina – Stephanie Rickenbaker**

36.    Plaintiff Stephanie Rickenbaker purchased Invisalign aligners in January 2019.  At the time of her purchase, continuing into the present, Plaintiff Rickenbaker was and is a resident of Charlotte, North Carolina.  Plaintiff Rickenbaker paid approximately $7000 for the aligners.  Plaintiff Rickenbaker received dental scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Rickenbaker purchased Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

**15.    Oregon – Misty Snow**

37.    Plaintiff Misty Snow purchased Invisalign aligners in January 2019, during which time she was a resident of Oregon.[5]   Plaintiff Snow initially paid for the entire cost of Invisalign aligners, approximately $5,350, out-of-pocket through payments to her dental office.  Plaintiff Snow was subsequently partially reimbursed by insurance for her purchase (in the amount of approximately $2,500) but was still individually responsible for paying the majority of the cost (approximately $2,850) of the Invisalign aligners.  Plaintiff Snow purchased Invisalign aligners at

---

[5] Snow has been an Idaho resident since August 2020.

1   prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby

2   suffered antitrust injury.

3          **16.**    **Tennessee – Wendy Rowland**

4          38.    Plaintiff Wendy Rowland purchased Invisalign aligners in December 2018.  At the

5   time of her purchase, continuing into the present, Plaintiff Rowland was and is a resident of Chapel

6   Hill, Tennessee.  Rowland paid approximately $5400 for the aligners.  Rowland received dental

7   scans as part of the treatment in receiving Invisalign aligners.  Plaintiff Rowland purchased

8   Invisalign aligners at prices that were artificially inflated because of Defendant's anticompetitive

9   scheme, and thereby suffered antitrust injury.

10  **B.**    **Defendant**

11         39.    Defendant Align Technology, Inc. is a Delaware corporation that had its corporate

12  headquarters in San Jose, California for the majority of the class period until January 1, 2021.

13  Defendant still maintains its primary research hub in San Jose, California.  Upon information and

14  belief, Defendant has corporate offices in the Northern District of California, has many Invisalign

15  providers in the Northern District of California which are trained by Defendant to prescribe Invisalign

16  and which purchase both iTero scanners and Invisalign aligners from Defendant for usage on Plaintiffs.

17  **C.**    **Agents & Co-Conspirators**

18         40.    Smile Direct Club ("SDC") is a Delaware corporation with its corporate headquarters

19  in Nashville, Tennessee.  During the Class Period, SDC and/or its predecessors, wholly owned or

20  controlled subsidiaries, or affiliates sold Aligners in interstate commerce, directly or through its

21  wholly owned or controlled affiliates, to purchasers in the United States.

22                              **IV.**    **FACTS**

23  **A.**    **Align's profits largely derive from its domination of the aligner market**

24         41.    Align's largest source of revenue comes from its Invisalign brand aligners, by far the

25  dominant product in the aligner market, with an approximately 90 percent share of the aligner market.

26  Align earns well over a billion dollars per year selling Invisalign products at gross margins exceeding

27  75 percent.  Its revenues and profits continue to grow year after year, and it continues to raise prices,

28  despite the (largely unsuccessful) efforts of other companies to break into the aligner market:

FIRST AM. CLASS ACTION COMPLAINT      -12-
Case No.:
010976-11/1584318 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24





*Source: Company Annual Reports, Credit Suisse Equity Research*

25   42.   Align also sells the iTero scanner.  Align acquired the iTero technology through a

26   corporate acquisition and then integrated it with the Invisalign system.  The iTero scanner's integration

27   with Invisalign, as well as Align's anticompetitive conduct described herein, have enabled iTero to

28   become the dominant scanner.  If the scanner market is defined to include Align's iTero and 3Shape's

Trios—the only two scanners properly understood to comprise the relevant "scanner market"—Align now controls approximately 80 percent of that market, which earns Align hundreds of millions of dollars a year.[6]

43.     An example of an iTero scanner is pictured below:



44.     The iTero scanner is highly profitable, with profit margins above 60 percent.  A May 2021 market analysis estimates the iTero install base at approximately 35,000.[7]  Meanwhile, Align has steadily increased the number of iTero units sold and number of restorative scans performed using

---

[6] For reasons discussed in more detail below, while certain other scanners can be used to order clear aligners, including Invisalign aligners, these are not viable substitute for the iTero or Trios scanners because they are not well suited to provide full mouth scans for aligner orders—and are in fact rarely used by providers for this purpose.

[7] A separate analysis notes that while iTero sales "were weak until 2015," they have grown at a compound annual growth rate of 32% between 2016 and 2020.

iTeros as digital case submission increasingly becomes the norm—part of what one recent market analysis characterizes as "the megatrend towards digital dentistry workflows":





45.     Although there are new entrants to the scanner market (discussed *infra*) Align's only real competitor in this market is 3Shape, which sells the Trios.  The Trios, like iTero, is designed for ordering multiple brands of aligners.

46.     Because of its dominance and consumer brand awareness, Invisalign is a "must have" for dental practices that offer aligner treatment to patients.  When a patient seeks Invisalign treatment, that patient would visit a dental practice authorized by Align to prescribe the treatment.  A dentist or staff member would then normally perform a scan of the patient's jaws, teeth, and bite using a scanner, and the dentist would review the scan.  If the dentist determines that Invisalign

1    treatment is appropriate, the dental practice will then purchase a set of custom-made Invisalign

2    aligners directly from Defendant for that patient's treatment.

3         47.    Align knew that the use of digital scanners, like iTero, would make it more likely that

4    a dental practice would use aligners—because of the scanner's design and "digital workflow,"

5    because it provides a more accurate impression of a patient's jaws, teeth, and bite for the improved

6    design of that patient's aligners, and because once a dental practice makes a large investment in a

7    digital scanner, that practice would be more likely to order more aligners as a way to pay for the

8    scanner. In addition, as described below, dental practices are able to access non-penalty pricing on

9    aligners as the number of Invisalign orders increases, thus making scanners—and in particular ones

10   that can be used to order Invisalign—a critical piece of a dental practice's business.

11        48.    The primary focus of Align is selling more aligners at extremely high profit margins.

12   As Align's CEO, Joe Hogan, stated in a July 2017 investor call, "[W]e're in the clear aligner business

13   and anything that help us to sell more clear aligners directly . . . would be in our . . . range.  So, that's

14   why we have a scanner business.  We have a scanner business not from a diversification standpoint.

15   We have a scanner business because it allows us to sell more clear aligners."

16        49.    The bottom line was (and is) that more iTero scanners equal more Invisalign orders for

17   Align.  As Hogan told investors in an April 2018 call, "So yeah, [iTero] is another component of growth

18   in the company overall.  What's great is it's synergistic growth, right.  You have equipment growth, but

19   it really leads to the growth of our core product line which is Invisalign."  And as Hogan reminded

20   Wall Street analysts when discussing scanner sales in an October 2018 investor call: "[R]emember, it's

21   just a wonderful footprint for us for future Invisalign business once we have those scanners in place."

22   Most recently, during a June 2021 call, Align's CFO, John Morici, emphasized: "[W]e know having an

23   iTero at a doctor's office is going to drive more Invisalign sales.  We see that lift within.  So, great

24   stand-alone business, very profitable.  But the added synergies that we get from both iTero and

25   Invisalign is significant."

26        50.    Align's strategy is working: not only have iTero sales increased consistently since

27   2016 (specifically, at an average rate of 32% between 2016 and 2020), but the number of scans

28

performed digitally—already an overwhelming majority of the total—continues to increase as well. On an April 2021 call, Hogan stated:

> In terms of digital scans used for Invisalign case submissions in Q1, total digital scans increased to 80.9% from 75.8% in Q1 last year. International scans increased to 75.1%, up from 68.7% in the same quarter last year.  For the Americas, 85.5% of the cases submitted digitally compared to 80.5% a year ago.  Cumulatively, over 35.4 million orthodontic scans and 7.5 million restorative scans have been performed with iTero scanners.

51.     With this dominance have come consistently extraordinary profits: in the fourth quarter of 2020, for instance, Align reported record sales of $834 million, including $700.7 million in aligner revenues and $133.8 million in "Imaging Systems" and "CAD/CAM Services revenues" – year-over-year increases of 28.9% and 26.0%, respectively.[8]

52.     The fact that competitor scanners make it easier to order aligners *could* have spelled trouble for Align's market dominance in the aligner market *if* the two available scanners, the iTero and Trios, were able to send scans to any aligner manufacturer.  Then dental practices could have offered Invisalign and competing aligners on equal footing, which would have engendered competition among aligner manufacturers that would have lowered prices and/or improved quality or innovation.  Indeed, Trios is such an "open" platform—as a technological matter, Trios can be used to order aligners from a wide range of manufacturers, including competitor Sirona (which recently unveiled its own Primescan intraoral scanner and clear aligner brand, "SureSmile").  But Align has created a "closed" system for iTero, which limits the ability of dental practices to use it to order competing aligners.  And Align has imposed contractual commitments to limit access to Trios and competing aligners and—after 3Shape refused Align's demand to send scans for aligner orders only to Align—terminated the highly profitable Interoperability Agreement with 3Shape, all to create a bulwark to defend Invisalign from competition.

---

[8] *See* https://www.streetwisereports.com/article/2021/02/04/align-technology-shares-grind-12-5-higher-after-firm-posts-record-q4-revenue-of-834-5-million.html.

FIRST AM. CLASS ACTION COMPLAINT          -17-
Case No.:
010976-11/1584318 V1

53.     Thus, for Align, monopolizing the scanner market was not just about increasing price (and profits) in the scanner market—which it did—but also about maintaining its monopoly power in the aligner market, and thereby maintaining its supracompetitive prices and profits on aligners.

**B.     The expiration of Align's intellectual property exposed it to competition**

54.     Defendant held hundreds of patents on its aligner technology.  These patents, along with other high barriers to entry, largely deterred entrants into the aligner market until recently. Align has aggressively wielded those patents as well, filing patent and trade proceedings against potential competitors in the aligner market as necessary to maintain its monopoly position.

55.     Meanwhile, the Invisalign brand has become synonymous with aligners generally.  As a result, dental practices engaged in the business of straightening teeth must carry Invisalign to satisfy the demands of customers.  And as described below, for those dental practices who want to offer Invisalign, Align has essentially made it impossible to offer competing aligners or to use scanners that compete with Align's iTero.

56.     Align's monopoly started to come under heightened threat beginning in 2017, due to the expiration of many of its key patents.  Having enjoyed years of operating without "the outside influence of other competitors coming in," as patent expiry loomed, Align changed its message to investors from reliance on the patents to protect its monopoly, to concern that "[w]hen patents expires, we lose the protection and competitive advantages they provided to us, which could negatively impact . . . operating results."  But instead of competing on the merits of its products and its pricing, Align responded to the emerging threat of competition by implementing the scheme, described in detail below, to use its monopoly power in both the aligner and scanner markets to maintain and/or increase its monopoly power in each market and continue to charge supracompetitive prices for both aligners and scanners.

**C.     Align implemented a closed system of scanners and aligners that would protect its monopolies in the respective markets**

57.     One piece of the bulwark protecting Align's monopoly power is Align's "closed system" design of its scanner and aligner technology.  For example, iTero is the only scanner with integration into the Align treatment system, including Align's "Invisalign Outcome Simulator."  Because of the way

iTero is integrated into the "digital workflow" a dental practice would use to order Invisalign, Align knew that placing its scanners in dental practices was going to drive those dental practices to use Invisalign exclusively.

58.     Second, iTero is intentionally designed in such a way that it is expensive, inefficient, and impracticable to use it to order non-Invisalign aligners.  For example, iTero does not create scans in the standard file format used by other aligner manufacturers, and thus, a dental practice wishing to order non-Invisalign aligners using iTero scans must either undertake an expensive and time-consuming process of converting iTero scans to a format that can be used for other aligners, or use silicone-based molds to create a cast of a patient's mouth and teeth, which is a messy, uncomfortable for the patient, time-consuming, and inefficient method.  By contrast, 3Shape's Trios scanner uses standard file formats and cloud technology to work with numerous aligner brands, including Invisalign (prior to Align's termination of 3Shape's Interoperability Agreement) and Sirona's "SureSmile" aligners.[9]  For this reason, Trios represented a breach in Align's bulwark protecting Invisalign from competition.

59.     Third, Align intentionally does not accept scans from any scanner for Invisalign orders, but rather, only allows Invisalign orders from a limited group of authorized scanners.  Until the termination of Align's Interoperability Agreement with 3Shape, discussed below, the Trios scanner was one such authorized scanner.

60.     Upon information and belief, Align has only allowed interoperability for scanners that are not designed for ordering aligners, that do not compete with iTero in the scanner market, and that do not represent a threat to Align's dominance of the aligner market.  According to 3Shape, at the Greater New York dental meeting in November 2017, Align executive Raphael Pascaud communicated to 3Shape that Align will no longer validate any non-iTero intraoral scanner for use

---

[9] Indeed, 3Shape and Sirona recently announced a partnership, as part of which Trios scanners will be more fully integrated into the SureSmile aligner order flow.  *See* https://www.3shape.com/en/press/2021/3shape-and-dentsply-sirona-announce-strategic-partnership ("In the immediate term, the partnership will focus on a collaboration for better access of TRIOS users to SureSmile Clear Aligners. Opening the platforms to the 3Shape system allows dental professionals to benefit from greater choices, more flexibility, and smoother workflows in the future.").

FIRST AM. CLASS ACTION COMPLAINT          -19-
Case No.:
010976-11/1584318 V1

with Invisalign.  Given that Invisalign orders are highly profitable for Align, this decision by Align terminated a previously highly profitable course of conduct for Align for the sole reason of furthering Align's exclusionary conduct.

61.     For example, while Sirona Dental Systems ("Sirona") launched "Primescan," a new scanner that has a digital workflow to create Sirona's SureSmile aligners, in early 2019,[10] Align has not extended Invisalign interoperability to Primescan.  Nor is Primescan qualified for Invisalign case submissions.  Thus, Primescan cannot be used to send scans to Align.

62.     In addition, on information and belief, while Align has interoperability agreements for ordering Invisalign cases with two other intraoral scanners—Midmark True Definition (formerly known as the 3M True Definition, hereafter "MTD") and the Sirona CEREC Omnicam (hereafter "CEREC")—neither agreement fosters an open ecosystem for ordering aligners that could meaningfully erode Align's aligner dominance, nor were they intended to have that effect.[11]

63.     Instead, on information and belief, Align entered into (and has maintained) interoperability with MTD and CEREC in order to access dental networks that use these intraoral scanners for restorative and other non-orthodontic applications (like crowns and bridges), rather than for aligner scans.  The MTD and the CEREC scanners are not viable substitutes for the iTero or Trios scanners because neither scanner is well suited to provide full mouth scans for aligner orders.  Neither the MTD nor the CEREC scanners are viable options for dental professionals seeking to send digital scans for Clear aligners.

64.     More broadly, the iTero and 3Shape scanners occupy a unique and rapidly growing market segment for so-called "DI" (dental impression) scanners, which are used to generate dental impressions—and are thus distinct from so-called "full CAD/CAM" (computer-aided design & computer-aided manufacturing) scanners, which dentists use for a wider array of procedures.  DI

---

[10] *See Dentsply Sirona unveils new high-precision intra-oral scanner Primescan*, Dental Tribune (Feb. 4, 2019), https://www.dental-tribune.com/c/dentsply-sirona/news/dentsply-sirona-unveils-new-high-precision-primescan-intra-oral-scanner/.

[11] For example, a 2019 survey of dental professionals conducted by Credit Suisse found that Sirona's Omnicam (CEREC) "was utilized by only 5% of the population (10% of digital impression users vs. 15% in 4Q), demonstrating still low penetration of XRAY's most established [dental impression] offering[.]"

scanners appeal to dentists and orthodontists because they are considerably cheaper (often between $25,000-40,000 for a DI unit vs. $130,000 for a full CAD/CAM unit), used for specialized applications, and typically have quicker innovation cycles.[12]  A June 2020 research note estimates that the global DI scanner market "was likely growing at a double-digit clip exiting 2019," and estimates its size at between $600 and $700 million.[13]

65.    Thus, DI scanners are essential for dental practices to offer and sell aligners (particularly Invisalign) to their patients, and dental practices typically do not purchase more than one scanner due to the expense.  In the case where a dental practice buys more than one scanner, that practice nonetheless would tend to use only one *brand* of scanner due to the cost of maintaining multiple software subscriptions and the time and expense to train personnel to use different scanners and software programs.  And like most such capital investments, a scanner is meant to last several years.[14]

---

[12] For example, a July 2019 survey by Credit Suisse states:

Sirona has chosen to forego its longstanding steadfast approach to promoting more comprehensive chairside CAD/CAM systems (scanner + mill).  As of March 2018, it began an initiative geared more toward standalone digital impression, with also a dedicated lab strategy, where it has been lacking.  At the Chicago Midwinter Show (Feb 21-23), XRAY launched its Primescan offering, its most meaningful product launch this year.  *Primescan is an open system that can connect with all labs, an important difference from its legacy Omnicam offering, with which data transfer to labs was a cumbersome process as it predominately promoted chairside systems. While it technically offered Omnicam for standalone digital impression, penetration was extremely low, with its salesforce not aligned with this strategy.  However, we view XRAY is meaningfully better positioned to penetrate the digital impression and chairside markets with the Primescan launch, which should also offer the company a fresh approach to the market, more aligned with broader market demand trends.*

[13] While the MTD is a DI scanner, it is primarily used for scanning individual teeth for crowns and similar local dental restorative work—and not for comprehensive, full-mouth orthodontic treatments.  It takes significantly longer to scan a patient's entire mouth with a MTD or CEREC scanner than with a Trios or iTero scanner.

[14] Indeed, the iTero website features a "ROI calculator" that prospective buyers can use to calculate the cost of scanner ownership over 1- and 5-year intervals.  *See* https://euitero-calc-prd-eu.herokuapp.com/na/total-cost-ownership.  For the iTero "Element" scanner, Align estimates the first year cost of ownership at $34,112 ($33,000 for the scanner itself and an estimated $1,112 for "scanner sleeves," with a free year of subscription service), and the five year cost of ownership at $55,840 ($33,000 for the scanner, $5,560 for sleeves, and $17,280 in subscription fees – or approximately $360 a month after the first year).

66.     Thus, the iTero scanner and Invisalign operate as a *de facto* product bundle by (a) making iTero the only viable option for dental practices seeking to sell the market-dominant Invisalign to their patients, and (b) preventing other scanners from becoming established in the market that would allow dentists to order competing aligners without undue burden.  Indeed, an October 2018 research note emphasizes how iTero scanners drive Invisalign utilization and create barriers to entry for potential competition:

> **DSOs Meaningfully Scale iTero and Thus Invisalign; Huge Competitive Barrier as Well.**  We continue to write about how not only is iTero important from a revenue perspective but also as a driver of Invisalign utilization, with a study showing Invisalign volumes increase 20% in the first year of introduction.  That said, iTero is still <20% penetrated into the Invisalign customer base and <10% into GPs.  While speculative, we estimate the Aspen agreement[15] will contribute ~40M in revenue in '19 or ~200 bps to growth . . . so the North America business could surprise as a result.  Importantly, given DSOs tend to use the same providers for equipment/supplies across all their practices, additional DSO agreements are significant barriers to entry for competition.

67.     In order to cause the vast majority of dental practices to have long-term dependence on both the iTero scanner and Invisalign aligners, Align has engaged in the anticompetitive scheme to entrench its monopoly power in the aligner and scanner markets.

**D.     Align terminated its interoperability agreement with 3Shape, sacrificing short-term profits in order to gain long term profits from the anticompetitive effects of its refusal to deal.**

68.     3Shape has been selling the Trios scanner internationally since 2011, and in the United States since 2012.  Unlike Align's iTero, the Trios can send scans to any manufacturer of aligners without any fees, delays, conversion process, or loss of image resolution.  This was an advantage to Trios customers because it allowed for choice of aligners and would have benefitted dental practices had other aligner manufacturers been able to compete with Invisalign on the merits with lower prices and/or better quality for aligners.

---

[15] As discussed in more detail below, on July 25, 2018, Align announced that it had also secured a deal with Aspen Dental, another of the nation's largest dental service organizations ("DSOs") with nearly 700 locations (and approximately 750 dentists), to equip all Aspen locations with iTero scanners.

69.     Indeed, Align's then-Chief Operating Officer told industry analysts in an April 23, 2015 investor call (when its aligner market dominance was protected by patents), such open systems:

> are better for our customers.  No one wants to have to redesign, start over, buy multiple pieces of equipment if they can have greatest utility from a scanner. . . . So, we believe what we hear from our customers is they don't want to be forced to buy a system from you for the pleasure of offering Invisalign to their patients and other therapies we may have down the road.  So we feel actually very strongly. . . . There's no reason for us not to act in complementary ways because it's good for the customer.  So in our minds, we don't need to own the channel. we don't need to have exclusivity.  *In fact, we want probably more high-quality scanners that can make it easier to do Invisalign and other chair-side procedures that we have the unique capabilities to fulfill.*

70.     In December 2015, Align and 3Shape entered into the Interoperability Agreement, under which the parties worked together to build an interface so that dental professionals could send Trios scans into Align's Invisalign workflow.  According to 3Shape, Align executive Raphael Pascaud testified in prior litigation that Align had entered into this Interoperability Agreement to increase aligner sales, including from dental practices that were already using the Trios scanner.

71.     But even as Align was preparing to enter into the Interoperability Agreement, according to 3Shape, Align was seeking to change the terms of its relationship with 3Shape by proposing an agreement whereby 3Shape would agree to make its Trios scanners send scans *exclusively* to Align for Invisalign aligners.  Align also did not want 3Shape to promote or offer alternative software capable of staging treatments from non-Invisalign aligners.  Align knew that 3Shape's open system and popularity represented a breach in the bulwark it had erected around Invisalign, and thus, the purpose of this proposed exclusive arrangement was for Align to impair other aligner manufacturers.

72.     3Shape refused to make the Trios exclusive to Align, as Align had asked.  Instead, 3Shape sought to continue to allow the Trios to send scans to any aligner manufacturer in the interests of open competition.  3Shape wanted to maintain 3Shape's relationships with other aligner manufacturers, as well as to allow 3Shape to develop its own software to compete with Align.  The Interoperability Agreement ultimately permitted 3Shape to provide scans to other aligner manufacturers as well as to continue to promote and offer its own software.

73.     According to 3Shape, shortly after the Interoperability Agreement was signed, Align began again to seek to change the terms.  In a February 2016 meeting, attended by top Align

FIRST AM. CLASS ACTION COMPLAINT                -23-
Case No.:
010976-11/1584318 V1

executives, Align made clear that as part of any further collaboration between the companies, 3Shape would need to treat Invisalign as the "preferred partner" for aligners.  In a November 2016 meeting, Align asked 3Shape to enter into a joint venture that would allow Align to control Trios.  3Shape again refused.

74.     According to 3Shape, throughout 2017, including at the International Dental Show in March 2017, Align executive Raphael Pascaud continued to demand that 3Shape agree to the joint venture that would exclude Invisalign competitors.  During this time, 3Shape has alleged that it heard from resellers and distributors that Align had threatened that it would end interoperability with Trios.

75.     On December 20, 2017, Align announced that it would terminate the Interoperability Agreement with 3Shape as of January 17, 2018, and the Trios would no longer be able to submit scans for Invisalign.

76.     After many dental practices and the American Association of Orthodontists expressed dismay at the termination, Align extended the date of termination to January 31, 2018, and then terminated the Interoperability Agreement on that date, making Trios scanners no longer capable of ordering Invisalign.

77.     This termination represented a sacrifice of revenue for Align, and it was economically irrational but for the market exclusion this profit sacrifice created.  Indeed, according to 3Shape, Align had profited from the interoperability agreement with 3Shape that allowed Trios users to order Invisalign, and in fact received 40,000 Invisalign orders from Trios in the United States between October 2016 and January 2018.  Upon information and belief, at an estimated consumer price of $3,000 to $8,000 per treatment with high profit margins, Align's termination of the interoperability agreement represented a profit sacrifice of many millions of dollars.

78.     Because Align has not blocked Trios users outside of the United States from ordering its aligners, there are approximately 23,000 Invisalign orders per month from those Trios users, which is nearly 40 percent of all Invisalign global submissions to Align.  Align sacrificed profits in the short run by refusing to allow the Trios or other potential scanners to order Invisalign in the United States, and Align engaged in this conduct solely to make the iTero the only viable scanner for dental professionals in the United States to purchase and use, which would allow it to enhance its monopoly

power in the scanner market, and would allow it to maintain its monopoly power in the aligner market.

79.     Although the Interoperability Agreement extends beyond the United States, Align terminated interoperability only with respect to the United States.  In the rest of the world, where Align has a materially lower aligner market share, Align has continued to accept scans from the Trios scanner because it cannot effectively force customers to use iTero by threatening to withhold access to Invisalign, and because Align profits from interoperability there just as it did when Trios interoperability existed in the United States.

80.     Interoperability had also been a benefit to dental practices who had increased choice of scanners and aligners, and who would have benefitted from increased competition in the form of lower prices but for Align's conduct.  Upon termination of the Interoperability Agreement, those dental practices with Trios scanners were forced either to quit offering Invisalign to patients (and many of those patients were in the middle of multi-month treatment programs with Invisalign), to order a new scanner (despite having spent thousands or tens of thousands of dollars on a Trios, which many dental practices find to be a superior scanner), or to go back to using silicone-based molds. According to 3Shape, for American dental practices seeking to order Invisalign aligners, termination of interoperability in the United States made the Trios "basically a paperweight," as one dental professional complained.

81.     In short, Align was willing to forego short-term profits on its aligners (from Trios owners ordering Invisalign), and to sacrifice customer goodwill, in order to engage in the anticompetitive Scheme described herein and thereby further its dominance in the aligner and scanner markets.  By gaining and/or maintaining its monopoly power in the aligner and scanner markets, and foreclosing competition in both markets, Align would profit far more than it lost by terminating the Interoperability Agreement, all at the expense of Align's customers.

**E.     Align signed exclusive dealing contracts with dental service organizations to entrench its monopoly power.**

82.     Beginning in mid-2018, Align entered into multiyear contracts with the two largest dental service organizations ("DSOs") in the country, Heartland Dental and Aspen Dental, that

effectively exclude 3Shape from their members' dental offices.  DSOs provide business support to independent dental practices, including by managing purchasing contracts with suppliers.  Align has reported that DSOs – whose members are bound by the purchase decisions of the DSO – are an important "strategic part of [Align's] overall strategy," are a "force multiplier" for Align, and were a significant factor in Align's 2018 "[r]ecord Q4 volumes [of sales]."

83. In line with its "Fusion Program," described below, Align dramatically dropped the price of the iTero to major DSOs in exchange for multi-year Invisalign order commitments.  Those commitments could practicably be achieved only if a DSO sent aligner scans exclusively to Align, and not to its aligner competitors.  As a result, sales of iTero scanners to DSOs increased dramatically, and sales of Invisalign were accordingly higher than they would have been absent these agreements.

84. On July 25, 2018, Align announced a multi-year deal with Heartland Dental, the nation's largest DSO with more than 850 supported dental offices (and approximately 1,300 dentists) across 35 states, to place iTero scanners in member dental offices, under a timeline that would place iTero in 90 percent of supported offices nationwide by the end of the year.  As a result of the deal, Heartland Dental purchased 900 iTero scanners in 2018.  The Heartland "endeavor represent[ed] the industry's single-largest scanner deployment." And as with Align's overall efforts to use iTero to lock practices into Invisalign, Heartland's "front-loading their businesses with iTero" will, in turn, "give them a very strong position in clear aligners."

85. On July 25, 2018, Align announced that it had also secured a deal with Aspen Dental, the nation's second largest DSOs with nearly 700 locations (and approximately 750 dentists) across 38 states, to equip all Aspen locations with iTero scanners.

86. 3Shape has stated that it bid for the Aspen Dental contract, and its Trios scanner scored the highest in Aspen Dental's evaluations, but Aspen Dental informed 3Shape that Aspen Dental did not select the Trios scanner because Align did not permit the Trios to interoperate with Invisalign.  In other words, because of Align's dominant position in the aligner market, Aspen Dental was forced to select Align's less desirable iTero scanner.

87.     DSOs represent a large and growing part of the dental market in the United States. According to an October 2018 research note, DSOs then accounted for approximately 20% of the US dental market (and counted 8% of US dentists as members), a figure expected to grow given the superior profitability of DSOs.  A separate September 2019 analysis of the digital dentistry market estimates that DSOs then made up 16% of the US dental care market and estimated that this figure would climb to 30% by 2021, noting a rapid trend in the market towards consolidation "aided by investment from private funds and M&A deals":





88.     Most recently, in June 2021, Align's CFO estimated that DSOs now make up between 20% and 25% of "overall dentistry."

89.     These DSO contracts have enabled Align to rapidly increase its market share in the scanner market and, because of Align's conduct as alleged herein, to use its increased monopoly power in the scanner market to maintain and enhance its monopoly power in the aligner market. Align reported an 84 percent growth in its scanner sales in North America in the first quarter of 2018. And in Q3 2018, Align saw "strong volume growth from the Dental Service Organizations (DSOs) channel which increased over 40% Y/Y in Q3."

90.     Align employees speak openly about the strategic (and synergistic) value of these DSO contracts.  During a Q1 2021 earnings call, Align CEO Joe Hogan emphasized the importance of Align's DSO partnerships as a "digital platform strategy" and driver of iTero adoption:

**Q**: One last one for me, just on the DSO, kind of the business model and strategy that you guys have for entrenching iTero systems in DSOs across all practices, kind of how do you approach that?  And when you do see DSOs, where the large majority of their practices have adopt the iTero scanner, what's the sort of pickup that you guys see in terms of utilization?  Thanks so much.

**Hogan**: Well, where you use iTero scanners, you train the doctors properly.  You have the right products in the GP channel like iGo and different products like that.  We get terrific uptake.  I mean, you can't measure it the way you do share a chair from orthodontic office.  *But our DSO business is significant now.  It's meaningful in that way.  And it's one where that digital platform strategy, as you kind of outlined in your question, is what we employ*.  But again, we employ it in different ways, depending on how a DSO really wants to engage with us.

91.     Most recently, during a June 2021 call, Align's CFO explained:

**Q**: Got it.  Okay.  I just got a good question from the audience.  I'll just throw that out now, which is talk about how your DSO relationships are working, have they evolved over time?  And to be blunt, how are you trying to sort of counter the threat of alternatives, particularly sort of lower-cost alternatives coming into some of these higher-volume customers?

**John F. Morici**: Well, I think DSOs are something that's happening within the industry.  I mean, some of these dental practices consolidate and companies going to consolidate these practices.  And it's just a way of life within this industry.  And for us, when we think about the benefits that this bring, our system, our platform, the way we want doctors to go-to-market is perfect for DSOs.  You think about ADAPT is kind of individual practices.  DSOs are ADAPT kind of on steroids from the standpoint that you sell into a DSO you're selling, many times you have an iTero that purchase and they purchase for their doctors.  It's the platform that they're buying into; the digital platform that we have, the visualization, the training that goes in, the marketing that we do and all the local marketing that they do.  It's a very good combination.  And remember, a lot of these DSOs, they're private equity owned; they're all about return on investment, return on capital.  And we can prove to them.  And why we see success with those DSOs is they're seeing the returns.  They're seeing the benefits.

And when we look at DSOs, I think sometimes it gets lost or makes the headline is, oh, that's at a lower price, it's a lower ASP.  Don't think of it that way.  Think of it as from a gross margin standpoint, it's very efficient for us to serve those customers.  And certainly, from an up margin standpoint, it's also efficient where we get the economies of scale.  Some of these DSOs are 500, 700 practices.  And we get some economies when we help with training, with marketing, with other go-to-market activities that we don't have to spend, they're spending locally there.  So, it's the way the industry is going.  And we're definitely a part of that.  But it really plays into our digital story, our digital conversion that we're trying to bring to this market, and DSOs are a way to do that.

**F.    Align's "Fusion Program" tied together iTero links, iTero prices and Invisalign sales.**

92.    In late 2017, as patent expiry loomed, Align launched the Fusion Program, a bundled pricing mechanism for iTero that further entrenched its dominance in the aligner and scanner markets.

93.    Upon information and belief, under the Fusion Program, the price of the iTero scanner depended on a dental practice's purchases of Invisalign.  Failure to meet a minimum threshold of Invisalign cases each year for a three-year period resulted in substantial annual back-end penalties. Align set these targets in a manner that forced the dental practices either to stop sending cases to Align's aligner competitors or trigger the substantial penalties.

94.    The penalties could total $10,000 over three years, or 30 percent or more of the cost of the iTero scanner (approximately $33,000 for the current iteration of the iTero, according to a pricing calculator available on Align's website, *see supra* note 14).  A dental practice that incurred these penalties would be at a substantial disadvantage to other dental practices that avoided these penalties.  Given Align's dominant position in the market for aligners, dental practices that wanted to offer aligner treatment could not forego Invisalign orders entirely.

95.    The effect of Align bundling its scanner with its market dominant aligners is that dental practices are substantially foreclosed from ordering aligners from Align's rivals.  Indeed, according to 3Shape, experts have described the Fusion Program as "a not-so-subtle effort on the part of management to lock these customers in for a fairly long time, in our view, just as Clear aligner competition is likely set to rise over the next 3-6+ months."

96.    Absent the bundled pricing, the Trios and iTero scanners were sold at similar list prices. In the bundle, however, the effective price of the iTero (when incorporating the incentives for effectively agreeing not to purchase aligners from Align's competitors) was $10,000 cheaper (as reflected in the penalty provisions of the program)—a discount of approximately 30% off the iTero's current sticker price of $33,000.[16] According to 3Shape, dropping the Trios price to offset the penalties

---

[16] *See* https://euitero-calc-prd-eu.herokuapp.com/na/total-cost-ownership (last accessed June 22, 2021).

on such sales would represent a loss of a third of the Trios scanner revenue, yet Align could make up

the lost revenue with the sales of just a few cases of Invisalign per iTero scanner.

**G.     At the same time it was monopolizing the scanner market, Align entered into a market allocation agreement with direct-to-consumer competitor Smile Direct Club, foreclosing competition in Align's primary sub-market of aligners sold through dentists.**

97.     SmileDirectClub ("SDC") is a teledentistry company founded in 2014 whose primary

business is selling clear aligners directly to consumers.  To order aligners from SDC, a person can

either visit an SDC "SmileShop" (a physical retail space) for an intraoral scan or use an at-home kit

to create an impression.  SDC then makes a 3D image of that person's teeth and sends it to be

reviewed by an orthodontist or dentist, who also approves a customized treatment plan.  After the

treatment plan is approved, SDC ships its aligners directly to the customer.[17]

98.     The product submarket for selling aligners directly to consumers is generally distinct

from—and overlaps little with—the product submarket for selling aligners to dentists.  Thus, these

two submarkets each constitute distinct relevant product markets. According to a 2016 statement by

Joe Hogan, Align's CEO, Align did not then perceive itself and SDC to then be competing for the

same cases, and anticipated "very little cannibalization of the existing market"—"2% or less"—as a

result of a supply agreement between the two companies (discussed in more detail below):

> The goal of our agreement with SmileDirectClub is to help expand the market and opportunity for our Invisalign doctors, while supporting SmileDirectClub's efforts to provide consumers with access to more choices in treating simple cases from the convenience of their own home.  *When we look at the volume of Invisalign cases, 2% or less fit the SmileDirectClub protocols, which means we expect there to be very little cannibalization of the existing market.*  We look forward to working with SmileDirectClub to broaden the scope of clear aligner treatment options for consumers, while helping refer and connect new patients to Invisalign providers.[18]

99.     More recently, during a June 2019 earnings call, Hogan reiterated this point,

explaining that "there is about a 10% with our adult demographic with SDC"—i.e., a 10% overlap

between the aligner product submarkets targeted by the two companies.  Hogan went on to explain

---

[17] *See* https://smiledirectclub.com/how_it_works/.

[18] *See* Align Press Release (July 28, 2016), *available at* https://investor.aligntech.com/news-releases/news-release-details/align-technology-supply-non-invisalign-clear-aligners (emphasis added).

FIRST AM. CLASS ACTION COMPLAINT          -30-
Case No.:
010976-11/1584318 V1

that this competition is concentrated in the market for "simple" (that is, less expensive and less

complex) cases:

> First of all on the DTC piece is, look I think it's—there's light and dark in that.  Right.
> I do feel that Smile Direct Club and Candid, they've raised the category awareness
> significantly.  And we hear throughout our doctor base, whether the orthodontics side
> or GP side, the patients come in asking about clear aligners much more than they have
> before.  So it forces that conversation.  It gives us an opportunity to engage at a level
> that I feel it's just our advertising alone, it would have never gotten to that level.  So
> that's a positive side.
>
> *The negative side is, it's—there are some price competition, that segment offers
> $2,000 or less kind of the case for simple case and its push some of the doctor office
> models and its pushed our portfolio too.  We're saying is that, we've always known as
> a 10% overlap and educating our customers, having customers to be able to which is
> our doctors, having this customers be able to use an iTero scanner to help to
> communicate and visualize exactly the treatment plan would be, giving patients some
> off ramp in the sense that they have issues during the treatment time that they can be
> addressed by a doctor directly.*
>
> All those things are things that we just have to make sure we take better advantage of
> —with our, with our doctors and the channels that we work with in order to take
> advantage of that increased interest that we see out there.[19]

100.    As explained above, Align has often filed lawsuits, including patent infringement

lawsuits, against potential competitors in the aligner market who threaten Align's dominance.

Consistent with this pattern, in 2015, just one year after SDC was founded, Align filed a patent

infringement lawsuit against SDC (then operating as SmileCareClub LLC, alleging that

SmileCareClub infringed fourteen Align patents related to the manufacture and sale of

SmileCareClub's clear aligners, and that SmileCareClub, deliberately deceived and confused patients

and unfairly competed with Align by making false and unsupported claims regarding the safety and

effectiveness of SmileCareClub's products (which are offered without any direct in-person contact

with a dental professional).[20]   In an accompanying press release, Roger E. George, Align's vice

president and general counsel, stated:

---

[19] *See* Align Q2 2019 Earnings Call Transcript (July 24, 2019), *available at*
https://www.fool.com/earnings/call-transcripts/2019/07/25/align-technology-inc-algn-q2-2019-
earnings-call-tr.aspx (emphasis added).

[20] *See* Complaint, *Align Techs. v. SmileCareClub et al.*, 15-cv-4864 (N.D. Ca., Oct. 22, 2015).

Doctors play a necessary and integral role in any orthodontic treatment process, starting with a diagnosis and treatment prescription based on an in-person examination of the patient.  This critical role continues with in-person consultations throughout treatment as the doctor monitors the patient's dental health and treatment progress.  The SmileCareClub do-it-at-home system lacks this critical oversight and entirely eliminates the doctor's role in treatment.  It instead replaces the doctor with an unknown email address and no actual patient contact, thus impairing the ability to accurately diagnose and care for the patient during treatment.[21]

101.    The parties reached a confidential settlement in July 2016.  On information and belief, as part of that settlement, Align purchased 17% of SDC for $46.7 million (later increased to 19%), loaned SDC $30 million, and obtained a seat on SDC's board of directors.  According to records from a separate lawsuit between Align and SDC, as part of this transaction, the two companies also entered into an operating agreement ("Operating Agreement") that contained several restrictive covenants.  Most notably, the agreement contained a non-compete covenant that effectively allocated the aligner market between Align and SDC.  SDC was restricted from selling its aligners to dentists while Align was restricted from selling its aligners to consumers.[22] The result of the agreement was to allocate the two product submarkets between Align and SDC with Align taking the product submarket of aligners sold through dental offices and SDC taking the product submarket of aligners sold directly to consumers.  The effect of the agreement was to further Align's Scheme to monopolize the aligner market, and, in particular, the product submarket of aligners sold through dental offices.

102.    Align and SDC also entered into supply agreement pursuant to which, according to a July 2016 press release:

---

[21] *See* Align Press Release (Oct. 22, 2015), *available at* https://investor.aligntech.com/news-releases/news-release-details/align-technology-files-patent-infringement-and-false-advertising.

[22] *See SDC Fin., LLC v. Align Tech., Inc.*, No. 1-19-1989, 2021 WL 465293 at *1 (Ill. App. Ct. Feb. 9, 2021).  A separate portion of the Operating Agreement also entitled other members to purchase a breaching member's interests in SDC for a price equal to the capital account of the breaching member as of the last day of the month preceding the breach plus the interest rate.  *Id.*

(1) Align would manufacture non-Invisalign clear aligners for SDC and become, as of October 2016, SmileDirectClub's exclusive third-party supplier for its "minor tooth movement aligner program;"[23] and

(2) Align and SDC would create "a new Invisalign doctor referral program . . . that [would] systematically refer the approximately 30 percent of SmileDirectClub's SMILECHECK case assessments that are too complex for their minor tooth movement product, to Invisalign providers in the patient's local area."[24]

103.     A USA Today article described the 2016 agreement as "a non-compete agreement between Align and Smile Direct Club.  That deal included an exclusive supply agreement in which Align made aligners for Smile Direct Club, but the companies agreed not to infringe on each other's territory."[25]

104.     In other words, when faced in 2015 with a potential competitor (SDC) in the clear aligner market, Align responded by first suing SDC, then by entering into a market allocation agreement with it—the practical effect of which was to foreclose any threat to Align's highly lucrative monopoly of the product submarket of aligners sold by dentists.  Notably, Align, in 2015, stated that SDC's business had "attempted to deceive the public regarding the safety and effectiveness of its product" but then, nine months later, entered into a business agreement with SDC where it invested tens of millions of dollars to purchase a significant portion of the company's business model.

---

[23] Since 2016, SDC has also manufactured and sold its own aligners (prior to that time it purchased clear aligners solely from third-party manufacturers).  *See* SDC FY2020 10-K at 24, 28, *available at* https://investors.smiledirectclub.com/static-files/023e2bff-6ce1-41fb-9cbf-53c9ff660d33.  However, according to Align, the supply agreement included a "minimum volume commitment" that remained in place through December 31, 2019.  *See Align Technology Provides Update Regarding SmileDirectClub (SDC) Dispute*, GlobalNewswire (April 25, 2018), *available at* https://www.globenewswire.com/news-release/2018/04/25/1487497/0/en/Align-Technology-Provides-Update-Regarding-SmileDirectClub-SDC-Dispute.html.  SDC purchased "almost" $28 million of aligners from Align in 2018 alone.  Jon Quest, *SmileDirectClub and Align Technology Ending Partnership in 2020*, The Motley Fool (Dec. 22, 2019), *available at* https://www.fool.com/investing/2019/12/22/smiledirectclub-and-align-tech-ending-partnership.aspx.

[24] *See* Align, Press Release (July 28, 2016), *supra* note 18.

[25] *See* Nathan Bomey, *SmileDirectClub to compete with Invisalign by selling aligners to dentists, orthodontists*, USA Today (Jan 14, 2020), https://www.usatoday.com/story/money/2020/01/14/smiledirectclub-invisalign-teeth-straightening-aligners-sdc-align-technology/4464609002/.

FIRST AM. CLASS ACTION COMPLAINT          -33-
Case No.:
010976-11/1584318 V1

1      105.    The binding nature of the market allocation agreement was vividly shown when Align

2 decided to encroach on SDC's agreed-upon turf.  As noted above, prior to the 2016 agreement, SDC

3 operated several SmileShops, brick-and-mortar stores intended to familiarize consumers with clear

4 aligners.  By contrast, Align did not have brick-and-mortar stores, and marketed to consumers via its

5 website and advertisements.

6      106.    However, in November 2017, Align opened two Invisalign "Scan Shops" in

7 California that mimicked SDC's "SmileShop" business model.  In response, SDC sent a cease-and-

8 desist letter to Align in which it claimed that Align violated the Operating Agreement's restrictive

9 covenants and that SDC was exercising its right to repurchase Align's membership interest; it

10 initiated arbitration against Align on April 2, 2018, alleging (1) that Align's Invisalign stores were

11 competing businesses in violation the Operating Agreement; and (2) that Align breached its fiduciary

12 duty by improperly using SDC's confidential information to design and launch its Invisalign stores.

13      107.    On March 4, 2019, the arbitrator issued an award in favor of SDC, finding Align in

14 breach of the parties' non-compete agreement and "permanently enjoin[ing] and prohibit[ing]" Align

15 from (1) conducting business at its Invisalign stores or from opening new stores; or (2) providing

16 certain services at its "physical retail establishments" in connection with the marketing and sale of

17 clear aligners.  The arbitrator also found that Align misused SDC's confidential information and

18 violated its fiduciary duties to SDC, and: (1) prohibited Align from using SDC's confidential

19 information; (2) ordered it to close its physical store by April 3, 2019; (3) ordered that it tender its

20 membership interest in SDC in exchange for payment; and (4) extended the parties' non-compete

21 provision to August 18, 2022.[26]

22      108.    Through its market allocation agreement with SDC, Align has furthered its

23 monopolization scheme by the foreclosure of competition in the aligner market—specifically, the

24 distinct, lucrative product market of aligners sold through dental offices, *see infra* Section VII.A—

25 which has enabled it to impose supracompetitive prices for aligners.

---

26

27    [26] On information and belief, and as discussed in more detail below, this extension did not apply
to prohibit SDC from beginning to distribute aligners through dental practices—and thus to compete
28 directly with Align in this market—beginning in 2020.

FIRST AM. CLASS ACTION COMPLAINT     -34-
Case No.:

**H.    Align's set of actions substantially foreclosed competition in the aligner and scanner markets.**

109.    Align's Scheme has substantially foreclosed competition in both the aligner and scanner markets and has enabled Align to impose supracompetitive prices for scanners and aligners.

110.    Through this Scheme, Align ties Invisalign to iTero to maintain dominance in both the aligner and scanner markets.  For example, because of the closed system architecture of Align's system, the dental practices using iTero scanners are effectively forced to use Invisalign or incur the expense and difficulty of using iTero to order rival aligners.

111.    A dental practice that wants to offer Invisalign must, for all practical purposes, purchase and use an iTero.  Since the implementation of the Scheme, the only true scanner option for these dental practices looking to offer Invisalign is the iTero.

112.    The DSO contracts themselves also represent long-term, exclusive commitments on the part of DSOs to deal only with Align for aligners and scanners.  Likewise, the Fusion Program ties iTero discounts to such high levels of aligner commitments over a number of years that those customers are essentially locked into using both the iTero and Invisalign exclusively.  All of this is compounded by Align's "closed system" design and the termination of the Interoperability Agreement with 3Shape, which means that any dental practice who wants to offer the dominant Invisalign product must use only an iTero scanner.

113.    A rival aligner manufacturer looking to compete against Align would have to offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its customers through this Scheme.  Likewise, Align has foreclosed Trios, its only true rival in the scanner market, and has, upon information and belief, not authorized interoperability for any other scanner manufacturer.  Because Align controls approximately 90 percent of the aligner market, that has substantially foreclosed any ability for a rival scanner manufacturer to compete.

114.    As discussed above, Align's scanner and aligner monopolies are self-reinforcing.  Align sought to use its substantial market power to eliminate competition from the Trios and other competing scanners that are able to order aligners from other manufacturers, thereby making the iTero the only viable option for dental practices to purchase and use.  Not only would that allow

Align to enhance its monopoly power in the scanner market, but that would also allow Align to prevent other aligner manufacturers from becoming established and competing with Invisalign, allowing Defendant to enhance its monopoly power in the aligner market.

115.    Indeed, these foreclosure effects and the harm to competition and consumers are not hypothetical.  After the expiration of key patents, Align began to face the prospect of competition in the aligner market from large companies with substantial experience in the dental field, such as Straumann, a global tooth replacement and orthodontics manufacturer who had purchased Align's largest (though still minimal) competitor ClearCorrect; Henry Schein, a worldwide distributor of medical and dental supplies that tried to introduce a competing aligner product; and 3M, a global manufacturer who tried to introduce a competing aligner product in May 2018. Yet despite the size and resources of the potentially competing aligner manufacturers, none of them have been able to gain a foothold in the aligner market, where Align has maintained an approximately 90 percent share.  Indeed, according to 3Shape, Align's CEO insisted that it could "still jack price in the marketplace" notwithstanding potential competitors, and indeed, Align did increase prices in 2019. Thus, because of Align's Scheme, choice has been limited and prices have continued to be supracompetitive.

116.    Additionally, according to 3Shape, since Align has engaged in this Scheme, 3Shape's business has been injured.  Its market share has dropped precipitously in the scanner market and Align has gained that market share due to the Scheme.  This has not only allowed Align to gain a monopoly in the scanner market, but that scanner market monopoly has enabled Align to maintain its monopoly in the aligner market.  As a result of the Scheme alleged herein, Defendant's sales of the iTero grew 84% in the first quarter of 2018 and rose by another 50% from the first quarter of 2018 to the third quarter.  In 2017, Defendant had over an 80% market share in the market for scanners in the United States.  Were the scanner market competitive, purchasers would have benefited from greater choice and lower prices.

117.    Align's market allocation agreement with SDC furthered its overall Scheme to monopolize the aligner market by preventing an emerging competitor from infringing on Align's dominant position in the most profitable submarket—aligners sold through dental offices.

118.    Defendant intended to harm, and indeed its anticompetitive actions have harmed competition in the aligner and scanner markets, resulting in higher prices, reduced competition, and reduced product choice.  This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendant's anticompetitive scheme, and therefore Defendant has caused antitrust injury to the Class.

## V.    INTERSTATE COMMERCE

119.    The market for aligners in the United States is a national market.

120.    Defendant has marketed its Invisalign aligners to dental practices and patients in all 50 states.

121.    Defendant has sold its Invisalign aligners to dental practices in all 50 states.

122.    Defendant has recruited and trained dental and orthodontic professionals to perform scans for Invisalign patients in all 50 states, and there are dental and orthodontic professionals who actively perform scans for Invisalign patients in all 50 states.

123.    The market for scanners in the United States is a national market.

124.    Defendant has marketed and sold its iTero scanner to dental practices in all 50 states.

125.    Defendant's business in aligners and scanners involves a continuous and uninterrupted flow of commerce across state lines.

126.    Defendant's anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for aligners and scanners.

## VI.    CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on their own behalf and on behalf of the following class (the "Class") for claims arising under Federal law:

> All persons or entities in the United States that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").  This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest.  The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

FIRST AM. CLASS ACTION COMPLAINT          -37-
Case No.:
010976-11/1584318 V1

128.    Plaintiffs also seek certification under Federal Rule of Civil Procedure 23(b)(2) and

23(b)(3) of the following subclass ("Statutory Right of Action Class") for claims arising under

California law in addition to certification of the Class under Rule 23(b)(2) for purposes of injunctive

relief:

> All persons or entities that purchased, paid and/or provided
> reimbursement for some or all of the purchase price for Invisalign
> aligners, while residing in Indirect Purchaser States[27], acquired for
> personal use during the period beginning May 4, 2017 until such time
> as the anticompetitive conduct alleged herein has ceased (the "Class
> Period").  This class excludes the Defendant; the officers, directors or
> employees of the Defendant; and any subsidiary, affiliate or other
> entity in which Defendant has a controlling interest.  The Class also
> excludes all federal, state or local governmental entities, all judicial
> officers presiding over this action and their immediate family members
> and staff, and any juror assigned to this action.

129.    Plaintiffs also seek certification under Federal Rule of Civil Procedure 23(b)(2) and

23(b)(3) of the following subclasses for claims arising under various antitrust, unfair competition,

unjust enrichment, and consumer protection laws of the states listed below:

> **Arizona class**: All persons or entities that purchased, paid and/or provided
> reimbursement for some or all of the purchase price for Invisalign aligners, while
> residing in Arizona, acquired for personal use during the period beginning May 4,
> 2017 until such time as the anticompetitive conduct alleged herein has ceased (the
> "Class Period").

> **California class**: All persons or entities that purchased, paid and/or provided
> reimbursement for some or all of the purchase price for Invisalign aligners, while
> residing in California, acquired for personal use during the period beginning May 4,
> 2017 until such time as the anticompetitive conduct alleged herein has ceased (the
> "Class Period").

> **Connecticut class**: All persons or entities that purchased, paid and/or provided
> reimbursement for some or all of the purchase price for Invisalign aligners, while
> residing in Connecticut, acquired for personal use during the period beginning July

---

[27] In addition to California, residents of the following states are included in this class: Alabama (*see* Ala. Code § 6-5-60(a)), Arizona, (*see* Ariz. Rev. Stat. Ann. Code § 44-1401) D.C. (*see* D.C. Code § 28-4509), Connecticut (*see* CT Gen Stat. § 35-46a), Hawaii (*see* Haw. Rev. Stat § 480-13(a)(l)), Iowa (*see* Iowa Code § 553.12), Kansas (*see* Kan. Stat. Ann. § 50-161 (B)), Maine (*see* Me. Rev. Stat. Ann. tit. 10, § 1104(1)), Maryland (*see* Md. Code Ann., Com. Law § 11-201), Michigan (*see* Mich. Comp. Laws Ann.§ 445.778), Minnesota (*see* Minn. Stat. Ann.§ 325D.57), Mississippi (*see* Miss. Code Ann. § 75-21-9), Nebraska (*see* Neb. Rev. Stat. § 59-821), Nevada (*see* Nev. Rev. Stat. Ann. § 598A.2 I O), North Dakota (*see* N.D. Cent. Code Ann. § 51-08.1-08), Oregon (*see* Or. Rev. Stat. § 646.780(1)(a)), Rhode Island (*see* R.I. Gen. Laws § 6-36-7(d)), South Dakota (*see* S.D. Codified Laws § 37-1-33), Utah (*see* Utah Code § 76-10-3109), Vermont (*see* Vt. Stat. Ann. tit. 9, § 2465(b)), and Wisconsin (*see* Wis. Stat. Ann.§ 133.18(1)(a)).

10, 2017[28] until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Florida class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Florida, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Illinois class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Illinois, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Iowa class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Iowa, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Maryland class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Maryland, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Massachusetts class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Massachusetts, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Michigan class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Michigan, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Minnesota class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while residing in Minnesota, acquired for personal use during the period beginning May 4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").

**Nebraska class**: All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners, while

---

[28] On July 10, 2017, Connecticut amended Conn. Gen. Stat. Ann. § 35-46a to authorize the assertion of claims by indirect purchasers for violations of state antitrust laws involving drugs, medicine, and medical devices.  *See* https://www.cga.ct.gov/2017/act/pa/pdf/2017PA-00241-R00SB-00445-PA.pdf.  On October 1, 2018, Section 35-46a was further amended to authorize suit by all indirect purchasers.  *See* https://www.cga.ct.gov/2018/ACT/pa/pdf/2018PA-00022-R00HB-05252-PA.pdf.

FIRST AM. CLASS ACTION COMPLAINT        -39-
Case No.:
010976-11/1584318 V1

1   residing in Nebraska, acquired for personal use during the period beginning May 4,
2   2017 until such time as the anticompetitive conduct alleged herein has ceased (the
    "Class Period").

3   **Nevada class**: All persons or entities that purchased, paid and/or provided
    reimbursement for some or all of the purchase price for Invisalign aligners, while
4   residing in Nevada, acquired for personal use during the period beginning May 4,
5   2017 until such time as the anticompetitive conduct alleged herein has ceased (the
    "Class Period").

6   **New York class**: All persons or entities that purchased, paid and/or provided
    reimbursement for some or all of the purchase price for Invisalign aligners, while
7   residing in New York, acquired for personal use during the period beginning May 4,
    2017 until such time as the anticompetitive conduct alleged herein has ceased (the
8   "Class Period").

9   **North Carolina class**: All persons or entities that purchased, paid and/or provided
    reimbursement for some or all of the purchase price for Invisalign aligners, while
10  residing in North Carolina, acquired for personal use during the period beginning May
    4, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the
11  "Class Period").

12  **Oregon class**: All persons or entities that purchased, paid and/or provided
    reimbursement for some or all of the purchase price for Invisalign aligners, while
13  residing in Oregon, acquired for personal use during the period beginning May 4,
    2017 until such time as the anticompetitive conduct alleged herein has ceased (the
14  "Class Period").

15  **Tennessee class**: All persons or entities that purchased, paid and/or provided
    reimbursement for some or all of the purchase price for Invisalign aligners, while
16  residing in Tennessee, acquired for personal use during the period beginning May 4,
    2017 until such time as the anticompetitive conduct alleged herein has ceased (the
17  "Class Period").

18      130.    The members of the Class are so numerous that joinder is impracticable.  On

19  information and belief, at least hundreds of thousands of individual consumers purchased aligners for

20  personal use during the Class Period.

21      131.    Common questions of law and fact exist as to all members of the Class.  Such

22  questions of law and fact common to the Class include, but are not limited to, the following:

23          a.      Whether Defendant terminated its agreement with 3Shape in order to maintain

24  and/or enhance its monopoly power in the market for aligners;

25          b.      Whether Defendant terminated its agreement with 3Shape in order to maintain

26  and/or enhance its monopoly power in the market for scanners;

27          c.      Whether Defendant's practice of allowing only its iTero scanner to send scans

28  directly to Defendant for Invisalign patients on commercially reasonable terms, and preventing

3Shape's Trios scanner and other potentially competing scanners from doing so, constitutes a violation of the antitrust laws;

          d.      Whether Defendant's policy of requiring dentists who wish to prescribe Invisalign aligners, but who do not use Defendant's iTero scanner or another approved scanner, to create manual casts of patients' teeth from a silicone mold, involves imposing a burdensome and inefficient alternative;

          e.      Whether Defendant's refusal to accept, for Invisalign orders, the standard file format used by other aligner manufacturers, has legitimate medical or technical reasons or is anticompetitive;

          f.      Whether Defendant's agreement with SDC to allocate the market for aligners is anticompetitive;

          g.      Whether Defendant's contractual restrictions and penalties imposed on customers for dealing with rivals are anticompetitive;

          h.      Whether Defendant has substantial market power in the market for aligners sold in the United States;

          i.      Whether Defendant has substantial market power in the market for scanners sold in the United States;

          j.      Whether Defendant has substantially foreclosed competition in the markets for aligners and/or scanners;

          k.      Whether Defendant's Scheme has artificially raised prices and reduced competition in the market for aligners;

          l.      Whether Defendant's Scheme has a legitimate pro-competitive justification;

          m.      Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for aligners;

          n.      Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for scanners;

          o.      The operative time period and extent of Defendant's antitrust violations;

p.      Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Invisalign aligners, and the proper measure of such overcharge damages; and

q.      The appropriate injunctive and equitable relief for the Class.

132.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members.  By advancing their claims, Plaintiffs will also advance the claims of all Class members, because Defendant participated in activity that caused all Class members to suffer similar injuries. Fed. R. Civ. P. 23(a)(3).

133.    Plaintiffs will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiffs' claims and those of absent Class or Subclass members that would make class certification inappropriate.  Counsels for Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiffs' claims and those of absent Class members.  Fed. R. Civ. P. 23(a)(4).

134.    A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3).  The damages suffered by each Plaintiffs and Class member is relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and Class members to redress the wrongs done to them.  Even if Plaintiffs and Class members could afford individual litigation, which is not the case, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

135.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.  Fed. R. Civ. P. 23(b)(2).

1      136.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this

2    action as a class action under Federal Rule of Civil Procedure 23.

3                          VII.    RELEVANT MARKETS

4    A.    The aligner market

5      137.    At all relevant times, Align had substantial market power in the market for aligners.

6    It had the power to maintain the price of Invisalign at supracompetitive levels profitably without

7    losing substantial sales to other products used for the same purposes as Invisalign.

8      138.    To the extent Plaintiffs' claims require the definition of a relevant market for aligners,

9    the relevant product market is the market for custom-manufactured, transparent, removable dental

10   aligners made from clear plastic or similar materials.

11     139.    Dental aligners sold through dental offices constitute a distinct product submarket that

12   is itself a defined market.  Align also possesses market power in this market, as reflected in a

13   dominant market share of at least 90% for aligners sold through dental offices.

14     140.    Dental aligners sold through dental offices feature more complex treatments than

15   dental aligners sold through other distribution channels, such as dental aligners that are sold directly

16   to consumers.  Dental aligners sold through dental offices use specialized vendors, dental offices, as

17   compared to dental aligners sold directly to consumers, that do not feature specialized vendors.

18   Dental aligners sold through dental offices also feature a distinct set of customers – consumers who

19   need complex treatment that cannot be addressed by aligners that are sold directly to consumers.  For

20   these consumers, only dental aligners sold through dental offices are able to meet their treatment

21   needs, which cannot be satisfactorily addressed by dental aligners that are sold directly to consumers.

22     141.    Dental aligners sold through dental offices also feature markedly higher prices than

23   dental aligners sold directly to consumers.  For example, the cost of Invisalign treatment generally

24   ranges between $3,000 to $8,000.  By contrast, currently, Smile Direct Club has a set price of $1,950

25   if the customer pays at once.[29] The significantly higher prices of dental aligners sold through dental

26

27

28            [29] https://smiledirectclub.com/faq/

FIRST AM. CLASS ACTION COMPLAINT         -43-
Case No.:
010976-11/1584318 V1

offices versus other distribution channels shows that there is minimal cross-price elasticity between the dental office and direct to consumer submarkets.

142.    Align itself has specifically explained that there is little overlap between the product submarkets of dental aligners sold through dental offices and dental aligners sold direct to consumers.  As explained above (*see supra* ¶ 98), Align's CEO has previously made clear that Align and SDC do not compete for the same cases, anticipating in 2016 "very little cannibalization of the existing market" ("2% or less") as a result of a supply agreement between the two companies; more recently, in 2019, Hogan explained that "there is about a 10% with our adult demographic with SDC"—i.e., a 10% overlap between the aligner product submarkets targeted by the two companies concentrated among less expensive, "simple"  (less medically complex) cases.

143.    Dental aligners sold through dentist offices constitute a distinct aligner submarket that is, itself, a relevant product market in which Align also possesses market power.  Dental aligners sold through dental offices feature more complex treatments than dental aligners sold through other distribution channels, such as dental aligners that are sold directly to consumers. Dental aligners sold through dental offices use specialized vendors, dental offices, as compared to dental aligners sold directly to consumers, that do not feature specialized vendors.  Dental aligners sold through dental offices also feature a distinct set of customers – consumers who need complex treatment that cannot be addressed by aligners that are sold directly to consumers. For these consumers, only dental aligners sold through dental offices are able to meet their treatment needs, which cannot be satisfactorily addressed by dental aligners that are sold directly to consumers. Dental aligners sold through dental offices also feature markedly higher prices than dental aligners sold directly to consumers.  For example, the cost of Invisalign treatment generally ranges between $3,000 to $8,000.  By contrast, currently, Smile Direct Club has a set price of $1,950 if the customer pays at once.[30] The significantly higher prices of dental aligners sold through dental offices versus other distribution channels shows that there is minimal cross-price elasticity between the dental office and direct to consumer submarkets.  Align itself has specifically explained that there is little overlap

_____
[30] https://smiledirectclub.com/faq/.

between the product submarkets of dental aligners sold through dental offices and dental aligners sold direct to consumers.

144.    Align has, in particular, exercised dominant market power in the distinct, definable product submarket of dental aligners sold through dentist offices.

145.    To the extent Plaintiffs' claims require the definition of a relevant market for aligners, the relevant geographic market is the United States.  The Food and Drug Administration has to approve medical devices such as aligners, and consumers in the United States cannot practically seek out alternative aligners from other countries that have not been approved for sale and use in the United States.  Therefore, the price of aligners in other countries does not affect the market for aligners in the United States.

146.    There are also high barriers to entry in the aligner market, due in part to the cost of establishing and running manufacturing facilities and the cost of regulatory approval.

147.    At all relevant times, Align has had an approximately 90 percent share of the market for aligners in the United States.  Moreover, there are substantial barriers to entry for potential competitors in the aligner market.

148.    Metal braces are not a reasonable substitute for aligners.  Aligners are used for patients with moderate tooth misalignment, or who cannot receive metal braces due to activities in which they are involved, such as certain sports.  Metal braces are used for patients with severe tooth misalignment, for whom aligners would not be sufficient for proper treatment.  Metal braces are also far more uncomfortable, typically take a longer period for treatment to complete, require patients to avoid certain foods, and require repeated visits to an orthodontist.

149.    Furthermore, as explained above (*see supra* ¶¶ 139-143), the submarket for selling aligners directly to consumers is generally distinct from—and overlaps little with—the submarket for selling aligners to (and/or through) dentists and orthodontists, given the fundamentally different types of cases these two distribution channels generally serve.

150.    A small but significant and non-transitory artificial inflation of the price of aligners would not cause any significant number of consumers to purchase other potentially substitutable products, including metal braces, instead, so as to make such price inflation unprofitable.  A small but

1   significant and non-transitory artificial inflation of the price of metal braces would not cause any

2   significant number of consumers to purchase aligners instead, so as to make the artificial price

3   inflation unprofitable.

4   **B.      The market for hand-held digital intra-oral scanners**

5           151.    At all relevant times, Align had market power in the market for scanners.  It had the

6   power to maintain the price of iTero scanners at supracompetitive levels profitably without losing

7   substantial sales to other products used for the same purposes as iTero scanners.

8           152.    To the extent Plaintiffs' claims require the definition of a relevant market for

9   scanners, the relevant product market is the market for hand-held digital intra-oral scanners designed

10   for ordering aligners (hereafter "scanner market").

11          153.    To the extent Plaintiffs' claims require the definition of a relevant market for

12   scanners, the relevant geographic market is the United States.  The Food and Drug Administration

13   has to approve medical devices such as scanners, and dental professionals in the United States cannot

14   practically seek out alternative scanners from other countries that have not been approved for sale

15   and use in the United States.  Therefore, the price of scanners in other countries does not affect the

16   market for scanners in the United States.

17          154.    There are also high barriers to entry in the scanner market, due in part to the cost of

18   establishing and running manufacturing facilities and the cost of regulatory approval.

19          155.    At all relevant times, Align has had an approximately 80 percent share in the market

20   for scanners in the United States.  Additionally, there are substantial barriers to entry for potential

21   competitors in the scanner market.

22          156.    As explained above, dental professionals use scanners to scan patients' mouths to

23   obtain three-dimensional digital impressions of patients' dental structures (a "scan"), process and

24   evaluate it through task-specific software, and then submit the scans to aligner manufacturers that are

25   customized to treat the patient's needs.  Having the ability to access and receive scans is

26   indispensable to competing in the aligner market.

27          157.    Currently, the iTero and Trios are the only two viable scanners in the scanner market.

28

FIRST AM. CLASS ACTION COMPLAINT         -46-
Case No.:
010976-11/1584318 V1

158.     Specifically, iTero and Trios are the only two viable scanners for orthodontic treatment that easily and accurately scan a patient's upper and lower jaws, teeth, and bite to create and deliver a digital 3D impression for ordering aligners.  They are also the only scanners that have the software and delivery systems to accommodate digital aligner workflow.  And, they have been in the same price class: as explained above, both are so-called "DI" (dental impression) scanners, which are considerably cheaper (often between $25,000-40,000 for a DI unit vs. $130,000 for a full CAD/CAM unit), used for specialized applications, and typically have quicker innovation cycles.

158.     Furthermore, compared to Trios, iTero is slower, more difficult to use, larger, lacks CAD integration, and is a closed system.  One commentator, reviewing the latest intraoral scanners, explained that "[t]he iTero does, however, have one saving grace, and that is its association with Invisalign."

159.     Following Align's termination of interoperability with 3Shape's Trios, iTero's market share has increased significantly in the United States.  In the third quarter of 2019, Align's iTero scanner and services revenues increased 16.5 percent, year-over-year.[31]  In the fourth quarter of 2020, Align reported a record year-over-year increase of 26.0 percent in the same revenue category.

160.     3Shape's growth in the scanner market effectively stopped in 2018.

161.     As explained above (*see supra* ¶¶ 62-64), both 3M and Sirona manufacture intraoral scanners—the MTD and CEREC, respectively.  But neither the MTD nor the CEREC scanner is a viable substitute for the iTero or Trios scanners, and they are not in the relevant scanner market.  The MTD and CEREC scanners are not viable substitutes for the iTero or Trios scanners because they are not well suited to provide full mouth scans for aligner orders.  As a result, the MTD and CEREC scanners are not a viable option for dental professionals seeking to send digital scans for aligners, and are rarely used for this purpose.[32]

---

[31] *See Align Technology Announces Third Quarter 2019 Financial Results*, BioSpace (Oct. 23, 2019), *available at* https://www.biospace.com/article/releases/align-technology-announces-third-quarter-2019-financial-results/ ("Q3'19 total revenues were $607.3 million, up 20.2% year-over-year, and Q3'19 scanner and services revenues were $91.1 million, up 16.5% year-over-year.").

[32] For example, a July 2019 survey of dental practitioners by Credit Suisse found that, of 42 survey respondents, 60% used the iTero for "digital scanning," while just 9% and 2% used the

162.     Specifically, unlike the iTero and Trios scanners, which were designed and manufactured to generate full mouth scans used to order aligners, both the MTD and CEREC scanners are focused on scanning individual teeth for crowns and similar local dental restorative work—and not on comprehensive, full-mouth orthodontic treatments.  It takes significantly longer to scan a patient's entire mouth with a MTD or CEREC scanner than with a Trios or iTero scanner.

163.     The MTD and CEREC scanners are also technologically inferior to the iTero and Trios scanners.  On information and belief, Align executive Raphael Pascaud has testified in International Trade Commission proceedings that Trios is better than the MTD and CEREC scanners, and that MTD and CEREC scanners "are outdated."

164.     The MTD and CEREC scanners are not purchased by dental professionals to generate full mouth scans used for ordering aligners.  The actual utilization rates for MTD's and CEREC's scanners to order aligners are low.

165.     Furthermore, the MTD and CEREC scanners rely on outdated technology, and their utilization rates have been declining.  The MTD scanner requires the use of a powder for scanning and generates a black-and-white scan.  The CEREC scanner's hardware is antiquated, having not been updated since 2012.

166.     Invisalign's advertising does not include MTD and CEREC as scanner options that can be used to order Invisalign—rather, the only scanner disclosed in its advertising is iTero.  For example, the following page appears in the "going digital" section of the webpage Align makes available to doctors interested in becoming Invisalign providers[33]:

---

CEREC (or "Omnicam") and MTD scanners, respectively, for this purpose.  Commenting on Sirona's then-recent launch of its "Primescan" scanner, the survey notes: "Primescan is an open system that can connect with all labs, an important difference from its legacy Omnicam offering, *with which data transfer to labs was a cumbersome process* as it predominantly promoted chairside systems.  While it technically offered Omnicam for standalone digital impression, *penetration was extremely low*, with its salesforce not aligned with this strategy." (emphasis added); *see also* note 13 (explaining that the MTD scanner is "primarily used for scanning individual teeth for crowns and similar local dental restorative work—and not for comprehensive, full-mouth orthodontic treatments").

[33] *See* https://www.invisalign.com/provider/digital-transformation/going-digital (last visited July 28, 2021).



167.     The process for sending digital scans to Align from the MTD or CEREC scanners is also more cumbersome and time consuming than sending digital scans from the iTero scanner and requires an additional, manual quality approval step based on the poor quality of the scan from such scanners.

168.     Other fringe scanners also do not competitively constrain Align.  As explained above, Align has only allowed interoperability for scanners that are not designed for ordering aligners, that do not compete with iTero in the scanner market, and that do not represent a threat to Align's dominance of the aligner market.  This in turn means the barriers to entry for a new supplier and scanner are insurmountable

169.     Likewise, silicone molds are not part of the scanner market because they are not viable substitutes for iTero and Trios scanners.

170.     Before the advent of digital intraoral scanners, dental professionals seeking to prescribe aligners were required to make manual dental impressions by inserting a metal or plastic tray containing impression material, such as silicone-based polyvinyl-siloxane or alginate, into a patient's mouth to generate a cast of the patient's teeth ("silicone mold").

171.    To take a dental impression using silicone molds, patients must bite into a rubbery and runny casting material for several minutes, waiting for it to set.  During this process, patients are subject to unpleasant odor and taste, and may experience gagging.  Patients may have to repeat this process more than once to get an adequate dental impression for aligners as manual impressions are often not accurate due to distortions and incomplete details.

172.    Accordingly, silicone molds are less appropriate for use with aligners, which require extremely accurate full mouth scans (in contrast to silicone molds, scans also allow for real-time simulations of teeth movement to best plan a course of treatment).  In particular, full mouth digital scans also offer flexibility and customization, because they allow dental professionals to use digital scans to simulate teeth movement and outcomes in software.

173.    Neither dental professionals nor Align itself view silicone molds as substitutes for full mouth scans.  In its Q1 2019 financial statement, Align reported that it expects that within a "year or two, nearly all Invisalign cases will be submitted digitally, primarily through an iTero scanner."  In a July 24, 2019 earnings call, Align's CEO confirmed that "dental is going digital."  And as noted above, a recent research note estimates that 86% of cases were submitted digitally in the Americas in the first quarter of 2021, a number that will likely continue to increase:



174.    Although Align accepts silicone molds for Invisalign orders, Align has itself admitted that these impressions are less accurate, more costly, and more stressful for the patient.  In fact, Align has highlighted for those considering a silicone mold that the rejection rate for molds is 13 to 14 times higher than the rejection rate for an iTero digital scan.

175.    Indeed, in its 2017 Annual Report, Align stated:

1
2
3
4

> digital scanning is more efficient and precise and more comfortable for patients, compared to the mess, discomfort and subjective nature of taking physical impressions.  The digitally scanned model is more accurate than a physical impression and substantially reduces the rate of restoration 'remakes' so patients are recalled less often and the appointment time for the restoration is shorter because of fewer adjustments which results in greater overall patient satisfaction.

5        176.    3Shape's Trios and Defendant's iTero are part of the relevant market for scanners.

6        177.    A small but significant and non-transitory artificial inflation in the price of scanners

7   would not cause any significant number of consumers to purchase other potentially substitutable

8   products, including 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners,

9   instead, so as to make the artificial price inflation unprofitable.

10                              **VIII.   ANTITRUST INJURY**

11       178.    Defendant's anticompetitive behavior resulted in antitrust injury to Plaintiffs and

12  other members of the proposed Class because it caused them to pay higher prices for Invisalign

13  aligners than they otherwise would have paid if not for Defendant's business practices.

14       179.    Plaintiffs purchased Invisalign aligners as part of a course of treatment from dentist

15  offices.  Plaintiffs either paid for the cost of Invisalign aligners directly, through financing arranged

16  by Align or indirectly, through dentist offices.  When purchased indirectly, Plaintiffs were paying for

17  an Invisalign aligner treatment whose sole product was the installation of Invisalign aligners.

18  Invisalign aligners constitute a significant, material cost for Invisalign aligner treatment provided by

19  Dentists.

20  **A.    Inflated prices of Invisalign aligners were passed on to consumers**

21       180.    The aligner market is subject to vigorous price competition between dentist offices

22  offering to provide the Invisalign aligner treatment.  As a result, increases in the prices of Invisalign

23  aligners will lead to corresponding price raises for the cost of Invisalign aligner treatment provided

24  by dentists.

25       181.    Align has itself recognized that dentists pass through the cost of Invisalign aligners to

26  patients.  The CEO of Invisalign, Joseph Hogan, specifically touted a new financing program where

27  patients paid Invisalign directly because it "eliminates the need for [dentists] to pass on the high

28  down payments to patients."

182.    As a result, the inflated prices of Invisalign aligners have been passed on to the Plaintiffs who purchased Invisalign aligners indirectly from dentists.

183.    Economic theory teaches that the only situations in which precisely zero pass through occurs is when an industry faces a perfectly elastic demand for its product (i.e., the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic (i.e., if even a very large increase in price for a product was incapable of stimulating additional supply).[34] Therefore, at least a partial pass through of an increase in the costs of Invisalign aligners onto the price of Invisalign aligner treatment – is the predicted outcome of successful monopolistic behavior.

184.    Thus, the extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established.  Based on both theory and the published studies in this area, it is likely that the pass-through rates of inflated costs on Invisalign aligners will exceed 100 percent, a situation known as "overshifting."

185.    Furthermore, academic literature on price dynamics in the pharmaceutical industry shows that prices decline between 7.7% and 83% following patent expiration.  Meanwhile, although Align lost 40 key patents in October 2017—including patents protecting the design and manufacture of Invisalign[35]—preliminary data indicates that its consumer-facing prices have declined by an average rate of only 1.6%. Invisalign prices would have declined by, at minimum, hundreds of

---

[34] The usual hypothesis that is commonly examined in empirical pass-through studies is whether pass through exceeds, falls short of or equals 100 percent.

[35] *See Align's Dominance of Clear-Teeth-Straightener Market Challenged*, Bloomberg Law (Aug. 28, 2018), https://news.bloomberglaw.com/business-and-practice/aligns-dominance-of-clear-teeth-straightener-market-challenged/.

dollars if they had followed the same decline in prices as other medical products that lost patent protection.



186.     Aligners are the primary physical component, and a significant cost, for Aligner treatments purchased by Plaintiffs. Aligners remain essentially unchanged when they are incorporated into Aligner treatments. When Aligners are purchased as part of an Aligner Treatment, it is a distinct, physically discrete component that does not undergo physical alterations. Aligners are identifiable in a manner that permits tracing to Defendant. As a result, Aligners follow a traceable physical chain of distribution from the Defendant to Plaintiffs and members of the Class, and any costs attributable to Aligners can be traced through the chain of distribution to Plaintiffs and members of the Class.

187.     Thus, Plaintiffs and other members of the proposed Class who purchased Invisalign aligners indirectly have suffered antitrust injury because they have been forced to pay supracompetitive prices for their Invisalign aligner treatments.  These inflated prices have been passed on to them by direct purchasers, such as dental offices.

## IX.   CAUSES OF ACTION

### VIOLATIONS OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF:
#### VIOLATION OF SECTION 2 OF THE SHERMAN ACT 15 U.S.C. §2 FOR MONOPOLIZATION OF THE ALIGNER MARKET
#### (ON BEHALF OF THE NATIONWIDE CLASS)

188.   Plaintiffs repeat and reiterate each of the allegations contained in paragraphs above as if fully set forth herein.

189.   The relevant product market is the aligner market, and the relevant geographic market is the United States.

190.   As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the aligner market and preventing its rivals from competing for aligner sales.  In particular, Align engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

191.   Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the aligner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

192.   The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the aligner market.

193.   There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

194.   As a direct, material, and proximate result of Defendant's violation of Section 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period because they have paid more for Invisalign aligner treatment than they otherwise would have paid in the absence of Defendant's unlawful conduct.

195.   These violations are continuing and will continue unless enjoined by this Court.

196.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendant, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT 15 U.S.C. §2 FOR**
**MONOPOLIZATION OF THE SCANNER MARKET**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

197.     Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

198.     The relevant product market is the scanner market, and the relevant geographic market is the United States.

199.     As a result of the Scheme alleged herein, Defendant possesses monopoly power in the scanner market, with a market share over 80%.

200.     As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the scanner market and preventing its rivals from competing for scanner sales.

201.     Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the scanner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

202.     The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the scanner market.

203.     There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

204.     As a direct, material, and proximate result of Defendant's violation of Section 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of Section 4 of the Clayton Act throughout the Class Period because they have paid more for Invisalign aligner treatment than they otherwise would have paid in the absence of Defendant's unlawful conduct.

205.     These violations are continuing and will continue unless enjoined by this Court.

206.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendant, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

207.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

208.    The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated classes.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA CLASS)

209.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

210.    By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. § 44-1401, *et seq*.

211.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the aligner and scanner markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the aligner market.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

212.    Defendant's violations of Arizona law were flagrant.

213.    Defendant's unlawful conduct substantially affected Arizona's trade and commerce.

214.    As a direct and proximate cause of Defendant's unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

215.    By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq*.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATIONS OF THE CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE §§ 16700, *ET SEQ.***
**(ON BEHALF OF THE STATUTORY RIGHT OF ACTION CLASS)**

216.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein. By reason of the foregoing, Defendant has violated California Business and Professions Code, §§ 16700, *et seq*. Plaintiffs on behalf of the Indirect Purchaser State Subclass allege as follows.

217.    Beginning at a time currently unknown to Plaintiffs, but at least as early as May 4, 2017 and continuing thereafter at least up to the present, Defendant engaged in a continuing unlawful conduct in restraint of trade and commerce described above in violation of section 16720, California Business and Professions Code.  Defendant acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of, and monopolize markets for aligner and scanner products at supra-competitive levels.

218.    The Cartwright Act applies to the anticompetitive, price-fixing, trade-restraining conduct of a single firm in certain circumstances when that firm by coercive conduct, imposes restraints to which distributors involuntarily adhere.  If a "single trader" pressures customers into anticompetitive contract terms, including exclusive dealing arrangements or illegal tie-ins, an unlawful combination is established with the meaning of the Cartwright Act, irrespective of any monopoly or conspiracy.  Stated differently, a "conspiracy" or "combination" within the meaning of the Cartwright Act is formed where a trader uses coercive tactics to impose restraints on uncooperative businesses.

219.    In particular, Defendant has executed a Scheme to pressure dental practices and Plaintiffs to pay unreasonable and supra-competitive prices for scanners and aligners.  Defendant has also (1) entered into exclusive dealing agreements with DSOs to further maintain its monopoly power in the aligner and scanner markets; and (2) entered into a market allocation agreement with SDC, which foreclosed competition in the lucrative submarket for aligners sold through dental offices and enabled Align to impose supracompetitive prices for aligners.

220.    All of these arrangements, individually and collectively, were unlawful combinations within the meaning of the Cartwright Act.  On information and belief, the unlawful acts were

FIRST AM. CLASS ACTION COMPLAINT          -57-
Case No.:
010976-11/1584318 V1

conceived and implemented by Defendant executives located in the State of California.  The effect of these unlawful combinations was to exclude competitors from the aligner and scanner markets, reinforce and grow Defendant's dominance and ability to extract anticompetitive profits and – fundamental to this action – cause the price of Invisalign aligner treatments to rise to artificially high, supra-competitive levels.

221.    As a direct result of Defendant's unlawful conduct, Plaintiffs and the Class members were overcharged when they purchased Invisalign aligners.

222.    Plaintiffs and other Class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

223.    Defendant's conduct violates the Cartwright Act.  Defendant's violations are continuing and will continue unless enjoined by the Court.

224.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have been injured in their business and property in that they paid more for Invisalign aligners than they otherwise would have paid in the absence of Defendant's unlawful conduct.  As a result of Defendant's violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

**FIFTH CLAIM FOR RELIEF:**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***
**(ON BEHALF OF THE CALIFORNIA CLASS)**

225.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

226.    By reason of the foregoing, Defendant has violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* Plaintiffs on behalf of the Indirect Purchaser State Subclass allege as follows.

227.    Defendant has committed acts of unfair competition, as defined by section 17200, *et seq.*, by engaging in an anticompetitive scheme to monopolize the aligner and scanner markets. Defendant acquired and maintained monopoly over the aligner and scanner markets through

anticompetitive conduct.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

228.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq*., including, but not limited to (1) violations of Section 2 of the Sherman Act; and (2) violations of the Cartwright Act.

229.    Defendant's acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

230.    Defendant's acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq*.

231.    Defendant's conduct was carried out, effectuated, and perfected within the state of California.  During most of the class period, Defendant maintained headquarters in California where their employees engaged in communications, meetings and other activities in furtherance of Defendant's monopolization Scheme.

232.    By reason of the foregoing, the Class is entitled to application of California law to a nationwide class and are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as result of such business acts and practices described above.

**SIXTH CLAIM FOR RELIEF:**
**VIOLATION OF THE CONNECTICUT ANTITRUST ACT**
**CONN. GEN. STAT § 35-24, *ET SEQ*.**
**(ON BEHALF OF THE CONNECTICUT CLASS)**

233.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

234.    The Connecticut Antitrust Act "expresses a public policy of promoting competition in the marketplace and prohibiting unreasonable restraints of trade, monopolies and attempts to monopolize a defined marketplace."

235.     Members of the Class purchased Invisalign aligners within the State of Connecticut during the Class Period.  But for Defendant's conduct set forth herein, the price of those aligners would have been lower, in an amount to be determined at trial.

236.     Defendant made contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling, or maintaining prices for scanners and aligners sold in Connecticut, and/or for the purpose of substantially lessening competition and creating a monopoly in the aligner and scanner markets, in violation of Conn. Gen. Stat. Ann. § 35-24, *et seq.*

237.     Defendant's unlawful conduct and practices have substantial anticompetitive effects in Connecticut, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

238.     Members of the Class who purchased Invisalign aligners in Connecticut were harmed by Defendant's anticompetitive conduct in a manner that the Connecticut Antitrust Act was intended to prevent when they paid more for aligners than they would have paid in a competitive market. Members of the Class who purchased aligners in Connecticut have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendant's anticompetitive conduct issues. Members of the Class who purchased Invisalign aligners in Connecticut are also entitled to all other forms of relief, including treble damages and reasonable attorneys' fees and costs.

**SEVENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201(2), *ET SEQ*.**
**(ON BEHALF OF THE FLORIDA CLASS)**

239.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq*. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade.  Florida Stat. § 501.204(1).

241.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

242.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

243.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.  Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action[.]").

244.    Plaintiffs purchased Invisalign aligners within the State of Florida during the Class Period.  But for Defendant's conduct set forth herein, the price of Invisalign aligners would have been lower, in an amount to be determined at trial.

245.    Defendant established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the markets for aligners and scanners, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as May 4, 2017 and continuing through the date of this filing.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

246.    Accordingly, Defendant's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

247.    Defendant's unlawful conduct substantially affected Florida's trade and commerce.

248.    As a direct and proximate cause of Defendant's unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for Invisalign aligners and are threatened with further injury.

249.    By reason of the foregoing, plaintiffs and the members of the Florida Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**EIGHTH CLAIM FOR RELIEF:**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT**
**740 Ill. COMP. STAT. ANN. 10/3(1), ET SEQ.**
**(ON BEHALF OF THE ILLINOIS CLASS)**

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

252.    Plaintiffs purchased Invisalign aligners within the State of Illinois during the Class Period.  But for Defendant's conduct set forth herein, the price of these aligners would have been lower, in an amount to be determined at trial.

253.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint.  740 ILCS 10/7(2).

254.    Defendant unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for scanners and aligners in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

255.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of Invisalign aligners in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**NINTH CLAIM FOR RELIEF:**
**VIOLATION OF THE IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ.***
**(ON BEHALF OF THE IOWA CLASS)**

256.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices."  Iowa Code § 553.2.

258.    Plaintiffs purchased Invisalign aligners within the State of Iowa during the Class Period.  But for Defendant's conduct set forth herein, the price of those aligners would have been lower, in an amount to be determined at trial.

259.    Defendant contracted, combined or conspired to restrain or monopolize trade in the markets for aligners and scanners, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for aligners and scanners, in violation of Iowa Code § 553.1, *et seq.*  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

260.    Defendant contracted, combined or conspired to restrain or monopolize trade in the market for aligners, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for aligners, in violation of Iowa Code § 553.1, *et seq.*

261.    Plaintiffs and members of the Iowa Class were injured with respect to purchases of Invisalign aligners in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## TENTH CLAIM FOR RELIEF:
### VIOLATION OF THE MARYLAND
### ANTITRUST ACT, ANN. COM. LAW § 11-201, *ET SEQ.*
### (ON BEHALF OF THE MARYLAND CLASS)

262.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    Maryland's antitrust laws prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

265.    Members of the Classes purchased Invisalign aligners within the state of Maryland during the Class Period.  But for Defendant's conduct set forth herein, the price of aligners would

have been lower, in an amount to be determined at trial. Defendant's unlawful conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs for aligners and scanners, reduced innovation, poorer customer service, and lowered output.

266.    Members of the Classes who purchased Invisalign aligners in Maryland were harmed by Defendant's anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent when they paid more for those aligners than they would have paid in a competitive market. Members of the Classes who purchased Invisalign aligners in Maryland suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendant's anticompetitive conduct issues. Members of the Classes who purchased Invisalign aligners in Maryland are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### ELEVENTH CLAIM FOR RELIEF:
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ*. (ON BEHALF OF THE MASSACHUSETTS CLASS)

267.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.    By reason of the conduct alleged herein, Defendant has violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 2, *et seq*.

269.    Plaintiffs purchased Invisalign aligners within the State of Massachusetts during the Class Period. But for Defendant's conduct set forth herein, the price of these aligners would have been lower, in an amount to be determined at trial.

270.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for aligners and scanners, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the aligner market.

271.    Defendant's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts.

272.    Defendant's unlawful conduct substantially affected Massachusetts' trade and commerce.

273.    As a direct and proximate cause of Defendant's unlawful conduct, the plaintiffs and the members of the Massachusetts Class have been injured in their business or property and are threatened with further injury.

274.    By reason of the foregoing, the plaintiffs and the Massachusetts Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Mass. Gen. Laws Ch. 93A § 9.

275.    Plaintiffs reserve their right to bring this claim under Mass. Gen. Laws Ch. 93A *et seq*.  Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served Defendant on July 30, 2021, via certified mail, return receipt requested, Demand for Payment Letters.  In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the Defendant within 30 days.  If necessary, plaintiffs will amend to add this specific claim under Mass. Gen. Laws Ch. 93A *et seq.*

**TWELFTH CLAIM FOR RELIEF:**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT**
**MICH. COMP. LAWS § 445.771, *ET SEQ.***
**(ON BEHALF OF THE MICHIGAN CLASS)**

276.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act."  Mich. Act 274 of 1984.

278.    Plaintiffs purchased Invisalign aligners within the State of Michigan during the Class Period.  But for Defendant's conduct set forth herein, the price of Invisalign aligners would have been lower, in an amount to be determined at trial.

279.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Mich. Comp. Laws. § 452.778(2).

280.     Defendant contracted, combined or conspired to restrain or monopolize trade or commerce in the markets for aligners and scanners, in violation of Mich. Comp. Laws § 445.772, *et seq*.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

281.     Plaintiffs and members of the Michigan Class were injured with respect to purchases of Invisalign aligners in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**THIRTEENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. § 325D.49, *ET SEQ*.**
**(ON BEHALF OF THE MINNESOTA CLASS)**

282.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283.     The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

284.     Plaintiffs purchased Invisalign aligners within the State of Minnesota during the Class Period.  But for Defendant's conduct set forth herein, the price of Invisalign aligners would have been lower, in an amount to be determined at trial.

285.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Minn. Stat. § 325D.56.

286.     Defendant contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for aligners and scanners within the intrastate commerce of and outside of Minnesota; and established, maintained, used or attempted to establish, maintains or uses monopoly power over the trade or commerce in the market for aligners and scanners within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for aligners and

scanners within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

287.    Plaintiffs and members of the Minnesota Class were injured with respect to purchases of Invisalign aligners in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**FOURTEENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. § 59-1602, *ET SEQ.***
**(ON BEHALF OF THE NEBRASKA CLASS)**

288.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.    By reason of the conduct alleged herein, Defendant has violated Neb. Rev. Stat. § 59-1602, *et seq.*

290.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the aligner and scanner markets, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

291.    Defendant's conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendant's actions within the stream of Nebraska commerce.

292.    Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

293.    Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nebraska Class's ability to protect themselves.

294.    Defendant's unlawful conduct substantially affected Nebraska's trade and commerce.

295.     As a direct and proximate cause of Defendant's unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

296.     By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

**FIFTEENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598A.010, *ET SEQ*.**
**(ON BEHALF OF THE NEVADA CLASS)**

297.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

298.     The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

299.     The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices.  Nev. Rev. Stat. Ann. § 598A.030(2).  Such acts include, inter alia, division of markets, allocation of customers, and monopolization of trade.  Nev. Rev. Stat. Ann. § 598A.060.

300.     Plaintiffs purchased Invisalign aligners within the State of Nevada during the Class Period.  But for Defendant's conduct set forth herein, the price of these aligners would have been lower, in an amount to be determined at trial.

301.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint.  Nev. Rev. Stat. Ann. §598A.210(2).

302.     Defendant divided Nevada markets, allocated Nevada customers, monopolized or attempted to monopolize trade or commerce of aligners and scanners within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

303.     Plaintiffs and members of the Nevada Class were injured with respect to purchases of Invisalign aligners in Nevada in that at least thousands of sales of Defendant's aligners took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendant's conduct.

304.     Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

305.     In accordance with the requirements of § 598A.210(3), notice of this action will be mailed to the Nevada Attorney General by plaintiffs.

### SIXTEENTH CLAIM FOR RELIEF:
### VIOLATION OF SECTION 340 OF
### THE NEW YORK GENERAL BUSINESS LAW
### (ON BEHALF OF THE NEW YORK CLASS)

306.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

307.     Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York.  N.Y. Gen. Bus. Law § 340(1).

308.     Plaintiffs purchased Invisalign aligners within the State of New York during the Class Period.  But for Defendant's conduct set forth herein, the price of Invisalign aligners would have been lower, in an amount to be determined at trial.

309.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law § 340(6).

310.     Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of aligners and scanners and restrained competition in the free exercise of the conduct of the business of aligners and scanners within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

311.    Plaintiffs and members of the New York Class were injured with respect to purchases of Invisalign aligners in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

**SEVENTEENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,**
**N.C. GEN. STAT. § 75-1, *ET SEQ*.**
**(ON BEHALF OF THE NORTH CAROLINA CLASS)**

312.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

313.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the scanner and aligner markets, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.  In particular, Defendant engaged in a Scheme to monopolize the distinct product submarket of aligners sold through dental offices.

314.    Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

315.    As a direct and proximate cause of Defendant's unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

316.    By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq*.

**EIGHTEENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. § 646.705, *ET SEQ*.**
**(ON BEHALF OF THE OREGON CLASS)**

317.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.  The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

318.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon.  Sections 705 through 899 thereof govern antitrust violations, with the

1   policy to "encourage free and open competition in the interest of the general welfare and economy of

2   the state."  Or. Rev. Stat. § 646.715.

3          319.    Plaintiffs purchased Invisalign aligners within the State of Oregon during the Class

4   Period.  But for Defendant's conduct set forth herein, the price of aligners would have been lower, in

5   an amount to be determined at trial.

6          320.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of

7   the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint.  Or.

8   Rev. Stat. § 646.780(1)(a).

9          321.    Defendant contracted, combined, or conspired in restraint of trade or commerce of

10   aligners and scanners, and monopolized or attempted to monopolize the trade or commerce of

11   aligners and scanners, in violation of Or. Rev. Stat. § 646.705, *et seq*.

12          322.    Plaintiffs and members of the Oregon Class were injured with respect to purchases of

13   aligners within the intrastate commerce of Oregon, or alternatively to interstate commerce involving

14   actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief,

15   including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and

16   investigative costs, and injunctive relief.

17                        **NINETEENTH CLAIM FOR RELIEF:**
                   **VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
18                        **TENN. CODE, § 47-25-101, *ET SEQ*.**
                        **(ON BEHALF OF THE TENNESSEE CLASS)**
19

20          323.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

21   allegation set forth in the preceding paragraphs of this Complaint.

22          324.    The Tennessee Trade Practices Act generally governs commerce and trade in

23   Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations

24   between persons or corporations made with a view to lessen, or which tend to lessen, full and free

25   competition in goods in Tennessee.  All such arrangements, contracts, agreements, or combinations

26   between persons or corporations designed, or which tend, to increase the prices of any such goods,

27   are against public policy, unlawful, and void.  Tenn. Code, § 47-25-101.

28

FIRST AM. CLASS ACTION COMPLAINT          -71-
Case No.:
010976-11/1584318 V1

325.     Defendant competed unfairly and colluded by meeting to divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

326.     Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee.  Specifically, Defendant's Scheme had the following effects: (1) price competition for aligners and scanners was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for aligners and scanners were raised, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for Invisalign aligners.

327.     During the Class Period, Defendant's illegal conduct had a substantial effect on Tennessee commerce as aligners and scanners were sold in Tennessee.

328.     Plaintiffs and the Tennessee Class purchased Invisalign aligners within the State of Tennessee during the Class Period.  But for Defendant's conduct set forth herein, the price for Invisalign aligners would have been lower, in an amount to be determined at trial.  As a direct and proximate result of Defendant's unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

329.     Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

330.     Plaintiffs and members of the Tennessee Class were injured with respect to purchases of Invisalign aligners in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against Defendant as follows:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified.

B.      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law.

C.      Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against Defendant in an amount to be trebled to the extent such laws permit.

D.      Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing its anticompetitive acts in furtherance of its Monopolization.

F.      Plaintiffs and the members of the classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

G.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

# XI.    DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.


DATED: July 30, 2021                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By    */s/ Rio S. Pierce*
       RIO S. PIERCE

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

*Counsel for Plaintiffs*