PAUL HASTINGS LLP
Steven A. Marenberg (SB# 101033)
James M. Pearl (SB# 198481)
stevenmarenberg@paulhastings.com
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone:  1(310) 620-5700
Facsimile:  1(310) 620-5899

*Attorneys for Defendant Align Technology, Inc.*

Additional counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of others similarly situated,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>                    Defendant. | CASE NO. 3:21-cv-03269-VC<br><br>**DEFENDANT ALIGN TECHNOLOGY, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:          December 16, 2021<br>Time:          2:00 p.m.<br>Place:         Courtroom 4, 17th Floor<br>Judge:        Hon. Vince Chhabria<br><br>Date Action Filed: May 3, 2021 |

**TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

II.     FACTUAL BACKGROUND ...........................................................................3

III.    LEGAL STANDARD .....................................................................................3

IV.     ARGUMENT .................................................................................................4

      A.     Plaintiffs Lack Constitutional Standing to Bring Sherman Act Claims for Injunctive Relief...................................................................................................4

      B.     Plaintiffs' First and Second Claims, Brought Under the Sherman Act, Fail to State Claims for Relief and Must Be Dismissed. ...........................................6

            1.     The SAC Does Not Plausibly Plead an Illegal Market Allocation Restricting SDC from Selling Aligners to Dentists. ...............................7

            2.     The SAC Does Not Plausibly Allege an Illegal Restraint of Trade in Violation of Section 1 of the Sherman Act...............................................8

                  i.     The SAC Does Not Allege a Per Se Violation of Section 1 Because the Rule of Reason Applies to Plaintiffs' Claim. .............9

                  ii.    The SAC Does Not Plausibly Allege an Illegal Restraint of Trade in Violation of Section 1 of the Sherman Act Under the Rule of Reason. ........................................................................10

            3.     Plaintiffs' Newly-Pleaded SDC Allegations Demonstrate the Implausibility, and Require the Dismissal of Their Section 2 Claim.......................................................................................................14

      C.     Plaintiffs' Section 1 Claim Is Time-Barred, Having Been Brought Outside the Four-Year Statute of Limitations Applicable to Such Claims. .......................15

      D.     The Court Should Dismiss Plaintiffs' State Law Claims......................................16

            1.     Plaintiffs' California Cartwright Act Claim (Fourth Claim) Is Based on Conduct That Is Not Actionable, and Thus Should Be Dismissed....................................................................................................16

                  i.     Defendant's Termination of Interoperability Is Unilateral Conduct That Is Not Cognizable Under the Cartwright Act..........17

                  ii.    Without the Improper Reliance on Unilateral Conduct, Plaintiffs' Cartwright Act Claim Must Be Dismissed. .................18

            2.     Plaintiffs' New York Donnelly Act (Fifteenth Claim) and Tennessee Trade Practices Act (Eighteenth Claim) Claims Are Based on Conduct That Is Not Actionable, and Thus Should Be Dismissed....................................................................................................19

            3.     Plaintiff Ellis Lacks Standing to Pursue Her California UCL Claim (Fifth Claim) Which Is, In Any Event, Inadequately Pleaded..................20

            4.     The Iowa Claim (Eighth Claim) Must Be Dismissed Because Plaintiff Sandner Did Not Purchase Invisalign Treatment During the Alleged Scheme. .........................................................................22

            5.     Plaintiffs Fail to Plead a Florida DUTPA Claim (Seventh Claim) With Particularity..............................................................................23

                     

6.      Plaintiffs Fail to Plead Diversity Jurisdiction over the Arizona
        Class Claims (Third Claim). ........................................................................23

E.      Align Preserves Its Arguments that Plaintiffs Lack Antitrust Standing to
        Pursue Their Claims that Align Monopolized the Putative Aligner Market. ........24

V.      CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acedo v. DMAX, Ltd.*,
   No. CV1502443MMMASX, 2015 WL 12912365 (C.D. Cal. July 31, 2015)..........................21

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998) ...........................................................................................14

*United States ex rel. Air Ctrl. Techs. v. Pre Con Indus.*,
   720 F.3d 1174 (9th Cir. 2013) ..........................................................................................16

*Anheuser-Busch, Inc. v. Abrams*,
   71 N.Y.2d 327, 520 N.E.2d 535 (1988).............................................................................20

*In re Animation Workers Antitrust Litig.*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015) ..............................................................................16

*Apple Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................................17

*Asghari v. Volkswagen Grp. of Am., Inc.*,
   42 F. Supp. 3d 1306 (C.D. Cal. 2013) ..............................................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................4

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ......................................................................................*passim*

*B-S Steel Of Kan., Inc. v. Tex. Indus., Inc.*,
   439 F.3d 653 (10th Cir. 2006) ............................................................................................5

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................4

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982)..........................................................................................................25

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ..............................................................................9, 10, 11

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)................................................................................................................9

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988)..........................................................................................................11

*Cal. Comput. Prods., Inc. v. IBM Corp.*,
    613 F.2d 727 (9th Cir. 1979) ................................................................. 13

*Canles v. U.S. Dep't of the Treasury*,
    No. 20-CV-20470-CV, 2020 WL 6684851 (N.D. Cal. Nov. 12, 2020) ..................... 4

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-CV-01143 YGR, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) .................. 14

*Cheverez v. Plains All Am. Pipeline, LP*,
    No. CV15-4113 PSG, 2016 WL 4771883 (C.D. Cal. Mar. 4, 2016).................... 21

*City of L.A. v. Lyons*,
    461 U.S. 95 (1983).......................................................................... 4, 5

*Cont'l TV, Inc. v. GTE Sylvania Inc.*,
    694 F.2d 1132 (9th Cir. 1982) ......................................................... 11, 13

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)........................................................................... 10

*Cowley v. Braden Indus., Inc.*,
    613 F.2d 751 (9th Cir. 1980) ............................................................... 11

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
    523 F.2d 389 (6th Cir. 1975) ............................................................... 16

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
    903 F. Supp. 2d 198 (S.D.N.Y. 2012)...................................................... 6

*Drum v. San Fernando Valley Bar Ass'n*,
    182 Cal. App. 4th 247 (2010) .............................................................. 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................... 24

*Fed. Trade Comm'n v. Kutzner*,
    No. SACV1600999BROAFMX, 2017 WL 5229182 (C.D. Cal. June 12, 2017),
    *aff'd*, 781 F. App'x 599 (9th Cir. 2019)................................................... 24

*Fenerjian v. Nongshim Co.*,
    72 F. Supp. 3d 1058 (N.D. Cal. 2014) ............................................... 22, 23

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................... 17

*Frost v. LG Elecs. Inc.*,
    No. 16-cv-05206-BLF, 2018 WL 6256790 (N.D. Cal. July 9, 2018)..................... 12

*FTC v. Actavis*,
 570 U.S. 136 (2013)................................................................................................ 10

*FTC v. Facebook, Inc.*,
 No. CV 20-3590 (JEB), 2021 WL 2643627 (D.D.C. June 28, 2021)...................... 18

*Fulford v. Logitech, Inc.*,
 No. C-08-2041 MMC, 2008 WL 4914416 (N.D. Cal. Nov. 14, 2008) .................... 21

*In re G-Fees Antitrust Litig.*,
 584 F. Supp. 2d 26 (D.D.C. 2008) ........................................................................... 6

*Garrison v. Oracle Corp.*,
 159 F. Supp. 3d 1044 (N.D. Cal. 2016) ................................................................. 16

*In re German Auto. Mfrs. Antitrust Litig.*,
 MDL No. 2796 CRB, 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020), *aff'd*, No.
 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) .......................................... 10

*Gonzalez v. Planned Parenthood of L.A.*,
 759 F.3d 1112 (9th Cir. 2014) ................................................................................. 7

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
 No. 19-MD-02918-MMC, 2020 WL 6270948 (N.D. Cal. Oct. 23, 2020) ............... 6

*Hart v. BHH, LLC*,
 No. 15CV4804, 2017 WL 2912519 (S.D.N.Y. July 7, 2017)................................... 21

*Hayden v. Portola Pharms., Inc.*,
 No. 20-CV-00367-VC, 2021 WL 909026 (N.D. Cal. Mar. 10, 2021)....................... 2

*Hertz Corp. v. Friend*,
 559 U.S. 77 (2010)................................................................................................... 24

*Huynh v. Quora, Inc.*,
 508 F. Supp. 3d 633 (N.D. Cal. 2020) .................................................................... 20

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
 No. 09-5815 CW, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010), *aff'd*, 487 F.
 App'x 362 (9th Cir. 2012) ....................................................................................... 20

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977)................................................................................................... 1

*Jones v. Micron Tech., Inc.*,
 400 F. Supp. 3d 897 (N.D. Cal. 2019) .................................................................... 23

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
 305 F.R.D. 164 (N.D. Cal. 2015)............................................................................... 5

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ................................................................. 13

*Lee v. Retail Store Emp. Bldg. Corp.*,
    No. 15-CV-04768-LHK, 2017 WL 346021 (N.D. Cal. Jan. 24, 2017) .................... 25

*State ex rel. Leech v. Levi Strauss & Co.*,
    No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980) ........................... 20

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ............................................................. 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 5

*Marroquin v. Wells Fargo, LLC*,
    No. 11CV163-L BLM, 2011 WL 476540 (S.D. Cal. Feb. 3, 2011) ........................ 24

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .................................................................... 4

*In re N.J. Title Ins. Litig.*,
    683 F.3d 451 (3d Cir. 2012) ...................................................................... 5

*In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*,
    No. CV 15-09996-BRO, 2016 WL 1192642 (C.D. Cal. Mar. 28, 2016) ................. 22

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ......................................................................... 5

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ............................................................................ 13

*Pac. Recovery Sols. v. Cigna Behavioral Health, Inc.*,
    No. 20-cv-02251-JCS, 2021 WL 1176677 (N.D. Cal. Mar. 29, 2021) .................... 9

*Pac. Steel Grp. v. Com. Metals Co.*,
    Case No. 20-cv-07683-HSG, 2021 WL 2037961 (N.D. Cal. May 21, 2021) ............ 9

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................. 11

*Polk Bros., Inc. v. Forest City Enter.*,
    776 F.2d 185 (7th Cir. 1985) .................................................................... 12

*Ryan v. Microsoft Corp.*,
    No. 14-CV-04634-LHK, 2015 WL 173852 (N.D. Cal. Apr. 10, 2015) .................. 16

*Shersher v. Sup. Ct.*,
    154 Cal. App. 4th 1491 (2007) ................................................................. 21

*Simon & Simon, PC v. Align Tech., Inc.*,
   No. 20-cv-03754-VC, 2021 WL 1309299 (N.D. Cal. Apr. 8, 2021) ........................................ 18

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .................................................................................................... 20

*Staley v. Gilead Scis., Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020) ...................................................................................... 19

*State Oil v. Khan*,
   522 U.S. 3 (1997) ........................................................................................................................ 9

*Sterling v. Taylor*,
   152 P.3d 420 (Cal. 2007) ............................................................................................................ 8

*Stewart v. Gogo, Inc.*,
   No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ...................................... 19

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ............................................................................... 9, 10

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) .................................................................................................... 15

*Universal Grading Ser. v. eBay, Inc.*,
   No. C-09-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ........................................ 11

*Williams v. Apple, Inc.*,
   449 F. Supp. 3d 892 (N.D. Cal. 2020) ................................................................................... 3, 21

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) .................................................................................................................. 15

**Statutes**

15 U.S.C. § 15b ................................................................................................................................ 15

28 U.S.C. § 1332(c)(1) .................................................................................................................... 24

28 U.S.C. § 1332(d)(2)(A) .............................................................................................................. 23

Cal. Bus. & Prof. Code § 16726 ..................................................................................................... 17

Cal. Bus. & Prof. Code § 17200, *et seq.* ....................................................................................... 21

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ..................................................................................................................... 3

U.S. Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for the
Licensing of Intellectual Property, at 5–6 (Jan. 12, 2017),
(https://www.justice.gov/atr/IPguidelines/download) ............................................................ 12

## <u>NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND</u>
## <u>AMENDED CLASS ACTION COMPLAINT</u>

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on December 16, 2021 at 2:00 P.M., or as soon thereafter as this matter may be heard in the courtroom of the Honorable Vince Chhabria at the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 4 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Align Technology, Inc. ("Defendant" or "Align") shall and hereby does move the Court to dismiss the Second Amended Class Action Complaint (ECF No. 61) filed by Plaintiffs pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted.

This motion is based on this notice of motion and supporting memorandum of points and authorities and reply briefing in further support of this motion any additional written or oral argument presented to the Court, as well as other matters that may properly come before the Court.

DATED:  November 11, 2021                    PAUL HASTINGS LLP


By: _____/s/ Steven A. Marenberg_____
                    Steven A. Marenberg

Steven A. Marenberg (SB# 101033)
James M. Pearl (SB# 198481)
stevenmarenberg@paulhastings.com
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone:  1(310) 620-5700
Facsimile:  1(310) 620-5899

Thomas A. Counts (SB# 148051)
Abigail H. Wald (SB# 309110)
tomcounts@paulhastings.com
abigailwald@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone:  1(415) 856-7000
Facsimile:  1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone:  1(312) 499-6000
Facsimile:  1(312) 499-6100

Noah Pinegar (*pro hac vice*)
noahpinegar@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone:  1(202) 551-1700
Facsimile:  1(202) 551-1705

Attorneys for Defendant
Align Technology, Inc.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' Second Amended Class Action Complaint (the "SAC") is the third attempt to plead a cognizable claim.  It is no more successful in that effort than their prior pleadings. Each Sherman Act claim in the SAC fails for multiple reasons.

First, like the previous complaints, the SAC's Sherman Act Section 2 monopolization claim (First Claim) fails because the Plaintiffs lack standing under Article III to assert such a claim. Specifically, all 16 putative Plaintiffs who obtained Invisalign treatment (the "Patient Plaintiffs") are, by their own admissions, "indirect purchasers" and may seek only injunctive relief (and not damages) for alleged violations of Section 2 under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).  To allege a cognizable claim for injunctive relief the Patient Plaintiffs must establish *constitutional* standing under Article III of the U.S. Constitution.  Yet again, the Patient Plaintiffs have no such standing because none of them allege (nor can they) any prospect of imminent future harm, each having already purchased an Invisalign treatment course, which is a one-off, non-recurring treatment.  The SAC's half-hearted attempt to create standing by claiming that one of the Patient Plaintiffs, Emily Vo, "intends to purchase Invisalign aligners in the future" (SAC ¶ 42) does not change the analysis.  Consequently, the First Claim for Relief (monopolization of the putative market for clear aligners) must be dismissed under to Rule 12(b)(1).

Second, and recognizing that they have failed to allege a Section 2 claim, Plaintiffs now attempt to assert for the first time—in their third pleading— a Section 1 claim (Second Claim). They allege that Align's relationship with SmileDirectClub, Inc. ("SDC") is a per se unlawful agreement to restrain trade in violation of Section 1 of the Sherman Act and claim damages, on behalf of a class of direct purchasers—not of Invisalign—but of *SDC's* aligners at supracompetitive prices.  Plaintiffs' pivot to Section 1 is equally unavailing for several reasons. As a threshold matter, Align and SDC ***never*** agreed to divide markets and no misreading of the Supply Agreement or Operating Agreement can make that so because neither agreement restricted SDC from selling aligners to doctors.  Moreover, under settled antitrust law, Plaintiffs' allegations about these agreements could never support a Section 1 claim.  The SAC establishes that, at most,

the Supply and Operating Agreements are either a textbook vertical supply arrangement that allowed for growth in what was a previously untapped direct-to-consumer aligner business, or a pro-competitive horizontal agreement with ancillary restraints.  In either instance the per se rule does not apply, and the claim fails under the rule of reason test.  And, if that were not enough, the Section 1 claim is also time-barred.  In sum, Plaintiffs' newly-concocted SDC-related allegations are merely opportunistic attempts to save their case by "continuing to throw spaghetti at the proverbial wall."  *Hayden v. Portola Pharms., Inc.*, No. 20-CV-00367-VC, 2021 WL 909026, at *1 (N.D. Cal. Mar. 10, 2021).  Thus, both of Plaintiffs' federal antitrust claims should be dismissed, Plaintiffs' state law claims are equally irreparably flawed for the following reasons:

- The Fourth (California Cartwright Act), Fifteenth (New York Donnelly Act), and Eighteenth (Tennessee Antitrust Law) Claims fail because they are founded on unilateral conduct not subject to the strictures of the laws of those states;

- The Fifth Claim (California UCL) must be dismissed because it seeks injunctive relief, which the California Plaintiff lacks standing to pursue, disguises its damages claim as restitution, and is also inadequately pleaded;

- The Eighth Claim (Iowa Law) must be dismissed because the class representative did not suffer any harm during the time the "scheme" occurred as alleged by Plaintiffs;

- The Seventh Claim (Florida Law) must be dismissed because it fails to plead the cause of action with particularity as required under Florida law; and

- The Third Claim (Arizona Law) must be dismissed because diversity does not and cannot exist under 28 U.S.C. § 1332 between the representative of the Arizona Class (and the entire Arizona class) and Align—which is based in Tempe, Arizona.[1]

Plaintiffs have tried three times to plead claims against Align and have failed each time.

---

[1] Given the multiplicity of Claims, for the Court's convenience Align has again appended a table (*see* **Table 1, attached**) summarizing the nature of the claims, the disposition required by the authorities presented herein and the grounds for such disposition.

Plaintiffs cannot remedy the SAC's shortcomings.  Therefore, the SAC must be dismissed with prejudice.

## II.    FACTUAL BACKGROUND

For purposes of this motion, the relevant allegations of the SAC are as follows.  Invisalign, Align's clear aligner product, is prescribed by providers as part of a course of treatment to correct misalignment of the teeth or jaw.  SAC ¶ 1.  Plaintiffs each paid some or all of the cost of a course of treatment that included Invisalign from a dental practice between January 2017 and June 2021. SAC ¶¶ 29–46.  Plaintiffs do *not* allege that any named Plaintiff has any *imminent* plans to purchase another Invisalign treatment course.

In July 2016, Align and SDC entered into a Supply Agreement and Operating Agreement[2] to resolve litigation that Align filed against SDC the prior year for manufacturing aligners that infringed upon Align's patents.  SAC ¶¶ 108–09.  The Supply Agreement established Align as SDC's exclusive third-party supplier of clear aligners, thereby allowing SDC to continue to sell aligners.  SAC, Ex. B.  Under the Operating Agreement, Align purchased 17 percent of SDC's equity, obtained a seat on SDC's board of directors, and agreed to certain other ancillary restrictions on its ability to compete with SDC that applied to all of SDC's equityholders.  SAC, Ex. A.  Notwithstanding any restrictions on Align, the Supply Agreement reserved to SDC the right to manufacture its own aligners and sell such aligners to doctors:  "*SDC **retains the right to, on its own** and not through directly or indirectly collaborating or working with third parties **manufacture, import, market, co-market, refer, sell or distribute clear aligners utilizing technology developed solely by SDC.***"  SAC, Ex. B, § 3.2.

## III.   LEGAL STANDARD

Rule 12(b)(1) requires that courts have valid subject-matter jurisdiction, including standing under Article III of the Constitution, over all of Plaintiffs' claims for relief.  Fed. R. Civ. P. 12(b)(1); *see Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 900 (N.D. Cal. 2020) (explaining the

---

[2] "Supply Agreement" refers to the Strategic Supply Agreement, dated as of July 25, 2016, between Align and SDC which is attached as Exhibit B to the SAC.  "Operating Agreement" refers to the Second Amended and Restated Operating Agreement of SmileDirectClub, LLC, dated as of July 25, 2016 and which is attached as Exhibit A to the SAC.

different procedures for challenges to constitutional standing and statutory standing). "When subject matter jurisdiction is challenged via a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of proving that jurisdiction exists." *Canles v. U.S. Dep't of the Treasury*, No. 20-CV-20470-CV, 2020 WL 6684851, at *1 (N.D. Cal. Nov. 12, 2020). Courts must dismiss claims over which they lack subject matter jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Rule 12(b)(6) requires that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To meet this, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. This is especially true in an antitrust case such as this, considering the "costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint[.]" *Bell Atl. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Where a plaintiff has "not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.* at 570.

## IV.   ARGUMENT

### A.   Plaintiffs Lack Constitutional Standing to Bring Sherman Act Claims for Injunctive Relief.

The Court previously dismissed Plaintiffs' Sherman Act Section 2 claim (the First Claim) because it seeks solely injunctive relief. Upon repleading, the Patient Plaintiffs still fail to allege imminent future harm, as required to seek injunctive relief, they lack constitutional standing to bring their Section 2 claim.[3]

Under Article III of the Constitution, "Plaintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues[.]" *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983) (internal quotation marks omitted). As admitted

---

[3] Plaintiffs also lack standing to seek injunctive relief under Section 1 of the Sherman Act for the same reasons. Plaintiffs have not alleged what specific relief they are seeking in connection with their Second Claim for Relief under Section 1 of the Sherman Act. To the extent they are seeking injunctive relief, however, the claim should also be dismissed for lack of Article III standing.

indirect purchasers, Plaintiffs are limited to seeking only injunctive relief on their Sherman Act
Section 2 claim. Therefore, they must also show "irreparable injury, a requirement that cannot be
met where there is no showing of any real or immediate threat that the plaintiff will be wronged
again[.]" *Id.* at 111.  "Past exposure to illegal conduct does not in itself show a present case or
controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse
effects." *Id.* at 102 (citation omitted).  "In other words, [a plaintiff] must demonstrate a very
significant possibility of future harm." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164,
195 (N.D. Cal. 2015) (internal quotation marks and citations omitted).  Plaintiffs, for the third
time, have failed to do so.

Here, each Plaintiff alleges only that he or she "purchased Invisalign aligners" at some
point between January 2017 and June 2021.  SAC ¶¶ 29–46.   None allege concrete plans to
purchase Invisalign aligners in the imminent future.  On their third attempt, the closest any plaintiff
comes to alleging imminent harm is the speculative allegation that Plaintiff Emily Vo "intends to
purchase Invisalign aligners ***in the future once [she is] financially ready*** to make the purchase"
(SAC ¶ 42 (emphasis added)).  But that allegation does not give Plaintiffs Article III standing to
seek injunctive relief.  The Supreme Court made clear in *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 564 (1992), that "'some day' intentions—without any description of concrete plans, or indeed
even any specification of when the some day will be—do not support a finding of the 'actual or
imminent' injury that our cases require."  This court likewise rejected speculative future plans as
an inadequate basis for constitutional standing in *Kamakahi*, holding that the plaintiff egg donor's
"statement that 'it's possible' she would donate [eggs] again represents, at most, a 'some day
intention.'" 305 F.R.D. 164, 196.[4]  Moreover, Plaintiffs' claim that at least some of the purported
representative plaintiffs allegedly financed the cost of Invisalign and/or are still making payments

---

[4] *See also In re N.J. Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) (title insurance purchasers
lacked standing to pursue injunctive relief based only on generalized claims that homeowners often
relocate); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008)
(no standing for injunctive relief where no "named plaintiff harbors an 'imminent' intention to buy
a new car" in same market conditions that previously allowed alleged anticompetitive harm); *B-S
Steel Of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 668 (10th Cir. 2006) (plaintiff lacked standing
to pursue injunctive relief where it was no longer purchaser of product and "failed to show any
possibility that it might resume such purchases in the future").

fares no better,[5] and has already been rejected by this court. *See* Order re: Hearing on Motion to Dismiss (ECF No. 50).[6]

Accordingly, each and every Patient Plaintiff lacks Article III standing to seek injunctive relief under the Sherman Act, and, therefore, cannot bring such claims on behalf of a putative class.

### B. Plaintiffs' First and Second Claims, Brought Under the Sherman Act, Fail to State Claims for Relief and Must Be Dismissed.

Plaintiffs' new allegations regarding SDC have only exacerbated the deficiencies of their prior pleadings. *First*, despite purporting to allege a market allocation whereby Align allocated to itself the exclusive right to sell aligners to doctors, Plaintiffs do not and cannot plausibly allege any restriction on SDC from selling aligners to doctors. On the contrary, the agreements Plaintiffs rely on to concoct their Section 1 claims *expressly preserve* SDC's right to sell aligners to doctors.

*Second*, Plaintiffs fail to plausibly plead the requisite allegations to state a claim arising out of any alleged market allocation and cannot do so. Notwithstanding Plaintiffs' invocation of the per se rule of antitrust liability, Align and SDC's relationship is properly analyzed under the rule of reason because the SAC explicitly admits that the relationship is a supply arrangement that benefitted competition. To state a rule of reason claim, Plaintiffs must plead that the harm from these restrictions outweighs its benefits, but there is no such plausible allegation.

---

[5] *See In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 34–35 (D.D.C. 2008) ("[L]ingering monetary injury, without any ongoing threat of recurrent violations [to the plaintiffs], is not sufficient to confer standing to seek an injunction.") (quoting *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 19 (D.D.C. 2004)); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 210 (S.D.N.Y. 2012) (citing *In re G-Fees*, 584 F. Supp. 2d at 35) (indirect purchasers of lacked standing where there was no risk of future harm other than lingering monetary injury).

[6] Likewise, to the extent Plaintiffs' seek injunctive relief based on their allegation that Align entered into a "market allocation agreement" with SDC, this also fails. According to Plaintiffs' own pleading, the allegedly restrictive agreement ended in 2019, SAC ¶ 139, and Plaintiffs do not allege that Align intends to extend or enter into a future agreement with SDC. It is well settled that "[t]o establish a Clayton Act claim for injunctive relief, the plaintiff must show 'a real threat of future violation or a contemporary violation of a nature likely to continue to recur.'" *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-MD-02918-MMC, 2020 WL 6270948, at *4 (N.D. Cal. Oct. 23, 2020) (dismissing claim for injunctive relief where defendants alleged price-fixing conspiracy had ended in May 2016).

*Third*, Plaintiffs' expanded allegations regarding the Align-SDC relationship are fatal to Plaintiffs' Section 2 claim for monopolization of the aligner market, because they belie any credible allegation of Align's monopoly power.

> **1.     The SAC Does Not Plausibly Plead an Illegal Market Allocation Restricting SDC from Selling Aligners to Dentists.**

Plaintiffs' allegations regarding Align's agreements with SDC fail on their face.  Plaintiffs had the benefit of reviewing the Supply Agreement and Operating Agreement, and attach both to the SAC.  The plain text of those agreements, however, irrefutably demonstrates that SDC was never subject to any restrictions on its ability to sell aligners to doctors.  *See* SAC ¶ 113.

Despite having express knowledge and evidence to the contrary, Plaintiffs attempt to allege that SDC was barred from selling aligners to doctors in an extended discussion of various terms of the Supply Agreement.[7]  *See* SAC ¶¶ 114–18.  Plaintiffs allege that Section 3.2 of the Supply Agreement restricted SDC's ability to sell to doctors, attempting to mislead the Court by *ignoring and omitting* mention of the critical 'notwithstanding' clause in Section 3.2 that expressly undermines their claim.  Specifically, Section 3.2 specifically reserves to SDC the ability to sell aligners through doctors:

> **Notwithstanding the foregoing provisions** of this Section 3.2, Align understands that **SDC retains the right to, on its own** and not through directly or indirectly collaborating or working with third parties **manufacture, import, market, co-market, refer, sell or distribute clear aligners utilizing technology developed solely by SDC** during the term of this Agreement, provided that SDC does not use any Align Confidential Information for such purpose.

*See* Supply Agreement § 3.2 (emphasis added).  Thus, Plaintiffs' allegation that SDC was restricted from selling clear aligners through dental practices must be disregarded, as it is expressly contradicted by the clear terms of the Supply Agreement.  *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("Although we normally treat all of a plaintiff's factual allegations in a complaint as true, we 'need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.'") (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).  And no other provision in the Supply or Operating Agreement

---

[7] Plaintiffs do not, because they cannot, allege that the Operating Agreement imposed any limitations on SDC's ability to sell aligners to doctors.

otherwise prevented SDC from selling to doctors.[8]

Plaintiffs continued reliance on an alleged interpretation of the Supply Agreement in a press release *four years after the fact* also does not save their claim.  *See* SAC ¶¶ 138–39.  An analysis of the Supply Agreement's compliance with Section 1 must be limited to the time the agreement was made, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 (9th Cir. 2021) (quoting *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995)), and limited to the actual text of the agreement.  *See Sterling v. Taylor*, 152 P.3d 420, 426 (Cal. 2007) ("Because the [contract] itself must include the essential contractual terms, it is clear that extrinsic evidence cannot *supply* those required terms.").   The actual terms of the Supply Agreement wholly undermine the plausibility of Plaintiffs' Second Claim for market allocation violating Sherman Act § 1, and require its dismissal.[9]  Extrinsic evidence can never change an agreement's plain terms, and thus Plaintiffs cannot navigate around the irrefutable fact that the Supply Agreement allowed SDC to sell aligners to doctors, thereby vitiating any claim for an illegal market allocation.

**2.**      **The SAC Does Not Plausibly Allege an Illegal Restraint of Trade in Violation of Section 1 of the Sherman Act.**

Even if the Supply Agreement could be implausibly read to limit SDC's ability to sell aligners to doctors, the SAC does not plausibly allege that the restriction is a violation of the antitrust laws.  The SAC alleges a vertical supply arrangement that:  (i) was between companies that were not actual or potential competitors as of July 2016; (ii) was part of a settlement of patent litigation, and (iii) increased output—*i.e.* was procompetitive.  Consequently, and notwithstanding the SAC's invocation of the per se rule, the rule of reason applies to Align and SDC's arrangement.  Yet, Plaintiffs do not allege a claim under the rule of reason:  the SAC fails to show any harm to competition, let alone harm that might outweigh the obvious procompetitive benefits from the

---

[8] Plaintiffs do not allege that any other provision of the Supply Agreement actually effected a market limitation on SDC's ability to sell aligners to doctors.

[9] Despite trying to ignore the plain text of the Supply Agreement, Plaintiffs are forced to concede that Section 3.2 permitted SDC to sell aligners to doctors.  Plaintiffs' try to evade that fact by alleging that during the term of the Supply Agreement SDC's "ordinary business practices . . . did not include selling aligners to the dental channel."  SAC ¶ 116.  But, whether SDC elected or not to sell to doctors at the time is of no legal moment and cannot save Plaintiffs' Section 1 claim.

Align-SDC arrangement (*e.g.*, increasing the number of aligners on the market).  For that reason, Plaintiffs' Section 1 claim must be dismissed.

      **i.**        **The SAC Does Not Allege a Per Se Violation of Section 1 Because the Rule of Reason Applies to Plaintiffs' Claim.**

Although Plaintiffs invoke the per se rule, as more fully explained in Align's Motion to Strike, filed herewith, the per se rule does not apply to the Align-SDC collaboration because Plaintiffs allege it is part of a broad pro-competitive arrangement.  That mandates dismissal because when a Court rejects a plaintiffs' per se claim at the pleading stage, "the Court need not consider a rule-of-reason theory of antitrust liability." *Pac. Recovery Sols. v. Cigna Behavioral Health, Inc.*, No. 20-cv-02251-JCS, 2021 WL 1176677, at *13 n.13 (N.D. Cal. Mar. 29, 2021); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038 (N.D. Cal. 2013) ("Should the court ultimately find that the United States cannot maintain a per se or quick look claim, the United States will then be without recourse to the rule of reason and its case will be dismissed.") (citation omitted).

Sherman Act Section 1 prohibits "unreasonable restraints" of trade.  *State Oil v. Khan*, 522 U.S. 3, 10 (1997).  The accepted standard for testing "whether a practice unreasonably restrains trade in violation of Section 1" is the "rule of reason." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (citing *Leegin Creative Leather Prods., Inc. v. PSKS*, Inc., 551 U.S. 877, 885 (2007)).  "A small group of restraints are unreasonable per se because they always or almost always tend to restrict competition and decrease output." *Aya Healthcare*, 9 F.4th at 1108 (citation omitted).

The per se classification is appropriate only when the complained-of practice is plainly anticompetitive and courts have considerable experience with the challenged business relationship. *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8–10 (1979).  It does not apply to vertical agreements. *See Brantley*, 675 F.3d at 1198-1200; *Pac. Steel Grp. v. Com. Metals Co.*, Case No. 20-cv-07683-HSG, 2021 WL 2037961, at *7 (N.D. Cal. May 21, 2021) ("vertical restraints should nearly always be analyzed under the rule of reason") (citation omitted).  By contrast, a per se analysis applies to only a small group of horizontal agreements—horizontal restraints between "actual or potential competitors" that have no purpose except stifling

competition.  *Aya Healthcare*, 9 F.4th at 1109.  On the other hand, horizontal restraints that are collateral to a separate, legitimate transaction and reasonably necessary to achieving that transaction's pro-competitive purpose, are analyzed under the rule of reason.  *Id.*  "[M]ergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively.   Accordingly, such combinations are judged under a rule of reason[.]"  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).   Further, settlements of patent litigation among would-be competitors in the Hatch-Waxman framework governing application to the FDA for generic pharmaceuticals are also analyzed under the rule of reason.  *See FTC v. Actavis*, 570 U.S. 136, 158–60 (2013).

Plaintiffs do not allege the type of naked horizontal restraint on trade between competitors that is necessary to support application of the per se rule to their Section 1 claim.  Rather, the SAC alleges either a textbook vertical supply arrangement that allowed for growth in what is alleged to be a previously untapped product market (*see* SAC ¶ 107 (SDC "pioneered the multi-billion dollar DTC . . . clear aligner market")), or, if the allegations of market allocation are credited as plausible, a pro-competitive horizontal agreement with ancillary restraints, which is also subject to the rule of reason.  Plaintiffs' claim should be dismissed.  *See eBay*, 968 F. Supp. 2d at 1039.

### ii.    The SAC Does Not Plausibly Allege an Illegal Restraint of Trade in Violation of Section 1 of the Sherman Act Under the Rule of Reason.

Under the rule of reason, to plead an illegal agreement that violates Section 1 of the Sherman Act, Plaintiffs must plausibly allege: (1) a contract, combination, or conspiracy among two or more distinct business entities; (2) by which the entities intended to harm or restrain trade or commerce among the several States; (3) which actually injures competition; and (4) antitrust injury.  *Brantley*, 675 F.3d at 1997.  "[C]ourts must look to the time an agreement was adopted in assessing its potential for promoting enterprise and productivity."  *Aya Healthcare*, 9 F.4th at 1110 (quoting *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995)).  Courts in this Circuit routinely dismiss Section 1 claims under the rule of reason for failure to state a claim.  *See, e.g.*, *In re German Auto. Mfrs. Antitrust Litig.*, MDL No. 2796 CRB, 2020 WL 1542373, at *8 (N.D. Cal. Mar. 31, 2020), *aff'd,* No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (rejecting "a broad

conspiracy with untenably narrow allegations"); *Brantley*, 675 F.3d at 1192 (affirming dismissal under rule of reason). Plaintiffs fail to plausibly allege injury to competition as necessary to sustain a claim under the rule of reason.

It is settled antitrust doctrine that restrictions contained in vertical agreements are justified by the agreements' efficiency-enhancing benefits. *See, e.g.*, *Cont'l TV, Inc. v. GTE Sylvania Inc.*, 694 F.2d 1132 (9th Cir. 1982); *Cowley v. Braden Indus., Inc.*, 613 F.2d 751, 755 (9th Cir. 1980); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988) (vertical non-price restraints have "real potential to stimulate interbrand competition, 'the primary concern of antitrust law'") (citation omitted). The same is true of ancillary (i.e., not naked) restrictions in a horizontal agreement. *See Aya Healthcare*, 9 F.4th at 1109 (citations omitted); *Bus. Elecs.*, 485 U.S. at 729 n.3 (ancillary restraints "enhance[ ] the value of the contract, or permit[] the 'enjoyment of its fruits.'") (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898)). The key question in either situation is whether a complaint plausibly alleges that the harm to competition from the particular restriction is outweighed by the agreement's efficiency-enhancing benefits. *See Universal Grading Ser. v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, at *6 (N.D. Cal. Mar. 8, 2011) ("Under the rule of reason, the court must analyze the degree of harm to competition along with any justifications or pro-competitive effects to determine whether the practice is unreasonable on balance.").

Here, Plaintiffs do not plausibly allege that any supposed harm to competition from the Align-SDC collaboration outweighs the indisputable output-enhancing benefits of that collaboration. Quite the opposite. The SAC alleges that the collaboration between Align and SDC was existential to SDC's business and far from a sham arrangement to inhibit competition. The SAC does not allege that SDC could have sold aligners in the United States in 2016 or beyond without Align's collaboration—SDC faced claims that it infringed fourteen Align patents. *See generally* SAC ¶¶ 105–32. The collaboration thus allowed *more* aligners to reach *more* patients, i.e., it increased output, which is a textbook benefit to competition. *See Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003) ("Improving customer choice is procompetitive").

The Align-SDC collaboration could not foster a supply of lawful aligners to meet SDC's needs absent mutual assurance that the collaboration would not be used to harm the other. *See Aya Healthcare*, 9 F.4th at 1110 (restrictions collateral to a collaboration were necessary to allow for collaboration "without 'cutting [one's] own throat'") (citation omitted). The collaboration was apparently critical to SDC's success: according to the SAC, SDC, a start-up in 2014, gained 90 percent of what is alleged to be a "multi-billion dollar" direct-to-consumer aligner "submarket." SAC ¶¶ 105, 107.

The SAC's allegations regarding the "no-poach" provisions of the Operating Agreement do not save the Section 1 claim. An ordinary non-solicit agreement in the context of a larger beneficial collaboration as the SAC alleges, is unremarkable—indeed pro-competitive. The clause prevented the raiding of SDC's employees by a minority equityholder with a board seat. *See Aya Healthcare*, 9 F.4th at 1111 (non-solicit necessary to protect party during collaboration). The Complaint does not allege how competition itself is harmed by this mutual covenant, and no Plaintiff alleges standing sufficient to challenge it. *Cf. Frost v. LG Elecs. Inc.*, No. 16-cv-05206-BLF, 2018 WL 6256790, at *5 (N.D. Cal. July 9, 2018).

Likewise, a non-compete restriction limiting Align from entering direct-to-consumer aligner sales is logically necessary to induce SDC into the collaboration. SAC ¶ 17; *see also* U.S. Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property, at 5–6 (Jan. 12, 2017), (https://www.justice.gov/atr/IPguidelines/download) (restrictions on intellectual property licensing protect investment in innovation and the investment the licensee makes). SDC equityholders required assurance that Align's ownership interest and board seat would not conflict with SDC's business in a way that would reduce the value of their own investments. In an influential case about ancillary restraints, a covenant not to compete lasting fifty years was upheld as justified among two retailers building a joint facility to expand output and increase convenience for customers, although it restricted the products each could sell. *See Polk Bros., Inc. v. Forest City Enter.*, 776 F.2d 185, 187, 190 (7th Cir. 1985) (party would not have entered agreement without assurance counterparty would not compete with it in sale of

products foundational to its business).[10]  A hypothetical restriction on SDC selling to dentists is no more than an ordinary ancillary restraint that is not prohibited under the rule of reason.  *See, e.g.*, *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1354–57 (9th Cir. 1982) (assignment of territories to ice cream franchisees was justified by its increasing output and interbrand competition); *GTE Sylvania*, 694 F.2d at 1138–40 (restriction requiring retailers to sell defendant's products from authorized locations only was reasonable as a matter of law).  Similarly, the referral provision (*see* SAC ¶¶ 18, 118) ensured that patients seeking treatment from SDC would get suitable aligner treatment even if their case was more complex than SDC could treat.  *See* SAC ¶¶ 106, 130.  Helping patients find the treatment they seek unquestionably improves the patient experience, which is efficiency-enhancing.  *See Cal. Comput. Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (improved customer experience a legitimate business justification); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018) ("[T]here is nothing inherently anticompetitive about Amex's antisteering provisions.").  The restrictions incidental to the Align-SDC arrangement do not violate antitrust law.

Plaintiffs' attempt to elevate ordinary provisions within a supply agreement and the acquisition of a minority equity position into antitrust violations is unavailing.  The SAC does not plausibly allege harm sufficient to overcome the increased output and increased competition that resulted from Align providing a supply of lawful aligners (SAC ¶ 18, Ex. B) and an infusion of capital (SAC ¶ 17) to an alleged disruptive "pioneer" (SAC ¶ 105).  No allegations support a conclusion that SDC had any other options at the time to simultaneously resolve fourteen patent infringement claims Align brought against it or fill its need for a stable supply of aligners that did not infringe Align patents.  Thus, Plaintiffs' Section 1 claim fails under the rule of reason.[11]

---

[10] The Ninth Circuit approvingly quoted and cited *Polk Brothers* earlier this year in *Aya Healthcare*.  *See* 9 F.4th at 1110–11.

[11] The Plaintiffs ignore the but-for world where the Align-SDC agreements do not exist. SDC would not have been able to sell aligners because of Align's patents. Thus, the Align-SDC agreements actually increased competition.

### 3.      Plaintiffs' Newly-Pleaded SDC Allegations Demonstrate the Implausibility, and Require the Dismissal of Their Section 2 Claim.

Notably, although the newly added allegations regarding SDC fail to support a Section 1 claim, they also belie the plausibility of the Section 2 claim because they show it rests on bad math and bad logic.  "Antitrust claims must make economic sense."  *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).  Such Antitrust claims as those plead in the SAC that do not make economic sense are not plausible and must be dismissed under Rule 12(b)(6).  *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) ("Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed.").

First, the SDC allegations render implausible the SAC's allegation that Align enjoyed durable monopoly power, an element of a plausible Section 2 claim, during the alleged monopolization period following Align's termination of interoperability with 3Shape—i.e., from 2018 onward.  The SAC posits Align has 90 percent of a putative $3 billion aligner market, yet the same pleading also alleges that SDC controls 90 percent of a putative ***multibillion dollar*** direct-to-consumer aligner "submarket."  *Compare* SAC ¶ 6 (alleging a $3 billion aligner market in 2019) *and* SAC ¶ 49 (alleging Align had 90 percent share of aligners) *with* SAC ¶ 107 (SDC's 90 percent share of DTC aligner submarket).  This is not just bad, implausible math; it is indicative of Plaintiffs' search for illusory antitrust claims.  Plaintiffs' allegations also imply that Align monopolized the aligner market by ceding most of it (the alleged direct-to-consumer "submarket") to SDC.  This too is implausible.

Second, the contradictions in the SAC's allegations regarding SDC's rise and its relationship with Align on the one hand, and Align's alleged monopoly power on the other, cannot be reconciled in a way that plausibly supports a conclusion that Align violated the antitrust laws.  SDC's rapid growth outpaced Align's growth during the same period (SAC ¶¶ 15, 49, 107) and that growth occurred while SDC was allegedly dependent upon others for supplying its DTC aligners, and remained so until at least 2019 (SAC ¶¶ 130, 136).  These allegations regarding

SDC's rise and success doom Plaintiffs' monopoly power allegations in the First Claim.[12]

Rather, the only logical conclusion that can be drawn from Plaintiffs allegations is that digital dentistry continues to develop and is a competitive industry: product introductions continue (*see* SAC ¶ 23 n.10 (Dentsply introduced a new high-precision scanner)); digital scanners "typically have quick[] innovation cycles" (SAC ¶ 191); new competitors rise (*id*. ¶ 6 ("[S]ince 2017, a number of major companies—including Straumann, Henry Schein, and 3Shape—have entered the clear aligner market[.]")); and new business models are introduced.[13] And, both 3Shape and now Dentsply Sirona allegedly choose to differentiate their scanners as "open systems." *See* SAC ¶ 72 n.12. Plaintiffs' monopolization claim is contradicted and rendered implausible by the allegations supporting their Section 1 claim and should be dismissed.

### C. Plaintiffs' Section 1 Claim Is Time-Barred, Having Been Brought Outside the Four-Year Statute of Limitations Applicable to Such Claims.

Independently, Plaintiffs' meritless allegations that Align and SDC illegally divided the purported aligner market are untimely and should be dismissed. Claims under Section 1 of the Sherman Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b (four-year statute of limitations for Section 1 claims). Courts have held that in antitrust cases, "the statute begins to run when a defendant commits an act that injures a plaintiff[]." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

Here, Plaintiffs allege that "[i]n July 2016, Align and SmileDirectClub entered into a simultaneous set of agreements that resolved the patent litigation [that Align initiated against SDC] and effectively allocated the aligner market between the two companies." SAC ¶ 109. The

---

[12] The SAC implies that SDC was prepared sell aligners at wholesale prices to dentists soon after it began operating in *2014* (*see* SAC ¶ 15). But that is belied by the SAC's *extensive* allegations that Align possessed a number of patents for clear aligners and enforced those patents at least through *2017*. *See* SAC ¶¶ 3, 5. If SDC, with its meteoric rise, was poised to enter the dentist "submarket" but for its agreements with Align, then it is not plausible that Align possessed durable monopoly power. *Cf.* SAC ¶¶ 170, 172; *see also United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.") (citation omitted).

[13] These allegations of robust competition and newly-emerged competitors further demonstrate that Plaintiffs will be unable to prove that there were ever any meaningful barriers to entry into the putative aligner market, undercutting their monopolization claim.

limitations period therefore commenced in July 2016. Plaintiffs were certainly on notice of their allegations by 2016, as both Align and SDC publicly announced the agreements. SAC ¶¶ 119, 120, n.23, n.24. Because Plaintiffs did not file suit until 2021, their allegations are beyond the applicable four-year statute of limitations. *United States ex rel. Air Ctrl. Techs. v. Pre Con Indus.*, 720 F.3d 1174, 1178 (9th Cir. 2013) ("A claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on the face of the complaint.").

The SAC's own allegations confirm nothing has tolled the applicable statute of limitations. Plaintiffs do not allege that Align engaged in any new, overt act,[14] as would be needed to restart the limitations period. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) (granting motion to dismiss Section 1 claim where there was no overt act following entering into alleged illegal agreement); *Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 173852 (N.D. Cal. Apr. 10, 2015) (same); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016) (same). Plaintiffs also have long been on notice of the alleged facts supporting their claim. *See Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) ("Any fact that should excite [Plaintiffs'] suspicion is the same as actual knowledge of his entire claim."). Accordingly, Plaintiffs' Section 1 claim must be dismissed as time-barred.

**D.    The Court Should Dismiss Plaintiffs' State Law Claims.**

**1.    Plaintiffs' California Cartwright Act Claim (Fourth Claim) Is Based on Conduct That Is Not Actionable, and Thus Should Be Dismissed.**

Plaintiffs Cartwright Act claim must be dismissed because it relies on a combination of facially implausible conduct and unilateral acts that are not cognizable under the Cartwright Act.[15]

---

[14] If anything, Plaintiffs allege that Align took steps that were inconsistent with the purported market allocation agreement, such as opening competing storefronts "that mimicked SDC's 'SmileShop' business model." SAC ¶ 134.

[15] Plaintiffs expressly plead two bases in support of their Cartwright Act claim: (i) an alleged "market allocation agreement" between Align and Smile Direct Club ("SDC"), and (ii) Align's alleged exclusive dealing arrangements with Dental Service Organizations ("DSOs"). Plaintiffs also seemingly rely, by incorporation by reference (SAC ¶ 256), on the termination of interoperability and bundled discount programs as support for the claim. Moreover, although the Cartwright Act claim does not expressly mention interoperability it makes reference to Defendant's alleged "Scheme" which Plaintiffs contend includes Defendant's termination of

No element of Align's alleged conduct supports the claim.  The Cartwright Act does not apply to unilateral conduct, and thus Align's termination of interoperability—as clear an instance of unilateral conduct as could exist—is not cognizable as part of Plaintiffs' Cartwright Act claim. The remaining conduct contained in the SAC fails as a matter of law to state an antitrust violation. As explained above, Defendant's agreements with SDC contain none of the restrictions alleged by the SAC and this Court has already determined that Defendant's agreements with DSOs and bundled discounts, as pleaded here, do not violate antitrust laws.

### i.    Defendant's Termination of Interoperability Is Unilateral Conduct That Is Not Cognizable Under the Cartwright Act.

The Cartwright Act prohibits "trusts," declaring that "every trust is unlawful, against public policy and void."  Cal. Bus. & Prof. Code § 16726.  The Act does not, however, reach unilateral conduct.  *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1203–04 (N.D. Cal. 2008) ("[T]he Cartwright Act 'does not address unilateral conduct.'") (quoting *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1476–77 (9th Cir. 1986)).  Indeed, an antitrust plaintiff must, as a threshold matter, allege the existence of a "combination . . . by two or more persons" to assert a claim under the Cartwright Act.   Cal. Bus. & Prof. Code § 16720.

Thus, "independent action by a market participant" is not cognizable under the Cartwright Act, "even if that action affects prices."  *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 255 (2010).  Align's alleged wrongful termination of interoperability—the purported lynchpin of the claimed "Scheme"—is a quintessential example of unilateral conduct that is not actionable under the Cartwright Act.  *Id.* (collecting cases holding that unilateral conduct, even with an effect on pricing, does not state a Cartwright Act claim).  Courts have rejected similar attempts to bring Cartwright Act claims for unilateral conduct, even where it was alleged that the "single trader pressure[d] customers or dealers into pricing arrangements."  *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1186 (N.D. Cal. 2012) (internal quotation marks omitted) (dismissing Cartwright Act claim because only unilateral conduct alleged).  Indeed, at the hearing on Align's Motion to Dismiss Plaintiffs' First Amended Complaint, the Court recognized that

---

interoperability and use of bundled discounts (*Id*. ¶ 259). Thus, in an excess of caution Align addresses all of these elements here, as it did with the First Amended Complaint.

Plaintiffs' attempt to support their Cartwright Act claim with the termination of interoperability was "a real stretch in terms of characterizing that as concerted action." Sept. 30, 2021 Hr'g Tr. at 19:15–17 (ECF No. 56). The Court observed that, taken to its logical conclusion, treating the termination of interoperability as actionable under the Cartwright Act means "anything [would] be concerted action" (*id*. at 19:19) and that allowing such a claim to proceed would "create an exception that would swallow the rule" (*id*. at 19:25–20:1). The Court's skepticism of Plaintiffs' attempt to expand the ambit of the Cartwright Act was well-placed. Plaintiffs' Cartwright Act claim should be dismissed.

### ii.     Without the Improper Reliance on Unilateral Conduct, Plaintiffs' Cartwright Act Claim Must Be Dismissed.

Once Align's alleged unilateral conduct (termination of interoperability) is stripped away, Plaintiffs' remaining allegations regarding Align's alleged "market allocation agreement" with SDC and "exclusive dealing agreements" with DSOs fail to support their Cartwright Act claim.

First, Plaintiffs' allegations regarding Align's agreements with SDC do not save the Cartwright Act claim. As explained above (and not repeated here), *supra* § IV(B)(1), SDC was never subject to any restrictions on its ability to sell aligners.

Second, Plaintiffs' conclusory allegations regarding exclusive dealing arrangements with DSOs and bundled discounts do not suffice to allege a claim. This Court already determined that the bundled discounting and exclusive dealing allegations that the Plaintiffs bring here cannot support an antitrust claim, even when considered together. *Simon & Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754-VC, 2021 WL 1309299, at *9 (N.D. Cal. Apr. 8, 2021) ("[T]he allegations about [the DSO contracts and Fusion Program]—even considered together—do not state a section 2 claim on their own."); Sept. 30, 2021 Hr'g Tr. at 19:15–17 (ECF No. 56) (treating conduct that "compels the customers to buy the monopolist's product" as concerted action "would swallow the rule"). Align acknowledges that the Court deemed the bundled discounts and alleged exclusive deals potentially actionable *when considered in combination with* allegations that Align terminated its interoperability agreement with 3Shape.[16] But, under the Cartwright Act, because Align's

---

[16] A recent decision that may be instructive concluded that conduct that is acceptable under the antitrust laws may not be aggregated together in order to articulate an antitrust violation. *See FTC*

termination of interoperability with 3Shape was unilateral conduct not reached by the statute, that combination of elements cannot save the claim. Thus, Align's alleged bundled discounts and exclusive deals with DSOs stand alone and do not support Plaintiffs' Cartwright Act claim. Indeed, the concept of bundled discounts is an illogical foundation for a Cartwright Act claim, as it would result in cost savings to purchasers of the discounted goods like Plaintiffs.

Moreover, in any event, the Cartwright Act, like the Sherman Act, requires a showing of substantial foreclosure. *See Stewart v. Gogo*, *Inc.*, No. C-12-5164 EMC, 2013 WL 1501484, at *5 (N.D. Cal. Apr. 10, 2013) (dismissing Cartwright Act claim where plaintiff failed to adequately allege substantial foreclosure of competition in the relevant market). The new allegations in the SAC regarding Defendant's agreements with DSOs further defeat the Cartwright Act claim, because they demonstrate, *on the pleadings*, that there is no substantial foreclosure here. *See* SAC ¶¶ 93–95. Plaintiffs allege that all DSOs comprise somewhere between 16 percent and 25 percent of the overall dentistry market. *Id.* Defendant is only alleged to have entered into contracts with a tiny fraction of that DSO market—*just two* DSOs with *only 1600* total dentists (SAC ¶¶ 92 – 93). This does not amount to substantial foreclosure. *See Stewart*, 2013 WL 1501484, at *5 (dismissing Cartwright Act claim where plaintiffs failed to plausibly plead substantial foreclosure).

Accordingly, because each instance of non-unilateral conduct alleged by Plaintiffs fails to state an antitrust violation (and Defendant's unilateral conduct is per se unactionable), Plaintiffs fail to state a claim under the Cartwright Act, and the Fourth Claim of the SAC must be dismissed.

### 2. Plaintiffs' New York Donnelly Act (Fifteenth Claim) and Tennessee Trade Practices Act (Eighteenth Claim) Claims Are Based on Conduct That Is Not Actionable, and Thus Should Be Dismissed.

Like the Cartwright Act, New York and Tennessee law "only allow for antitrust claims where there is concerted action." *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 642 (N.D. Cal.

---

*v. Facebook, Inc.*, No. CV 20-3590 (JEB), 2021 WL 2643627, at *17 (D.D.C. June 28, 2021) ("[T]o be actionable, an unlawful refusal-to-deal scheme would have to be made up of refusals that were themselves independent violations of the *Aspen Skiing* test." (citing *Simon & Simon*, No. 19-506, 2020 WL 1975139, at *8 (D. Del. Apr. 24, 2020) and *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02–4770 MRP, 2004 WL 5907538, at *5–6 (C.D. Cal. June 10, 2004) ("explaining that a course-of-conduct liability theory cannot 'allow for clearly legal acts to be thrown into the mix to bolster a plaintiff's antitrust case'")).

2020) (dismissing New York and Tennessee claims on this basis).  Without reliance on unilateral conduct, Plaintiffs' claims under New York and Tennessee law fail for the same reasons as Plaintiffs' Cartwright Act claim.  *See Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335, 520 N.E.2d 535, 539 (1988) ("[T]he Donnelly Act—often called a "Little Sherman Act"—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980) ("Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.").

> **3.** **Plaintiff Ellis Lacks Standing to Pursue Her California UCL Claim (Fifth Claim) Which Is, In Any Event, Inadequately Pleaded.**

Plaintiffs' California Unfair Competition Law (UCL) claim fails for four reasons.

First, the UCL provides only equitable relief, which is available only if a legal remedy would be inadequate.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Where, as here, plaintiffs do not allege that a legal remedy such as damages would be inadequate, the UCL claim must be dismissed.  *See id.*; *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 662 (N.D. Cal. 2020) (collecting cases).  As in *Huynh*, Plaintiffs here actually seek damages, which confirms that they believe a legal remedy would be adequate.  *See* 508 F. Supp. 3d at 662.

Second, Plaintiffs do not plausibly allege they are entitled to the only remedies available under the UCL—restitution or an injunction—and instead, impermissibly seek damages.  *See Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, No. 09-5815 CW, 2010 WL 3619884, at *9 (N.D. Cal. Sept. 10, 2010), *aff'd*, 487 F. App'x 362 (9th Cir. 2012) (dismissing UCL claim where complaint actually sought damages because no allegations supported a restitution request).  Here, Plaintiffs seek "full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant[.]"  SAC ¶ 275.  Although more verbose, this is plainly a request for damages and does not constitute the return of any money or property belonging to Plaintiffs, which is Plaintiffs' only available remedy.

Indeed, nowhere in the SAC are there any allegations tracing "money or property [belonging to plaintiffs] to money or property within the defendant's possession" as would be

required to obtain restitution under the UCL.  *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *3 (C.D. Cal. Mar. 4, 2016) (dismissing UCL claim where such allegation was lacking); *Fulford v. Logitech, Inc.*, No. C-08-2041 MMC, 2008 WL 4914416, at *3 (N.D. Cal. Nov. 14, 2008) (same).  Plaintiff Ellis does not state to whom she made payments, but presumably she either paid her dentist and/or her insurer for her Invisalign treatment.  SAC ¶ 30 (stating Plaintiff Ellis "paid $2000 up front" with the remainder "financed by insurance"); ¶ 218 ("Plaintiffs purchased Invisalign aligners as part of a course of treatment from dentist offices").  Payments to third-parties without allegations plausibly tracing those funds to the defendant are insufficient to obtain restitution under the UCL.  *See, e.g.*, *Acedo v. DMAX, Ltd.*, No. CV1502443MMMASX, 2015 WL 12912365, at *16 (C.D. Cal. July 31, 2015) (dismissing UCL restitution request where plaintiffs alleged they paid third-party resellers and did not allege facts indicating that defendants, as opposed to those resellers were in possession of the plaintiffs' funds); *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013) (dismissing UCL restitution request where complaint only pled that plaintiff made payments to a third-party intermediary, not the defendant).[17]  Because Plaintiff Ellis does not actually have a viable restitution claim under the UCL, she is limited to injunctive relief.  But for the reasons described above, Plaintiff Ellis lacks constitutional standing to seek injunctive relief, thus mandating dismissal.  *See Williams*, 449 F. Supp. 3d at 906 (dismissing UCL injunction claim where plaintiffs failed to allege future injury to satisfy Article III standing).

Third, Plaintiff Ellis also fails to plead the required substantive elements of a UCL claim.  The SAC fails to allege under which prong of the UCL Plaintiff is proceeding, as she simply incants, without any specificity, each of the three species of an unfair competition claim under the UCL—unfair (SAC ¶¶ 271, 272), unlawful (*id.*), and fraudulent (*id.* ¶¶ 271–273)—in describing her claim.  *See* Cal. Bus. & Prof. Code § 17200, *et seq.*  But, Plaintiff's UCL claim cannot move

---

[17] *Shersher v. Sup. Ct.*, 154 Cal. App. 4th 1491, 1494 (2007) does not lead to a different result. *Shersher* "merely stand[s] for the unremarkable proposition that recovery of restitution is not categorically barred for payments made to third parties."  *Hart v. BHH, LLC*, No. 15CV4804, 2017 WL 2912519, at *4–5 (S.D.N.Y. July 7, 2017).  It does not conflict with the well-established rule that plaintiffs must "allege[] facts indicating that defendants, as opposed to independent third party retailers, obtained their money or property[.]"  *Id.* (internal quotation marks omitted).

forward under any of the three prongs, as it is premised on the exact same conduct as her federal and state antitrust claims (SAC ¶¶ 268–275), which should be dismissed for the reasons herein. *See supra* §§ IV(A)–(C).  In such cases as this, a plaintiff whose UCL claim is premised on the same conduct as the antitrust claims likewise faces dismissal of her UCL claim where her antitrust claims are subject to dismissal.  *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557–58 (9th Cir. 2008) (dismissing UCL claim relying on Sherman Act claims where Sherman Act claims failed for, among other reasons, lack of antitrust injury); *In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*, No. CV 15-09996-BRO (JEMx), 2016 WL 1192642, at *5 (C.D. Cal. Mar. 28, 2016) (UCL claim that relied on "Defendants' alleged 'abuse of its monopoly position' and charging 'supra-competitive prices,'" and did not rely on any facts pleaded independent of plaintiff's antitrust claims was not independent of antitrust claims).

Fourth, Plaintiff Ellis purchased Invisalign in July 2017, before Align's patents "protecting the design and manufacture of Invisalign" are alleged to have expired in October 2017 (SAC ¶ 224), and before Align terminated interoperability with 3Shape (SAC ¶¶ 83, 84), and thus she could not have suffered harm from allegedly inflated prices caused by Align's purported conduct. Plaintiff Ellis, accordingly, does not have standing to assert class claims.  *Fenerjian v. Nongshim Co.*, 72 F. Supp. 3d 1058, 1082 (N.D. Cal. 2014) ("[W]here it is clear from the pleadings that class representatives lack standing to assert class claims, courts in this District routinely dismiss[] those claims at the pleadings stage.").

### 4.    The Iowa Claim (Eighth Claim) Must Be Dismissed Because Plaintiff Sandner Did Not Purchase Invisalign Treatment During the Alleged Scheme.

Plaintiffs' Eighth Claim for Relief under Iowa law (Iowa Code § 553.1, *et seq.*) should be dismissed because it lacks a class representative who purchased Invisalign Treatment while the conduct that Plaintiffs complain about was occurring.

Iowa named plaintiff Sandner alleged she purchased Invisalign treatment for her son in "June 2017."  SAC ¶ 33.  Yet, according to the SAC, the alleged "Scheme" started with the expiration of certain Align patents in "late 2017." (SAC ¶¶ 7, 100). And, Align did not allegedly terminate interoperability with 3Shape until January 31, 2018.  SAC ¶ 76.  Accordingly, Plaintiff

Sandner could not have suffered harm from allegedly inflated prices caused by Align's purported scheme, and therefore lacks standing to assert class claims. *Fenerjian*, 72 F. Supp. 3d at 1082.

     **5.**     **Plaintiffs Fail to Plead a Florida DUTPA Claim (Seventh Claim) With Particularity.**

Plaintiffs' Seventh Claim for Relief under the Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "DUTPA") should also be dismissed because "Florida law requires that DUTPA claims be pled with particularity," in compliance with the heightened pleading standards of Rule 9(b). *Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 927 (N.D. Cal. 2019) (citing *Wrestlereunion, LLC v. Live Nation TV Holdings, Inc.*, No. 07-cv-2093-JDW-MSS, 2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008)). "To state a claim for damages under DUTPA, a plaintiff must plead: (i) a deceptive act or unfair practice, (ii) causation, and (iii) actual damages." *Id.* at 928 (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).

Florida Plaintiff Venus Alderman does not satisfy the heightened pleading standard. The SAC does not allege from which dental practice she purchased an Invisalign treatment course, how such dental practice was impacted by Align's purported conduct, what brand of scanner(s) the practice owned, what price the dentist paid to order Invisalign as a result, how much the dentist was allegedly overcharged, or the overcharge amount that was passed down as a result of the conduct. Indeed, based on the facts at hand, Plaintiff Alderman could have gone to a dental practice that participated in the Fusion Program, and that therefore paid *less* for the alleged bundle of scanner and Invisalign aligners. Notably, thirteen of the sixteen named Plaintiffs who purchased Invisalign treatment paid more for treatment than Plaintiff Alderman. SAC ¶¶ 30, 31, 33–45. Without more, dismissal is warranted.

     **6.**     **Plaintiffs Fail to Plead Diversity Jurisdiction over the Arizona Class Claims (Third Claim).**

Plaintiffs' Third Claim for Relief under Arizona law (Ariz. Rev. Stat. § 44-1401, *et seq.*) must be dismissed, because they have failed to allege CAFA jurisdiction over the Arizona Class. To meet CAFA's minimum diversity requirement, "any member of a class of plaintiffs [must be] a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). This requirement is not met when a corporation with dual citizenship is a citizen of the same state as the class

plaintiff.  *See Marroquin v. Wells Fargo, LLC*, No. 11CV163-L BLM, 2011 WL 476540, at *2 (S.D. Cal. Feb. 3, 2011).  Here, Celeste Hamilton, the representative plaintiff of the Arizona Class, is a citizen of Arizona.  (SAC ¶ 23).  Align maintains its corporate headquarters in Tempe, Arizona. *See* Align Technology, Inc., Current Report (Form 8-K) (May 3, 2021) (https://www.sec.gov/Archives/edgar/data/1097149/000109714921000023/algn-20210430.htm) (listing Tempe, Arizona location as Align's "Principal Executive Offices") (attached as **Exhibit A** to the Declaration of S. Marenberg in Support of Defendant Align Technology, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint).[18]  Align is thus a citizen of Arizona for diversity purposes.  28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]"); *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) ("We conclude that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's . . . [a]nd in practice it should normally be the place where the corporation maintains its headquarters").  Thus, the claim of the Arizona Class must be dismissed for lack of diversity jurisdiction.

### E.   Align Preserves Its Arguments that Plaintiffs Lack Antitrust Standing to Pursue Their Claims that Align Monopolized the Putative Aligner Market.

The Court should also dismiss the First Claim for Relief and certain state law claims for the independent reason that the Plaintiffs fail to sufficiently allege antitrust standing to bring a claim for monopolization of the putative aligner market.[19]  The SAC still fails to allege any facts

---

[18] The Court may take judicial notice of records filed with governmental agencies, including Defendant's SEC filings that show that its principal place of business is in Arizona and was so at the time the original Complaint was filed.  *See Fed. Trade Comm'n v. Kutzner*, No. SACV1600999BROAFMX, 2017 WL 5229182, at *3 (C.D. Cal. June 12, 2017), *aff'd*, 781 F. App'x 599 (9th Cir. 2019) (taking judicial notice of documents filed with secretary of state showing corporate registration information).

[19] Plaintiffs' failure to allege antitrust standing would require the dismissal of their claims under Arizona (Third Claim), California (Fourth Claim), Connecticut (Sixth Claim), Florida (Seventh Claim), Iowa (Eighth Claim), Maryland (Ninth Claim), Michigan (Eleventh Claim), Nebraska (Thirteenth Claim), Nevada (Fourteenth Claim), New York (Fifteenth Claim), North Carolina (Sixteenth Claim), Oregon (Seventeenth Claim), and Tennessee (Eighteenth Claim) Law.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007).  Additionally, for avoidance of doubt, to the extent any such state law claims still rely on the monopolization of the purported Scanner Market, the SAC likewise fails to allege antitrust

necessary to make it plausible that increases in the cost of Invisalign must have been passed down to patients as part of the overall cost of treatment.

Plaintiffs have failed to allege that increases in the price of Invisalign treatment was "a necessary step in effecting the ends of the alleged illegal conspiracy" to monopolize the purported aligner market. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982). Indeed, there are no allegations stating, for example, what percentage of the cost of treatment is attributable to Invisalign for each plaintiff, that treatment prices rose or fell over time along with the cost of Invisalign, or that dentists or orthodontists operate on sufficiently low margins such that they would be forced to pass on price increases in the cost of treatment materials to patients. To the contrary, where the highest alleged cost of Invisalign *treatment* is over 250 percent greater than the lowest, despite using the same aligner system, the only plausible conclusion is that it is *not* the cost of aligners that is driving changes in treatment cost, but any number of other factors.

Align, accordingly, incorporates the arguments it made regarding Plaintiffs' lack of antitrust standing in its Motion to Dismiss Plaintiff's Complaint (ECF No. 18) and its Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (ECF No. 37) as though fully stated here for purposes of preserving those arguments.[20]

## V.      CONCLUSION

For the foregoing reasons, the SAC should be dismissed.

DATED:  November 11, 2021                                 PAUL HASTINGS LLP


By:      */s/ Steven A. Marenberg*
                        Steven A. Marenberg

---

standing in that market, as explained more fully in Align's Motion to Strike. And, in any event, such claims were previously abandoned. *See, e.g., Lee v. Retail Store Emp. Bldg. Corp.*, No. 15-CV-04768-LHK, 2017 WL 346021, at *20 (N.D. Cal. Jan. 24, 2017) ( "Plaintiffs' failure to even argue the issue in their opposition indicates a waiver of this claim.").

[20] Align recognizes that the Court previously held that Plaintiffs did have antitrust standing to pursue their claim for monopolization of the putative aligner market under Section 2 of the Sherman Act. *See* Order re: Hearing on Motion to Dismiss (ECF No. 50).

Steven A. Marenberg (SB# 101033)
James M. Pearl (SB# 198481)
stevenmarenberg@paulhastings.com
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone:  1(310) 620-5700
Facsimile:  1(310) 620-5899

Thomas A. Counts (SB# 148051)
Abigail H. Wald (SB# 309110)
tomcounts@paulhastings.com
abigailwald@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone:  1(415) 856-7000
Facsimile:  1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone:  1(312) 499-6000
Facsimile:  1(312) 499-6100

Noah Pinegar (*pro hac vice*)
noahpinegar@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone:  1(202) 551-1700
Facsimile:  1(202) 551-1705

Attorneys for Defendant
Align Technology, Inc.

**Table 1:  Disposition of Plaintiffs' Claims in Defendant's Motion to Dismiss SAC**

| Claim | Putative Class | Statute | Reason(s) for Dismissal | | Brief Reference | Page(s) |
|---|---|---|---|---|---|---|
| **1.** | Nationwide Injunctive Relief Class | 15 U.S.C. § 2 (putative aligner market monopolization) | (i) | Lack of Constitutional Standing | § IV(A) | 4-6 |
| | | | (ii) | Failure to State a Claim | § IV(B) | 6-13 |
| | | | (iii) | Lack of Antitrust Standing[1] | § IV(E) | 24-25 |
| **2.** | Nationwide SDC Purchaser Class | 15 U.S.C. § 1 (alleged per se market allocation) | (i) | Failure to State a Claim | § IV(B) | 6-13 |
| | | | (ii) | Statute of Limitations Bar | § IV(C) | 15-16 |
| **3.** | Arizona Class | A.R.S. § 44-1401, *et seq.* | (i) | Lack of Diversity Jurisdiction | § IV(D)(6) | 23-24 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **4.** | California Class | Cal. Bus. & Prof. Code §§ 16700, *et seq.* | (i) | Failure to State a Claim | § IV(D)(1) | 16-19 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **5.** | California Class | Cal. Bus. & Prof. Code §§ 17200, *et seq.* | (i) | Failure to State a Claim | § IV(D)(1) | 16-19 |
| | | | (ii) | Lack of Constitutional Standing | § IV(D)(3) | 20-22 |
| **6.** | Connecticut Class | Conn. Gen. Stat. Ann. § 35-24, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **7.** | Florida Class | Fla. Stat. § 501.201(2), *et seq.* | (i) | Failure to State a Claim | § IV(D)(5) | 23 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **8.** | Iowa Class | Iowa Code § 553.1, *et seq.* | (i) | Failure to State a Claim | § IV(D)(6) | 22-23 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **9.** | Maryland Class | Md. Comm. Law Code Ann. § 11-201, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **11.** | Michigan Class | MCLS § 445.771, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **13.** | Nebraska Class | R.R.S. Neb. § 59-1602, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **14.** | Nevada Class | Nev. Rev. Stat. Ann. § 598A.010, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **15.** | New York Class | NY CLS Gen Bus § 340 | (i) | Failure to State a Claim | § IV(D)(2) | 19-20 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **16.** | North Carolina Class | N.C.G.S. § 75-1, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **17.** | Oregon Class | ORS § 646.705, *et seq.* | (i) | Lack of Antitrust Standing | § IV(E) | 24-25 |
| **18.** | Tennessee Class | Tenn. Code Ann. § 47-25-101, *et seq.* | (i) | Failure to State a Claim | § IV(D)(2) | 19-20 |
| | | | (ii) | Lack of Antitrust Standing | § IV(E) | 24-25 |

---

[1] Federal and state antitrust standing arguments are made for purposes of preservation.