Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br> v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>          Defendant. | No. 3:21-cv-03269-VC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT ALIGN TECHNOLOGY, INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date: December 16, 2021<br>Time: 2:00 p.m.<br>Place: Zoom Webinar<br>Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION .................................................................................................1

II.     LEGAL STANDARD ...........................................................................................3

III.    ARGUMENT ........................................................................................................3

        A.      Plaintiffs have sufficiently alleged standing to pursue injunctive relief. ...................3

        B.      Plaintiffs state a claim for relief under Section 1 of the Sherman Act. ......................5

                1.      Plaintiffs plausibly allege an illegal restraint of trade under
                        Section 1. .......................................................................................5

                        a.      Align's market allocation scheme is a naked horizontal
                                restraint. ..............................................................................6

                        b.      Plaintiffs' newly pled SDC allegations are consistent
                                with their Section 2 claim..................................................7

        C.      Plaintiffs' Section 1 claim is not time barred. ........................................................10

        D.      Plaintiffs' state law claims are adequately pled. ....................................................14

                1.      Plaintiffs have sufficiently pled a Cartwright Act claim. ............14

                        a.      Plaintiffs adequately plead an illegal market allocation
                                agreement restricting SDC from selling aligners to
                                dentists. ..............................................................................14

                        b.      Align's termination of the interoperability agreement is
                                actionable under the Cartwright Act because it was done
                                to effectuate a tying agreement and done coercively. .......18

                        c.      Align's exclusive dealing agreements are actionable
                                under the Cartwright Act. ..................................................21

                2.      Plaintiffs have standing to pursue their California UCL claim. ...................22

                3.      Plaintiffs' claim under Iowa law is timely. .................................24

                4.      Plaintiffs' Florida Deceptive and Unfair Trade Practice Act
                        claim is pled with particularity...................................................24

                5.      The Court should exercise supplemental jurisdiction over the
                        claim under Arizona law. ..............................................................25

IV.     CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

<u>Page(s)</u>

### CASES

*AFMS, LLC v. United Parcel Serv. Co.*,
  2011 WL 13128436 (C.D. Cal. Nov. 23, 2011) ............................................................... 9, 10

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015) ................................................................................. 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................ 3

*AT&T Mobility LLC v. Phone Card Warehouse, Inc.*,
  2009 WL 10671270 (M.D. Fla. June 25, 2009) ............................................................... 25

*B-S Steel Of Kansas, Inc. v. Texas Indus., Inc.*,
  439 F.3d 653 (10th Cir. 2006) ........................................................................................... 5

*Belton v. Comcast Cable Holdings, LLC*,
  151 Cal. App. 4th 1224 (2007) ........................................................................................ 20

*Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.*,
  34 A.D.3d 91, 823 N.Y.S.2d 79 (2006) ........................................................................... 22

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................................................... 9

*In re Buspirone Pat. Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002) .............................................................................. 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ..................................................................................................... 24

*In re Cipro Cases I & II*,
  61 Cal. 4th 116 (2015) ..................................................................................................... 15

*Clayworth v. Pfizer, Inc.*,
  49 Cal. 4th 758 (2010) ..................................................................................................... 23

*Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*,
  111 F.3d 1427 (9th Cir. 1996) ......................................................................................... 12

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) ......................................................................................... 21

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ............................................................................ 26

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................... 20

*Freeman v. San Diego Ass'n of Realtors*,
   77 Cal. App. 4th 171 (1999) ................................................................................. 20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................................. 4

*FTC v. Actavis*,
   570 U.S. 136 (2013) ................................................................................................. 7

*G.H.I.I. v. MTS, Inc.*,
   147 Cal. App. 3d 256 (Ct. App. 1983) ........................................................... 15, 21

*Garrison v. Oracle Corp.*,
   159 F. Supp. 3d 1044 (N.D. Cal. 2016) ............................................................... 14

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   744 F.2d 588 (7th Cir. 1984) .................................................................................. 6

*In re Glumetza Antitrust Litig.*m
   2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ........................................... 12, 13, 14

*Hoang v. Bank of Am., N.A.*,
   910 F.3d 1096 (9th Cir. 2018) .............................................................................. 26

*Huynh v. Quora, Inc.*,
   508 F. Supp. 3d 633 (N.D. Cal. 2020) ................................................................. 23

*In re Juul Labs, Inc., Antitrust Litig.*,
   2021 WL 3675208 (N.D. Cal. Aug. 19, 2021) ................................................. 8, 19

*In re K-Dur Antitrust Litig.*,
   338 F. Supp. 2d 517 (D.N.J. 2004) ....................................................................... 13

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) ........................................................................... 5

*Kolling v. Dow Jones & Co.*,
   137 Cal. App. 3d 709 (1982) ................................................................................ 19

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ................................................................................ 3

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993) ............................................................................... 14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................. 5

*Meijer, Inc. v. 3M*,
   2005 WL 1660188 (E.D. Pa. July 13, 2005) ........................................................................ 13

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) ........................................................................................... 19

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) ..................................................................................................... 5

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014) ................................................................................ 13

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ............................................................................................. 9

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ........................................................................................ 13

*Palmer v. BRG of Georgia, Inc.*,
   498 U.S. 46 (1990) .............................................................................................................. 6

*Picketfence Inc. v. R.R. Donnelley & Sons Co.*,
   2007 WL 9811030 (N.D. Cal. Nov. 6, 2007) ................................................................ 18

*In re Qualcomm Antitrust Litig.*,
   292 F. Supp. 3d 948 (N.D. Cal. 2017). .......................................................................... 20

*Rollins, Inc. v. Butland*,
   951 So. 2d 860 (Fla. Dist. Ct. App. 2006) .................................................................... 25

*Ryan v. Microsoft Corp.*,
   2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) .............................................................. 14

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ................................................................................... 11, 12

*Shersher v. Super. Ct.*,
   154 Cal. App. 4th 1491 (2007) ................................................................................. 23, 24

*Simon & Simon, PC v. Align Tech., Inc.*,
   2021 WL 1309299 (N.D. Cal. Apr. 8, 2021) ..................................................... 1, 20, 21, 22

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
   506 F.3d 832 (9th Cir. 2007) ............................................................................................. 4

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   2013 WL 2181185 (E.D. Tenn. May 20, 2013) .............................................................. 13

*State Farm Mut. Auto. Ins. Co. v. Fernandez*,
   767 F.2d 1299 (9th Cir. 1985) ........................................................................................ 18

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................4

*Twin City Sportservice, Inc. v. Charles O'Finley & Co., Inc.*,
    676 F.2d 1291 (9th Cir. 1982) ...........................................................................9

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ...........................................................................6

*United States v. eBay, Inc.*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) .............................................................8

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    722 F. Supp. 2d 1079 (D. Minn. 2010) ............................................................13

*Williams v. Apple, Inc.*,
    449 F. Supp. 3d 892 (N.D. Cal. 2020) ...............................................................3

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) .......................................................................4, 5

## STATUTES

28 U.S.C. § 1367(a) ................................................................................................26

California Unfair Competition Law .........................................................................23

Cartwright Act .................................................................................................*passim*

Donnelly Act ..........................................................................................................22

Florida's Deceptive and Unfair Trade Practice Act ..........................................25, 26

Sherman Act ....................................................................................................*passim*

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 8(d) ......................................................................23

Federal Rule of Civil Procedure 12(b)(1).................................................................3

Federal Rule of Civil Procedure 12(b)(6).................................................................3

## I.     INTRODUCTION

Plaintiffs' Second Amended Complaint contains two distinct sets of claims. In particular, the amended complaint is bolstered by new allegations based on the text of the Operating and Supply Agreements, which were only provided to Plaintiffs after they had filed the First Amended Complaint.

**First**, on behalf of consumer purchasers of Invisaligner treatments, Plaintiffs have alleged a scheme by Align to monopolize the product submarket of aligners sold through dental practices. Plaintiffs have brought a federal Section 2 claim for injunctive relief, and various state law claims, based on that conduct. This Court has already recognized that these allegations, when brought by direct purchaser dental practices, constitute a "strong overall Section 2 claim."[1] Furthermore, this Court has also already recognized that "a series of activities will combine to create an antitrust violation."[2] To that end, Plaintiffs have added additional allegations of another anticompetitive activity by Align to maintain its monopoly—namely a agreement between Align and SmileDirectClub ("SDC") whereby SDC, an aligner manufacturer and retailer in the direct-to-consumer channel (the "DTC" submarket), was prevented from competing in the market for aligners sold through dentists (the "dentist-directed" submarket). These allegations strengthen Plaintiffs' claims based on Align's anticompetitive conduct to monopolize the dentist-directed aligner product submarket, and are based on (1) the written language of a contractual agreement between Align and SDC, as well as (2) public statements from SDC's co-founder that the agreement prevented SDC from competing in the dentist-directed submarket. Indeed, and notably, SDC announced plans to compete in this product submarket immediately after the agreement between itself and Align expired.

Align implicitly concedes that Plaintiffs have sufficiently pled claims for this monopolization scheme under a number of different state laws, failing in its motion to specifically challenge Plaintiffs' claims under the laws of Connecticut, Maryland, Massachusetts, Michigan, Minnesota,

---

[1] *Simon & Simon, PC v. Align Tech., Inc.*, No. 20-CV-03754-VC, 2021 WL 1309299, at *9 (N.D. Cal. Apr. 8, 2021).

[2] *Id.* at *5.

Nebraska, Nevada, North Carolina, and Oregon. Instead, Align makes three primary challenges to this set of claims.

First, it argues that Plaintiffs lack standing to bring a claim for injunctive relief under Section 2 of the Sherman Act. But one plaintiff, Emily Vo, has specifically alleged an intention to buy Invisaligners in the future on behalf of her minor child. This suffices to establish standing at the pleading stage. Second, Align argues that Plaintiffs' new allegations undermine their proposed market definition of a dentist-directed aligner product submarket. But Plaintiffs have explained in detail the practical indica indicating that dentist-directed aligners constitute a distinct market— including distinct customers, distinct prices, and specialized vendors. Indeed, Align itself has repeatedly made public statements that there is little overlap between the dentist-directed and direct-to-consumer product submarkets. Third, Align argues that its conduct is not actionable under the laws of California, New York, and Tennessee because it is unilateral. But Align's allocation of the dentist-directed submarket and exclusive dealing arrangements are obviously bilateral agreements with third parties. Furthermore, as this Court already recognized, Align's termination of the interoperability agreement allowed it to use its market power in the aligner market to coerce dental practices into purchasing Align's scanners. Imposing restraints on customers by coercive conduct to which the customers involuntarily adhere is actionable as a combination under the laws of California, New York, and Tennessee. Therefore, Plaintiffs have sufficiently pled their claims for Align's monopolization of the dentist-directed product submarket.

***Second***, on behalf of consumer direct purchasers of SDC aligners, Plaintiffs have pled a per se market allocation agreement according to which Align agreed not to compete in the DTC submarket in exchange for an ownership interest in SDC.[3] Strangely, Align's primary response to this Section 1 claim is to argue with a straw man, repeatedly proclaiming that Align never entered into an agreement that prevented *SDC* from competing in the *dentist-directed submarket*. As a threshold matter, this is plainly an issue of factual dispute: SDC's co-founder has publicly stated that the agreement prevented it from competing in the dentist-directed product submarket, and Plaintiffs

---

[3] *See* Operating Agreement § 7.9(e).

propose a plain text reading of the Supply Agreement consistent with interpretation. But more importantly, it is a non sequitur: Plaintiffs' Section 1 claim is unmistakably focused on Align's agreement not to compete in the DTC product submarket, and Align never disputes that the agreement with SDC prevented it from competing in that market.

Finally, Align's statute of limitations argument also fails. Specifically, Plaintiffs allege sufficient overt acts to toll the statute of limitations under the "continuing violations" doctrine—including both (1) an amendment to the market allocation provisions of the written agreement within the statute of limitations period, and (2) continuing overcharges from the anticompetitive agreement.

## II.   LEGAL STANDARD

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."[4] For purposes of a 12(b)(6) motion, a "claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[5] A motion to dismiss pursuant to Federal Rule 12(b)(1) tests whether the Court has subject matter jurisdiction, including Article III standing for Plaintiffs.[6] The Court uses the same standard as Rule 12(b)(6) to resolve facial attacks on Article III standing brought under Rule 12(b)(1): the Court "accept[s] the plaintiff's allegations as true and draw[s] all reasonable inferences in the plaintiff's favor, the court [then] determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."[7]

## III.   ARGUMENT

### A.   Plaintiffs have sufficiently alleged standing to pursue injunctive relief.

Though the plaintiff bears the burden of establishing that party's standing, **"[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may**

---

[4] *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 900 (N.D. Cal. 2020).

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[6] *Williams*, 449 F. Supp. 3d at 900.

[7] *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

**suffice."**[8] At the pleading stage, a court looks at the "complaint to determine whether [the plaintiff] had standing, accepting as true all of the complaint's material allegations.[9] In order to establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[10] A plaintiff threatened with future injury has standing to sue "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"[11]

Plaintiff Vo has alleged that she intends to purchase Invisalign aligners in the future for her minor child, and that she will be injured by paying supracompetitive prices for Invisalign aligners as a result of the anticompetitive conduct.[12] At the pleading stage, Vo's allegations of an intention to purchase aligners for her minor child are sufficient.[13] This future injury is fairly traceable to Align's conduct, because, as set forth in detail in Plaintiffs' complaint, Align's anticompetitive conduct has caused Plaintiffs to pay supracompetitive prices for Invisaligner treatment.[14] And Plaintiff Vo's injury would be redressed by a favorable decision because she seeks injunctive relief enjoining Align from its anticompetitive conduct and an injunction against Align's anticompetitive conduct would "limit the extent of the threatened injury."[15]

In response, Align argues that Vo's allegations of a future intention to purchase Invisaligners are insufficient, but, in doing so, relies primarily on cases decided after extensive discovery. In

---

[8] *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838–39 (9th Cir. 2007) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

[9] *Id.*

[10] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

[11] *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018)

[12] SAC ¶¶ 41–42.

[13] *See Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014) ("we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct'").

[14] SAC ¶¶ 218–31.

[15] *Zappos*, 888 F.3d at 1030.

*Lujan*, the Supreme Court decided, at summary judgment, that Plaintiffs did not have standing based on an analysis of Plaintiffs' affidavits and deposition testimony.[16] Similarly, in *Kamakahi*, the court held that there was no standing at the class certification stage based on deposition testimony that the class representative had no plans to make future transactions.[17] Align also cites, in passing, cases where no plaintiff had alleged an intention to make future purchases.[18] But those cases are clearly distinct because here, as Plaintiff Vo has specifically alleged an intent to purchase Invisaligners in the future.

Align's argument ultimately fails because "each element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."[19] It may be that, "[a]s litigation proceeds beyond the pleadings stage, the Complaint's allegations will not sustain Plaintiffs' standing on their own."[20] But, at this stage, Plaintiff Vo's allegations of an intent to purchase Invisaligners give her standing to pursue injunctive relief because the court "presumes that general allegations embrace those specific facts that are necessary to support the claim."[21]

**B.      Plaintiffs state a claim for relief under Section 1 of the Sherman Act.**

**1.      Plaintiffs plausibly allege an illegal restraint of trade under Section 1.**

Align offers a variety of reasons that Plaintiffs' newly pled Section 1 claim must fail, arguing that it is not only legally insufficient but factually incoherent. Plaintiffs respond to these arguments below.

---

[16] *Lujan*, 504 U.S. at 563.

[17] *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 195 (N.D. Cal. 2015).

[18] *See* Mot. to Dismiss at 5 n. 4 citing *In re N.J. Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) (holding plaintiffs did not have standing for injunctive relief because Plaintiffs "[did] not show that any [Plaintiff] plans to buy… in the future"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008) ("Nowhere, however, does the complaint make any allegation regarding a named plaintiff's intention to buy or lease another new vehicle within such a time frame as could be deemed imminent."); *B-S Steel Of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 668 (10th Cir. 2006) (affirming summary judgment because Plaintiff "failed to show any possibility that it might resume such purchases in the future").

[19] *See Lujan*, 504 U.S. at 561.

[20] *Zappos*, 888 F.3d at 1028.

[21] *See Lujan*, 504 U.S. at 561.

a.      **Align's market allocation scheme is a naked horizontal restraint.**

Align does not dispute that the Operating Agreement allocated the direct-to-consumer channel to SDC by preventing Align from competing in this market; this is a "classic" market allocation agreement between competitors, and thus a per se illegal horizontal agreement.[22] The case law places special emphasis on the foreclosure not just of actual but potential competitors, and the inherently pernicious effect of both: "when firms in the same line of business agree not to enter each other's territories they violate Section 1 of the Sherman Act even if they might be able to show that dividing markets had yielded economic benefits greater than any plausible estimate of the costs in diminished competition."[23]

Align seeks to re-cast this scheme, along with the other anti-competitive restraints Plaintiffs allege, as either a "vertical supply arrangement" or, alternatively, mere "ancillary restraints" that were "subordinate" and "reasonably necessary" to achieving a pro-competitive deal with SDC. But Align repeatedly conflates Plaintiffs' distinct Section 1 and Section 2 claims, spending numerous pages arguing about whether the Section 1 claim supports a claim for market allocation of the dentist product submarket based on the Supply Agreement. However, allocation of the dentist directed submarket is not the basis for Plaintiffs' Section 1 claim. Instead, the plain text of the Section 1 claim focuses exclusively on allocation of the direct to consumer (hereafter "DTC") product submarket to SDC, and is brought solely on behalf of consumers who purchased SDC aligners.[24] By contrast, allocation of the dentist-directed product submarket to Align, together with the other alleged anti-competitive restraints in the Supply Agreement, were part of Align's overall scheme to monopolize the dentist-directed submarket; these allegations (among others) form the basis of Plaintiffs' state law claims on behalf of purchasers of Invisaligner treatments.

---

[22] *United States v. Brown*, 936 F.2d 1042, 1045-46 (9th Cir. 1991) ("[a] market allocation agreement between competitors at the same market level is a classic per se antitrust violation.").

[23] *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir. 1984) (Posner, J.); *see also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 47–49 (1990) (finding per se illegal company's agreement not to compete with competitor "outside of Georgia" even though, at time agreement was signed, company did not do business outside of Georgia).

[24] *See* SAC ¶¶ 244–45.

For the reasons set forth in detail in their Opposition to Align's Motion to Strike (where Align makes these same arguments in more detail),[25] Plaintiffs have sufficiently alleged that Align's allocation of the DTC product submarket to SDC was a naked horizontal restraint subject to per se scrutiny.[26]

Align argues in the alternative that, even assessed under the rule of reason, Plaintiffs' Section 1 claim fails because Plaintiffs do not plausibly allege "injury to competition" outweighing the agreements' purported "efficiency-enhancing benefits." But Plaintiffs plead their Section 1 claim only as a per se violation. Furthermore, as explained in Plaintiffs' Opposition to Align's Motion to Strike—where Align again makes identical arguments to those found in its Motion to Dismiss, invoking the "ancillary restraints" doctrine—the two "procompetitive purposes" that Align purports to identify in its business arrangement with SDC are completely unconnected from the Operating Agreement. As courts in this district recognize, ultimate resolution of this issue is a question of fact.[27]

> **b.  Plaintiffs' newly pled SDC allegations are consistent with their Section 2 claim.**

Align seeks to make an end-run around the discovery process by arguing that, as a threshold matter, Plaintiffs new allegations regarding SDC are so riddled with "bad math" and "bad logic" that the SAC now collapses in on itself.[28] The Court should disregard these arguments.

---

[25] As elsewhere in its briefing, Align here uses its Motion to Strike primarily as a vehicle for expanding on the page limits otherwise applicable to its Motion to Dismiss. In the interests of judicial economy, Plaintiffs do not duplicate the arguments they make in opposition to identical arguments raised in Align's Motion to Strike.

[26] In a lone sentence of its brief, Align also asserts that "settlements of patent litigation among would-be competitors in in the Hatch-Waxman framework governing FDA approval of generic pharmaceuticals are also analyzed under the rule of reason." Mot. to Strike at 3 (citing *FTC v. Actavis*, 570 U.S. 136, 158-60 (2013)). But the only case it cites stands for no such sweeping proposition: in *Actavis*, the Supreme Court declined to apply the per se rule to reverse payment settlement agreements, explaining that, because a number of factors affect if and under what circumstances these payments have "anticompetitive effects," the rule of reason should apply. *Id.* at 159.

[27] *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039–40 (N.D. Cal. 2013); *In re Juul Labs, Inc., Antitrust Litig.*, No. 20-CV-02345-WHO, 2021 WL 3675208, at *19 (N.D. Cal. Aug. 19, 2021).

[28] *See* Mot. to Dismiss at 14–15.

Align argues that Plaintiffs' various allegations regarding monopoly power are rendered incoherent when read alongside one another because "[t]he SAC posits Align has 90 percent of a putative $3 billion aligner market, yet the same pleading also alleges that SDC controls 90 percent of a putative multibillion dollar direct-to-consumer 'submarket.'"[29] But a careful reading of the complaint itself reveals that Plaintiffs' references to Align's 90% market share refer, in context, to Align's share of the distinct submarket for aligners sold through dental officers. Specifically, in the sections of the SAC describing Align's market power (Section IV.A) and the relevant aligner markets (Section VII.A), this is clearly specified: for example, Paragraph 49 of the complaint includes—immediately below its allegation that Align possesses "an approximately 90-percent share of the aligner market"—a graph indicating that Align has 92% of "doctor-directed" market share, while Paragraph 172 states in relevant part:

> Dental aligners sold through dental offices constitute a distinct product submarket that is itself a defined market. Align also possesses market power in this market, as reflected in a dominant market share of at least 90% for aligners sold through dental offices.

There is no conflict between these allegations and Plaintiffs' allegations that SDC possesses, according to one analysis, a "90%+ market share" of the DTC market[30]—both of which are consistent with Plaintiffs' definition of separate (and little overlapping) submarkets for "dental aligners sold through dentist offices" and "the submarket for selling aligners directly to consumers."[31] Furthermore, courts in the Ninth Circuit recognize that "both market definition and market power are essentially questions of fact,"[32] and "have often expressed reluctance to dismiss

---

[29] *Id.* (citing SAC ¶¶ 6, 49, 107); *see also* Mot. to Strike at 12–14. Plaintiffs note that Align's mostly overlapping arguments on this point are split between its Motion to Dismiss and Motion to Strike briefing.

[30] SAC ¶ 107.

[31] *Id.* ¶¶ 170–183. As explained in more detail in the SAC, Align's own CEO has stated publicly that there is an approximately 10% "overlap" between its own "adult demographic" and SDC's, with this overlap concentrated in the market for "simple" (less expensive and clinically complex) cases. *Id.* ¶ 175.

[32] *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) ("Our ... decisions establish that both market definition and market power are essentially questions of fact."); *see also Twin City Sportservice, Inc. v. Charles O'Finley & Co., Inc.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is basically a fact question . . . .").

antitrust complaints for failure to plead the existence of a viable 'market'" for this reason.[33] Plaintiffs have plausibly alleged distinct submarkets.

In particular, Plaintiffs' alleged product submarket of a dentist-directed channel meets the "practical indicia" of determining product submarkets identified by the Supreme Court.[34] In particular, four facts support this conclusion. First, Align itself recognized that the dentist-directed channel was a "separate economic entity", with Align's CEO stating that there was approximately 10% overlap in patients between the two aligner product submarkets.[35] Second, as explained by Align, the dentist-directed submarket features distinct customers whose treatments are too complex to be satisfied by direct-to-consumer treatments.[36] Third, the dentist-directed submarket features "distinct prices" that are "not sensitive" to the lower-priced DTC treatments, with dentist-direct Invisaligner treatments costing between $3,000 to $8,000—significantly more than the $2,000 that SDC generally charges for its DTC aligner treatments.[37] Fourth, the dentist-directed submarket features "specialized vendors," namely dental practices who supervise provision of Invisaligner treatments.

Align also argues that the SAC's allegations regarding SDC's rise and relationship with Align are irreconcilable with Align's alleged monopoly power, and thus "doom" Count I.[38] However, this appears to simply be a restatement of Align's mistaken belief that Plaintiffs' allege Align possessed 90% of an "aligner market" composed of both the DTC and dentist-directed channels, and is resolved by the discussion above: as pled, there is no inherent inconsistency between SDC's rapid growth in the DTC submarket and Align's monopoly maintenance in the dentist-directed submarket.

---

[33] *AFMS, LLC v. United Parcel Serv. Co.*, No. CV1005830MMMAJWX, 2011 WL 13128436, at *8 (C.D. Cal. Nov. 23, 2011) (collecting cases).

[34] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

[35] SAC ¶ 175.

[36] *Id.* ¶ 120.

[37] *See id.* ¶¶ 85, 175.

[38] Mot. to Dismiss at 14; *see also* Mot. to Strike at 13–14.

Finally, Align suggests that SDC's potential ability to "enter the dentist 'submarket' but for its agreement with Align" renders implausible Plaintiffs' claims that Align possessed durable market power[39] and that, more broadly, "the only logical conclusion that can be drawn from Plaintiffs allegations is that digital dentistry continues to develop and is a competitive industry"[40]—thus undermining Plaintiffs' Section 2 monopolization claim as well. But not only is Align's narrative massaging impermissible at this stage; it also unwittingly highlights why a monopolist like Align would, when faced with potential markets entrants and threatened by stiff winds of change, choose to respond not by competing on the merits but instead with a bevy of anticompetitive (and illegal) actions aimed at protecting its market share. Had Align competed fairly, there would be no need for this suit.

### C.    Plaintiffs' Section 1 claim is not time barred.

Align next argues that Plaintiffs' Section 1 claim must be dismissed because it was filed more than four years after July 2016, when Align and SDC entered the Operating Agreement.[41] But it ignores well-trodden caselaw holding that, in cases like this one—where a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years—purchasers can avail themselves of the "continuing violation" doctrine to toll the applicable statute of limitations.[42]

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: "1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'"[43] "This standard is meant to differentiate

---

[39] Mot. to Dismiss at 14 n.12.

[40] *Id.* at 15.

[41] *Id.* at 15–16 (citing 15 U.S.C. § 15b).

[42] Consistent with the applicable statute of limitations, Plaintiffs limit their claims under Section 1 to the four years preceding filing.

[43] *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation."[44]

Align argues that Plaintiffs fail to allege "any new, overt act ... needed to restart the limitations period."[45] To the contrary, and most obviously, Align and SDC executed a revised version of the Operating Agreement on January 31, 2018, which is less than four years from the date of filing Plaintiffs' Amended Complaint.[4] ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. This revision of the Operating Agreement constitutes an overt act because, as recognized by the Ninth Circuit, the "'[t]he typical antitrust continuing violation occurs ... when conspirators continue to meet to fine-tune their cartel agreement.'"[49]

Furthermore, Plaintiffs allege in the SAC that, after SDC initiated arbitration to enforce the Operating Agreement's restrictive covenants—and then prevailed—Align was ordered to close its "Scan Shops" by April 2019, and thus exit the direct-to-consumer market in furtherance of the parties' 2016 agreement to allocate the submarket for selling aligners directly to consumers.[50] To the

---

[44] *Id.*

[45] Mot. to Dismiss at 16.

[46] *See* ECF No. 51 (Operating Agreement filed pursuant to the Court's order).  On September 30, 2021, Align filed two versions of the Operating Agreement under seal: (1) The Second Amended and Restated Operating Agreement of SmileDirectClub, LLC, dated as of July 25, 2016 ("2016 Operating Agreement"); and (2) the Operating Agreement of SDC Financial, LLC, dated as of January 31, 2018 ("2018 Operating Agreement").

[47] *Compare* 2016 Operating Agreement at 20 ████████████████████████████████ ██████████████████████████████████████████) *with* 2018 Operating Agreement at 21 ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.

[48] *Compare* 2016 Operating Agreement at Ex. A *with* 2018 Operating Agreement at Ex. A.

[49] *Samsung*, 747 F.3d at 1204 (quoting *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir.2004)) (holding that adoption of 2006 agreement with same terms as 2003 agreement on new products constituted an overt act).

[50] *See* SAC ¶¶ 133–135.

extent Align complied with the 2019 closure deadline, this was alone an "overt act" sufficient to toll the statute of limitations; in the Ninth Circuit, "an action taken under a pre-limitations contract [is] sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action, *even if that would have required breaching the allegedly anti-competitive contract*."[51] Indeed, Align's closure of its stores in 2019 closely parallels the defendant in *Columbia Steel*, where the Ninth Circuit held that a reaffirmation by a defendant in 1990 of its adherence to a market allocation agreement entered into in 1972 served as an overt act for purpose of tolling the statute of limitations.[52]

More broadly, Align construes the "overt act" requirement too narrowly here, ignoring Ninth Circuit authority that "the Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."[53] Indeed, as Judge Alsup recently explained in *In re Glumetza Antitrust Litig.*, "most other cases to address this question have concluded that continued overcharges constitute a continuing violation."[54] Animating these cases is

---

[51] *Samsung*, 747 F.3d at 1203 (emphasis added) (citing *Hennegan v. Pacifico Creative Serv,, Inc.*, 787 F.2d 1299 (9th Cir.1986) and *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427 (9th Cir. 1996)).

[52] *Columbia Steel,* 111 F.3d at 1444.

[53] *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). Generally, "if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings." *In re Buspirone Pat. Litig.*, 185 F. Supp. 2d 363, 378, 380 (S.D.N.Y. 2002) (sustaining purchaser plaintiffs' claims under continuing violations doctrine "based on allegations of injury arising from purchases of Buspar at allegedly inflated prices beginning four years prior to the filings of their respective Complaints.").

[54] No. C 19-05822 WHA, 2020 WL 1066934, at *6 (N.D. Cal. Mar. 5, 2020) (collecting cases); *see also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 237 (D. Conn. 2015) (finding plaintiffs' claims timely for overcharges incurred within four years preceding filing); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 746 (E.D. Pa. 2014) (same); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2013 WL 2181185, at *26–29 (E.D. Tenn. May 20, 2013) (concluding "plaintiffs should be allowed to proceed with their claims because—even if most or all of the overt acts alleged as part of the continuing conspiracy occurred outside the limitations period—Plaintiffs have sufficiently alleged those acts resulted in Plaintiffs being overcharged for metaxalone well into the limitations period."); *In re Wholesale Grocery Prod. Antitrust Litig.*, 722 F. Supp. 4d 1079, 1086–89 (D. Minn. 2010) (finding continuing violations doctrine applied where conspiracy to allocate markets resulting in alleged charging of supra-competitive prices within limitations period); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004) (finding continuing violation

the recognition that, while a monopolist's *competitor* may be injured as soon as a conspiracy is effectuated, customers are "not injured until later, when Defendants use[] their newly-acquired market power to charge supra-competitive prices"—thus rendering a defendant's purposeful absence from a market, together with alleged supracompetitive prices, "new and independent acts that inflicted new and accumulating injury rather than unabated, inertial consequences or reaffirmations of a previous conspiracy."[55] Consistent with this authority, Plaintiffs only seek damages under their Section 1 claim for overcharges on SDC aligners that occurred within four years of the date of filing of the complaint.[56] For the same reason, Align's authority is distinguishable: in none of its cited cases did plaintiffs allege ongoing overcharges resulting from an illegal conspiracy, nor were any of the plaintiffs purchasers from alleged co-conspirators; instead, each dealt with a conspiracy to depress wages allegedly initiated outside the four-year limitations period.[57]

---

theory applied where settlement agreements entered into more than four years prior nevertheless resulted in overcharges "within the applicable time limitations"); *Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005) ("[C]ourts have held that, in purchaser antitrust actions, the requisite injurious act within the limitations period can include being overcharged as the result of an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control.").

[55] *See Wholesale Grocery*, 722 F. Supp. 2d at 1086 (citing, *inter alia*, II Phillip Areeda & Herbert Hovencamp, Antitrust Law ¶ 320c4); *see also Glumetza*, 2020 WL 1066934, at *6 ("Assertio and Santarus describe their February 2016 conduct not as overt, but instead as inaction reflecting continued adherence to the 2012 settlement. Yes, they defined their duties in the 2012 settlement, but the price gouging anticipated by the agreement extended for years, well into the later four-year period."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) ("B & LE's argument obfuscates the difference between, on the one hand, an 'overt act' necessary to show the existence of a conspiracy, and, on the other hand, an 'injurious act' causing damages within the limitations period. This argument fails to recognize that certain conspiracies, such as boycotts, operate through inaction. As the district court observed in this case, 'overt acts aren't what cause damage. It is the effectiveness of the overall conspiracy that causes damages.'").

[56] *See* SAC ¶ 161 (defining class as "All persons or entities in the United States that purchased, paid and/or provided reimbursement for some or all of the purchase price for SmileDirectClub aligners acquired for personal use during the period beginning October 22, 2017 until such time as the anticompetitive conduct alleged herein has ceased); *Glumetza*, 2020 WL 1066934, at *6.

[57] *See* Mot. at 16 (citing *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015); *Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at *13 (N.D. Cal. Apr. 10, 2015) (holding complaint was "bereft of *any* dates or details with regards to [defendant's] specific conduct.") (emphasis in original); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1072 (N.D. Cal. 2016) (plaintiffs "failed to allege any acts of enforcement, renewal, or expansion" during the statute of limitations period).

Here, Plaintiffs allege that the Operating Agreement allowed SDC to charge supracompetitive prices for aligners during the class period.[58] Consequently, "the *conduct taken*"—charging supracompetitive prices—"continued well into the later four-year period" following entry of the Operating Agreement, and each new aligner sale by SDC at a supracompetitive price was a "continuing act" that "triggered the statute of limitations anew for that act."[59]

### D.    Plaintiffs' state law claims are adequately pled.

#### 1.    Plaintiffs have sufficiently pled a Cartwright Act claim.

"Agreements to establish or maintain a monopoly are restraints of trade made unlawful by the Cartwright Act."[60] For purposes of the Cartwright Act, "a boycott by a single trader constitutes concerted activity if it is occasioned by coercion, threats or intimidation and thereby procures the unwilling cooperation of another."[61]

##### a.    Plaintiffs adequately plead an illegal market allocation agreement restricting SDC from selling aligners to dentists.[62]

Align does not dispute that, to the extent the Supply Agreement allocated the dentist-directed market to Align, this would constitute a combination for purposes of the Cartwright Act. Instead, it argues that Plaintiffs' reading of the Supply Agreement is incorrect. The Court should reject this argument which, at a minimum, raises a disputed question of fact and glosses over the other anticompetitive restrictions found in the Supply Agreement.

---

[58] *See, e.g.*, SAC ¶¶ 141, 212–231. Furthermore, while the Supply Agreement ended on December 31, 2019, Align remains restrained from entering the direct-to-consumer channel until August 18, 2022. *See* SAC ¶ 141.

[59] *Glumetza*, 2020 WL 1066934, at *6.

[60] *In re Cipro Cases I & II*, 61 Cal. 4th 116, 148 (2015).

[61] *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 268 (Ct. App. 1983).

[62] Align raises this argument as part of its challenge to Plaintiffs' Section 1 claim. However, as explained above, allocation of the dentist directed submarket is not a basis for Plaintiffs' Section 1 claim, which is premised only on Align and SDC's allocation of the DTC submarket. Instead, Plaintiffs allege Align and SDC's allocation of the dentist directed submarket—as well as the other anticompetitive restraints in the Supply Agreement—as an additional basis for their claim that Align engaged in a scheme to monopolize the distinct product submarket of aligners sold through dental offices.

Plaintiffs allege that Section 3.2 of the Supply Agreement restricts SDC from distributing aligners through dentists (i.e., the dentist-directed submarket), thus impermissibly allocating this submarket to Align. Section 3.2 states in relevant part:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████ Notwithstanding the foregoing provisions of this Section 3.2, Align understands that SDC retains the right to, on its own and not through directly or indirectly collaborating or working with third parties manufacture, import, market, co-market, refer, sell or distribute clear aligners utilizing technology developed solely by SDC during the term of this Agreement, provided that SDC does not use any Align Confidential Information for such purpose.

A straightforward reading of the Supply Agreement supports Plaintiffs' claims: the first sentence of Section 3.2 states that ███████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████ " According to the Agreement's own definitions, independent dental practices would count as third parties, since "Affiliates" is narrowly defined to only include companies that are majority owned or controlled by SDC.[63] On its face, then, this language appears to prevent SDC from working with third party dental practices to sell aligners through the dental practice channel to Plaintiff consumers.

Align responds by focusing on the following sentence of Section 3.2, which it claims irrefutably demonstrates that SDC was never subject to any restrictions on its ability to sell aligners to doctors":

> Notwithstanding the foregoing provisions of this Section 3.2, Align understands that SDC retains the right to, *on its own and not through directly or indirectly collaborating or working with third parties*

---

[63] *See id.* § 1.1 ("'Affiliate' of a company means any corporation or other entity that controls, is controlled by, or is under common control with that company, where 'control' means either (i) direct or indirect ownership of at least fifty percent (50%) of the outstanding shares of stock entitled to vote for the election of directors (other than shares of stock whose voting rights are subject to restriction), or (ii) or in the case of an entity that does not have outstanding shares or securities (as may be the case in a partnership, joint venture or unincorporated association), direct or indirect ownership of at least fifty percent (50%) of the ownership interest representing the right to make the decisions for such entity, but such control will be deemed to exist only so long as such ownership or control exists.")

> manufacture, import, market, co-market, refer, sell or distribute clear
> aligners utilizing technology developed solely by SDC during the term
> of this Agreement, provided that SDC does not use any Align
> Confidential Information for such purpose."

First of all, this sentence is limited to stating Align's "understanding" of SDC's rights. By contrast,

the preceding sentence definitively states that

▮▮▮▮▮▮▮▮▮▮" And, in any case, this sentence makes clear that SDC could only sell or

distribute clear aligners "on its own and not through directly or indirectly collaborating or working

with third parties"—i.e., it clarifies that SDC was allowed to soldier on with its pre-existing DTC

business. Meanwhile, SDC could not sell or market aligners through the dental practice channel on

its own because doing so would require SDC to work and collaborate with third parties, namely

dental practices, to distribute, market, and sell SDC-branded aligners to consumers. Thus, by the

plain language of Section 3.2, SDC was prohibited from selling aligners through the dental practice

channel by collaborating or working with dental practices. Indeed, the restrictions in Section 3.2

were so facially broad that the parties themselves felt the need to further clarify in writing that

Section 3.2



This provision further supports the inference that Section

3.2 restricted SDC's ability to manufacture and sell aligners outside of its current DTC model.

Align once again strains to divert attention from evidence supporting Plaintiffs' reading of

Supply Agreement (and tending to disproving its own): a January 2020 press release in which SDC's

co-founder stated, "[w]e have seen increasing demand from the dentists and orthodontists in our

network who wish to provide SmileDirectClub clear aligners to their in-office patients, and with our

agreement with Align Technology now expired, we are no longer obligated to stay in the direct-to-

consumer channel.[64] Rather than make any attempt to explain these statements—statements by a

---

[64] *See* SAC ¶ 138–39 & Ex. C (press release).

██████████████████████████████[65]—much less harmonize them with its proposed construction of the Supply Agreement, Align responds only that the Supply Agreement's language is unambiguous and the press release should be ignored.[66]

Not only are Align's claims regarding contract interpretation unpersuasive and unintuitive, particularly when considered alongside Section 3.1's █████████████████████ ███████████████████ at most, they raise a question of contractual ambiguity improperly resolved on a motion to dismiss.[67]

Furthermore, Plaintiffs' reading of the Supply Agreement becomes yet more plausible when considered alongside the other anti-competitive restrictions on SDC's ability to compete found in the Supply Agreement, all of which furthered Align's Scheme to monopolize the dentist-directed submarket. Specifically, the Supply Agreement: (1) installed Align as SDC's sole third-party aligner supplier, thus effectively re-directing 30% of competitor ClearCorrect's revenues to Align[68]; (2) required that "complex" cases unable to be handled by SDC, then an estimated 30% of all SDC case assessments, be referred exclusively to Align rather than other potential competitors in the dentist-direct market[69]; (3) ensured SDC could not solicit Align employees[70]; and (4) provided a

████████████████████████████████████████████████████████████████████

---

[65] *See* Operating Agreement at p.29 ███████████████████████████ .

[66] *See* Mot. at 8.  Align previously sought to imply the press release was inaccurate by noting, in a footnote, that "notably . . . [it] has been taken down from SDC's website." Mot. to Dismiss FAC [ECF No. 37] at n.22.  Strikingly, however, Align has now twice stopped short of saying that the press release is inaccurate, and SDC has yet to formally renounce, retract, or otherwise correct it. *See* SAC ¶ 139.  Furthermore, as Plaintiffs have previously noted, *see* DE 43 at 21, the fact that SDC chose to scrub public discussion of an anticompetitive market allocation agreement from its website may simply reflect a belated realization that antitrust conspiracies are best conducted in secret.

[67] *See State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir. 1985) ("The interpretation of a contract presents a mixed question of law and fact.  The existence of an ambiguity must be determined as a matter of law. If an ambiguity exists, a question of fact is presented."); *see also Picketfence Inc. v. R.R. Donnelley & Sons Co.*, No. C 07-1551 JL, 2007 WL 9811030, at *2 (N.D. Cal. Nov. 6, 2007) ("Defendant's argument that the Target opportunity falls outside the terms of the Agreement because it is not a client located within the Territory is a question of contract interpretation and resolving ambiguity, which would be prematurely decided on a Motion to Dismiss.")

[68] SAC ¶¶ 130–31.

[69] *Id.* ¶¶ 118–22

[70] *Id.* ¶¶ 123.

████████████[71] Considered together, these restrictions further support the inference that the Supply Agreement entrenched Align's monopolization by preventing SDC from competing in the dentist-directed submarket.[72]

> b.   **Align's termination of the interoperability agreement is actionable under the Cartwright Act because it was done to effectuate a tying agreement and done coercively.**

Under the Cartwright Act, a "conspiracy" or "combination" necessary to support an antitrust action can be found "where a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere."[73] Thus, "if a single trader" pressures customers or dealers into adhering to resale price maintenance, territorial restrictions, exclusive dealing arrangements or illegal "tie-ins," an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a producer to determine with whom it will deal."[74]

Here, this Court has already recognized that Align's termination of the interoperability agreement brought about the "involuntary acquiescence" of dental practices, whereby termination "compel[s] dentists to acquire the iTero scanner, which in turn … effectively compel[s] dentists to focus primarily or exclusively on selling Invisalign":

> The allegations in the complaint create a strong inference that the only conceivable reason for terminating the agreement with 3Shape was to stifle competition in both the aligner and scanner markets. The

---

[71] *Id.* ¶¶ 125–26.

[72] Align argues in its Motion to Strike that the Supply Agreement's non-solicitation provision was a "commonplace" clause necessary "to prevent the raiding of employees by minority equityholders," and that its exclusive referral provision was in fact "efficiency enhancing" because it "ensured that patients seeking treatment from SDC would get suitable aligner treatment[.]" Mot. to Strike at 11–12. But "[p]laintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*," "even if defendants' alternative theories ultimately may be more convincing to the jury," *In re Juul Labs, Inc.*, 2021 WL 3675208, at *18 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original)). Furthermore, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole," and the court "must give plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (internal citation and quotation marks omitted). At this stage, Plaintiffs plausibly allege an alternative and more compelling explanation: these restrictions were part and parcel of an agreement to further Align's monopoly by preventing competition in the dentist-direct submarket from SDC.

[73] *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 720 (1982).

[74] *Id.*

complaint alleges that the agreement resulted in tens of thousands of Invisalign orders for Align. And, given the price of each Invisalign order, Align sacrificed millions of dollars in short-term profits by terminating the agreement. According to the complaint, the sacrifice only made economic sense if Align expected the termination to result in long-term gains from an eventual enhancement of monopoly power. *The plaintiffs explain in detail how the termination would run 3Shape out of the scanner market by compelling dentists to acquire the iTero scanner, which in turn would effectively compel dentists to focus primarily or exclusively on selling Invisalign, thus entrenching the company's monopoly power in both markets.*[75]

As previously recognized by the Court, in essence, Plaintiffs have alleged that Align's termination of the interoperability agreement imposed a de facto tying arrangement upon dental practices between Align's Invisaligners and iTero scanners. A tying arrangement "under antitrust laws exists when a party agrees to sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product), thereby curbing competition in the sale of the tied product.[76] Tying arrangements are actionable under the Cartwright Act.[77]

As this Court explained, Align had economic power in the market for aligners because "Invisalign has become synonymous with aligners generally, and the product is considered "must have" for dental practices that offer aligners."[78] Prior to termination of the interoperability agreement, a dental practice could order "must have" Invisaligners with either 3Shape or Align scanners.

But after termination of the interoperability agreement, a dental practice that "wishes to offer Invisalign to patients, … is allegedly limited as a practical matter to using the iTero scanner to generate those orders." Therefore, as recognized by the Court, "because Invisalign dominates the aligner market and is a 'must have' for dental practices, iTero is left as the only sensible scanner

---

[75] *See Simon & Simon*, 2021 WL 1309299, at *6 (emphasis added); *see also id*. at *3 ("And as dental practices invest in iTero, the investment creates a long-term dependence on Invisalign, since that is the only aligner for which iTero is designed to make scans.").

[76] *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999).

[77] *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1234 (2007) ("Both the Sherman Act and the Cartwright Act . . . prohibit tying arrangements that operate as unreasonable restraints on trade.").

[78] *Simon & Simon,* 2021 WL 1309299, at *2.

option."[79] Thus, Align's termination of the interoperability agreement coercively imposed upon dentists a *de facto* tying restraint where they had to purchase Trios scanners (the tied product) as a condition for placing orders for Invisaligners (the tying product). Indeed, the tying restraint then further strengthened Align's market power in the aligner market because the Trios scanners were only capable of placing orders for Invisaligners. This conduct is actionable under the Cartwright Act because a "combination" under the antitrust laws may be formed if a manufacturer "imposes restraints on dealers or customers by coercive conduct and they involuntarily adhere to those restraints."[80]

Moreover, Plaintiffs have alleged, and this Court has already recognized, that Align repeatedly attempted to pressure 3Shape to limit Trios orders to just Invisalign aligners.[81] After that pressure failed, Align *then* terminated the interoperability agreement. The Cartwright Act holds that "a boycott by a single trader constitutes concerted activity if it is occasioned by coercion, threats or intimidation and thereby procures the unwilling cooperation of another."[82] Here, Align's boycott of 3Shape was occasioned by threats or intimidation against 3Shape, and ultimately procured the "unwilling cooperation" of dental practices who were forced to order Align scanners and aligners because they were left with no alternatives.[83] Align's conduct is closely analogous to that of the defendant in *Qualcomm*, where Judge Koh found that the plaintiffs sufficiently pled a Cartwright Act claim where they alleged that Qualcomm coerced purchasers into licensing contracts.[84] Plaintiffs' detailed allegations of coercive conduct by Align against both 3Shape and dental practices distinguish this case from Align's cited authority, *Free FreeHand Corp. v. Adobe Sys. Inc.*, in which Judge Koh found that plaintiffs' Cartwright Act claim failed as a matter of law because they did not

---

[79] *Id.* at *3.

[80] *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986), *opinion modified on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987).

[81] *See Simon & Simon,* 2021 WL 1309299, at *2 (describing Align's various attempts to pressure 3Shape to enter into a "venture that would exclude Align's competitors in the aligner market.").

[82] *G.H.I.I.*, 147 Cal. App. 3d at 268.

[83] *Id.*

[84] *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 974–77 (N.D. Cal. 2017).

allege that the defendant took "punitive action against Plaintiffs seeking to migrate to [defendant's] competitors."[85]

             c.       **Align's exclusive dealing agreements are actionable under the Cartwright Act.**

Exclusive dealing contracts by a monopolist designed to further its monopoly are actionable under the Cartwright Act.[86] And this Court has already recognized that the allegations regarding these contracts "suggest that both contracts stifle competition and commit dental practices to a monopolist's products."[87] Align's only response is to compartmentalize away its conduct—arguing that the exclusive dealing agreements, standing alone, are not independently actionable.[88] But this Court has already held that, under Section 2 of the Sherman Act, "a series of activities will combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation."[89] So too under the Cartwright Act, where California courts have held that an exclusive dealing agreement by a monopolist should be "viewed in context with its other alleged anticompetitive behavior" in determining whether the exclusive dealing agreement resulted in substantial market foreclosure.[90] Align's anticompetitive exclusive dealing agreements are both independently actionable under the Cartwright Act and should be considered in their totality with the other alleged anticompetitive conduct.

Align also reiterates its arguments about the Cartwright Act for the New York and Tennessee state claims, claiming those state laws "only allow concerted action."[91] But, as discussed in detail

---

[85] 852 F. Supp. 2d 1171, 1186 (N.D. Cal. 2012).

[86] *See Fisherman's Wharf,* 114 Cal. App. 4th at 339 ("Section 16727…prohibits exclusive dealing arrangements that "'substantially lessen competition or tend to create a monopoly.'").

[87] *Simon & Simon,* 2021 WL 1309299, at *9.

[88] Mot. to Dismiss at 18–19.

[89] *Simon & Simon,* 2021 WL 1309299, at *5.

[90] *Fisherman's Wharf*, 114 Cal. App. 4th at 339 (reversing grant of summary judgment for Defendant on plaintiff's exclusive dealing claim under the Cartwright Act).

[91] Mot. to Dismiss at 19–20.

above, each aspect of Align's anticompetitive conduct constitutes concerted action, and thus Align's

arguments against the New York and Tennessee state law claims fails for the same reason.[92]

### 2.     Plaintiffs have standing to pursue their California UCL claim.

Align makes a series of arguments against the claim under the California Unfair Competition

Law. Each argument fails.

First, Align argues that equitable relief is available under the UCL only if a legal remedy

would be inadequate. But, Plaintiffs can plead in the alternative under Rule 8(d).[93] The UCL claim

on behalf of California residents is plead in the alternative with their claim for damages under the

Cartwright Act. Align has moved to dismiss the Cartwright Act claim as well. If the Court were to

dismiss the Cartwright Act claim, then there would be no adequate legal remedy available for the

injuries suffered by California residents.[94]

Second, Align argues that Plaintiff Ellis cannot seek restitution because there are no

allegations tracing money or property she paid back to Align. But it is well established under the

UCL that indirect purchasers may seek restitution from a defendant.[95] The key question is whether

the plaintiff "had an ownership interest in the money or property acquired by the defendant through

unlawful means."[96] Here, Plaintiff Ellis had an ownership interest in the money she paid for

Invisaligner treatment, and it is reasonable to infer that a portion of the money Ellis paid her dentist

for Invisaligner treatment then went to Align. Plaintiffs have alleged in detail that the costs of

---

[92] *See Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.,* 34 A.D.3d 91, 94, 823 N.Y.S.2d 79, 81–82 (2006) (stating requirements for monopolization claim under the Donnelly Act).

[93] *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

[94] *See Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 662 (N.D. Cal. 2020) (collecting cases holding that plaintiffs could not pursue UCL claims for equitable restitution because they had adequate legal remedy on other claims for the same conduct).

[95] *Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1498 (2007) (plaintiffs who were indirect purchasers of defendant's software had UCL standing); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787–89 (2010) (pharmacies that were indirect purchasers of defendant drug manufacturer's drug had UCL standing).

[96] *Shersher*, 154 Cal. App. 4th at 1500.

Invisaligners are traceable through the chain of distribution and are passed on into the cost of Invisaligner treatments.[97]

Align relies primarily on distinguishable cases where plaintiffs sought restitution for funds that clearly never reached the possession of a defendant, such as cases where plaintiffs sought restitution against a manufacturer defendant for purchases of secondhand items from a private party[98] or where plaintiffs sought restitution for lost wages from an oil spill.[99] By contrast, in *Shersher*, for example, the state appellate court held that the plaintiff's allegation that "he paid money to a retailer to purchase Microsoft's product based on false or misleading statements on the product package" supported a claim for restitution under the UCL.[100] Plaintiff Ellis has made the same type of allegations here.

Third, the "unlawful" prong of the UCL "prohibits anything that can properly be called a business practice and that at the same time is forbidden by law."[101] Align argues that this prong is not satisfied because Plaintiffs' antitrust claims are subject to dismissal, but this Court has already held that direct purchaser plaintiffs have satisfactorily pled a claim under the Sherman Act. Plaintiff Ellis's UCL claim is based on the same underlying conduct and thus, Plaintiff Ellis has satisfactorily pled a claim under the UCL "unlawful" prong based on allegations that Align's conduct has violated the Sherman Act, and that this conduct caused an injury to Plaintiffs.

Fourth, Align argues that Plaintiff Ellis was not injured because she purchased Invisalign in July 2017, before termination of the interoperability agreement. But Plaintiffs' UCL claim

---

[97] SAC ¶¶ 218–31.

[98] *See* Mot. to Dismiss at 21 (citing *Fulford v. Logitech, Inc.,* No. C-08-2041 MMC, 2008 WL 4914416, at *2 (N.D. Cal. Nov. 14, 2008) (plaintiff denied restitution where they purchased product from a previous owner); *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1323–24 (C.D. Cal. 2013) (plaintiff purchased vehicle "used from a third party")).

[99] *See* Mot at 21 (citing *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *3 (C.D. Cal. Mar. 4, 2016) ("The profits which Defendants gained from their refusal to properly monitor their pipelines cannot be the same property Plaintiffs lost, because Defendants would have gained those profits regardless of whether Plaintiffs were injured. In other words, even if the same conduct caused Plaintiffs' injury and Defendants' enrichment, Plaintiffs cannot state a UCL claim unless Defendants benefitted because of Plaintiffs losses.")

[100] *Shersher*, 154 Cal. App. 4th at 1500.

[101] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

encompasses the agreements between SDC and Align that were entered into in 2016. Plaintiff Ellis's purchases occurred after those agreements were entered into, and thus, she suffered harm from Align's conduct.

Therefore, Plaintiffs have sufficiently pled a claim under the UCL for unlawful conduct against Align.

### 3.   Plaintiffs' claim under Iowa law is timely.

Align argues that Plaintiff Sandner's claim is untimely because Plaintiff first made payments for Invisalign in 2017, before Align's final termination of the interoperability agreement in January 2018. But Plaintiff Sandner's claim is timely because her first payments occurred after Align entered into its agreements with SDC in 2016.

### 4.   Plaintiffs' Florida Deceptive and Unfair Trade Practice Act claim is pled with particularity.

Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA") "sweepingly declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[102] "Antitrust violations are included within the conduct proscribed by the FDUTPA."[103] This Court has already held that a claim under Section 2 of the Sherman Act exists against Align for its conduct.

In response, Align argues that Plaintiff Alderman has failed to plead her claim with particularity under the FDUTPA. But, to state a claim for damages under the FDUPTA, Plaintiff must plead "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."[104] Plaintiff Alderman has pled the unfair practice (Align's monopolization), causation (Align's monopolization has led to supracompetitive prices for Invisaligners that were passed through by dental practices in the form of supracompetitive prices for Invisaligner treatments) and actual damages (Plaintiff purchased Invisaligner treatment at supracompetitive prices).[105] And here, unlike in other cases, there

---

[102] *AT&T Mobility LLC v. Phone Card Warehouse, Inc.*, No. 608CV1909ORL18GJK, 2009 WL 10671270, at *5 (M.D. Fla. June 25, 2009)

[103] *Id.* (internal quotation and citation marks omitted).

[104] *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006).

[105] *See* SAC ¶¶ 218-31.

can be no dispute that the Invisaligner treatments that Plaintiff Alderman purchased included Invisaligners that originated from Align itself.[106]

> **5.    The Court should exercise supplemental jurisdiction over the claim under Arizona law.**

Section 1367 provides that a Court may exercise supplemental jurisdiction provided that it has original jurisdiction.[107] Here, the Court has original jurisdiction over Plaintiffs' Section 1 and Section 2 claims under the Sherman Act. The Court should exercise supplemental jurisdiction over Plaintiff's Arizona claim because it arises from the same case or controversy as Plaintiff's Section 1 and Section 2 claims.

## IV.    CONCLUSION

Plaintiffs respectfully request the Court to deny Align's motion to dismiss in its entirety; however, if the motion is granted in any part, Plaintiffs request leave to amend.[108]

DATED: November 29, 2021                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
   Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com

---

[106] *See, e.g., In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1322 (S.D. Fla. 2010) (dismissing FDUTPA claim because it did not "allege sufficient information about what particular products were purchased from which Defendants.").

[107] 28 U.S.C. § 1367(a).

[108] *See Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) ("A party may amend its pleading with the court's leave, which the court should freely give when justice so requires. This policy is to be applied with extreme liberality.").

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Counsel for Plaintiffs*