Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>              Defendant. | No. 3:21-cv-03269-VC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT ALIGN TECHNOLOGY, INC.'S MOTION TO STRIKE**<br><br>Date: December 16, 2021<br>Time: 2:00 p.m.<br>Place: Zoom Webinar<br>Judge. Hon. Vince Chhabria |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................................1

II.     LEGAL STANDARD ............................................................................................................3

III.    ARGUMENT .........................................................................................................................3

        A.      Plaintiffs' Section 1 claim is appropriate for per se treatment. ...................................3

                1.      Align's extended motion to dismiss briefing is not a suitable
                        grounds for striking Plaintiffs' Section 1 Claim. .............................................3

                2.      Plaintiffs have plausibly alleged a market allocation agreement
                        between Align and SDC to allocate the market for aligners sold
                        to consumers. ...................................................................................................5

                        a.      Align fundamentally mischaracterizes Plaintiffs'
                                Section 1 claim. ...................................................................................6

                        b.      The operating agreement is a horizontal agreement
                                between competitors. ...........................................................................6

                        c.      Plaintiffs have sufficiently alleged that the Operating
                                Agreement is a per se restraint, and Align's arguments
                                that it is an ancillary restraint implicate questions of fact
                                not suitable for resolution on the pleadings. ......................................10

        B.      Plaintiffs' allegations regarding SDC make "economic sense." ...............................14

        C.      *AGC* does not apply to Plaintiffs' state law claims for damages for
                their Invisaligner purchases. .....................................................................................17

        D.      The reiterated arguments against Plaintiffs' California and Iowa state
                law claims fail. ..........................................................................................................17

IV.     CONCLUSION ....................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
    2018 WL 11230167 (N.D. Cal. May 21, 2018) .................................................................. 15

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ............................................................. 10, 12, 13, 15

*C-E Mins., Inc. v. CARBO Ceramics, Inc.*,
    2012 WL 13008801 (N.D. Ga. Mar. 14, 2012) ......................................................... 11

*FTC v. Actavis*,
    570 U.S. 136 (2013) ....................................................................... 14, 15, 16

*Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wisconsin*,
    1993 WL 78756 (N.D. Ill. Feb. 26, 1993) ............................................................ 5

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) ........................................................................ 5

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................................... 14

*In re Juul Labs, Inc., Antitrust Litig.*,
    2021 WL 3675208 (N.D. Cal. Aug. 19, 2021) ....................................................... 7, 12

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ........................................................................ 11

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ............................................................................... 5, 7

*RingCentral, Inc. v. Nextiva, Inc.*,
    2020 WL 4039322 (N.D. Cal. July 17, 2020) ...................................................... 3, 4

*Roller Bearing Co. v. United States*,
    341 U.S. 593 (1951) ............................................................................... 15

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) .................................................................... 11, 13

*Simon & Simon, PC v. Align Tech., Inc.*,
    2021 WL 1309299 (N.D. Cal. Apr. 8, 2021) ........................................................ 2, 16

*Sosa v. DirecTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................... 15

- ii -

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
    2021 WL 5474898 (N.D. Cal. Nov. 23, 2021) ...................................................................5

*Tawfilis v. Allergan, Inc.*,
    157 F. Supp. 3d 853 (C.D. Cal. 2015) ............................................................................14

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ..........................................................................................5

*United States v. eBay, Inc.*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) ..........................................................................12

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ........................................................................................................15

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ....................................................................................1, 3, 4

## STATUTES

Sherman Act, 15 U.S.C. § 1 ...................................................................................*passim*

## FEDERAL RULES

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................4

Federal Rule of Civil Procedure 12(f) ............................................................................3, 4

## OTHER AUTHORITIES

Areeda & Hovenkamp, Antitrust Law (3d ed. 2012) ...............................................5, 6, 10

## I.    INTRODUCTION

Constrained by the page limits otherwise applicable to its Motion to Dismiss, Align has also filed a Motion to Strike littered with pages of arguments that Plaintiffs have not "plausibly alleged" or "failed to allege" various elements of their claims—a motion that, meanwhile, makes no attempt to explain how Plaintiffs' Section 1 and Section 2 claims are an "insufficient defense," "redundant," "immaterial," "impertinent," or "scandalous."[1] The result is a mishmash of often overlapping 12(b)(6) argument spread across 43 pages of briefing; Plaintiffs have endeavored to consolidate their arguments as much as possible between opposition briefs.

As a threshold matter, although Align repeatedly conflates Plaintiffs' distinct Section 1 and Section 2 claims—spending numerous pages disputing whether the Section 1 claim supports a claim for market allocation of the dentist-directed submarket—allocation of the dentist-directed submarket is not the basis for Plaintiffs' Section 1 claim, nor does Plaintiffs' Section 1 claim turn on the Supply Agreement. Instead, Plaintiffs' Second Amended Complaint ("SAC") contains two distinct sets of claims:

*First*, on behalf of direct purchasers of SDC aligners, Plaintiffs bring a claim under Section 1 of the Sherman Act alleging a per se market allocation agreement—unmistakably contained within the Operating Agreement—whereby Align agreed to not compete in the direct-to-consumer ("DTC") aligner product submarket and, in exchange, received an ownership interest in SDC. Align does not dispute that it entered into an agreement prohibiting it from competing in the DTC product submarket.

In its Motion to Strike, Align argues that it was not a potential competitor to SDC in the DTC market, and that Plaintiffs' Section 1 claim therefore fails on first principles. But Align clearly had the ability to compete in this market, and contemporaneous market analyses recognized it and SDC as competitors. Moreover, Align actually did attempt to compete in the DTC channel when, in 2017, it opened retail stores—and was then forced to close them after SDC initiated arbitration to enforce

---

[1] *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973-74 (9th Cir. 2010).

the Operating Agreement. These facts clearly support an inference at the pleading stage that Align was a potential competitor to SDC at the time the Operating Agreement was signed.

Align also argues that the Operating Agreement's allocation of the DTC market to SDC is merely an "ancillary" restraint subordinate to the separate Supply Agreement. But courts have repeatedly held that whether a horizontal restraint should be analyzed as a naked, per se restraint or an ancillary restraint is an inherently fact-intensive inquiry not suitable for disposition on the pleadings. The same result is warranted here: Plaintiffs have sufficiently pled that the restraint in the Operating Agreement was neither (1) subordinate or collateral to the Supply Agreement nor (2) reasonably necessary to achieve a procompetitive purpose—most obviously because Align could have sold aligners to SDC without taking an ownership interest in it that prohibited Align from competing in the DTC market.

**Second**, on behalf of consumer purchasers of Invisaligner treatments, Plaintiffs have alleged a scheme by Align to monopolize the product submarket of aligners sold through dental practices; they bring a federal Section 2 claim for injunctive relief, and various state law claims, based on that conduct.[2] In their SAC, Plaintiffs add new allegations of anticompetitive conduct by Align to perpetuate this scheme and maintain its monopoly: namely, a market allocation agreement between Align and SDC whereby SDC was prevented from competing in the market for aligners sold through dentists.

Align seeks to strike these allegations based on a hasty grab bag of primarily factual disputes that are not appropriate for resolution on a motion to dismiss, much less a motion to strike. For example, Align challenges, in passing, Plaintiffs' distinction between the dentist-directed and DTC submarkets, but this distinction is well-pled and supported by Align's own public statements emphasizing the key differences and minimal overlap between these two consumer channels. Align also argues that its agreement with SDC is shielded by the First Amendment as part of Align's effort

---

[2] This Court has already recognized that these allegations, when brought by direct purchaser dental practices, constitute a "strong overall Section 2 claim," and that "a series of activities will combine to create an antitrust violation." *Simon & Simon, PC v. Align Tech., Inc.*, No. 20-CV-03754-VC, 2021 WL 1309299, at *5, *9 (N.D. Cal. Apr. 8, 2021).

to enforce its patents but, even if the Supply Agreement was a patent-settlement agreement, the Supreme Court has repeatedly recognized that such agreements can run afoul of the antitrust laws. In short, Plaintiffs' allegations regarding the market allocation agreement simply strengthen their already well-pled claims based on Align's anticompetitive monopolization scheme. They should not be struck.

## II.   LEGAL STANDARD

Rule 12(f) provides that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[3] The Ninth Circuit has interpreted Rule 12(f) based on its "plain meaning", holding that material may be struck if, and only if, it is "(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous."[4] "Motions to strike are generally disfavored and 'should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation' or 'unless prejudice would result to the moving party from denial of the motion.'"[5] "If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion."[6]

## III.   ARGUMENT

**A.   Plaintiffs' Section 1 claim is appropriate for per se treatment.**

### 1.   Align's extended motion to dismiss briefing is not a suitable grounds for striking Plaintiffs' Section 1 Claim.

Align's arguments in the motion to strike regarding Plaintiffs' Section 1 claim is a blatant end run around both Ninth Circuit authority and this Court's standing order on page limits. Align never so much as tries to explain how Plaintiffs' Section 1 and Section 2 claims are an insufficient defense, redundant, immaterial, impertinent, or scandalous. Under clear Ninth Circuit law, these are the ***only*** grounds for striking material from the pleadings.

---

[3] *Whittlestone*, 618 F.3d at 973.

[4] *Id.* at 973–74.

[5] *RingCentral, Inc. v. Nextiva, Inc.*, No. 19-CV-02626-NC, 2020 WL 4039322, at *5 (N.D. Cal. July 17, 2020) (citing *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted)).

[6] *Id.*

Align often is unable to even maintain the pretense that it seeks to strike Plaintiffs' well-pled allegations, rather than enlarge the number of pages allowed for its motion to dismiss: its motion to strike is littered with pages of arguments that Plaintiffs have not "plausibly alleged" or "failed to allege" various elements of their Section 1 claim.[7] But, as specifically held by the Ninth Circuit, the proper grounds for arguing that Plaintiffs have not plausibly alleged something is a motion to dismiss—not a motion to strike. As the court has explained: "[W]ere we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading … we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose."[8]

Align's cited authority reveals its blatant ruse: in its discussion of Plaintiffs' Section 1 claim, Align cites not a single decision where a court struck claims on the basis of the types of arguments Align advances. Instead, Align's motion to strike-née-dismiss repeatedly relies on motion to dismiss or summary judgment cases.[9] But, as the Ninth Circuit has made very clear, cases decided at the 12(b)(6) stage do not provide the standard for motions to strike and, to hold otherwise would wreak havoc with the different standards of review used for motions to dismiss and motions to strike.[10]

---

[7] *See, e.g.,* Mot. to Strike at 9 ("even if the SAC had plausibly alleged that Align and SDC were actual or potential competitors as of the time of the agreements (which it does not) . . ."); *id.* at 7 ("Plaintiffs fail to allege facts to show why it is plausible that Align would, as of 2016, enter an allegedly less lucrative product sub-market at the risk of upending its relationships with its core customer base."); *id.* at 4 ("The well-pleaded allegations in the SAC do not plausibly allege a horizontal market allocation agreement among competitors").

[8] *Whittlestone*, 618 F.3d at 973.

[9] *See, e.g.,* Mot. to Strike at 4 (arguing failure to allege facts supporting that parties to an agreement were actual or potential horizontal competitors dooms a per se Section 1 claim, and citing cases decided at the motion to dismiss stage); *id.* at 9 (arguing that "because Plaintiffs' conflicting theories do not make economic sense, the claims should be dismissed or, at the very least, have the per se allegations therein stricken", and citing case decided at motion to dismiss stage).

[10] *Whittlestone*, 618 F.3d at 974 ("[I]f a party may seek dismissal of a pleading under Rule 12(f), the district court's action would be subject to a different standard of review than if the district court had adjudicated the same substantive action under Rule 12(b)(6)").

Indeed, as this Court recently recognized, "a court dismisses claims, not allegations," at the pleading stage.[11]

 Apart from its blatant disregard for Ninth Circuit authority, Align's tiresome gambit wastes this Court's time, forcing it to track extended versions of often identical arguments across two separate sets of pleadings. Plaintiffs respond fully to all of Align's arguments below, but maintain that both the parties and the Court would have been far better served by Align bringing its Motion to Dismiss as an actual Motion to Dismiss.

> **2. Plaintiffs have plausibly alleged a market allocation agreement between Align and SDC to allocate the market for aligners sold to consumers.**

 It is basic antitrust law that "[a] market allocation agreement between competitors at the same market level is a classic per se antitrust violation."[12] The case law places special emphasis on the foreclosure of both actual and potential competitors, and the inherently pernicious effect of both, because, as recognized by Judge Posner, "when firms in the same line of business agree not to enter each other's territories they violate Section 1 of the Sherman Act even if they might be able to show that dividing markets had yielded economic benefits greater than any plausible estimate of the costs in diminished competition."[13] Indeed, the Supreme Court has specifically explained that it is market allocation when competitors allocate a market even if they have never competed in it.[14] Thus, market allocation agreements may be per se anticompetitive even if they are not reciprocal.[15] At heart, the

---

[11] *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, No. 21-CV-03496-VC, 2021 WL 5474898, at *5 (N.D. Cal. Nov. 23, 2021).

[12] *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("[a] market allocation agreement between competitors at the same market level is a classic per se antitrust violation.")

[13] *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir. 1984) (Posner, J.); *see also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990).

[14] *See Palmer*, 498 U.S. at 47–49 (finding per se illegal company's agreement not to compete with competitor "outside of Georgia" even though, at time agreement was signed, company did not do business outside of Georgia).

[15] *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wisconsin*, No. 88 C 20265, 1993 WL 78756, at *13 (N.D. Ill. Feb. 26, 1993) ("The thrust of the Supreme Court's reasoning is the agreement's anticompetitive effect on a market. Assuming Blue Cross entered an agreement whereby it agreed to stay out of the Illinois health insurance market, but Health Care did not reciprocally agree to stay out of the Wisconsin health insurance market, the net effect is an anticompetitive effect on the Illinois health insurance market."); *see also* Areeda & Hovenkamp, Antitrust Law, ¶ 2030(c) (3d ed. 2012) ("[M]any horizontal market division agreements cover

"important element is that the agreements at issue are arrangements among competitors that give one firm the right to restrict the way that a rival expands or innovates."[16]

### a.   Align fundamentally mischaracterizes Plaintiffs' Section 1 claim.

As a threshold matter, Align repeatedly conflates Plaintiffs' distinct Section 1 and Section 2 claims, spending numerous pages arguing about whether the Section 1 claim supports a claim for market allocation of the dentist product submarket based on the Supply Agreement. But allocation of the dentist directed submarket is not the basis for Plaintiffs' Section 1 claim.[17] Instead, the plain text of the Section 1 claim focuses exclusively on allocation of the DTC product submarket to SDC, and is brought solely on behalf of consumers who purchased SDC aligners.[18]

### b.   The operating agreement is a horizontal agreement between competitors.

Here, Plaintiffs have specifically alleged a Section 1 market allocation agreement between Align and SDC, contained within the Operating Agreement, where Align agreed not to compete in the DTC channel and, in exchange, received a 17% ownership interest in SDC.[19] In particular, the Operating Agreement specifically stated that Align could not "███████████████████ ██████████████"[20] The Agreement defined ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

something less than, or different from, absolute bans on selling in one another's designated territory … . The case law is clear that a market division need not be an agreement that each firm will stay completely out of the assigned territory of the other.").

[16] *See* Areeda & Hovenkamp, Antitrust Law, ¶ 2030(c).

[17] Furthermore, Align's argument that the Supply Agreement prohibits SDC from selling aligners is unpersuasive, as explained more fully in Section III.D.1.a of Plaintiffs' opposition to Align's motion to dismiss.

[18] *See* SAC ¶¶ 244–45.

[19] *See* SAC ¶¶ 17, 110–12, 141 & Ex. A (Operating Agreement).

[20] *See* Operating Agreement § 7.9(e).

████████████████████████████████████████████████████ [1] Notably, this

provision was enforced against Align when, in November 2017, it opened two "Scan Shops"

mimicking SDC's consumer-facing "SmileShop" business model; Align was forced to close them

when SDC initiated (and later prevailed in) arbitration to enforce the Operating Agreement's

restrictive covenants.[22]

Courts have repeatedly recognized that agreements where one competitor cedes a market to

another competitor, in exchange for a share of the resulting supracompetitive profits, are

anticompetitive. For example, the Supreme Court specifically held that it was per se market

allocation when one competitor agreed to exit a geographic product market and, in exchange,

received a share of the revenues from that product submarket.[23] Similarly, Judge Orrick recently held

in *Juul Labs* that plaintiffs sufficiently alleged per se market allocation based on an agreement

between Altria and Juul Labs as part of which Altria purchased a 35% stake in Juul and, in exchange,

Altria agreed to stop competing with Juul Labs in the e-cigarette market[24]; Judge Orrick held this

was sufficient to allege a per se anticompetitive agreement even though Altria's written contract with

Juul Labs did not "expressly require" Altria to leave the market.[25] Here, the inference of a per se

agreement is stronger than in *Juul Labs* because the Operating Agreement expressly prevents Align

from operating a competing business with SDC.

Align never disputes that the Operating Agreement prevented Align from competing in the

DTC market. It would be hard to argue otherwise—since a mediator issued an injunction against

---

[21] *Id.* § 7.9(f).

[22] *Id.* ¶¶ 134–135.

[23] *See Palmer*, 498 U.S. at 47–49.

[24] *In re Juul Labs, Inc., Antitrust Litig.*, No. 20-CV-02345-WHO, 2021 WL 3675208, at *1 (N.D. Cal. Aug. 19, 2021) ("The heart of plaintiffs' allegations, as those made by the Federal Trade Commission ('FTC') in proceedings against JLI and Altria, is that Altria intentionally departed from the e-cigarette market (despite actively competing with JLI in that market) and joined forces with JLI under a non-compete agreement in order to gain access to and control over JLI's market-leading product and technology. In return, JLI (and its major investors) received billions of dollars as well as access to Altria's extensive distribution network, retail opportunities, and regulatory expertise.")

[25] *Id.* at *17.

Align competing in the DTC market based on the Operating Agreement.[26] Nor does Align dispute that it was able to compete in the DTC market—in its briefing, Align proudly notes that SDC was "using dated and simplistic aligner technology that was ten years old," i.e., technology that Align already possessed. And, of course, the Supply Agreement shows that Align was able to supply SDC with the aligners that it used for the DTC market. Thus, Align obviously could have competed in the DTC market because it could have sold those same aligners directly to consumers.

Instead, Align makes the factual argument that it was not a potential competitor to SDC in the DTC aligner market because selling aligners directly to consumers would jeopardize its business relationships with dentists. This argument fails for three independent reasons.

First, Align itself did attempt, the year after signing the Operating Agreement, to compete in the DTC market by opening stores that marketed aligners directly to consumers. Align makes various factual assertions to explain away this conduct but, at the motion to dismiss stage, it is reasonable to infer that Align was a potential competitor of Smile Direct Club in the DTC market in 2016 because it did attempt to compete in that market in 2017. Specifically, Align argues that Plaintiffs' allegations regarding its decision to open these "Scan Shops" "do[] not transform Align into a likely competitor to SDC in direct-to-consumer aligner sales" because Plaintiffs "do not allege that this store would have operated without a dentist interaction" and because these stores "refer[red] potential Invisalign patients to a local dentist or orthodontist."[27] But Align makes no attempt to reconcile this with an arbitrator's finding that Align's stores were competing businesses in violation of the Operating Agreement's restrictive covenants on Align's ability to compete with SDC.[28] Furthermore, it appears that Align's model for these shops was in fact similar to SDC's: as explained in the SAC, SDC refers "case assessments" to remote dental professionals.[29] At a minimum, this implicates a question of fact. Indeed, Align's emphasis that it only opened a "single brick-and-mortar location" is particularly

---

[26] SAC ¶ 135.

[27] Mot. to Strike at 7–8 & n.6.

[28] *See* SAC ¶¶ 111, 134–35.

[29] *See id.* ¶ 105 (describing SDC ordering process "patient workflow").

ironic.[30] Align was prevented from opening more such locations **because** of the market allocation agreement.

Second, Align utterly fails to explain why it would have been (1) economically irrational for it to directly sell aligners to consumers because of the harm to its relationship with dentists, but meanwhile (2) economically rational for it to supply aligners to SDC, which then directly sold those aligners to consumers. Furthermore, Plaintiffs have not asserted, nor has Align provided any evidence, that selling aligners to consumers would have required Align to entirely sacrifice its existing relationships. Indeed, Align supplied aligners to SDC for sale directly to consumers without apparent fear of hurting its existing business relationships. And Align itself reassured dentists that its ownership interest in SDC would help it control the development of the direct to consumer product submarket: Align's CEO remarked publicly in 2016 that Align's equity ownership in SDC could "help [it] control how this market develops protecting the orthodontic community."[31] Meanwhile, 2016 market analyses recognized Align and SDC as competitors.[32]

Furthermore, Plaintiffs allege that the DTC and dentist-directed channels are distinct multi-billion dollar submarkets, overlapping (by Align's own account) with respect to only 10% of "simple" cases.[33] It is therefore not only plausible but consistent with the structure of the underlying aligner market as a whole that Align could enter the DTC submarket without undercutting its position in the dentist-directed submarket; it would be economically irrational for Align *not* to contemplate this.[34]

---

[30] Mot. to Strike at 7.

[31] *Id.* ¶ 129.

[32] *Id.* ¶¶ 129–130 (citing 2016 research note stating: "As we learn more and more about the SDC relationship, we believe [Align] is strategically positioning itself ahead of future competition (various patents expire in late 2017) that will likely compete at the low end of the market initially.").

[33] SAC ¶¶ 170–83.

[34] Conversely, Align's argument that SDC was not a "potential competitor" in the dentist-directed submarket because it "was incapable of producing aligners to compete for sales to dentists" strains credulity. Mot. to Strike at 5–6. Not only is it at odds with Align's public statements; even assuming that SDC lacked the same manufacturing capacity and technology as Align in 2016, that does not mean it was unable to sell aligners through dentists, or that it wasn't seen as a *potential* threat in this channel—particularly given Align's then-looming patent expirations in 2017 and fear of competition in the market for "simple" cases. Indeed, on January 14, 2020, immediately after the

Third, even accepting Align's assertions, the most logical inference is that the anticompetitive market allocation made "economic sense" because it provided an elegant solution to Align's business conundrum—allowing it to gain a share of supracompetitive profits in the DTC market through its ownership stake in SDC while avoiding direct entrance that would potentially jeopardize its monopolization of the dentist product submarket. Conversely, the market allocation agreement also provided SDC with protection from the uncertain threat of competition, allowing it to "keep prices higher or innovation rates lower in the affected market."[35] Indeed, at its core, every market allocation agreement involves competitors' determination that competition is less profitable than collusion. The fact that Align's business determination may have been based on complex factors does not alter the analysis. What matters is that, rather than make a legal, unilateral decision not to compete in the market, Align chose to enter into an agreement with a competitor that specifically restrained it from competing. That agreement is what Section 1 of the Sherman Act forbids.

   c.   **Plaintiffs have sufficiently alleged that the Operating Agreement is a per se restraint, and Align's arguments that it is an ancillary restraint implicate questions of fact not suitable for resolution on the pleadings.**

The Ninth Circuit has recognized that a horizontal agreement between competitors is exempt from the per se rule and analyzed under the rule of reason if it meets two requirements: the restraint must be "(1) 'subordinate and collateral to a separate, legitimate transaction,'" and "(2) 'reasonably necessary'" to achieving that transaction's pro-competitive purpose.[36]

Align conclusorily asserts that the first requirement is satisfied because "Plaintiffs concede [the Operating and Supply Agreements] must be considered together."[37] But the question under

---

Supply Agreement expired, SDC announced plans to "offer its clear aligners through the wholesale channel, providing dentists and orthodontists an in-office option in 2020." SAC ¶ 138.

[35] *See* Areeda & Hovenkamp, Antitrust Law, ¶ 2030(b) ("Market-division agreements serve not merely to eliminate actual competition among the agreeing parties; they also eliminate the threat of competition and thus enable parties to keep prices higher or innovation rates lower in the affected market. As long as Alpha Company does not know what Beta Company's entry plans are, Alpha must make its pricing and innovation decisions subject to the threat of Beta's entry. But as soon as Alpha and Beta have executed a market-division agreement, then Beta is no longer a threat and Alpha can relax.").

[36] *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (internal citations omitted).

[37] Mot. to Strike at 9.

Ninth Circuit law is whether the restraint in the Operating Agreement is "subordinate and collateral to a separate, legitimate transaction." Plaintiffs in no way concede that the Operating Agreement is subordinate and collateral to the Supply Agreement.[38]

First, and most obviously, the Operating and Supply Agreements are entirely *separate* agreements. Align and SDC could have chosen to enter into one rather than two agreements, but they did not do so. And, most notably, the Operating Agreement's provisions do not depend on the continuing existence of the Supply Agreement: while the Supply Agreement concluded at the end of 2019, the anticompetitive effect of the Operating Agreement remains in place, with Align still prohibited from entering the DTC market.[39] Thus, these two agreements can and do exist independent of each other. And, even if the Supply and Operating Agreements are considered together, courts recognize that "the fact that such a horizontal allocation agreement is contained within a vertical agreement does not save it."[40]

In similar circumstances, courts in this District have held that the determination of whether to apply per se treatment to a horizontal restraint between competitors must be made "based on factual evidence relating to the agreement's formation and character."[41] For example, in *eBay*, Judge Davilla

---

[38] Plaintiffs also do not concede that the Supply Agreement is itself a separate, legitimate transaction; rather Plaintiffs have alleged the Supply Agreement furthered Align's monopolization of the dentist-directed market.

[39] ████████████████████████████████████████████████████ As part of a 2019 judgement against Align based on its breach of the parties' covenant not to compete, an arbitrator extended the Operating Agreement's non-compete provision to August 18, 2022. SAC ¶¶ 135, 141.

[40] *C-E Mins., Inc. v. CARBO Ceramics, Inc.*, No. 1:11-CV-02574-JOF, 2012 WL 13008801, at *4 (N.D. Ga. Mar. 14, 2012) (considering a per se restraint a requirement in a vertical supply agreement that a potential competitor not enter a product market); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) (explaining that an ancillary restraint "must be related to the efficiency sought to be achieved. If it is so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary."); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 338–39 (2d Cir. 2008) ("[U]nder the doctrine of ancillary restraints, when a challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing purposes of a joint venture, it will be evaluated apart from the rest of the venture. This doctrine seeks to distinguish between those restraints that are intended to promote the efficiencies of a joint venture and those that are simply unrelated.") (Sotormayor, J., concurring) (internal citations omitted).

[41] *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039–40 (N.D. Cal. 2013).

rejected both parties' characterization of an agreement at the pleading stage, emphasizing the need

for "factual evidence" before making a determination:

> eBay challenges the United States' assertion that the alleged agreement
> is a naked one, instead arguing that the agreement is ancillary to a
> legitimate procompetitive business purpose: Mr. Cook's service on
> eBay's board. The court agrees with eBay's contention that the fact
> that the United States labeled the agreement a naked one does not
> make it so. By the same token, however, the court cannot hold that the
> agreement is ancillary simply because eBay posits that it is. The court
> must instead make that determination based on factual evidence
> relating to the agreement's formation and character.
>
> Though the parties supply substantial legal argument to support their
> respective positions, they do so without the benefit of discovery, and
> thus without sufficient factual evidence to support their contentions. At
> this stage in this action, the court simply cannot determine with
> certainty the nature of the restraint, and by extension, the level of
> analysis to apply.[42]

Similarly, Judge Orrick held that plaintiffs had adequately alleged a per se agreement because

"whether the Agreement was a 'naked' *pro se* restraint (as characterized by plaintiffs given the

unwritten but otherwise expressed requirement that [defendant] leave the market) or merely an

'ancillary' restraint (as characterized by the defendants whereby Altria was only prohibited from

introducing new products into the market and part of the defendants' 'larger endeavor whose success

they promote') cannot be determined at this juncture."[43] Notably, *Aya* itself, a case that Align heavily

relies upon, was decided at the summary judgment stage. The same result should apply here—

whether or not the market allocation of the DTC product market is per se or ancillary can only be

determined with the benefit of discovery to determine whether the Operating Agreement was truly

subordinate and collateral to the Supply Agreement.

The second requirement of *Aya* is that a restraint must be reasonably necessary to achieving a

transaction's procompetitive purpose. But the two "procompetitive purposes" that Align purports to

identify in its business arrangement with SDC are completely unconnected from the Operating

Agreement.

---

[42] *Id.*

[43] *In re Juul Labs*, 2021 WL 3675208, at *19.

First, Align claims the Supply Agreement ensured lawful supply to SDC and thus increased output. But Align could obviously have sold aligners to SDC without taking an ownership interest in SDC that prohibited it from competing in the DTC market; furthermore, the Operating Agreement contains no provisions related to ensuring supply of aligners from Align to SDC. Though Align insists that the Operating Agreement's restriction on its ability to compete with SDC was a "reasonable inducement" to assure SDC's "pre-existing equityholders" of the "value of their investment,"[44] this argument proves too much: by Align's logic, any vertically integrated monopolist could simply bootstrap a market allocation scheme into an agreement to supply an actual or potential competitor with an input to its business.[45] Furthermore, Align's argument that SDC had to be induced into entering into the Operating Agreement is in obvious tension with its repeated arguments elsewhere that the Supply Agreement "ensured lawful supply of clear aligners to SDC."[46] Ensuring a lawful supply seems more than sufficient inducement for SDC to enter into the Supply Agreement with Align without any need for SDC to also receive separate contractual assurances that Align would not compete with SDC.

Second, Align claims that the agreements resolved patent infringement litigation and thus prevented SDC from "free riding" on Align's intellectual property rights. But Align would not be "free riding" on its own intellectual property if it chose to sell aligners in the DTC market. Indeed, Align competing against SDC in the DTC market would seem to be the most procompetitive way to prevent this purported "free riding". Here, to the contrary, the Operating Agreement actively prevented Align from even using its own intellectual property to compete against SDC. Thus, Align has failed to identify *any* connection between the Operating Agreement and the prevention of "free riding," much less demonstrate that the Operating Agreement was "narrowly tailored" to prevent SDC from free riding on Align's intellectual property.

---

[44] Mot. to Strike at 11.

[45] *See Rothery*, 792 F.2d at 224 (if ancillary restraint is "so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary.")

[46] Mot. to Strike at 10.

Therefore, Plaintiffs have sufficiently alleged that Align's allocation of the DTC product submarket to SDC was a naked horizontal restraint subject to per se scrutiny.[47] Align's procompetitive explanations for the market allocation agreement are not suitable for resolution at this stage.[48] As courts in this district recognize, decision on ultimate classification of the challenged restraint is a question of fact that is "more appropriate for summary judgment."[49]

**B.      Plaintiffs' allegations regarding SDC make "economic sense."**

Align offers a grab bag of reasons why Plaintiffs' allegations regarding the SDC-Align relationship should be struck wholesale from the complaint. None has merit.

*First*, Align argues that Plaintiffs' allegations regarding the SDC-Align relationship are internally inconsistent. These claims—which rest on a fundamental misreading of Plaintiffs' complaint—are identical to arguments Align makes in its motion to dismiss; Plaintiffs respond to them in their opposition to that motion.[50]

*Second*, Align argues once more that it would be "economically illogical and inherently contradictory" for it to enter the DTC market. But as explained above, this claim falls apart on close inspection.

*Third*, Align argues that Plaintiffs' "SDC allegations" should be struck wholesale from the complaint because they "implicate[] … Align's right to petition for redress of grievances under the

---

[47] In a lone sentence of its brief, Align also asserts that "settlements of patent litigation among would-be competitors in in the Hatch-Waxman framework governing FDA approval of generic pharmaceuticals are also *analyzed* under the rule of reason." Mot. to Strike at 3 (citing *FTC v. Actavis*, 570 U.S. 136, 158-60 (2013)). But the only case it cites stands for no such sweeping proposition: in *Actavis*, the Supreme Court declined to apply the per se rule to reverse payment settlement agreements, explaining that, because a number of factors affect if and under what circumstances these payments have "anticompetitive effects," the rule of reason should apply. 570 U.S. at 159.

[48] *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 864 (C.D. Cal. 2015) (holding that "even if the Court were to agree with [defendant]" that the challenged market allocation agreement contained within an IP license "alleges procompetitive aspects…the purported procompetitive nature…is not a matter that can be adjudicated on a motion to dismiss. At most [Defendant] has raised factual issues that are inappropriate to resolve at this stage.").

[49] *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (collecting cases).

[50] *See* Mot. to Dismiss at 14–15; Plaintiffs' Opp'n to Mot. to Dismiss at Section III.B.1.b (responding to these arguments).

First Amendment pursuant to the *Noerr-Pennington* doctrine"[51] But Plaintiffs' claims do not depend on proving Align's "liability for petitioning conduct"[52] or that its lawsuit against SDC was part of a larger "anticompetitive scheme."[53] Instead, Plaintiffs' monopolization claims are based not on Align's initiation of litigation but on the Supply Agreement that Align entered into with SDC.[54] And, in any case, the Supreme Court has specifically recognized that "patent-related settlement agreements can sometimes violate the antitrust laws."[55] By Align's logic, any agreement made against the backdrop of litigation, no matter how facially anticompetitive, would be afforded effective antitrust immunity under the *Noerr-Pennington* doctrine absent proof the underlying claims were brought in bad faith. To the contrary, the Supreme Court has repeatedly recognized that anticompetitive agreements are not immunized from antitrust liability simply because intellectual property is involved.[56]

Furthermore, the Court has already recognized in *Simon & Simon* that a number of factual issues surround Align's patent suit against 3Shape—including whether the suit has merit or, alternatively, was "brought in retaliation for 3Shape's refusal to comply with Align's ongoing pressure to make the Trios scanner exclusive to Invisalign"—are disputed questions of fact

---

[51] Mot. to Strike at 14 (citing *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 934–35 (9th Cir. 2006)).

[52] *Sosa*, 437 F.3d at 929, 933 (under *Noerr-Pennington* doctrine, those who petition government for redress are generally immune from statutory liability for "petitioning conduct", including filing of legal complaints).

[53] *See Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-CV-00923-BLF, 2018 WL 11230167, at *9 (N.D. Cal. May 21, 2018) (discussing proper test employed for "how to evaluate a constitutionally protected lawsuit as part of a larger anticompetitive scheme.")

[54] Similarly, resolving Align's "ancillary restraints" defense would not require adjudication of the underlying patent suit's merits or otherwise "implicate[] Align's right to petition for redress of grievances under the First Amendment": as explained above, the relevant inquiry here in determining liability is whether the Operating Agreement was (1) in fact "subordinate and collateral" to the Supply Agreement and (2) "reasonably necessary" to Align's purported pro-competitive purposes, not whether the underlying lawsuit was justified or the threat of liability real. *See Aya Healthcare*, 9 F.4th at 1109.

[55] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 149 (2013) ("[T]his Court's precedents make clear that patent-related settlement agreements can sometimes violate the antitrust laws.").

[56] *See United States v. Sealy, Inc.*, 388 U.S. 350, 351, 357–58 (1967) (allocation of exclusive territories, including for usage of trademark, was unlawful); *Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951) ("Nor can the restraints of trade be justified as reasonable steps taken to implement a valid trademark licensing system").

potentially relevant to Plaintiffs' monopolization claim.[57] Align makes no attempt here to recon with the Court's holding, the logic of which applies equally to Plaintiffs' SDC-related allegations. Whether or not Align's patent infringement claims against SDC were truly legitimate, or instead were brought in order to pressure SDC into entering anticompetitive agreements, is an obvious disputed question of fact.

*Fourth*, and finally, the Court should reject Align's speculative assertion that Align and SDC's collaboration as a whole was "output-enhancing." As explained in more detail in Plaintiffs' opposition to Align's Motion to Dismiss, the Supply Agreement furthered Align's monopolization of the dentist-directed submarket.[58] Meanwhile, as explained above, the Operating Agreement unquestionably allocated the DTC submarket to SDC. In other words, the Supply and Operating Agreements together restrained competition in the submarkets in which SDC and Align dominate, thus prohibiting two competitors otherwise willing to invest in market entry (as subsequent events demonstrated) from entering the playing field—to the detriment of customers.[59]

Furthermore, contrary to Align's assertions, SDC already had a supply of aligners (from ClearCorrect, an Align competitor) prior to entering into the Supply Agreement.[60] And, the Supply Agreement further indicates that SDC ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████[1] Thus, the Supply Agreement appeared to have simply substituted aligners from Align for pre-existing sources of aligners, rather than increasing overall output. Moreover, Plaintiffs have alleged in detail that by the middle of 2019,

---

[57] *Simon & Simon,* 2021 WL 1309299, at *6–7.

[58] *See* Pls.' Opp'n to Mot. to Dismiss at Section III.D.1.a.

[59] In a lone sentence of its brief, Align also asserts that "settlements of patent litigation among would-be competitors in in the Hatch-Waxman framework governing FDA approval of generic pharmaceuticals are also *analyzed* under the rule of reason." *Id.* at 3 (citing *FTC v. Actavis*, 570 U.S. 136, 158-60 (2013)). But the only case it cites stands for no such sweeping proposition: in *Actavis*, the Supreme Court refused to apply the *per se* rule to reverse payment settlement agreements, explaining that, because a number of factors affect if and under what circumstances these payments have "anticompetitive effects," the rule of reason should apply. 570 U.S. at 159.

[60] *See* SAC ¶¶ 130–31.

[61] Supply Agreement § 3.2.

SDC had stopped ordering any aligners from Align under the Supply Agreement[62]; thus, even though there was, by that point in time, *no* output from the Supply Agreement, the anticompetitive provisions of the Supply Agreement that prevented SDC from competing in the dentist-directed submarket remained in force.

**C.** *AGC* **does not apply to Plaintiffs' state law claims for damages for their Invisaligner purchases.**

Align argues that Plaintiffs lack *AGC* standing to bring claims for monopolization of the scanner market. But, in their amended complaint, Plaintiffs have removed their claim for injunctive relief under the Sherman Act for monopolization of the scanner market. And, for their state law claims, Plaintiffs only seek money damages for their purchases of Invisaligners. Indeed, it is not disputed that Plaintiffs never personally purchased scanners from Align. Thus, it is entirely unclear what Align seeks to strike under this argument. Furthermore, as explained in detail in prior briefing, Courts in this district have held that *AGC* does not apply to claims brought under the state laws of Arizona, California, Michigan, New York, North Carolina, Oregon, and Tennessee.[63]

**D.** **The reiterated arguments against Plaintiffs' California and Iowa state law claims fail.**

Align reiterates identical versions of its arguments in the motion to dismiss against Plaintiffs' claims under the Cartwright Act and Iowa state law. As discussed in the motion to dismiss, both sets of arguments fail. For purposes of the Cartwright Act, Plaintiffs have pled a series of combinations by Align. For the Iowa state law claim, Plaintiff Sandner's purchase of Invisaligners in 2017 occurred after Align entered into the anticompetitive agreements with SDC in 2016.

**IV.    CONCLUSION**

Plaintiffs respectfully request that the Court deny Align's motion to strike.

---

[62] SAC ¶ 136.

[63] *See* ECF No. 43, Plaintiffs' Opposition to Defendant Align Technology Inc.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint, at Section IV.C.1.

DATED: November 29, 2021          Respectfully submitted,

                                  HAGENS BERMAN SOBOL SHAPIRO LLP

                                  By */s/ Steve W. Berman*
                                      Steve W. Berman (*pro hac vice*)
                                  Theodore Wojcik (*pro hac vice*)
                                  1301 Second Avenue, Suite 2000
                                  Seattle, WA 98101
                                  Telephone: (206) 623-7292
                                  Facsimile:  (206) 623-0594
                                  Email: steve@hbsslaw.com
                                  Email: tedw@hbsslaw.com

                                  Rio S. Pierce (SBN 298297)
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                  715 Hearst Avenue, Suite 202
                                  Berkeley, CA 94710
                                  Telephone: (510) 725-3000
                                  Facsimile:  (510) 725-3001
                                  Email: riop@hbsslaw.com

                                  *Counsel for Plaintiffs*