PAUL HASTINGS LLP
Steven A. Marenberg (SB# 101033)
James M. Pearl (SB# 198481)
stevenmarenberg@paulhastings.com
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone:  1(310) 620-5700
Facsimile:  1(310) 620-5899

*Attorneys for Defendant Align Technology, Inc.*

Additional counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MISTY SNOW, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>Defendant. | CASE NO. 3:21-cv-03269-VC<br><br>**DEFENDANT ALIGN TECHNOLOGY, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:        December 16, 2021<br>Time:        10:00 a.m.<br>Place:       Courtroom 4, 17th Floor<br>Judge:      Hon. Vince Chhabria<br><br>Date Action Filed: May 3, 2021 |

## TABLE OF CONTENTS

PAGE

I.   Plaintiffs' Sherman Act Claims Fail .......................................................................2

     A.   Plaintiffs Still Fail to Plead Article III Standing.............................................2

     B.   Plaintiffs' *Per Se* Sherman Act, Section 1 Claim Must Be Dismissed. ...................4

          1.   The Agreements Among Align and SDC Are Properly Viewed as a
               Single Collaboration. ....................................................................................4

          2.   The SAC's Allegations Show the Collaboration Increased Output,
               Especially in Light of Settling Patent Infringement Claims. ......................5

          3.   Plaintiffs' Argument About Developments Occurring a Year After
               the Align-SDC Collaboration Began Ignores Applicable Law...................8

     C.   Plaintiffs' Section 1 Claim Is Time-Barred. .............................................................8

     D.   The SAC's Contradictory Allegations Render the Section 2
          Monopolization Claim Implausible, Notwithstanding Plaintiffs'
          Rationalizations..................................................................................................10

II.  Plaintiffs' New Theories Cannot Save the State Law Claims. ..........................................11

     A.   Plaintiffs' Cannot State a Cartwright Act Claim by Misreading the Supply
          Agreement or Attempting to Shoehorn Blatantly Unilateral Conduct.................11

          1.   Align's Termination of Interoperability Is Not Concerted Conduct..........11

          2.   Plaintiffs' Unsupported SDC Allegations Should Be Disregarded. ..........12

          3.   Alleged Exclusive Dealing Does Not Violate the Cartwright Act. ...........13

     B.   Plaintiffs' UCL Claim Fails Because It Improperly Seeks Damages
          Through a Restitution Remedy; and Fails to State a Claim...................................14

     C.   Plaintiffs Lack Standing to Bring the Iowa Claim (Eighth Claim) Because
          the SDC Allegations Are Not Cognizable Thereunder..........................................15

     D.   Plaintiffs Cannot Avoid the Heightened Pleading Standard Applicable to
          the Florida Claim, Which They Concede They Cannot Meet. ..............................15

     E.   The Arizona Claim (Third Claim) Should Be Dismissed......................................15

III. Conclusion .......................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc., v. FTC*,
1 F.4th 102 (2d Cir. 2021) ........................................................................................ 6

*In re ATM Fee Antitrust Litig.*,
768 F. Supp. 2d 984 (N.D. Cal. 2009) ...................................................................... 8

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ................................................................................. 4, 8

*Bedi v. Hewlett-Packard Co.*,
No. 07–12318–RWZ, 2008 WL 11226235 (D. Mass. Nov. 17, 2008) ...................... 7

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................................. 2

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) ............................................................................................ 14

*Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*,
111 F.3d 1427 (9th Cir. 1996) .................................................................................. 9

*Ervin Equip. Inc. v. Wabash Nat'l Corp.*,
No. 4:15-cv-104, 2017 WL 416304 (N.D. Ind. Jan. 31, 2017) ............................... 10

*Fenerjian v. Nongshim Co.*,
72 F. Supp. 3d 1058 (N.D. Cal. 2014) .................................................................... 15

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.*,
114 Cal. App. 4th 309 (2003) ................................................................................. 13

*Fulford v. Logitech, Inc.*,
No. C-08-2041 MMC, 2008 WL 4914416 (N.D. Cal. Nov. 14, 2008) .................... 14

*G.H.I.I. v. MTS, Inc.*,
147 Cal. App. 3d 256 (1983) .................................................................................. 12

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) .................................................................... 9

*Gerlinger v. Amazon.Com, Inc.*,
311 F. Supp. 2d 838 (N.D. Cal. 2004) ...................................................................... 8

*In re Germ. Auto. Mfrs. Antitrust Litig.*,
392 F. Supp. 3d 1059 (N.D. Cal. 2019) ................................................................ 4, 7

*In re Humira (Adalimumab) Antitrust Litig.*,
　465 F. Supp. 3d 811 (N.D. Ill. 2020) ........................................................................ 6, 7

*Ice Cream Distribs of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
　No. 09-5815 CW, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010) ............................ 14

*Jones v. Micron Tech., Inc.*,
　400 F. Supp. 3d 897 (N.D. Cal. 2019) ....................................................................... 15

*In re JUUL Labs, Inc., Antitrust Litigation*,
　No. 20-CV-02345-WHO, 2021 WL 3675208, at *17-18 (N.D. Cal. Aug. 19,
　2021) ...................................................................................................................... 7, 8

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) .................................................................................................. 2, 3

*In re MacBook Keyboard Litig.*,
　No. 5:18-CV-02813-EJD, 2019 WL 6465285 (N.D. Cal. Dec. 2, 2019) ................... 3

*Mirpad, LLC v. Cal. Ins. Guar. Ass'n*,
　132 Cal. App. 4th 1058 (2005) .................................................................................. 12

*Nalley v. Laporte*,
　No. 21-cv-06180-TSH, 2021 WL 3565438 (N.D. Cal. Aug. 12, 2021) ..................... 5

*In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*,
　No. CV 15-09996-BRO, 2016 WL 1192642 (C.D. Cal. Mar. 28, 2016) ................... 14

*In re NFL's Sunday Ticket Antitrust Litig.*,
　933 F.3d 1136 (9th Cir. 2019) .................................................................................... 5

*In re Pac. Gateway Exch., Inc. Sec. Litig.*,
　169 F. Supp. 2d 1160 (N.D. Cal. 2001) ..................................................................... 5

*Peng v. Mei Chin Penghu*,
　335 F.3d 970 (9th Cir. 2003) .................................................................................... 15

*Prince v. DSM Nutritional Prods. LLC*,
　854 F. App'x 233 (9th Cir. 2021) ............................................................................... 3

*In re Qualcomm Antitrust Litig.*,
　292 F. Supp. 3d 948 (N.D. Cal. 2017) ..................................................................... 12

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
　532 F.3d 963 (9th Cir. 2008) .................................................................................... 11

*Samsung Elecs. Co. v. Panasonic Corp.*,
　747 F.3d 1199 (9th Cir. 2014) .................................................................................... 9

*Shersher v. Super. Ct.*,
    65 Cal. Rptr. 3d 634 (Ct. App. 2007)........................................................................... 14

*Simon & Simon v. Align Tech., Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. 2021) ........................................................................ 13

*Skaff v. Meridien N. Amer. Beverly Hills*,
    506 F.3d 832 (9th Cir. 2007) ...................................................................................... 3

*Snake River Farmers' Ass'n, Inc. v. Dep't of Lab.*,
    9 F.3d 792 (9th Cir. 1993) ......................................................................................... 3

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir.), *amended,* 275 F.3d 1187 (9th Cir. 2001)........................... 10

*Stewart v. Gogo, Inc.*,
    No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ..................... 14

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................................................... 2, 3

*U.S. v. eBay, Inc.*,
    968 F. Supp. 2d 1032 (N.D. Cal. 2013) ..................................................................... 8

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    20-MD-02966-LHK, 2021 WL 3612497 (N.D. Cal. Aug. 13, 2021)......................... 7

**Statutes**

28 U.S.C. § 1367(b) ................................................................................................ 15

**Other Authorities**

Align July 28, 2016 Press Release, https://investor.aligntech.com/news-
    releases/news-release-details/align-technology-supply-non-invisalign-clear-
    aligners............................................................................................................... 5

Areeda & Hovenkamp, Antitrust Law § 704b4 (4th ed.) ............................................ 6

Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of
    Intellectual Property at 5 (Jan. 12, 2017),
    https://www.justice.gov/atr/IPguidelines/download ................................................ 7

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

Just as the Second Amended Complaint ("SAC") radically departs from the antitrust theories spun in Plaintiffs' prior pleadings, the Opposition radically departs from the actual allegations of the SAC.  Despite Plaintiffs' ever-changing theories over multiple complaints, one unifying theme remains:  Plaintiffs cannot state an antitrust claim against Align—not under Section 2 of the Sherman Act (the original claim), not under Section 1, and not under the numerous state statutes they attempt to invoke.

Specifically, nothing in the Opposition does or could change the conclusion that Plaintiffs lack Article III standing to bring their Section 2 claim, which they originally copied from the direct purchaser plaintiffs' complaint in the *Simon & Simon* case.  Plaintiffs premise their standing to pursue the monopolization claim solely on the allegation that one of the sixteen named plaintiffs may, at some unknown time in the future, buy Invisalign treatment for her unidentified child when she is "financially ready."  This is not the "imminent" harm required for standing. The Court should reject Plaintiffs' third ill-pleaded effort to allege Article III standing.

Plaintiffs' new Section 1 claim, which (curiously) complains of supracompetitive prices on aligners sold by *SmileDirectClub* ("SDC") in a putative direct-to-consumer ("DTC") submarket (yet, without naming SDC as a defendant), also fails.  Plaintiffs now disavow a Section 1 rule of reason claim and there is nothing in the collaboration between Align and SDC that supports a *per se* violation of Section 1.   To the contrary, the SAC details an output-enhancing, *i.e.*, pro-competitive, arrangement that resolved patent litigation between Align and SDC, not a naked market allocation to which the *per se* rule would apply.  The Opposition also does nothing to avoid the conclusion that Plaintiffs' Section 1 claim is both time-barred, as well as implausible and inconsistent with Plaintiffs' Section 2 claim.  In their desperate gambit to save this case no matter the allegations, Plaintiffs have pleaded themselves out of it.

In addition to Plaintiffs' infirm federal claims, their state law claims remain fundamentally defective.  In particular, Plaintiffs' Cartwright Act claim does not sufficiently allege concerted activity, and Plaintiffs' new legal theories and baseless assertions do not remedy this defect.  Plaintiffs' other state law claims suffer from a variety of defects including failure to state a claim

and lack of standing.  Accordingly, Plaintiffs' SAC should be dismissed.

## I.     PLAINTIFFS' SHERMAN ACT CLAIMS FAIL

### A.     Plaintiffs Still Fail to Plead Article III Standing.

Plaintiffs' Opposition confirms that its sole alleged basis for Article III standing on its Section 2 claim is a single allegation in the SAC: that Plaintiff Vo "intends to purchase Invisalign aligners in the future once [she is] financially ready to make the purchase."  SAC ¶ 42.  This allegation is the SAC's only addition to the First Amended Complaint, which the Court dismissed for lack of Article III standing, and it does nothing to change the result. Plaintiffs make two arguments in their effort to prop up Plaintiff Vo's insufficient standing arguments.  First, they argue that Plaintiff Vo's intent to purchase Invisalign for an unnamed child at some unknown point in the future, following certain unidentified financial contingencies, suffices for Article III standing to pursue injunctive relief.  Second, Plaintiffs argue that, even if it does not suffice, they should be allowed to take discovery on their Section 2 claim and attempt to discover some unexplained basis for constitutional standing.  Both arguments are without merit.

First, Plaintiff Vo's future intent is not the type of "imminent" or "certainly impending" injury that supports Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Rather, Plaintiff Vo concedes that any future purchase she intends to make for her second child is an uncertain and contingent event. Plaintiff Vo's alleged future harm depends on at least (i) her family being "financially ready to make the purchase," if ever; (ii) her unnamed child reaching an undisclosed age at which point they may seek treatment, if ever; and (iii) Invisalign treatment still allegedly being subject to supracompetitive prices at this unknown future date.  *See* SAC ¶ 42.  This "highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending."  *Clapper*, 568 U.S. at 410.

Plaintiffs misplace reliance on various inapposite cases discussing standing to pursue claims when a plaintiff faces criminal enforcement actions by governments or paying attorney's fees.[1]  Contrary to Plaintiffs' argument, constitutional standing to pursue injunctive relief requires

---

[1] For example, *Susan B. Anthony List v. Driehaus* was concerned with "when the threatened

that a plaintiff demonstrate something more than a mere *intent* to engage in future conduct that might lead to harm. *See Lujan*, 504 U.S. at 564. Indeed, in *Lujan*, the Supreme Court rejected the plaintiff's statement that "I intend to go back to Sri Lanka . . . I don't know [when]. . . . In the future." as too speculative to support Article III standing. 504 U.S. at 564. Plaintiff Vo's statement that she "intends" to purchase Invisalign in the future, but that she does not know when or if any other conditions precedent will be satisfied, is no different.

Second, as a last-ditch pivot, Plaintiffs ask that dismissal of their Section 2 claim be deferred until after discovery. But all facts relevant to standing are held solely by *Plaintiffs*, in particular Plaintiff Vo. Thus, Plaintiffs need no discovery; if such facts exist, they should have been presented by now (after three failed attempts). There is no credible justification for delaying disposition of this issue. Challenges to Article III standing can be, and frequently are, resolved on motions to dismiss. Indeed, here (with respect to the First Amended Complaint), and in other cases, this Court has recognized that claims may be dismissed at the pleading stage for lack of Article III standing. *See, e.g.*, *Prince v. DSM Nutritional Prods. LLC*, 854 F. App'x 233 (9th Cir. 2021) (affirming dismissal for lack of Article III standing (Chhabria, J., below)); *Snake River Farmers' Ass'n, Inc. v. Dep't of Lab.*, 9 F.3d 792, 793–94 (9th Cir. 1993) (affirming Rule 12 dismissal for lack of Article III standing); *In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2019 WL 6465285, at *4 (N.D. Cal. Dec. 2, 2019) ("A party may seek dismissal of a suit for lack of subject-matter jurisdiction on grounds of . . . lack of standing 'in a motion to dismiss under [Rule] 12(b)(1), not Rule 12(b)(6).'" (quoting *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000))).

Accordingly, Plaintiffs' Section 2 claims should again be dismissed for lack of standing.

---

enforcement of a criminal law creates an Article III injury," an irrelevant issue here. 573 U.S. 149 (2014). *Susan B. Anthony* nevertheless reiterated the requirement that a threatened future injury be "certainly impending," or that there be a "'substantial risk' that the harm will occur." *Id*. (quoting *Clapper*, 568 U.S. at 414, n.5). Neither of those requirements are met here.

*Skaff v. Meridien N. Amer. Beverly Hills* premised standing on the fact that the plaintiff, a paraplegic, had actually experienced ADA-violative conditions at the defendant's hotel and thus was actively deterred from returning until the conditions were remedied. 506 F. 3d 832, 840–41 (9th Cir. 2007) (per curiam). That is a far cry from the alleged circumstances of Plaintiff Vo.

- 3 -

**B.     Plaintiffs' *Per Se* Sherman Act, Section 1 Claim Must Be Dismissed.**

Plaintiffs' briefing transforms their Section 1 claim in a way that makes it more vulnerable to dismissal.  By disavowing a rule of reason claim (MTD Opp'n at 7) in their Opposition, Plaintiffs make it so that the only question the Court must answer at this stage is whether the Align-SDC collaboration which provided a supply of DTC aligners is among the "small group of restraints [that] are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (citation omitted); *see also In re Germ. Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1069-73 (N.D. Cal. 2019) (dismissing *per se* claim where not plausibly alleged).  Contract covenants that are (1) subordinate and collateral to a separate, legitimate transaction and (2) reasonably necessary to achieve the transaction's procompetitive purpose do not meet that standard.  *Aya*, 9 F.4th at 1109 (internal quotations and citation omitted).  Here, the SAC pleads that (1) the non-compete provision is subordinate and collateral to the overall SDC-Align vertical arrangement; and (2) necessary to the Align-SDC collaboration's procompetitive purpose of increased output as part of resolving pending patent litigation.

**1.     The Agreements Among Align and SDC Are Properly Viewed as a Single Collaboration.**

The Operating Agreement, Supply Agreement, and resolution of Align's patent infringement claims against SDC were all expressly connected, executed simultaneously and do not constitute a naked horizontal restraint to allocate markets worthy of *per se* condemnation.

The text of the Operating Agreement and Supply Agreement reflect a unified arrangement.  Section 1.7 of the Operating Agreement reads: "Align and [SDC] are entering into various other transaction documents for purposes of establishing their business relationship, including, without limitation, the Strategic Supply Agreement."  The Supply Agreement explicitly acknowledged the concurrent execution of the Operating Agreement, and resolution of Align's then-pending patent infringement suit against SDC.  *See* Supply Agr't § 22.1 (providing for dismissal of *Align Tech., Inc. v. SmileCareClub LLC et al.*, No. 15-04864-BLF (N.D. Cal.)).

The SAC allegations also stress the interlocking nature of the Operating Agreement and Supply Agreement.  Plaintiffs allege that "Align entered into ***a set of interlocking agreements*** in

July 2016 with . . . SmileDirectClub."). *See* SAC ¶ 15; SAC ¶ 16 ("***the two companies entered into an interlocking set of agreements***").[2]  The Align-SDC agreements cannot be disaggregated and must be considered together.  *See In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1148–53 (9th Cir. 2019) (analyzing combined effect of three separate, "interlocking agreements").

Even considered alone (contrary to applicable law), the Operating Agreement cannot be reduced to a simple equity-for-non-compete swap—more is present.  It provides for capital contributions of members, Op. Agr't §§ 3.2–3.7, which supported SDC's "efforts to provide consumers with access to more choices."[3]  Plaintiffs' argument in Opposition requires that the Court treat the rest of the Operating Agreement as a sham, notwithstanding the absence of any supporting allegations, and the Supply Agreement as unrelated, contrary to law.  *See supra*.

Plaintiffs posit that Align and SDC could have entered into one contract rather than two, MTS Opp'n at 11, but that is irrelevant, indeed, antithetical to antitrust analysis of ancillary restraints, *see Sunday Ticket*, 933 F.3d at 1148–53, and is not alleged in the SAC.  "The [C]ourt cannot assume . . . that the [plaintiffs] can prove facts that [are] not alleged."  *Nalley v. Laporte*, No. 21-cv-06180-TSH, 2021 WL 3565438, at *2 (N.D. Cal. Aug. 12, 2021) (citation and quotation omitted).

### 2.    The SAC's Allegations Show the Collaboration Increased Output, Especially in Light of Settling Patent Infringement Claims.

The SAC does not plausibly allege a naked horizontal market allocation, but instead a collaboration that increased aligner output.  The Align-SDC collaboration provided capital for SDC and ensured it a stable supply of non-infringing aligners, all of which increased aligner output.  *See* SAC ¶ 110 (citing Align's $46.7 million investment in SDC, and the Operating and Supply Agreements).  Likewise, the resolution of patent claims eliminated free riding—SDC's infringement of Align's intellectual property.  *See* Supply Agreement § 22.1 (resolving *Align Tech., Inc. v. SmileCareClub LLC, et al.*, No. 15-04864-BLF (N.D. Cal.)).  Plaintiffs cannot

---

[2] Also, Align and SDC entered the agreements simultaneously.  *See* SAC ¶¶ 109, 113.

[3] Align July 28, 2016 Press Release, https://investor.aligntech.com/news-releases/news-release-details/align-technology-supply-non-invisalign-clear-aligners.  The SAC cited the same press release, *see* SAC ¶ 39 n.23, which the Court may then consider as part of Align's Motion.  *See In re Pac. Gateway Exch., Inc. Sec. Litig.*, 169 F. Supp. 2d 1160, 1164 (N.D. Cal. 2001).

dispute these procompetitive justifications, alleged in the SAC, and based on fundamental antitrust law.  As the leading antitrust treatise explains, "a patent dispute that settles with a market division license agreement will be approved."  Areeda & Hovenkamp, Antitrust Law § 704b4 (4th ed.).

Where such justifications are alleged in the complaint, a court should dismiss a *per se* claim.  For example, in *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), the court dismissed a *per se* market allocation claim because the *per se* rule does not apply to defendants who temporarily gave up their efforts to introduce competing biosimilars in the U.S. in return for near-immediate permission to launch biosimilars in Europe.  *Id.* at 836. Recognizing that patents likely barred the biosimilar defendants from launching in the U.S. absent the agreement, the court found that "[a]n agreement that allows competitors to enter markets from which there is a chance they would otherwise be excluded is not on its face anticompetitive."  *Id.* at 838.  The Second Circuit likewise rejected summary condemnation of competitors' agreement to not bid on terms for search engine advertising included in an agreement settling trademark claims.  *1-800 Contacts, Inc., v. FTC*, 1 F.4th 102 (2d Cir. 2021).  The court rejected abbreviated FTC treatment of the agreements under an "inherently suspect" framework and held that FTC failed to show under a rule of reason analysis a less-restrictive alternative that achieved the same benefits.  *See id.* at 119–22 (crediting procompetitive justification of settling trademark disputes).

Plaintiffs argue that SDC's supply of aligners from ClearCorrect shows that the Supply Agreement ***merely maintained*** SDC output rather than increasing it.  *See* MTS Opp'n at 16.  That ignores that Align sued SDC for patent infringement in 2015 during the time ClearCorrect supplied SDC, SAC ¶ 16, and that Align held ***hundreds of patents*** protecting its aligner technology.  SAC ¶ 62.  The SAC does not allege that SDC could sell aligners without the Operating Agreement, Supply Agreement, and resolution of the Align-SDC patent infringement suit.  *Cf. Humira*, 465 F. Supp. 3d 811.  Plaintiffs' argument also ignores the SAC's allegations that SDC's aligners supplied by ClearCorrect limited SDC's effectiveness.  *See* SAC ¶ 130 (citing public reports that recognized the ClearCorrect aligner technology was outdated).  It is implausible to assume SDC's growth would have been identical using ClearCorrect aligners between 2016 and 2019 given the SAC allegations about the limitations of that technology.  *See* MTS at 5–6.

Plaintiffs do not seriously rebut Align's analysis of ancillarity, instead engaging in a series of suppositions unsupported by their own allegations. The argument that "Align could obviously have sold aligners to SDC," MTS Opp'n at 12, assumes away the patent infringement suit.[4] Plaintiffs' supposition about Align entering DTC to eliminate freeriding, *see* MTS Opp'n at 13, is also incoherent. That would do nothing to stop SDC's infringement of Align patents, claims Align brought in 2015. SAC ¶ 16. Align supplying SDC with aligners resolved the infringement claims, *see* Supply Agreement § 22.1, and territorial limitations accompanying patent licenses "may serve procompetitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible." Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property at 5 (Jan. 12, 2017), https://www.justice.gov/atr/IPguidelines/download.[5]

Implicitly acknowledging the flaw of their *per se* theory, Plaintiffs ask the Court to delay determining whether the *per se* rule applies. But courts routinely reject the *per se* rule on motions to dismiss. *See, e.g.*, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 20-MD-02966-LHK, 2021 WL 3612497, at *31 (N.D. Cal. Aug. 13, 2021) (dismissing *per se* market allocation theory related to reverse payments made by defendant as part of patent settlement to delay generic drug entry); *Humira*, 465 F. Supp. 3d at 838 n.16 ("there are no facts that need to be developed before determining which rule to apply here"); *German Auto.*, 392 F. Supp. 3d 1059. Plaintiffs fail to show that discovery is warranted. Moreover, SDC, from which Plaintiffs would seek DTC pricing and sales information to show supracompetitive prices and injury, is not a party to this case.[6]

Plaintiffs' primary authority in support of its effort to defer consideration of this issue, *In re JUUL Labs, Inc., Antitrust Litigation*, is inapposite. *JUUL* involved allegations of an *unwritten agreement* among the defendants that allocated markets ***in addition to*** a written contract; a

---

[4] Plaintiffs' "bootstrap" ad absurdum, *see* MTS Opp'n at 13, also ignores critical facts. SDC relied upon Align for a stable aligner supply free of patent infringement liability as well as operating capital. The supplier relationship is not so easily ignored. *See Bedi v. Hewlett-Packard Co.*, No. 07–12318–RWZ, 2008 WL 11226235, at *1 (D. Mass. Nov. 17, 2008) (dismissing *per se* claim).

[5] Plaintiffs concede that in cases with alleged reverse payments in patent settlements under the Hatch-Waxman generic drug FDA framework, the rule of reason applies. MTD Opp'n at 7 n.26.

[6] Anomalously, the § 1 claim alleges that SDC's product, not any Align product, was sold by SDC at supracompetitive prices yet SDC is not even named as a defendant.

combination that required testing "on an evidentiary basis."  20-CV-02345-WHO, 2021 WL
3675208, at *17–18 (N.D. Cal. Aug 19, 2021).[7]  Plaintiffs' other authority all involved alleged
unwritten agreements.  *See U.S. v. eBay, Inc.*, 968 F. Supp. 2d 1032, 1032 (N.D. Cal. 2013); *In re
ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 1004 (N.D. Cal. 2009).  Here, by contrast, Plaintiffs
rely **solely** on written agreements **incorporated** into the SAC, rendering the market allocation issue
amenable to resolution on the pleadings.

> ### 3.      Plaintiffs' Argument About Developments Occurring a Year After the Align-SDC Collaboration Began Ignores Applicable Law.

To constitute a cognizable horizontal restraint, Plaintiffs further must, but cannot, show
that Align was an actual or potential competitor in the DTC market. Plaintiffs argue that Align's
*2017* storefront location that did not sell directly to consumers but referred interested customers to
nearby dentists, MTD at 8 n.6, shows it was a potential DTC competitor in *2016*.  This ignores the
law and the allegations in the SAC.  For Sherman Act purposes, agreements are analyzed for
potential harm/benefit **as of the time they were executed**, not years later.  *Aya*, 9 F.4th at 1110
(citation omitted); *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 849 (N.D. Cal. 2004) ("**at
the time [the] ancillary restraint was adopted**") (emphasis added).  Likewise, an arbitrator's 2019
interpretation of the Operating Agreement's restrictive covenant has no bearing on whether Align
was a potential competitor in DTC as of July 2016.  *See id.*[8]

### C.      Plaintiffs' Section 1 Claim Is Time-Barred.

Plaintiffs fail to articulate any continuing violation that tolled the statute of limitations for
their Section 1 claim, which is an independent basis to dismiss the claim.

Plaintiffs' assertion that the January 31, 2018 amendment to the Operating Agreement
restarted the statute of limitations is wrong.  No change to the contract in 2018 cited by Plaintiffs
had any bearing on their claim that Align was barred from entering the alleged DTC market or had
any effect on Align's operations or conduct vis-à-vis SDC.  First, the change in the definition of
the restricted territory applied only to "Class W" members of SDC, **which did not include Align**.

---

[7]  *JUUL* involved neither settlement of patent infringement claims nor a supply relationship.

[8]  Also, if it were true that antitrust law deferred to contract phrasing, there would be no ancillary restraints analysis, *c.f.* MTS at 9–11, the underlying collaboration would be the end of the inquiry.

*See, e.g.*, Op. Agr't § 2.1 (defining Class W Member as a member holding Class W units), Ex. A (showing Align as solely holding Class C units).  Second, the increase in Align's interest in SDC did not alter any alleged restriction on Align.  *Compare Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1072 (N.D. Cal. 2016) (Section 1 claim time-barred where "[p]laintiffs have simply failed to allege any acts of enforcement, renewal, or expansion after" agreements were signed) *with Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203 (9th Cir. 2014) (continuing violation where Samsung expanded unlawful license agreements over time to cover new card models).

Plaintiffs' next contention that Align's decision to comply with a court order is an overt act restarting the statute of limitations defies logic.  Plaintiffs cite no case where a third party could rely on a dispute between contracting parties as a means of tolling the statute of limitations, particularly where, as here, the dispute evinced a disagreement between the parties as to the scope of the agreement.  *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.* is inapposite, and demonstrates why tolling is inappropriate here.  111 F.3d 1427 (9th Cir. 1996).  As the Ninth Circuit explained, *Columbia Steel* concerned "non-legal" (*i.e.*, non-enforcement) actions within the limitations period that were consistent with the terms of an out-of-period market allocation agreement.  *Samsung*, 747 F.3d at 1203.  The antitrust limitations period is restarted by "action taken under a pre-limitations contract . . . so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract."  *Id*.  Align did the exact opposite; consistent with what the Ninth Circuit implies ***would not*** restart the statute of limitations.  Align was held to have breached the Operating Agreement by attempting to open retail locations.  Plaintiffs cite no cases holding that a party must go beyond breach, and engage in contemptuous conduct in order to not restart the limitations period.

Because the Ninth Circuit adheres to the accrual rule, Plaintiffs' Section 1 claim accrued in 2016, when Align and SDC entered into the allegedly anti-competitive agreements.  *See Garrison*, 159 F. Supp. 3d at 1065.  No exception exists that would toll or restart the statute of limitations here.  Plaintiffs' Section 1 claim should, accordingly, be dismissed as time-barred.

**D.      The SAC's Contradictory Allegations Render the Section 2 Monopolization Claim Implausible, Notwithstanding Plaintiffs' Rationalizations.**

As Align's Opening Brief pointed out, the internal contradictions in the SAC not only undermine the Section 1 claim, but the Section 2 monopolization claim as well.  For example, the SAC alleges a $3 billion aligner market in 2019, SAC ¶ 6, of which Align had a 90 percent share, SAC ¶ 49, but also alleges that SDC has a 90 percent share of a "multibillion dollar" DTC aligner submarket.  SAC ¶ 107.  The math and SAC allegations are clear, irrefutable, and implausible.

Plaintiffs respond by accusing Align of not reading their allegations "in context" and asking the Court to imply a different meaning to the text of the SAC.  MTD Opp'n at 8.  Not so.  The SAC expressly alleges that Align has "an approximately 90-percent share of ***the aligner market***." SAC ¶ 49.  Plaintiffs' desired "context" (of importing an unwritten limitation into the pleading) is not liberal construction, but inferences that run contrary to the SAC's allegations.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended,* 275 F.3d 1187 (9th Cir. 2001) ("Nor is the court required to accept as true . . . unreasonable inferences.").  Plaintiffs fall back to the strawman that market definition should be deferred until later in the case.  But Align is not arguing market definition; but pointing out contradictions in the SAC that render the claims *implausible*—a matter to be decided on the pleadings.[9]

Plaintiffs also try to assume away the fact that the SAC's allegations of SDC's rapid growth in DTC aligners doom their allegations that Align has monopoly power in the overall aligner market.  *See* MTD at 15; MTD Opp'n at 9.  The absence of durable barriers to entry defeats a monopolization claim, even at the motion to dismiss stage.  *See, e.g.*, *Ervin Equip. Inc. v. Wabash Nat'l Corp.*, No. 4:15-cv-104, 2017 WL 416304, at *5 (N.D. Ind. Jan. 31, 2017) ("This is an admission that there are low barriers to competition in this market which essentially means that Wabash has pled its way out of court.").  Because these contradictions—all of which are pleaded within the four corners of the SAC—cannot be credibly resolved, Plaintiffs' Section 2 claim fails.

---

[9] Plaintiffs did not plead the Section 1 and Section 2 claims in the alternative, nor does the Opposition argue as much.  While Align disputes Plaintiffs' alleged markets and submarkets, Align accepted Plaintiffs' market allegations as pleaded at this stage.

## II.   PLAINTIFFS' NEW THEORIES CANNOT SAVE THE STATE LAW CLAIMS.

### A.   Plaintiffs Cannot State a Cartwright Act Claim by Misreading the Supply Agreement or Attempting to Shoehorn Blatantly Unilateral Conduct.

Align's Motion demonstrated that: (1) an essential element of a Cartwright Act claim is concerted activity; and (2) the SAC's allegations are not sufficient to plausibly satisfy that requirement.  Nothing in the Opposition refutes that conclusion.

#### 1.   Align's Termination of Interoperability Is Not Concerted Conduct.

Plaintiffs ignore the clear indications of the Court[10] and all facts to the contrary and persist in attempting to cast Align's termination of interoperability—quintessentially unilateral conduct—into concerted action cognizable under California's Cartwright Act.  That attempt fails.

Plaintiffs' cavalier attempt to cast the termination of interoperability as concerted conduct in its most recent brief is inconsistent with Rule 11.  As in prior briefing, the Opposition attempts to cast Align's unilateral termination of interoperability as a "tying agreement," (Opp'n at 18), despite there being no basis for such a claim. The SAC does not mention, much less plausibly allege, that Align, through its termination of interoperability or otherwise, conditioned the sale of Invisalign on the purchase of iTero and thus engaged in an illegal tying "agreement."  A tying arrangement (as Plaintiffs attempt to allege) can only exist where a seller with market power "conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)."  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (citation omitted).  Yet, the SAC alleges the contrary; that, following the termination of interoperability with 3Shape, doctors still had three ways to order Invisalign without buying an iTero: (1) "silicone-based molds," (2) the "Midmark True Definition" scanner, and (3) the "Sirona CEREC Omnicam" scanner.  SAC ¶¶ 70, 88.  This is hardly a coerced tying "agreement."

Plaintiffs also cannot plead concerted action by recasting Align's unilateral termination of interoperability as a "practical boycott."  Opp'n at 18.  "It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms

---

[10] The Court characterized Plaintiffs' argument on this score as "a real stretch in terms of characterizing that as concerted action," Sept. 30, 2021 Hr'g Tr. at 19:15–17 (ECF No. 56), which, if credited, would mean "anything [would] be concerted action" (*id*. at 19:19) and "create an exception that would swallow the rule" (*id*. at 19:25–20:1).

- 11 -

on which it will transact business." *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 267 (1983) (citations omitted). "Thus, only *group* boycotts are unlawful under the Sherman and Cartwright Acts." *Id.* at 268 (citations omitted). "[A] boycott by a single trader" only constitutes "concerted activity if it is occasioned by coercion, threats or intimidation and thereby procures the unwilling cooperation of another." *Id.* (citations omitted). Plaintiffs have not alleged that Align procured unwilling cooperation to restrain trade by another party through coercion. Regarding 3Shape, Plaintiffs allege the opposite—that 3Shape did *not* succumb to alleged demands for exclusivity. SAC ¶¶ 79–80. And, the SAC does not even try to allege any dentist was required to purchase an iTero due to Align terminating interoperability with 3Shape.[11]

### 2.  Plaintiffs' Unsupported SDC Allegations Should Be Disregarded.

The Court should reject Plaintiffs' attempt to transmogrify their SDC allegations into whatever set of facts they need to survive dismissal. Plaintiffs have now acknowledged that any attempted claim that SDC was precluded from selling aligners to doctors must turn on the language of the Supply Agreement, specifically Section 3.2. MTD Opp'n at 15–16. But the Supply Agreement has no market allocation in Section 3.2 or elsewhere, as Plaintiffs appear to concede by attempting to distort Section 3.2 into a one-sided sale restriction (unsupported by the section's actual text). After repeatedly attempting to ignore the all-important "notwithstanding" clause in Section 3.2, Plaintiffs acknowledge its existence but ask the Court to nevertheless disregard it.

Plaintiffs' argument requires rewriting the Supply Agreement into an absurdity: if doctors, to whom SDC can lawfully sell aligners by virtue of the "notwithstanding" clause, can also be third parties to such transactions, the "notwithstanding" clause would be a meaningless superfluity. *See Mirpad, LLC v. Cal. Ins. Guar. Ass'n*, 132 Cal. App. 4th 1058, 1073 (2005) ("An interpretation . . . that creates an ambiguity where none existed by rendering words redundant or superfluous

---

[11] Plaintiffs' reliance on *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948 (N.D. Cal. 2017) is likewise misplaced. In *Qualcomm*, it was alleged that OEMs had no choice but to accept "a separate license" for standard essential patents "on Qualcomm's preferred terms" because Qualcomm "conditions OEMs' access to Qualcomm's modem chips" on it. "Unless OEMs agree to take out a separate SEP licensing agreement with Qualcomm on Qualcomm's preferred terms that covers all of the handsets that the OEM sells, Qualcomm will not supply the OEM with any Qualcomm modem chips." Here, there are no allegations that a dental practice cannot purchase Invisalign unless it purchases an iTero (or undertakes any other action to Align's benefit).

violates all rules of construction.").  Put differently, it defies logic—and thus pleading plausibility—to conclude that any entity, doctor or otherwise, can be at the same time a counterparty to sale transaction with SDC and also a third party to that transaction.  In other words, it is doctors who would be buying aligners from SDC, not those doctors' patients.  That is exactly the position that the fifteen Invisalign Plaintiffs allege they occupy vis-à-vis Align.  But Plaintiffs ask the Court to ignore the implications of their self-claimed "indirect purchaser" status and to adopt a wholly illogical construction for the Supply Agreement in order to keep their withering Cartwright Act claim alive.  Notably, this reading is so lacking that Plaintiffs do not bother suggesting that it plays any role in their allegations of a Sherman Act Section 1 violation.

Thus, there is no well-pleaded factual basis in the Supply Agreement for Plaintiffs' allegation of a market allocation scheme between Align and SDC and thus the SDC-related allegations do not and cannot supply the concerted activity required by the Cartwright Act.[12]

### 3.  Alleged Exclusive Dealing Does Not Violate the Cartwright Act.

This Court has already determined that the bundled discounting and exclusive dealing allegations brought here cannot support an antitrust claim, even when considered together.  *Simon & Simon v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 918 (N.D. Cal. 2021) ("[T]he allegations about [the DSO contracts and Fusion Program]—even considered together—do not state a section 2 claim on their own.").  In the only authority Plaintiffs cite, *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.*, 114 Cal. App. 4th 309 (2003), the court held an allegation that *written* exclusive dealing contracts that foreclosed 20 percent of the market was only sufficient when considered in combination with other "exclusive dealing arrangements implied through its other unlawful practices (illegal tie-ins and unfair pricing discrimination)."  114 Cal. App. 4th at 336, 339.  Here, Plaintiffs allege that **all** DSOs comprise somewhere between 16 percent and 25 percent of the overall dentistry market.  *See* SAC ¶¶ 95–96.  Yet Align is only alleged to have entered into

---

[12] Plaintiffs throw more mud on the wall by referencing "the other [alleged] anti-competitive restrictions on SDC's ability to compete found in the Supply Agreement."  MTD Opp'n at 17.  These other provisions, however, are not alleged to effect any market allocation and, if anything, further support why the Section 1 claim must fail, as Plaintiffs' reference to these other restrictions, and the fact that the Supply Agreement is intimately connected to the Operating Agreement undercut any serious argument that the Operating Agreement contains a naked horizontal restraint.

contracts with a tiny fraction—*just two DSOs*—of the DSO market.  This is not substantial foreclosure.  *See, e.g.*, *Stewart v. Gogo, Inc.*, No. C-12-5164 EMC, 2013 WL 1501484, at *4 (N.D. Cal. Apr. 10, 2013) (dismissing Cartwright Act claims where market share was 16 percent).

Accordingly, none of Plaintiffs' theories plausibly allege concerted activity or constitute an actionable conspiracy under the Cartwright Act.  Thus, the claim should be dismissed.

## B.    Plaintiffs' UCL Claim Fails Because It Improperly Seeks Damages Through a Restitution Remedy; and Fails to State a Claim.

First, Plaintiffs improperly seek damages through the UCL's restitution remedy.  Plaintiffs' reliance on *Shersher v. Super. Ct.*, 65 Cal. Rptr. 3d 634 (Ct. App. 2007) cannot save them. Notwithstanding *Shersher*, a consumer seeking restitution from a third-party manufacturer must still "allege that the money he paid for [the product] is now, or ever was, in the possession of [Defendant]." *Fulford v. Logitech, Inc.*, No. C-08-2041 MMC, 2008 WL 4914416, at *3 (N.D. Cal. Nov. 14, 2008) (dismissing UCL claim where such allegation was lacking).[13]  Plaintiffs have failed to allege with any specificity how they were forced to pay for Invisalign specifically (rather than treatment as a whole), which dooms their plea for restitution.  Further, Plaintiffs' request for "full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits" (SAC ¶ 275) that purportedly accrued to Defendant is a damages claim disguised as a restitution request, which is impermissible.  *See Ice Cream Distribs of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, No. 09-5815 CW, 2010 WL 3619884, at *9 (N.D. Cal. Sept. 10, 2010).

Second, Plaintiffs improperly attempt to bootstrap the predicate unlawful conduct for their UCL claim onto that of entities not party to this litigation.  MTD Opp'n at 23 ("Plaintiff Ellis's UCL claim is based on the same underlying conduct [as the *Simon & Simon* case].")  The allegations of the Plaintiffs in this case have not been deemed actionable and, if dismissed, require dismissal of the UCL claim.  *In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*, No. CV 15-09996-BRO (JEMx), 2016 WL 1192642, at *5 (C.D. Cal. Mar. 28, 2016).

Third, because SDC was not precluded from selling aligners to doctors under the terms of

---

[13] *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 765 (2010), is of no help.  There, the plaintiffs alleged in detail the wholesale scheme by which overpriced pharmaceuticals reached the pharmacy plaintiffs, with defined mark-ups at each step in the distribution chain.  Unlike here, the plaintiffs in *Clayworth* did not rely on oblique economic theory to attempt to articulate a theory of loss.

the Supply Agreement, and no such restrictions existed, that conduct cannot make Plaintiff Ellis's claims timely. *Fenerjian v. Nongshim Co.*, 72 F. Supp. 3d 1058, 1082 (N.D. Cal. 2014).

### C.   Plaintiffs Lack Standing to Bring the Iowa Claim (Eighth Claim) Because the SDC Allegations Are Not Cognizable Thereunder.

Plaintiffs' SDC allegations do not save the standing infirmities with the SAC's Iowa Claim (Eighth). For the reasons set forth above, Plaintiffs' SDC claims are without basis in fact and are contradicted by the SAC's allegations. Plaintiffs thus lack standing because their claims arose prior to the complained-of conduct in the SAC once the baseless SDC allegations are disregarded.

### D.   Plaintiffs Cannot Avoid the Heightened Pleading Standard Applicable to the Florida Claim, Which They Concede They Cannot Meet.

Plaintiffs do not contest that their Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") must adhere to the pleading standard of Rule 9(b). *See, e.g.*, *Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 927 (N.D. Cal. 2019) (citing *Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*, No. 07-cv-2093-JDW-MSS, 2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008)) (FDUTPA claims analyzed under Rule 9). Plaintiffs do not meet that high pleading standard. Instead, they rely on general claims of "supracompetitive prices," despite Plaintiff Alderman paying less than thirteen of the sixteen Plaintiffs who purchased Invisalign treatment. SAC ¶¶ 30–31, 33–45.

### E.   The Arizona Claim (Third Claim) Should Be Dismissed.

If Plaintiffs' Sherman Act claims are dismissed, the Court should dismiss the Arizona Claim, because the supplemental jurisdiction statute does not apply to non-diverse claims where diversity is otherwise the sole basis of federal jurisdiction. *See* 28 U.S.C. § 1367(b). The Third Claim is a non-diverse claim that should be dismissed if the federal claims are dismissed. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 974 (9th Cir. 2003) (court may dismiss state claims under 1367(b) where federal claims are dismissed before trial).

## III.   CONCLUSION

Thus, for these reasons and those in the Motion, the SAC must be dismissed with prejudice.

DATED:  December 9, 2021 PAUL HASTINGS LLP

By:  */s/ Steven A. Marenberg*
Steven A. Marenberg

Steven A. Marenberg (SB# 101033)
James M. Pearl (SB# 198481)
stevenmarenberg@paulhastings.com
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone:  1(310) 620-5700
Facsimile:  1(310) 620-5899

Thomas A. Counts (SB# 148051)
Abigail H. Wald (SB# 309110)
tomcounts@paulhastings.com
abigailwald@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone:  1(415) 856-7000
Facsimile:  1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone:  1(312) 499-6000
Facsimile:  1(312) 499-6100

Michael F. Murray (*pro hac vice*)
Noah Pinegar (*pro hac vice*)
michaelmurray@paulhastings.com
noahpinegar@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone:  1(202) 551-1700
Facsimile:  1(202) 551-1705

Attorneys for Defendant
Align Technology, Inc.