UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISTY SNOW, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>        Defendant. | Case No. 21-cv-03269-VC<br><br>**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 65 |

        The plaintiffs are consumers who purchased clear dental aligners to straighten their teeth. The bulk of the plaintiffs' allegations concern Align's alleged monopolization of the market for aligners sold to consumers through dentists. These allegations mirror those that survived a motion to dismiss in a related suit brought by dentists. *See Simon & Simon, PC v. Align Technology, Inc.*, 533 F. Supp. 3d 904 (N.D. Cal. 2021). But the plaintiffs have tacked on a set of tangentially related allegations concerning agreements between Align and SmileDirectClub, an emerging competitor that sells aligners directly to consumers, rather than through dentists. The plaintiffs allege that Align and SmileDirectClub entered into a set of agreements in which Align agreed not to compete in the direct-to-consumer market, and SmileDirectClub agreed not to compete in the dentist-directed market.

        Align has moved to dismiss the complaint in its entirety. This ruling discusses the new allegations concerning SmileDirectClub. Because the plaintiffs have plausibly alleged that Align's agreement not to compete in the direct-to-consumer market was a naked restraint on trade, the plaintiffs' Section 1 claim survives. But because the reverse restraint—SmileDirectClub's commitment not to compete in the dentist-directed market—was not

anticompetitive, some of the plaintiffs' state law claims must be dismissed. The remainder of Align's motion to dismiss is addressed in an accompanying order.

I

Align has dominated the aligner market for decades through its business model of selling its aligners (called Invisalign) through dentists.[1] But in 2014, SmileDirectClub entered the scene with a new approach: selling aligners directly to consumers. People could either go to a physical store (called "SmileShops") for an intraoral scan or use an at-home kit. Scans would then be sent to a SmileDirectClub dentist or orthodontist who would confirm that the treatment plan was simple enough for SmileDirectClub's services. If so, the consumer would be approved for treatment.

The beauty of SmileDirectClub's service is that it cuts out the middleman: "A customer using SmileDirectClub could conceivably go through the entire process of straightening their teeth without ever once having met with an orthodontist." There are limits to this approach, as SmileDirectClub can only handle minor cosmetic changes. For this reason, there is little overlap between the markets for aligners sold through dentists and those sold directly to consumers (at least as alleged in the complaint). Still, the emergence of a (cheaper) direct-to-consumer option gave Align reason to worry. Why go to the dentist if you can straighten your teeth from the comfort of your own home?

But Align had something that SmileDirectClub did not: patents. In 2015, Align filed a patent infringement lawsuit against SmileDirectClub, alleging that SmileDirectClub infringed fourteen Align patents related to the manufacture and sale of clear aligners. The lawsuit settled. In a pair of agreements (the "Supply Agreement" and "Operating Agreement"), Align and SmileDirectClub constructed a deal whereby SmileDirectClub could continue selling aligners directly to consumers with Align's blessing—subject to certain conditions.

---

[1] Unless otherwise noted, the facts described in this section come from the well-pleaded allegations in the complaint. As is required at this early stage, all inferences are drawn in favor of the plaintiff. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

In the Supply Agreement, Align agreed to supply aligners to SmileDirectClub. In exchange, SmileDirectClub promised to refer any patients who did not qualify for its services to Align. As part of the Operating Agreement, Align purchased a 17% stake in SmileDirectClub for $46.7 million. The agreements contained mirror restrictive covenants: SmileDirectClub agreed not to enter the dentist-directed market and Align agreed not to sell aligners directly to consumers.[2]

According to the complaint, the "overall effect" of these covenants was to "allocate the two product submarkets" between Align and SmileDirectClub, in direct defiance of the antitrust laws. The plaintiffs argue that the restraint on Align's ability to enter the direct-to-consumer market constitutes a per se violation of Section 1 of the Sherman Act. As for the restraint on SmileDirectClub, the plaintiffs argue that it contributes to Align's unlawful monopolization of the dentist-directed market, recognized under Section 2.

## II

The plaintiffs' Section 1 claim stands apart from their other allegations. While most of the plaintiffs' claims concern harm to the dentist-directed market, the Section 1 claim—brought on behalf of a class of consumers who purchased aligners from SmileDirectClub—alleges harm to the direct-to-consumer market.

### A

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. Despite the categorical language of this provision, the Supreme Court has interpreted this text "to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Under Section 1, agreements in restraint of trade are evaluated under two standards. Some restraints are subject to the rule of reason, a "fact-specific assessment

---

[2] Align disputes this characterization, arguing that the agreements do not limit SmileDirectClub's ability to sell aligners through dentists. While Align may have the better reading of the contracts, the plaintiffs' reading is plausible. Drawing all inferences in the plaintiffs' favor, as must be done at this stage, the Court accepts the plaintiffs' interpretation for the purposes of this motion. *See Twombly*, 550 U.S. at 555–56.

of 'market power and market structure'" to determine the restraint's "'actual effect' on competition." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). But other types of agreements are "conclusively presumed to be unreasonable" due to their "pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5 (1958). This class of agreements—which includes horizontal price fixing and market allocation—is deemed illegal per se. *See Copperweld Corp.*, 467 U.S. at 768; *American Express*, 138 S. Ct. at 2283–84.

The class of restraints that is illegal per se has been narrowed further. "[T]he *per se* rule is designed for 'naked' restraints rather than agreements that facilitate productive activity." *Polk Brothers, Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188 (7th Cir. 1985). When a procompetitive agreement contains some anticompetitive elements, a court must determine whether the restrictions on competition are "naked" or "ancillary." *Id.* at 188–89. For example, "[i]f two people meet one day and decide not to compete, the restraint is 'naked'; it does nothing but suppress competition." *Id.* at 189. On the other hand, "[i]f A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is 'ancillary.'" *Id.* In this latter world, the agreement between A and B expands output by "putting B to work." *Id.* The covenant not to compete, which would be reasonably necessary to induce A to contract with B, is therefore not automatically problematic under the antitrust laws. Therefore, while naked restraints are unlawful per se, ancillary restraints are evaluated under the rule of reason. *See Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021).

The threshold question of whether an agreement is naked or ancillary has two parts. First, to be ancillary, the restraint must be "subordinate and collateral to a separate, legitimate" (that is, procompetitive) transaction. *Id.* (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986)). Second, the restraint must be "'reasonably necessary' to achiev[e] that transaction's pro-competitive purpose." *Id.* (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899)).

4

B

To begin, Align argues that its agreement with SmileDirectClub should be understood as a vertical restraint—a restraint "imposed by agreement between firms at different levels of distribution." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730 (1988). Align wants to characterize its agreement this way because, unlike horizontal restraints, vertical restraints are presumptively subject to the rule of reason. *See American Express*, 138 S. Ct. at 2284.

But as alleged in the complaint, Align and SmileDirectClub were potential competitors, both in the market for dentist-directed aligners and the market for direct-to-consumer aligners. Moreover, the plaintiffs highlight a few instances in which this potential competition edged into the actual—for example, when Align attempted to open its own brick-and-mortar shop, only to be sued by SmileDirectClub and enjoined by an arbitrator enforcing Align's agreement not to compete. This is sufficient to put the agreements in the "horizontal" category. As the Supreme Court has recognized, a market division agreement between potential competitors constitutes a horizontal restraint on trade. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990).

C

The thrust of the agreement between Align and SmileDirectClub was to permit SmileDirectClub to sell aligners, despite Align's patents.[3] This agreement had serious benefits to consumers. Assuming (as the complaint seems to) that Align's patents were valid and legitimately infringed by SmileDirectClub, SmileDirectClub would not have been able to sell *any* aligners without Align's permission. This is a consequence of the lawful monopoly that a product patent confers on a patentholder. *See* 35 U.S.C. § 154(a)(1) (granting patentholders "the right to exclude others from making, using, offering for sale, or selling" the covered product). The arrangement therefore had the potential to greatly increase output, as a new crop of

---

[3] The fact that Align and SmileDirectClub structured this deal through two contracts, as opposed to one, does not impact the analysis, as antitrust liability does not hinge on such formalities. The challenged restraint must be considered in the context of the agreement as a whole.

5

consumers would have the ability to purchase aligners. The challenged restraint on trade is thus but one collateral aspect of a broader, procompetitive agreement.

The more challenging issue is whether the restraint on Align's ability to enter the direct-to-consumer market was "reasonably necessary" to the parties' procompetitive collaboration. The "reasonably necessary" test asks whether this cooperation would have been possible absent the challenged restraint. *See Aya Healthcare*, 9 F.4th at 1110; *Polk Brothers*, 776 F.2d at 190. This is an inherently fact-specific inquiry that is difficult to determine with certainty at the motion to dismiss stage. *See In re Juul Labs, Inc. Antitrust Litigation*, 2021 WL 3675208, at *19 (N.D. Cal. Aug. 19, 2021). But at this juncture, the question is whether the plaintiffs have plausibly alleged that the parties would have entered into the cooperative agreement absent this restriction.

The plaintiffs' story goes something like this. Faced with SmileDirectClub's burgeoning competition, Align had two options: shut it down or join forces. Align opted for the latter, crafting the deal in its favor in three ways. First, Align received a new stream of income from SmileDirectClub's purchases of its aligners through the Supply Agreement. Second, Align received referrals from SmileDirectClub, increasing its customer base. And third, Align gave SmileDirectClub a monopoly over the direct-to-consumer market, but took a cut of the monopoly profits through its newly acquired ownership interest in SmileDirectClub. In the plaintiffs' telling, the first two advantages were sufficient to induce Align to collaborate. The third was merely icing on the cake.

Whether the allegations in the complaint adequately support this story—as opposed to being "merely consistent with" it—is a close question, because alternative explanations for Align's conduct are available. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). For example, Align suggests that its investment in SmileDirectClub was not for the purpose of splitting monopoly profits, but to protect its cooperative enterprise. If SmileDirectClub went under, Align would lose the benefits of the deal—its new income stream and potential referrals. In Align's version of the story, the Operating Agreement was a necessary aspect of the broader

cooperative arrangement as it increased the likelihood that SmileDirectClub would be around long enough to benefit Align.

But this story is not fully satisfying either. For one thing, nothing in the complaint suggests that SmileDirectClub was short on cash. It would therefore be inappropriate to make this inference against the plaintiffs at this stage of the proceedings. And the plaintiffs' story is consistent with the underlying power dynamics between Align and SmileDirectClub. Consider it this way: When Align sued SmileDirectClub for patent infringement, Align held all the cards. If it wanted to, it could prevent SmileDirectClub from selling any aligners, to anyone, for the life of its patents. The restrictions on SmileDirectClub therefore make sense and were likely reasonably necessary for the cooperative agreement to take place at all. But the reverse is not true. Given the power imbalance between Align and SmileDirectClub, there was no reason for Align to restrain itself to induce SmileDirectClub to come to the table. The plaintiffs have therefore plausibly alleged that the restriction on Align's ability to sell aligners directly to consumers was not reasonably necessary for the cooperative undertaking.

The plaintiffs' story somewhat teeters on the edge of plausibility. But ultimately, it tips in the plaintiffs' favor. Whether discovery will reveal an alternative explanation for this restriction is, of course, an open question.

**D**

Finally, the statute of limitations has not run on this claim. "[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). This logic applies with equal force here. The plaintiffs plausibly allege that Align and SmileDirectClub entered into a horizontal market allocation agreement that inflated prices in the direct-to-consumer market. The named plaintiff for this claim, Dana Bozian, purchased SmileDirectClub aligners in June 2020—less than one year before this lawsuit was filed. The claim therefore falls well within the four-year statute of limitations period. 15 U.S.C. § 15b.

### III

The remainder of the plaintiffs' claims concern Align's alleged monopolization of the dentist-directed aligner market. Under federal antitrust law, indirect purchasers—those who "are two or more steps removed from the violator in a distribution chain"—cannot recover damages under the Sherman Act. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 & n.1 (2019); *see Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). Many states have taken a different tack, however, passing so-called "*Illinois Brick* repealer statutes" that clarify that indirect purchasers *may* sue for damages under the state cause of action. *See, e.g.*, Cal. Bus. & Prof. Code § 16750(a); Conn. Gen. Stat. § 35-46a(1).

The plaintiffs allege that Align has unlawfully monopolized the dentist-directed aligner market in violation of Section 2 of the Sherman Act. In this market, however, the plaintiffs are indirect purchasers; they purchased aligners from dentists, not Align itself. Their only recourse for damages is therefore under state law. Align has moved to dismiss many of the plaintiffs' state law claims, only one of which will be discussed here: the plaintiffs' claim under California's Cartwright Act. The remaining state law claims are addressed in an accompanying order.

### A

Before jumping into the Cartwright Act claim, a brief description of the plaintiffs' remaining allegations is necessary. The plaintiffs allege that Align secured its dominance over the dentist-directed aligner market by tying the sale of its aligners to its scanners—the tool with which dentists create an image of a patient's teeth and jaw that serves as a blueprint for the patient's custom aligners. This scheme was accomplished through three sets of challenged conduct. First, Align terminated an interoperability agreement it had with a rival scanner manufacturer, forcing dentists to use Align's scanner if they wanted to sell Invisalign-brand aligners. Second, Align launched a discount program (the "Fusion Program") through which dentists received a discount on their Align-brand scanner if they committed to making a minimum number of Invisalign orders. Finally, Align entered into multiyear contracts with two dental service organizations (DSOs) in which the DSOs agreed to only work with Align in

providing its member dental offices with both scanners and aligners.

In a related lawsuit, a group of dentists sued Align under Section 2 of the Sherman Act for these same allegations. *See Simon & Simon*, 533 F. Supp. 3d 904. The dentists' Section 2 claim survived a motion to dismiss, as the termination of the interoperability agreement "amounts to a section 2 violation on its own." *Id.* at 913. With respect to the Fusion Program and DSO contracts, although they were somewhat "problematic from an antitrust standpoint," they were insufficient to state a claim (even considered together) in the absence of the interoperability agreement. *Id.*

**B**

California's Cartwright Act declares "every trust . . . unlawful." Cal. Bus. & Prof. Code § 16726. An unlawful trust is defined as "a combination . . . by two or more persons" for certain enumerated purposes. § 16720. The Act has therefore been interpreted as mirroring Section 1 of the Sherman Act and only addressing concerted action, as opposed to unilateral conduct. *See Free FreeHand Corp. v. Adobe Systems Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012); *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 266 (Cal. Ct. App. 1983). To state a claim under the Cartwright Act, then, the plaintiffs must allege that 1) there was an agreement between two or more entities; and 2) the agreement was an unreasonable restraint of trade. *See Free FreeHand Corp.*, 852 F. Supp. 2d at 1185.

The plaintiffs point to three separate actions on the part of Align that they argue constitute concerted, as opposed to merely unilateral, action. First, the plaintiffs argue that the agreement between Align and SmileDirectClub unlawfully "allocated the dentist-directed market to Align." Second, the plaintiffs contend that "Align's termination of the interoperability agreement is actionable under the Cartwright Act because it was done to effectuate" a coercive tying agreement. Finally, the plaintiffs point to Align's exclusive dealing agreements with DSOs.

1. Agreement with SmileDirectClub: Align's agreement with SmileDirectClub can only serve as the basis for a Cartwright Act claim if the plaintiffs plausibly allege that it is an unreasonable restraint of trade. But this argument fails for the same reason the argument

9

concerning the mirror restraint prevailed: Align's patents, Align's rules.

Given Align's patents, it would have been lawful for Align to prevent SmileDirectClub from entering either aligner market. That Align permitted SmileDirectClub to enter one market, even if not both, was therefore procompetitive. And as discussed above, the additional concessions that Align was able to extract from SmileDirectClub were reasonably necessary to achieve the cooperative purpose underlying the agreements. With respect to this aspect of the agreement, then, Align and SmileDirectClub "were cooperating to produce, not to curtail output; the cooperation increased the amount of [aligners] available and was at least potentially beneficial to consumers; [and] the restrictive covenant made the cooperation possible." *Polk Brothers*, 776 F.2d at 190. The restriction on SmileDirectClub's ability to sell aligners to dentists is therefore merely an ancillary restraint on trade, evaluated under the rule of reason. *See id.*

To determine whether a restraint violates the rule of reason, courts "apply a three-step, burden-shifting framework." *Aya Healthcare*, 9 F.4th at 1111. But at the motion to dismiss stage, the focus is on step one: whether the plaintiff has plausibly alleged "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *American Express*, 138 S. Ct. at 2284; *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197–98 (9th Cir. 2012). The plaintiffs have not met that burden here. Whether or not Align and SmileDirectClub entered into this agreement, SmileDirectClub would not have been able to enter the dentist-directed market. The restraint on SmileDirectClub's ability to sell aligners through dentists therefore flowed not from the agreement, but from Align's patents.[4]

---

[4] The plaintiffs point out that the restraint on SmileDirectClub's ability to enter the dentist-directed market extended to December 31, 2019, while at least some of Align's patents were set to expire in late 2017. This fact alone is insufficient to plausibly allege that the restraint had anticompetitive effects. For one thing, the plaintiffs do not clearly allege when SmileDirectClub would have lawfully been able to enter the dentist-directed market in the absence of this restraint. Further, the plaintiffs have not alleged that any delay resulted in anticompetitive effects, when considered within the context of the broader, procompetitive agreement. After all, this restraint would not have prevented other firms from entering the dentist-directed market upon the expiration of Align's patents.

The fact that an agreement "fall[s] within the scope of the exclusionary potential of [a] patent" does not necessarily "immunize the agreement from antitrust attack." *FTC v. Actavis, Inc.*, 570 U.S. 136, 147 (2013) (first quoting *FTC v. Watson Pharmaceuticals, Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012), *rev'd*, 570 U.S. 136). In *Actavis*, the Supreme Court recognized that, in certain limited contexts, a settlement of a patent dispute may violate the antitrust laws, even if the settlement does not exceed the scope of the patent. But the concerns raised in *Actavis* are not present here. *Actavis* concerned the unique context of "reverse payment" settlements—settlements of patent infringement litigation that require "the claimed infringer[] not to produce the patented product until the patent's term expires" in exchange for payment. *Id.* at 140. Such agreements are somewhat suspicious, as "a party with no claim for damages . . . walks away with money simply so it will stay away from the patentee's market." *Id.* at 152. The situation alleged here—a party with a strong claim extracting favorable contract terms from an infringer—does not raise similar concerns of collusion. The aspects of the Supply and Operating Agreements that restrict SmileDirectClub's ability to compete in the dentist-directed market are therefore not cognizable under the antitrust laws and cannot be the concerted action on which the plaintiffs' Cartwright Act claim relies.

2. Termination of Interoperability Agreement: The plaintiffs next argue that Align's unilateral termination of the interoperability agreement resulted in a "combination" in restraint of trade because it roped dentists into its scheme—when Align terminated the interoperability agreement, dentists faced a "*de facto* tying restraint where they had to purchase Trios scanners (the tied product) as a condition for placing orders for Invisaligners (the tying product)."

To begin, the plaintiffs' reliance on Align's termination of the interoperability agreement suffers from a fatal flaw: the named plaintiff for the Cartwright Act class, Cindy Ellis, purchased her aligners prior to Align's termination of the interoperability agreement. Cindy Ellis therefore does not have standing to challenge Align's allegedly unlawful tie.

But substituting in a different plaintiff would not save this claim. In support of their argument that Align's unilateral termination of the interoperability agreement constitutes

concerted action, the plaintiffs point to cases in which California courts have held that a "combination" in restraint of trade exists "where a trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses." *G.H.I.I.*, 147 Cal. App. 3d at 268. But this "single trader" theory only extends to situations in which the trader pressures the unwilling participant into some sort of agreement, like a pricing arrangement or boycott. *Id.* That logic does not extend to the allegations here. It is true, to some extent, that Align "coerced" dentists to purchase its aligners and scanners by virtue of the alleged tie. But to find the dentists an "unwilling participant" in a "combination" on that basis would virtually erase the Cartwright Act's concerted-action requirement as every sale of goods involves multiple parties. It cannot be that a monopolist conspires with its customers every time they purchase tied products. The dentists here are victims of Align's alleged acts—not co-conspirators. *See, e.g.*, *Free FreeHand Corp.*, 852 F. Supp. 2d at 1186.

3. DSO Contracts: Finally, the plaintiffs point to the exclusive-dealing agreements between Align and the DSOs. But as this Court has already held, these agreements do not establish a standalone claim. *See Simon & Simon*, 533 F. Supp. 3d at 913. They therefore cannot be the basis for a Cartwright Act claim.

Because the plaintiffs failed to allege any concerted action, the Cartwright Act claim is dismissed with leave to amend.

* * *

In conclusion, the motion to dismiss the Section 1 claim is denied and the motion to dismiss the Cartwright Act claim is granted.

**IT IS SO ORDERED.**

Dated: February 16, 2022

                                                    VINCE CHHABRIA
United States District Judge