PAUL HASTINGS LLP
James M. Pearl (SB# 198481)
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

*Attorneys for Defendant Align Technology, Inc.*

Additional counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>        Defendant. | CASE NO. 3:21-CV-03269-VC<br><br>**DEFENDANT ALIGN TECHNOLOGY, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION AND *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY**<br><br>Date:     November 16, 2023<br>Time:    10:00 a.m.<br>Place:   Courtroom 4, 17th Floor<br>Judge:  Hon. Vince Chhabria |

**TABLE OF CONTENTS**

**PAGE**

I.      Introduction.................................................................................................................1

II.     Factual Background ....................................................................................................3

        A.      Align Catalyzed Evolution in Orthodontics.................................................3

                1.      Align Revolutionized Orthodontic Treatment ...............................4

                2.      Align Subsequently Pioneered Digital Dentistry.........................5

        B.      Align Sued 3Shape for Patent Infringement and Terminated
                Interoperability.............................................................................................6

        C.      Align's Business Is Doctor-Focused and Designed to Support Doctors .................6

        D.      Align Has No Say in How Doctors Price *Invisalign* to Patients...........................8

        E.      Plaintiffs Seek to Certify 11 Indirect Purchaser Classes With a More
                Expansive Class Period Than What the Direct Purchaser Plaintiffs Propose.........9

        F.      Plaintiffs' Attempt to Show Common Impact Across Their Many Classes .........10

III.    Legal Standard ...........................................................................................................11

IV.     Argument ...................................................................................................................12

        A.      Plaintiffs' Benchmark Model Fails to Support Certification Because It
                Cannot Separate Lawful and Allegedly Unlawful Exclusionary Conduct ...........13

        B.      The Implant Market Is Not Comparable ..................................................17

                1.      Comparing an Entire Market to a Single Product Is Inapposite ...............17

                2.      Plaintiffs' Benchmark Is Not Founded on Any Patent Analysis ...............18

                3.      The Implant Market Is Clouded by Anticompetitive Conduct .................20

                4.      Dr. Vogt's Benchmark Model Should be Excluded ...............................21

        C.      Plaintiffs' Pass-On Argument Is Based on Incomplete Data That Is
                Obscured by a Pervasive Use of Averages ...........................................21

                1.      Plaintiffs Do Not Establish Common Harm to the Direct
                        Purchasers .................................................................................22

                2.      Plaintiffs Do Not Establish Pass-On Because Dr. Vogt Does Not
                        Rely on Actual Dentist Data on Actual Products.....................................22

        D.      Plaintiffs Have Not Met Their Burden Under Rule 23(a).................................27

                1.      Plaintiffs Also Cannot Satisfy Rule 23(b)(3) Because, Atypical of
                        the Putative Class, Ms. Vo Lacks Standing ..............................................27

                2.      Plaintiffs Are Not Adequate Class Representatives.................................28

                3.      Plaintiffs' Class Definitions Are Unworkable ..........................................30

V.      Conclusion .................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..............................................................................15

*Allied Orthopedic Appliances v. Tyco Health Care Group*,
592 F.3d 991 (9th Cir. 2010) ....................................................................14, 16, 17

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)..............................................................................................11

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..............................................................................................28

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..............................................................................................16

*In re Benco Dental Supply Co., et al.*,
Docket No. 9379 (Fed. Tr. Comm.)......................................................................20

*Benedict v. Hewlett-Packard Co.*,
314 F.R.D. 457 (N.D. Cal. 2016)..........................................................................29

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................................16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).............................................................................1, 12, 13, 14

*Dent v. NFL*,
No. 22-15261, 2023 WL 2983580 (9th Cir. Apr. 18, 2023)..................................28

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ..........................................................................12, 27

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022), *cert. denied sub nom. Sanofi-Aventis U. S., LLC
v. Mylan, Inc.*, 143 S. Ct. 1748 (2023)................................................................15

*In re Flash Memory Antitrust Litig.*,
No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .................21, 25

*In re Graphics Processing Units ("GPU") Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)..................................................................... *passim*

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
EXCLUDE EXPERT TESTIMONY

**TABLE OF AUTHORITIES**

**Page(s)**

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020) ................................................26

*Hamilton v. Wal-Mart Stores, Inc.*,
39 F.4th 575 (9th Cir. 2022) ................................................12

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ................................................28

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
442 F. Supp. 3d 1329 (D. Or. 2020) ................................................19

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ................................................20

*Intel Corp. Microprocessor Antitrust Litig. ("Intel Corp.")*, MDL 05-1717, 2014
WL 6601941 (D. Del. Aug. 6, 2014) ................................................27

*Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*,
340 F.R.D. 383 (N.D. Cal. 2021) ................................................28

*Kamakahi v. Am. Soc'y for Reproductive Medicine*,
305 F.R.D. 164 (N.D. Cal. 2015) ................................................27

*Kihn v. Bill Graham Archives LLC*,
No. 20-17397, 2022 WL 18935 (9th Cir. Jan. 3, 2022) ................................................12

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................13

*In re Lithium Ion Batteries Antitrust Litigation*,
No. 13-MD2420 YGR 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ................................................24

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................18, 21

*Muffett v. City of Yakima*,
No. CV-10-3092-RMP, 2012 WL 12827492 (E.D. Wash. July 20, 2012) ................................................21

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ................................................14

*In re Optical Disk Drive Antitrust Litig. ("ODD 1")*,
303 F.R.D. 311 (N.D. Cal. 2014) ................................................26, 27

*Persian Gulf Inc. v. BP W. Coast Prod. LLC*,
632 F. Supp. 3d 1108 (S.D. Cal. 2022) ................................................20

*Phillips v. U.S. Customs and Border Protection*,
74 F.4th 986 (9th Cir. 2023) ................................................28

**TABLE OF AUTHORITIES**

**Page(s)**

*Powell v. Anheuser-Busch Inc.*,
2012 WL 12953439 (C.D. Cal. Sept. 24, 2012) ....................................................21

*In re Quintus Sec. Litig.*,
201 F.R.D. 475 (N.D. Cal. 2001).........................................................................29

*Sali v. Corona Regional Medical Center*,
909 F.3d 996 (9th Cir. 2018) ...............................................................................11

*Sanchez v. Hearst Commc'ns, Inc.*,
No. 20-cv-05147-VC, 2022 WL 1400853 (N.D. Cal. May 4, 2022)................................12, 14

*Senne v. Kansas City Royals Baseball Corp.*,
934 F.3d 918 (9th Cir. 2019) ................................................................................12, 28

*Shannon v. Crowley*,
538 F. Supp. 476 (N.D. Cal. 1981) .......................................................................17

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019)...........................................................................21, 22

*Stemmelin v. Matterport, Inc.*,
No. 20-04168, 2022 U.S. Dist. Lexis 44732 (N.D. Cal. Mar. 14, 2022) ................................13

*Teradata Corp. v. SAP SE*,
570 F. Supp. 3d 810 (N.D. Cal. 2021) ...................................................................17

*UFCW Local 1776 v. Teikoku Pharma*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) .................................................................17

*United States Board of Oral Implantology, et al. v. American Board of Dental
Specialties, et al.*,
Case No. 18-CV-06520 (N.D. Ill. Sept. 25, 2018)..................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).............................................................................................11

*Woods v. Google LLC*,
No. 11-CV-01263-EJD, 2018 WL 4030570 (N.D. Cal. Aug. 23, 2018) ................................29

**Other Authorities**

Fed. R. Civ. P. 23(a)(3)...............................................................................................27

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* (5th ed. 2020) ....................................................15

## TABLE OF ABBREVIATIONS

| Abbreviation | Referenced Document |
|---|---|
| 3Shape | 3Shape Trios A/S |
| Action | This case, *Snow v. Align Tech., Inc.*, Case No. 3:21-cv-03269-vc |
| Align | Defendant Align Technology, Inc. |
| Align Resps. To Plaintiffs' Second Set Interrogs. ___ | Align's objections and responses to plaintiffs' second set of interrogatories served in this action on December 2, 2022, attached as Pearl Ex. 22 |
| Align 2019 10-K | Align's Form 10-K for the Fiscal Year Ended December 31, 2019 |
| Align 8/2023 10-Q | Align's Form 10-Q, dated Aug. 4, 2023, available at: https://investor.aligntech.com/sec-filings/sec-filing/10-q/0001097149-23-000059 |
| Barry Dep. ___ | Transcript of the December 14, 2022 deposition of Lisa Barry, noticed and taken in this action, attached as Pearl Ex. 10 |
| Campbell Dep.___ | Transcript of the January 23, 2023 deposition of Katie Campbell, noticed and taken in this action, attached as Pearl Ex. 36 |
| Carnaghi Dep.___ | Transcript of the February 16, 2023 deposition of Angela Carnaghi, noticed and taken in this action, attached as Pearl Ex. 34 |
| Class Period | The specific period of time that plaintiffs specify for the putative classes in this action, namely July 1, 2018 to present |
| Cohanim ¶ __ | Expert report of Babak "Bobby" Cohanim, D.D.S., M.S., dated May 5, 2023, attached as Pearl Ex. 2 |
| Compl. | Plaintiffs' Fifth Amended Class Action Complaint, dated March 24, 2023, and filed at ECF No. 290-2 |
| Cusack Dep. | Transcript of the March 16, 2023 deposition of John Cusack, noticed and taken in this matter, attached as Pearl Ex. 9 |
| Doctor | Dentists and orthodontists |
| Dr. Matian | Dr. Sherwin Matian, D.D.S., the owner and operator of VIP |
| Dr. Simon | Dr. William Simon, D.D.S., the owner and operator of S&S |

| Abbreviation | Referenced Document |
|---|---|
| DSO | Dental service organizations |
| Ezzio Dep. ___ | Transcript of the February 23, 2023 deposition of Jennifer Ezzio, noticed and taken in this action, attached as Pearl Ex. 60 |
| Garay Dep. ___ | Transcript of the January 27, 2023 deposition of Cecelia Garay, noticed and taken in this action, attached as Pearl Ex. 31 |
| Gooch Dep. ____ | Transcript of the January 31, 2023 deposition of Jaime Gooch, noticed and taken in this action, attached as Pearl Ex. 29 |
| Gooch Rog Response | Plaintiff Jaime Gooch's Responses to Interrogatories served in this action on September 28, 2022, attached as Pearl Ex. 39 |
| Grossman Dep. ___ | Transcript of the July 28, 2023 deposition of Jay Grossman, noticed and taken in this action, attached as Pearl Ex. 23 |
| Hamilton Dep. ___ | Transcript of the February 2, 2023 deposition of Celeste Hamilton, noticed and taken in this action, attached as Pearl Ex. 32 |
| Hansen Dep. ___ | Transcript of the February 10, 2023 deposition of Justin Hansen, noticed and taken in this action, attached as Pearl Ex. 55 |
| Implants | Dental implants |
| Kaza Dep.___ | Transcript of the February 3, 2023 deposition of Srini Kaza, noticed and taken in this action, attached as Pearl Ex. 8 |
| Kling Dep. ____ | Transcript of the January 20, 2023 deposition of Kerri Kling, noticed and taken in this action, attached as Pearl Ex. 14 |
| Li Dep. ____ | Transcript of the December 20, 2022 deposition of Mu Li, noticed and taken in this action, attached as Pearl Ex. 7 |
| Matian Dep.___ | Transcript of the January 8, 2023 deposition of Sherwin Matian, D.D.S., noticed and taken in the related *Simon & Simon* action, attached as Pearl Ex. 12 |
| Mot. ___ | Plaintiffs' memorandum in support of their motion for class certification, dated July 31, 2023, and filed at ECF No. 389 |
| Mound Dep. ____ | Transcript of the January 24, 2023 deposition of Tracy Mound, noticed and taken in this action, attached as Pearl Ex. 61 |
| Patel Dep. ____ | Transcript of the March 9, 2023 deposition of Kinnery Patel, D.D.S., noticed and taken in this matter, attached as Pearl Ex. 13 |
| Pater Dep. ____ | Transcript of the December 22, 2022 deposition of Martin Pater, noticed and taken in this action, attached as Pearl Ex. 6 |

| Abbreviation | Referenced Document |
|---|---|
| Pearl Ex. ___ | Exhibit to the Declaration of James Pearl in support of defendant Align Technology, Inc.'s opposition to motion for class certification and *Daubert* motion to preclude expert testimony |
| Plaintiffs | Collective reference to the named plaintiffs in the section 2 aspect of this case, including: Celeste Hamilton; Jamie Gooch; Tracy Mound; Katie Campbell; Jennifer Ezzio; Angela Carnaghi; Elisabeth Skibba; Justin Hansen; Cecelia Garay; Stephanie Rickenbaker; Misty Snow; and Emily Vo |
| Rickenbaker Dep. _ | Transcript of the January 19, 2023 deposition of Stephanie Rickenbaker, noticed and taken in this action, attached as Pearl Ex. 35 |
| Ritter Dep.___ | Transcript of the January 31, 2023 deposition of Trenton Ritter, noticed and taken in this action, attached as Pearl Ex. 18 |
| S&S | Simon & Simon, PC d/b/a City Smiles, a plaintiff in the related *Simon & Simon* action |
| Simon Dep.___ | Transcript of the January 20, 2023 deposition of William Simon, D.D.S., noticed and taken in the related *Simon & Simon* action, attached as Pearl Ex. 11 |
| Skibba Dep. ___ | Transcript of the January 26, 2023 deposition of Elisabeth Skibba, noticed and taken in this action, attached as Pearl Ex. 33 |
| Snow Dep. Vol. I ___ | Transcript of the January 18, 2023 deposition of Misty Snow, noticed and taken in this action, attached as Pearl Ex. 30 |
| Snow Dep. Vol. II ___ | Transcript of the January 26, 2023 deposition of Misty Snow, noticed and taken in this action, attached as Pearl Ex. 59 |
| Snyder ¶ ___ | Expert report of Edward A. Snyder, Ph.D., dated May 5, 2023, attached as Pearl Ex. 4 |
| Snyder | Expert sur-reply report of Edward A. Snyder, Ph.D., dated September 29, 2023, attached as Pearl Ex. 28 |
| Stiroh ¶ ___ | Expert report of Lauren J. Stiroh, Ph.D., dated May 5, 2023, attached as Pearl Ex. 3 |
| Stiroh Dep. ___ | Transcript of the June 7, 2023 deposition of Lauren J. Stiroh, noticed and taken in this action, attached as Pearl Ex. 27 |
| Stoll ¶ ___ | Expert report of Robert Stoll, Esq., dated May 5, 2023, attached as Pearl Ex. 15 |

| Abbreviation | Referenced Document |
|---|---|
| VIP | VIP Dental Spas, a plaintiff in the related *Simon & Simon* action |
| Vo Dep. __ | Transcript of the February 17, 2023 deposition of Emily Vo, noticed and taken in this action, attached as Pearl Ex. 62 |
| Vogt Dep. __ | Transcript of the August 21, 2023 deposition of William Vogt, noticed and taken in this action, attached as Pearl Ex. 1 |
| Vogt IR¶ __ | Expert report of William B. Vogt Ph.D., in support of class certification and merits, dated March 10, 2023, filed under seal at ECF No. 390-4 |
| Vogt RR ¶ __ | Expert rebuttal report of William B. Vogt Ph.D., in support of class certification and merits, dated June 30, 2023, filed under seal at ECF No. 390-6 |

I.      **INTRODUCTION**

The *Snow* Plaintiffs' attempt to demonstrate common impact suffers from three glaring flaws, each of which independently precludes certification.

*First,* Plaintiffs rely on a flawed benchmark that cannot separate lawful from illegal conduct. The Supreme Court has clearly held that before a class may be certified, any model supporting a plaintiff's damages case must be able to distinguish what common impact is caused by lawful conduct and what impact is caused from exclusionary, illegal conduct. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs do not satisfy this fundamental requirement. Plaintiffs instead rely on the testimony of their economic expert, Dr. William Vogt. Dr. Vogt proffers a benchmark comparison model that assumes liability from three types of allegedly exclusionary conduct: (1) exclusive dealing; (2) Align's termination of interoperability with 3Shape; and (3) bundling. The model then purports to measure the impact to the class.

But Dr. Vogt's benchmark model runs afoul of *Comcast* because the model's "all or nothing" nature prevents any ability of the finder of fact to disaggregate any conduct deemed to be lawful. Dr. Vogt admitted at deposition that his model was incapable of separating the impact from any of the different types of conduct.[1]

> "**Q:** If the exclusive dealing programs were found to be legal but the court still found or the jury still found that termination of interoperability was exclusionary, what happens to the 17 percent overcharge number? **A.** So that question -- I mean, that hypothetical is different enough from what I was actually asked to do, but I think the only answer I could have to that is that I would have to, you know, go back and think again and consider how my analysis would be different. **Q.** But there's nothing in your analysis that allows you to turn on or off certain alleged misconduct and rerun it through the model, correct? **A.** As it's structured now, that's right.[2]

The problem for the *Snow* Plaintiffs is that Dr. Vogt's exclusive dealing analysis suffers from three dispositive flaws: (1) he fails to consider the short duration and easy terminability of Align's discount programs; (2) he conducts no analysis of any of Align rival's costs, efficiency, or

---

[1] *See* Pearl Ex. 1, Vogt Dep. at 29:8-15.
[2] Pearl Ex. 1, at 23:19-24:8.

- 1 -                    ALIGN'S OPP'N TO MOT. FOR CLASS
                                                                              CERT. & *DAUBERT* MOTION TO
                                                                              EXCLUDE EXPERT TESTIMONY

ability to match or compete against any Align discount program; and (3) he fails to analyze any single doctor or group of doctors to determine if any Align program actually resulted in exclusivity. Dr. Vogt simply did not do the work to demonstrate that Align's competitors could not compete against or match Align's short term discounts. Such short term discounts, even when accompanied by exclusivity conditions, are viewed by the Ninth Circuit as pro-competitive as long as a competitor can bid for the business when the short term is up. Without showing that a substantial portion of doctors were locked in to long term exclusive deals that actually foreclosed other aligner manufacturers from competing, the Plaintiffs' exclusive dealing allegations are dead on arrival. Because the exclusive dealing alleged therefore does not meet the Ninth Circuit's standard for exclusionary conduct, it cannot be included in any damages model.[3]

In addition to its *Comcast* problem, Plaintiffs' benchmark is based on a stunningly simplistic and inapposite analogy between dental implants and *Invisalign*. Dr. Vogt postulates that because some unidentified patents related to implants expired for multiple competitors on multiple products and the prices later declined across implant brands, prices for the *Invisalign* brand of aligners should have seen the same decline when certain *Invisalign* patents expired in 2017. But despite the critical assumption that the patents in implants are similar to the patents relevant to this case, Dr. Vogt lacks any basis for his analogy because he conducted no analysis or investigation into the scope of the implant patents or *Invisalign* patents upon which his benchmark model turns. He conceded that he is not a patent expert and does not know the scope or patentability of any implant patents or aligner patents.[4] He does not even rely on another expert with such expertise. The implant analogy falls apart under even a common sense comparison. Dr. Vogt's model uses as his benchmark pricing *numerous* high end and low end implant brands unknown to consumers. He compares these multiple unknown implant companies to a *single*, nearly omnipresent and

---

[3] For purposes of this motion, the Court only need look at exclusive dealing to determine that the *Snow* Plaintiffs' model cannot support a common impact showing. Align will show at summary judgment that the termination of interoperability and bundling claims also are deeply flawed and cannot support liability. *See, e.g.*, Defendant Align Technology, Inc.'s Opposition to Plaintiffs' Motion to Preclude (*Simon & Simon* ECF No. 214).
[4] Pearl Ex. 1, at 60:13-61:11, 62:21-63:11.

exceedingly popular consumer brand, *Invisalign.*[5] It should surprise no one that a nationally advertised premium brand can sustain pricing more than unknown brands in the value segment. Finally, Dr. Vogt at deposition admitted that he was simply unaware of market conditions he concedes in his report are critical to any benchmark comparison. The implant benchmark is the foundation of Plaintiffs' common impact and damages case. But it fails common sense, it fails *Daubert*, and it cannot support certification.

Dr. Vogt's pass-through argument is no better than his benchmark. With years to collect the necessary data to conduct the proper pass-through analysis from the doctors who allegedly passed through the pricing, the *Snow* plaintiffs and Dr. Vogt simply did not do the work. Dr. Vogt's pass-through analysis is instead based on the records of a small dental finance company and a few DSOs. But even in these limited slices of data covering a tiny fraction of doctors, Dr. Vogt relies on averaging costs and prices across products and/or practices, never isolating the costs and prices associated with a single product and practice. He averages costs of Align across all products to the doctors and then further averages the pricing of *multiple* doctors to the patients. When one uses Dr. Vogt's own regressions on actual individual dentist practices *or* breaks down the data by Align product *or* looks at the *Invisalign* costs and patient prices for a single product for an individual dental practice, there is no evidence of consistent pass through. Without evidence of consistent pass through, there is no common impact to the class.

In addition to failing to show common impact, Plaintiffs have not met their burden under Rule 23(a) and cannot satisfy Rule 23(b)(2).  For these reasons, as explained more fully herein, Plaintiffs' Motion should be denied and the expert testimony of Dr. Vogt should be stricken.

## II.    FACTUAL BACKGROUND

### A.    Align Catalyzed Evolution in Orthodontics

This is a case involving orthodontics, a dental specialty that focuses on moving a patient's teeth into proper occlusion (*i.e.*, alignment). Orthodontic treatment restores and establishes function and occlusion, improves aesthetics, and maintains and improves oral and systemic health.

---

[5] Vogt IR § J.

Edward Angle established the first orthodontic school in 1900, approximately ten years after he created a system to categorize malocclusion (*i.e.*, improper alignment), which is still used today.[6] For nearly 100 years, orthodontists have used braces (also called fixed appliances or wires and brackets) to treat malocclusion.[7] Today, the vast majority of orthodontic treatments continue to be done with braces, and most orthodontists rely on the Angle malocclusion classification method.[8]

### 1.    Align Revolutionized Orthodontic Treatment

Align harnessed the power of computer-added design and 3-D printing to manufacture clear plastic trays to treat malocclusion, introducing *Invisalign* to the U.S. in 1999.[9] Aligners, like other dental products, are a Class II medical device regulated by the FDA.[10] Align's innovative process allows custom medical devices that apply precise pressure to teeth to facilitate orthodontic movement, and, as a result, over 15 million patients have been treated with *Invisalign*.[11]

As with any other disruptive company, Align obtained (and still is obtaining) hundreds of patents on its technology, and spent (and still is spending) significant sums of money (more than $1 billion since inception) on R&D to enable better patient treatment and compete against braces.[12] Several of Align's first patents for *Invisalign* expired in 2017, but a number of companies received FDA approval for clear aligners even before that happened.[13] Today, many companies

---

[6] *See* Pearl Ex. 2, Cohanim ¶ 5 n.1.

[7] *See id*. ¶ 44.

[8] *See id*. ¶¶ 5 n.1, 44-45.

[9] *See id*. ¶ 53; Pearl Ex. 3, Stiroh ¶ 28.

[10] *See id*. ¶¶ 28-29; Pearl Ex. 4, Snyder ¶¶ 89, 370; Align 2019 10-K at p. 3 ("The *Invisalign* System is regulated by the FDA as a Class II medical device."); Pearl Ex. 5, ALIGNAT-SNOW00214236 at -243. Align disagrees with Plaintiffs' proposed "market" construction of an "in-office clear aligner market." (Mot. at 3-4, 6-7, 9.) Aligners are teeth-straightening devices, and thus should not be considered independent of any other teeth-straightening devices, including braces or direct-to-consumer aligners. Indeed, Align markets against braces, and one of the promotions that Plaintiffs' expert challenges as exclusive – the Bracket Buy Back promotion – expressly targets braces. Pater Dep. at 174:4-15.

[11] *See* Align, https://www.aligntech.com/newsroom ("Align Technology reaches 15 millionth *Invisalign* patient milestone. Accelerating adoption of *Invisalign* clear aligner treatment globally reflects Align's continued investment in product innovation and commitment to international expansion."); Align, https://www.aligntech.com/about.

[12] Pearl Ex. 6, Pater Dep. at 25:25-26:5.

[13] *See* FDA 510k clear aligner approvals: ClearCorrect, Inc., https://www.accessdata.fda.gov/cdrh_docs/pdf8/K082556.pdf (grants approval on February 6,

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
PRECLUDE EXPERT TESTIMONY

manufacture aligners that are sold in the U.S., including: Dentsply Sirona, Straumann, Henry Schein, 3M, Envista, SmileDirectClub, Byte, Candid, and Angel Align.[14]

### 2.  Align Subsequently Pioneered Digital Dentistry

After revolutionizing orthodontic treatment, Align pioneered digital dentistry with iTero —an intraoral scanner that provides digital impressions of a patient's teeth. When *Invisalign* first launched, patients would have to have impressions of their teeth taken with putty ("PVS"). The PVS impression would be digitized, and a custom treatment plan would be made according to the doctor's prescription using Align's software. Align would then custom manufacture and ship *Invisalign* aligners to the patient's doctor. Today, just under half of dental practices in the U.S. use only PVS for dental impressions, but PVS remains the "gold standard" of impression-taking.[15] Consequently, all or nearly all aligner companies accept PVS for configuring aligners.[16]

PVS no longer accounts for the majority of dental impressions because, as Align was digitizing orthodontic treatment, other companies were digitizing impressions.[17] In 2011, Align purchased Cadent, which had introduced an intraoral scanner in 2004, the iTero HD, which spawned evolution in scanner offerings.[18] Scanners have grown in popularity with more companies offering them, including 3Shape, CareStream, Medit, Dentsply-Sirona, and others.[19] Today, scanners are used to take digital impressions of patients' teeth for many purposes, including

---

2009); ClearPath Orthodontics Ltd, available at https://www.accessdata.fda.gov/cdrh_docs/pdf16/K162609.pdf (grants approval on July 6, 2017).
[14] Pearl Ex. 2, ¶¶ 42-43, 51, 56-57; Pearl Ex. 4, ¶¶ 56, 63, 70, 84-89; Pearl Ex. 3, ¶¶ 29-37. *See also* Pearl Ex. 7, Li Dep. at 24:19-24, 31:24-33:22.
[15] *See* Pearl Ex. 4, ¶¶ 39, 58-59, 66, 69, 109, 360; Pearl Ex. 8, Kaza Dep. at 124:9-125:10. *See also* Pearl Ex. 9, Cusack Dep. at 64:2-20; Pearl Ex. 2, ¶¶ 14, 38-39, 77.
[16] *See* Pearl Ex. 2, ¶ 79; Pearl Ex. 8, at 56:3-13, 125:21-23; *see e.g. Impression Materials*, ClearCorrect, available at https://support.clearcorrect.com/hc/en-us/articles/115009156668-Impression-Materials.
[17] *See* Pearl Ex. 2, ¶ 69.
[18] *See id.*; Pearl Ex. 10, Barry Dep. at 158:9-14; *Align Technology Completes Acquisition of Intra-oral Scanning Leader Cadent*, Align (May 2, 2011), available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-completes-acquisition-intra-oral-scanning.
[19] Pearl Ex. 2, ¶¶ 70-71, 76; Pearl Ex. 4, ¶¶ 61-62, 90-92, 183, 361iii.

ALIGN'S OPP'N TO MOT. FOR CLASS CERT. & *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY

restorative (*e.g.*, bridges and implants) and orthodontic (aligners and retainers) treatments.[20] iTero scans can be sent to competing aligner companies by exporting an industry-standard STL file, and competing aligner companies market that they accept iTero scans exported as an STL file.[21]

### B.   Align Sued 3Shape for Patent Infringement and Terminated Interoperability

Align has worked with some scanner competitors, qualifying their scanners for use in submitting scans for *Invisalign*—called "interoperability."[22] One such example was Align's qualification of 3Shape's scanner, the TRIOS.[23] That relationship ended in December 2017—a month after Align sued 3Shape for patent infringement—because failing to terminate would provide 3Shape with waiver and other defenses against Align's claims. These defenses were then actually asserted by 3Shape before Align beat the defenses in both litigation and at the International Trade Commission.[24] 3Shape also countered with its own barrage of patent claims and brought an antitrust claim, which spawned this antitrust case.[25] Eventually, ████████████████████ ████████████████████████████████████.[26]

### C.   Align's Business Is Doctor-Focused and Designed to Support Doctors

Align sells its products to dentists and orthodontists (together, "doctors"), and to companies that own a number of dental practices ("DSOs").[27] █████████████████████████ ████████████████████████████████████████████████████

---

[20] Pearl Ex. 2, ¶¶ 69, 72-73, 81-83; Pearl Ex. 4, ¶¶ 58, 60, 82; Pearl Ex. 11, Simon Dep. at 40:10-24; Pearl Ex. 12, Matian Dep. at 47:23-48:4.

[21] Pearl Ex. 2, ¶¶ 41-42, 81-87; Pearl Ex. 4, ¶¶ 63-66; Pearl Ex. 13, Patel Dep. at 35:10-35:16; Pearl Ex. 12, at 47:19-48:4.

[22] Pearl Ex. 4, ¶ 63 n.51; Pearl Ex. 8, at 36:15-21, 123:17-19, 124:2-4; Pearl Ex. 14, Kling Dep. at 49:17-20; Pearl Ex. 7, at 77:19-25.

[23] Pearl Ex. 4, ¶ 115; Pearl Ex. 8, at 36:19-21.

[24] Pearl Ex. 4, ¶ 115; Pearl Ex. 15, Stoll ¶ 85; *see Simon and Simon, PC and VIP Dental Spas v. Align Tech., Inc.*, No. 3:20-cv-03754-VC, (N.D. Cal. Nov. 29, 2022), ECF No. 214-03 (Pearl Ex. 16, 3Shape Initial Post-Hr'g Br. at 70, No. 337-TA-1091 (Oct. 5, 2018) (excerpts)).

[25] *3Shape A/S v. Align Tech., Inc.*, No. 1:18-cv-00697-LPS (D. Del. filed May 8, 2018); *3Shape A/S v. Align Tech., Inc.*, No. 1:18-cv-00886-LPS (D. Del. filed June 14, 2018); *3Shape Trios A/S v. Align Technology, Inc.*, No. 1:18-cv-01332-LPS (D. Del. filed Aug. 28, 2018).

[26] *See* Pearl Ex. 17, ALIGNAT-SNOW00733990 (Align-3Shape settlement agreement).

[27] *See* Pearl Ex. 3, ¶¶ 43, 45; *see also* Pearl Ex. 18, Ritter Dep. at 8:1-6, 9:19-24 (testifying that DSOs comprise "roughly 20 percent" of Align's U.S. sales of *Invisalign*)

████████████████████████████████████████████████████████████

████████████████.[28] In addition to offering *Invisalign* for sale at list price ███

████████████████████████, Align has run various promotions and programs to

sell *Invisalign*, iTero, or both *Invisalign* and iTero together,[29] and also offers a loyalty program to

*Invisalign*-certified doctors, Advantage, whereby doctors receive "points" for *Invisalign*

prescriptions, which can lead to discounts on *Invisalign* cases.[30] Doctors are never required by

Align to join or participate in any promotional programs.[31] Align has also never offered a

promotion that resulted in *Invisalign* being priced below cost.[32]

    The Fusion program is a promotional program for iTero.[33] The Fusion program allows

doctors to defer their payment of a full-priced iTero into three annual payments, the second and

third of which might include a forgiveness of or reduction in the payment owed in exchange for

the doctor meeting certain goals for *Invisalign* case prescriptions.[34] Effectively, █████████

████████████████████████████████████████████████████████████

███ No Fusion program participants ever pay more than the iTero list price.[35] Other companies

selling aligners and scanners offer similar bundles, including Ormco and ClearCorrect.[36]

    Other Align contracts and promotions contain a range of terms; some include terms

███████████████████████████████.[37] Align has never enforced these terms, and

doctors have always retained full discretion to prescribe whatever treatments they want while

---

[28] Pearl Ex. 3, ¶¶ 22, 103, 108-09.

[29] *See* Pearl Ex. 3, ¶¶ 45-46; Pearl Ex. 6, at 19:15-19; Pearl Ex. 4, ¶¶ 130-132; Pearl Ex. 19, ALIGNAT-SNOW738132 (North America Promo Review Q1 2019); Pearl Ex. 20, ALIGNAT-SNOW00768596 (IFC GP Fusion Program Summary).

[30] Pearl Ex. 6, at 69:19-22, 75:1-2, 144:12-19; Pearl Ex. 21, ALIGNAT-SNOW00028159, at -171-178; Pearl Ex. 22, Align Resps. to Plaintiffs' Second Set of Interrogs., Interrog. No. 2.

[31] Pearl Ex. 6, at 175:15-22.

[32] Pearl Ex. 6, at 162:10-13, 164:2-5, 165:2-12, 166:1-7, 167:3-5, 168:14-18, 169:9-12, 170:7-9, 171:24-172:2, 172:25-173:2, 173:25-174:3.

[33] Pearl Ex. 18, at 13:22-14:14; Pearl Ex. 14, at 70:10-20; Pearl Ex. 4, ¶ 40.

[34] Pearl Ex. 14, at 68:11-70:8.

[35] *See* Pearl Ex. 18, at 12:23-13:7; Pearl Ex. 10, at 40:11-42:6.

[36] *See* Pearl Ex. 4, ¶ 70 n. 72; Pearl Ex. 2, ¶¶ 75-76.

[37] *See* Pearl Ex. 4, ¶¶ 152, 169; Pearl Ex. 6, at 23:2-24:4, 178:7-179:16.

     - 7 -      ALIGN'S OPP'N TO MOT. FOR CLASS CERT. & *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY

enrolled in Align promotional programs or under a contract with Align.[38] These discount programs are generally short term and easily terminable by the dentist.[39] Align's promotional pricing is consistent with the pricing practices of competitors, which also offer volume and loyalty discounts, as well as incentives to doctors who turn in materials they might otherwise use for braces.[40]

### D.   Align Has No Say in How Doctors Price *Invisalign* to Patients

Align does not control what doctors charge patients for *Invisalign* treatment.[41] Indeed, Drs. Matian and Simon, the doctor-owners of the DPP class representatives in the related S&S case, both testified at deposition that they have absolute discretion and final determination over what to charge patients for *Invisalign* treatment.[42] Many factors influence how doctors price *Invisalign* treatment to patients, including recessions, inflation, unemployment rate and labor costs, insurance limitations, material/supply costs, prices charged by other doctors, geography of the doctor's practice, whether the doctor is an orthodontist or a general dentist, and other overhead costs.[43]

Given the great variety of factors relevant to doctor pricing determinations and Align's absence of control, doctors do not all charge patients the same price for *Invisalign* treatment and do not always adjust their pricing to patients whenever Align increases material costs or lab fees.[44] Deposition testimony taken in this case and the related S&S case is illustrative. In the S&S case, Dr. Matian testified that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████.[45] Dr. Simon also testified that ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

---

[38] Pearl Ex. 6, at 23:2-18, 26:19-27:1, 28:12-17, 143:2-6, 150:16-152:1, 176:1-10.

[39] Pearl Ex. 4, ¶ 174; Pearl Ex. 6, at 19:15-19 ("Most promotions are short in duration.").

[40] Pearl Ex. 2, ¶¶ 33, 52, 102; Pearl Ex. 6, at 174:4-15.

[41] Pearl Ex. 7, at 219:21-220:5; Pearl Ex. 6, at 156:7-157:4, 158:9-18; Pearl Ex. 18, at 145:11-14.

[42] *See* Pearl Ex. 12, at 28:24-30:10, 30:22-24; 37:25-38:11; Pearl Ex. 11, at 27:23-28:1.

[43] *See* Pearl Ex. 2, ¶¶ 40, 93-94; Pearl Ex. 11, at 24:20-26:10.

[44] Pearl Ex. 2, ¶¶ 40, 95, 97-98, 101; Pearl Ex. 23, Grossman Dep. at 178:7-17, 199:21-200:2; Pearl Ex. 12, at 30:7-21, 33:6-34:14, 36:3-37:1; Pearl Ex. 11, at 24:20-26:10.

[45] Pearl Ex. 12, at 37:25-38:16, 46:1-14, 46:24-47:18, 68:24-69:5, 137:7-138:9.

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
PRECLUDE EXPERT TESTIMONY

████████████████████████████████████████████.[46] Meanwhile, in

this case, Plaintiffs have testified that they know different doctors may charge different prices for

*Invisalign* treatment, paid anywhere from $2,747 to $7,119.60 for their *Invisalign* treatments, and

that each of them had a different experience in terms of receiving discounts/promotional pricing

and receiving payment contributions from insurance and/or relatives.[47]

### E.   Plaintiffs Seek to Certify 11 Indirect Purchaser Classes With a More Expansive Class Period Than What the Direct Purchaser Plaintiffs Propose

Plaintiffs move to certify 11 classes of indirect purchasers of *Invisalign* under the Sherman

Act and the laws of various states, with a class period of July 1, 2018 to present.[48]

Plaintiffs seek to certify a nationwide injunctive relief class under the Sherman Act with

Emily Vo as the representative based on her alleged intent to purchase *Invisalign* in the future for

her daughter when her family is "financially ready."[49] Ms. Vo testified that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████[50]

Plaintiffs also seek to certify 10 state indirect purchasers of all persons that purchased, paid,

and/or provided reimbursement for some or all of the purchase price for *Invisalign* Treatments that

used any of the following types of *Invisalign* products—"Comprehensive," "Moderate," "GO,"

"Teen," "Assist Product Tracking," "Lite," "Express Ten," "Multi-stage Comprehensive," or

"Assist" treatment[51]—while residing in Arizona, California, Maryland, Massachusetts, Michigan,

Minnesota, Nebraska, Nevada, North Carolina, or Oregon, acquired for personal use from July 1,

2018 until such time as the alleged anticompetitive conduct has ceased.[52]

---

[46] Pearl Ex. 11, at 23:3-27:3, 30:2-31:4.
[47] Appendix "B" details the different Plaintiffs' experiences with their *Invisalign* purchases.
[48] (*See* Mot. at 1; Compl. ¶¶ 253, 255.)
[49] (Compl. ¶ 43.)
[50] Pearl Ex. 62, Vo Dep. at 126:21-135:13.
[51] In his expert report, Dr. Vogt states that he was instructed by counsel that the proposed SIP Class should not include the Express and Express 5 *Invisalign* products. Vogt IR ¶ 17 n.4.
[52] Appendix "XX" hereto contains a chart that identifies the proposed representatives of the SIP Classes and relevant information regarding their *Invisalign* purchases, including what *Invisalign*

**F.      Plaintiffs' Attempt to Show Common Impact Across Their Many Classes**

Plaintiffs' economic expert, Dr. Vogt, purports to show class-wide impact through a benchmark comparison of *Invisalign* to dental implants.[53] He opines that aligner prices should have fallen after certain patents for *Invisalign* expired in 2017 at the same rate as implant prices declined after certain implant patents expired in a different time period, after which certain entry followed. Dr. Vogt identifies the difference in the price decline as 17.6%, which he declares to constitute the overcharge rate on *Invisalign*'s prices.[54] He further contends that the "dental implant market" *in and after* 2012 is an appropriate benchmark for studying aligners in the but-for world *in and after* 2018 because it has "a similar set of competitive manufacturers" and "a similar set of purchasers," involves intraoral scanners in the order process, and also had "key patents" expire.[55]

Dr. Vogt opines that there were no uninjured class members because he performed two correlation analyses, comparing the price of *Invisalign* across different tiers in Align's Advantage loyalty discount program (which Plaintiffs do not challenge as anticompetitive) and across different *Invisalign* products (comparing the price of each *Invisalign* product against *Invisalign* Comprehensive).[56] As a matter of econometrics, a correlation analysis measures whether two variables move in the same direction (+100% correlated means the prices always move in the same direction, while -100% means they always move in opposite directions). Dr. Vogt purports to use his correlation analyses to show that there was common harm to direct purchasers, which would have been passed on to indirect purchasers; he contends that harm is common to the proposed classes because his correlation analyses show "*Invisalign* prices increased for every Advantage tier and product in the proposed class" and because "prices were correlated by at least 75% across products and by 91% across [Advantage] tiers."[57]

---

product they purchased (if known), what price they paid, whether Plaintiffs received a discount, and whether insurance covered any portion of the cost of the Plaintiffs' *Invisalign* treatment.
[53] Vogt IR ¶¶ 787-90.
[54] *Id*. ¶¶ 745-46, 787-90; *see also* Pearl Ex. 4, ¶¶ 248-56.
[55] Vogt IR ¶¶ 27(e), 559-60.
[56] Vogt IR ¶¶ 794-99.
[57] Vogt RR ¶ 66.

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
PRECLUDE EXPERT TESTIMONY

Further, Dr. Vogt purports to conduct a pass-on analysis, which he contends shows average pass-on rates for all doctors relating to increases in price for *Invisalign* ranging from 86-99.8%.[58] Dr. Vogt performs three empirical analyses to support his pass-on analyses: (i) a regression analysis to predict prices paid by doctors to Align for Comprehensive lab fees from zip code-based data produced by one small dental financing company, OrthoFi, using quarterly order volumes from transactional data produced by Align, which Dr. Vogt then in turn shoehorns into a second regression model to estimate indirect purchaser price as a function of the predicted doctor price resulting from his first regression; (ii) a regression model estimating prices that Smile Brands' (a DSO) dental practices charged indirect purchasers utilizing data produced by Smile Brands as a function of *Invisalign* price data, provider type, and quarterly and zip code fixed effects, which model Dr. Vogt aggregates across all providers to the quarter, zip code, and provider-type level; and (iii) a combination of monthly data obtained from OrthoFi, Smile Brands, and two other DSOs, Aspen and PepperPointe, limited to 2018 on, from which Dr. Vogt first estimates prices charged by doctors to indirect purchasers as a function of prices doctors paid Align, and next interprets the coefficient on his estimated doctor price as amounting to a pass-through rate.[59] Dr. Vogt did not look at the records of any individual doctor. Nor did Plaintiffs commission any survey or study of doctors to determine if they, in fact, passed on increases in price to purchasers of *Invisalign.*

## III.   LEGAL STANDARD

Rule 23 provides more than a mere pleading standard, and does not "establish an entitlement to class proceedings for the vindication of statutory rights"; rather, it "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Before a class can be certified, the Court must conduct a "rigorous analysis" to ensure that both Rule 23(a) and Rule 23(b) are satisfied by a preponderance of the evidence.[60] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351

---

[58] Vogt IR ¶¶ 846-71.

[59] *Id*. ¶¶ 846, 861-71, 1015, 1017.

[60] Align recognizes that Plaintiffs are not required to rely on admissible evidence at the class certification stage. *Sali v. Corona Regional Medical Center*, 909 F.3d 996, 1004–05 (9th Cir.

(2011). This means that the Court must determine whether expert opinion is admissible, "judg[e] the persuasiveness of the evidence presented," and "resolve any factual disputes necessary to determine" if Plaintiffs have met their burden. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011). And even if the Court determines that expert evidence is admissible, this does not mean that Plaintiffs have met their burden under Rule 23.

"[A]t class certification, the question is whether it is likely that liability can be adjudicated on a classwide basis, or whether individual differences instead preclude common treatment." *Sanchez v. Hearst Commc'ns, Inc.*, No. 20-cv-05147-VC, 2022 WL 1400853, at *2 (N.D. Cal. May 4, 2022). Plaintiffs must satisfy all four Rule 23(a) requirements and show under Rule 23(b)(3) that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. To certify the 10 state classes under Rule 23(b)(3), Plaintiffs must establish that common issues "predominate" over issues requiring individual proof and adjudication. *Id*. at 33.

As for the national injunctive relief class, Plaintiffs must meet a narrower standard under Rule 23(b)(2): they must show class aggregation is needed and that the challenged conduct can be enjoined or declared unlawful as to all class members. *See Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 587-88 (9th Cir. 2022) (citing *Dukes*, 564 U.S. at 360). "Rule 23(b)(2)'s inquiry into predominance is less searching [than Rule 23(b)(3)'s] not because it is less stringent, but because no inquiry should even be needed–predominance must be 'self-evident.'" *Kihn v. Bill Graham Archives LLC*, No. 20-17397, 2022 WL 18935, at *3 (9th Cir. Jan. 3, 2022). Class certification also fails under Rule 23(b)(2) where the putative class representative lacks standing. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 925 (9th Cir. 2019).

## IV.   ARGUMENT

Plaintiffs efforts to demonstrate, by a preponderance of the evidence, that class certification is proper under Rule 23(a) and 23(b)(3) fails because (i) Dr. Vogt has a single, inflexible benchmark methodology that he admits does not, and cannot separate lawful exclusive dealing

---

2018).  As a result, Align has not objected to all inadmissible evidence presented by Plaintiffs, and expressly preserves its objections to such evidence.

from any other cause when measuring class-wide impact; (ii) Dr. Vogt's selection of the implant benchmark is not sufficiently comparable to *Invisalign* to be reliable; and (iii) Dr. Vogt fails to demonstrate that any overcharge was actually passed on from direct purchasers to Plaintiffs. Dr. Vogt's flawed analysis should therefore be excluded and class certification denied. But even if the Court determines that Dr. Vogt's reports are admissible, the Court still should not certify the putative classes, as Plaintiffs have not met their burden with respect to Rule 23(a) and 23(b)(3).

A.     **Plaintiffs' Benchmark Model Fails to Support Certification Because It Cannot Separate Lawful and Allegedly Unlawful Exclusionary Conduct**

"In *Comcast*, the Supreme Court rejected the concept that 'at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide' and required plaintiffs bringing an antitrust suit to tie each theory of liability to a calculation of damages." *Stemmelin v. Matterport, Inc.*, No. 20-04168, 2022 U.S. Dist. Lexis 44732, at *26 (N.D. Cal. Mar. 14, 2022) (quoting *Comcast*, 569 U.S. at 35)). "[A]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation" and "must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35 (internal citation omitted); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (same).

Here, Plaintiffs' crude benchmark purporting to show common impact and damages runs afoul of *Comcast* because it cannot distinguish among damages stemming from Plaintiffs' three theories of liability: (1) termination of interoperability; (2) bundled discounts; and (3) alleged exclusive dealing. Plaintiffs rely on Dr. Vogt's model to draw a wildly simplistic comparison: patents existed, then some expired, and prices later declined in implants; therefore, after certain Align patents expired, the same decline in prices should follow for *Invisalign*-brand aligners, but they did not; ergo, class-wide damages to *Invisalign* purchasers.

This model is entirely untethered from any of the conduct that Plaintiffs challenge and reaches the same conclusion whether such conduct is lawful or unlawful. If Plaintiffs' broth of alleged conduct were dramatically different, or even just different with respect to one aspect, the

"model" remains the same and thus produces the same result. The model does not adjust or otherwise react. It is all or nothing. Consequently, every bit of the conduct that Plaintiffs challenge must be found illegal for the model to pass muster under *Comcast*. If even one promotion among those that Dr. Vogt deems exclusionary is actually lawful, Plaintiffs' model will have erroneously assigned damages to lawful conduct because the model does not and cannot produce a different result than the one it produces now. This flaw is apparent from Dr. Vogt's expert report. Lest there be any doubt, Dr. Vogt agrees with this understanding of his model, as he admitted at deposition: "Q. But there's nothing in your analysis that allows you to turn on or off certain alleged misconduct and rerun it through the model, correct? A. As it's structured now, that's right."[61] *Comcast* instructs that such a model cannot satisfy Rule 23(b)(3). *See* 569 U.S. at 35.

A "look ahead" to fundamental merits flaws in a plaintiff's argument is not only appropriate at class certification, but necessary. *Sanchez*, 2022 WL 1400853, at *2 ("[A]t class certification, the question is whether it is likely that liability can be adjudicated on a classwide basis, or whether individual differences instead preclude common treatment. The Court *must look ahead* to the trial." (emphasis added)). Such a look ahead dooms Plaintiffs' benchmark model and, with it, their Motion because it shows that certain of the agreements and programs that Plaintiffs allege to be exclusive deals are facially lawful and not anticompetitive. This means that Dr. Vogt's benchmark runs directly afoul of *Comcast* and cannot support class certification.

Contracts that are short-term or easily terminated are not illegal, even if they are exclusive. In *Allied Orthopedic Appliances v. Tyco Health Care Group*, the Ninth Circuit held that market-share discount agreements and sole-source agreements did not, alone or together with other conduct, constitute exclusionary conduct under § 2 of the Sherman Act. *See* 592 F.3d 991, 996–97 (9th Cir. 2010). The contracts could be terminated by the customers, allowing them "at anytime to forego the discount offered by [the defendant] and purchase from a generic competitor." *Id.* at 997; *see also Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("[T]he short duration and easy terminability of these agreements negate substantially their

---

[61] Pearl Ex. 1, at 23:19-24:8.

potential to foreclose competition"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1821a1 (5th ed. 2020) (explaining that duration is important to analysis of exclusive dealing because dealers can switch immediately if supplier exercises market power such as by raising prices above competitive level); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) (granting summary judgment for defendant on exclusive dealing claim, in part due to absence of evidence on indicia such as contract duration: "The record simply does not indicate what proportion of the market is bound up in long-term contracts at any particular point in time or to what effect."); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022), *cert. denied sub nom. Sanofi-Aventis U. S., LLC v. Mylan, Inc.*, 143 S. Ct. 1748 (2023) ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination.").

Despite this plain guidance, Dr. Vogt analyzed easily terminable agreements that were short duration and included these agreements as exclusionary contracts in his model. Dr. Vogt lacks evidence to support condemning these promotions as exclusionary. Of the nine discount programs Dr. Vogt analyzed, most were six months or a year.  For example, ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████.[62] None of the above program terms included a restriction on the termination of the program by doctors.[63] Worse yet, Dr. Vogt did not analyze purchase data for doctors that participated in the programs cited above—or any others— to confirm whether the doctors exclusively purchased *Invisalign* or also bought other aligner brands.[64] He instead assumes that contract provisions that doctors voluntarily entered and could easily exit nonetheless forced exclusivity that foreclosed rival aligner companies.

The facts do not support that conclusion, and neither does Dr. Vogt's testimony. Align

---

[62] *See* Appendix B.
[63] *Id*.
[64] *See* Pearl Ex. 1, at 16:1-24.

executives testified that ███████████████████████.[65] Dr. Vogt agreed.[66] The details of the programs he identified as exclusionary confirm the same.[67] And yet Dr. Vogt nevertheless treated these programs as exclusionary.[68] He admits, however, that he did no analysis of competitors to determine whether they were actually excluded, or whether they were equally efficient or whether they were, in fact, unable to complete against Align's discounts.[69]

Short term, easily terminable discount programs (even with exclusivity conditions) are lawful under *Allied Orthopedic* and *Omega*. Discounts such as those challenged by Plaintiffs are procompetitive in that they provide lower costs to doctors and then consumers. *See Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."). *See also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 907 (9th Cir. 2008) (quoting Areeda & Hovenkamp, *Antitrust Law*, ¶749a at 322–34 (Supp. 2006) (antitrust analysis focuses on an equally efficient competitor because "[r]equiring the defendant's pricing policies to protect the trade of higher cost rivals is overly solicitous of small firms and denies customers the benefits of the defendant's lower costs"). The programs would only be unlawful if Align was locking up large portions of the market into long term exclusive contracts that could not be matched by equally efficient competitors. *See Allied Orthopedic*, 592 F.3d at 997 (holding the "easy terminability" of an exclusive dealing arrangement "negate[s] substantially [its] potential to foreclose competition" because customers subject to discount agreements can "choose at anytime to forego the discount offered" and purchase from less expensive competitor). Plaintiffs made no effort to establish those facts. They did not take discovery of competitors to determine if they could compete against the discounts nor did they canvas doctors to determine whether they were locked in, in practice or in fact. Not analyzing rivals' ability to compete and not analyzing whether the

---

[65] *See* Pearl Ex. 6, at 175:15-176:10; 183:1-9.
[66] *See* Pearl Ex. 1, at 15:8-20.
[67] *See e.g.* Pearl Ex. 24, ALIGNAT-SNOW00588022; Pearl Ex. 25, ALIGNAT-SNOW00306106; Pearl Ex. 26, ALIGNAT-SNOW00033076.
[68] *See* Vogt ¶ 306.
[69] Pearl Ex. 1, at 33:8-14.

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
PRECLUDE EXPERT TESTIMONY

agreements actually resulted in exclusivity in a monopolization case is nothing more than willful blindness by Dr. Vogt and the *Snow* Plaintiffs. They have thus built their claim of market exclusion on an unsupported assumption. Governing Ninth Circuit antitrust law demands more. *See id*.

Because Dr. Vogt did not conform his exclusion theory to Ninth Circuit precedent, his opinions should be excluded. *UFCW Local 1776 v. Teikoku Pharma*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) (citation omitted) ("exclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process."); *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 844 (N.D. Cal. 2021), (excluding portions of expert's opinions related to alleged harm to competition for being "unreasonable" and "based on an incorrect legal standard"). Even if Dr. Vogt's opinion is not excluded, the legality of Align's short term discount programs is fatal to Dr. Vogt's all-or-nothing benchmark model.

### B.    The Implant Market Is Not Comparable

Plaintiffs' benchmark is not comparable to *Invisalign*. A reliable benchmark methodology "requires a comparison of the [defendant's] own business with one nearly as identical as possible." *Shannon v. Crowley*, 538 F. Supp. 476, 481–82 (N.D. Cal. 1981) (citing *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393 (9th Cir. 1957) ("Where no basis for comparison was shown, such evidence has been rejected.")). The implant market fails the comparability standard for three reasons: (i) Plaintiffs attempts to compare an entire market to a single product, *Invisalign*, without any justification for the critical differences between the two; (ii) Plaintiffs fail to assess the differences in scope and effect of "key" patents in the implant market versus the scope and effect of "key" *Invisalign* patents; and (iii) Plaintiffs fail to account for anticompetitive conduct in the implant market during the benchmark period.

### 1.    Comparing an Entire Market to a Single Product Is Inapposite

Comparing pricing across numerous implant brands to a single aligner brand is inapposite. Dr. Vogt identifies three "similarities" between implants and *Invisalign*: they are used by doctors, they are placed with the assistance of scanners, and they have a similar set of manufacturers.[70]

---

[70] Vogt IR ¶¶ 559-560.

None are compelling. Rather, Dr. Vogt ignores numerous material differences, making the benchmark unreliable. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974–76 (C.D. Cal. 2012) (failure to consider key differentiating factors renders a benchmark unreliable).

*First*, *Invisalign* aligners are customized for each patient,[71] where implants are often mass produced, available in preconfigured sizes, and can be kept in inventory before needed with a specific patient. [72] *Second*, no implant has any material consumer brand recognition while *Invisalign* is a world-famous brand, cultivated by decades of marketing investment. [73] *Third*, aligners involve more advanced technology than implants, and thus require much higher levels of investment in research and development. [74] *Fourth*, the range of possible treatments varies significantly between aligner brands (and even within different types of a single brand), allowing for significant differentiation and recognition among patients—many of whom are more likely to ask a doctor to treat malocclusion with *Invisalign* than to identify a particular implant brand (most of which are unknown) to treat a broken or missing tooth. [75] Implants are thus highly commoditized, resulting in patient decisions being driven primarily by price.[76] The inappositeness of Plaintiffs' benchmark model precludes class certification.

### 2.    Plaintiffs' Benchmark Is Not Founded on Any Patent Analysis

Plaintiffs' benchmark model relies, at its core, upon the analogy around implant-related patents and *Invisalign*-related patents, and the impact of the expiry of those patents on price.[77] Dr. Vogt found that "key" patents affecting both expired and therefore, absent anticompetitive conduct, *Invisalign* prices should mirror a decline across implant brands.[78] This analysis is not

---

[71] Pearl Ex. 1, at 82:8-10.
[72] *See* Pearl Ex. 2, ¶¶ 43, 115; Pearl Ex. 4, ¶ 264iv; Pearl Ex. 35, Stiroh Dep. at 192:9-193:4. *See also* Pearl Ex. 23, at 325:3-23 (testifying that his practice keeps implants in storage, but does not have similarly generic aligners, because, unlike implants, aligners have to be custom fit).
[73] Pearl Ex. 1, at 64:5-12.
[74] Pearl Ex. 2, ¶ 43.
[75] Pearl Ex. 2, ¶ 43; Pearl Ex. 4, ¶ 264(ii); Pearl Ex. 3, ¶ 128.
[76] Pearl Ex. 2, ¶ 43.
[77] *See, e.g.*, Pearl Ex. 1, at 70:20-23 ("[B]y the construction of the analysis, it's accounting for patent expiration and the rush of entry and the timing of those things").
[78] Vogt IR ¶¶ 572-578.

ALIGN'S OPP'N TO MOT. FOR CLASS
CERT. & *DAUBERT* MOTION TO
PRECLUDE EXPERT TESTIMONY

credible, however, as it makes two errors about the role of patents in the implant market. *First,* Dr. Vogt errs in his analysis of the scope and effect of the patents he purports to rely upon because he has no applicable patent expertise. *Second*, he incorrectly rejects an alternative, non-patent explanation for the observed price decrease in implants that he uses as his benchmark.

Dr. Vogt's first error results from his assumption that patents that expired in the implant market were of the same scope and effect as those that expired related to *Invisalign*. But he admits that he did not do a legal analysis of the patents for implants or *Invisalign*.[79] He also admits he lacks expertise in analyzing the scope or effect of patents and did not attempt that analysis.[80] Thus, his assumption that certain implant patents and *Invisalign* patents were "key,"[81] is erroneous. *See ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 442 F. Supp. 3d 1329, 1360–61 (D. Or. 2020) (expert's assumption about similarity between businesses was erroneous where expert "ha[d] no expertise in the [relevant] industry on which to base such an assumption").[82]

Plaintiffs' second error is assuming that the price decrease that Dr. Vogt observed in the implant market was caused by patent expiry, to the exclusion of another, more probable cause: the emergence of a robust value segment of the implant market. A value segment in implants began to emerge in 2010, right in the midst of Dr. Vogt's selected benchmark period.[83] At that time, several premium implant manufacturers began marketing or acquiring value implant products.[84] Dr. Vogt found that "between 2010 and 2014 (particularly in 2013 and 2014) the value segment expanded via a series of expansions by established industry players."[85] The value segment of the implant market grew significantly during the benchmark period, doubling between 2004 and 2016 to

---

[79] Pearl Ex. 1, at 60:20-61:11.
[80] Pearl Ex. 1, at 60:20-22, 61:11.
[81] Vogt IR ¶¶ 27(e), 559-60.
[82] To the extent Dr. Vogt relies upon Dr. Grossman for the propriety of using implants as a benchmark for *Invisalign*, *see* Vogt RR ¶¶ 59, 346, Dr. Grossman testified that he did not do any kind of economic or scientific analysis comparing implants to aligners, and that he has no personal experience with patent expiry. Pearl Ex. 23, at 327:9-330:19.
[83] Pearl Ex. 1, at 66:3-12.
[84] Pearl Ex. 1, at 66:13-67:2.
[85] Vogt IR ¶ 573.

become half of the total unit volume in the implant market.[86] Rather than attempt an analysis of this entry, Dr. Vogt summarily rejects the emergence of the low-price "value" segment of implants in which leading players in the implant space participated as a potential cause of the implant price decreases.[87] But the introduction of a value segment is a more logical cause for the implant price decrease than patent expiry. In lieu of analyzing the implant value segment, Dr. Vogt instead chose to infer that "the rush of entry following the patent expiration . . . explains the price decline."[88]

### 3.      The Implant Market Is Clouded by Anticompetitive Conduct

The benchmark method requires that a plaintiff select a "comparable business not affected by the anticompetitive conduct at issue." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). "An expert selecting a benchmark period must have a *reasonable basis* to assume that the period is free of anticompetitive conduct." *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 632 F. Supp. 3d 1108, 1167 (S.D. Cal. 2022). If the "'clean' period contains years of allegedly anticompetitive conduct, the idea that prices in the 'clean' benchmark period can be fairly traced to variables impacting price, and not the anticompetitive conduct, falls apart." *Id.* Plaintiffs' implants benchmark is rife with notable instances of anticompetitive conduct and Dr. Vogt testified that such factors would be important but he did not account for these in selecting the benchmark.[89]

In the *Dental Supplies Antitrust Litigation*, Case No. 16-CV-00696 (E.D.N.Y. Feb. 11, 2016), three different dental supply companies, including one that Dr. Vogt highlights as a key implant supplier, were accused of conspiring to fix prices for dental supplies, including implants, from as far back as 2005. Two years later, the FTC brought an enforcement action for the same misconduct, alleging it peaked in or around 2013—during Dr. Vogt's selected benchmark period of 2012-2016. *See In re Benco Dental Supply Co., et al.*, Docket No. 9379 (Fed. Tr. Comm.). Dr. Vogt also ignores allegations that an alleged conspiracy artificially depressed the number of doctors certified to place implants during his selected benchmark period. *See United States Board*

---

[86] Vogt IR ¶ 582.
[87] *See* Pearl Ex. 4, ¶¶ 266-67.
[88] Pearl Ex. 1, at 67:17-19.
[89] Pearl Ex. 1, at 59:9-60:19.

*of Oral Implantology, et al. v. American Board of Dental Specialties, et al.*, Case No. 18-CV-06520 (N.D. Ill. Sept. 25, 2018). Dr. Vogt was not aware of these cases and did nothing to account for these in selecting his benchmark.[90]

Without a legally valid benchmark to rely upon, Plaintiffs have no means for showing impact and certification must be denied.

### 4. Dr. Vogt's Benchmark Model Should be Excluded

Because Dr. Vogt conducted no patent analysis, was unaware of and did not analyze major market events (entry of value segment, significant litigation, and regulatory activity) and because comparing multiple quasi-generic brands to one consumer brand is facially suspect, his benchmark model is unreliable and should be excluded. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 at 974–76; *Powell v. Anheuser-Busch Inc.*, 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012) (excluding expert opinions that "fail[ed] to sufficiently consider the relevant underlying facts necessary to support his opinions and conclusions"); *Muffett v. City of Yakima*, No. CV-10-3092-RMP, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012).

### C. <u>Plaintiffs' Pass-On Argument Is Based on Incomplete Data That Is Obscured by a Pervasive Use of Averages</u>

Like the benchmark analysis, Plaintiffs' attempt to demonstrate pass-on is unreliable and fails, as it is founded on Dr. Vogt's unreliable analysis. To obtain certification of an indirect purchaser class, "plaintiffs must offer a model of impact and damages that demonstrates the alleged overcharge was passed through to each successive link in the distribution chain, and ultimately to the plaintiffs." *Sidibe v. Sutter Health*, 333 F.R.D. 463, 494–95 (N.D. Cal. 2019). This requires showing in the first instance that the direct purchasers paid an artificially inflated price , and that those direct purchasers passed on some or all of that inflated cost to the indirect purchasers. *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010); *In re Graphics Processing Units ("GPU") Antitrust Litig.*, 253 F.R.D. 478, 502 (N.D. Cal. 2008). Plaintiffs fail to show either component of pass-on as required for class certification.

---

[90] Pearl Ex. 1, at 59:9–60:19.

### 1.   Plaintiffs Do Not Establish Common Harm to the Direct Purchasers

Plaintiffs cannot establish the first prong of pass-through because they do not establish common harm to the direct purchasers of *Invisalign.* Dr. Vogt's pass-on analysis does not show that, in a but-for world with lower prices, all or most doctors would pay lower prices. His analysis also glosses over and fails to analyze the individualized pricing negotiations of Align's various direct purchasers. *See In re GPU*, 253 F.R.D. at 504–05 (denying class certification where "individualized negotiations took place between defendants and their direct purchasers" but plaintiffs failed to analyze it, and "simply argue[d] that pass-through occurred nonetheless"). In addition, Dr. Vogt fails to control for other economic factors that can make prices move (*e.g.*, supply and demand factors impacting price, such as increased demand for cosmetic procedures.).[91] Further, Dr. Vogt fails to account for individualized factors that affect different categories of purchasers.[92] For example, his analysis fails to account for the fact that DSOs are differently situated than unaffiliated doctors, as DSOs have multiple offices and unique bargaining power, which results in their negotiation of distinct, and generally more favorable, contract pricing for *Invisalign*.[93] A close examination of prices paid by specific DSOs shows that actual prices paid by different customers do not necessarily increase over time.[94]

Because Dr. Vogt's correlation analysis suppresses variation in *Invisalign* pricing without adequately controlling for changes in demand and supply factors or different direct purchaser bargaining positions and effects, it cannot reliably establish that any doctor paid an overcharge that was passed on to Plaintiffs. The lack of a competent model precludes Plaintiffs from relying on it to establish class-wide impact.[95] *See Sidibe*, 333 F.R.D. at 495–98.

### 2.   Plaintiffs Do Not Establish Pass-On Because Dr. Vogt Does Not Rely on Actual Dentist Data on Actual Products

Plaintiffs also cannot establish pass-on because Dr. Vogt's analysis fails to establish that

---

[91] Pearl Ex. 3, ¶ 121.
[92] *Id*. ¶ 122.
[93] *See id*. ¶ 44, 122.
[94] *See id*. ¶ 151, Figure 15.
[95] *Id*. ¶ 123.

- 22 -                      ALIGN'S OPP'N TO MOT. FOR CLASS CERT. & *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY

any harm to direct purchasers was actually passed on to indirect purchasers. Dr. Vogt makes three critical errors in attempting to demonstrate pass-on: he bases his conclusions on unreliable data; he errs in interpreting that data; and, in the absence of data, he relies on anecdotal and incomplete evidence from doctors regarding pricing practices.

> ### a.     Dr. Vogt uses incomplete and unreliable data, which he then averages to obscure differences

Dr. Vogt relies on flawed data from Smile Brands, Aspen, and OrthoFi. The data produced by Smile Brands and Aspen is unreliable because it lacks sufficient information to identify the specific type of *Invisalign* product sold—e.g., a low-stage aligner offering that uses 5 or 10 trays, versus a comprehensive offering that uses over 50 trays. Product type materially impacts product price (*i.e.*, a product with fewer stages costs less than a product with unlimited stages).

The Aspen and OrthoFi data is unreliable because it does not contain information about prices the doctors paid Align for *Invisalign*, a fundamental piece of any pass-through analysis.[96] This prevents any assessment of pass-on because the price paid in the first instance by doctors is unknown. Similarly, Align's data does not allow for Dr. Vogt to deduce what a doctor charged for *Invisalign* on an individualized patient basis because Align does not track, collect, or maintain any regularly updated data regarding prices charged by doctors to patients for *Invisalign*.[97]

The problem of incomplete data is purely of Plaintiffs' making. It is also fatal. At the beginning of this case, Plaintiffs knew they would need to establish that changes in the prices that Align charged to doctors for *Invisalign* actually resulted in changes to the prices charged by doctors to patients. Ultimately, neither Dr. Vogt nor Plaintiffs adduced, or even attempted to adduce, evidence from doctors that would allow for reasonable conclusions about pricing practices as a whole, which defeats their pass-on claims. *See In re GPU*, 253 F.R.D. at 505. The *Snow* Plaintiffs could have simply subpoenaed a reasonable sampling of doctors and tracked whether those doctors raised their prices on specific products in response to Align price increases on those products.

---

[96] *Id.* n.319.
[97] Pearl Ex. 4, ¶ 279.

Rather than go out and systematically seek that quantitative and qualitative data from individual doctors, the *Snow* Plaintiffs instead chose to rely on narrow and unrepresentative slices of data from selected DSOs and a dental finance company.[98] The result is a pass-on analysis that does not actually test the correct question: whether actual dentists consistently changed their prices in response to changes in Align pricing. This failure is sufficient grounds to exclude Dr. Vogt's opinion on pass through. In *In re Lithium Ion Batteries Antitrust Litigation,* Judge Gonzales Rodgers struck an opinion by one of the plaintiffs' pass-through experts because plaintiffs had not obtained the correct data in discovery.  No. 13-MD-2420 YGR, 2017 WL 1391491, at *12 (N.D. Cal. Apr. 12, 2017); *see also In re GPU*, 253 F.R.D. at 505 (holding plaintiffs' pass-on damages model failed because it did not demonstrate how pass-on could be established absent wholesaler-by-wholesaler and re-seller-by-re-seller investigation).

> ### b.    Dr. Vogt avoids the proper individualized analysis of doctors using specific products

Even with the incomplete data he possessed, Dr. Vogt assiduously avoided any individual analysis that would have demonstrated whether pass-on consistently occurred. Dr. Vogt could have looked at the pricing decisions of individual practices in response to cost changes using the updated OrthoFi data or the PepperPointe data but he did not. Using the OrthoFi data that has individual practice pricing, Dr. Vogt still uses average costs and average prices. The costs he uses are not even the actual costs paid by an individual OrthoFi practice but they are the *average* costs paid by *all practices* in that zip code. While he uses the actual prices charged to patients by each OrthoFi practice, he averages across all products and patient prices in a given quarter.[99] The averages obscure the inconsistency of the pass-on.

---

[98] Plaintiffs assertion that "[m]any dentists and orthodontists . . . state openly that they pass on costs and costs saving to their patients . . ." is foundationless.  (Mot. at 15.)  Neither Plaintiffs nor their expert performed any kind of survey or analysis to support this conclusory assertion, and the only "support" they can point to are the unreliable self-serving statements of one of the Plaintiff's owners (Dr. Matian), who actually testified that ███████████████████████████████ ███████████████████████████████████████████████████████████ *see supra* § II(D), and paid-for statements from another general dentist, Dr. Grossman.
[99] Pearl Ex. 28, Snyder Sur-Reply Report ¶¶ 7, 10, 15–23.

While Dr. Vogt purports to examine pass-on for two practices in response to analysis by Align's economic expert, Dr. Vogt actually calculates *one* combined pass-on rate for these *two* practices, a pass-on rate of 99%.[100] But using his model and calculating the pass-on rate by practice reveals that one of the two practices had no statistically significant pass-on—meaning he combined the practices to disguise that his model cannot consistently show pass-on at the practice level.[101] Thus, performing Dr. Vogt's analysis at the practice level cuts the pass-through rate nearly in half.

Of the data sets that Dr. Vogt relies on for his pass-on analysis, only the data produced by PepperPointe has information about ███████████████████████████████████████ ████████████████████████████████ But the PepperPointe data actually shows that the prices doctors charge to patients are *not* closely tied to cost, and so does not support the conclusion that cost savings would be passed on to indirect purchasers if direct purchasers obtained more favorable pricing from Align.[102] The PepperPointe data reveals that ████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████ *Flash Memory*, 2010 WL 2332081, at *11 (denying class certification where pass-on model does not account for variety of product types and price points). These results indicate that doctors do not make the pass-on decisions that Vogt suggests they do.[103] In fact, an analysis of Align's Advantage discount program indicates that doctors do not pass discounts or price changes onto their customers.[104] As a result, doctors in a but-for world would not have passed on the discounts Dr. Vogt suggests would exist in such a world.[105]

Dr. Vogt's pass-on regression glosses over numerous points of data that show, against his conclusions, that Align offers a wide range of products, at different prices and at different negotiated prices with different direct purchasers.[106] Dr. Vogt ignores these issues and merely

---

[100] Vogt RR ¶ 477.
[101] Pearl Ex. 28, ¶¶ 37–38.
[102] Pearl Ex. 3, ¶¶ 159-160, Figure 22.
[103] Pearl Ex. 4, ¶¶ 294-299.
[104] Pearl Ex. 28, ¶¶ 31–36.
[105] *Id.*
[106] See, e.g., Cohanim ¶¶ 5, 34, 55; Align 8/2023 10-Q; "Invisalign Product Portfolio," available at https://cloud.news.aligntech.com/productportfolio; Snyder ¶ 57; Stiroh ¶¶ 43-44, 57-58.

assumes a rate of pass-on despite the varying prices among purchasers. *See In re Optical Disk Drive Antitrust Litig. ("ODD 1")*, 303 F.R.D. 311, 314 (N.D. Cal. 2014) (denying class certification where the plaintiffs aggregated prices across purchasers such that the expert's model assumed class-wide impact (and pass-on)). For instance, Dr. Vogt fails to account for changes in the *Invisalign* product mix when analyzing Smile Brands' data, which, if considered, would cause Dr. Vogt's pass-on estimate to fall dramatically—to below 30%.[107] In other words, individual Smile Brands dental practices did not, in fact, pass-on increases in *Invisalign* costs to indirect purchasers, but Dr. Vogt ignores that fact in the data.[108] Finally, Dr. Vogt obscures the fact that the PepperPointe and Smile Brands data (contrary to his opinion) shows that prices charged to indirect purchasers remained constant when the doctors' *Invisalign* lab fees changed, as opposed to moving with those changes.[109] Dr. Vogt's use of averages and assumptions which obscure the actual pass-on rate of actual doctors on actual, specific products renders Dr. Vogt's pass-on opinion unreliable and incapable of justifying class certification. *See ODD 1*, 303 F.R.D. at 314.

In sum, because Dr. Vogt's pass-on analysis involves estimates based on incomplete and contrary data sets, contains analytical flaws, is inconsistent with the record regarding variations in doctor purchasing and pricing of *Invisalign*, and not grounded in any contrary evidence from doctors, Plaintiffs cannot establish pass-on and so are not entitled to class certification.  Likewise, Dr. Vogt's pass-on analysis is unreliable and should be excluded for the same reasons.[110]

### c.    Dr. Vogt's Flawed Pass-On Model Precludes Certification

The failure of Dr. Vogt's pass-on analysis has fatal consequences for Plaintiffs' request for class certification because the only basis that Plaintiffs offer to show common impact to the 11 putative indirect purchaser classes is Dr. Vogt's opinions. Thus, Plaintiffs have not met their burden to establish by a preponderance of the evidence that the putative classes should be certified. *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 986-87 (9th Cir. 2020) (holding that

---

[107] *Id*. ¶¶ 278, 283-92.
[108] *Id*. ¶¶ 290-92.
[109] *Id*. ¶¶ 293-304; Pearl Ex. 3, ¶¶ 159-161.
[110] *See also* Pearl Ex. 4, ¶ 45.

exclusion of the expert's testimony was "fatal" to the motion for class certification where the expert provided the basis for plaintiffs to show that they satisfied Rule 23(b)(3)). *Kamakahi v. Am. Soc'y for Reproductive Medicine* is instructive. There, the court excluded the plaintiffs' economic expert's opinions because his analysis did "not reliably support his conclusion that impact or damages are subject to classwide proof, and because absent such a showing, his reports are not relevant to the issue of class certification." 305 F.R.D. 164, 179-82 (N.D. Cal. 2015). Because the excluded expert's models were, as here, the plaintiffs' only method of determining damages through class-wide proof, "the Court f[ound] that Plaintiffs . . . failed to show their ability to prove damages on a class basis." *Id.* at 187. The result in this case should be the same.

    **D.**    <u>Plaintiffs Have Not Met Their Burden Under Rule 23(a)</u>

        **1.**    **Plaintiffs Also Cannot Satisfy Rule 23(b)(3) Because, Atypical of the Putative Class, Ms. Vo Lacks Standing**

Plaintiff Emily Vo, the sole representative of the Nationwide Injunctive Relief Class, does not satisfy Rule 23(a)'s typicality requirement. In determining typicality, courts ask "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984; *see also* Fed. R. Civ. P. 23(a)(3). Ms. Vo is atypical because she is differently situated from insurer members of the proposed Nationwide Injunctive Relief Class and because she personally lacks Article III standing.

A plaintiff's claims are not typical of a putative class when the putative class contains discrete purchaser groups. *See ODD I*, 303 F.R.D. at 318; *Intel Corp. Microprocessor Antitrust Litig. ("Intel Corp.")*, MDL 05-1717, 2014 WL 6601941, at *11-12 (D. Del. Aug. 6, 2014) (holding that a "class consisting of both individual and enterprise customers cannot be certified when the representatives do not also include both individual and enterprise customers" because the groups have different purchasing power and negotiation experiences). Such is the case here. Plaintiffs' proposed Nationwide Injunctive Relief Class includes insurers. Yet, Ms. Vo's claims are not typical of those insurers, which are differently situated than patients (and payor parents like Ms. Vo), especially where the insurers have lifetime maximum coverage for orthodontic treatment

at prices far below the costs of *Invisalign* (i.e., they would never bear the full cost of *Invisalign*).[111] Because Ms. Vo is an individual, not an insurer, her claims are atypical of her class.

In addition, Ms. Vo does not satisfy Rule 23(a)'s typicality requirement because she has a "unique background and factual situation [that] requires [her] to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Ms. Vo seeks prospective injunctive relief based on her "some day intention" to purchase *Invisalign* for her daughter.[112] Where a plaintiff seeks relief for a future injury, she must show that the injury is "certainly impending" or there is a "substantial risk" it will occur. *Phillips v. U.S. Customs and Border Protection*, 74 F.4th 986, 991 (9th Cir. 2023) (citations omitted). Ms. Vo cannot do so, as she testified that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ Because Ms. Vo is the lone putative class representative for the Nationwide Injunctive Relief Class and lacks standing as to the requested relief, the putative Nationwide Injunctive Relief Class cannot be certified under Rule 23(b)(2). *Senne*, 934 F.3d at 925; *Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*, 340 F.R.D. 383, 387 (N.D. Cal. 2021) ("[W]here a named plaintiff lacks standing as to the requested relief, there is no class.").

### 2. Plaintiffs Are Not Adequate Class Representatives

Plaintiffs also cannot establish that they would be adequate representatives for the putative state law classes.[114] Rule 23(a)(4) requires Plaintiffs to show they will "fairly and adequately protect the interests of the class." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

---

[111] *See* Pearl Ex. 3, ¶¶ 162-69.

[112] *See supra* § II(E).

[113] *Id.*

[114] Align does not concede that it would be manageable for the Court to permit the simultaneous litigation of ten different state law class claims, as Plaintiffs propose.  (Mot. at 25.)  Plaintiffs have not met their burden to show that these states have similar state laws and that similar state law defenses would apply and/or be non-viable.  This is fatal to certification.  *See Dent v. NFL*, No. 22-15261, 2023 WL 2983580, at *1  (9th Cir. Apr. 18, 2023) (Unreported) (noting that district courts are not required to survey the law of all implicated states, and plaintiffs must analyze all proposed jurisdictions in order to meet their burden to establish commonality under Rule 23(b)(3)).

Jaime Gooch is not an adequate class representative because she is susceptible to unique defenses given that she has not even completed payment for her *Invisalign* (as of filing her claims, she still owes her Doctor nearly $1,000).[115] In addition, Ms. Gooch does not satisfy Rule 23(a)'s adequacy requirement because she is a business development executive for Aptus Court Reporting Services whose professional responsibilities include generating business from law firms in the litigation industry, such as class counsel,[116] and the possibility that she may benefit from future business from class counsel as a result of her involvement in this lawsuit creates a disqualifying conflict of interest with the putative class. *See Woods v. Google LLC*, No. 11-CV-01263-EJD, 2018 WL 4030570, at *4 (N.D. Cal. Aug. 23, 2018) (citing cases). Misty Snow is not an adequate class representative because, in addition to a unique *Invisalign* treatment experience involving a general practitioner and an orthodontist, payment with an FSA card, insurance coverage, and multiple *Invisalign* discounts,[117] Ms. Snow has been convicted of a crime of dishonesty.[118]

At least seven Plaintiffs also fail to satisfy Rule 23(a)'s adequacy requirement because their testimony reveals that they do not understand and/or are not controlling the major decisions of this case. *See Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 471 (N.D. Cal. 2016); *In re Quintus Sec. Litig.*, 201 F.R.D. 475, 481-82 (N.D. Cal. 2001) ("The two principal responsibilities assumed by a lead plaintiff are: (1) monitor the conduct of class counsel, and (2) decide whether and when the case should be settled or taken to trial. Only a lead plaintiff who can reasonably be expected to discharge these responsibilities can be considered adequate under FRCP 23."). Specifically, Cecilia Garay and Celeste Hamilton testified that they did not even know the claims of this case.[119] Similarly, Elisabeth Skibba, Misty Snow, Stephanie Rickenbaker, Angela Carnaghi, and Katie Campbell testified that they did not review or recall reviewing the Complaint before it was filed.[120]

---

[115] *See* Appendix A.
[116] *See* Pearl Ex. 29, Gooch Dep. at 15:11-16, 19:23-20:10.
[117] *See*  Appendix A.
[118] *See* Pearl Ex. 30, Snow Dep. Vol. 1 at 17:14-25
[119] *See* Pearl Ex. 31, Garay Dep. at 36:11-17; Pearl Ex. 32, Hamilton Dep. at 40:15-17, 44:16-25.
[120] *See* Pearl Ex. 33, Skibba Dep. at 48:8-10; Pearl Ex. 30, at 138:6-12; Pearl Ex. 34, Carnaghi Dep. at 32:17-22; Pearl Ex. 35, Rickenbaker Dep. at 40:1-3; Pearl Ex. 36, Campbell Dep. at 39:14-24.

### 3. Plaintiffs' Class Definitions Are Unworkable

Lastly, the Court should deny the Motion because Plaintiffs' class definitions are simply unworkable. In an effort to fit their claims to Dr. Vogt's flawed models, Plaintiffs proposed Class Period that is *more extensive* than that proposed by the direct purchaser plaintiffs. It begins six months earlier than the direct purchasers even allege they were overcharged.



"By definition, indirect purchasers must prove that an overcharge was levied on direct purchasers of defendants' products, who then passed all or some of that overcharge through to the indirect purchasers." *In re GPU*, 253 F.R.D. 478, 502 (N.D. Cal. 2008). It is impossible for Plaintiffs and the putative classes to have been harmed by a passed-on overcharge during a time when the direct purchasers were not, by their own admission, subject to an unlawful overcharge.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion and decline to certify each of the putative classes. The Court should further grant Align's *Daubert* Motion and exclude the Expert Reports and testimony of Dr. Vogt.

DATED: September 19, 2023

PAUL HASTINGS LLP

By:    /s/ James M. Pearl
          James M. Pearl

James M. Pearl (SB# 198481)
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

Thomas A. Counts (SB# 148051)
Abigail H. Wald (SB# 309110)
tomcounts@paulhastings.com
abigailwald@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone: 1(415) 856-7000
Facsimile: 1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone: 1(312) 499-6000
Facsimile: 1(312) 499-6100

Michael F. Murray (*pro hac vice*)
michaelmurray@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone: 1(202) 551-1700
Facsimile: 1(202) 551-1705

Noah Pinegar (*pro hac vice*)
noahpinegar@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 319-4090

Attorneys for Defendant
Align Technology, Inc.

**APPENDIX A**

The following chart identifies Plaintiffs' proposed representatives of the putative state classes and relevant information regarding their Invisalign purchases, including product purchased (if known), price paid, whether Plaintiffs received a discount, or whether insurance covered any portion of the cost of their Invisalign treatment:[1]



---

[1] Data reported in the chart is culled from a variety of sources, including: Pearl Ex. 37, Hamilton Rog Response Nos. 2, 4; Pearl Ex. 38, CLSPLTF_000046; Pearl Ex. 32, at 73:7-13; Pearl Ex. 39, Gooch Rog Response Nos. 2, 4; Pearl Ex. 40CLSPLTF_001902 at -03; Pearl Ex. 41, ALIGNAT-PATI ENT00000129; Pearl Ex. 42, Mound Rog Response Nos. 3, 4; Pearl Ex. 43, CLSPLTF_000104 at -105; Pearl Ex. 44, CLSPLTF_000107; Pearl Ex. 45, Campbell Rog Response Nos. 2, 4; Pearl Ex. 46, ALIGNAT-PATIENT00000001; Pearl Ex. 47, Ezzio Rog Response Nos. 2, 4; Pearl Ex. 48, ALIGNAT-PATIENT00000090; Pearl Ex. 49, Carnaghi Rog Response Nos. 2, 4; Pearl Ex. 50, CLSPLTF_000604 at -604; Pearl Ex. 51, CLSPLTF_000017; Pearl Ex. 34, at 48:13-18, 75:11-76:15; Pearl Ex. 52, Skibba Rog Response No. 3; Pearl Ex. 33, at 56:1-9, 76:1-6, 121:20-122:6, 126:11-24; Pearl Ex. 53, Rickenbaker Rog Response Nos. 2, 4; Pearl Ex. 35, at 46:18-21, 54:8-22; Pearl Ex. 54, Hansen Rog Response Nos. 2, 4; Pearl Ex. 55, Hansen Dep. at 53:21-25, 59:25-60:3; Pearl Ex. 56, Garay Rog Response Nos. 2, 4; Pearl Ex. 31, at 50:14-20, 59:18-60:4; Pearl Ex. 57, Snow Rog Response Nos. 3, 4; Pearl Ex. 58, CLSPLTF_004577 at -4583; Pearl Ex. 59, Snow Dep. Vol. II at 341:12-18.

Additionally relevant deposition testimony elicited from the Plaintiffs in this action, demonstrating their unique circumstances and knowledge that doctors do not uniformly price Invisalign or pass-on Invisalign-related costs to patients follow:

- **Plaintiff Katie Campbell** testified that she paid an orthodontist in Maryland $6,000 for Invisalign, and that her purchase included the aligners, a carrying case for the aligners, cleaning crystals, associated treatments by the Doctor, and one set of retainers.  She also testified that she knew Doctors may charge different prices for Invisalign, but had declined to shop around.[2]

- **Plaintiff Angela Carnaghi** testified that she paid $2,747 to an orthodontist in Michigan for Invisalign, and that while the listed cost for her Invisalign treatment was $6,555, her insurance paid $2,000 toward it, she received a $1,000 promotional offset from the Doctor, and her Doctor also gave her additional discounts of $669 ("in-network") and $144 (pay in full).  She also testified that she knows different Doctors may offer different discounts on Invisalign.[3]

- **Plaintiff Jennifer Ezzio** testified that she paid $5,440 to an orthodontic practice in Massachusetts for Invisalign.[4]

- **Plaintiff Cecelia Garay** testified that she paid $5,750 to an orthodontist in Nevada for Invisalign, and that her purchase price included retainers and a $500 discount.[5]

- **Plaintiff Jaime Gooch** testified that she agreed to pay $4,580 in monthly installments to

---

[2] Pearl Ex. 36 at 51:1-18, 57:18-58:10, 109:22-110:25.
[3] Pearl Ex. 34, at 40:15-41:12, 47:12-17, 71:5-76:18, Ex. 137 thereto.
[4] Pearl Ex. 60, Ezzio Dep. at 56:7-58:13, 62:20-63:1.
[5] Pearl Ex. 31, at 50:6-51:1, 53:14-21, 54:13-23, 56:21-57:5.

an orthodontist in California for Invisalign,[6] and confirmed in her response to an Interrogatory that she will not finish making her monthly payments to that orthodontist until April 5, 2024.[7]  Ms. Gooch also testified that she understands that Doctors have discretion in setting prices for Invisalign, and before agreeing to pay her orthodontist for Invisalign, she discussed Invisalign with her general dentist, who presented her two quotes: approximately $6,000 and $4,000.[8]

- **Plaintiff Celeste Hamilton** testified that she paid approximately $4,000 to a general dentist in Arizona for Invisalign, and that her purchase included all associated scans and buttons, but not any retainers.  She also testified that she is aware that Doctors can compete with each other with respect to prices charged for Invisalign.[9]

- **Plaintiff Justin Hansen** testified that he paid $4,920 to an orthodontist in Nebraska for Invisalign.  He also testified that he understood Doctors can offer various discounts.[10]

- **Plaintiff Tracy Mound** testified that she paid $5,162 to an orthodontist in California for Invisalign, and that her purchase included all associated treatment visits and x-rays, Dental Monitoring, and one retainer.  She also testified that she inquired about discounts for her Invisalign treatment and that her Doctor declined to provide one.  Ms. Mound further testified that she understands different Doctors can charge different prices for the same services.[11]

- **Plaintiff Stephanie Rickenbaker** testified that she paid $6,880 to an orthodontist in North Carolina for Invisalign, and that her purchase included diagnostic records, consultation with the Doctor, placement of the aligners, active treatment time, aligner removal, one set of retainers, and six months of retention visits.  She also acknowledged that the price Doctors charge for Invisalign might vary based on the complexity of the patient's

---

[6] Pearl Ex. 29, at 81:17-20.
[7] Pearl Ex. 39, No. 4.
[8] Pearl Ex. 29, at 46:19-21, 82:20-24, 84:14-17, 85:3-86:12.
[9] Pearl Ex. 32 at 58:4-59:19, 66:7-18, 69:6-17.
[10] Pearl Ex. 55, at 52:11-18, 54:1-14, 57:6-14, 59:9-13, 101:7-17.
[11] Pearl Ex. 61, Mound Dep. at 43:11-44:2, 49:15-24, 51:1-15, 83:9-84:14.

malocclusion, and that Doctors can compete with one another on price for Invisalign and offer different discounts.[12]

- **Plaintiff Elisabeth Skibba** testified that she paid $7,119.60 to an orthodontist in Minnesota for Invisalign, inclusive of $1,000 gifted to her by her parents, and that her Doctor gave her a discount of approximately $300.  She also testified that her Doctor presented her with a range of prices for Invisalign, including $6,834.82 if she were to pay in full (which she declined), an installment payment plan with a 3% financing fee (which she declined), and another interest-free installment payment plan (which she took). Ms. Skibba also testified that her Invisalign purchase included retainers and her appointments. She further testified that she is aware that Doctors can compete with one another on prices of their products or treatments.[13]

- **Plaintiff Misty Snow** testified that she obtained Invisalign treatment from two Doctors:  a general dentist in Oregon, to whom she paid approximately $2,850 using an FSA card for Invisalign, and an orthodontist in Idaho, to whom she paid $900 for subsequent consultation and treatment, but no additional payments for Invisalign.  She further testified that the total cost of her Invisalign Comprehensive treatment was $5,600, and included five years of coverage, but that her insurer paid $2,500 directly to her general dentist for her Invisalign treatment, and that her Doctor gave her discounts of $750 for Invisalign and $142.50 for payment in full. Ms. Snow also testified that she is aware that different Doctors charge different prices for Invisalign, that Doctor pricing may vary based on geographic location of the Doctor's practice, and that some Doctors even offer discounted pricing for Invisalign on Groupon.[14]

- **Plaintiff Emily Vo** testified ██████████████████████████████████

---

[12] Pearl Ex. 35, at 46:14-47:10, 53:21-54:2, 66:9-19, 70:20-72:20, Exs. 264-265 thereto.

[13] Pearl Ex. 33, at 37:15-17, 38:24-39:3, 55:24-56:9, 64:19-24, 67:1-17, 69:5-70:10, 70:18-21, 119:20-124:18,126:20-24, Ex. 842 thereto

[14] Pearl Ex. 30, at 181:1-19, 185:1-186:21,192:21-193:7, 196:3-199:22, 200:22-202:20,  206:13-209:12, Exs. 244-247; Pearl Ex. 59, at 307:18-25, 310:19-312:1, 340:11-343:20, 352:25-353:25, 370:4-374:19, Ex 275.

---

[15] Pearl Ex. 62, at 49:14-50:1, 55:4-14, 68:1-81:6, 105:2-106:5, 108:12-109:2, 122:1-22, Ex. 145.

App. A-5                ALIGN'S OPP'N TO MOT. FOR CLASS
                                                    CERT. & *DAUBERT* MOTION TO
                                                    PRECLUDE EXPERT TESTIMONY

**APPENDIX B**



---

[9] Pearl Ex. 3, ¶ 45, n. 125; ALIGNAT-SNOW00033076-77.

App. B-2