Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>   v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>                       Defendant. | No. 3:21-cv-03269-VC (TSH)<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT ALIGN TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Hearing Date: January 25, 2023<br>Hearing Time: 10:00 a.m.<br>Judge: Hon. Vince Chhabria<br>Location: Courtroom 5 – 17th Floor |

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT..................................................................................... 1

II.   BACKGROUND ....................................................................................................... 3

    A.    In the face of impending expiry of key patents, Align sought to lock doctors into its ecosystem.................................................................................. 3

    B.    Align terminated interoperability with 3Shape to harm competition ............................ 4

    C.    Beginning in 2017, Align implemented new exclusive dealing programs intended to foreclose competition ..................................................................... 8

        1.    The Fusion program................................................................................ 8

        2.    Exclusive dealing with individual dentists and DSOs .......................................... 8

III.  LEGAL STANDARD .............................................................................................. 9

IV.   ARGUMENT ...................................................................................................... 10

    A.    Align unlawfully refused to deal ................................................................. 10

        1.    Align fails to show 3Shape's patent defenses justified TOI ................................ 13

        2.    There is abundant evidence of pretext ................................................. 16

        3.    Align abandons any claim it terminated interoperability because 3Shape "was not living up to its commitments" ................................... 18

        4.    TOI resulted in a profit sacrifice ........................................................ 19

        5.    Plaintiffs satisfy each of the elements necessary to plead a refusal to deal ........................................................................... 20

        6.    Discovery has confirmed Plaintiffs' allegations ................................ 21

    B.    Align's exclusive dealing arrangements constitute anticompetitive conduct............... 22

        1.    The Fusion program was anticompetitive....................................... 22

        2.    Align's exclusivity programs for individual dental practices were anticompetitive............................................................................. 23

        3.    Align's contracts with DSOs were anticompetitive ........................... 25

        4.    Align foreclosed competitors from reaching the "ultimate consumer" ............... 26

    C.    There is a triable issue of fact on each element of Plaintiffs' monopolization claim.......................................................................... 27

        1.    Each component of the scheme impaired rivals and restricted competition .......................................................................... 28

2.    Align's anticompetitive conduct had a significant effect on competition ............................................................................................. 31

D.    Plaintiffs properly aggregate Align's anticompetitive conduct ..................................... 32

E.    Plaintiffs' expert testimony is admissible ........................................................ 34

F.    Plaintiff Vo has standing to pursue injunctive relief under the Sherman Act ....................................................................................................... 35

010976-11/2419494 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ...................................................................................10, 12

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ................................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).................................................................................................2, 10, 20

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) .......................................................................................*passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................................9

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
  868 F. Supp. 2d 876 (N.D. Cal. 2012) ..............................................................................3, 24

*CollegeNet, Inc. v. Common Application, Inc.*,
  355 F. Supp. 3d 926 (D. Or. 2018) ......................................................................................25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)..........................................................................................................11, 12

*Entrata, Inc. v. Yardi Sys., Inc.*,
  2019 WL 4597519 (D. Utah Aug. 14, 2019) ..................................................................10, 20

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) .................................................................................................27

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ................................................................................10, 11, 12

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ...............................................................................24

*In re Glumetza Antitrust Litig.*,
  2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) .....................................................................34

*Hangarter v. Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ................................................................................................34

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .....................................................................................*passim*

*Iqvia Inc. v. Veeva Sys. Inc.*,
    2018 WL 4815547 (D.N.J. Oct. 3, 2018) ..............................................................21

*McHugh v. United Serv. Auto. Ass'n*,
    164 F.3d 451 (9th Cir. 1999) .............................................................................34

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ....................................................................*passim*

*In re Namenda Direct Purchaser Antitrust Litig.*,
    331 F. Supp. 3d 152 (S.D.N.Y. 2018) ................................................................34

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ..............................................................25, 26, 32

*In re Roundup Prod. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ..............................................................35

*Stein v. Pac. Bell*,
    172 F. App'x 192 (9th Cir. 2006) .......................................................................20

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ...........................................................................................24

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ...........................................................................31

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .........................................................................11, 12

*United States v. Microsoft Corp.*,
    1998 WL 614485 (D.D.C. Sept. 14, 1998) .........................................................24

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................12, 25, 29, 30

*Valassis Commc'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) .......................................................32

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .......................................................................11, 18

010976-11/2419494 V1

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|------|------------|
| **Align** | Defendant Align Technology, Inc. |
| **Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Plaintiffs' Opposition to Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony, concurrently filed herewith. |
| **Pearl Ex.** | Exhibit to the Declaration of James M. Pearl in Support of Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony (ECF Nos. 470, 471) |
| **MSJ** | Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony (ECF No. 471-3 (sealed version)) |
| ***Simon*** | *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas v. Align Technology, Inc.*, Case No. 3:20-cv-03754-VC (N.D. Cal.) |
| **Grossman** | Expert Report of Dr. Jay S. Grossman, D.D.S, (ECF No. 390-5) |
| **Grossman Rebuttal** | Rebuttal Expert Report of Dr. Jay S. Grossman, D.D.S, (ECF No. 390-7) |
| **Snyder** | Expert Report of Edward A. Snyder, Ph.D. (ECF No. 471 (Pearl Ex. 11)) |
| **Stoll** | Expert Report of Robert Stoll, Esq. (ECF No. 471 (Pearl Ex. 55)) |
| **Vogt** | Expert Report of William B. Vogt, Ph.D., In Support of Class Certification and Merits (ECF No. 390-4) |
| **Vogt Rebuttal** | Expert Rebuttal Report of William B. Vogt, Ph.D., In Support of Class Certification and Merits (ECF No. 390-6) |
| **Wagner** | Expert Report of R. Polk Wagner (ECF No. 471, (Pearl Ex. 85)) |
| **Wagner Reply** | Expert Reply Report of R. Polk Wagner (ECF No. 471 (Pearl Ex. 76)) |

## I.    PRELIMINARY STATEMENT

Until 2017, Align enjoyed a patent-protected monopoly on the sale of in-office clear aligners. Then came the expiration of "key" patents— ███████████ —which Align expected would lead to a wave of market entry. At the same time, intraoral scanners were quickly becoming the dominant method by which dentists ordered clear aligners. Align sold both Invisalign and its own scanner, iTero, which was designed to be "closed," i.e., designed for ordering Invisalign.[1] It faced competition from other scanner manufacturers—most notably 3Shape, whose "Trios" scanner was designed to be "open," i.e., capable of easily ordering aligners from multiple manufacturers.

Align understood that if dentists were locked into a "closed" ecosystem of scanners and aligners, it would be much more likely to maintain its monopoly power in the aligner market. Thus, rather than compete fairly, Align undertook a three-part scheme: (1) termination of its interoperability agreement with 3Shape ("TOI"), (2) below-cost bundling of iTero and Invisalign through the Fusion program, and (3) exclusive dealing. The result of this scheme, which began almost simultaneously with patent expiration, was to lock dentists into Align's ecosystem and stifle competition.

The evidence of this scheme is compelling. First, in September 2017, Align created the "Fusion" program, as part of which it offers roughly 50% discounts on iTero scanners— ███████████ ███ —in exchange for dentists' 3-year commitment to order progressively more Invisalign cases. Evidence makes clear Fusion was intended to (1) drive out scanner and clear aligner competitors; and (2) lock doctors into Invisalign. Align's CEO wrote of the program: ███████████████ ██████████████████████████████████████████."

Second, beginning in at least 2015, Align ███████████████████ ███████████████████ Align subsequently decided to enter into an interoperability agreement with 3Shape whereby Trios users could order Invisalign. But it terminated interoperability in January 2018 after (1) ███████████████ ███████████ and (2) the competitive threat from it grew. Although TOI ████████ █████, it ultimately succeeded in entrenching Align's monopoly. As one executive remarked in 2018: " ██████████████████."

---

[1] As discussed below, while it is possible to order competing aligners using an iTero, Align does not ███████████████████████████. *See infra* § IV.C.1.

- 1 -

Third, beginning in 2018, Align pursued a strategy of entering long term contracts with dental service organizations ("DSOs") that conditioned Invisalign discounts on exclusivity provisions. Not long afterwards, in 2019, Align began offering various programs to individual dentists that conditioned discounts on their agreement not to use competing clear aligners. Once again, these programs were intended to foreclose competition. One presentation discussing Align's individual discount programs lists ████████████████████████████████████████████████████."

Collectively, Align's scheme foreclosed ████████ of the aligner market during the class period. And it was effective: following patent expiry, Align—despite attempted entry by many large competitors ████████████████████████████████████████████████████ ████████████████████████. Vogt §§ H.1, L.1.2. This is in stark contrast to other markets, where patent expiry is reliably and intuitively followed by lower prices, market share, and margins.

Align makes three basic arguments in its motion. The first is that it had three "conceivable" reasons for TOI. MSJ at 10-20. Align simply presupposes these reasons were valid. But *Aspen* makes clear that, so long is there is evidence that a defendant's proffered reasons for its refusal to deal are invalid—as there is here—this is a question for the jury.[2] Align tries to sidestep this by arguing that it prevails at summary judgment simply by presenting plausible hypothetical reasons for its refusal to deal, regardless of whether they were Align's actual motivation for TOI. MSJ at 11. Not only does this run afoul of blackletter law, but it is a veiled attempt to shield relevant, damaging evidence from consideration that would lead (if accepted) to absurd and unjust results. Plaintiffs present extensive evidence that Align's purportedly "valid" reasons for TOI are pretextual, including undisputed expert testimony from a patent law expert that Align was not justified in terminating interoperability to protect its patent rights. Align's actual reasons for terminating interoperability are a question for the jury.

Second, Align presents a grab bag of arguments why its exclusive dealing programs were "lawful." MSJ at 20-25. These ignore the law and overlook contrary facts. Align claims that, in analyzing the Fusion program, Plaintiffs' expert had to examine rivals' cost data in addition to performing a discount attribution test. But the Ninth Circuit rejected this argument in *Cascade*.[3] Similarly, Align repeats its

---

[2] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604–05 (1985).
[3] *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 905 (9th Cir. 2008).

claim that short duration exclusive dealing programs are categorically "lawful"[4] and asserts that Plaintiffs provide "no support" for their claim that these programs foreclosed rivals—but ignores direct evidence of foreclosure, including analysis showing ███████████████████████████ ██████████████████████████████.

Third, Align asserts that Plaintiffs must demonstrate its conduct excluded competition to prevail on their monopolization claim (and that they fail to do so). MSJ at 25-30. But Plaintiffs demonstrate (1) that each component of Align's scheme constitutes anticompetitive conduct and (2) that its anticompetitive conduct, in the aggregate, severely damaged competition. This is sufficient to prove a claim under Section 2. Plaintiffs respectfully request the Court deny Align's motion.

## II.    BACKGROUND

### A.    In the face of impending expiry of key patents, Align sought to lock doctors into its ecosystem

Align has long understood that key patents it held related to Invisalign were due to expire in 2017, and predicted that competition would increase following expiration. Vogt ¶ 5 n.5; Ex. 1. At the same time, the aligner market was going through an important transition in how dentists ordered clear aligners. Historically, dentists used so-called PVS impressions to take manual molds of patients' teeth and order clear aligners. However, intraoral scanners, which are used to take digital impressions of the mouth, have steadily replaced PVS and today overwhelming predominate.[5] In 2011, Align purchased the company Cadent Holdings, whose portfolio included an intraoral scanner called the "iTero."

Align has designed its iTero scanner to be closed, i.e. functionally limited in its ability to order competing aligners.[6] Other scanner competitors, like 3Shape, designed open scanners that were easily capable of ordering aligners from multiple companies. Align understood that it would create a ██████████ ████████████████████████████████████████████████████████████

---

[4] As discussed more below, this is wrong: the Ninth Circuit has never held that short-term or easily terminated contracts are categorically legal, and those factors do not "create any safe harbor." *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 904 n.12 (N.D. Cal. 2012).
[5] In Q1 2013, ████████████████████████████████ . Vogt ¶ 94. █████ Align internal documents make clear that Align ██████████████████████████████ ████████████████████████████████████ ." *See infra* § IV.C.1.

Ex. 3. Align's multi-faceted anticompetitive scheme locked dentists into its closed ecosystem to maintain its aligner monopoly.

**B.    Align terminated interoperability with 3Shape to harm competition**

Early on, Align welcomed interoperability between Invisalign and other scanners. For example, between 2014 and 2015, Align qualified two competitors' scanners for interoperability, and emphasized publicly that it "support[ed] an open system approach to digital impressions." Exs. 4, 5. In April 2015, Align's COO told analysts that "being an open system" was "better for [Align's] customers," explaining: "[T]here's no good reason for [Align] not to act in complementary ways because it's good for the customer. So in our minds, we don't need to own the channel. We don't need to have exclusivity. In fact, we want probably more high-quality scanners that can make it easier to do Invisalign[.]" Ex. 6.

But this enthusiasm soon began to wane. Beginning in 2015, Align executives 

[7] Specifically, they feared that Align's

. Align discussed

*Id*. Complicating the decision was that

. *See* Ex. 9.[8] Align thus proposed that

_____

[7] In an October 2015 email

Ex. 7.

Align even debated whether it should

. *Id.*

█████████████████████████████████████████████████████" *Id.* at -186.[9] Align signed an agreement with 3Shape in December 2015 whereby dentists could directly submit scans from 3Shape's Trios scanner to order Invisalign (the interoperability agreement).

Both before the signing the agreement and in later negotiations, Align focused on ███████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. For example, in a 2015 email recounting a meeting with 3Shape's CEO, Align CEO Joe Hogan explained: "████████████████ ███████████████████████████████████████████." Ex. 10 at -853, -854.[10]

But 3Shape ████████████. Indeed, in negotiating the interoperability agreement, Align ███████ █████████████████████████████.[11] Undeterred, Align ████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████.[12] Specifically:

- In March 2016, Align executives ████████████████████████████████████████████████ ████████████████████████████. Ex. 14 at -235.   On March 31, 2016, a 3Shape executive █████████████████████████████████████████████████████████████████████████ █████████████████████." Ex. 15 at -82.

- In August 2016, Align sent 3Shape ████████████████████████████████████████. Ex. 16 at -17.[14] In a ████████████████████████████████████████████████. Ex. 18 at -993 to -995.

─────────────────────────

[9] *See also* Ex. 8 at -314 ████████████████████████████████████████████████████████ ███████████████. Mr. Hogan also recounted that during the meeting he had emphasized, ███ ███████████████████████████████████████████████████████████." *Id.* ████████████████████ *See* Ex. 11 at -113 (June 29, 2018 deposition of Abhishek Ganguly) ██████████████████████ ███████████████████████████████████████████████████████████████████████. In a 2016 email, Align executive Abhishek Ganguly, Align's lead negotiator with 3Shape, wrote the ███████████████████████████████. In a separate 2016 email, Mr. Ganguly hypothesized ██████████████████████████████████████████████████. Ex. 13 at -120 ██████████████████████████ Mr. Pascaud wrote that the ████████████████████████████████████████████████████████ r." *Id.* ██████████████████████████████████. An internal Align presentation sent to senior Align executives to ████████████████████████████████████████████████████████████████████████ ████████████████████████. Ex. 17 at -889, -895.

- In September 2016, Align ███████████████████████████████████████ ███████████████████████████. *See* Ex. 20 at -121, -122, -127, -128. 3Shape never ███████████.

Frustrated, Align employees ████████████████████████████████████ ███████████████████████ A 3Shape internal email recounts a ████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████. [16] Align's Raphael Pascaud afterwards wrote to Mr. Hogan that ████████████████████████████████████████████████████████████████ ██████████████" Ex. 23 at -07. Mr. Hogan responded: "███████████████████ ███████████████████████████████████████████████████." *Id.*

At the same time, two things were happening: (1) ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████. Ex. 26 at -626. In March 2017, Mr. Pascaud argued that ████████████████████████████████████████████████████████████████. Ex. 27 at -801. An Align executive responded ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████." *Id.* at -799, 800. [19] In another March 2017 email, Mr. Pascaud █████████████████████████████████████

---

[15] As used here, ██████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 19 at -72. Specifically, the email ████████████████████████████████████████████████████ ████████████████████████████████." *See* Ex. 21. Other internal Align documents discussing this ██████████████████████████████████████. Ex. 22 at -953. Invisalign submissions from Trios █████████████████████████████████████████ ███████████████████████████████████████████ Ex. 24 at -381. In a December 2016 email, Mr. Pascaud wrote ██████████████████████████████ ███████████████████████████████████████████████" Ex. 25 at -918, -919. The same executive added elsewhere: ██████████████████████████████████████ ███████████████████████████████████████████ *Id.* at -800.

█████████ and instructing his team to prepare for a 3Shape "████████████." Ex. 28 at -414.

Substantial evidence indicates that, throughout 2017, Align employees ██████████████████████████████████████:

- Notes from a ████████████████████████████████████████████████████ ████████████████. Ex. 29 at -126.

- In a June 2017 email, Mr. Ganguly argued, ████████████████████████████████████ ████████████████████." Ex. 31 at -300. In a August 2017 presentation, Align wrote of ████████████████████████████████████████████████." Ex. 59 at -458.

- On November 14, 2017, the same day Align filed its patent infringement lawsuit against 3Shape, ████████████████████████████████████████████████." Ex. 32.

Align sued 3Shape for patent infringement on November 14, 2017; shortly afterwards, on December 18, it informed 3Shape that it would terminate interoperability in the United States effective January 17, 2018. Align employees ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████.[22]

Align's decision coincided with its ████████ and the beginning of a rush of competitive entry. *See* Vogt Fig. 3 & ¶¶ 5 n.5, 77-86. After TOI, employees ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. An executive wrote:

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[20] At his deposition in this case, Align executive Abhishek Ganguly, ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. Ex. 30 at 250:24-251:9, 254:3-255:4.

[21] *See also* Ex. 33 (Align executive asking on November 14, 2017: ████████████████████ ████████████████").

████ For example, in January 2018, Mr. Hogan wrote internally: ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 34 at -686.

████████████████████████████████████████████████████

████████████████████████ Ex. 37 (emphasis in original). In other words, Align's plan worked.

## C. Beginning in 2017, Align implemented new exclusive dealing programs intended to foreclose competition

In late 2017—months before terminating interoperability with 3Shape in the U.S.—Align began implementing a set of bundling and exclusive dealing programs that foreclosed competition: (1) the Fusion program; (2) programs for individual doctors that conditioned Invisalign discounts on agreement not to use competing clear aligner brands in their practice; and (3) exclusivity contracts with DSOs.

### 1. The Fusion program

Align launched the Fusion program in 2017. Ex. 38. The typical terms allow a doctor to purchase an iTero scanner for $14,999 (rather than $29,999) if the doctor meets incremental Invisalign volume targets for three years following purchase. Ex. 39.[23] From its inception, Fusion was designed to foreclose competition by ███████████████████████████████████████████████████ ██████████████████████████████████. *See* Exs. 40, 41 Align documents ███████████████████████████████" (Ex. 42 at p.37) and list among the program's goals: ████████████████████████████" (Ex. 43 at -46). Align executives discussed how Fusion ███████████████████████████ ██████████████████. Align CEO Joe Hogan wrote: ██████████████ ██████████████████████████████████████" Ex. 40.

### 2. Exclusive dealing with individual dentists and DSOs

Starting in 2018, Align entered exclusive dealing arrangements with DSOs, which comprise a significant, and growing, share of the in-office clear aligner market. Ex. 45 at -546 to -49. *First*, in March 2018, Align and Heartland (the largest U.S. DSO, *see id.*) agreed on a "████████████████ ██████████████████████████████" Ex. 46. Align understood that this contract ████████████

---

[23] If the doctor can meet the volume targets each year, she receives a $15,000 (or 50%) discount on her iTero purchase. If the doctor fails to meet the goal in any year, then she must pay back a portion of the discount (i.e. if she does not meet the target in year 3, she must pay $5,000). "Incremental" means additional cases beyond a practice's pre-Fusion order volume.

[24] For example, in June 2017, Align executive Kerri Kling wrote: ██████████████████ ████████████████████████████████████████████████████



. John Morici, Align's CFO, wrote:

Joe Hogan, Align's CEO, responded: "

" Ex. 47; *see also* Ex. 48 (stating that                                    ").

*Second*, starting in late 2019, Align entered at least eight multi-year contracts with DSOs that required them to commit to Invisalign exclusivity in exchange for discounts. *See* Pearl Ex. 11 ¶ 175 & Fig. 26 (listing contracts and duration). Align understood these contracts as a solution to competitive threats that it faced. During this period, Align used

*See, e.g.*, Exs. 49, 50; Vogt § F.4.4. Another Align presentation from this period lists

. Ex. 51 at -026.

*Third*, between 2019 and 2021, Align offered nine programs that provided Invisalign discounts in exchange for a commitment that dentists not offer competing clear aligner brands or marketing materials in their practices. Align documents indicate that these discounts were

[25]

## III.   LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[26] In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor; "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is

---

[25]  Align executive Joseph Megan, who worked on these materials, testified that

Ex. 55 at 194:22-195:15; *see also* Ex. 56 at -166, -167) (Align's CFO                        ).

[26]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

ruling on a motion for summary judgment."[27]

## IV.   ARGUMENT

### A.    Align unlawfully refused to deal

A refusal to deal with a competitor does not violate Section 2 if "valid business reasons exist for that refusal."[28] Align argues that it is entitled to summary judgment because it had three "conceivable" rationales for TOI: (1) protection of its patent claims; (2) 3Shape's "non-compliance" with its own commercial commitments; and (3) the fact that TOI was "economically rational." MSJ at 11-16. The problem with this argument is that Align presupposes that the reasons it offers were valid (or "conceivable"[29]). But the Supreme Court made clear in *Aspen* that, so long is there is some evidence in the record that could support a finding that a defendant's proffered reasons for its refusal to deal were invalid, this is a question for the jury.[30] Consistent with this, both the Supreme Court and the Ninth Circuit have held that weighing whether a reason is valid or "conceivable" implicates evidence of pretext. For example, in *Kodak*, the Ninth Circuit upheld a jury instruction that asked whether the defendant proffered a "legitimate business justification" and then, even if it did, "whether [] such reason is pretextual—in other words, [is] not a genuine reason for [the defendant's] conduct."[31] It explained: "[e]vidence regarding the state of mind of … employees may show pretext, when such evidence suggests

---

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[28] *Aspen Skiing Co.*, 472 U.S. at 597.

[29] Align repeatedly quotes *Aerotec*'s holding that "there is only a duty not to refrain from dealing where the *only conceivable rationale or purpose* is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004)) (emphasis added). But there is no indication in *Aerotec* that the Ninth Circuit intended to create a more stringent standard for proving exclusive dealing claims by use of the phase "only conceivable," which does not appear in *MetroNet*, *Aspen*, or *Trinko*. Instead, this language appears to be a restatement (or rephrasing) of *Aspen*'s holding that a refusal to deal is not legally actionable if there are "valid business reasons" for it. In *Qualcomm*, as discussed below, the Ninth Circuit still tested the validity of the business reasons behind Qualcomm's conduct.

[30] *Id.* at 604–05 ("Since the jury was unambiguously instructed that Ski Co.'s refusal to deal with Highlands 'does not violate Section 2 if valid business reasons exist for that refusal,' we must assume that the jury concluded that there were no valid business reasons for the refusal. The question then is whether that conclusion finds support in the record."); *see, e.g., Entrata, Inc. v. Yardi Sys., Inc.*, 2019 WL 4597519, at *6 & n.5 (D. Utah Aug. 14, 2019) (denying summary judgment where evidence supported finding "proffered business reasons for refusal to deal … were invalid," including evidence that justifications were pretextual.).

[31] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 n.12 (9th Cir. 1997).

- 10 -

that the proffered business justification played no part in the decision to act."[32]

Align offers an alternative interpretation of the law that would ensure that no refusal to deal ever reaches a jury. It first argues that the Court's inquiry into Align's proffered alternative rationales "does not turn on what Align was subjectively thinking, just what is objectively conceivable in Align's position," MSJ at 11—that is, Align argues it prevails at summary judgment or trial merely by presenting plausible hypothetical reasons for its refusal to deal, rather than actual ones. For this proposition, Align cites this Court's motion to dismiss order in *Simon* and the Ninth Circuit's *Qualcomm* decision. But neither says this. Instead, in *Simon*, the Court emphasized that the relevant question is not why Align might have imposed TOI, but why it actually did.[33] Similarly, while Align observes that, in *Qualcomm*, the Ninth Circuit recognized that Qualcomm ceased a course of dealing "in response to developments in patent law's exhaustion doctrine" (MSJ at 11), it omits the next sentence of the decision, which states: "[n]othing in the record or in the district court's factual finding rebuts these claims."[34] In other words, the Ninth Circuit did not credit Qualcomm's reason for refusing to deal as "objectively conceivable" or hypothetically credible; it instead relied on undisputed factual findings regarding Qualcomm's actual rationale, and made clear it could have been rebutted with contrary facts. Other courts have also rejected Align's argument that if a defendant "merely postulates 'a valid business purpose'—apparently including any business purpose a defendant could dream up … that 'ends the inquiry.'"[35]

Align's suggestion that "what [it] was subjectively thinking"[36] is somehow irrelevant to this Court's, or the jury's, inquiry here—i.e., evidence regarding its actual reasons for TOI—is also

---

[32] *Id.* at 1219. In reaching this conclusion, the Ninth Circuit also rejected Kodak's claim, identical to Align's here, that "its subjective motivation is irrelevant." *Id.* Similarly, in its own *Kodak* decision, the Supreme Court held that summary judgment was inappropriate where "[f]actual questions existed[ed] … about the validity and sufficiency of each claimed justification" for the business reasons Kodak proffered for its exclusionary conduct. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196–97 (3d Cir. 2005) (factual record "amply support[ed] … conclusion that Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices" where "asserted justifications for [its] exclusionary policies [were] inconsistent with its announced reason for the exclusionary policies, its conduct enforcing the policy, its rival suppliers' actions, and deals' behavior in the marketplace.")

[33] *Simon* ECF No. 91 at 14.

[34] *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020). As the Ninth Circuit further noted in *Qualcomm*, "the district court itself acknowledged that this was Qualcomm's purpose."

[35] *See, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 461 (7th Cir. 2020).

[36] Align also appears to contradict itself, arguing in one paragraph of its brief that the inquiry into its proffered reasons does not "turn on [its] … subjective thinking," and in the next that "the Ninth Circuit looked to subjective evidence" in assessing the refusals to deal in *MetroNet* and *Qualcomm*. MSJ at 11.

- 11 -

impossible to reconcile with *Kodak*'s holding that "[e]vidence regarding the state of mind of … employees may show pretext" if it "suggests that the proffered business justification played no part in the decision to act."[37] This is a veiled attempt to shield relevant, highly damaging evidence from consideration, and would lead to absurd and unjust results if accepted.[38]

Second, Align argues that any analysis of pretext "comes *after* the assessment of whether a refusal to deal amounts to anticompetitive conduct." MSJ at 19-20. But how could the Court or a jury evaluate if a refusal to deal is anticompetitive—i.e., if "valid" reasons exist for the refusal—if it cannot consider evidence regarding a defendant's actual motives, including evidence of pretext? This argument flows from a misstatement of the law. Align writes: "if the plaintiff establishes a prima facie case of monopoly power *and anticompetitive conduct* as well as negative effects on competition, the burden then shifts to the defendant to offer 'a nonpretextual claim that its conduct is indeed a form of competition on the merits[.]'" MSJ at 19 (quoting *Qualcomm*, 969 F.3d at 991) (emphasis added). But Align's brief adds the word "conduct" where it does not appear. *Qualcomm* reads:

> … if a plaintiff successfully establishes a prima facie case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a procompetitive justification for its conduct. If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim.[39]

This is blackletter law: even if a plaintiff can prove anticompetitive effects under Section 2 (e.g., use of monopoly power to "foreclose competition," "gain a competitive advantage," or "destroy a competitor"), a defendant may still prevail by showing "nonpretextual" procompetitive justifications for its conduct—which the plaintiff is then entitled to rebut.[40] Align cites no case that holds otherwise,[41]

---

[37] *Kodak*, 125 F.3d at 1219. In reaching this conclusion, the Ninth Circuit also rejected Kodak's claim, identical to Align's here, that "its subjective motivation is irrelevant." *Id.*

[38] By Align's reasoning, a "subjective" hypothetical email stating "the only reason we pursued TOI is to hobble 3Shape and harm competition" would be insufficient to defeat summary judgment—and in fact irrelevant to the Court or jury's analysis—were there were also evidence it was hypothetically "conceivable" Align pursued TOI for other, procompetitive reasons.

[39] *Qualcomm*, 969 F.3d at 991 (internal citations and quotation marks omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).

[40] *Kodak*, 504 U.S. at 482-83. Both *Qualcomm* and the Ninth Circuit's subsequent *Kodak* decision cite this same portion of the Supreme Court's *Kodak* decision. *See also Dentsply*, 399 F.3d at 197-98.

[41] Align also argues that its characterization of the law explains "why in *Qualcomm, Aerotec*, and *MetroNet* the Ninth Circuit did not assess (or even reference) *Kodak*'s pretext question in its analysis of the refusal-to-deal test." MSJ at 20. But the more logical explanation is that evidence of pretext was not at issue in these cases, each of which turned on separate facts and legal questions.

much less one suggesting that Plaintiffs should be artificially limited in (or prevented from) relying on evidence that "suggests [Align's] proffered business justification played no part in [its] decision to act."[42]

It is no mystery why Align advances this reading of the law: as discussed below, because it made a strategic choice not to waive privilege, Align has affirmatively limited itself to relying only on so-called "objective" evidence.[43] But just because Align has tied one hand behind its back does not mean Plaintiffs are similarly limited in proving their case. So long as there is some evidence in the record, including subjective evidence or evidence of pretext, that could support a finding that Align's proffered reasons for its refusal to deal were invalid, summary judgment is improper.

### 1.    Align fails to show 3Shape's patent defenses justified TOI

Align proffers one reason for why (it claims) it *actually* terminated interoperability: the need to "protect the validity of its patent claims" in anticipation of certain 3Shape defenses in patent litigation, which Align now states is "what actually occurred." MSJ at 12; *see also id.* at 7. In pursuing this defense, Align made a strategic choice: rather than waive privilege—and permit discovery into whether it received or relied on legal advice that the patent litigation provided a basis for TOI—Align committed to relying only on "objective evidence" regarding the "merits" of 3Shape's "patent law defenses." In opposition to Plaintiffs' motion to preclude[44], it wrote:

> Align does not intend to put on evidence regarding its subjective beliefs about the merits of defenses in the patent litigation at all. Rather, Align intends to put on objective evidence—from a patent law expert and from 3Shape's ITC filings and internal documents—regarding the merits of patent law defenses.

*Simon* ECF No. 214 at 10; *see also id.* at 2, 13. In other words, rather than put forward testimony and documents regarding its actual decisionmaking, Align committed to making an "objective" showing that (1) 3Shape's patent law defenses had "merit," and that (2) "under blackletter patent law Align faced the choice of terminating the [interoperability agreement … in the United States or jeopardizing its patent claims by continuing to deal with 3Shape." *Id.* at 2. To prevail at summary judgment, then, Align must establish that there is no dispute on two points: (1) TOI weakened (or mooted entirely) 3Shape's patent

---

[42] *Kodak*, 125 F.3d at 1219. The Ninth Circuit also rejected Kodak's claim, identical to Align's here, that "its subjective motivation is irrelevant." *Id.*

[43] This commitment notwithstanding, as discussed more below, Align freely cites subjective evidence when it advances its proffered alternative reasons for TOI.

[44] Plaintiffs previously filed a motion seeking an order precluding Align from arguing that it terminated interoperability to protect its patent interests unless Align produced all materials subject to its implied waiver of privilege. *Simon* ECF No. 191.

law defenses; and (2) the patent litigation was the actual reason that Align refused to deal with 3Shape. Align does not, and cannot, make this showing.

Align relies on three pieces of evidence. **First**, it cites testimony from its CEO, Joe Hogan, that "terminating interoperability was necessary, because failing to do so could compromise [Align's] patent suits[.]" MSJ at 12-13 (citing Pearl Ex. 6);[45] *id.* at 7 (citing Pearl Ex. 36), 19. Align's reliance on this evidence defies its previous representation that it did "not intend to put on evidence regarding its subjective beliefs about the merits of defenses in the patent litigation at all." *Simon* ECF No. 214 at 10. Unless Align is prepared to waive privilege, and reopen discovery, it should not be allowed to rely on this evidence; it implicates "the content of [the] advice" Align received "on the strength of [its] legal claims"—which Align previously conceded would be a basis for waiving privilege. *See id.* at 9.[46]

**Second**, Align identifies an email from 3Shape executive ███████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ MSJ at 12-13. Align's use of this document underscores its strange position: Align refuses to waive privilege regarding its subjective assessment of whether TOI was necessary, yet seeks to prevail by pointing to 3Shape's purported assessment of the same. But the relevant question in this case is why Align actually terminated interoperability, not why 3Shape thought it did.

Further, Align's reliance on this document runs into two problems. First, ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████; indeed, other record evidence indicates that 3Shape ████████████████

---

[45] At his deposition, Mr. Hogan testified that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████. *See* Pearl Ex. 6 at 166:14-25.

[46] As the Court explained in its order denying Plaintiffs' motion to preclude, "[i]n the unlikely event that questions relating to the legitimacy of the positions Align took cannot be adjudicated without reference to privileged materials, the issue can be revisited at that time." *Simon* ECF No. 227.

[47] *See* Ex. 57. Documents produced in this litigation indicate that ████████████████████████████████ ████████████████████████ *Id.* at -82.

███████████████████████████████████.[48] Second, Plaintiffs' expert, Professor Wagner,

opines that ███████████████████████████████████████████████████████████

███████████, *see* Wagner Reply ¶¶ 51-55.[49] Align does not discuss, much less seek to exclude, this

portion of Prof. Wagner's report. At a minimum, this raises a disputed question of fact.

    **Third**, Align notes that ████████████████████████████████████████████████

███████████████████████████████. MSJ at 13-14.[50] Align argues that "[t]hese defenses

would undoubtedly have been strengthened if Align had not terminated interoperability promptly after

initiating its claims against 3Shape." *Id.* at 14. This is arguably the most important assertion in Align's

brief: if 3Shape's defenses *were not* strengthened by TOI, then it follows that TOI was unnecessary to

"protect" Align's patent claims. But Align cites no authority for this claim—and in fact cites its own

patent expert, Robert Stoll, only once for a factual proposition regarding the Align-3Shape settlement.

*See id.* at 14 n.64. This is because it cannot: despite acknowledging in his report that ██████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Stoll ¶¶ 55-56, 67.

However, even if those defenses were ████████████████████████████████████████████

█████████████████████████████████████████████████████████.[51]

───────────────────

[48] For example, three days after ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████.").

    At the same time it filed four patent lawsuits against 3Shape in Delaware, Align also filed complaints
with the ITC. *See* Press Release, Align Tech., Align Technology Files Six Patent Infringement Lawsuits
Asserting 26 Patents Against 3Shape (Nov. 14, 2017) http://tinyurl.com/44s63ejs.
[50] As Align concedes, this defense in fact failed in the ITC preceding, but remained "live" when Align
and 3Shape settled the patent litigation. *Id.*
[51] Mr. Stoll opines only that ██████████████████████████████████████████████████

█████████████████████████████████████████████████ *See* Wagner Reply ¶¶ 28-30, 48.

Align's failure to proffer any evidence on this point—which it has long argued is case dispositive—is noteworthy: despite committing to providing "objective evidence" from a patent law expert "regarding the merits of [3Shape's] patent law defenses," it abandons any attempt to do so. And aside from seeking to exclude Prof. Wagner's "ultimate opinion" that Align was not justified in terminating interoperability to protect its patent rights (*see infra* § E), Align ignores Prof. Wagner's opinion that none of 3Shape's equitable defenses were strengthened by TOI (and that one was in fact weakened). Wagner § III; Wagner Reply ¶¶ 10-11, 20-25, 30-34, 42-44. Align also fails to address Prof. Wagner's opinion that the plain language of interoperability agreement preserved Align's patent rights; the agreement included provisions clearly specifying that it was not and could not be construed as either a license or waiver of any patent rights. Wagner § II.B; Wagner Reply ¶¶ 28, 45-46. Align's expert

. *See* Stoll ¶¶ 76-77.

In sum, despite committing to prove, using only objective evidence, that "blackletter" patent law gave it a reasonable basis for TOI, Align has abandoned any attempt to do so.

### 2.    There is abundant evidence of pretext

Extensive evidence "suggests that [Align's] business justification"—the need to protect its patent rights—is pretextual because it "played no part in the decision to act."[52] As discussed in detail above, the evidence in this case tells a clear story. In 2015, well before entering the interoperability agreement, Align



. Align chose partnership, and
. *See* Ex. 24 at -381. But despite

[53] When 3Shape

---

[52] *Kodak*, 125 F.3d at 1219.
[53] As noted above, Align saw this combination as
*See supra* at p. 6 & n.17.

Ex. 23. Internal Align documents make clear that,

█████████████████████████████████ .[54]

The evidence further shows that, throughout 2017, Align employees

.” Ex. 27.[55] Align's leadership then debated

. *See supra* pp. 6-8.

Further, documents created immediately afterward Align sued 3Shape in November 2017 indicate that

.[56] Align's primary consideration

.[57]

Indeed, these documents indicate that Align

---

[54] As Mr. Hogan wrote in 2015: “
.” Ex. 10; *see also* Ex. 12 at -857
]”).
As discussed above, during this period, Align was also preparing for a rush of competitive entry in anticipation of the ███████████████ in November 2017.
[56] *See, e.g.*, Ex. 60
; *see also* Ex. 61 (
).
As Mr. Hogan wrote in January 2018: “
.” Ex. 54 at -85; Ex. 62

██████████████████████." Ex. 34 at -86.[58] Align employees meanwhile ████████

██████ █ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

At a minimum, this evidence of pretext raises a question of fact about whether Align terminated

interoperability to "protect its patents" or whether, alternatively, it did so to harm competition.[60]

### 3. Align abandons any claim it terminated interoperability because 3Shape "was not living up to its commitments"

Align also argues that it was "conceivable" for it to terminate interoperability due to what it

characterizes as 3Shape's "non-compliance with its own commitments under the [interoperability

agreement][.]" MSJ at 14-15. Align seeks to have its cake and eat it too. Align states unequivocally in

its brief that it terminated interoperability due to patent concerns, writing that this is what "actually

occurred." MSJ at 12. It follows logically that Align did not terminate due to concerns about 3Shape's

purported non-compliance—indeed, Align presents no evidence that it terminated interoperability for

this reason or that its executives ever considered doing so.[61] To the contrary, while Align argues that

3Shape "had no intent to deliver on its promise to provide restorative interoperability to Align," MSJ at

14-15, it ignores conflicting evidence suggesting that: (1) 3Shape was ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████, *see* Pearl Ex. 56 at -63, -65) and (2) Align ████████████████

---

[58] In November 2017, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ █"Ex. 63.

████ *See, e.g.*, Ex. 64 at -318 (████████████████████████████████████████████████

████): Ex. 65 ████████████████████████████████████████████████

████████████████████████████████████████████████).

[60] Align argues that any analysis of pretext is "futile" because the interoperability agreement was terminable ████████████████. MSJ at 20. This misunderstands the inquiry in a refusal to deal case: was a defendant's purpose to sacrifice short-term benefits obtain higher long-term profits by excluding competition? This inquiry would be the same—and Align would still be subject to antitrust liability— even if Align had terminated the interoperability agreement pursuant to this provision. Further, the factual record discloses at least one obvious reason that Align would invoke litigation as a pretext for TOI: the desire to provide a plausible reason to, and prevent blowback from, its Trios-owning customers.

[61] Once again, Align argues that 3Shape thought Align may have terminated interoperability for this reason. But the relevant question is why Align terminated interoperability. As explained above, in a refusal to deal case, it is not sufficient for a defendant to "merely postulate[] 'a valid business purpose' … regardless of feasibility or value" that 'ends the inquiry.'" *Viamedia*, 951 F.3d at 461.

████████████████████████████████████████████████████████ (Ex. 67 at -91).[62]

Further, even if Align were to argue that it actually terminated interoperability for this reason, the same

evidence of pretext above indicates that it "played no part in its decision to act."[63]

### 4.    TOI resulted in a profit sacrifice

Align argues that (1) TOI did not result in a profit sacrifice, and that (2) "increased iTero and

Invisalign sales from terminating interoperability was *actually conceived* within Align." MSJ at 16

(emphasis added). But Align identifies no record evidence for this latter claim,[64] and in fact ignores

substantial conflicting evidence—including (a) evidence that the ███████████████████████

██████████████████████████████████████████ *see* Ex. 15 at -80; and (b) evidence that

senior Align executives in fact ██████████████████████████████████

████████████████████████████████████, *see* Ex. 31 at -300, noting ████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ " Ex. 32; *see*

*also* Ex. 69 (Align email stating ███████████████████████████████ ). TOI put this

profit at risk—doctors had a choice to either switch scanner or switch clear aligner brand—and Align's

decision to terminate interoperability in the U.S. only made sense if it expected termination to foreclose

competition over the long run.[65]

Further, Dr. Vogt opines that but-for its anti-competitive effects, TOI made no economic sense

and represented, at a minimum, a short-term profit sacrifice of █████████████████████

████████████████████████████████████████████████████████████████

█████████████████ . *See* Vogt ¶ 625; *see generally id.* § K.2; Vogt Rebuttal § D.1. As Dr. Vogt

notes, Align's own internal analysis found █████████████████████████████████████████

---

[62] As Leon Rasovsky—who led Align's collaboration with 3Shape in 2017—wrote in notes on a call with 3Shape in early 2018: "███████████████████████████████████████████████
███████████████ " Ex. 68 at -45.
[63] *Kodak*, 125 F.3d at 1219.
[64] In relevant part, Align cites deposition testimony concerning Align's █████████████████
█████████████████████████████████████ MSJ at 16 & n.75.  Neither speaks to whether TOI was expected to increase iTero and Invisalign sales.
[65] As discussed above, Align executives ██████████████ ████████████████████████████████████████
████████████████████████████████ *See supra* pp. 17-18; *see also* Vogt ¶¶ 630-642.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Vogt ¶ 627; Vogt Rebuttal ¶¶ 202-05. Dr. Vogt also finds that there was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Vogt Rebuttal ¶¶ 188-190; *see* Ex. 24 at -381. This evidence shows that Align was willing "to forsake short-term profits to achieve an anti-competitive end."[66]

Align does not seek to exclude Dr. Vogt's analysis, much less his finding that Align sacrificed short term profits (in fact, it ignores their existence). Instead, Align only cites to the flawed analysis of its own expert Dr. Snyder.[67] But that simply means there is a disputed issue of material fact.

### 5.    Plaintiffs satisfy each of the elements necessary to plead a refusal to deal

Align argues that Plaintiffs do not sufficiently plead the elements of a refusal to deal as set forth in *MetroNet*. MSJ at 16-17. Specifically, it argues (1) that interoperability was not a "course of dealing" because the interoperability agreement was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and (2) interoperability has never been sold "at a retail price." MSJ at 16-17. But Align has already made and lost both these arguments in its *Simon* motion to dismiss briefing. *See Simon* ECF No. 52 at 12-13 & n.10. Align cites no authority for its claim that, merely because a commercial agreement has a limited term or is terminable, it cannot be a "course of dealing." Nor does this make sense: by Align's logic, no commercial relationship governed by contract could give rise to liability. Align also misstates *MetroNet*, which does not categorically require that a defendant refuse to sell a product to a plaintiff at retail price.[68] Instead, *MetroNet* simply identifies this as one factor the Supreme Court "found significant for creating antitrust liability" in *Aspen* because it "indicated a willingness to sacrifice short-term benefits in order

---

[66] *See, e.g.*, *Yardi Sys., Inc.*, 2019 WL 4597519, at *6 (denying summary judgment where defendant "was willing to lose 100 customers to 'cut off' [competitor's] 'custom integration.'").

[67] Align cites Dr. Snyder for the vague proposition that TOI "led in short order to increased sales in both iTero scanners and Invisalign." MSJ at 15-16. But as Dr. Vogt explains, Dr. Snyder's approach is based on a conceptual flaw: it makes no attempt to isolate the effect of TOI from the growth that Align would have experienced regardless of TOI. *See* Vogt Rebuttal §§ D.1.2, D.1.3. Dr. Snyder's approach would find no profit sacrifice even if ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Vogt Rebuttal ¶¶ 177-187. If accepted, this methodology would eviscerate the profit sacrifice test.

[68] Align also argues that it would be "administratively prohibitive" for the Cour to "direct Align to deal" (i.e., reinstate interoperability). MSJ at 17. But this is a premature argument about the prospective remedy the Court should craft in the event the jury finds liability; it is not relevant at summary judgment. It is also not a reason to deny retroactive monetary relief for the harm Plaintiffs have already suffered.

- 20 -

to obtain higher profits in the long run from the exclusion of competition."[69] Evidence shows that Align's willingness to sacrifice short-term profits through TOI was "prompted not by competitive zeal but by anticompetitive malice."[70] Further, Align *did* refuse to sell aligners at retail price to dentists who attempted to order them using Trios, which is consistent with what courts have found as sufficient to show a refusal to sell at a retail price.[71]

### 6.    Discovery has confirmed Plaintiffs' allegations

Align argues that the Court's previous questions about TOI have been answered in its favor "without dispute" in discovery. This is a remarkable, and untrue, claim.

1.  *If Align doesn't want to do business with an infringer of its patents, why does it continue to do business with 3Shape in other countries?* Align argues once again, with reference only to subjective evidence, that it actually terminated interoperability to avoid "a possible waiver" defense, i.e., 3Shape's equitable defense of waiver. MSJ at 18. But it inexplicably ignores substantial evidence (discussed above) that ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████." Ex. 34 at -86. Align's refusal to face this evidence is telling.

2.  *How did it come about that Align discovered the alleged patent infringement right around the time that 3Shape was refusing to make its scanner exclusive to Invisalign? And given the number of patent lawsuits between Align and 3Shape, is it appropriate to conclude anything from just one of these lawsuits without a deeper analysis and more detailed timeline?* The record is now clear that Align was ██████████████████████████████. Align concedes this point but prevaricates that in "technology companies," "enforcement often involves a complex determination" and that Align "eventually determined that 3Shape's potential infringement warranted enforcement." MSJ at 18-19. This answer, however, never reckons with the substantial evidence, discussed above, that Align executives ████████████████████████████████████████████████████████.

3.  *Does the patent infringement suit have merit, or is it brought in retaliation for 3Shape's refusal to comply with Align's ongoing pressure make the Trios scanner exclusive to Invisalign?* Align argues that 3Shape's settlement of outstanding patent lawsuits answers "as a matter of law" that these suits had merit. But the relevant question is not whether the patent suits had merit; instead it is whether they justified TOI. Further, 3Shape's decision to settle the patent litigation, standing alone, does not demonstrate that Align's suits had merit. To the contrary, 3Shape ███████ ██████████████████████████████████████████, *see* Pearl Ex. 4 at -91, and in fact prevailed

---

[69] *MetroNet*, 383 F.3d at 1132 ("The second fact in *Aspen Skiing* to which *Verizon* attached significance was the defendant's refusal to sell tickets to the plaintiff 'even if compensated at retail price,' thus suggesting a calculation that its future monopoly retail price would be higher."). Align's only cited authority, *Stein v. Pac. Bell*, 172 F. App'x 192, 194 (9th Cir. 2006) is consistent because the course of dealing at issue there "was not presumably profitable" and instead a "product of … regulatory authority."
[70] *MetroNet*, 383 F.3d at 1132.
[71] *See, e.g.*, *Iqvia Inc. v. Veeva Sys. Inc.*, 2018 WL 4815547, at *3 (D.N.J. Oct. 3, 2018) (finding section 2 claim adequately alleged where, although defendant did not "charge for" terminated agreement, the agreement was "prerequisite" to subscriptions for which it did charge).

against Align in the ITC proceeding.[72] Further, as discussed above, substantial evidence indicates that Align ███████████████████████████████████████████████████████

## B. Align's exclusive dealing arrangements constitute anticompetitive conduct

Starting in late 2017—the same time it faced its ████████ and mere months before TOI—Align entered bundling and exclusive dealing arrangements with doctors and DSOs. These programs were devised to foreclose competition in the clear aligner and scanner markets—and did so, foreclosing up to ██% of the aligner market by order volume during the class period. Vogt ¶ 744, Fig. 52.

### 1. The Fusion program was anticompetitive

Bundled discounts are exclusionary if, "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them."[73] Dr. Vogt performs several discount attribution tests on the Fusion program,[74] all of which show that Align's bundling resulted in ██████████████████████████—and thus finds Fusion was an exclusionary bundled discount. Vogt § K.11; Vogt Rebuttal § D.2.[75]

This is consistent with ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ 3Shape, by contrast, does not sell aligners and therefore could not monetize a bundled discount in the same way. This is exactly the anticompetitive concern with bundled discounts the Ninth Circuit recognized in *Cascade*.[76] Further, Align's executives repeatedly ███████████████████████████████

---

[72] *See* "3Shape wins once again in the ITC" (Nov. 18, 2020), https://tinyurl.com/ytxvmu9e.

[73] *Cascade Health*, 515 F.3d at 910.

[74] Fusion offers dentists 50% discounts on iTero scanners (usually approximately $15,000) if they meet incremental Invisalign volume targets over a three year period following purchase. *See* Vogt §§ F.3, K.9-11. If a doctor does not meet the incremental Invisalign targets, then they forgo either a portion or all of the discounts on the iTero. *Id.* ¶¶ 293-94. Dr. Vogt further opines that the Fusion Program a form of *de facto* exclusive dealing that raised rivals' costs. Vogt §§ K.9; K.10; *see Simon* ECF No. 91 at 15. ███████

[75] In particular, Dr. Vogt's test used Align's ████████████████████████████ ████████████████████████. Vogt ¶¶ 736-741.

[76] *Cascade*, 515 F.3d at 909 ("[T]he primary anticompetitive danger posed by a multi-product bundled discount is that [it] can exclude a rival is who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter.").



" (Ex. 43 at -46), [REDACTED]" (Ex. 44), "[REDACTED]

[REDACTED]" (Ex. 41), [REDACTED]" (Ex.

42 at p.37), and that [REDACTED]

[REDACTED]" (Ex. 70 at -69).

Align fails to meaningfully address Dr. Vogt's analysis or the record. First, Align states that Plaintiffs "must show that the discounts fail a discount attribution…test" and that Plaintiffs' "inexplicable failure to follow the law of the Ninth Circuit is…fatal to Plaintiffs' bundling theory." MSJ at 20. But Align then acknowledges that Dr. Vogt did perform a "discount attribution test" which it does not "challeng[e] … as a matter of summary judgment." MSJ at 21 n.93.[77] Align never tries to square this rhetorical circle. Instead, it pivots to the cursory argument that Plaintiffs "did not examine any cost data from rivals" and thus have not shown that Fusion excluded competition. MSJ at 21. However, Align's unsupported assertion that Plaintiffs must examine rivals' cost data *in addition to* performing a discount attribution test is contradicted by *Cascade*, in which the Ninth Circuit rejected a proposal that cost data of actual competitors be examined in assessing whether a bundled discount was anticompetitive.[78] Instead, the Ninth Circuit held that the discount attribution test, focused solely on the defendant's cost data (to represent an equally efficient hypothetical rival), was "preferrable on grounds of both administrability and principle."[79] Plaintiffs meet this standard.

### 2. Align's exclusivity programs for individual dental practices were anticompetitive

Between 2019 and 2021, Align offered nine programs whereby doctors received discounts on Invisalign purchases from Align *only if* they agreed to both [REDACTED]

[REDACTED] *See* Appendix A (collecting contracts and relevant language); *see also* Vogt § F.4. Seven of the programs

[REDACTED]

---

[77] Align claims Dr. Vogt's test is "significantly flawed and not credible," but does not identify any specific flaws in the test or otherwise substantiate its claim with reference to any record evidence. *Id.*

[78] *Cascade Health*, 515 F.3d at 905 (explaining that a potential discounter would struggle to evaluate legality of potential bundled discount if required to consider actual rivals' costs, for which it may lack information, "thus making it hard for that potential discounter…to determine whether the discount it wishes to offer complies with the antitrust laws").

[79] *Id.* at 906–07 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 749a at 322-23 (Supp.2006)).

- 23 -

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████. *See* Appendix A; Ex. 97. Further, most of the

programs only ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████.

*Id.* Align claims that these programs were "lawful" because of their short duration. MSJ at 22-23. But it

relies only on Ninth Circuit cases where exclusive dealing contracts were challenged under Section 1,

and the short duration of the contracts was found to be a significant factor in determining that plaintiffs

failed to show the "substantial foreclosure" necessary to plead a stand-alone Section 1 exclusive dealing

claim. *Id.*[80] Plaintiffs have not brought a Section 1 claim, nor are they claiming that the contracts would

be independently actionable. Rather, as the Court has previously recognized, these exclusive dealing

contracts are an anticompetitive component of Align's overall scheme. *See* ECF No. 482 at 2-3.[81]

The relevant question at summary judgment is thus not whether the exclusive dealing contracts at

issue were independently "lawful," but instead whether they, considered holistically along with the rest

of Align's scheme, foreclosed competition.[82] Plaintiffs present qualitative and quantitative evidence that

these contracts, which covered up to ██% of all Invisalign orders (Vogt ¶¶ 704-11 & Figs. 46 & 47), had

anticompetitive effects that contributed to the scheme. *First*, Align itself expected these programs would

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *See supra* at p. 9.[83] *Second*, Dr. Vogt

demonstrates that after introduction of these programs, the share of dentists ordering competing aligners

████████████████████████████████████████████ (Vogt Rebuttal § D.3.4 & Fig. 9), while

---

[80] Further, the Ninth Circuit has never held that short-term or easily terminated contracts are categorically legal, and those factors do not "create any safe harbor." *Church & Dwight*, 868 F. Supp. 2d at 904 n.12. And courts recognize that short term and/or easily terminable contracts, even standing alone, can have anticompetitive effects where, as here, they have the "practical effect" of suppressing competition. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–28 (1961); *United States v. Microsoft Corp.*, 1998 WL 614485, at *20 (D.D.C. Sept. 14, 1998) (rejecting argument that "short-term" agreements could not unreasonably restrain trade and denying summary judgment on this basis).

[81] As the Court recognized in its class certification order, Dr. Vogt "offered opinions about the exclusionary agreements that [are] consistent with the theory permitted by this Court's prior order: [he] assessed the anticompetitive effect of and damages from the exclusionary agreements in combination with the TOI as part of a broader Section 2 claim." *Id.*

[82] *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012).

[83] *See, e.g.*, Ex. 74 -at 923 (██████████████████████████████████████████████): Ex. 56 ████████████████████████████████████████████████████████████████).



Align's own market share (and margins) ▮▮▮▮▮▮▮▮▮▮ (Vogt ¶¶ 530-540, 758-774). This is consistent with foreclosed competition. *Third*, these contracts match the criteria that ▮▮▮▮▮▮▮▮▮. *See* Vogt Rebuttal ¶¶ 248-58.[84]

Align's claim now that the contracts were "not exclusive as a matter of law" rings hollow in the face of extensive evidence that they were anticompetitive as a matter of fact. MSJ at 23. Further, the facts here clearly distinguish Align's conduct from *Omega*, where the plaintiffs failed to produce (unlike here) "credible evidence to support their contention that" the defendant's exclusive dealing "actually deterred entry into [the] market."[85]

### 3. Align's contracts with DSOs were anticompetitive



In a 2019 email, Align executive ▮▮▮▮▮▮▮▮▮▮." Ex. 75 at -804. Over the next 18 months, Align entered contracts with at least eight DSOs containing various explicit exclusivity requirements, primarily that the DSOs ▮▮▮▮▮▮▮. *See* Appendix B (collecting contract terms); Vogt § F.4.5. Each of these agreements was for ▮▮▮▮▮▮▮. Pearl Ex. 11 ¶ 175 & Fig. 26 (listing contracts and duration). Further, in 2018, Align entered a ▮▮▮ contract with Heartland Dental, the largest DSO in the country, that required Heartland to ▮▮▮▮▮▮. As explained above, Align understood the agreement as ▮▮▮▮▮▮▮" *See supra* p. 9; Exs. 47, 48. Align argues that Plaintiffs nevertheless fail to show

---

[84] Indeed, courts have expressly recognized that, in Section 2 monopolization cases, two important considerations in assessing exclusive dealing are whether it "reasonably appear[s] capable of making a significant contribution to … maintaining monopoly power" and whether competing firms that wanted to use the distribution channels subject to exclusivity "constituted nascent threats" to defendant's monopoly power." *Microsoft*, 253 F.3d at 79. Both criteria are met here. *See also CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 952 (D. Or. 2018) (exclusive dealing plausibly alleged where defendant was dominant supplier and high switching costs existed).

[85] *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997). To the contrary, the Ninth Circuit noted that one market entrant had "increased [its market share] since its entry by at least one third in fact increased its market share by one-third," and prices in the market meanwhile decreased.

that Heartland's doctors "were constrained from dealing with Align's rivals." MSJ at 24. But transactional data shows that Invisalign ████████████████████████████████████ ████████████████████████████████████████████████████████████████.[86] This indicates that Align's contract had the "practical effect" (*see Simon* ECF No. 91 at 15) of preventing competitors from doing business with Heartland.

Align claims the remaining DSO agreements are not actually exclusive because the contracts, which it falsely describes as "marketing agreements,"[87] state that dentists retain (as is required by law) their professional judgment. MSJ at 24-25. Putting aside evidence that Align ████████████████ ███████████████████████████████████████████████—"the main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement."[88] These contracts have anticompetitive effects because they explicitly prevent DSOs, in a variety of ways, from using competing aligners for multiple years; indeed, Align never explains how a dentist would prescribe non-Invisalign aligners if his DSO was ████████████████████████████████.

### 4. Align foreclosed competitors from reaching the "ultimate consumer"

Align argues that its exclusive dealing does not foreclose competition because doctors are "wholesalers of aligners" and competing aligner manufacturers may still be able to reach the "ultimate consumers," i.e. patients. MSJ at 25. But in *Omega*, the Ninth Circuit held that the exclusive dealing arrangements at issue with distributors raised less anticompetitive concern because competitors could engage in direct-to-consumer sales.[89] Here, the relevant market (which Align has not challenged at

---

[86] Specifically, between Q1 2019 and Q4 2020 ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
███████████████████ *See* Ex. 76.

Align claims these DSO contracts only contain exclusivity requirements regarding marketing and are "merely marketing agreements" that do not relate to Invisalign's "actual purchase." MSJ at 24. This is false. ██████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ *See* Plaintiffs' Appendix B (listing relevant terms); *see also* Vogt § F.4.5 (collecting relevant language).

[88] *Omega*, 127 F.3d at 1162.

[89] *Id.* at 1163. Align's argument also contradicts its claim, at the motion to dismiss stage, that patients lacked antitrust standing because "end-patients do not buy Invisalign from their dentists" and instead buy Invisalign treatments that contain other components. ECF No. 18 at 5-6.

summary judgment) consists of aligner manufacturers that sell to dentists, not directly to patients. *See* Vogt § G. There is no direct-to-consumer method of distribution in the in-office aligner market that lessens the anticompetitive effect of Align's exclusive dealing arrangements with dentists.[90]

## C.    There is a triable issue of fact on each element of Plaintiffs' monopolization claim

A section 2 monopolization claim "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[91] Align claims in Section C of its brief that Plaintiffs' monopolization claim fails because they fail to show that Align's conduct had the "effect of excluding competition in the putative aligner market." MSJ at 25. Align repeatedly asserts without support that this is the test Plaintiffs must meet.[92]

Align's proposed requirement uses antitrust jargon but does not match the well-established two-step test for monopolization. Importantly, its argument fails to address the fact that Align has not moved for summary judgment on its possession of monopoly power—thus conceding that this is a contested issue of fact. As the Ninth Circuit explained, "monopoly power is the 'substantial ability to control prices or exclude competition.'"[93] Align's concession on this issue supports the conclusion that Align's rivals were excluded because Align would not otherwise have monopoly power. Dr. Vogt provides economic analysis showing that Align's ability to control prices and exclude competition during the relevant period indicate that it possessed monopoly power. *See* Vogt §§ H.1, K, L.1.

Instead, Align's arguments appear to be related to the second element—that the "the defendant acquired or maintained its monopoly through 'anticompetitive conduct.'"[94] As discussed above, each component of Align's scheme constitutes anticompetitive conduct, which the Ninth Circuit has explained "is behavior that tends to impair the opportunities of rivals and either does not further competition on

---

[90] Further, although there is evidence in the record that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ").
*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023).
[92] *See e.g.,* MSJ at 26 (stating, without citation, that "In order to have a viable theory of competitive harm, Plaintiffs must…show that Align's conduct excluded rivals from the putative aligner market.")
[93] *Epic*, 67 F.4th at 998.
[94] *Id.*

the merits or does so in an unnecessarily restrictive way."[95] Align's further challenges in Section C of its brief fail because (1) each component of Align's scheme impaired the opportunities of rivals in a manner that did not further competition on the merits; and (2) Align's anticompetitive conduct, in the aggregate, had a significant effect on competition in furtherance of the maintenance of its monopoly.

**1.    Each component of the scheme impaired rivals and restricted competition**

Align's bunding, exclusive dealing, and TOI are anticompetitive conduct that tended to impair the opportunities of rivals and did not further competition on the merits. *First*, Align's bundling through Fusion is anticompetitive because Plaintiffs have shown that this bundle resulted in Align offering below-cost pricing, which the Ninth Circuit has held could "exclude an equally or more efficient competitor and thereby reduce consumer welfare in the long run."[96]

*Second*, Align's exclusive deals, in general, had the actual effect of limiting dentists' ability to deal with rivals because they had explicit exclusivity language that restricted customers from dealing with competing aligner manufacturers. Align claims that its exclusive dealing did not exclude competitors because Plaintiffs "have no evidence of any rival being unable to match or beat Align's discounts." MSJ at 29. But this is not a legal requirement for pleading exclusive dealing; Align appears to conflate exclusive dealing claims with predatory pricing claims. Instead, the relevant question (for purposes of establishing liability) is whether exclusive dealing foreclosed competition.[97]

Regardless, Align never explains how a rival could match or beat Align's discounts with a DSO that has agreed not to offer competing clear aligners for at least ▮▮▮▮▮▮. Further, documentary evidence establishes that Align understood its contract with Heartland ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Vogt § F.4.3; consistent with this,

---

[95] *Cascade Health*, 515 F.3d at 894.
[96] *Id.* at 896.
[97] Align supports its assertion with a citation to the Court's discussion of *de facto* exclusive dealing at the motion to dismiss stage. But the Court's order nowhere states that this is a requirement of pleading *de facto* exclusive dealing. *See Simon* ECF No. 91 at 15. Further, in *Allied Orthopedic*, the Ninth Circuit concluded that easy terminability "negate[d] substantially" the relevant agreements' "potential to foreclose competition" "because 'a competing manufacturer need[ed] only offer a better product or a better deal to acquire their [business]'"—not that plaintiffs were required to show that rivals could in fact offer better deals. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (quoting *Omega*, 127 F.3d at 1163). As explained elsewhere, Plaintiffs present evidence that Align's short term programs with individual dentists impaired rivals despite their duration.

Invisalign was ██████████████████████████████████████████████████. *See* Ex. 76. This shows competitors were generally unable to match or beat Align's arrangement with Heartland.

Finally, contrary to Align's claims, Plaintiffs have presented extensive evidence that the programs with individual dentists impaired rivals. *See supra* § B.2.[98] Align claims the programs were not exclusive by pointing to ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *Vogt Rebuttal* ¶¶ 272-78. Further, the fact that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[99]

*Third*, TOI impaired rivals' opportunities by effectively forcing doctors to purchase iTero scanners and thus Invisalign; this foreclosed a substantial volume of orders (approximately ██% of the total aligner market) that would have otherwise been open to competition. *See* Vogt § K.4. Align first claims that iTero can still produce so-called "STL" files which can be sent to competing aligner manufacturers. But Plaintiffs' expert, Dr. Grossman, explains that ordering competing clear aligners using an STL file is a confusing, complex, time-intensive process that dissuades doctors from ordering competing aligners by imposing higher time and staffing costs. Grossman ¶¶ 45-56: Grossman Rebuttal ¶¶ 9-19; Vogt § G.6. Align emphasizes that named plaintiff dentists in the *Simon* action have used iTero to order competing aligners, but omits the fact that all of them have described this process as so cumbersome that they rarely do so.[100] Align also notes that competitors Clear Correct and Envista Spark receive orders submitted via STL, ████████████████████████████████████████████████████████████████████████████

_____

[98] Further, Dr. Vogt finds that aligner competitors not only ████████████████████████████
████████████████████████████████████████████████████████████████████████)
Align also offers no specific procompetitive justification for any of these exclusive dealing contracts; it thus fails to even try to rebut that the exclusive dealing contracts had anticompetitive effects. *See, e.g.*, *Microsoft*, 253 F.3d at 59. If the short duration exclusive dealing was procompetitive, then it is strange timing that Align chose to end most of those programs in June 2021—very shortly after this Court's order denying Align's motion to dismiss in the *Simon* action in February 2021.

[100] In addition to Dr. Grossman, all three dentists in the *Simon* action emphasized the difficulty of using STL files to order competitor aligners. Ex. 79 at 77:9-11 (Dr. Matian described workflow as "very cumbersome"); Ex. 80 at 71:10-25 (Dr. Simon described "certain restrictions on the ability to obtain aligners in other fashions"); Ex. 81 at 49:7-51:13 (Dr. Patel testified he only did one case by exporting an STL because "[t]here were so many" steps and "it was quite cumbersome.")



.[101]

Align's internal documents also make clear that Align _____ " Ex. 24 at -84 _____ ). Most notably, Align's decision to terminate _____ [102] Documents and testimony from Align _____

_____ [104]

Align also argues that TOI was not plausibly foreclosing because doctors can order Invisalign using PVS impressions. MSJ at 28. But Align again ignores extensive record evidence, including expert testimony, that PVS impressions (1) are seen as uncomfortable, slower, less accurate, and outmoded, and thus not a reasonable substitute for scanners; and (2) do not impose a competitive restraint on iTero. Grossman ¶¶ 19, 26-29, 43-44, 56; Grossman Rebuttal § B; Vogt § G.5.2. Consistent with this, Dr. Vogt finds that _____ . *See* Vogt ¶¶ 510-15.[105]



[101] _____

_____ *See id.* at -78 _____ "). Critically, the _____ . *See generally* Pearl Ex. 44. For example, in 2016, _____ " *See* Ex. 83 at -36. In a July 2017 email, _____ " Ex. 84 at -32. *See, e.g.,* Ex. 85 at -38 _____ ); Ex. 27 at -800 _____ "); Ex. 86 at -24 _____

**2.    Align's anticompetitive conduct had a significant effect on competition**

Plaintiffs have pled a scheme theory of liability under Section 2. Under that theory, "a series of activities…combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation."[106] Dr. Vogt analyzed the total effect of Align's scheme on competition in two steps. First, he calculated the size of the total in-office aligner market—including both Align and competitors like ClearCorrect—using data from a third-party company that collects prescribing information from dentists. Vogt § H.1. Second, Dr. Vogt determined how much of the market was foreclosed by each type of conduct and found that, in aggregate, Align's conduct foreclosed up to ███% of the total aligner market (and consistently over ██% starting in 2020). Vogt § K. Dr. Vogt also shows that (1) ██████████████████████████████, unlike a competitive benchmark where entry caused prices to fall, Vogt § L; and (2) ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████, *id.* ¶¶ 616-618.

Align raises three challenges to Dr. Vogt's analysis. *First*, it claims that Dr. Vogt used "only Align's sales data" for calculating "exclusivity" and that this "approach omits purchases of competing products." MSJ at 25. That is wrong.[107] Dr. Vogt calculated "foreclosure" using data from a third party source that ██████████████████████████████████ (*see* Ex. 73), as well as data from ClearCorrect ██████████████████████████████. *See* Vogt Rebuttal § D.3.4. Align also claims that Plaintiffs' model does not analyze the "total addressable market." MSJ at 26. But Dr. Vogt's foreclosure metric is based on a total addressable market of all sales made by in-office aligner manufacturers, including both Align and its competitors.[108]

---

[106] *See Simon* ECF No. 91 at 10; *see also Microsoft*, 253 F.3d at 78 ("a monopolist's unilateral campaign of acts intended to exclude a rival that in the aggregate has the requisite impact warrants liability even if the acts viewed individually would be lawful for want of a significant effect upon competition").

[107] Align's argument seems inadvertently copied from its *Simon* summary judgment motion. Align ascribes discussions at the class certification hearing related to Dr. Singer's approach to Dr. Vogt's approach. Align states that the "Court rightly recognized that Plaintiffs' definition of exclusivity is a 'misnomer'" (*See* MSJ at 25-26 & n.113), but the document it cites (Pearl Ex. 64) does not contain this language—which is instead from the Court's questioning of Dr. Singer. *See* Align *Simon* MSJ at 24 & n.110. Plaintiffs do not in any way agree with Align's criticisms of Dr. Singer's analysis.

[108] Align suggests that the "total market" consists of all US dentists. MSJ at 26. This is non-sensical; only a subset of dentists have ever sold clear aligner treatment—that is who Dr. Vogt focuses on.

- 31 -

*Second*, Align claims that Dr. Vogt fails to show "substantial" foreclosure from exclusive dealing. MSJ at 29-30. But the conduct challenged here is an overall monopolization scheme that also includes TOI; thus, the question is whether Align's scheme as a whole substantially foreclosed competition, not whether its constituent parts did individually. Further, Align mainly relies on case law involving Section 1 exclusive dealing claims, where it is often held that foreclosure shares of at least 30-40% are necessary to state a standalone claim. That is not the kind of claim at issue here; indeed, the Court previously recognized that "under section 2, foreclosing about 30% of the market suffices as substantial."[109] Dr. Vogt finds foreclosure shares of up to ██% from Align's bundling and exclusive dealing during the relevant period and that, collectively, Align's conduct foreclosed up to ██% of the market during the relevant period. Vogt ¶¶ 608, 744 & Figs. 34, 52. This is significant anticompetitive conduct that fulfills the second prong of the monopolization standard under Section 2.

*Third*, Align claims that its exclusive dealing was not foreclosing (and that any foreclosure percentage is "irrelevant") because rivals entered the market. MSJ at 30. But attempted competitive entry and market growth alone are not a get-out-of-jail-free card; were this true, no monopolization scheme would ever be cognizable in an expanding market. Indeed, *Omega* makes clear that the relevant question is whether Align's exclusive dealing "actually deterred entry into [the] market."[110] Plaintiffs present extensive evidence that it did: although rivals attempted entry, Align's scheme prevented them from effectively competing and in fact caused competitors to ████████████████, *see* Vogt Rebuttal ¶¶ 264-270, while its (1) ████████████████████████████████████ ████████████████████████████████, *see* Vogt ¶¶ 530-540, 758-774. This is inconsistent with a competitive market in which there was significant competitive entry.

**D.    Plaintiffs properly aggregate Align's anticompetitive conduct**

Align seeks to again relitigate Plaintiffs' ability to aggregate conduct as part of a single scheme. It first argues that "a refusal to deal that is not independently unlawful can never be aggregated" with other

---

[109] *Simon* ECF No. 91; *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298 (9th Cir. 1982) (24% foreclosure from exclusive dealing sufficient for a Section 2 claim).

[110] *Omega*, 127 F.3d at 1164. Align ignores that, as noted above, the plaintiffs in *Omega* failed to produce (unlike here) "credible evidence to support their contention that" the defendant's exclusive dealing "actually deterred entry into this market." *Id.* To the contrary, the Ninth Circuit noted that one market entrant had "increased [its market share] since its entry by at least one third," and prices in the market meanwhile decreased. *Id.*

conduct in a "broth claim." MSJ at 31. But Plaintiffs do not seek to aggregate a "lawful" refusal to deal with other conduct; instead, as discussed above, evidence and expert analysis demonstrates that TOI was independently unlawful. Second, Align argues that "short-term, volume discounts and above-cost bundled discounts" are "lawful" and "cannot be aggregated." MSJ at 30. But as discussed above, Align concedes that it is not "challenging it as a matter of summary judgment" Dr. Vogt's finding that Align's sold the iTero ██████████████ though the Fusion Program.[111] Similarly, Plaintiffs do not include any "short-term, volume discounts" without exclusivity requirements as part of their scheme;[112] instead, they include only exclusive dealing programs, and demonstrate they contributed to the harm from Align's scheme by excluding competitors. Align identifies no authority holding that exclusive dealing cannot be aggregated as part of a scheme if it has anticompetitive effects.

Second, Align argues that Plaintiffs' refusal to deal and exclusive dealing allegations are in tension because TOI allowed Align to increase prices while exclusive dealing entailed discounting. MSJ at 31-32. There is no tension; evidence shows that Align executives viewed this conduct as part of a scheme to foreclose nascent competitors. TOI locked doctors into Align's ecosystem, thus preventing competitors from gaining scale and allowing Align to maintain, and increase, its monopoly price—and was abetted by the Fusion program, which leveraged below-cost scanner pricing in service of Align's supracompetitive aligner pricing. Align's exclusive dealing contracts in turn provided temporary discounts off Align's monopoly price that furthered its scheme and maintained its monopoly power by foreclosing the market from competition.

Align again conflates claims for predatory pricing and exclusive dealing: exclusive dealing works by offering customers a lower price than if they reject the contract, not a lower price than would prevail in the but-for world (or a below-cost price).[113] This is a key distinction: indeed, Dr. Vogt demonstrates

---

[111] Align relies on *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9-10 (S.D.N.Y. Feb. 21, 2019), where the court held that a pricing practice must "pass muster" under the price-cost test to be included in a "broth" claim. But there is no tension between that case and Plaintiffs' theory: Dr. Vogt demonstrates that Align sold iTero below cost. Further, *Valassis* recognizes—consistent with longstanding precedent—that "[n]othing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful." *Id.*

[112] In support of its argument, Align cites a portion of this Court's previous order discussing Align's Advantage Program, which does not include exclusivity language and instead offers dentists discounts based on order volumes. *See Simon* ECF No. 91 at 11.

[113] To illustrate, a monopolist in effect is offering a customer the following: "If you accept this exclusive

that ███████████████████████████████████████████████████████

███████████████. Vogt Rebuttal § F.2.3.

Align also ignores the synergistic anticompetitive effect between each aspect of the scheme. For example, a dentist may have been using 3Shape's Trios until TOI. Following TOI, the dentist was then lured into purchasing an iTero scanner through the Fusion bundle that also committed him to purchasing a large volume of Invisalign. Align then offered the dentist promotional programs that conditioned discounts on exclusivity, ████████████████████████████████.[114] Each aspect of Align's scheme worked together to lock dentists into its closed ecosystem and foreclose competition.

## E.    Plaintiffs' expert testimony is admissible

**Prof. Wagner.** Align has not put forward "objective" expert testimony regarding whether TOI was justified to "protect" its patent claims. But Plaintiffs have: Prof. Wagner opines that (1) none of 3Shape's equitable defenses were strengthened by TOI; and (2) Align was not justified in terminating interoperability in anticipation of these defenses. Align does not challenge Prof. Wagner's qualifications, methodology, or opinions regarding the merits of 3Shape's defenses. Instead, it argues that this second opinion constitutes improper testimony on the "ultimate issue to be decided." MSJ at 33-34. However, "expert testimony that is otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[115] Align cites a single, inapposite case that reiterates the proposition that testimony on "issues of law" is improper where, for instance, it is "used to provide legal meaning" to a document whose interpretation is a question of law for the court (e.g., an insurance policy).[116] But patent experts are permitted to testify regarding the merits of underlying patent litigation in antitrust cases where that litigation is "not directly at issue" and instead bears on other ultimate questions.[117] Prof.

---

contract, you get a discount on the monopoly price. If you reject, you pay the monopoly price." Exclusive dealing is effective as an anticompetitive tool because, unless enough other customers reject the exclusive deal to ensure a competitive outcome, an individual customer is better off accepting the exclusive contract even if it is suboptimal compared to a competitive world.
[114] Most of the programs with individual dentists ███████████████████████████████
███████████████. Appendix A; Ex. 97.
[115] *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).
[116] *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999).
[117] *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 186-188 (S.D.N.Y. 2018) (expert opinion on likely outcome of patent litigation, including "strength" of parties' underlying legal claims and defenses, admissible); *In re Glumetza Antitrust Litig.*, , 2021 WL 3773621, at 14, 16 (N.D.

Wagner's testimony is no different: he offers an opinion of the merits of 3Shape's defenses that in turn bears on whether Align's actions raise antitrust concerns.

**Dr. Vogt.** Align makes two attacks on Dr. Vogt. First, it claims Dr. Vogt's "opinions" are "not based on sufficient facts or data" because Dr. Vogt did not consider (1) data from rival aligner manufacturers; (2) evidence from rivals regarding their ability to compete against Align's bundling (Fusion); or (3) data from direct purchasers about whether they were ordering rival aligners. MSJ at 34. But Align fails to (a) identify which of Dr. Vogt's opinions should be excluded; (b) explain in any detail why these claimed flaws warrant exclusion; or (c) cite a single case in support of its argument(s). It appears that Align's *Daubert* challenge is recycled from the various other claims Align makes related to Plaintiffs' exclusive dealing claims, which Plaintiffs rebut above.[118] These arguments go at most to weight.[119] Second, Align again argues that Dr. Vogt's opinions are unreliable because his benchmark model "uses conduct"—exclusive dealing—"that is otherwise lawful in determining damages." MSJ at 34-35. But the suggestion the benchmark "uses conduct" to "determine damages" fundamentally misunderstands how Plaintiffs' model works; the Court has already rejected this argument.[120] The Court has also repeatedly rejected Align's claim that exclusive dealing must be "itself illegal under Section 2" to be included in Plaintiffs' scheme. ECF No. 482 at 3.

## F.    Plaintiff Vo has standing to pursue injunctive relief under the Sherman Act

Align argues again that Plaintiff Vo lacks standing; its arguments are identical to its class certification opposition. MSJ at 32; *compare* ECF No. 422 at 27-28. Faced with the same record and same arguments, the Court credited that Plaintiff Vo "has said that she would like to purchase Invisalign for her child in the future when financially ready and has taken steps towards doing so" and found she has standing. ECF No. 482 at 13 (citing ECF No. 488 at 26 n.77). Align offers no reason to revisit that holding.

---

Cal. Aug. 25, 2021) (refusing to exclude a patent expert's testimony on likelihood "of proving infringement" and on whether "[the relevant parties] would prevail in their respective patent litigation.")
[118] As Plaintiffs explain above: (1) Dr. Vogt used data from a third party source that Align itself relied on; (2) *Cascade Health* forecloses Align's assertion that Plaintiffs' must examine rivals' cost data; and (3) Dr. Vogt showed that the share of doctors ordering competitor aligners declined abruptly after these contracts were introduced.
[119] *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1113 (N.D. Cal. 2018).
[120] ECF No. 482 at 4 ("[T]he benchmark compares the real world to a world without any of Align's alleged anticompetitive conduct. Thus, if the jury were to reject Vogt's conclusion that the exclusive dealing agreements had anticompetitive effect, then the benchmark would still function to capture the anticompetitive effect of the remaining conduct at issue[.]").

DATED: December 22, 2023             Respectfully submitted,

                                  HAGENS BERMAN SOBOL SHAPIRO LLP

                                  By */s/     Steve W. Berman*
                                     Steve W. Berman (*pro hac vice*)
                                  Theodore Wojcik (*pro hac vice*)
                                  Joseph M. Kingerski (*pro hac vice*)
                                  1301 Second Avenue, Suite 2000
                                  Seattle, WA 98101
                                  Telephone: (206) 623-7292
                                  Facsimile:  (206) 623-0594
                                  Email: steve@hbsslaw.com
                                  Email: tedw@hbsslaw.com
                                  Email: joeyk@hbsslaw.com

                                  Rio Pierce (SBN 298297)
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                  715 Hearst Avenue, Suite 300
                                  Berkeley, CA 94710
                                  Telephone: (510) 725-3000
                                  Facsimile:  (510) 725-3001
                                  Email: riop@hbsslaw.com

                                  *Counsel for Plaintiffs*

010976-11/2419494 V1

**APPENDIX A:**
**Individual Discount Program Terms and Conditions**



| Program | Relevant terms | Retroactive credits | Align monitored compliance | iTero connection |
|---|---|---|---|---|
| Go Forward (Ex. 88) | | | | |
| GP Accelerator (Ex. 89) | | | | |
| Tipping Growth Accelerator (Align Pro 360 / Teen 360 / Teen Awesomeness Center) (Ex. 90) | | | | |

A-1

| Program | Relevant terms | Retroactive credits | Align monitored compliance | iTero connection |
|---|---|---|---|---|
| Reingage/AA CA (Ex. 91) |  | | | |
| Schulman Group Program Promotion (SSG) (Ex. 92) | | | | |

| Program | Relevant terms | Retroactive credits | Align monitored compliance | iTero connection |
|---------|----------------|---------------------|----------------------------|------------------|
| | | ███████ | | |
| Elite Doctor Program (Ex. 93) | ███████ | | ███████ | ███████ |
| Welcome Back (Ex. 94) | ███████ | ███████ | ███████ | ███████ |
| Bracket Buy Back Off the Shelf (Ex. 95) | ███████ | ███████ | ███████ | ███████ |

A-3

| Program | Relevant terms | Retroactive credits | Align monitored compliance | iTero connection |
|---|---|---|---|---|
| Off Cycle / Private Contracting Pilot (Ex. 96) |  | | | |

**APPENDIX B:**
**DSO Program Terms and Conditions**

| DSO | Relevant terms |
|---|---|
| Smile Doctors<br>(Ex. 71) | █████████████████████████ |
| Orthodontic Management Company<br>(Pearl Ex. 78) | █████████████████████████ |
| My Orthos<br>(Pearl Ex. 79) | █████████████████████████ |
| MB2<br>(Pearl Ex. 69) | █████████████████████████ |
| 42 North Dental<br>(Pearl Ex. 80) | █████████████████████████ |
| Jefferson Dental<br>(Pearl Ex. 81) | █████████████████████████ |
| Apex Dental<br>(Pearl Ex. 82) | █████████████████████████ |
| Mid-Atlantic Dental Partners<br>(Pearl Ex. 83) | █████████████████████████ |

B-1