PAUL HASTINGS LLP
James M. Pearl (SB# 198481)
Emma Farrow (SB# 347126)
jamespearl@paulhastings.com
emmafarrow@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

*Attorneys for Defendant Align Technology, Inc.*

Additional counsel on Signature Page

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, et al., individually and on behalf of others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>　　　　　　Defendant. | CASE NO. 3:21-cv-03269-VC<br><br>**DEFENDANT ALIGN TECHNOLOGY, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY**<br><br>Date:　　　January 25, 2024<br>Time:　　　10:00 a.m.<br>Place:　　　Courtroom 4, 17th Floor<br>Judge:　　　Hon. Vince Chhabria<br><br>**PUBLIC REDACTED VERSION** |

Case No. 3:21-cv-03269-VC

ALIGN'S REPLY ISO MOT. FOR SUMM.
J. & *DAUBERT* MOT. TO PRECLUDE
EXPERT TEST.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I. ALIGN DID NOT UNLAWFULLY REFUSE TO DEAL WITH 3SHAPE ................. 2

    A. There Are Multiple Conceivable Rationales for Terminating Interoperability, Notwithstanding Plaintiffs' Backwards Pretext Argument......... 3

        1. Plaintiffs Misstate the Relevant Inquiry for Refusal-to-Deal Claims. ................................................................................................. 3

        2. There Is No Genuine Dispute of Material Fact that Multiple Conceivable Rationales Existed for Termination ..................................... 6

            i. Align's Termination of Interoperability to Protect the Strength of Its Patent Claims Was the Real, and Conceivable, Rationale. ............................................................... 6

            ii. 3Shape's Failings Were a Conceivable Basis for Termination. ............................................................................... 10

            iii. Align's Increase in Profitability Is a Conceivable Rationale....... 10

    B. Plaintiffs Confirm They Cannot Satisfy the *MetroNet* Elements ....................... 11

        1. Align-3Shape Interoperability Was Not a Course of Dealing. ................ 11

        2. Align Did Not Sell Interoperability at Retail. .......................................... 12

II. THERE IS NO TRIABLE ISSUE OF FACT THAT ALIGN'S DISCOUNT PROGRAMS ARE LAWFUL ............................................................................... 13

III. PLAINTIFF VO LACKS ARTICLE III STANDING ................................................... 15

IV. PLAINTIFFS' EXPERT TESTIMONY SHOULD BE PRECLUDED......................... 15

CONCLUSION................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Shape TRIOS A/S v. Align Tech., Inc.*,
No. 1:18-cv-01332-LPS ............................................................................................9

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..................................................................... *passim*

*Allied Orthopedic Appliances v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ...........................................................2, 13, 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)...........................................................................4, 5, 6

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ..........................................................................3

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
868 F. Supp. 2d 876 (N.D. Cal. 2012) ...........................................................14

*Dreamstime v. Google, LLC*,
54 F.4th 1130 (9th Cir. 2022) ......................................................................14

*Drinkwine v. Federated Publ'ns, Inc.*,
780 F.2d 735 (9th Cir. 1985) ..........................................................................4

*Epicenter Recognition, Inc. v. Jostens, Inc.*
81 F. App'x 910 (9th Cir. 2003) ...................................................................13

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..........................................................14

*FTC v. Qualcomm, Inc.*
411 F. Supp. 3d 658 (N.D. Cal. 2019) ..................................................1, 4, 5, 14

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) ....................................................................... *passim*

*In re Google Play Store Antitrust Litig.*,
No. 21-md-02981-J, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023))....................................15

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .................................................................5, 6

*MetroNet Services Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ..................................................................... *passim*

— ii —

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Neeld v. NHL*,
   594 F.2d 1297 (9th Cir. 1979) ...................................................................................2

*Novell Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...............................................................................11

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) .................................................................................4, 5

*Omega Env'tl, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) .......................................................................2, 13, 15

*Pac. Bell Tel. Co. v. linkLine Comm'ns, Inc.*,
   555 U.S. 438 (2009)..............................................................................................3, 12

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
   396 F. Supp. 3d 851 (N.D. Cal. 2019) .....................................................................9

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................................12

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
   8 F.4th 479 (6th Cir. 2021) .....................................................................................12

*Stein v. Pac. Bell*,
   172 F. App'x 192 (9th Cir. 2006) ...........................................................................12

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)................................................................................................14

*Ticketmaster Corp. v. Tickets.com Inc.*,
   127 F. App'x 346 (9th Cir. 2005) ...........................................................................13

*UFCW Loc. 1776 & Participating Emp's. Health & Welfare Fund v. Teikoku
   Pharma USA*,
   296 F. Supp. 3d 1142 (N.D. Cal. 2017) .................................................................15

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005).....................................................................................6

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2011) ...................................................................................6

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
   914 F.2d 1256 (9th Cir. 1990) ................................................................................10

*Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)........................................................................................1, 6, 12

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

**Page(s)**

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020). ............................................................................................6

*W. Parcel Express v. UPS*,
  190 F.3d 974 (9th Cir. 1999) ...........................................................................................13

**Other Authorities**

Model Jury Instrs. in Civ. Antitrust Cases, Ch. 3 § 2 (Am. Bar Ass'n June
  2016) ...................................................................................................................................5

## TABLE OF ABBREVIATIONS

| ABBREVIATION | REFERENCED DOCUMENT |
|---|---|
| 3Shape | Non-Party 3Shape TRIOS A/S |
| Align | Defendant Align Technology, Inc. |
| DSO | Dental Service Organizations |
| Motion | Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony |
| Opp'n | Plaintiffs' Opposition to Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony |
| Pearl Ex.___ | Exhibit to the Declaration of James M. Pearl in Support of Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony |
| Plaintiffs | Collective reference to the named plaintiffs |
| *Simon* case | *Simon & Simon, PC, et al. v. Align Technology, Inc.*, Case No. 3:20-CV-03754-VC |
| *Simon* MTD Order | Motion to Dismiss Order in *Simon & Simon, PC, et al. v. Align Technology, Inc.*, Case No. 3:20-CV-03754-VC, ECF No. 91 |
| *Simon* Plaintiffs | The plaintiffs in the *Simon* case, S&S and VIP |
| S&S | Simon & Simon, PC d/b/a City Smiles, a plaintiff in the *Simon & Simon* action |
| TOI Model | Dr. Singer's Termination of Interoperability regression model, which he ran separately for aligners and scanners |
| VIP | VIP Dental Spas, a plaintiff in the *Simon & Simon* action |

## INTRODUCTION

The Ninth Circuit's unanimous decision in *FTC v. Qualcomm* reinforces decades of precedent placing the burden squarely on plaintiffs to show as an element of a refusal-to-deal that "the *only conceivable rationale or purpose* for the refusal is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020) ("*Qualcomm*") (citations omitted) (emphasis added). In its opening brief, Align established that Plaintiffs cannot meet their burden because uncontroverted, contemporaneous evidence confirms that Align terminated 3Shape's interoperability with Invisalign to avoid ceding equitable defenses to Align's patent infringement claims, which ███████████████████████ but actually advanced in court. *See* Mot. 12-13. That patent-based rationale dooms Plaintiffs' claim just as in *Qualcomm* itself.

Against this straightforward application of *Qualcomm*, Plaintiffs offer evidence they claim shows Align's rationale to be pretextual and argue that they must therefore reach the jury. But *Qualcomm* renders that course a reversible error. There, the district court found significant evidence of pretext and on that basis rejected the defendant's proffered justification. *FTC v. Qualcomm, Inc.*, 411 F. Supp. 3d 658, 756 (N.D. Cal. 2019) ("*Qualcomm 2019*"). The Ninth Circuit reversed without weighing pretext evidence against the defendant's proffered justification, as Plaintiffs seek here. *Qualcomm*, 969 F.3d at 993-97. Sections II(A) & (B) of the Opposition are irrelevant to the conceivable rationale inquiry for the same reason.

Plaintiffs also ask the Court to ignore other binding refusal-to-deal precedent. In *MetroNet Services Corp. v. Qwest Corp.*, the Ninth Circuit heeded the Supreme Court's narrowing of refusal-to-deal claims. 383 F.3d 1124 (9th Cir. 2004) (applying *Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)). *MetroNet* requires that the refusal to deal involve the refused sale of a product that was sold at retail. 383 F.3d at 1132. But it is undisputed that Align never sold interoperability, let alone at retail. This, too, dooms Plaintiffs' refusal-to-deal theory.

Plaintiffs' approach to other allegedly exclusionary conduct is equally dismissive of binding authority. Plaintiffs assert that they need not analyze the ease of exiting sales contracts or

ALIGN'S REPLY ISO MOT. FOR SUMM. J. & *DAUBERT* MOT. TO PRECLUDE EXPERT TEST.

their duration, as *Allied* and *Omega* prescribe, because they bring a monopolization claim.[1] Opp'n 32. That is demonstrably wrong; *Allied* and *Omega* contain binding dictates for analyzing whether short-term discounting violates antitrust law that the Ninth Circuit has subsequently applied to monopolization claims. The presumptions in those cases must be engaged, lest the law penalize conduct that is long-recognized as enhancing competition and delivering lower prices to consumers. Plaintiffs also argue that the Court should disregard tests from Ninth Circuit law when, as here, a plaintiff argues the combined effect of conduct and disclaims certain standalone theories. Opp'n 32-33. No court in the Ninth Circuit (or, to Align's knowledge, in any other jurisdiction) has approved this sweeping expansion of the antitrust laws. Plaintiffs' rule would penalize lawful conduct, including volume discounts, and subvert the fundamental premise of the antitrust laws—"to maintain and promote competition." *Neeld v. NHL*, 594 F.2d 1297, 1298 (9th Cir. 1979).

## ARGUMENT

## I.   ALIGN DID NOT UNLAWFULLY REFUSE TO DEAL WITH 3SHAPE

In its opening brief, Align established that it did not unlawfully refuse to deal with 3Shape first and foremost because multiple "conceivable rationales" (*Qualcomm*, 969 F.3d at 993–94) existed for the termination of interoperability: (1) as 3Shape itself both admitted and litigated in the ITC, the protection of Align's patent enforcement, (2) 3Shape's failure to live up to its commitments, and (3) profit maximization. In addition, Align established that Plaintiffs' claim fails under the *MetroNet* test requiring that interoperability be part of a "voluntary and profitable course of dealing" and "sold at retail." 383 F.3d at 1132. Unable to show a disputed issue of fact for these dispositive arguments, Plaintiffs' Opposition misstates the relevant legal test and ignores the three most recent refusal-to-deal cases from the Ninth Circuit. As predicted, Plaintiffs argue about pretext, and they offer impermissible expert testimony that usurps the province of the jury. Throughout their Opposition, Plaintiffs offer a curated, but non-persuasive, set of internal company musings to distract from the weakness of their arguments.

---

[1] *Allied Orthopedic Appliances v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010); *Omega Env'tl, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997).

**A.    There Are Multiple Conceivable Rationales for Terminating Interoperability, Notwithstanding Plaintiffs' Backwards Pretext Argument.**

As the Court held at the motion-to-dismiss stage in the related *Simon* case, there is no liability when there is a "conceivable rationale" other than excluding competition. *See* Order Denying *Simon & Simon* Motion to Dismiss, ECF No. 91 ("*Simon* MTD Order") at 11. Plaintiffs' primary argument, that the jury must decide about the reason for a refusal to deal if there is "some evidence in the record that could support a finding that a defendant's proffered reasons for its refusal to deal were invalid," Opp'n 10, is exactly backwards and does not create a genuine issue of material fact as to whether Align's demonstrated rationales were "conceivable."

**1.    Plaintiffs Misstate the Relevant Inquiry for Refusal-to-Deal Claims.**

Conduct alleged in monopolization claims is analyzed under the rule of reason, with specific tests for specific conduct. *See, e.g., Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 904 (9th Cir. 2008) (bundling); *Qualcomm*, 969 F.3d 993-94 (refusal to deal). This avoids chilling behavior that enhances competition. *See, e.g., Pac. Bell Tel. Co. v. linkLine Comm'ns, Inc.*, 555 U.S. 438, 451 (2009).  Under the rule of reason, there is a burden-shifting framework, under which "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Qualcomm*, 969 F.3d at 991 (citation omitted). "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id*. Finally, "[i]f the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

When a plaintiff brings a refusal-to-deal claim, the Ninth Circuit has prescribed a specific test for *the first stage* of the burden-shifting framework:

> [A] company engages in prohibited, anticompetitive conduct when (1) it "unilateral[ly] terminat[es] . . . a voluntary and profitable course of dealing,"; (2) "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition,'"; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers.

*Qualcomm*, 969 F.3d at 993–94 (internal citations omitted). This test is clear: if there is a "conceivable rationale" at the first stage other than harming competition, there is no exclusionary

conduct. If there is no exclusionary conduct, there is no reason to proceed to steps 2 and 3 of the burden-shifting framework where pretext would be considered.

*Qualcomm* is instructive. The district court had analyzed whether Qualcomm's rationale for a purported refusal to deal—that patent law motivated its strategy to monetize its intellectual property—was pretextual. *Qualcomm 2019*, 411 F. Supp. 3d at 751-58. It placed that within the *MetroNet* test and concluded that Qualcomm was motivated by a "willingness to sacrifice short-term benefits" so as to "obtain higher profits in the long run from the exclusion of competition" in light of evidence of "anticompetitive malice." *Id.* at 760-62 (citations and internal quotation marks omitted). On appeal, the Ninth Circuit decisively rejected this approach, holding that the second element of *MetroNet*—a willingness "to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition"—was not satisfied because Qualcomm "responded to the change in patent-exhaustion law by choosing the path that was 'far more lucrative.'" *Qualcomm*, 969 F.3d at 994 (quoting *Qualcomm 2019*, 411 F. Supp. 3d at 753). Nowhere did the Ninth Circuit analyze whether this rationale was pretextual, *see id.*, despite dozens of pages of factual findings by the district court. *See Qualcomm 2019*, 411 F. Supp. 3d at 698-756. *Qualcomm* confirms that the "conceivable rationale" inquiry at stage one and the "prextext" inquiry at stage two after the burden has shifted are not the same.[2]

This framework is well-ingrained in the Ninth Circuit. For example, in *Drinkwine v. Federated Publ'ns, Inc.*, 780 F.2d 735, 740 (9th Cir. 1985), the court did not assess the defendant's exact intent because that is not required under *Aspen Skiing* where justifications other than anticompetitive harm can explain a defendant's behavior. *See id.* at 739 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (holding that in a refusal-to-deal case, "[i]ntent must . . . exist but is subsumed in an analysis of the exclusionary conduct"). Likewise, in *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 371 (9th Cir. 1988), the court did not inquire

---

[2] Plaintiffs assert that "the Ninth Circuit still tested the validity of the business reasons behind Qualcomm's conduct," Opp'n 10 n.29, and that it relied on "undisputed factual findings regarding Qualcomm's actual rationale, and made clear it could have been rebutted with contrary facts." Opp'n 11. This ignores a comparison between the district court and Ninth Circuit decisions. *See supra.* The district court even observed a strategy to destroy a particular rival's margins to limit its investment in later-generation products. *See Qualcomm 2019*, 411 F. Supp. 3d at 745.

ALIGN'S REPLY ISO MOT. FOR SUMM.
J. & *DAUBERT* MOT. TO PRECLUDE
EXPERT TEST.

into the defendant's true intent, explaining that "[t]he economic rationale [for refusing to deal], *even if not the only rationale for the decision*, excluded competition necessarily" and thus precluded liability. *Id*. (emphasis added).

This framework makes sense of the blackletter principle, reflected in *Oahu* and the ABA model jury instructions, that "[a] refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors." MODEL JURY INSTRS. IN CIV. ANTITRUST CASES, Ch. 3 § 2 (AM. BAR ASS'N JUNE 2016), ABA-JI-CIVANTI 3.B.2. Put differently, if there is a mixed motive, there is no exclusionary conduct, even if one of the motives is to harm competitors. If courts need to sort out which of multiple motives was pretextual and which was not, this law would not make sense.

Despite all of this, Plaintiffs argue that *Aspen Skiing* requires denial of summary judgment. Not so. *Aspen Skiing* was a post-verdict decision in which the Supreme Court observed the defendant's "***failure to offer any efficiency justification*** whatever." 472 U.S. at 608 (emphasis added). The decision is silent about a pretext argument. *See id.* That is in stark contrast to *Qualcomm 2019*, where the district court rejected the defendant's "self-serving and pretextual justifications for [its] refusal to license modem chip suppliers," 411 F. Supp. 3d at 756, only to be overturned by a unanimous Ninth Circuit. *Qualcomm*, 969 F.3d at 993-95.[3]

Plaintiffs also argue that the decision in *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997), shows that this case must reach trial. Wrong again. As the Ninth Circuit explained, after upholding the jury verdict on exclusionary conduct, "[o]ur conclusion that the [plaintiffs] ***have shown that*** [the defendant] has both attained monopoly power and ***exercised exclusionary conduct*** does not end the inquiry" because "[the defendant's] conduct may not be actionable if supported by a legitimate business justification" and "[a] plaintiff may rebut an asserted business justification by demonstrating . . . [it] is pretextual." *Id.* (emphasis added).[4] That

---

[3] Importantly, Plaintiffs are arguing that conduct in the *scanner* market is somehow implicated in the *aligner* market. This cannot be. *See Qualcomm*, 969 F.3d at 993 ("harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law").

[4] Plaintiffs misread the *Simon* Order as having ruled out weighing objectively conceivable justifications. Opp'n 11. The Court stated that it would not require Plaintiffs to rebut alternative

is, in *Kodak*, unlike here, the plaintiff already shifted the burden to the defendant by showing no conceivable rationale for the refusal. *Aerotec* is instructive. There, the Ninth Circuit held that even actual "intent to foreclose competition," let alone evidence of pretext, was "not sufficient alone to establish liability." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

Plaintiffs' three remaining arguments are likewise unavailing. First, even though Align need only show an objectively conceivable rationale, which it did, Align's summary judgment motion is not based on "hypothetical" reasons for its termination, Opp'n 11, but an actual reason supported by contemporaneous evidence (including detailed public statements), Mot. 11-15. Second, Plaintiffs protest that Align's reading of refusal-to-deal law bars a claim from ever reaching a jury. Opp'n 11. But under Plaintiffs' theory every case gets to the jury as long as plaintiffs show "some evidence" (Opp'n 10) that a defendant wanted to win business from a rival. That is not consistent with the fact that "*Aspen Skiing* is at or near the outer boundary of § 2 liability" and that companies are allowed to want to succeed. 540 U.S. at 399. Plaintiffs also argue that Align suggests its subjective thinking is irrelevant to the Court's inquiry. Opp'n 11. That is not true: Align established that its rationale is relevant to *Qualcomm's* "conceivable rationale" test. Mot. 11; *infra* § B(1). Plaintiffs are incorrect on the law, and do not meet their burden.[5]

### 2.    There Is No Genuine Dispute of Material Fact that Multiple Conceivable Rationales Existed for Termination

In its Motion, Align established that there were at least three objectively conceivable rationales supporting termination. *See* Mot. 11-16. Plaintiffs' Opposition fails to rebut any of them.

#### i.    Align's Termination of Interoperability to Protect the Strength of Its Patent Claims Was the Real, and Conceivable, Rationale.

Align demonstrated that it was not only conceivable, but also true, that it terminated U.S.

---

conceivable rationales ***at the pleading stage***, but specifically held that the issue "often" can be decided at summary judgment. *Simon* Order at 13-14. Likewise, in *Viamedia, Inc. v. Comcast Corp.*, the Seventh Circuit merely resolved the pleadings-stage measure of a refusal to deal in cases with near parity to *Aspen Skiing*. 951 F.3d 429 (7th Cir. 2020).

[5] Plaintiffs' assertion that the Supreme Court has "held that weighing whether a reason is valid or 'conceivable' implicates evidence of pretext," Opp'n 10, is not supported. Plaintiffs' citations to *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2011) and *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005), a pair of ***exclusive dealing*** cases, are irrelevant to the issue of Plaintiffs' burden to show no conceivable justification in a refusal-to-deal claim. Opp'n 11-12.

interoperability to protect its patent claims against equitable defenses. *See* Mot. 12-14.[6] Plaintiffs do not create a genuine issue of material fact about the conceivability of this rationale.

*First*, Plaintiffs' argument that Align disavowed subjective evidence is wrong. Opp'n 13. In its Opposition to the *Simon* Plaintiffs' Motion to Preclude, ECF No. 191, Align laid out the applicable test for a refusal-to-deal claim and the evidence relevant to each step.[7] Align explicitly argued that subjective evidence is relevant, but made clear it did not intend to rely on the subjective advice of its counsel.[8] Plaintiffs obfuscate the difference between the analysis—which is objective—and the evidence that may be considered—which may be objective or subjective. Here, the question is whether it was objectively conceivable for Align to fear a waiver defense by 3Shape in the patent litigation (it was), and the Court may consider both objective and subjective evidence. Align produced copious, non-privileged evidence of its subjective belief that termination protected its patent claims.[9] Align did not refuse to produce subjective evidence, it only refused to waive privilege. Indeed, Plaintiffs rely heavily on subjective evidence in their Opposition.[10] The evidence establishes that it is conceivable that an entity in Align's position would terminate its interoperability with 3Shape to avoid conceding equitable defenses to its patent claims.[11] It is also strongly corroborated by *3Shape having litigated that position*—that Align delaying terminating by months precluded Align patent suits against 3Shape.[12] Plaintiffs' supposition as to a different meaning for 3Shape's ███████████████████████████████ is hollow. Opp'n 14.[13]

---

[6] Notably, Plaintiffs have not alleged or argued that Align's patent claims were a sham.

[7] *See Simon* case, Def.'s Opp'n to Pls.' Mot. to Preclude, ECF No. 215-1.

[8] *Id.* at 6 (explaining that evidence "can be objective, such as legal doctrines and economic analysis . . . [and it] also can take subjective forms, such as witness testimony or documentary evidence").

[9] *See, e.g.*, Berman Ex. 34 (discussing "███████████████████████████████████████████████████████████████████████████); Pearl Ex. 6, at 164:1-166:19; 169:14-170:24, 276:1-16; Pearl Ex. 38, Pearl Ex. 39; Pearl Ex. 40; Pearl Ex. 41, Pearl Ex. 42.

[10] *See, e.g.*, Berman Ex. 34.

[11] It would also be relevant intent evidence at a later stage of the refusal-to-deal inquiry if Plaintiffs can somehow prove that Align's termination rationales were not conceivable (though they cannot).

[12] *See* Pearl Ex. 3 at 70 ("Align has also waived its right to pursue its infringement claims . . . Align consented to and continues to consent to Trios scans").

[13] *See* Pearl Ex. 1 (████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ )").

Plaintiffs also try to re-write the privilege dispute, where Plaintiffs tried to force Align to produce privileged information regarding the subjective legal advice it received about termination. *See* Mot. to Preclude, *Simon* ECF No. 191. The Court rejected that, and found it "unlikely" that Plaintiffs' refusal-to-deal claim "cannot be adjudicated without reference to privileged materials." Order denying Mot. to Preclude, *Simon* ECF No. 227. The Court said nothing about subjective evidence because it was not at issue. The Court said privileged evidence would not be necessary. Align does not rely on privileged evidence but its public, non-privileged statements at the time.

*Second*, there is no merit to Plaintiffs' argument that Align cited no authority for the proposition that terminating was necessary to avoid conceding equitable defenses to its patent claims, Opp'n 15-16, or that Align "abandoned any attempt" to demonstrate that patent law gave it a "reasonable basis" for terminating. Opp'n 16. Align cited and attached the expert report of Robert Stoll, a former Commissioner of the U.S. Patent & Trade Office, who testified about the equitable defenses that are well-recognized in patent law.[14] The Stoll Report paragraphs cited in the Motion (pp. 13–14) discuss the equitable defenses of estoppel (Pearl Ex. 55 ¶ 58), implied license/waiver (*id.* ¶ 63), and unclean hands (*id.* ¶ 66). Also, Align repeatedly cited 3Shape's briefing to the ITC in which it argued that Align conceded equitable defenses by not terminating interoperability sooner. *E.g.*, Mot. 1 n.2, 7 n.35, 8 n.41, 13 & nn.60-63, 18 n.85. It follows from 3Shape's arguments that terminating was necessary to avoid conceding such defenses.[15]

*Third*, Plaintiffs' argument that external 3Shape communications show Align did not need to terminate interoperability to pursue its ITC claims is not credible. Opp'n 14-15. 3Shape crafted its public statements to say that no "statute or rule at the ITC . . . requires" Align to terminate.[16] But the issue is one of equitable defenses, not statutes or rules.

*Fourth*, Plaintiffs misstate what Align must show to demonstrate the conceivability of its proffered rationale. *See* Opp'n 13-14. Align need not establish that terminating weakened 3Shape's

---

[14] Mot. 13-14 and n.64.
[15] 3Shape's argument that it relied upon Align's approval to "expend resources" would likewise have grown stronger over time absent termination as 3Shape spent additional resources. *Id.* at 71.
[16] Opp'n 15 n.48 (citing Berman Ex. 57).

defenses, just that not terminating could have facilitated them, as 3Shape argued.[17] Plaintiffs' citation to Wagner urging that Align did not need to terminate interoperability to protect its patent rights, Opp'n 15-16, is of no moment. An expert's mere assertion does not create a genuine issue of material fact. *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 886 (N.D. Cal. 2019). There is no dispute that 3Shape argued Align waived its patent claims when winding down interoperability extended beyond filing the suits.[18] Uncontroverted evidence shows this is the defense Align feared and that 3Shape asserted it.[19] Further still, ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.[20] Wagner's supposition that Align could have done a *better* job preserving its patent rights[21] six years later does not negate guarding against the defenses 3Shape asserted. 3Shape validated and vindicated Align's rationale.[22]

*Fifth*, Plaintiffs fail in their attempt to bolster their self-serving expert testimony with record quotes to argue that Align intended to harm 3Shape by bringing the patent cases. *See* Opp'n 6-7. Nothing they cite undermines the conceivability of Align terminating to avoid conceding equitable defenses in the patent cases and instead are the type of statements about winning business that the Ninth Circuit accepts.[23] *See, e.g., Qualcomm*, 969 F.3d at 994-95; *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1259 (9th Cir. 1990) (wanting to "wound" competitor insufficient). "Competitors are not required to engage in a lovefest; indeed, even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Aerotec*, 836 F.3d 1171 (citation omitted).

---

[17] Pearl Ex. 3 at 70-71. As shown above, it would suffice for this to be one among multiple rationales for termination, *see supra* at 5, but this was the actual reason as well. *See* Mot. 12-13.

[18] Pearl Ex. 3 at 70 (3Shape arguing to the ITC that Align "waived its right to pursue its infringement claims" based on interoperability); Pearl Ex. 43 at 168-69.

[19] *Id.*; *see supra* n.9.

[20] Mot. 7-8 (citing Pearl Ex. 1).

[21] *See* Pearl Ex. 76, ¶¶ 54-56. 3Shape argued patent misuse and was rejected. *See 3Shape TRIOS A/S v. Align Tech., Inc.*, No. 1:18-cv-01332-LPS at ECF No. 59 (D. Del. Aug. 15, 2019), adopted at ECF No. 62 (D. Del. Sept. 26, 2019). .

[22] *See* Mot. 12-13.

[23] Such evidence might be relevant at the pretext stage (though it would still fail).

*Finally, sixth*, Plaintiffs' unfounded construction of 3Shape's internal documents fails. *See* Opp'n 14. 3Shape's assertion of equitable defenses to the ITC[24] ███████████████████,[25] which destroys Plaintiffs' up-is-down argument. The particular 3Shape ████████████ █████████████████████████████████████████████████.[26]

### ii. 3Shape's Failings Were a Conceivable Basis for Termination.

It was also conceivable, as shown in contemporaneous documents, for Align to have terminated interoperability due to 3Shape shirking its contractual commitment to provide interoperability between Align's scanner and 3Shape's restorative software.[27] Plaintiffs argue that Align cannot advance this rationale because Align argued the actual reason was patent concerns. Opp'n 18. But the inquiry is whether a rationale is conceivable, *see supra* at 3-4, and there can be multiple conceivable rationales. *See Qualcomm*, 969 F.3d at 994 (avoiding patent exhaustion and using a practice that was more lucrative in the short and long term). Plaintiffs alternatively argue they identified documents suggesting Align and 3Shape, at one time, were making progress on reverse interoperability. Opp'n 18. But that has no bearing on whether it was conceivable; the evidence shows that at a critical time, there was insufficient progress.[28]

### iii. Align's Increase in Profitability Is a Conceivable Rationale.

Plaintiffs do not rebut that termination was profitable for Align. Opp'n 19-20. Plaintiffs argue that ████████████████████████████████████████████████████████, Opp'n 19, but their parsing inappropriately omits sales of Align's iTero scanner.[29] *See Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1077 (10th Cir. 2013) ("Parsing profits from different product lines would defeat this project, holding firms liable for making moves that enhance their overall

---

[24] *See* Pearl Ex. 3 at 70; Pearl Ex. 43 at 178, 182; Pearl Ex. 55 ¶¶ 55-67.

[25] *See* Pearl Ex. 3, 3Shape Initial Post-Hr'g Br. at 70, No. 337-TA-1091 (Oct. 5, 2018) (excerpts); *see also* Pearl Ex. 2, at 57:3-59:12, Dep. Ex. 875.

[26] Pearl Ex. 1; *see also* Pearl Ex. 2, Dep. Trans. of John Cusack, as Rule 30(b)(6) designee for 3Shape, Mar. 16, 2023, at 59:18-61:4, Dep. Ex. 876.

[27] *See* Pearl Exs. 50-52; Pearl Ex. 47, at 223:13-226:25, Dep. Ex. 425; Pearl Ex. 48, at 186:4-192:2; Pearl Ex. 44 at § 1.9; Pearl Ex. 45; Reich Ex. 1 at 41:11-45:14 (admitting that 3Shape believed █████████████████████████████████████████).

[28] *See* Pearl Exs. 50-52; Pearl Ex. 47, at 223:13-226:25, Dep. Ex. 425; Pearl Ex. 48, at 186:4-192:2.

[29] *See* Pearl Ex. 11 ¶ 127.

efficiency, if at the expense of a particular business line."). Plaintiffs' expert recognized that " ██

██████████████████████████████████████████████████ "[30] That is,

███████████████████████████████████████████████████████

█████████ ."[31] Plaintiffs want it both ways: to recognize that Align's scanner and Invisalign

are complementary, Opp'n 1, but claim that termination made no economic sense, Opp'n 19-20,

which ignores the benefit to Align *scanners* from termination. Indeed, Plaintiffs' expert cited

██████████████████████████████████████ .[32] Plaintiffs' tale that Align

██████████ million in profits, Opp'n 20, is incredible. It assumes that initial growth during the

year of interoperability remains constant and either (i) carries forward beyond the end date Align

and 3Shape contemplated; or (ii) surged higher in unprecedented fashion despite a 'key attribute'

of the TRIOS advanced by Plaintiffs being its delivery of cases to aligner rivals. Opp'n 1, 3. As in

*Qualcomm*, Align did not sacrifice (and indeed maximized) short-term and long-term profits.[33]

**B.   Plaintiffs Confirm They Cannot Satisfy the *MetroNet* Elements**

**1.   Align-3Shape Interoperability Was Not a Course of Dealing.**

As Align established, there was no course of dealing between it and 3Shape cognizable

under *MetroNet*. Mot. 16-17. There was only one contract between Align and 3Shape related to

interoperability, and it did not contemplate any further interaction between Align and 3Shape after

interoperability commenced, apart from 3Shape's own interoperability commitment that it never

fulfilled.[34] This is not a "course of dealing" but a one-off arrangement for the benefit of 3Shape

and Align's joint customers. The fact that the Scanner Agreement █████████████

███████████████████████████████████████████████████████

██████ .[35] *See St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 487 (6th Cir.

2021) (concerning exercise of a "pre-approved exit ramp" in a contract).

---

[30] Pearl Ex. 63 ¶ 626.
[31] Pearl Ex. 63 ¶ 626.
[32] *See* Ex. 63, Fig. 35. Align's expert agrees. *See* Ex. 11, Fig. 19.
[33] Pearl Ex. 11 ¶¶ 120–26, Figs. 16-20; Lambert Ex. 52 at 148:1-23 ("iTero benefitted" from terminating interoperability: "We were able to sell more iTeros.").
[34] Pearl Ex. 44 at § 1.9; *see supra* n.29.
[35] This is on top of the evidence in the Motion that there was no course of dealing. Mot. 16.

### 2.    Align Did Not Sell Interoperability at Retail.

Invisalign interoperability is unquestionably not a retail product (or service), and Align never refused to sell interoperability at a retail price. Plaintiffs argue that *MetroNet*'s elements are suggestions rather than requirements, Opp'n 20, but are wrong. After *Trinko* vacated a Ninth Circuit decision, the Ninth Circuit parsed what remained of the refusal-to-deal theory. *MetroNet*, 383 F.3d at 1126. Analyzing *Trinko*, the Ninth Circuit relayed in *MetroNet* that, because Verizon's interconnection services were not a retail product, the plaintiffs did not have a valid refusal-to-deal claim. *See id.*, 383 F.3d at 1132-33; *see also Trinko*, 540 U.S. at 402. This case is directly akin to *Trinko*. At most, Align refused to provide a connectivity service to 3Shape. Interoperability is not a product sold at retail and is not subject to a Section 2 claim under *Trinko*, and *MetroNet*.

Plaintiffs baselessly argue that Align rejected sales of Invisalign ***to dentists*** who sought to submit using a 3Shape scanner, and dentists operate at retail. Opp'n 21. Their sole support is a non-binding out-of-circuit decision that did not analyze *MetroNet*. The law of the Ninth Circuit requires a refusal to deal to be a refusal *of a rival*, and held there is no liability unless a defendant refused sale of a product *to a rival* that it previously sold in a retail market. *See MetroNet*, 383 F.3d at 1132; *Stein v. Pac. Bell*, 172 F. App'x 192, 194 (9th Cir. 2006); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (dismissal).[36] Dentists are not rivals.

The absence of retail sales confirms the lack of a judicially feasible remedy. Ninth Circuit law precludes the Court from ordering the reinstitution of interoperability. Mot. 17. Any suggestion that interoperability is administratively feasible is contrary to *Aerotec*. 836 F.3d at 1184 ("[C]ourts are 'ill suited'" to "artificially create" "market conditions" preceding the alleged refusal to deal. (quoting *Trinko*, 540 U.S. at 408)). The Court is ill-suited to manage U.S. interoperability for 3Shape's oldest model scanners that have not been interoperable in the U.S. for over six years.[37]

---

[36] The sold at retail liability element relates to the *Trinko* concern about the administrability of a remedy. *See* 383 F.3d at 1133. Thus, Plaintiffs are wrong to argue that administrability should not factor in at this stage. *See* Opp'n 20 n. 68. It has been a central concern that precludes refusal-to-deal liability. *Trinko*, 540 U.S. at 407-08, 414-15; *linkLine*, 555 U.S. at 452-53.

[37] Plaintiffs' theory makes no sense. There is no evidence that competition would have increased in the aligner market if interoperability continued. 3Shape admitted that it stopped pursuing other aligner relationships during interoperability. *See* Pearl Ex. 3 at 71.

## II.    THERE IS NO TRIABLE ISSUE OF FACT THAT ALIGN'S DISCOUNT PROGRAMS ARE LAWFUL

There is no triable issue of fact to advance Plaintiffs' monopoly broth theory to trial. When Plaintiffs' refusal-to-deal theory cannot stand as an independent claim, it cannot be aggregated in a broth, Mot. 30-31, a point to which Plaintiffs, tellingly, offer no response. Plaintiffs have also conceded that the alleged exclusive contracts and programs they are trying to incorporate into a broth theory cannot stand alone without a refusal-to-deal theory. *See* Opp'n 24 ("nor are [Plaintiffs] claiming that the contracts would be independently actionable").[38]

Align demonstrated that the challenged discount programs enhanced competition and were not exclusive. Mot. 20-25. Nearly all contracts Plaintiffs challenge were short-term and exited at will by dentists. Mot. 22-23.[39] Plaintiffs do not dispute this, but argue the significance. Opp'n 24, n.80. *W. Parcel Express v. UPS* shows why that fails. 190 F.3d 974, 976 (9th Cir. 1999). There, the allegedly exclusive contracts were not actionable because, as here, they "did not foreclose consumers from entering into contracts with [rivals]." *Id.* Plaintiffs have not shown, and cannot show, evidence of foreclosure of rivals. Plaintiffs completely ignored corporate practice of medicine laws, Mot. 24, and instead assumed DSO exclusivity. *See* Opp'n. But Plaintiffs' expert did not examine any dentist purchase data to verify whether they bought exclusively from Align.[40]

Plaintiffs' curated documents purportedly show Align 

---

[38] Plaintiffs do not argue a standalone bundling theory. *See* Opp'n Plaintiffs pivot between arguing exclusive dealing and *de facto* exclusive dealing. *See* Opp'n 8, 23-34 (exclusive), 8-9, 22 n.74 (*de facto*). The Ninth Circuit has not accepted a *de facto* exclusive dealing theory or its contours, but at a minimum, there would have to be "long-term agreements…as effective as mandatory purchase requirements," *see Aerotec*, 836 F.3d at 1182, which Plaintiffs have not shown.

[39] Plaintiffs argue that the short duration of Align contracts is irrelevant because *Omega* and *Allied* were Section 1 restraint of trade cases. Opp'n 24. That is wrong. The Ninth Circuit has cited *Omega* in various monopolization cases. *See, e.g., W. Parcel Express*, 190 F.3d at 976; *Epicenter Recognition, Inc. v. Jostens, Inc.*81 F. App'x 910, 911 (9th Cir. 2003). *See also Ticketmaster Corp. v. Tickets.com Inc.*, 127 F. App'x 346, 348 (9th Cir. 2005) (monopolization/restraint of trade); *Qualcomm*, 969 F.3d at 1003 (monopolization/restraint of trade). Plaintiffs provide no support for their view that short-term contracts would be uniquely anticompetitive in a monopolization claim.

[40] Pearl Ex. 61 at 16:1-24. Plaintiffs misunderstand Align's argument, asserting it applied the test of predatory pricing. Opp'n 28. Rather, Align demonstrated the absence of "practical effect" of harming competition. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-28 (1961).

---

████████████, but do not suffice to avoid summary judgment.[41] Internal evidence was present in the exclusive dealing portion of *Qualcomm 2019*, *see* 411 F. Supp. 3d at 725, but the Ninth Circuit rejected it, too. 969 F.3d at 1004 ("we do not agree that these agreements had the actual or practical effect of substantially foreclosing competition"). Plaintiffs cannot show a genuine issue of material fact that the contracts they challenge were actually exclusive. *See Simon* Order 15.[42]

The implication of Plaintiffs' broth theory, that at-will discounts somehow become exclusionary alongside termination is nonsensical. They are still just discounts that can be rejected for a competing offer. *See Allied*, 592 F.3d at 1002.[43] Plaintiffs also do not dispute that significant market entry occurred contemporaneously. *See* Mot. 30. That renders hollow their claim that Align ████████████████████████████ Opp'n 32, especially because Plaintiffs' expert did not analyze any rivals to compare.[44] *See Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 897 (N.D. Cal. 2012) (*partially vacated on other grounds*) (finding plaintiff failed to raise a triable issue of fact as to defendant's market power where it did not offer evidence of rivals' profit margins). Plaintiffs' evidence is similarly flawed as to STL export—the feature by which dentists can use Align iTero scanners to order competing aligners. *See* Mot. 27. Align demonstrated that STL export severs any notion of "synergistic effect" between termination of interoperability and Align discount programs. *See* Mot. 27-28, 31. ████████████████

████████████████████████████████████

████████████.[45] Plaintiffs show no genuine issue of material fact about synergistic effect.

---

[41] Opp'n 9 n.25, 24 and n.83, 25, 28.

[42] Plaintiffs' foreclosure analysis is infected by the same issue, rendering their calculation of foreclosure overstated. *See* Opp'n 2, 31. Additionally, Plaintiffs' expert used survey results to calculate foreclosure, *see* Berman Ex. 82, Vogt Fig. 16, not "all sales" as claimed. Opp'n 31.

[43] Plaintiffs argue for treating their conduct broth "holistically." Opp'n 24 and n.82. *Free FreeHand Corp. v. Adobe Sys. Inc.*, a pleadings-stage case, did not rule out first applying exclusive dealing precedents before deciding if the contracts could be grouped with other conduct. *See* 852 F. Supp. 2d 1171 (N.D. Cal. 2012). A similar argument by plaintiffs was recently rejected. *See Dreamstime v. Google, LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022).

[44] Pearl Ex. 61, at 29:16-33:14. Plaintiffs' claim that █████████████████████████████████
████████████████████████████. Opp'n 26 (citing Berman Ex. 76); Pearl Ex. 61, at 29:16-33:14.

[45] Berman Ex. 82. A single rival's growth to 6%-8% alongside increasing industry output has

Case No. 3:21-cv-03269-VC                                  - 14 -

ALIGN'S REPLY ISO MOT. FOR SUMM.
J. & *DAUBERT* MOT. TO PRECLUDE
EXPERT TEST.

## III.    PLAINTIFF VO LACKS ARTICLE III STANDING

Vo lacks standing for the injunctive relief claim. Mot. 32. Plaintiffs argue that class certification resolves this. Opp'n 35. Not so. The administrability concerns Align raises preclude an order restoring interoperability. Mot. 17. The refusal-to-deal theory was not argued at the class stage.[46] *Cf. In re Google Play Store Antitrust Litig.*, No. 21-md-02981-J, 2023 WL 5532128, at *2 (N.D. Cal. Aug. 28, 2023) (developments post-class led court to consider *Daubert* motion anew).

## IV.    PLAINTIFFS' EXPERT TESTIMONY SHOULD BE PRECLUDED

Professor Wagner seeks to play the role of factfinder and expert. Mot. 33-34. Plaintiffs' half-hearted attempt to marshal authority, Opp'n34, is unavailing. Wagner seeks to offer an opinion tracking **nearly verbatim** Plaintiffs' assertion of what they must show and usurp the trier of fact on the ultimate issue in the case.[47]

Dr. Vogt conceded that he examined no dentist data to inform his assessment of exclusivity, cost data of rivals, or any evidence of rivals' ability to compete. Mot. 35. Plaintiffs ignore Align's precedents.[48] More fundamentally, Dr. Vogt neglected to evaluate duration and terminability, which Ninth Circuit precedents require.[49]

## CONCLUSION

The Court should grant Align's Motion and enter judgment for Align on Plaintiffs' claims. The Court should further grant Align's *Daubert* Motion to the extent judgment is not entered on Plaintiffs' claims in their entirety.

DATED: January 11, 2024                    PAUL HASTINGS LLP

By: */s/ James M. Pearl*
                                                          James M. Pearl

---

"preclude[d] a finding that exclusive dealing is an entry barrier of any significance." 127 F. 3d at 1164. In addition to Envista, other rivals entered and grew. *See* Mot. 30. *See also* Pearl Ex. 73.

[46] *See* ECF No. 482. Nor was it asked to do so. ECF No. 425-3 at 2 n.3.

[47] Compare Opp'n 16 ("that 'blackletter' patent law gave it a reasonable basis for TOI") with Pearl Ex. 84 at 101:3-6 ("[T]he patent law did not provide Align a reasonable basis for terminating interoperability in order to protect its patents").

[48] Mot. 35 n.154.

[49] Mot. at 21-23; *See also UFCW Loc. 1776 & Participating Emp's. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) ("[E]xclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process.")

ALIGN'S REPLY ISO MOT. FOR SUMM. J. & *DAUBERT* MOT. TO PRECLUDE EXPERT TEST.

James M. Pearl (SB# 198481)
Emma Farrow (SB# 347126)
jamespearl@paulhastings.com
emmafarrow@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

Thomas A. Counts (SB# 148051)
tomcounts@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone: 1(415) 856-7000
Facsimile: 1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone: 1(312) 499-6000
Facsimile: 1(312) 499-6100

Michael F. Murray (*pro hac vice*)
michaelmurray@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone: 1(202) 551-1700
Facsimile: 1(202) 551-1705

Noah B. Pinegar (*pro hac vice*)
noahpinegar@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 319-4090

Attorneys for Defendant
Align Technology, Inc.