Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>                                    Defendant. | No. 3:21-cv-03269-VC (TSH)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND OPPOSITION TO *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY**<br><br>**[PUBLIC REDACTED VERSION]**<br><br><br>Hearing Date: May 30, 2024<br>Hearing Time: 10:00 a.m.<br>Judge: Hon. Vince Chhabria<br>Location: Courtroom 5 – 17th Floor |

**TABLE OF CONTENTS**

<u>**Page**</u>

GLOSSARY OF DEFINED TERMS ............................................................................................ v

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     ARGUMENT ................................................................................................................ 2

        A.      Dr. Vogt's regression analysis is reliable. ...................................................... 2

        B.      Dr. Vogt's yardstick analysis is reliable. ...................................................... 10

        C.      SDC could have charged lower prices. ........................................................... 12

        D.      All class members were injured. ..................................................................... 13

        E.      Align's arbitration-related arguments are untimely and lack merit. ........... 15

        F.      Plaintiffs' class period is not overbroad. ...................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abdurahman v. Prospect CCMC LLC*,
   42 F. 4th 156 (3d Cir. 2022) ............................................................................................18

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .....................................................................13

*In re Apple iPhone Antitrust Litig.*,
   2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ....................................................................13

*Bruno v. Bozzuto's, Inc.*,
   311 F.R.D. 124 (M.D. Pa. 2015) ........................................................................................11

*Chen-Oster v. Goldman, Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y. 2015) ..................................................................................6

*In re: College Athlete NIL Litig.*,
   2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) .....................................................................14

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 477 (N.D. Ill. 2019) (Ohio) .....................................................................17

*In re: Domestic Drywall Antitrust Litig.*,
   322 F.R.D. 188 (E.D. Pa. 2017) ...........................................................................................6

*Dynetix Design Sols. Inc. v. Synopsys Inc.*,
   2013 WL 2053890 (N.D. Cal. May 14, 2013) ......................................................................9

*Ehret v. Uber Techs., Inc.*,
   148 F. Supp. 3d 884 (N.D. Cal. 2015) ...............................................................................18

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ....................................................................13

*FBC Mortg., LLC v. Skarg*,
   2023 WL 6933359 (N.D. Cal. Oct. 19, 2023) ....................................................................16

*In re Google Assistant Priv. Litig.*,
   2024 WL 251407 (N.D. Cal. Jan. 23, 2024) .......................................................................17

*In re Henson*,
   869 F.3d 1052 (9th Cir. 2017) ...........................................................................................17

*Herrera v. LCS Fin. Serv. Corp.*,
   274 F.R.D. 666 (N.D. Cal. 2011) .......................................................................................18

*Hill v. Xerox Bus. Servs., LLC*,
59 F.4th 457 (9th Cir. 2023) ...................................................................................15, 16, 17

*Judge v. Unigroup, Inc.*,
2017 WL 3971457 (M.D. Fla. Sept. 8, 2017)...........................................................17

*Kelly v. Pub. Util. Dist. No. 2 of Grant Cnty.*,
552 F. App'x 663 (9th Cir. 2014) ...........................................................................16

*Kipp v. Weyerhauser Co.*,
354 F. Supp. 3d 622 (E.D. Pa. 2018) ......................................................................18

*Kleen Prod. LLC v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015)...............................................................................18

*Leidel v. Coinbase, Inc.*,
729 F. App'x 883 (11th Cir. 2018) ..........................................................................18

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ...................................................................................11

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ...........................................................14

*Lozano v. AT & T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) ..................................................................................19

*Martin v. Yasuda*,
829 F.3d 1118 (9th Cir. 2016) ................................................................................16

*In re Merrill Lynch Tr. Co. FSB*,
235 S.W.3d 185 (Tex. 2007) ...................................................................................18

*Miller v. Travel Guard Grp., Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) ........................................................18

*Moehrl v. Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ......................................................18, 19

*Morsberger v. ATI Holdings, LLC*,
2023 WL 2711754 (N.D. Ill. Mar. 30, 2023) ...........................................................17

*Newirth by & through Newirth v. Aegis Senior Cmtys., LLC*,
931 F.3d 935 (9th Cir. 2019) ..................................................................................16

*In re Optical Disk Drive Antitrust Litig.*,
2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .............................................................14

*In re Packaged Seafood Prod. Antitrust Litig.*,
332 F.R.D. 308 (S.D. Cal. 2019) ..............................................................................6

*Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*,
    511 F. Supp. 2d 324 (E.D.N.Y. 2007) ...................................................................................11

*In re Pork Antitrust Litig.*,
    665 F. Supp. 3d 967 (D. Minn. 2023) .......................................................................................5

*Rushing v. Williams-Sonoma, Inc.*,
    2020 WL 6787135 (N.D. Cal. Oct. 8, 2020) ..........................................................................17

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
    2024 WL 606166 (C.D. Cal. Jan. 10, 2024) ..........................................................................16

*Santich v. VCG Holding Corp.*,
    443 P.3d 62 (Colo. 2019)........................................................................................................17

*Scheurer v. Fromm Foods LLC*,
    863 F.3d 748 (7th Cir. 2017) .................................................................................................17

*Sicily by Car S.p.A. v. Hertz Glob. Holdings, Inc.*,
    2015 WL 2403129 (D.N.J. May 20, 2015)............................................................................17

*Sitzer v. Nat'l Ass'n of Realtors*,
    12 F.4th 853 (8th Cir. 2021) ....................................................................................2, 15, 17

*Slamon v. Carrizo (Marcellus) LLC*,
    2020 WL 2525961 (M.D. Pa. May 18, 2020).......................................................................18

*Slaten v. Experian Info. Sols., Inc.*,
    2023 WL 6890757 (C.D. Cal. Sept. 6, 2023) .......................................................................16

*Specialty Earth Scis., LLC v. Carus Corp.*
    2021 WL 4804076 (N.D. Ill. Oct. 14, 2021) ........................................................................11

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)...............................................................................................................14

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|---|---|
| **Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Plaintiffs' Reply in Support of Motion for Class Certification, concurrently filed herewith.[1] |
| **Op. Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification (ECF No. 540-2) |
| **Doman Ex.** | Exhibit to the Declaration of Joe Doman in Support of Align's Opposition to Class Certification (ECF No. 562-1) |
| **Compl.** | Plaintiffs' Fifth Amended Class Action Complaint (ECF No. 366) |
| **Mot.** | Align Technology, Inc.'s Opposition to Motion for Class Certification and *Daubert* Motion to Preclude Expert Testimony (ECF No. 562) |
| **Br.** | *Snow* Plaintiffs' Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof (ECF No. 540) |
| **Berman Decl.** | Declaration of Steve W. Berman in Support of Plaintiffs' Reply in Support of Motion for Class Certification, concurrently filed herewith |
| **Vogt** | Expert Report of William B. Vogt, Ph.D., In Support of Class Certification and Merits (ECF No. 541-3) |
| **Vogt Rebuttal** | Expert Rebuttal Report of William B. Vogt, Ph.D., In Support of Class Certification and Merits (ECF No. 541-3) |
| **Mummalaneni** | Expert Report of Narasimha Mummalaneni, Ph.D., filed concurrently herewith |
| **Mathur** | Expert Report of Divya Mathur, Ph.D. (Align) (Doman Ex. 14) |
| **Snyder** | Expert Report of Edward A. Snyder, Ph.D. (Align) (Doman Ex. 25) |
| **Lacey** | Expert report of John M. Lacey, Ph.D. (Doman Ex. 39) |
| **PARTIES** | |
| **Align** | Defendant Align Technology, Inc. |
| **SDC** | SmileDirectClub, LLC |

---

[1] Plaintiffs begin the exhibit numbers to their Reply at Ex. 43 so that these numbers run consecutively with the exhibits to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification (ECF No. 540-2).

## I.   PRELIMINARY STATEMENT

In July 2016, Align agreed not to compete with SDC in the DTC market. The motivation behind the agreement (hereafter "RC") was clear: SDC wanted ███████████████ ███████████████████████ Freed from any competitive constraint, SDC's prices raced upwards ██████████████, allowing SDC to reap supracompetitive profits. And Align ███████████████████████████████████████████████ ██████████—locked it out of a market Align executives █████████████████.

Plaintiffs' expert, Dr. Vogt, presents three primary impact and damage models quantifying the harm the Restrictive Covenant caused consumers. First, Dr. Vogt uses a regression analysis to analyze whether a variety of factors (e.g., increased costs) can explain SDC's unprecedented price increases and finds ████████. Second, Dr. Vogt corroborates his regression by constructing a "yardstick" model that measures damages using prices that Align ███████████████████████████ Third, Dr. Vogt corroborates his regression by analyzing the change in the trend of SDC's prices after Align entered the market by opening DTC stores. Each methodology finds hundreds of millions in overcharges.

Align devotes its opposition to two main arguments. First, it raises scattershot *Daubert* challenges to Dr. Vogt's first two models, arguing that any price increases coinciding with the RC were sheer coincidence, that Align's modeling of ████████ was implausible, and that SDC could not have charged lower prices. These criticisms, which rest on ignoring critical facts and deleting contrary data, cannot get around the empirical fact at the heart of Dr. Vogt's regression analysis: SDC's prices rose significantly after the RC was signed, stopped rising when Align opened DTC stores, then began rising again when SDC succeeded in closing those stores. Align meanwhile disclaims its ████████, the basis for Dr. Vogt's yardstick, as an unreliable "spreadsheet drafted by some Align employees." But these "employees" were ██████ ███████████████████████████████████████████ ███████████████████████████████.

Second, Align argues that class certification would be "unworkable" because it "may"

attempt to enforce arbitration clauses and class action waivers in some class members' contracts, claiming that it has a right to do so under some states' laws. But Align waived any right to arbitrate by litigating Plaintiffs' claims on the merits for more than two years while "keep[ing] a contractual right to arbitration in its back pocket[.]"[2] It also fails to identify a single state in which it would definitively be able to compel arbitration. And even if Align could eventually compel arbitration against some class members, this does not defeat class certification. Instead, courts regularly certify a class and then, if the defendant establishes some class members should be excluded because of arbitration clauses, modify the class definition. The Court should not allow Align to use the untested threat of arbitration to defeat certification.

## II.    ARGUMENT

### A.    Dr. Vogt's regression analysis is reliable.

Dr. Vogt uses a regression analysis to evaluate whether direct costs (COGS), marketing costs, bad debt, or demand conditions can explain SDC's unprecedented price increases between July 6, 2016 (when Align agreed to the RC) and August 18, 2022 (when the RC expired)—and finds that ██████. This is an uncontested fact that Align ignores and its expert economist, Dr. Mathur, concedes. *See* Br. at 19-22; Vogt § I.3; Vogt Rebuttal ¶¶ 225-27.

Faced with this problem, Dr. Mathur—and Align—take an alternative path to attacking Dr. Vogt's regression: timing. Dr. Mathur argues that, after accounting for various factors, SDC prices were in fact on an upward trend before the RC was signed, and that Dr. Vogt thus conflates the impact of the RC with a preexisting price trend. Mathur § IV.B. But to reach this result, Dr. Mathur is forced to delete two critically relevant types of data:

- **<u>All SDC pricing data before February 2016.</u>** Dr. Mathur deletes a full year of SDC pricing data from before February 2016, which is when SDC replaced what were then three separate products with a single product. Mathur ¶ 92.

- **<u>All "SmilePay" pricing data.</u>** During the class period, Align charged customers separate prices for "SmilePay" and "FullPay," with approximately ██% of customers electing "SmilePay" during the period for which SDC produced data. In measuring changes in SDC's price over time, Dr. Mathur replaces *all* SmilePay prices with their FullPay equivalent, i.e.,

---

[2] *Sitzer v. Nat'l Ass'n of Realtors*, 12 F.4th 853, 857 (8th Cir. 2021).

she pretends separate SmilePay prices do not exist. *Id.* ¶ 91.

Deleting pre-February 2016 data—more than a year (or 74%) of the "clean" (pre-RC) data—allows Dr. Mathur to present the erroneous impression that SDC was already consistently raising prices at the beginning of the data she reviews. Vogt Rebuttal ¶¶ 174-82. And by ignoring SmilePay prices, i.e., the actual price paid by most class members, Dr. Mathur artificially conceals pricing trends damaging to Align's case: that SmilePay prices were either *falling or flat*, and FullPay prices were rising only slightly, in much of the "clean" period. *Id.* ¶¶ 183-202. Neither choice is consistent with standard econometric technique; economists typically account for varying products by using "product fixed effects" rather than deleting data. *Id.* ¶¶ 178, 188-202. When Dr. Vogt incorporates the full SDC transaction data into his regression model and adds products effects, he finds damages of $422 million. *Id.* ¶¶ 244-48, 250-52. In short, Dr. Mathur's criticisms fall apart when all the data is considered.

Align raises three *Daubert* challenges to Dr. Vogt's regression model, all centered on the claim that factors other than the RC drove SDC's pricing. These arguments parrot Dr. Mathur's core claim—that Dr. Vogt uses *too much* data, not too little—and do not withstand scrutiny.

**Dr. Vogt shows the RC affected SDC pricing.** Align argues that Dr. Vogt's regression model is fatally unreliable because he has "performed no test that can show that SDC's pricing trend changed at the time of the Align agreement." Mot. at 17-18. But Align criticizes only the "Chow test" Dr. Vogt performs, which finds that there was a statistically significant break in SDC's pricing on the date when Align agreed to the RC. Vogt Rebuttal § C.5.

As a threshold matter, Align ignores the significant documentary and empirical evidence on which Dr. Vogt relies to show the clear effect that Align's competitive threat (and the removal thereof) had on SDC's pricing.[3] Dr. Vogt analyzes how both SDC's pricing changed (1)

---

[3] For example, SDC Chairman David Katzman testified that █████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ FAC ¶¶ 189-90.

at the time the RC was signed, finding a  ██████████████████████ (*see* Br. at 18-19); and (2) when Align opened its stores, finding that SDC stopped raising its prices during the period that Align's DTC stores were open, then quickly resumed raising its prices once it had succeeded in closing the stores through arbitration. Vogt § I.2.1. Remarkably, Align's own expert, Dr. Mathur, identifies a statistically significant break in SDC's upward pricing trend in July 2017—exactly the period in which SDC █████████████ █████████████. Vogt Rebuttal §§ C.2, D.4. In short, both experts agree that ████████████████████████████████████████████.

Align ignores this substantial evidence that the RC had a significant, consistent effect on SDC's pricing, and instead places all its chips on Dr. Mathur's analysis that SDC's prices showed "[an] increasing price trend before the [RC] was signed." Mot. at 17. But this analysis rests on Dr. Mathur's disregard of (a) all pre-February 2016 SDC transaction data and (b) all SmilePay transaction data. As Dr. Vogt explains, by deleting the majority of available data from the "clean" period, Dr. Mathur conceals that SmilePay prices were either *falling or flat*, and FullPay prices were rising only slightly—and thus artificially manufactures a "preexisting" upward price trend when there was none to control for. Vogt Rebuttal ¶¶ 183-202. Further, when Dr. Vogt uses the full range of data and inserts a time trend into his model that expressly controls for any pre-existing trend in SDC prices, he finds still substantial damages and class-wide common impact that corroborate his primary model—i.e., he confirms yet again that the increase in SDC prices coinciding with and following the RC cannot be explained by any pre-existing trend in SmileDirectClub prices. *Id.* ¶¶ 253-55; Br. at 21.[4] This analysis refutes Align's critique that Dr. Vogt does not disentangle the effect of the RC on SDC's pricing from the effect of any

---

[4] Dr. Vogt does not use a time trend in his primary regression because the "time trend" and the "pre" vs. "post" period are correlated; even if there were no trend in prices, some of the effect of the conduct would be attributed to the time trend. Br. at 21. Here, there was no clear, uniform trend in SDC prices prior to the RC. And as discussed below, to the extent there was a pre-existing upward trend in FullPay prices, it coincided perfectly with the beginning of RC negotiations and is not truly "clean." As Dr. Vogt testified, economists refer to these as "anticipatory effects" and controlling for them in a study produces inaccurate results. Ex. 43.

preexisting time trend. Mot. at 18.[5]

Align also ignores that the purpose of a multiple variable regression analysis is to control for non-conspiratorial factors that affect SDC's prices, and thus measure the effect of the challenged conduct on price.[6] That is why regression analysis is an accepted technique for measuring damages in antitrust cases—it is a statistical methodology for testing whether challenged conduct had an effect on prices.[7] Dr. Vogt's regression analysis confirms the hypothesis that the RC affected prices because it measures a statistically significant overcharge.

Align's narrow critique of Dr. Vogt's Chow test also fails to acknowledge that its purpose was to respond to Dr. Mathur's "Sup-Wald" test—which Dr. Mathur uses to identify a *single* break in SDC's pricing in July 2017. As Dr. Vogt explains, a Sup-Wald test only looks for the single largest change in a time trend, and will identify only one change in a time series *even if* multiple changes exist. Vogt Rebuttal ¶ 213. But here, the relationship between Align and SDC went through significant changes over the relevant period that would be expected to produce multiple changes in SDC's approach to pricing. *Id.* ¶¶ 212-19. And when Dr. Vogt performs a Chow test—which tests whether the relationship between the control variables (such as costs) and the dependant variable (SDC's price) changed on a specific date—he finds a significant break in the trajectory of SDC's pricing at the point at which it agreed to the RC, consistent with the analysis in his opening report. *Id.* ¶¶ 217-19; Vogt § I.1. This supports Dr. Vogt's regression model and is consistent with extensive documentary evidence in the case.[8] More generally,

---

[5] Align claims that Dr. Vogt "admitted" that "the only reliable way to assess data showing an increasing price trend is to determine if there is a significant change in the trend." Mot. at 18. This is false. Align appears to refer here to Dr. Vogt's statement (quoted in its brief) that "failing to account for … time trends produces unreliable results." *Id.* But as explained above, when Dr. Vogt uses all the SDC data, he finds there is *no time trend for which to control*. And when Dr. Vogt does (conservatively) insert a time trend into his model, he still finds that SDC prices cannot be explained by any pre-existing trend in SDC prices. *See* Br. at 21.

[6] As noted above, Dr. Vogt's control variables include direct costs (COGS), marketing costs, bad debt, and demand conditions).

[7] *See generally In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 991 (D. Minn. 2023) ("Regression analysis is a generally accepted econometric approach to determining causation and damages in the antitrust context[.]") (citation and quotation omitted).

[8] Align argues only that if Dr. Vogt had performed a Chow test on other dates, he "could have

courts routinely find experts' regressions reliable—even if, unlike Dr. Vogt, they fail a Chow test—where, as here, an expert "present[s] sufficient evidence from which a jury could conclude that all or nearly all Plaintiffs were impacted by Defendants' alleged agreement to fix prices."[9]

**Dr. Vogt accounts for SDC's addition of a "financing charge."** On July 1, 2016, five days before Align formally agreed to the RC, SDC increased the price of SmilePay from $1,500 to $1,735, while holding the price of FullPay at $1,500. Vogt Fig. 1. Align argues (1) SDC made the decision to implement this price increase, which it euphemistically calls a "financing fee," independent of the RC; and (2) Dr. Vogt's regression model is unreliable because it improperly "attribute[s]" this initial price increase "as being caused by the RC." Mot. at 13-15.[10] There are four problems with this claim.

*First*, Align ignores that Dr. Vogt applied widely accepted econometric techniques by converting SmilePay prices into their "net present value" ("NPV"), rather than using nominal Smile Pay prices including the "financing charge" (as Align's argument implies).[11] The undisputed NPV of SmilePay prices shows a nearly identical trend to FullPay prices (which were unaffected by the financing charge) in the period immediately coinciding with and following the purported introduction of the financing charge.[12] And after the "finance charge" was added and the RC was signed—i.e., once the threat of competition from Align was removed—both FullPay

gotten the same results," i.e., identified other structural breaks. Mot. at 18. But the fact that there are potentially other statistically significant breaks in pricing is irrelevant to Dr. Vogt's analysis of whether there was a statistically significant change in pricing when the RC was executed.

[9] *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 229 (E.D. Pa. 2017); *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 325 (S.D. Cal. 2019) (finding model's failure of Chow test did not render it unreliable and noting "virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model."); *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 122 (S.D.N.Y. 2015).

[10] This assertion misstates Dr. Vogt's testimony; he stated there was a "price increase" in July 2016 "because of a change in the advertised SmilePay price," Mot. at 13 (citing Doman Ex. 31), not that his model "attributes" price changes to the RC.

[11] This conversion accounts for vfactors like payment terms, interest rates, and default rates in order to calculate the expected value of a SmilePay transaction. Vogt Rebuttal ¶¶ 188-202.

[12] This is because at the same time SDC purportedly introduced a new "financing charge," it also extended the term length on SmilePay from 12 months to 15 months. Vogt Rebuttal ¶¶ 188-89 & Fig. 8. In Dr. Vogt's NPV conversion, these two effects are offsetting because the longer a loan's term, the lower its net present value. None of Align's four experts raises any dispute with this calculation, or its applicability in this case.

and SmilePay prices steadily increased from less than $1,500 to approximately $1,700:



*Id.* ¶¶ 190-202 & Fig. 10. This increase in *both* SmilePay and FullPay prices has nothing, and cannot have anything, to do with the "finance charge" on which Align myopically focuses.

*Second*, Align's argument rests on its incorrect assertion that SDC first introduced a financing charge for SmilePay on July 1, 2016, and that Dr. Vogt's model is capturing the effect of non-conspiratorial conduct that was only present in the "dirty period." But this claim is false, and again turns on Align ignoring SDC data. In fact, for two thirds of the "clean" period Dr. Vogt analyzed, SmilePay had a financing charge relative to FullPay.[13] Therefore, Align's argument that SDC first set a strategic goal in February 2016 ██████████████████ ██████████████ is nonsensical[14] and contrary to SDC's pricing history because SDC already

---

[13] *See* Vogt Fig. 1 & Tbl. 1, Vogt Rebuttal §§ C.3, C.4. (discussing financing fee that SDC first introduced for SmilePay in October 2015—with an ensuing price differential until April 2016, when SDC raised FullPay prices to match SmilePay).

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

had a financing charge—since October 2015. This misrepresentation is again fatal to Align's argument because: (1) the fact that there was a "finance charge" on SmilePay transactions in *both* the "clean" and "dirty" (pre- and post-RC) portions of Dr. Vogt's regression undermines any suggestion that Dr. Vogt inadvertently attributes an overcharge to the effect of a pricing strategy (the "financing charge") that was present only in the "dirty" period; and (2) if steering customers from SmilePay to FullPay via a price differential was of utmost priority for SDC, it is hard to understand why it launched SmilePay with a so-called financing charge, then removed it.

*Third*, Align also ignores the corroborating effect of Dr. Vogt's two other primary models—the yardstick and trend models (*see* Br. at 22-23)—that calculate similar overcharges as Dr. Vogt's regression, even though those models do not use any data from the "clean" period prior to July 5, 2016, and thus cannot attribute any of their overcharge to the introduction of the financing charge.[15] Each of these models produces similar results, with the yardstick model in fact calculating higher damages than Dr. Vogt's regression analysis.

*Fouth*, Align's argument is premised on assuming away a disputed question of fact: whether the July 1, 2016 SmilePay price increase was connected to the RC. Align claims there is "no evidence" of a connection. Mot. at 14. But it simply ignores extensive contrary evidence catalogued and discussed in Dr. Vogt's report:



- In May 2016, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- Beginning in mid-June, and continuing through early July, Align and SDC began ████████████████████████████████████████████████████████████████████████████████████████.

*See* Vogt § 1.1; Vogt Rebuttal § C.4. In other words, just one day after the parties entered into a term sheet, SDC's Chairman ████████████████████████████████████████████████

---

████████████████████████████████████████████████████████████. Doman Ex. 16; Doman Ex. 5 at -81.

[15] To project but-for prices, the yardstick model uses Align's ████████████████ and the trend model uses SDC's change in pricing after Align began opening DTC stores. *See* Br. at 22-23.

███████. And by the time that increase was implemented, (1) SDC's CEO had explained internally that the Align-SDC partnership would ████████████████████████████████████ ████████████████████████████ (*see* Ex. 44; Vogt ¶ 546); and (2) negotiation of the ████████ ████████. The record evidence thus makes clear that the immediate effect of negotiations related to the RC between Align and SDC was ████████████████████████████████████[16]; as Dr. Vogt testified, this type of "anticipatory effect" is common in economics and consistent with the fact that negotiations were ongoing during this period. Ex. 43.

Align's contrary argument is a factual dispute for the jury.[17] Its *Comcast* argument fails for the same reason: if the jury agrees that the July 1 SmilePay price increase was attributable to the RC, there is no "lawful conduct" to control for. And, as discussed above, the overcharges calculated by Dr. Vogt's models are not driven by the "financing charge" anyway.

**DTC competition does not affect Dr. Vogt's results.** Align argues that Dr. Vogt's fails to "control" for the entry of DTC competitors in his regression model. Mot. at 15-16. But had Dr. Vogt "controlled" for DTC entry, this would lead—if competition caused SDC to lower its prices (despite overwhelming evidence to the contrary)—to *higher* damages, because the purpose of Dr. Vogt's regression analysis is to control for those non-conspiratorial variables (e.g., costs) that would explain SDC's price *increases* following the RC. Align's challenge to Dr. Vogt's model would only have merit if DTC competition caused SDC to raise its prices, leading Dr. Vogt to (mis)attribute to the RC price increases that should be attributed to increased competition. Otherwise, it only demonstrates another way in which Dr. Vogt's regression is conservative.

Apart from being nonsensical, Align's critique is also wrong on the facts. Align argues, without any evidentiary or expert support, that Dr. Vogt conflates the effect of Candid's entry

---

[16] This is consistent with Mr. Katzman's testimony that 

*Dynetix Design Sols. Inc. v. Synopsys Inc.*, 2013 WL 2053890, at *3 (N.D. Cal. May 14, 2013) (factual dispute between experts "best left to the trier of fact").

into the market with Align's decision to open to DDTC stores, and that Candid's entry—not Align's—caused SDC to halt price increases in November 2017. But Align is silent on the mountain of contrary evidence that Dr. Vogt summarizes, all of which supports the conclusion that DTC competition did not constrain SDC's pricing. Vogt §§ H.1-2.[18] Most notably, Align ignores testimony from Mr. Katzman that, as late as September 2 ███████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Vogt ¶¶ 338-46.[19]

## B.  Dr. Vogt's yardstick analysis is reliable.

Align has spent this case fleeing any suggestion it ever intended to enter the DTC market, previously representing it was "not plausibly in [its] economic interest to sell aligners direct to consumers" and that Plaintiffs' allegations were "economically illogical." ECF No. 67 at 4, 7-8. This turned out to be false. Align's CEO described "███████████████████████████████ ███████████████████████████████████████████████████████████████." Op. Ex. 23. At the same time Align was ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Br. at 9-11. Dr. Vogt uses Align's modeling to create an alternative "yardstick" damages model, estimating damages by taking the difference between ████████████████████████████████████████ ████████████████████████████████. *Id.* at 22-23.[20]

Align sprints away from its modeling, downplaying it as a "spreadsheet drafted by some

---

[18] For example, Align's assertion is impossible to square with the fact that, upon removing Align from the market in arbitration, SDC resumed increasing prices—despite many new DTC competitors entering the market between late 2017 and early 2019. *See* Vogt ¶¶ 345-48, 455-57.
[19] Far from a "high profile" new entrant, Candid ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████. Vogt ¶¶ 334-37 & Fig. 8. Align's CEO ████████████████████████████████████████████. Vogt ¶ 341. ████████ This modeling ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████. Vogt Rebuttal ¶ 160; Doman Ex. 36 at p.5.

Align employees." Mot. at 19. This strains credulity. These employees ████████ ████████████████████████████████████████████████████████████████████████████ ██████. Vogt ¶¶ 184-98; Vogt Rebuttal ¶¶ 132-39; Doman Ex. 38. And the "spreadsheet"—██████ ████████████████████████████████████████████████████████████████████ (Doman Ex. 38), with Align executives referring to its projections as "██████████████" (Ex. 45 at -37).

Align argues its work was so shoddy that Dr. Vogt's yardstick is fatally unreliable, and that its modeled prices were unrealistic. This ignores the record evidence and Dr. Vogt's report. Vogt Rebuttal ¶¶ 18-23 & § B.6.[21] Dr. Vogt opines—consistent with the ████████████ ████████████████████████████████████ (Doman Ex. 36 at p.5)—that the key question for Align ██████████████████████████████████████ ██████████████████████████████████████████████. Vogt ¶¶ 421-30; Vogt Rebuttal ¶¶ 143-48. Align argues that the spreadsheet "wildly underestimated" its costs because SDC's costs (and its marketing costs in particular) increased between 2017-2022. Mot. at 19. But Dr. Vogt analyzes Align's costs and concludes that its established manufacturing, lower COGS, and prominent brand would have made it a more efficient competitor. Vogt Rebuttal § B.3.

Align analogizes this case to *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015), where two experts conducted "no independent investigation" into and "had no knowledge of the details surrounding" data produced by the defendant. *Id.* at 137. *Bruno* is inapposite: Dr. Vogt (1) analyzes in detail the circumstances surrounding the ████████████████████ and (2) performs his own corroboratory analysis of Align's costs. On similar facts, courts regularly recognize that companies' internal projections can form the basis of experts' damages models.[22]



---

[21] Align's citation in its brief to after-the-fact deposition testimony from Mr. Ganguly is contradicted by Mr. Ganguly's contemporaneous ████████████████. Ex. 45 at -38.

[22] *See, e.g.*, *Specialty Earth Scis., LLC v. Carus Corp.* 2021 WL 4804076, at *18 (N.D. Ill. Oct. 14, 2021) (finding expert's reliance on internal sales projects reliable and concluding it was "not reasonable to infer that a well-established and successful company like [the defendant] routinely relied on guesswork in making the sales projections that informed its business decisions."); *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 334 (E.D.N.Y. 2007) (finding internal projections reliable for "establishing damages of lost sales or profits" and "any flaws…go to…weight"); *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) (credibility of

C.      **SDC could have charged lower prices.**

Align argues that Dr. Vogt's opinions are unreliable because he "failed to consider" whether SDC could have reduced its prices "without going bankrupt much sooner," and that the but-for world pricing Dr. Vogt posits "would have been unsustainable" because they imply an operating loss. Mot. at 20-21. But Align omits a key fact: SDC intentionally █████████████ ████████████████████████████████████████████████████. Vogt §§ H.4, I.3.5; Vogt Rebuttal § E. Apart from marketing costs, SDC had both high gross and operating margins. Vogt ¶¶ 359-64. Rather than bank early profits ██████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. *Id.* ¶¶ 365-77. The purpose of this ███████████████████████████████████████████████ ███████████████████████████████████████████████" Vogt ¶¶ 363-74.[23] With this strategy, SmileDirectClub would have earned minimal to negative operating margins regardless of its chosen price level or gross margins. *Id.*; Vogt Rebuttal § E.[24] The record evidence indicates that, had SDC charged lower prices, it would have earned less revenue and therefore spent less on marketing. Vogt Rebuttal ¶¶ 270-80.

Align's claim that SDC's but-for world prices were unsustainable hinges on the opinion of its accounting expert, Dr. Lacey, who assumes that SDC's *marketing costs per treatment* would have been the same in the but-for world. But the evidence contradicts this assumption: SDC's marketing expenses ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████. *See* Vogt Rebuttal ¶¶ 267-80. Further, Plaintiffs' marketing expert, Dr. Mummalaneni, opines that companies regularly set their advertising budgets as a function of a previous period's

---

expert who relied on defendant's "internal projects" "was for the jury to determine").
[23] Dr. Vogt cites extensive evidence that SDC employees referred to marketing as an ████████████████████████████████████████████████. ¶¶ 363-74
Indeed, SDC was valued it at $8.9 billion when it went public in 2019 and raised $1.9 billion from investors between 2016 and late 2019. Vogt ¶¶ 179, 564.

revenue; in fact, this is the predominant approach for many major brands. Mummalaneni ¶¶ 9-15. Align says nothing about Dr. Mummalaneni's analysis.[25]

Align argues that Dr. Vogt's opinion should be excluded, but does not challenge his—or Dr. Mummalaneni's—methodology. Instead, Align relies on *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) to argue that, because SDC went bankrupt, it is "not logical" that it could have charged less. Mot. at 21. But this ignores the complex causes of SDC's bankruptcy (including the substantial toll from ongoing litigation with Align[26]) and the fact that SDC ███████████████████████████. Other DTC companies remain in business, and ████████████ produced by SDC competitor AlignerCo shows that AlignerCo ██ ████████ selling its aligners for 40%-50% less than SDC—well below the lowest but-for price Dr. Vogt uses. Vogt ¶¶ 351-54, 361; Ex. 46.[27] Align's arguments only go to weight.[28]

**D.    All class members were injured.**

Align argues that Plaintiffs' class should not be certified because it fails to exclude the approximately 6.6% (at most) of class members who have defaulted, or will default, on their payments to SDC. Mot. at 21-22.[29] Critically, Align's argument hinges on the unsupported

---

[25] Align's argument also implies that there should be a correlation between SDC's prices and its marketing spending. But Dr. Vogt's damages model specifically controls for both marketing expenses and COGS and finds that neither explains SDC's price increases. Vogt ¶¶ 479-83. To the contrary, ███████████████████████████████████████████████████. *Id.* ¶¶ 414, 82.

[26] Align's litigation with SDC played a significant role in SDC's bankruptcy: in an October 2023 bankruptcy filing, SDC cited the costs of ongoing litigation with Align, including a $63 million dollar arbitration judgment pending against it, as having "negatively impacted [its] liquidity forecast and [its] ability to negotiate with third parties." *See* ECF No. 200 at 23-24, *In re: SmileDirectClub, Inc., et al.*, Case No. 23-90786 (Bankr. S.D. Tex. Oct. 30, 2023).

[27] AlignerCo's prices have since fallen more, further consistent with Dr. Vogt's opinion; as of May 2, 2024, AlignerCo's lowest-priced "Smile*Advantage*" was advertised for $795. *See* Ex. 47.

[28] *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *4 (S.D.N.Y. Mar. 28, 2014) (court should exclude expert testimony only if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith," otherwise arguments go to weight); *compare In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *57 (E.D.N.Y. Oct. 15, 2014) (model did not pass "laugh test" where it suggested customers were "undercharged … anywhere from *millions to hundreds of quadrillions of dollars per transaction*.") (emphasis in original).

[29] Dr. Mathur estimates that "approximately 6.6% of putative class members are likely delinquent on their payments," while noting separately that "[s]ome delinquent customers also default on their loans." Mathur ¶¶ 157-58. Align argues separately that the number of defaulting

assumption that defaulting class members "have not paid *any overcharge*." *Id.* (emphasis added).
But Align cites no case law in support of its position that a class member who owes more money
in the actual world than in the but for world has not suffered an injury. To the contrary, an
individual's antitrust damages are based on the difference between their actual economic
condition and their "but for" condition absent the antitrust violation.[30] An SDC customer who
owes $1,000 in the actual world, but would only owe $800 in the but for world, has a difference
in their actual economic condition as a result of the antitrust violation that constitutes an injury in
fact.[31] Comparably, courts in this district recognize that consumers suffer an antitrust injury
when they purchase a lower quality product in the actual world than they would have in the but
for world, even if they would have paid the same amount of money for the product each time.[32]

Separately, Align assumes without any evidentiary support that, in the but-for world,
SDC would have (a) lowered SmilePay prices without (b) correspondingly lowering its down
payment and monthly payment amounts.[33] The record evidence contradicts this. Dr. Vogt
demonstrates that when Align opened its stores, SDC reduced SmilePay prices by reducing the
monthly payment amount rather than the repayment term; when Align was ordered to close those
stores, SDC increased this payment amount and held the repayment term constant. Vogt Rebuttal
¶¶ 283-85; Vogt § I.2.3. This is evidence that, in the but-for world, SDC would react to Align
competition by reducing monthly SmilePay payment amounts. Therefore, customers who default
partway through repayment still paid more out of pocket in the actual world in the form of higher

---

customers has "skyrocketed after SDC's bankruptcy." Mot. at 22. But neither Align nor Dr.
Mathur identify any evidence the default rate has changed or will change. Vogt Rebuttal ¶ 301.
[30] *See In re: College Athlete NIL Litig.*, 2023 WL 8372787, at *9 (N.D. Cal. Nov. 3, 2023)
(confirming with respect to antitrust damages, "[t]he guiding principle is that the antitrust victim
should recover the difference between its actual economic condition and its 'but for' condition
absent the antitrust violation.") (quoting P. Areeda & H. Hovenkamp, *An Analysis of Antitrust
Principles and Their Application* § 392 (5th ed. 2023 supp.)).
[31] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, (2021) ("If a defendant has caused …
monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact[.]"); *cf. Van v.
LLR, Inc.,* 962 F.3d 1160, 1162 (9th Cir. 2020) (holding that "the temporary loss of use of one's
money constitutes an injury in fact").
[32] *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *9 (N.D. Cal. Feb. 8, 2016).
[33] Dr. Mathur asserts this claim in a single sentence in her report. Mathur ¶ 158.

down payments and monthly repayment amounts than they would have in the but-for world.[34]

Even accepting Align's arguments as true, courts have found certification is appropriate when up to 6% of class members were uninjured.[35] Here, 6% of class members (a combination of delinquent and defaulted class members) is the maximum number that fall into this category.

### E.    Align's arbitration-related arguments are untimely and lack merit.

Align argues that class certification would be "unworkable" because (a) class members signed arbitration agreements and/or class action waivers (hereafter "Agreements") with SDC and (b) Align "may" attempt to enforce these provisions as a non-signatory under certain states' equitable estoppel law—thus requiring (if Align succeeds) putative class members in certain states to individually litigate.[36] Mot. at 23-29. In other words, Align seeks to deprive all class members of relief with eleventh hour speculation that some may be subject to the Agreements.

Align's argument fails for three reasons. *First*, Align has waived its right to invoke the Agreements. A party waives a contractual right, including a right to compel arbitration, where it (1) has "knowledge of an existing right to compel" and (2) takes "intentional acts inconsistent with that existing right[.]"[37] Both conditions are met here. Align has long had knowledge of the Agreements: it invested in SDC in 2016, and contends in its brief that SDC's terms and conditions have "always included an arbitration agreement." Mot. at 23.[38] Despite this, Align has sought to play a game of "heads I win, tails you lose" by litigating Plaintiffs' Section 1 claim on the merits for more than two years while "keep[ing] a contractual right to arbitration in its back

---

[34] To the extent an SDC customer paid *nothing* to SDC (e.g., neither a down payment nor any monthly payments), she is not a member of Plaintiffs' class.

[35] *See, e.g., In re Lidoderm Antitrust Litig.*, 2017 WL 679367 at *12-14, 20 (N.D. Cal. Feb. 21, 2017) (certification appropriate even if 6-7% of classes uninjured, because it represented a *de minimis* number of class members) (collecting cases).

[36] In a footnote, Align speculates it "may also be able to enforce the agreements against class members who purchased prior to April 2019 by virtue of Align's membership in SDC, LLC." Mot. at 25 n.114. But it makes no attempt to identify the doctrine on which it would rely to do so, and neither case it cites contains any analysis of whether a non-signatory third party to an arbitration agreement may, by virtue of its investment in a signatory, compel arbitration.

[37] *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 460, 468 (9th Cir. 2023).

[38] Plaintiffs even attached these agreements to their Fourth Amended Complaint, which was filed in October 2022. *See* ECF No. 181 ¶ 49 & Exs. D, E.

pocket[.]"[39] Plaintiffs added their Section 1 claim in October 2021, and filed amended complaints in October 2022 and March 2023 adding Section 1 class representatives and a rule of reason claim, respectively. ECF Nos. 61, 181, 290-2. In that time, Align has filed motions to dismiss the Section 1 claim (ECF Nos. 65, 67), to join SDC as a party (ECF No. 124), and opposing Plaintiffs' motion to amend (ECF No. 324), as well as two answers (ECF Nos. 121, 384) and a motion to modify the schedule requesting "briefing summary judgment before class certification to …. expedite[] resolution of the merits of plaintiffs' Section 1 claim" (ECF No. 379 at 1). The parties have engaged in extensive discovery, including fact and expert depositions, and exchanged thousands of pages of merits expert reports. At no point has Align moved to compel, indicated that it would do so, or even raised the Agreements as an affirmative defense or issue in any prior filing, including its multiple Answers—despite now claiming it would succeed in compelling arbitration against Plaintiffs Eaton and Bozian. Mot at 26-27. Align did not even ask any of the class representatives a single question about the Agreements at their depositions.

Courts considerer "the totality of the parties' actions" in determining whether a party has acted inconsistently with its right to arbitrate, and generally find waiver where a party fails to assert its right to arbitrate early in a case and instead actively litigates on the merits.[40] Align's actions check virtually every box courts look for in evaluating whether a party acted inconsistently with its right to arbitrate[41], and its total silence regarding arbitration in this litigation—including its invocation of arbitration now for the "express purpose of defeating class

---

[39] *Sitzer*, 12 F.4th at 857.

[40] *Hill*, 59 F.4th at 470-71; *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016); *Kelly v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 552 F. App'x 663, 664 (9th Cir. 2014).

[41] *See, e.g.*, *Newirth by & through Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 941 (9th Cir. 2019) (filing a motion to dismiss with prejudice on merits issues was an inconsistent act); *Hill*, 59 F. 4th at 476 (filing of a motion for summary judgment is the "most clear[]" evidence that a party "actively litigated" the case); *see FBC Mortg., LLC v. Skarg*, 2023 WL 6933359, at *3 (N.D. Cal. Oct. 19, 2023) (waiver where defendant waited eight months before filing motion to compel); *Slaten v. Experian Info. Sols., Inc.*, 2023 WL 6890757, at *5 (C.D. Cal. Sept. 6, 2023) (waiver where party delayed arbitration for 18 months and represented to court it may file motion for summary judgment).

certification entirely, rather than refining the scope of the class"[42]—demonstrates a "conscious decision to continue to seek judicial judgment on the merits of [the] arbitrable claims."[43]

In a footnote, Align argues that the Court could not find waiver because, until a class is certified, Align cannot compel arbitration against putative class members. Mot. at 25 n.113. But the Ninth Circuit recently rejected this argument, explaining that it has "never suggested that for waiver purposes, knowledge of an existing right to arbitrate requires a present ability to move to enforce an arbitration agreement" and that "a class action defendant could waive the right to arbitrate against *putative* class members by affirmatively renouncing that right."[44]

Critically, Align's potential waiver is a common, class-wide issue that does not require individualized inquiry or state-by-state analysis of the law—because it turns only on Align's conduct after the initiation of the litigation. This is because "waiver is a unilateral concept" that "looks only to the acts of [the defendant]" and "does not depend upon when the law requires or authorizes such a right to be asserted."[45] Consistent with this, the Eighth Circuit recently affirmed a court's finding that the defendant waived its right to arbitrate in a (then-putative) class action where it waited 305 days before moving to compel against the named plaintiff while litigating the case on the merits.[46] The Court should reach the same result.

*Second*, Align has not demonstrated that it could successfully invoke the Agreements against any member of the class, much less against a "substantial" number. Mot. at 27. To the contrary, Align appears to concede (Mot. at 26) that it cannot enforce the Agreements in any

---

[42] *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2024 WL 606166, at *6–9 (C.D. Cal. Jan. 10, 2024).
[43] *Martin*, 829 F.3d at 1125.
[44] *Hill*, 59 F.4th at 470 (emphasis in original).
[45] *Id.* at 469-70 & n.15. Even in the cases on which Align relies, *see* Mot. at 25 n.113, the plaintiffs—unlike here—were plausibly on notice of the defendant's potential attempt to compel. In *Rushing v. Williams-Sonoma, Inc.*, 2020 WL 6787135, at *3 (N.D. Cal. Oct. 8, 2020), the defendant's assertion of arbitration as affirmative defense "put Plaintiffs on notice that [defendant] may move to compel arbitration." Similarly, in *Kumandan* (where Google asserted arbitration in its answer), Judge Freeman went on to deny Google's motion to compel, finding that it waived this right by waiting to assert its purported arbitration rights for years while litigating the case on the merits. *In re Google Assistant Priv. Litig.*, 2024 WL 251407, at *3, 6 (N.D. Cal. Jan. 23, 2024). (Plaintiffs note that the *Kumandan* case Align cites at footnote 113 of its brief was later recaptioned *In re Google Assistant Priv. Litig.*).
[46] *Sitzer*, 12 F.4th at 856-57.

state that applies a "traditional equitable estoppel test," which includes not only Illinois but Ohio, Colorado, New Jersey, Virginia, Maryland, and Wisconsin.[47] Align is also silent on the fact that (at least) tens of millions of additional putative class members live in states—including, among many others, California,[48] New York,[49] and Texas[50]—where it would not be able to invoke the Agreements under state law equitable estoppel principles. And Align is incorrect that it could successfully enforce the Agreements in Florida[51] and Pennsylvania.[52] Thus, Align flunks its burden of proving that it will be successful in enforcing the Agreements at all.

Further, even if Align could compel arbitration against some class members, the mere existence of arbitration agreements affecting unnamed class members does not defeat class certification where no individualized inquiry would be required.[53] Align argues that enforcing the Agreements would "lead[] to individualized issues" (Mot. at 27), but contradicts itself in arguing that whether class members are bound by the Agreements is a binary question of state

---

[47] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 487 (N.D. Ill. 2019) (Ohio); *Santich v. VCG Holding Corp.*, 443 P.3d 62, 66 (Colo. 2019) (Colorado); *Sicily by Car S.p.A. v. Hertz Glob. Holdings, Inc.*, 2015 WL 2403129, at *5 (D.N.J. May 20, 2015) (New Jersey); *Judge v. Unigroup, Inc.*, 2017 WL 3971457, at *5 (M.D. Fla. Sept. 8, 2017) (Virginia); *Morsberger v. ATI Holdings, LLC*, 2023 WL 2711754, at *4 (N.D. Ill. Mar. 30, 2023) (Maryland); *Scheurer v. Fromm Foods LLC*, 863 F.3d 748, 753-54 (7th Cir. 2017) (Wisconsin).
[48] *In re Henson*, 869 F.3d 1052, 1061 (9th Cir. 2017).
[49] *Id.* at 1060 (finding "no material difference between New York and California's" law).
[50] *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007).
[51] Under Florida law, a non-signatory seeking to compel arbitration under a theory of equitable estoppel "must show both that [the plaintiff] is relying on the agreement to assert its claims against them and that the scope of the arbitration clause covers the dispute." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017). This first condition is not met when the plaintiff asserts statutory or non-contractual claims. *See, e.g.*, *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018).
[52] Under Pennsylvania law, equitable estoppel "allows a non-signatory to bind a signatory where the non-signatory establishes: '(1) a close relationship between the entities involved; and (2) the claims against it are intimately founded in and intertwined with the underlying contractual obligations.'" *Kipp v. Weyerhauser Co.*, 354 F. Supp. 3d 622, 625 (E.D. Pa. 2018) (third party could not invoke arbitration because it was not in a sufficiently close relationship as with the party to the arbitration clause) (collecting cases); *Abdurahman v. Prospect CCMC LLC*, 42 F. 4th 156, 161-62 & n.6 (3d Cir. 2022) (reiterating two-factor test under Pennsylvania law and rejecting argument that if a "plaintiff declines to name a party whose presence might implicate arbitration, then a court should interpret the agreements as if the plaintiff did.").
[53] *See, e.g.*, *Miller v. Travel Guard Grp., Inc.*, 2023 WL 7106479, at *18 (N.D. Cal. Sept. 15, 2023) ("An arbitration clause alone, however, does not prevent class certification."); *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902 (N.D. Cal. 2015) (same); *Herrera v. LCS Fin. Serv. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011).

law. Consistent with this, "[c]ourts have held that issues related to arbitration agreements do not have to be resolved at the class certification stage; but can be resolved through the creation of subclasses or the elimination of some members of the class at a later stage."[54]

Nor would this require "interminable satellite litigation." Mot. at 27. Instead, this issue could be easily resolved through a motion to compel and/or modify the class definition. In *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023), for example, one defendant, HomeServices, moved at class certification to strike class members whose agreements contained arbitration clauses—which were substantially more varied than the agreement here, and covered purchases made in a wide variety of states—arguing that it could compel arbitration as a non-signatory under state equitable estoppel principles. The court denied HomeServices' request and certified the class but, recognizing that whether arbitration agreements were enforceable "against the unnamed class members …. could vary depending on the language of the particular arbitration provision and the applicable state's contract law," directed it to file a separate motion if it "wish[ed] to narrow one or both classes" certified. *Id.* at *24.

A similar procedure would be appropriate here.[55] If Align wants to attempt to enforce the Agreements, it should be required to (a) show that it has not, on a class-wide basis, waived its right to compel arbitration; (b) identify those states in which it believes the Agreements are enforceable and then (c) meet its burden of proving that it can compel arbitration against at least certain class members' claims. If Align meets that burden, the Court can modify the class definition to exclude class members from states where Align can compel arbitration.

---

[54] *Slamon v. Carrizo (Marcellus) LLC*, 2020 WL 2525961, at *22 (M.D. Pa. May 18, 2020) (collecting cases); *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 607 (N.D. Ill. 2015) (explaining that "the majority of cases hold that the existence of contractual provisions does not automatically defeat class certification," and instructing defendants to file motion to modify class definition to exclude those class members after class was certified).

[55] Align relies primarily on *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007). But *Lozano* recognizes only that a district court has the discretion to deny certification where state-by-state variations in law make plaintiffs' claims unsuitable for class treatment. Waiver was also not an issue in *Lozano*. Further, the Ninth Circuit emphasized that the plaintiff (1) was on notice, unlike here, that AT&T intended to compel arbitration; and (2) failed to "explain[] how the district court was to conduct this analysis and how practical such analysis would be[.]" *Id.* at 728. *Moehrl* presents a straightforward template for how the Court could handle this issue.

**F.     Plaintiffs' class period is not overbroad.**

Align argues the class period should end on December 31, 2020 because any injury after this date "cannot be attributed to any agreement into which [it] voluntarily entered[.]" Mot. at 29. But Align cites no authority for the proposition that it is immune from liability for the enforcement of an agreement into which it voluntarily entered. It would not only be counterintuitive but perverse to create such a novel rule here given (a) that Align is jointly and severally liable with SDC, which affirmatively requested that the RC be equitably tolled in order to further exclude Align from the DTC market (Op. Ex. 32 at p.33) and (b) the clear impact of Align's market entry, and exit, on SDC's prices—which further harmed class members.

Align also argues the class period should be limited because the arbitrator's injunction did not bar Align from ███████████████████ after December 31, 2020, and that its choice not to do so reflected an "independent business decision." Mot. at 29-30. But the restriction on ███████████████ prevented Align from competing with SDC in the ███████ ███████████████████████ (*see* Br. at 10), and thus indisputably prevented Align from entering the DTC market in a (if not *the*) key way until August 2022. Further, had Align attempted to open a "pure DTC" business, it would likely have faced—based on its ████████████████████████████████████████ ████████████—additional litigation from SDC, given Arbitrator Saltarelli's decision to permanently enjoin Align from ███████████████████████████ Op. Ex. 32 at p. 35. And Align's claim that it was █████████████████ is contrary to the text of Arbitrator Saltarelli's order, which appears ████████████████████ ███.[56] Both a subsequent arbitrator and Align's own experts appear to share this understanding of Arbitrator Saltarelli's order.[57]

---

[56] *See* Op. Ex. 32 at pp. 33-34 (granting SDC's request that ████████████ ███████████████████████").

Doman Ex. 55 at p.7 (subsequent arbitration finding original arbitration █████████ ██████; Mathur ¶¶ 13 n.18, 106; Snyder ¶ 110.

DATED: May 3, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/  Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

*Counsel for Plaintiffs*