# EXHIBIT 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

```
MISTY SNOW, individually      )
and on behalf of all          )
others similarly situated,    )
                              )  CASE NO.
        Plaintiff,            )
                              )  3:21-CV-03269-VC
vs.                           )
                              )
ALIGN TECHNOLOGY, INC.,       )
                              )
        Defendant.            )
_____)
```

REMOTE VIDEOTAPED DEPOSITION OF

WILLIAM BRIAN VOGT, PH.D.

Friday, February 9, 2024; 11:14 a.m. EST

Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Notary Public

Job No. SY008670

1                William Brian Vogt, Ph.D.
2                I mean, that's not the -- that's not
3    the world that we live in.  The -- the preperiod
4    doesn't have any -- any clear trend, and the
5    little uptick at the end is during the time the
6    -- the agreement was being negotiated, and so --
7    so I -- I don't think that, you know -- I don't
8    think there's any reason to believe that there's
9    a trend here that needs to be taken account of.
10               I mean, if your question is, if there
11   were to be a trend that needed to be taken
12   account of and -- and I didn't take account of
13   it, I think that would be bad, yes.  But that's
14   not where we are.
15         Q.    You've testified about this little,
16   as you put it, uptick at the end, and you've
17   said that -- that there's a possibility, I
18   think, that this was what you called
19   "anticipatory price increase."
20               Now, am I right that you don't
21   actually know one way or another whether the
22   restrictive covenant caused -- actually caused any
23   price increase before July 2016?
24         A.    I think I do.  I think that, you
25   know, there's a -- there's a clear reason to

1                William Brian Vogt, Ph.D.
2    divide up the -- the time period the -- the way
3    I do.  There's a -- there's an economic story,
4    an economic theory for why taking away a
5    potential entrant might lead to a -- a -- a
6    price increase.
7                And then if you just look at the
8    data, right, what the data looked like is
9    there's -- they bounce around, and they're
10   pretty flat in the -- in the -- in the -- in the
11   clean period, and then right after or as soon as
12   the operating agreement goes into effect, the
13   price shoots up by a lot.  And then once Align
14   enters with the DDCT -- the DDTC stores, the
15   price flattens out.  And then when the DDTC
16   stores are forced to go away by the arbitration
17   conclusion, the prices start going up again.
18                I think the -- the fact that the
19   data is --
20        Q.    I'm going to interrupt because I
21   didn't ask anything about DDTC or the
22   arbitration, or anything, and we are going to
23   have to take more time for this deposition.
24                I was asking about whether --
25                MR. PIERCE:  The witness gets to

Page 141

1                William Brian Vogt, Ph.D.
2         finish the answer.  If you want to make a
3         motion --
4              MS. GIULIANELLI:  I will --
5              MR. PIERCE:  -- to resume the
6         deposition --
7              MS. GIULIANELLI:  -- I actually
8         will.
9              MR. PIERCE:  -- after seven hours,
10        that's fine.  Let the witness finish his
11        answer, and then we can --
12             MS. GIULIANELLI:  Let me --
13             MR. PIERCE:  -- fight about it in
14        court afterwards.
15             MS. GIULIANELLI:  -- let -- let me
16        finish, Rio -- with Mr. Pierce, because I
17        want just an answer to my question.
18   BY MS. GIULIANELLI:
19        Q.   And my question was whether or not
20   you actually are able to opine one way or
21   another about whether the restrictive covenant
22   actually caused any price increase below --
23   before July 2016.
24             And I don't want a speech about an
25   arbitration and stores and price periods in 2017.

1                William Brian Vogt, Ph.D.
2                MR. PIERCE:  The witness was
3        providing a full answer to your prior
4        question.
5                Mr. Vogt, please finish answering
6        the question.  Then Ms. Giulianelli can
7        answer her -- ask her next question.
8                THE WITNESS:  Yes, I mean, I was
9        explaining the -- the basis of my view
10       that the operating agreement caused the --
11       caused the price increase, and it's -- and
12       it's what I said; it's the combination of
13       the -- the circumstances of the case, the
14       -- you know, economic theory, which would
15       lead one to believe that there's a -- a
16       potential reason for the operating
17       agreement to cause the -- the price
18       increase and the -- the way the data line
19       up with the facts of the case and the --
20       the economic theory.
21               And this uptick beforehand, I mean,
22       sure, there's reasons to believe that that
23       could be caused by -- by the operating
24       agreement.  The operating agreement was
25       being negotiated at that time, and the --

1                William Brian Vogt, Ph.D.
2           and the -- the parties involved knew that
3           the operating agreement was being
4           negotiated at that time.
5      BY MS. GIULIANELLI:
6           Q.    Are you offering an opinion that
7      prices that SDC was charging in the marketplace
8      before July of 2016 were actually inflated
9      because of the operating agreement?
10          A.    I'm offering the opinion that that's
11     a potential -- that's a possible and even likely
12     explanation for the uptick at the end of the
13     clean period.
14                Beyond that, since that effect, if it
15     were there, would tend to make prices in the
16     clean period higher; it would make the damages
17     calculation conservative.
18          Q.    Is it your -- can you offer an
19     opinion to any degree of scientific certainty
20     that prices were increasing in April of 2016
21     because of the restrictive covenant?
22          A.    I -- I can tell you that standard
23     practice in economics when conducting an event
24     study is to worry about these sorts of
25     anticipatory effects.  It's very common for --

1                William Brian Vogt, Ph.D.
2    for that to be, you know, a -- a concern, and
3    it's -- it's standard practice to try to take
4    account of it in one way or another.
5           Q.   In this case, did you do any analysis
6    to determine when these, as you say,
7    anticipatory effects because of the restrictive
8    covenant started?
9           A.   Sure.  I examined the -- I examined
10   the timeline of events.  I considered the fact
11   that the negotiations were ongoing during this
12   period.  And, obviously, I brought to bear, you
13   know, the -- the relevant economic theories and
14   the -- and the circumstances of the -- and the
15   circumstances of the -- of the events as they
16   unfolded and the -- and the -- the movement of
17   prices, as -- as I told you before.
18                I mean, the fact that the prices went
19   up, you know, by this large amount right after
20   the operating agreement was put into place
21   certainly should lead you to suspect that maybe
22   some of that spilled back into the -- into the
23   clean period.
24           Q.   Are you aware that SDC and Align did
25   not begin negotiating the operating agreement

```
 1                    C E R T I F I C A T E
 2            I, Cindy L. Sebo, Nationally Certified Court
 3   Reporter herein, do hereby certify that the foregoing
 4   remote deposition of WILLIAM BRIAN VOGT, PH.D., was
 5   taken before me pursuant to notice at the remote time
 6   and place indicated; that said witness duly swore
 7   remotely to tell the truth, the whole truth ,and
 8   nothing but the truth under penalties of perjury;
 9   that said testimony of the witness was correctly
10   recorded to the best of my abilities in machine
11   shorthand, thereafter transcribed under my
12   supervision with computer-aided transcription;
13   that the deposition is a true and accurate record of
14   the testimony given by the witness; that I am neither
15   counsel, nor kin to any party in said action, nor
16   interested in the outcome; and that a copy of this
17   transcript obtained from a source other than the
18   court reporting firm, including an adversary or
19   co-counsel in the matter, is uncertified and may not
20   be used at trial.
21
22            Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR,
              RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR
23            30XI00244600, NJ CRT 30XR00019500, WA CSR
              23005926, OR 230105, TN CSR 998, TX CSR
24            12778 Remote Counsel Reporter,
              LiveLitigation Authorized Reporter, Notary
25            Public
```