Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
        tedw@hbsslaw.com
        joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3 001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>    Defendant. | Case No. 3:21-cv-03269-VC<br><br>**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT WITH ALIGN TECHNOLOGY, INC.**<br><br>**REDACTED PUBLIC VERSION**<br><br>Date:   December 12, 2024<br>Time:   2:00 p.m.<br>Dept:   Courtroom 4 – 17th Floor<br>Judge:  Hon. Vince Chhabria |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   RESPONSES .......................................................................................................1

     A.    Why would it be appropriate to approve a settlement agreement involving the distribution of coupons that would incentivize even more customers to do business with Align? ............................................1

     B.    Why is a claims process needed?..............................................................5

     C.    Why do all class members receive an equal pro rata share of the settlement fund?......................................................................................8

     D.    What are the strengths and weaknesses of plaintiffs' case? .................12

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ........................................................................16, 17

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ..................................................................................3

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) .................................................................................17

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................................4

*In re Lithium Ion Batteries Antitrust Litig.*,
2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) .....................................................12

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) ..................................................................10

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................9

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) .............................................................................9, 10

*In re Oracle Sec. Litig.*,
1994 WL 502054 (N.D. Cal. June 18, 1994) .........................................................9

*Simon & Simon, PC v. Align Tech., Inc.*,
533 F. Supp. 3d 904 (N.D. Cal. 2021) ...................................................................2

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982) ................................................................................4

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).................................................................................................2

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................................10

**Statutes**

Sherman Act Section 1..............................................................................................4

## I.      INTRODUCTION

Plaintiffs submit the following responses to the Court's September 18, 2024 Order Denying Motion for Preliminary Approval of Class Settlement ("Order").[1] The Parties appreciate the careful attention and guidance provided by the Court in the Order and have endeavored to satisfy each of the Court's concerns. As a result, the Parties have entered an Amended Settlement Agreement and drafted updated Notice Forms. For efficiency, Plaintiffs incorporate by reference their prior motion for preliminary approval filed before the Court and focus this renewed motion on specifically addressing the four issues raised by the Court in its prior Order.[2] Plaintiffs understand that per the Court's Order Granting Stipulation for Extension of Time to Submit Renewed Motion for Preliminary Approval of Class Action Settlement,[3]  Align also intends to file a response to this motion that addresses some of the issues raised in the Court's prior order.

## II.      RESPONSES

### A.      Why would it be appropriate to approve a settlement agreement involving the distribution of coupons that would incentivize even more customers to do business with Align?

The Parties' Amended Settlement Agreement provides Settlement Class Members with the option to receive a $300 coupon for Invisalign treatment and/or $50 in coupons for Align's "Vivera" retainers.[4] The coupons for Vivera retainers are newly added as part of the renegotiated

---

[1] ECF No. 624.

[2] *See* Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement with Align Technology Inc., ECF No. 612.

[3] ECF No. 626.

[4] Decl. of Rio S. Pierce in Support of Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement with Defendant Align Technology, Inc., Ex. B Amendment to the Settlement Agreement at 1–2. The retainer coupons will be issued in 5 coupons of $10 each because the parties anticipate that class members who utilize the coupons will purchase multiple sets of retainers over an extended period of time. *See id.*

settlement, and are included in order to provide an additional form of potential relief to class members who may not be interested in obtaining further aligner treatment. Retainers are of potential interest to class members, even if they have successfully completed aligner treatment, because it is recommended that individuals use retainers after the completion of aligner treatment in order to preserve the teeth movement that has been performed by the aligners.

That being so, neither of the coupons raise competitive concerns for four principal reasons.

*First*, the coupons do not feature any of the indicia that courts generally recognize as raising anticompetitive concerns. The coupons are a voluntary discount that Align is offering to a limited set of customers. As this Court has previously recognized, a competitor offering lower prices is not anticompetitive. With respect to Align's Advantage Program, the Court previously explained that "a system for providing short-term (one year) volume discounts" did not "add anything to [Plaintiffs'] antitrust theory."[5] The same logic applies with even more force here—where the discounts are not volume-based discounts being offered to dentists (who are repeat purchasers) but instead are one-off discounts being offered directly to consumers (who will purchase at most one additional course of aligner treatment through usage of coupons). And there is nothing anticompetitive, without something more, about lower prices, regardless of whether they are offered by a business with or without market power, because "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."[6]

Furthermore, the coupons are only redeemable for two years from the date of Final Approval of the settlement, as long as a class member claims the coupon within one year from the

---

[5] *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 917 (N.D. Cal. 2021) (quoting *Allied Orthopedic Appliances v. Tyco Health Care Group*, 592 F.3d 991, 997 (9th Cir. 2010)).

[6] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

date of final approval of the settlement.[7] The coupons are also optional—a class member may choose to claim or not claim them. And indeed, class members are not incentivized to claim them because claiming (or not claiming) them has no effect on the monetary relief that they will receive.

Courts also recognize that discounts may raise anticompetitive concerns if they result in sales of a product below variable cost.[8] But the coupons here will not result in Align selling aligners at predatory prices. The average sales price at which Align has sold aligners to dentists has never been below ███ during the period for which Plaintiffs have available data.[9] Align's cost of goods sold generally has ranged between ███████ dollars.[10] Here, the aligner coupon represents a real discount for Align on its average sales price, but will not lead it to engaging in below cost sales that may be considered predatory.

*Second*, the nature of the product at issue further mitigates any concerns about anticompetitive effects. Aligner treatment, when performed correctly, is generally a one-time purchase. A patient who purchases aligner treatment using the offered coupon will not be locked into an ongoing business relationship with Align in any other market—in the way, for example, that a customer who purchases an iPhone may be locked into certain related aftermarkets (such as usage of iCloud or Apple wallet products).

*Third*, the portion of the coupons related to aligner treatment represent a small portion of a total aligner market. For example, if 9% of the class claims the aligner coupon—the median claims

---

[7] Decl. of Rio S. Pierce in Support of Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement with Defendant Align Technology, Inc., Ex. B Amendment to the Settlement Agreement at 1–2.

[8] *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 900–901 (9th Cir. 2008).

[9] Plaintiffs' Motion for Class Certification, ECF No. 389 Ex. 2, Expert Report of William B. Vogt, Ph.D. at 349, Figure 91.

[10] *Id.* at 321, Figure 74.

rate in consumer class actions, based on statistics published by the Federal Trade Commission[11]—the total claimed coupon value would be approximately $38 million dollars.[12] However, Align's U.S. aligner revenue in 2021 (the last year for which Plaintiffs have complete data) was $1.3 billion. In this circumstance, the total claimed coupon value would represent just 2.9% of Align's revenue in the relevant market, without accounting for the competition of additional aligner manufacturers. And for the reasons discussed above, the coupons are not foreclosing because they lack the characteristics of conduct that causes market foreclosure. But in any case, courts routinely recognize that substantial foreclosure in a market generally requires at least 20 to 30% of the market.[13] Even using conservative assumptions, the portion of the affected market here is significantly smaller. Coupon relief will therefore not amount to anything close to substantial foreclosure.

*Fourth*, the revised settlement agreement now also provides that a class member may obtain a coupon for retainer treatment. This relief is likely valuable to a greater number of class members than the Invisalign treatment coupon. The reason is that the Invisalign treatment coupon will likely be claimed only by a subset of class members who elect to redo or supplement the teeth straightening procedures they already completed with SDC. By contrast, according to the American Association of Orthodontics, all patients who complete teeth straightening treatment—

---

[11] *See* Alison Frankel, *FTC's comprehensive study finds median consumer class action claims rate is 9%*, REUTERS (Sep. 10, 2019), https://www.reuters.com/article/world/ftcs-comprehensive-study-finds-median-consumer-class-action-claims-rate-is-9-idUSKCN1VV2QT/.

[12] Plaintiffs estimate that there are approximately 1.4 million class members. A 9% claims rate would mean that approximately 126,000 class members claimed a coupon.

[13] *See, e.g.*, *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1304 (9th Cir. 1982) (finding a contract that restricted 24% of the relevant market resulted in cognizable foreclosure); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015) (recognizing a substantial share has been quantified as 40 to 50 percent of the relevant market in cases arising under Section 1 of the Sherman Act).

including all 1.4 million class members who purchased SDC aligners—"should utilize a retainer" because they "are crucial for supporting the bone around your teeth as they adapt to their new position" and to "keep [] teeth straight and minimize relapse."[14] And, importantly, there have been no claims that Align possesses any market power in any proposed retainer market. Therefore, these coupons do not raise any anticompetitive concerns.

Therefore, the distribution of these coupons as a limited form of supplementary relief will not anticompetitively entrench Align's market power based on established principles of antitrust law and the specific circumstances of the coupons offered here. Their presence should not militate against approval of the settlement, which will provide prompt relief to the class that has already waited three years since the filing of the litigation.

**B.    Why is a claims process needed?**

Plaintiffs have developed a new notice process and allocation plan after reviewing the customer contact information produced by SmileDirectClub and in response to the Court's comments on this point.

Plaintiffs have pursued class member contact information from multiple sources.[15] Obtaining class member contact information has been difficult, primarily because SmileDirectClub ("SDC") is now in Chapter 7 bankruptcy and does not have any functioning business operations.[16] Nevertheless, following extensive negotiations, Plaintiffs have obtained two

---

[14] *Understanding Retainers: The Key to Maintaining Your Smile*, American Association of Orthodontists (last visited Oct. 28, 2024), https://aaoinfo.org/treatments/retainers/.

[15] Decl. of Rio S. Pierce in Support of Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement with Defendant Align Technology, Inc. at ¶ 3.

[16] *Id.*

primary sources of class member contact information from the bankruptcy trustee for the estate of SDC.

*First*, Plaintiffs obtained a file that contains ███ Class Member records for actual Class Members as provided by SDC.[17] The data in this file appears to be comprehensive and complete, and includes the approximate date of purchase, the type of purchase, and both physical and digital addresses for these class members.[18] However, this data source is incomplete because the total class number of transactions is approximately 1,400,000.[19]

*Second*, Plaintiffs obtained 63 additional electronic files from the estate of SDC that were pulled from databases that SDC maintained on Salesforce.[20] This production was made because Plaintiffs requested that the estate of SDC produce all potentially relevant class member contact information after they reviewed the initial spreadsheet with information on approximately ███ class members—and realized it did not contain contact information for a significant portion of the class.[21] The bankruptcy trustee for SDC represented to Plaintiffs that the material they produced contained a mix of customer contact information, including potential customers and other sales leads who were not actually class members because they never purchased SDC's product.[22] Plaintiffs' settlement administrator, Epiq, has completed an analysis of this information and found that, in total, the files contain over 20 million e-mail addresses and over 2 million mailing

---

[17] *Id.* at ¶ 4.

[18] *Id.*

[19] *Id.*

[20] Plaintiffs understand that Salesforce provides various types of customer relationship management software that SDC used in the course of its business operations; *see Id.* at ¶ 5.

[21] *Id.* at ¶¶ 5–6.

[22] *Id.*

addresses.[23] These files generally do not provide specific details on any transactions associated with an e-mail address or mailing address.[24] Consistent with the statements of the bankruptcy trustee for SDC, the volume of contact information significantly exceeds the total number of class transactions.

Therefore, based on this available information, Plaintiffs propose the following claims process that will include (1) direct payment to the class members for whom Plaintiffs have been able to identify reliable information as well as (2) an opportunity for all potential class members to submit a claim.[25]

1. Plaintiffs will send notice (both mailed and electronic) to the approximately ███ class members for whom Plaintiffs have reliable information on their transactions.[26] This notice will state that these class members will receive payment reflecting their pro rata share of the settlement after final approval regardless of whether they submit a claim. This notice will further state that these class members are eligible to receive an additional payment (based on redistribution of funds not claimed by class members) if they submit a claim. These proposed electronic and postcard notice forms are attached as Exhibits D and F.[27]

---

[23] *Id.* at ¶ 6.

[24] *Id.* Plaintiffs have also subpoenaed Apple and Google for the contact information of those who downloaded the SDC app from either Apple's App Store or Google's Play Store. Plaintiffs expect that Apple and Google will make productions within the next month. Plaintiffs will incorporate that contact information in the electronic notice that they provide. *See Id.* at ¶ 7.

[25] A claims process will also allow each class member to elect to receive the coupon portion of the settlement. The coupon portion of the settlement is entirely optional and will not diminish any Settlement Class member's pro rata share of the settlement fund.

[26] Epiq will review and validate this data as part of the claims administration process.

[27] Plaintiffs also attach an Amendment to the Settlement Agreement, a revised Long Form Notice and a Revised Claims Form as Exhibits B, C, and H. These revised forms include information about the additional coupon relief now available, as well as the proposed revised method of allocation. *Id.* at ¶ 8. The specific amount of direct payment will be filled in once Epiq

If a Settlement Class member that will receive a direct payment also fills out a claims form, they will be entitled to additional money. This additional money will be the difference between (a) the Settlement Class member's pro rata share of the settlement fund based on the amount of Settlement Class members who submit claims and (b) the money she initially receives via direct payment. For the convenience of the Settlement Class members, Plaintiffs plan to issue a single payment for each of these Settlement Class Members after final approval.

2.     Plaintiffs will also send e-mail notice to all potential class members that they can identify from the files that the trustee for SDC produced.[28] This notice will state that valid members of the class will receive a payment if they submit a claim. This proposed electronic notice form is attached as Exhibit E and the proposed postcard notice form is attached at Exhibit G. If an eligible Settlement Class member who is not going to receive a direct payment fills out a claims form, she will be entitled to the full amount of her pro rata share of the settlement fund. The pro rata share to which each class member is entitled will be determined after Final Approval of the settlement is granted, once Plaintiffs have received and validated all claims.

Under this proposed approach, all Settlement Class Members who submit valid claims forms will ultimately receive the same payment amount.

**C.     Why do all class members receive an equal pro rata share of the settlement fund?**

After further consideration, Plaintiffs submit that providing an equal pro rata share of the settlement fund to Settlement Class members is the most equitable approach to distributing funds for the following reasons. .

---

finishes reviewing and validating this data. Currently, Plaintiffs anticipate that the pro rata direct payment will be approximately $11.05, based on a total settlement fund of approximately $15.9 million and an estimated class size of approximately 1.4 million class members.

[28] To the extent practicable, Epiq will clean and validate the contact information before distributing this electronic notice.

*First*, all Settlement Class members (1) suffered the same economic injury, (2) allege their injury arises from the same course of conduct, and (3) had equally strong claims on the merits. Further, (4) the maximum difference in overcharges paid between Settlement Class members was less than $150.[29] In similar circumstances, courts have approved pro rata distribution plans.[30]

*Second*, even the most comprehensive set of SmileDirectClub's customer contact information for approximately ████ class members does not generally record each customer's method of payment (i.e., SmilePay or FullPay). Plaintiffs will not be able to independently confirm whether a Settlement Class member paid with SmilePay or FullPay until that Settlement Class member submits a claims form. Due to this lack of information, counsel for Plaintiffs have not identified any way to reliably issue direct payments to class members depending on their method of payment, without the class member first submitting a claims form. In its prior order, the Court encouraged Plaintiffs to identify a method for making direct payment to class members even if they did not provide a claims form. Distributing an equal pro rata share to Settlement Class members will allow for direct payment to be made to a significant number of class members even if they do not ultimately submit a claims form.

*Third*, counsel for Plaintiffs respectfully submit that the relatively small differences in both overcharge and estimated payment between SmilePay and FullPay militate in favor of a pro rata distribution across all class members, particularly considering the fact that significantly more class members selected SDC's "SmilePay" (rather than "FullPay") option. On an individual class

---

[29] Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement with Align Technology, Inc., ECF No. 612 at 6, 11–12.

[30] *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 945 (9th Cir. 2015); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."); *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

member basis, the maximum percentage difference is approximately 42% between the highest overcharge and lowest overcharge.[31]   This is a significantly smaller percentage difference than other antitrust cases in which courts have approved an equal pro rata plan of allocation.[32]

Furthermore, although FullPay damages were higher on an individual basis, on a collective basis, SmilePay damages were higher because significantly more class members used that payment option.  Specifically, Plaintiffs' alleged SmilePay damages were $249,412,476 and FullPay damages were $172,547,378, so total damages were $421,959,854.[33]  This means SmilePay comprised 59% of the damages pool[34] and FullPay comprised 41% of the damages pool.[35]  There were also 941,983 SmilePay transactions during the class period and 508,152 FullPay transactions during the class period.[36] After accounting for the maximum attorneys' fees, costs, and settlement

---

[31]  The maximum overcharge suffered by a class member was $352 and the minimum overcharge was $230. Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 6, Rebuttal Report of William B. Vogt, Ph.D. at 100. So, $(352-230) / ((352 + 230) * 0.5) = 0.41924$.

[32] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 940 (equally apportioning a settlement fund among class members where some class members paid for a Netflix subscription for more than six years and some for a significantly shorter period); Plaintiffs' Motion for Class Certification, ECF No. 128, at 8, *In re Online DVD-Rental Antitrust Litig.*, Case No. 4:09-md-02029-PJH (N.D. Cal. 2010) (showing Netflix subscription prices ranging between $8.99 and $16.99 during the class period, which is a 62% difference); *see In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("[C]ourts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable).

[33] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 6, Rebuttal Report of William B. Vogt, Ph.D. at 100.

[34] $249,412,476 / 421,959,854 = 0.59108$.

[35] $172,547,378 / 421,959,854 = 0.40892$.

[36] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 6, Rebuttal Report of William B. Vogt, Ph.D. at 100.

administrator's fees, there will be approximately $15,471,992 in the settlement fund.[37] So, if damages were divided between SmilePay and FullPay customers and all eligible Settlement Class members participate in the settlement, each SmilePay customer would be entitled to $9.69[38] and each FullPay customer would be entitled to $12.48.[39] But if damages are divided equally among the class members and all eligible Settlement Class members participate in the settlement, class members would each be entitled to $10.67.[40] This is less than a $1 difference between proportional SmilePay damages and less than a $2 difference between proportional FullPay damages.

*Fourth*, dividing the settlement fund equally also avoids a perverse outcome if there is a significantly greater percentage of settlement participation among SmilePay or FullPay customers. For example, if 200,000 eligible Settlement Class members participate in the settlement,[41] of which 100,000 participants are SmilePay customers and 100,000 participants are FullPay customers, then each SmilePay customer would be entitled to $91.28[42] and each FullPay customer would be entitled to $63.43.[43] In this scenario, SmilePay customers would be entitled to almost 50% more cash, despite the fact that FullPay customers were overcharged more than SmilePay customers. By contrast, if the settlement fund is divided equally, all Settlement Class members who submitted

---

[37] This is the difference between the $27.5 million settlement fund and the maximum attorneys' fees ($8.25 million), maximum costs ($3 million), and maximum settlement administrator's fees ($778,008).

[38] ($15,471,992 * 0.59) / 941,983 = $9.69.

[39] ($15,471,992 * 0.41) / 508,152 = $12.48.

[40] $15,471,992 / (941,983 + 508,152) = $10.66.

[41] This would represent a claims rate of approximately 15%, which is above the median rate found by the FTC in its study of class action settlements. *See* Frankel, *supra*. These claims would also supplement the automatic payments received by some class members.

[42] (15,471,992 * 0.59) / 100,000 = 91.28.

[43] ($15,471,992 * 0.41) / 100,000 = $63.43.

claims would be entitled to $77.35[44]—a far more equitable outcome that still recognizes all Settlement Class members suffered the same economic injury, all allege their injury arises from the same course of conduct, and all had equally strong claims on the merits.

For these reasons, Plaintiffs respectfully submit that an equal pro rata allocation plan that does not vary depending on method of payment is most appropriate.

**D.      What are the strengths and weaknesses of plaintiffs' case?**

Plaintiffs maintain that the evidence produced in discovery supports their claims.[45] But "[a]ntitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute."[46] "The best case can be lost and the worst case can be won, and juries may find liability but no damages. None of these risks should be underestimated."[47] Plaintiffs discuss the primary strengths and weaknesses of the case that have emerged during discovery.

*First*, the existence and scope of the challenged agreement is typically a heavily disputed factual matter. Here, by contrast, the existence of a written agreement between Align and SDC that explicitly restrained Align's ability to compete in the DTC aligner market is undisputed. Documentary evidence, including deposition testimony, shows that both parties specifically understood that the restrictive covenant would stop Align from competing in the DTC aligner market. For example, Align itself, in briefing that it submitted as part of one of its arbitrations with

---

[44] $15,471,922 / 800,000 = $77.35

[45] *See* Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement with Align Technology, Inc., ECF No. 612 at 2.

[46] *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020), *aff'd*, 2022 WL 16959377 (9th Cir. Nov. 16, 2022)

[47] *Id*.; *see also* Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement with Align Technology, Inc., ECF No. 612 at 10–11.

SDC, stated that ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████ [8] Both Align and SDC also understood that the restrictive covenant served SDC's

specific goal of keeping Align out of the DTC market. Align's CEO testified at a 2018 deposition

that, at the time Align entered the Operating Agreement, ███████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████ [9] SDC's CEO, David Katzman, also testified at an arbitration

hearing that he ████████████████████████████████████████████████ [50]

However, while Align does not dispute the existence of the restrictive covenant, Align contends

that the restrictive covenant had no effect, because it did not compete in the alleged DTC aligner

market and had no capability to do so.[51]

*Second*, the key question in resolving whether the restraint at issue—the restrictive

covenant—will ultimately be analyzed under the per se or rule of reason standard is whether it was

"reasonably necessary" for the overall business relationship between Align and SDC. Plaintiffs

submit that the developed factual record shows that the restrictive covenant was not reasonably

necessary to Align and SDC entering into a deal.  Plaintiffs conducted extensive discovery related

to the negotiations over the business relationship between Align and SDC. That negotiating history

---

[48] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 5, Expert Report of William B. Vogt, Ph.D. at 57.

[49] *Id.*

[50] *Id.* at 53.

[51] Align relies on documents and deposition testimony to show that, at the time the contracts were executed, Align had never sold aligners in the alleged DTC market, had no plans to do so, and that Align was incapable of entering the DTC channel itself because (it claims) it lacked the infrastructure, expertise, and regulatory approvals necessary to sell DTC. *See* Defendant Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 7, n.25.

revealed a clear lack of connection between the supply agreement between Align and SDC (pursuant to which Align supplied SDC with aligners) and the restrictive covenant.[52] ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████[3] ████████████████████████████[4] ██████████

████████████████████████████████████████████████████████

████[55] ████████████████████████████████████████████[6]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████[57] All of these facts tend to show that the restrictive covenant was not reasonably necessary to the business relationship between Align and SDC. Indeed, Align itself repeatedly proposed versions of the business relationship that did not include a restrictive covenant.

*Third*, the developed factual record shows that the restrictive covenant had an actual effect on competition. After Align attempted to enter the DTC aligner market by opening retail stores, SDC invoked the restrictive covenant to obtain an injunction from an arbitrator that forced Align to close all of its retail stores.[58] The factual record also shows the significant economic value that

---

[52] *See* Plaintiffs' Motion for Class Certification, ECF No. 540 at 2–3.

[53] *Id.* at 7–8.

[54] *Id.*

[55] *Id.* at 8.

[56] *Id.*

[57] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 5, Expert Report of William B. Vogt, Ph.D. at 52.

[58] *Id.* at 59; Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 32, March 4 Arbitration Award (holding that Align had ███████████████████████████████████████████████ ████████████████████████████████████████████████████████

SDC placed on restricting competition. ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████



The value that SDC placed on preventing competition from Align was also obvious to Align executives, who understood that Align was SDC's primary potential competition. As Joe Hogan, Align's CEO, wrote in July 2017: ████████████████████████████████

██████████████████████████████ [0]

*Fourth*, the economic data shows a clear and obvious price effect. Starting in July 2016, when Align and SDC entered into the restrictive covenant, SDC increased its prices substantially even though its costs per treatment were rapidly decreasing.[61] This change in pricing behavior was unusual and represented a statistically significant break from SDC's prior pricing practices. The pricing trend following the restrictive covenant is also exactly what an economist would expect from an anticompetitive agreement: (1) SDC raised prices once it entered into the restrictive

---

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[59] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 5, Expert Report of William B. Vogt, Ph.D. at 201–203.

[60] *Id.* at 124.

[61] *Id.* at 154–56.

covenant with Align; (2) SDC stopped raising prices when Align attempted to compete by opening so-called "DDTC" stores to compete with SDC; (3) SDC resumed raising prices after it succeeded in enforcing the restrictive covenant.

*Fifth*, the facts of the economic transactions at issue make this a strong case for class certification. The case involves a single product sold by a single defendant at two established price points (one for SmilePay and one for FullPay). SDC consistently set national, uniform prices for both SmilePay and FullPay.[62] Consistent with these facts, in negotiating the settlement, Plaintiffs placed a reasonably high likelihood on the class ultimately being certified.

Nevertheless, the case also has significant risks that make a settlement ultimately in the best interests of the class. Plaintiffs enumerate the most significant risks that they considered in determining the settlement represented a fair and reasonable result for the class.

*First*, it is uncertain whether the restraint at issue—the restrictive covenant—will ultimately be analyzed under the per se or rule of reason standard.  Align has indicated that it would move for summary judgment on Plaintiffs' per se claim, arguing that its overall agreement with SDC was an "output enhancing deal, centered around a vertical supply agreement," and thus that the agreement "is manifestly not within the 'small group of restraints are unreasonable *per se* because they always or almost always restrict competition and decrease output.'"[63] The key question in resolving this issue is whether the restrictive covenant was "reasonably necessary" for

---

[62] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 6, Rebuttal Report of William B. Vogt, Ph.D. at 75.

[63] Defendant Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 9, n.47 (quoting *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021)).

the overall business relationship between Align and SDC.[64] Align will rely on testimony from senior executives at both Align and SDC that they would not have executed the agreements if not for the restrictive covenant. For example, Joe Hogan, Align's CEO, testified that without the restrictive covenant, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████[65]

Plaintiffs have responses. As discussed above, this testimony is inconsistent with the negotiating history, as well as deposition testimony from other executives at both Align and SDC.[66] Further, even if credited, this testimony also conflates the subjective views of the parties with the searching analysis that courts conduct in order to determine whether a challenged restraint is actually reasonably necessary.[67] Nevertheless, a finder of fact may credit the testimony from senior decisionmakers at both Align and SDC regarding their business reasons for entering into a deal and determine that the Restrictive Covenant was an ancillary restraint—one that should be analyzed under the rule of reason. If the rule of reason applies, then the settlement value of the case decreases, as the rule of reason is a more favorable standard for antitrust defendants than the

---

[64] *Aya Healthcare Servs.,* 9 F.4th at 1109 (explaining that a horizontal restraint is ancillary if it is "subordinate and collateral to a separate legitimate transaction" and "reasonably necessary to achieving that transaction's pro-competitive purpose.").

[65] Expert Report of Professor Steven Davidoff Solomon at 12; *see also* David Katzman Deposition, p. 366:11-21 ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

[66] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 5, Expert Report of William B. Vogt, Ph.D. at 50–52.

[67] *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699, 704 (7th Cir. 2023) ("Another problem with using the appearance of a clause in a contract that, on the whole, increases output, is that the clause may have nothing to do with the output.  A "restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful.").

per se standard. And this testimony, if credited, may also affect how the ultimate finder of fact evaluates whether there were less restrictive alternatives to the restrictive covenant for obtaining the purported procompetitive benefits from the relationship between Align and SDC.

*Second*, if the restraint is evaluated under the rule of reason, then the finder of fact will have to weigh the anticompetitive effects against the procompetitive benefits of the business relationship between Align and SDC. Align has presented evidence that it was uniquely situated to provide the manufacturing capacity, funding, and access to its patents necessary for SDC to scale the first-ever DTC aligner company,[68] and that these Align contributions to SDC made possible by the Align-SDC relationship caused SDC's subsequent exponential sales growth, with SDC's aligner output increasing by 3,000 percent per month."[69] Align will also produce multiple economic experts who will testify that the restrictive covenant had no effect on SDC's pricing and that their economic models show no overcharges. Under the rule of reason, a finder of fact could credit the evidence relied upon by Align to find that procompetitive benefits of the Align-SDC deal outweighed its alleged anticompetitive harms and that the restrictive covenant had no effect on the prices of SDC aligners.

*Third*, SDC filed for bankruptcy in the fall of 2023. The bankruptcy ultimately became a Chapter 7 liquidation and SDC has now shuttered its business operations. Align has seized on this fact to advance several arguments related to key economic questions in the case. In particular, Align has argued that SDC's eventual bankruptcy makes Plaintiffs' modelled overcharges unrealistic because SDC could not have afforded to charge lower prices in the but for world than

---

[68] Defendant Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 7–9.

[69] Defendant Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 9, n.46.

it charged in the actual world.[70] In support of this argument, Align has also emphasized that, on a GAAP basis, SDC was consistently unprofitable since its formation.[71] Plaintiffs' position is that this argument is meritless because (1) SDC's unprofitability was directly related to its decision to invest (ultimately excessively) its revenues into marketing expenses in order to obtain a first mover advantage; and (2) SDC could and did adjust its marketing expenses if it wanted to, such as in the period around its initial public offering.[72] Nevertheless, Plaintiffs understand that this argument may have an appeal that strengthened certain of Align's challenges to Plaintiffs' economic modeling and acknowledge the risks associated with convincing a jury that an ultimately bankrupt company was nonetheless reaping supracompetitive profits before its bankruptcy.

*Fourth*, it is undisputed that at least the bulk of the proposed class entered into agreements with SDC that contained arbitration and class waiver provisions. Align has argued that "[t]he proposed class members each signed arbitration agreements and most also signed class-waiver agreements that make certifying a Rule 23 class impractical and unworkable."[73] As Plaintiffs have explained in the class certification briefing, Align has waived its right to invoke the agreements, Align has not demonstrated that it could successfully invoke the agreements against any member of the proposed Settlement Class, and this issue could readily be resolved through a motion to compel or modify the class definition.[74] However, even if the Court were to adopt Plaintiffs' position and certify the class, it is possible that Align would nevertheless bring motions to compel

---

[70] *Id.* at 20–21.

[71] *Id.*

[72] Plaintiffs' Reply in Support of Motion for Class Certification, ECF No. 582 at 12–13.

[73] Defendant Align Technology Inc.'s Opposition to Motion for Class Certification and Daubert Motion to Preclude Expert Testimony, ECF No. 562 at 23.

[74] Plaintiffs' Reply in Support of Motion for Class Certification, ECF No. 582 at 15–17.

arbitration or modify the class definition for at least some states.[75] If Align succeeded in bringing those motions (e.g., by successfully compelling arbitration as to purchases by class members in certain states), this would significantly affect the likely settlement value that the class could obtain.

*Fifth*, the economic modeling of overcharges is complicated, and there is a significant range in the potential damages that a finder of fact could find based on the economic models provided by the expert witnesses. Plaintiffs themselves have presented several economic models, with damages that range from approximately $209[76] million to $543 million.[77] Align indicated that it intended to move to Daubert plaintiffs' damages expert at the summary judgment stage to exclude three of his four damages models because they were before-after models that improperly failed to account for the expiration of the Restrictive Covenant in August 2022, and thus that those models are unreliable and must not be presented to a jury.

If Align were to prevail on its challenge to Dr. Vogt's methodologies, only his alternative "Model 4" damages of $209 million, which incorporated SDC sales data after the August 2022 expiration of the restrictive covenant, would be presented to the jury. That decision would significantly reduce the amount of damages the class received. Plaintiffs submit that their economic models are reliable and precisely consistent with the price effect that would be expected from an anticompetitive restraint that allocated a market between the two primary competitors in that market. Nonetheless, even if liability is proven, it is difficult to reliably predict how the ultimate finder of fact will ultimately determine which model is reliable for use in estimating

---

[75] *Id.* at 12–13.

[76] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 6, Rebuttal Report of William B. Vogt, Ph.D. at 78.

[77] Plaintiffs' Motion for Class Certification, ECF No. 540 Ex. 5, Expert Report of William B. Vogt, Ph.D. at 188.

damages. For example, in one recent case, Plaintiffs obtained a $4.7 billion jury verdict against the NFL and other defendants in an antitrust case, but the Court then granted a judgment notwithstanding the verdict and found that Plaintiffs' damages model was not reliable.[78] Therefore, there is a wide range of potential damages that could be awarded even if Plaintiffs establish liability.

***

Ultimately, Plaintiffs carefully weighed the strengths and weaknesses of the case before determining settlement was the superior course of action. The proposed settlement ensures all Settlement Class members nationwide receive meaningful and immediate relief. Plaintiffs respectfully request that the Court preliminarily approve the settlement.

---

[78] *See* Order Granting Defendants' Motion for Judgment as a Matter of Law, *In re: NFL "Sunday Ticket" Antitrust Litigation*, Case No. 2:15-ml-02668-PSG-SKX (C.D. Cal. 2015), ECF No. 1513.

DATED: October 28, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/  Rio S. Pierce*
Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
        tedw@hbsslaw.com
        joeyk@hbsslaw.com

*Counsel for Plaintiffs*