# EXHIBIT 1

## EXHIBIT FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MISTY SNOW, individually and on behalf of others similarly situated, | 3:21-cv-03269-VC |
| Plaintiffs, | |
| v. | |
| ALIGN TECHNOLOGY, INC., | |
| Defendant. | |

**DECLARATION OF EDWARD A. SNYDER, PH.D.**

**NOVEMBER 12, 2024**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY


# TABLE OF CONTENTS

I.     **QUALIFICATIONS**..................................................................................................... 1

II.    **BACKGROUND**....................................................................................................... 2

III.   **ASSIGNMENT** ....................................................................................................... 3

IV.   **THE COUPONS WOULD NOT HAVE AN ADVERSE EFFECT ON COMPETITION**................................................................................................ 4

     A.   The Invisalign coupons would not have an adverse effect on competition ..................... 5

     B.   The Vivera retainer coupons would not have an adverse effect on competition ............. 9

     C.   Summary ..................................................................................................... 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I, Edward A. Snyder, Ph.D., declare as follows:

## I.    QUALIFICATIONS

1.    My name is Edward A. Snyder.  I am the William S. Beinecke Professor of Economics and Management at Yale University.  My primary expertise is Industrial Organization ("IO"), the field of economics that deals most directly with pricing and distribution of products, interactions among competitors, contracting practices, vertical integration, and antitrust issues. My research draws on relevant theory, investigates real-world behavior, and is predominantly empirical in nature.  I conducted three scholarly projects on antitrust policy and enforcement with Thomas E. Kauper, Professor of Law Emeritus at the University of Michigan Law School and former Assistant Attorney General in charge of the Antitrust Division, US Department of Justice.  I have been an Editor of the *Journal of Law and Economics*.

2.    I earned my MA in Public Policy and PhD in Economics from the University of Chicago.  My PhD thesis focused on price-fixing and examined enforcement of Section 1 of the Sherman Antitrust Act by the U.S. Department of Justice; this involved reviewing over 200 price-fixing conspiracies.    Over the course of my academic career, I have taught courses on microeconomics, the application of IO to business, and economic analysis of major policy issues, which I co-taught for nine years with Gary S. Becker (Nobel Prize Laureate) and Kevin Murphy (Clark Medalist and winner of the MacArthur "Genius" Award).  I have been retained as an economics expert in a wide range of antitrust cases, including matters concerning pharmaceuticals, consumer products, transportation services, financial services, professional services, entertainment, and high-tech industries.  I submitted a report relating to Section 1 claims in this matter on November 10, 2023 ("Snyder Section 1 Report").[1]

---

[1]    Expert Report of Edward A. Snyder, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, November 10, 2023 ("Snyder Section 1 Report").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

3. I make this declaration based on information that I believe to be true and based on my knowledge and expertise. If called as a witness, I would testify to the substance of this declaration.

## II. BACKGROUND

4. The "Original Settlement Agreement,"[2] dated August 20, 2024, between Plaintiffs and Align Technology, Inc. ("Align"), includes these provisions:

   i. A monetary settlement amount of $27.5 million,[3] and

   ii. A coupon to each eligible settlement class member offering a "$300 discount for Invisalign treatment to be used for the Invisalign Lab Fee" that is "redeemable for two years from the date of Final Approval of the Settlement."[4]

5. Regarding (ii), I understand that the term "eligible settlement class member" refers to individuals who purchased Smile Direct Club aligners through the Direct-to-Consumer channel during the period October 22, 2017 to August 18, 2022 and who, therefore, are members of the proposed class of consumers.

6. I have reviewed the Court's Order Denying Motion for Preliminary Approval of Class Settlement, in which the Court stated:

   > Why would it be appropriate, in an antitrust case where the defendant is the dominant player in the market, to approve a settlement involving the distribution of coupons that would incentivize even more customers to do business with that defendant? The motion for preliminary approval contains no discussion of this,

---

[2] Settlement Agreement, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, August 20, 2024 ("Original Settlement Agreement").

[3] Original Settlement Agreement, ¶ 16.

[4] Original Settlement Agreement, ¶ 28.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and no discussion of the effects that the coupon distribution could have on competition in the aligner industry.[5]

7.  I understand that, in response to the Court's denial, Plaintiffs and Align agreed to an amendment to the settlement agreement.[6]  The two provisions cited in Paragraph 4 above remain and the settlement would provide an additional coupon:

  i.  A "coupon to each eligible Settlement Class Member for a $10 discount for each Vivera retainer [Align's retainer] up to a total of five Vivera retainers ('Vivera Coupons')" that is "redeemable for five years from the date of Final Approval of the Settlement."[7]

According to the Amendment to the Settlement Agreement, a "Settlement Class Member may use both an Invisalign Coupon and Vivera Coupons."[8]

## III.  ASSIGNMENT

8.  Counsel for Align have asked me to review the Original Settlement Agreement and the Amendment to Settlement Agreement,[9] and evaluate (a) the effects that the Invisalign coupons would have on competition in the aligner industry, and (b) the effects that the Vivera retainer coupons would have on competition in the retainer industry.  I have not been asked to provide opinions on the other components of the Original Settlement Agreement or on other issues raised in the Court's Order Denying Motion for Preliminary Approval of Class Settlement.

9.  In executing my assignment, I have directed employees of Analysis Group, Inc., an economic research and consulting firm, to assist me.  I am being compensated at an hourly rate of $1,400 for time spent on this matter and I receive compensation based on the professional fees of

---

[5]  Order Denying Motion for Preliminary Approval for Class Settlement, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, Docket No. 624, September 18, 2024, p. 1.

[6]  Plaintiffs' Renewed Motion for Preliminary Approval of Amended Class Action Settlement with Align Technology, Inc., Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, Docket No. 628, October 28, 2024, Exhibit B ("Amendment to Settlement Agreement").

[7]  Amendment to Settlement Agreement, ¶ 28.b.

[8]  Amendment to Settlement Agreement, ¶ 28.c.

[9]  Original Settlement Agreement; Amendment to Settlement Agreement.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Analysis Group.  No compensation is contingent on the nature of my findings or on the outcome of this litigation.

10. The documents, materials, and other information I have relied upon in conducting my analysis and forming my opinions are listed in Appendix A.  My updated Curriculum Vitae and list of my expert testimony within the past four years are in Appendix B.

## IV.    THE COUPONS WOULD NOT HAVE AN ADVERSE EFFECT ON COMPETITION

11. I understand the Court's concern about the potential effects of the coupons in generating more business for the firm that consumers turn to for redeeming the coupons, and thus adding to that firm's market share.  Presuming that the firm supplies good products and services, the coupons could also enhance their reputation and provide further opportunities for learning-by-doing.

12. This logic need not apply, however, in situations where there is a limited pool of consumers who might redeem the coupon and when the time period for redemptions is limited.  In this context, as I explain below, the number of redeemed coupons is expected to be low.

13. Another factor is, of course, whether the firm in question has market power.  While it is not appropriate for me to go into detail on this issue, I will state with respect to the Invisalign coupons that Align's products compete with other treatments for malocclusions.  As I explained in my earlier expert report in this case, Invisalign competes not only with other clear aligners provided by other companies, but also with traditional braces.[10]

14. Regarding the Vivera retainer coupons, I note that Plaintiffs do not allege that Align has market power in retainers, which is consistent with the fact that Align has several well-established competitors.

15. As I explain in the balance of this section, my view is that the coupons would not have an adverse effect on competition and may enhance competition in some cases.

---

[10]    Snyder Section 1 Report, ¶ 32 ("… DTC and [Dentist or Orthodontist Provided ('DOP')] aligners compete with each other (as well as braces) in a single antitrust market for teeth straightening.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### A.  The Invisalign coupons would not have an adverse effect on competition

16.    The Invisalign coupons will marginally increase Align's market share for a limited period of time, because the coupons must be redeemed within two years of the final approval of the settlement.[11]  Therefore, the Invisalign coupon would have a short-term impact, and not bring customers to Align on an ongoing basis.

17.    Moreover, the number of eligible consumers redeeming the Invisalign coupons is expected to be small.  The total number of class members, who by definition purchased SDC treatments, is estimated to be approximately 1.4 million.  Given that most consumers only purchase aligners once, this means that this finite number will not grow over time, i.e., it is a stock, not a flow.[12]  Of those class members, only some would want retreatment.  Of those class members who want retreatment, only some would want Invisalign treatment (as opposed to braces and non-Invisalign clear aligners).  Notably, even with a coupon, treatments by doctors with Invisalign aligners may be too expensive or inconvenient for some patients.  Indeed, survey research published in the *Journal of the American Dental Association* found that cost and convenience were factors for consumers who decided to purchase DTC aligners (which included SDC aligners).[13]  Thus, class members who originally purchased SDC aligners also may choose retreatment from other manufacturers operating in the DTC channel.  Of note, one

---

[11]    Amendment to Settlement Agreement, ¶ 28.a ("The Invisalign Coupon shall be redeemable for two years from the date of Final Approval of the Settlement, as long as the Settlement Class Member claims the Invisalign Coupon within one year from the date of Final Approval of the Settlement.").

[12]    A stock is a quantity (e.g., capital, products, or existing customers, among others) that is fixed in a given point in time, while a flow is represented by a quantity that is added to or subtracted from a system over a period of time at a given rate (e.g., an annual salary of $100,000 *per year*, or newly acquired users *per month*).  See, for example, Fisher, Irving, "What Is Capital?" The Economic Journal, Vol. 6, No. 24, 1896, pp. 509–34 at p. 514 ("[…] all wealth presents a double aspect in reference to *time*. It forms a *stock* of wealth, and it forms a *flow* of wealth. The former is, I venture to maintain, capital, the latter, income and outgo, production and consumption. Stock relates to a *point* in time, flow to a *stretch* of time. Food in the pantry at any instant is capital, the monthly flow of food through the pantry is income.").

[13]    Wexler, Anna, Nagappan, Ashwini, Beswerchij, Andrew, and Rebekah Choi, "Direct-to-Consumer Orthodontics: Surveying the User Experience," Journal of the American Dental Association, August 2020, Vol. 151, No. 8, pp. 625–636 at Table 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

such manufacturer, AlignerCo, offered promotional pricing to SDC's customers after SDC's bankruptcy and exit from the DTC channel.[14]

18.  In assessing the potential competitive effects of the Invisalign coupons, it is also important to recognize that <u>a large proportion of the approximately 1.4 million eligible settlement members would have already made decisions about retreatment – both whether to purchase retreatment services and which services to purchase.</u>  Some would have chosen a different supplier in the DTC channel; and others would have concluded that they should choose doctors and dentists for retreatment using clear aligners or braces.

19.  It is also important to consider the substantial time intervals between when consumers bought SDC's services and when the Invisalign coupons would become available.  The proposed class period, which determines eligibility for the coupons, includes part or all of six calendar years, i.e., 2017-2022.  Consider the consumers who purchased SDC treatments in 2019 – the year when SDC had the most sales.  Those consumers have had *five years* to decide whether to seek retreatment.[15]

20.  For 2019 and other years within the class period, the additional customers Align would gain from Invisalign coupons would come from (i) those who had not previously sought retreatment, and (ii) those who would be motivated by the offer of the $300 discount coupon.[16]  **Figure 1** depicts the relevant stages that would determine the number of additional Invisalign customers.

---

[14]  AlignerCo, "ALIGNERCO Extends Support to Millions of Customers Affected by SmileDirectClub Closure with Free Treatment Assessment and Exclusive Discounts," HealthcareDive, December 26, 2023, available at https://www.healthcaredive.com/press-release/20231226-alignerco-extends-support-to-millions-of-customers-affected-by-smiledirectc.

[15]  Snyder Section 1 Report, Figure 8.

[16]  Even though the receipt of a $300 coupon would prompt some former SDC customers to consider retreatment, treatment using Invisalign aligners may be too expensive or inconvenient for some.

**Figure 1: Additional Invisalign Customers from Invisalign Coupons**



21. As indicated above, we lack information about the subset of SDC customers who might seek retreatment. However, survey research published in the *Journal of the American Dental Association* analyzing experiences with DTC aligners found that 6.6 percent of respondents visited a dentist or orthodontist due to side effects experienced.[17] We also lack information about the number of former SDC customers who have been retreated to date.

22. Assuming that the 1.4 million settlement class members were to seek retreatment at the reported rate of visits to doctors for side effects, 6.6 percent, and that all of them years later opted to purchase Invisalign using the Invisalign Coupons, that would provide an upper bound of 92,400 additional Invisalign purchases over the two year period contemplated by the Settlement.[18] ████████████████████████████████████████████████

---

[17]  Wexler, Anna, Nagappan, Ashwini, Beswerchij, Andrew, and Rebekah Choi, "Direct-to-Consumer Orthodontics: Surveying the User Experience," Journal of the American Dental Association, August 2020, Vol. 151, No. 8, pp. 625–636 at p. 5.

[18]  1.4 million x (6.6 percent / 100) = 92.4 thousand.

 [19] Assuming that 6.6 percent of the class settlement members seek retreatment through the Invisalign Coupon over a two year period,                                                        .[20] As discussed above, given that only some customers would want retreatment and some of those customers have already sought retreatment, it is likely that fewer customers would seek retreatment using the coupon.

23. The Invisalign coupon could enhance price competition in some cases if doctors (or even DOP aligner companies) offer competing discounts on other aligners to compete with the Invisalign discount. Patients have numerous options for teeth straightening, including braces, DTC aligner companies other than SDC, and aligner companies other than Invisalign who sell to dentists and orthodontists.[21] Doctors set the price to patients for this last group of aligners.[22] As a result, the Invisalign coupons could enhance price competition if doctors offer competing discounts on other aligners to compete with the Invisalign coupon. For example, if a doctor offers Invisalign aligners priced at $4,200 and an alternate brand priced at $4,000, with the $300 Invisalign coupon, Invisalign would be the less expensive option for the consumer. This could increase price competition from the doctor's other orthodontic product; especially if the doctor receives a lower margin on Invisalign, he or she may be incentivized to reduce the price of the alternative product.

24. Lastly, I expect there to be limited reputational effects from the Invisalign coupons from the additional sales over a two-year period. Decisions by some class members to use Invisalign aligners would not be known to others.[23] Put differently, the Invisalign Coupons would not

---

[19]  Invisalign Transaction Data.

[20]  

[21]  See Expert Report of Edward A. Snyder, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, May 5, 2023 ("Snyder Section 2 Report"), ¶¶ 51-53, 84-89.

[22]  See Snyder Section 1 Report, ¶ 76 ("It should be noted that Align does not dictate the prices charged by dental professionals.").

[23]  See Katz, Michael. L., and Carl Shapiro, "Network Externalities, Competition, and Compatibility," The American Economic Review, 1985, Vol. 75, No. 3, pp. 424–440 at p. 424 (explaining that network effects

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

create high switching costs or "lock-in" that would act as entry barriers for competitors and would not reinforce Align's alleged market power.[24]

### B. The Vivera retainer coupons would not have an adverse effect on competition

25. The Vivera retainer coupons would be redeemable for a five-year time period.[25]  In contrast to the fixed pool of customers who could redeem Invisalign coupons, there is a flow of potential retainer customers.

26. However, I understand from counsel that there are no allegations that Align has market power in retainers.    Indeed, as an initial matter, the Vivera retainer coupons do not present anticompetitive concerns for three reasons.

> First, patients can choose from a wide variety of available retainers, ranging from bonded permanent retainers to retainers with metal wires (also known as "Hawley" retainers), and clear plastic retainers (also known as "Essix" retainers).[26] According to the American Association of Orthodontists, retainers can be "made from clear plastic, acrylic, or wires that fit snugly over or behind the teeth"[27].

> Second, there are numerous companies that make retainers.  For example, Align, AlignerCo, Straumann Group (ClearCorrect), Henry Schein, Ormco, 3M, Dentsply Sirona (SureSmile®), Glidewell Dental Lab, Retainers Direct, Dr. Direct Retainers, Graham Tool Co Inc, SportingSmiles, and NewSmile.[28]

---

occur when "the utility that a given user derives from the good depends upon the number of other users who are in the same 'network' as is he or she.").

[24]  See Farrell, Joseph, and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Elsevier, In Handbook of Industrial Organization, Vol. 3, 2007, pp. 1967–2072 at p. 1970 ("Switching costs and network effects bind customers to vendors if products are incompatible, locking customers or even markets in to early choices. Lock-in hinders customers from changing suppliers in response to (predictable or unpredictable) changes in efficiency, and gives vendors lucrative ex post market power – over the same buyer in the case of switching costs (or brand loyalty), or over others with network effects.").

[25]  Amendment to Settlement Agreement, ¶ 28.b ("The Vivera Coupons shall be redeemable for five years from the date of Final Approval of the Settlement, as long as the Settlement Class Member claims the Coupons within one year from the date of Final Approval of the Settlement.").

[26]  Cleveland Clinic, "Teeth Retainer," August 25, 2022, available at https://my.clevelandclinic.org/health/treatments/10899-teeth-retainer.

[27]  American Association of Orthodontists, "Understanding Retainers: The Key to Maintaining Your Smile," available at https://aaoinfo.org/treatments/retainers/, accessed on November 8, 2024.

[28]  See Invisalign, "Vivera™ Retainers," available at https://www.invisalign.com/vivera-retainers, accessed on November 6, 2024; AlignerCo, "The Role of Retainers in Clear Aligner Treatment: Aftercare Essentials," June

9

Third, many doctors manufacture retainers in-house.[29] Importantly, patients undergoing treatment with aligners from a specific brand—for example, Align's Invisalign—do not need to acquire retainers from that same brand,[30] so there is no "lock in" for these patients.

27.



[31] Given that retainers are necessary to preserve the progress of the teeth straightening procedures for all of these individuals,

which includes

---

25, 2023, available at https://alignerco.ca/blogs/blog/the-role-of-retainers-in-clear-aligner-treatment-aftercare-essentials; ClearCorrect, "ClearCorrect's Treatment & Pricing Options: Retainers," available at https://support.clearcorrect.com/hc/en-us/articles/4402074198807-ClearCorrect-s-Treatment-Pricing-Options#01H7DGDN66JRY1G0SCSKCVMH2M, accessed on November 11, 2024; Glidewell Dental Lab, "Glidewell Clear Aligners," available at https://glidewelldental.com/solutions/clear-aligners, accessed on November 6, 2024; Henry Schein Orthodontics, "Reveal Retainers," available at https://henryscheinortho.com/revealretainers/, accessed on November 7, 2024; Ormco, "Retainers," available at https://store.ormco.com/en-us/peripherals/intra-oral/retainers, accessed on November 7, 2024; Solventum, "3M™ Clarity™ Retainers," available at https://www.solventum.com/en-us/home/f/b5005543012/, accessed on November 7, 2024; SureSmile®, "SureSmile® Retainers," available at https://www.suresmile.com/en/suresmile-retainers/, accessed on November 7, 2024; Retainers Direct, "Orthodontist Approved Custom Clear Retainers," available at https://retainersdirect.com/, accessed on November 6, 2024; Dr. Direct Retainers, "Custom Clear Aligners & Retainers," available at https://drdirectretainers.com/, accessed on November 6, 2024; Graham Tool Co, "GrahamTool Co. Inc.," available at https://www.grahamtool.com/at-homedental, accessed on November 6, 2024; SportingSmiles, "Affordable Online Replacement Teeth Retainers," available at https://sportingsmiles.com/teeth-retainers/, accessed on November 6, 2024; NewSmile, "Buy Retainers & Night Guards Directly From the Lab – NewSmile™ USA," available at https://www.newsmilelife.com/pages/newsmile-choose-a-retainer-or-night-guard-plan-new-customers, accessed on November 6, 2024.

29    See, for example, Hawley, Nathan J., "A Look at How We Make Our Clear Retainers In House – What are Clear Retainers?" Hawley Orthodontics, October 24, 2022, available at https://hawleyorthodontics.com/a-look-at-how-we-make-our-clear-retainers-in-house/ (plastic retainers); Great Lakes Dental Technologies, "Retainers," available at https://www.greatlakesdentaltech.com/products/thermal-forming/thermal-forming-material/retainers.html, accessed on November 6, 2024 (selling products for wire and acrylic retainers).

30    See, for example, Invisalign, "Invisalign Vivera™ Retainers" available at https://www.invisalign.com/provider/why-invisalign/vivera, accessed on November 7, 2024 ("Vivera retainers can be used on patients who have had their teeth straightened using other orthodontic methods, not just Invisalign treatment.").

31

braces and aligners,[32] ██████████████████████████████████████[33] even without factoring in retainers sold for non-orthodontic purposes.[34]

### C. Summary

28. The Court's logical concern about anticompetitive effects of the coupons does not apply in this context. Regarding Invisalign coupons, I would not expect any anticompetitive effects because of the finite stock of potential customers, the fact that many potential customers have already made their retreatment decisions, and the two-year time period in which the coupons would be redeemable. Regarding Vivera retainer coupons, I would not expect any anticompetitive effects because Align's estimated share of retainer sales is very small.

I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing statements are true and correct, and that this declaration was executed this 12th day of November 2024 in Falmouth, Massachusetts.

*Edward A. Snyder*

Edward A. Snyder

November 12, 2024

---

[32]  Snyder Section 2 Report, ¶ 46.

[33]  (33 percent / 10 percent) = 3.3 percent; (33 percent / 15 percent) = 2.2 percent.

[34]  For example, I understand that retainers can be used for "tongue thrust" and "temporomandibular disorder (TMD)." Colgate, "Retainers for Teeth: What Are They and Why Wear Them?" January 9, 2023, available at https://www.colgate.com/en-us/oral-health/adult-orthodontics/retainers-for-teeth-why-wear-them-and-how-to-keep-them-safe#.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# APPENDIX A

# MATERIALS RELIED UPON

**Expert Reports (including associated backup materials, work papers, and cited documents)**

### Defendant Experts

Expert Report of Edward A. Snyder, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, May 5, 2023.

Expert Report of Edward A. Snyder, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, November 10, 2023.

## Legal Documents

Order Denying Motion for Preliminary Approval for Class Settlement, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, Docket No. 624, September 18, 2024.

Plaintiffs' Renewed Motion for Preliminary Approval of Amended Class Action Settlement with Align Technology, Inc., Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, Docket No. 628, October 28, 2024.

Settlement Agreement, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, August 20, 2024.

## Academic Literature

### Articles

Fisher, Irving, "What Is Capital?" The Economic Journal, Vol. 6, No. 24, 1896, pp. 509–534.

Katz, Michael L., and Carl Shapiro, "Network Externalities, Competition, and Compatibility," The American Economic Review, 1985, Vol. 75, No. 3, pp. 424–440.

Wexler, Anna, Nagappan, Ashwini, Beswerchij, Andrew, and Rebekah Choi, "Direct-to-Consumer Orthodontics: Surveying the User Experience," Journal of the American Dental Association, August 2020, Vol. 151, No. 8, pp. 625–636.

### Books

Farrell, Joseph, and Paul Klemperer, "Chapter 31: Coordination and Lock-In: Competition with Switching Costs and Network Effects," Elsevier, In Handbook of Industrial Organization, Vol. 3, 2007, pp. 1967–2072.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Data**

Invisalign Transaction Data

**Other Publicly Available Documents**

### Websites

American Association of Orthodontists, "Understanding Retainers: The Key to Maintaining Your Smile," available at https://aaoinfo.org/treatments/retainers, accessed on November 8, 2024.

AlignerCo, "ALIGNERCO Extends Support to Millions of Customers Affected by SmileDirectClub Closure With Free Treatment Assessment and Exclusive Discounts," HealthcareDive, December 26, 2023, available at https://www.healthcaredive.com/press-release/20231226-alignerco-extends-support-to-millions-of-customers-affected-by-smiledirectc.

AlignerCo, "The Role of Retainers in Clear Aligner Treatment: Aftercare Essentials," June 25, 2023, available at https://alignerco.ca/blogs/blog/the-role-of-retainers-in-clear-aligner-treatment-aftercare-essentials.

ClearCorrect, "ClearCorrect's Treatment & Pricing Options: Retainers," available at https://support.clearcorrect.com/hc/en-us/articles/4402074198807-ClearCorrect-s-Treatment-Pricing-Options#01H7DGDN66JRY1G0SCSKCVMH2M, accessed on November 11, 2024.

Cleveland Clinic, "Teeth Retainer," August 25, 2022, available at https://my.clevelandclinic.org/health/treatments/10899-teeth-retainer.

Colgate, "Retainers for Teeth: What Are They and Why Wear Them?" January 9, 2023, available at https://www.colgate.com/en-us/oral-health/adult-orthodontics/retainers-for-teeth-why-wear-them-and-how-to-keep-them-safe#.

Dr. Direct Retainers, "Custom Clear Aligners & Retainers," available at https://drdirectretainers.com/, accessed on November 6, 2024.

Glidewell Dental Lab, "Glidewell Clear Aligners," available at https://glidewelldental.com/solutions/clear-aligners, accessed on November 6, 2024.

Graham Tool Co, "GrahamTool Co. Inc.," available at https://www.grahamtool.com/at-homedental, accessed on November 6, 2024.

Great Lakes Dental Technologies, "Retainers," available at https://www.greatlakesdentaltech.com/products/thermal-forming/thermal-forming-material/retainers.html, accessed on November 6, 2024.

Hawley, Nathan J., "A Look at How We Make Our Clear Retainers In House – What are Clear Retainers?" Hawley Orthodontics, October 24, 2022, available at https://hawleyorthodontics.com/a-look-at-how-we-make-our-clear-retainers-in-house/.

Henry Schein Orthodontics, "Reveal Retainers," available at
https://henryscheinortho.com/revealretainers/, accessed on November 7, 2024.

Invisalign, "Invisalign Vivera™ retainers" available at
https://www.invisalign.com/provider/why-invisalign/vivera, accessed on November 7,
2024.

Invisalign, "Vivera™ Retainers," available at https://www.invisalign.com/vivera-
retainers, accessed on November 6, 2024.

NewSmile, "Buy Retainers & Night Guards Directly From the Lab – NewSmile™ USA,"
available at https://www.newsmilelife.com/pages/newsmile-choose-a-retainer-or-night-
guard-plan-new-customers, accessed on November 6, 2024.

Ormco, "Retainers," available at https://store.ormco.com/en-us/peripherals/intra-
oral/retainers, accessed on November 7, 2024.

Retainers Direct, "Orthodontist Approved Custom Clear Retainers," available at
https://retainersdirect.com/, accessed on November 6, 2024.

Solventum, "3M™ Clarity™ Retainers," available at https://www.solventum.com/en-
us/home/f/b5005543012/, accessed on November 7, 2024.

SportingSmiles, "Affordable Online Replacement Teeth Retainers," available at
https://sportingsmiles.com/teeth-retainers/, accessed on November 6, 2024.

SureSmile®, "SureSmile® Retainers," available at
https://www.suresmile.com/en/suresmile-retainers/, accessed on November 7, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

October 2024

**APPENDIX B**
**CURRICULUM VITAE**
**EDWARD A. SNYDER**

CONTACT INFORMATION

    email:  tsnyder@yale.edu
    office tel.:  203-432-6037
    website:  http://edwardasnyder.com

    regular mail:                                        express mail:

     Yale School of Management                 Yale School of Management
     P.O. Box 208200                             165 Whitney Avenue
     New Haven, CT 06520-8200               New Haven, CT 06520

EDUCATION

    B.A., Colby College, 1975 (Economics, Government)

    M.A., University of Chicago, 1978 (Public Policy)

    Ph.D., University of Chicago, 1984 (Economics)

CURRENT APPOINTMENTS

**Yale School of Management**
William S. Beinecke Professor of Economics and Management

-    *Research*:
  - o   Industrial Organization, Antitrust and Competition Policy, Law & Economics, Management, Analysis of High-Tech Industries

    *Teaching*:

  - o   *Economic Analysis of High-Tech Industries,* Spring I 2020, Fall 2020, Fall 2021, Fall 2022, Fall 2023; Fall 2024.
  - o   *Stakeholders, Management, and Capitalism,* Fall II, 2023; Fall II 2024.
  - o   *Analysis of Global Competition Law* (co-taught with Pierre Cremieux and Fiona Scott Morton), Fall 2013 and Fall 2014.
  - o   *Field Project in Commercial Real Estate Development* (co-taught with Roland Betts), Fall 2015.
  - o   Guest lecturer for *Antitrust Law,* Yale Law School, Spring 2019.

**Yale Department of Economics**
Professor of Economics (Secondary Appointment)

**Yale University Jackson School of Global Affairs**
(Courtesy Appointment)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Global Network for Advanced Management**
Senior Advisor to the Steering Committee (July 2022 to Present)
Founder and Chair of the Steering Committee (2013 to June 2022)


**Doctor of Economics Sciences (Honorary), University College Dublin, December 13, 2023**

PREVIOUS APPOINTMENTS

**Yale School of Management**
Indra K. Nooyi Dean and William S. Beinecke Professor (July 2011 – June 2019)

*Decanal Responsibilities*:  Overall academic, financial, and administrative leadership of Yale School of Management (Yale SOM)

*Major achievements and initiatives*:

- Conception and development of the Global Network for Advanced Management (GNAM), a network of 32 top business schools.
- Conception and introduction in 2012 of the Master of Advanced Management – a one-year degree program, post-MBA, for students from GNAM member schools; introduction in 2017 of Master of Management Studies, a one-year degree program with multiple tracks of study.
- Introduction of the Global Studies Requirement and Global Studies Accounts for all MBAs and MAM students.
- New Leadership Curriculum for all MBAs and MAM students.
- Establishment of the Initiative for Organizational Performance.
- Launch of school-wide initiatives on Asset Management, Healthcare, and Sustainability.
- Development and introduction of Foundational Courses for Yale Masters-level students and Yale College students.
- Build-out of Yale SOM's Entrepreneurship Program and appointment of Inaugural Director of Entrepreneurship Programs.
- Substantial increase in scholarship support for Masters-level students.
- Led establishment of Yale Center Beijing in 2014 and responsible for subsequent management of the Center.
- Establishment of the Yale SOM Council of Global Advisors.
- Increased levels of alumni involvement; the highest percentage of annual giving by alumni of any Yale academic unit.
- Eight consecutive years of operating surpluses (FY2012 – FY2019).

*School and University Service*:

- Member of the Yale University Cabinet (2013 – 2017).
- Member of the Yale University Cabinet Steering Committee (2016 – 2017).
- Member of the Yale School of Management Board of Advisors (2011 – 2019).
- Member of Yale SOM's Appointments, Curriculum, and Strategy Committee (2014 – 2017).
- Member of the Yale University Carbon Task Force (2015 – 2016).


**University of Chicago, Booth School of Business**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dean and George Shultz Professor of Economics (July 2001 – June 2011)

*Decanal Responsibilities:* Overall academic, financial, and administrative leadership of the school.

*Teaching responsibilities:* Economic Analysis of Major Policy Issues (co-taught with Gary S. Becker and Kevin M. Murphy).

*Editor*: Journal of Law & Economics (2002 – 2009)

*Major achievements and initiatives as Dean:*

- o Dramatic increases in the number of endowed faculty professorships, endowed faculty fellowships, and the endowments in research and teaching centers.
- o Nine years of 17.1% annual growth of MBA scholarship support.
- o Naming of the school with unrestricted funds provided by David Booth – the largest gift ($300m) to the University of Chicago and the largest gift ever to a business school.
- o Increased the school's endowment from approximately $200m in 2001 to over $500m, independent of the Booth gift.
- o Substantial improvements in the influence, visibility, and recognition of the school, including improved rankings, e.g., BusinessWeek #1 rankings in 2006, 2008, and 2010, and Economist #1 rankings in 2006 and 2009.
- o Improvements in the quality and diversity of the MBA classes.
- o Large increases in support for PhD students, including dramatic increases in endowment for PhD program.
- o Established the Global Advisory Board, with Councils for Asia; the Americas; and Europe, Middle East, and Africa.
- o Oversaw the launch of the Initiative on Chicago Price Theory, which became the Becker Center.
- o Developed funding for the Fama-Miller Center.
- o Successfully moved the School's Europe Campus from Barcelona to London.
- o Moved into the school's new campus (Harper Center) in Hyde Park on time and on budget.
- o Developed first-of-kind positioning advertising campaign by a business school.
- o Appointments of two women to decanal positions.
- o Elimination of debt on three facilities.
- o Cumulative operating surpluses of $100.4m over nine-year period.

*University Service:*

- o Member, Academic Leadership Group (July 2001 – June 2010).
- o Oversight Responsibilities for two University Centers (Stigler Center and Becker Center).
- o Member, Provost Ad Hoc Tenure Review Committees (2002 – 2010).
- o Member, Board of Directors, Argonne National Laboratories (July 2008 – June 2010).
- o Member of various Dean and VP Search Committees (2003 – 2009).
- o Advisory work on University's globalization efforts (2007 – 2010).
- o Member, Social Sciences Deans Group, (2009 – 2010).


**University of Virginia**
Dean and Charles C. Abbott Professor of Business Administration (July 1998 – June 2001)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Decanal Responsibilities:* Overall academic, financial, and administrative leadership of the Darden School.

*Major achievements and initiatives as Dean:*

- o First MBA Program growth in 24 years.
- o Increase in nine-year capital campaign from $98m to $212m.
- o Establishment of Batten Institute in 1999.
- o Established Financial Self-Sufficiency for the Darden School, eliminating reliance on unrestricted state support.
- o Completion of Phase II of new Darden Grounds.
- o Increased diversity of MBA classes.
- o Appointments of two women to decanal positions.
- o Appointments of two African-Americans to faculty positions.
- o Innovative programs on e-business with global partners.
- o Established program partnerships with University of Michigan and University of California at Berkeley.

**University of Michigan**
Senior Associate Dean, University of Michigan Business School (1995 – 1998)

*Responsibilities*: MBA Programs (full-time, evening, global), BBA Program, and Masters of Accounting Program. Managed School international programs and corporate relationships. Oversight of Admissions & Student Services and the Office of Career Development. Significant responsibility for faculty recruitment and development. Member of School's Executive Committee.

*Major achievements and initiatives as Senior Associate Dean:*

- o Global initiatives including International Multi-disciplinary Action Program (IMAP) and Brazil node of Global MBA program.
- o Integration of admissions and career development functions.
- o Rationalization of real estate curriculum.

Director, Davidson Institute at the University of Michigan Business School (1992 – 1995)

*Responsibilities*: Executive and academic leadership to establish a legally independent Institute focused on business and public policy issues in transition economies and emerging markets.

*Major achievements and initiatives as Director:*

- o Developed corporate relationships in China, Central Europe, India, and Russia, and with U.S. firms committed to operating in transition economies.
- o Major research initiative on bank privatization in Central Europe and Russia.
- o Design and development of in-company projects involving teams of Master's-level students working in transition economies.
- o Design and delivery of executive education programs for managers from transition economies.
- o Progressive increases in outside funding contributing to a $3m quasi-endowment for the Institute.

Chair, Business Economics and Public Policy (1992 – 1995)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Responsibilities*:  Curriculum and staffing of BBA and MBA courses.  Faculty development of group of 11 faculty members specializing in business economics.

Faculty Member (1982-1994)

*Responsibilities*:  MBA Core course coordinator of *Applied Microeconomics* (four years).  Design and development of *Competitive Tactics,* a course analyzing competition and cooperation among firms; marketing and distribution of products; and related antitrust issues.

Member, Board of Directors, Davidson Institute (focusing on transition economies and emerging markets) (1995 – 1998)

Member, Executive Committee, Tauber Manufacturing Institute, University of Michigan (1996 – 1998)

Member, Executive Committee, Erb Institute (focusing on environmental management), University of Michigan (1996 – 1998)

Research Consultant, Federal Home Loan Bank Board / U.S. Senate Committee on Banking (1989)

Consultant, Antitrust Division, U.S. Department of Justice (1982-1985)


**University of Chicago**

John M. Olin Visiting Associate Professor, Center for the Study of the Economy and the State (1991 – 1992)

**Antitrust Division, U.S. Department of Justice**

Economist (1978 – 1982; intermittent service through 1985)

Staff Economist, National Commission to Review Antitrust Laws and Procedures (1978 – 1979)

PUBLICATIONS

Articles in Journals:


"The Fraying of Criminal Antitrust Enforcement" (Co-author: D. Daniel Sokol), <u>Yale Journal on Regulation</u>, forthcoming June 2025.

"A Counterfactual Analysis of Amazon's Acquisitions Under the 2023 Merger Guidelines" (co-authors I. Simmons and S. Zaslavsky), <u>Review of Industrial Organization</u> Vol. 64, Issue 5, August 2024, pp. 1-36.

"The Vast Space in which the Vertical Merger Guidelines Lived," The Antitrust Bulletin, Volume 67, Issue 3, September 2022, pp. 424-433.

"Enforcement of Anti-Collusion Laws Against Domestic and Foreign Firms" (Co-author: Pierre Cremieux), Journal of Law & Economics, Vol. 59 (November 2016), pp. 775-803.
Reprinted in Concurrences, No.4-2017.

"Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis", (Co-authors: Pierre Cremieux and Ian Simmons), The George Mason Law Review, Summer 2010, pp. 939-967.

"Bank Privatization in Transitional Economics: A General Framework with Application to Hungary's Magyar Kulkereskedelmi Bank Transaction", (Co-authors: Karen Schnatterly, Roger C. Kormendi, and Christopher Jereb), The Financier, vol. 5, No. 2 & 3 (1998), pp. 6-23.

"Allocation of Litigation Costs--American and English Rules," (Co-author: James W. Hughes) in The New Palgrave Dictionary of Economics and the Law, ed. Peter Newman, Macmillan Publishers Ltd, vol. 51 (1998), pp. 51-56.

"Transactional Structures of Bank Privatizations in Central Europe and Russia," (Co-author Anna Meyendorff), Journal of Comparative Economics, (August 1997), pp. 5-30.

"Privatization and Performance of the Czech Republic's Komercni Banka," (Co-author: Roger C. Kormendi), Journal of Comparative Economics, (August 1997), pp. 97-128.

"Litigation under the English and American Rules: Theory and Evidence," (Co-author: James W. Hughes), Journal of Law & Economics, vol. 38 (April 1995), pp. 227-250.

"United States v. United Shoe Machine Corporation: On the Merits," (Co-author: Scott E. Masten), Journal of Law & Economics, vol. 36 (April 1993), pp. 33-70.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds., (Edward Elgar Publishing, Ltd., London), 1995, pp. 588-625.
Reprinted in Case Studies in Contracting and Organization, S. Masten, ed., (Oxford University Press), 1996, pp. 224-254.
Reprinted in Journal of Reprints for Antitrust Law and Economics, issue on Landmark Antitrust Decisions Revisited, 26, 1997, pp. 643-680.
Reprinted in Pricing Tactics, Strategies, and Outcomes, (M. Waldman & J. Johnson, ed.). Cheltenham, UK: Edward Elgar Publishing. 2007

"Misuse of the Antitrust Laws: The Competitor Plaintiff," (Co-author: Thomas E. Kauper), Michigan Law Review, vol. 90, (December 1991), pp. 551-603.
Reprinted in The Journal of Reprints for Antitrust Law and Economics, vol. 25, no. 2, (1995), pp. 657-709.

"The Costs of Organization," (Co-authors: Scott E. Masten and James W. Meehan, Jr.), Journal of Law, Economics, and Organization, vol. 7, (Spring 1991), pp. 1-25.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds., (Edward Elgar Publishing, Ltd., London), 1995, pp. 119-143.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (Co-author: James W. Hughes) <u>Journal of Law, Economics, and Organization</u>, vol. 6, (Fall 1990), pp. 345-380.

"The Effect of Higher Criminal Penalties on Antitrust Enforcement," <u>Journal of Law & Economics</u>, vol. 33, (October 1990), pp. 439-462.

"The Design and Duration of Contracts: Strategic and Efficiency Considerations," (Co-author: Scott E. Masten) <u>Law and Contemporary Problems</u>, vol. 52 (Winter 1989), pp. 63-85.

"The Origins and Resolution of the Thrift Crisis," (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong) <u>Journal of Applied Corporate Finance</u>, vol. 2 (Fall 1989), pp. 85-100.

"Vertical Integration in the U.S. Auto Industry: A Note on the Influence of Transactions Specific Assets," (Co-authors: Scott E. Masten and James W. Meehan, Jr.) <u>Journal of Economic Behavior and Organization</u>, vol. 12 (October 1989), pp. 265-73.

"New Insights into the Decline of Antitrust Enforcement," <u>Contemporary Policy Issues</u>, vol. 7 (October 1989), pp. 1-18.

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn from Claims Data?" (Co-author: James W. Hughes) <u>Journal of Business & Economic Statistics</u>, vol. 7, (October 1989), pp. 423-431.

"Evaluating Medical Malpractice Reforms," (Co-author: James W. Hughes) <u>Contemporary Policy Issues</u>, vol. 7, (April 1989), pp. 83-98.

"An Inquiry into the Efficiency of Private Antitrust Enforcement," (Co-Author: Thomas E. Kauper), <u>Georgetown Law Journal</u>, vol. 74, (April 1986), pp. 401-469.

"Efficient Assignment of Rights to Sue for Antitrust Damages," <u>Journal of Law & Economics</u>, vol. 28, (May 1985), pp. 469-482.  Reprinted in <u>The Journal of Reprints for Antitrust Law and Economics</u>, vol. 25, no. 2, (1995), pp. 969-982.

Books / Articles in Books and Volumes:

"Can Four Traders Fix the Price of Money? The Euro-US Dollar Antitrust Litigation," in <u>Antitrust Economics at a Time of Upheaval: Competition Policy Cases on Two Continents</u>, Editors John Kwoka and Lawrence J. White, Competition Policy International, 2023, pp. 361-376.

"Competitive Discounts and Antitrust Policy," (Co-authors: Kevin M. Murphy and Robert H. Topel), <u>The Oxford Handbook of International Antitrust Economics</u>, Volume 2, (2015), edited by Roger D. Blair and D. Daniel Sokol, Chapter 5, pp. 89-119.

"Five Easy Questions", Ch.2.3, in <u>Leadership Development for a Global World: The Role of Companies and Business Schools</u>, J.Canals (ed.), Palgrave Macmillan Ltd. Houndmills, Basingstoke, London 2012, pp. 145-160.

<u>Globalization of Management Education: Changing International Structures, Adaptive Strategies, and the Impact on Institutions</u>, (Co-authors: Chair of AACSB Taskforce Robert F. Bruner, et al.), Emerald Group Publishing, (2011).

"Social Learning and Transaction Cost Economics," <u>Advances in Strategic Management</u>, A. Huff and J. Walsh, eds., (1997), pp. 223-228.

<u>Crisis Resolution in the Thrift Industry</u>, (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong), Kluwer Academic Press, (1989).

"Private Antitrust Cases That Follow on Government Cases," (Co-author: Thomas E. Kauper) in <u>Private Antitrust Enforcement: New Learning and New Evidence</u>, ed. Lawrence J. White, M.I.T. Press, (1988), pp. 329-370.

"Minimizing Waste Water Treatment Costs at the Plant Level," (Co-author: Dan Yaron) in <u>Environmental Policy</u>, vol. II, ed. George Tolley, et al., Ballinger Publishing Co., (1983), pp. 115-136.

<u>Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws and Procedures</u>, (January 1979), co-authored Chapter 11 on Insurance.

Working Papers / Research in Progress:

"Amazon's Three Major Lines of Business" (co-authors J. Canaday and M. Hughes) Stigler Center Working Paper #319 (available here); SSRN Working Paper (available here).

"The *Sealy* Antitrust Litigation: Testing the Free Rider Hypothesis," (Co-author: Michael J. Moore), November 2020.

"How Amazon Became Amazon," (Co-author: Marley Hughes), March 2023.

"The Second Score Auction Model in Antitrust Cases," (B. Banternghansa, K. Zitenyi), March 2023 (Preliminary draft).

Book Reviews:

<u>Confessions of an Economic Hit Man</u>, John Perkins, (Berrett Koehler, 2004), <u>Journal of Economic Literature</u>, vol. 43 (December 2005), pp. 1063-1065.

<u>Concentration and Price</u>, ed. Leonard W. Weiss, (M.I.T. Press, 1989), <u>Journal of Economic Literature</u>, vol. 30 (September 1991), pp. 1205-1207.

<u>Impact Evaluations of Federal Trade Commission Vertical Restraints Cases</u>, ed. Robert H. Lande, et al., (Federal Trade Commission, 1984), <u>Journal of Economic Literature</u>, vol. 24 (December 1986), pp. 47-48.

Other Publications:

"Reflections on Five Years of Pursuing Purpose and Profit," A Conversation with Allan Murray, John Seifert, Ravi Dhar, Jon Iwata, and Ted Snyder, Yale Initiative on Stakeholder Innovation and Management, August 26, 2024, som.yale.edu/story/2024/reflections-five-years-pursuing-purpose-and-profit

Brief of Law and Economics Scholars as Amici Curiae in Support of Defendants-Appellees, *Susan Giordano, et al. v. Saks Incorporated, et al.* (United States Court of Appeals for the Second Circuit, November 3, 2023).

Brief of Legal and Economic Scholars as Amici Curiae in Support of Appellant, *Tesla, Inc. et al., v. Louisiana Automobile Dealers Association* (United States Court of Appeals for the Fifth Circuit, October 19, 2023).

"Exponential Alliance" (Co-authors: David Bach and Camino de Paz), BizEd, (July/August 2017), pp. 18-27.

"Five Good Questions" CFO Insights (May 14, 2015).

"The Future of §2 Enforcement and the Analysis of Dominant Firms" 2010 Antitrust Section Symposium: New York State Bar Association, pp. 12-23.

"A New Approach to Antitrust Class Certification," (Co-authors: Pierre Cremieux and Ian Simmons), Law 360, (June 14, 2010).

Brief of Amici Curiae Antitrust Law and Business School Professors, and Economists, In support of Petition for a Writ of Certiorari, *National Football League, et al. v. Ninth Inning, Inc. et al.* (Ninth Circuit Court of Appeals, April 8, 2020).

Amicus Brief from Group of Antitrust Economists in Support of Defendants-Appellees, In re: Effexor XR Antitrust Litigation, No. 15-1184 (3rd Cir. February 23, 2016).

Amicus Brief from Group of Antitrust Economists to the U.S. Court of Appeals for the Third Circuit, filed May 10, 2016, regarding Wellbutrin XL Antitrust Litigation (E.D. Pa. September 23, 2015).

Amicus Brief from Group of Antitrust Economists to the U.S. Court of Appeals for the Third Circuit, filed December 21, 2015, regarding Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Company, et al., 2:12-cv-03824 (E.D. Pa. April 16, 2015).

*In Re. DAP Antitrust Litigation*, Expert Report, The Antitrust Litigation Course, American Bar Association (Antitrust Section), Mock Trial in U.S. District Court for E.D. of Pennsylvania, MDL. Docket No. 1999, (October 4-5, 2007).

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed August 24, 2006, regarding *Weyerhaeuser Co., v. Ross-Simmons Hardwood Lumber Co., Inc.*, 411 F.3d (9th Cir. 2005).

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed March 24, 2006, regarding *William Twombly, et al., v. Bell Atlantic Corporation*, et al., 313 F. Supp. 2d 174 (S.D.N.Y. October 7, 2003); *William Twombly, et al., v. Bell Atlantic Corporation, et al.*, 425 F.3d 99 (2nd Cir. 2005).

Amicus Brief of Antitrust Economists in *People of the State of NY v. Actavis plc and Forest Laboratories, LLC* (14-4624), filed January 15, 2015; matter on appeal for the U.S. District Court for the SDNY (Civil Action No. 1:14-07473).

"Bank Privatizations in Central Europe and Russia," Davidson Institute Report to the U.S. Department of Treasury, (March 1996).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Director's View," <u>The Davidson Window</u>, vol.1, (Winter 1994), pp. 1-2; vol.1, (Summer 1994), pp. 1-2; vol. 1, (Spring 1995), pp. 1-2.

"Transitions in Expertise," <u>The Journal of the International Institute</u>, (Winter 1994), (July/August 2017), pp. 6-8.

<u>Crisis Resolution in the Thrift Industry: Beyond the December Deals</u>. (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong), Report of the Mid America Institute, (March 1989).

Popular Press:

"Is the Era of Shareholder Primacy Over?" *Yale Insights*, September 11, 2024; and "Reflections on Five Years of Pursuing Purpose and Profit," Yale Program on Stakeholder Innovation and Management, August 26, 2024.

"Are we being Stupid about COVID-19?," *The Hill*, (November 10, 2020).

"Is Flattening the Curve Bad for Health" co-author L.S. Dugdale, *The Hill*, (March 26, 2020).

"How to Build Bridges across an Organization," *Financial Times*, (August 4, 2019).

"Yale SOM's Ted Snyder on the Durability of The M7, MBA Application Declines & More," *Poets and Quants*, (June 24, 2019).

"A Different Degree of Disruption," *Biz@HKUST*, pp. 22-25, (June 2019).

"Statistics and Sports: Deflategate," Analysis Group, 2015 Year in Review.

"Dean of the Year: The Three-Peat Change Agent," *Poets and Quants*, (December 16, 2015).

"10 Business Schools to Watch in 2016," *Poets and* Quants, (December 16, 2015).

"Faculty and students call for calmer tone in campus protests," *Wall Str*eet *Journal*, (December 3, 2015).

"IIM-B students can opt for lessons from Yale, Berkeley, and other top Business schools," *Prep Sure* (November 19, 2015).

"Research top priority for IIM-B," *Live Mint*, (December 2, 2015).

"Global meet for business students concludes," *Hindu*, (November 18, 2015).

"IIMB Students to Gain Global Exposure," *New Indian Express*, (November 18, 2015).

"Berkeley Haas becomes 28th school in Yale's Global Network," *Financial Times*, (November 5, 2015).

"How Yale is beginning to crack into the elite B-school ranks," *Fortune*, (December 17, 2014).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Businessweek's 2014 Winners and Losers," *Poets and Quants*, (November 14, 2014).

"Is Michigan State Really Better Than Yale?" *New York Times*, (August 7, 2012).

"Yale Redefines What It Means to Be Global," *Wall Street Journal*, (June 7, 2012).

"Can 'Ted' Snyder Work His Magic on Yale's School of Management?" *Poets & Quants*, (February 8, 2012).

"Yale's Big, Audacious Global Bet," *Poets and Quants*, (February 8, 2012).

"Q&A with Edward Snyder, Dean, Yale School of Management," *Business Standard, Mumbai*, p. 12, (November 8, 2011).

"If You Get the People Right, They Build the School," *Financial Times*, (October 17, 2011).

"Turnaround Specialist to Take on Yale," *Wall Street Journal*, (June 3, 2010).

"The Subtle Strategist," *Financial Times*, (April 11, 2010).

"Student ≠ Customer," *Nytimes.com, Room for Debate*, (January 4, 2010).

"2016 Olympics," *Chicago Tribune*, (September 17, 2009).

"The Party's Over: The Coming Business School Shake-out," *BusinessWeek.com*, (April 2, 2009).

"Global Learning for a Truly Integrated MBA," *Financial Times*, (February 19, 2009).

"Driven Mad by Traffic Congestion," *Business Week Chicago*, (April 2008).

"The Market's Place," *Chicago Tribune*, (August 12, 2007).

"Advocating a Carbon Tax," CNBC Europe, (February 19, 2007).

"Are B-Schools Slacking Off?" *Business Week*, (February 11, 2007).

"The Quiet American?" *Global Focus*, Vol. 1, No. 2, (2007).

"Dean's Column: The Toughest and the Best Advice," *Financial Times*, (May 15, 2006).

"On MBAs," *Financial World*, London, (September 2005).

"Are Business Schools Becoming Global," *India Times*, (August 2005).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Global Challenge," *The Guardian*, London, (August 4, 2005).

"Vigorous Competition Better than any Oath," *Handelsblatt.com*, (September 4, 2003).

"Playing the Game the American Way," *Budapest Business Journal*, (July 9, 1993).

"An English Reform of American Law," *Wall Street Journal*, (August 9, 1991).

Business School Cases and Class Materials:

One-Pagers on IO concepts (n=18).

Briefs related to High-Tech Industries (n=12).

Alternative Tools to Influence Market and Non-Market Behavior.

W.R. Grace Co.'s Zonolite Licensee Program: How to Exploit Two Related Monopolies and Improve Economic Efficiency.

Job Risk.

Pricing Decisions: Custom Limousines.

The Choice of Technologies.

Mimicking the S&P 500.

Human Capital, Work, and Leisure.  Co-author: Scott E. Masten.

Sugar Quotas.  Co-author: Edward J. Mitchell.

## GRANTS AND FELLOWSHIPS

Yale School of Management Summer Research Grants to study private and public antitrust enforcement (2019-2022).

Grants from University of Virginia Darden School's Batten Institute and University of Chicago Booth School of Business for major extension of previous research, 2009–10.  Resulted in "Napsterizing Pharmaceuticals: Access, Innovation, and Welfare" (January 2011).

Grants from Aventis Pharmaceuticals, University of Chicago Graduate School of Business, University of Virginia Darden School, and Bates College 2000–01.  Resulted in "Napsterizing Pharmaceuticals: Access, Innovation, and Consumer Welfare," NBER Working Paper (October 2002).

BT Grant of funds and equipment to the University of Michigan Business School to deliver educational modules using new technologies (November 1995).

U.S. Department of Treasury Grant to the Davidson Institute to study bank privatizations in Central Europe and Russia. Co-investigator: Roger C. Kormendi (June 15, 1995 – December 31, 1995).

Bradley Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (July 1, 1989 – June 30, 1990).

RGK Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (July 1, 1989 – June 30, 1990).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

University of Michigan Office for the Study of Public and Private Institutions Research Grant to study contract mechanisms to protect non-patentable innovations. Co-investigator: Scott E. Masten (Summer 1989).

Robert Wood Johnson Foundation Grant to study the effects of tort reforms on medical malpractice litigation. Co-investigator: James W. Hughes (June 1, 1987 – December 31, 1988).

Earhart Foundation Grant to study the effects of the Supreme Court's *Brunswick* decision on private antitrust litigation (Summer 1986).

University of Michigan Business School Summer Research Grants to study private and public antitrust enforcement and other law and economics issues (1984, 1985, 1989, 1990, 1992, and 1993).

University of Chicago, Committee on Public Policy Studies Fellowship (1978).


INVITED PAPERS, LECTURES, CONFERENCE PRESENTATIONS, PUBLIC TESTIMONY*

* In this section I include information regarding my testimony and briefings in public settings. The website edwardasnyder.com includes information regarding my testimony in various litigations.

"The Fraying of Criminal Antitrust Enforcement," co-author D. Daniel Sokol, Yale Law School, Law and Markets: A Conference on Themes in the Work of George Priest, September 7, 2024.

"The Real Reason that China's Economy is Faltering," Keynote Remarks at INCAE Commencement; San Jose, Costa Rica, May 10, 2024.

"The 'How' of Management Education," Remarks at Honorary Degree Ceremony, University College Dublin, December 13, 2023.

William F. Buckley Jr. Program at Yale, The 60th Anniversary of Milton Friedman's Capitalism and Freedom, December 2, 2022, Panelist with Robert Barro (Harvard) and Diana Furchtgott-Rothwith (Heritage Foundation).

"Five Objectives for Yale SOM," Keynote, 2022 Yale US – China Distinguished Colloquium, April 22, 2022.

"High Tech Industries: China and the US," Yale Center Beijing, March 11, 2021.

"The Anti-Globalization Narrative and Implications for Management Education," Keynote address at Zhejian University School of Management 40th Anniversary Forum (November 1, 2020), http://www.cma.zju.edu.cn/en/school/videos.aspx.

"Value of Networks in Times of Increased Frictions," Keynote address at the Annual Meeting of the Academy of International Business, (June 26, 2018).

"Global Innovation: China and the World," Remarks at Fortune Brainstorm Tech International panel, (December 5, 2017).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"The Anti-Globalization Narrative: Implications for Business Schools," Keynote speech at Deusto Business School's Centenary Celebration, (January 17, 2017).

"The Anti-Globalization Narrative," Keynote speech at the 6th International Business School Shanghai Conference, hosted by Antai College of Economics and Management, Shanghai Jiao Tong University, (October 17, 2016).

"Crafting Strategic Relationships," panel at the 2016 AACSB International Conference and Annual Meeting (ICAM) (with Kai Peters, Chief Executive, Ashridge Business School), (April 5, 2016).

Remarks at the Yale Law School's Corporate Law Center Advisory Board Dinner, (March, 8, 2016).

"Global Antitrust Enforcement," Keynote at the Antitrust Law Section Annual Meeting, New York State Bar Association (NYSBA), (January 28, 2016).

"Past, Present, and Future of Business Education," Keynote speech at Fudan University School of Management's Partnership Deans Gathering, (November 5, 2015).

Keynote speaker at the 6th Indian Management Conclave, (July 29, 2015).

"Globalizing Business Schools: The New Frontier," Closing Keynote speech at the Graduate Management Admission Council (GMAC) Leadership Conference, Fort Lauderdale, FL, (January 24, 2014).

Keynote speaker at The Rotman School's Future of Business Education Conference, Toronto, Canada, (November 5, 2013).

"Antitrust Enforcement in the EU and US: An Empirical Assessment of the Influence of Protectionism," invited paper (with Pierre Cremieux), American Law and Economics Association, Vanderbilt University Law School, (May 17, 2013).

"Emerging Markets and Business School Strategies," Invited moderator, International Conference and Annual Meeting for The Association to Advance Collegiate Schools of Business, (April 9, 2013).

"Turkey as a Pivotal Country in the Global Economy," Presentation to DEıK, Foreign Economics Relations Board, Istanbul, Turkey, (November 30, 2012).

"Management Challenges in the Global Economy," Presentation to faculty, students and staff at Renmin University of China School of Business, Beijing, China, (March 2012).

"The Management Education Industry," AACSB Annual Deans Conference Plenary Session with Deans Christine Poon, Joseph Thomas, and Andrew Policano, Phoenix, AZ, (February 20, 2011).

"U.S. Business Schools and the MBA: A Long Perspective," EFMD Annual Meeting of Deans and Directors, Lyon, France, (January 25, 2011).

"Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis," George Mason 13th Annual Symposium on Antitrust Law, (February 4, 2010); Analysis Group Seminar, New York, NY, (October 20, 2010).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Digging Out of the Deficit," Executive Roundtable Panel Discussion with Governors Tim Pawlenty (MN), Donald Carcieri (RI), Mark Sanford (SC), Robert McDonnell (VA), and John Kasich, Candidate for Governor (OH), Cincinnati, OH, (September 20, 2010).

"Corporate Governance," Inside Counsel's 10th Annual Super Conference, invited panel, Chicago, IL, (May 25, 2010).

"The Future of §2 Enforcement," Antitrust Law Section Annual Meeting, New York State Bar Association (NYSBA), (January 28, 2010).

"Global Antitrust Enforcement," Center for Public Studies, Santiago, Chile, (September 2009).

"Globalization of Management Education," Plenary Speaker at AACSB Annual Deans Conference, San Francisco, CA, (February 5, 2009).

"The Role of Economic Experts in Class Certification in the United States," The American Bar Association Section of Antitrust Law Trial Practice Committee, (June 17, 2008).

"How to Use Economics," Illinois Agricultural Leadership Seminar, Chicago, IL, (August 2006).

"Are Business Schools Becoming Truly Global?" with Dean Santiago Iñiguez, AACSB Dean's Conference, San Diego, CA, (February 6, 2006).

"Strategic Choices in a Global Environment," Presentation with Dean Santiago Iñiguez. European Foundation for Management Development Deans' Conference, Rotterdam School of Management, The Netherlands, (January 26, 2006).

"How to Use Economics," Distinguished Alumni Presentation, Colby College, (October 2005).

"Hatch-Waxman and Public Policy Toward Pharmaceuticals," Presentation at Summer 2002 Conference for Western Attorneys General, (2002).

Congressional Briefing, "Hatch-Waxman Reconsidered: How Best to Promote Prescription Drug Innovation and Affordability," sponsored by the Alliance for Health Reform and supported by the National Institute of Health Care Management, (June 13, 2002).

Combined Federal Trade Commission and Department of Justice Hearings on Competition and Intellectual Property Policy, presentation of testimony on Hatch-Waxman and Public Policy Toward Pharmaceuticals, (March 2002).

Graduate Business Conference, Johnson Graduate School of Management, Cornell University, invited panel, The Future of Management Education, (March 2001).

"Economics and Government Policy," Panel Discussion with Edward P. Lazear, Randall S. Kroszner, and Lawrence H. Summers, Honoring Gary S. Becker: A Conference, Chicago, IL, (February 11, 2001).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

New York State Bar Association, invited panel on Indirect Purchaser Litigation in Antitrust, New York, NY, (January 2001).

University of Virginia, E-Summit's Plenary Session, (November 1999).

European Association of Comparative Economics, Annual Conference, invited panel, Bank Privatization, Grenoble, France, (September 1996).

University of Chicago, Conference on Tort Reform, Commentator for Steven Shavell, (June 1996).

U.S. Department of Treasury, Davidson Institute, "Banks in Transition: Investment Opportunities in Central Europe and Russia," New York, NY, (May 1996).

U.S. Department of Treasury, Davidson Institute, "Bank Privatization in Central Europe and Russia," Budapest, Hungary, (April 1996).

American Law and Economics Association, invited paper (with Greg Niehaus), "Damage Schedules in the Products Liability System and the Efficiency of Consumption Choices," (May 1994).

American Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (January 1994).

University of Michigan Presidential Forum on *Constituting International Expertise: Who, What, Where Why, How?*, "Transitions in Expertise," (October 1993).

American Law and Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (May 1992).

Western Economic Association, 100 Years of the Sherman Act, invited paper (with Thomas E. Kauper), "Misuse of the Antitrust Laws," (June 1990).

Western Economic Association, Applied Microeconomics, invited paper, "Aftermath of the *Sealy* Antitrust Litigation," (June 1990).

Law and Society Association, invited paper (with James W. Hughes), "The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (June 1989).

Duke University, Conference on the Law and Economics of Contracting, invited paper (with Scott E. Masten), "The Design and Duration of Contracts: Strategic and Efficiency Considerations," (April 1988).

U.S. Senate Banking Committee, testimony based on research paper ("The Origins and Resolution of the Thrift Crisis"), (February 1988).

Georgetown University, Conference on Private Antitrust Enforcement, invited paper (with Thomas E. Kauper), "An Inquiry into the Efficiency of Private Antitrust Enforcement," (November 1985).

Hoover Institution, Conference on Antitrust and Economic Efficiency, invited paper, "Efficient Assignment of Rights to Sue for Antitrust Damages," (August 1984).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SEMINARS AND OTHER PRESENTATIONS

Yale School of Management, Problems with Global Antitrust Enforcement (February 2016).

Vanderbilt Law School, American Law & Economics Association (May 2013).

University of Chicago
Applied Price Theory Workshop (May 1984, October 1984, and October 2002).
Economics and Legal Organization Workshop (October 1990, January 1992, and May 1992).

University of Virginia, e-Summit (November 1999).

U.S Treasury (February 1996).

Davidson Institute Research Seminar Series (April 1995).

University of Michigan, Center for Chinese Studies (October 1994).

Young Presidents Organization, Asia Region Meetings (February 1994).

Confederation of Indian Industries, CEO Forum (February 1994).

Harvard University Law School, Law and Economics Seminar (April 1993).

George Mason University Law School, Law and Economics Seminar (October 1992).

University of Illinois, Industrial Organization Workshop (April 1992).

Georgetown University Law School, Law and Economics Workshop (November 1991).

Cornell University Law School (April 1991).

University of Southern California, Applied Micro Workshop (October 1990).

University of California at Los Angeles, Industrial Organization Workshop (October 1990).

Virginia Polytechnic Institute, Economics Department Seminar (November 1989).

Ohio State University, Industrial Organization Seminar (May 1988), Microeconomic Theory Workshop (October 1986).

Federal Trade Commission (October 1988, October 1992).

Western Economic Association (July 1987, July 1988, June 1990, and July 1996).

Duke University, Center for the Study of Business Regulation (November 1986 and December 1992).

Colby College (May 1985, February 1992, and March 1996).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S. Department of Justice, Antitrust Division (May 1985, May 1986, May 1987, November 1989, and May 1991).

Washington University, Industrial Organization Workshop (March 1985).

University of Michigan,
Industrial Organization Workshop (February 1984, April 1985, September 1986, January 1988, and March 1988).
Law and Economics Seminar (October 1989, April 1990, and January 1992).

PH.D. THESIS COMMITTEE SUPERVISION

Alowin M. Th. L. Moses, "A Model of Voucher Privatization" (University of Michigan, 1996).

Vijay Singal, "Efficiency Versus Market Power in Mergers: Evidence from the Airline Industry" (University of Michigan, 1992).

David E. Weinstein, "Essays on Japan's Trade and Industrial Structure" (University of Michigan, 1991).

Debra J. Holt, "Understanding Strategic Choice: The Statistical Analysis of Experimental Games" (University of Michigan, 1990).

David J. Denis, "Asymmetric Information and the Market for Seasoned Equity Offerings: Theory and Evidence" (University of Michigan, 1988).

Amy J. Broman, "The Impact of Federal Income Tax Policy on the Charitable Contributions Behavior of Households" (University of Michigan, 1987).

James W. Hughes, "Tort Reforms and Medical Malpractice Litigation" (University of Michigan, 1986).

Barton L. Lipman, "Delaying or Deterring Entry: A Game-Theoretic Analysis" (University of Michigan, 1985).

BOARDS, ASSOCIATIONS, TASK FORCES, AND CONSULTING

Member, ESMT Academic Advisory Board (2019-present)

Member, MIT Corporation's Visiting Committee for the Sloan School of Management (2017-2024).

Chair, Review Committee, Hong Kong University of Science and Technology, Business School (Spring 2019).

Member, Committee for Economic Development of the Conference Board (CED) (2016-2020).

Chair or Member, AACSB Accreditation Review Committees, including:
Wharton Business School,* University of California, Berkeley (Haas), University of California, Los Angeles (Anderson), MIT Sloan, Columbia Business School, Georgetown (McDonough), HEC Paris, Fudan School of Business, and Stanford Graduate School of Business.*  (*Multiple reviews)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Member, Board of Directors, KemperSports, KemperLesnick

Member, Board of Trustees, Colby College (2012 – 2018).

Member, International Advisory Committee, School of Business, Renmin University of China (2018-2020).

Member, 3rd Advisory Board of Antai College of Economics and Management, Shanghai Jiao Tong University (November 2015 – October 2018).

Member, Board of Directors, Argonne National Laboratories, (July 2008 – June 2010).

Former Member, American Law and Economics Association.

For information about Consulting Experience, refer to http://edwardasnyder.com/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EDWARD A. SNYDER EXPERT TESTIMONY IN THE PAST FOUR YEARS**

1. United States District Court for the District of Connecticut
   *Tarah Kye Borozny et al. v. RTX Corporation et al.*
   Case No. 3:21-cv-1657
   **Reports and deposition 2024**


2. United States District Court for the Northern District of California
   *Simon and Simon, et al. v. Align Technology, Inc. and Misty Snow v. Align Technology, Inc.,*
   Case No. 3:20-cv-03754-VC and Case No. 3:21-cv-03269-VC
   **Reports and deposition 2023**


3. United States District Court for the District of Colorado
   *United States of America v. Jayson Jeffrey Penn, et al., Criminal Action No. 20:CR-152-PAB*
   **Trial testimony 2022**

4. United States District Court for the District of Columbia
   *United States of America v. Bertelsmann SE & CO. KGaA, Penguin Random House, LLC, ViacomCBS, INC. and Simon & Schuster, Inc., Civil Action No. 1:21-cv-02886*
   **Report, deposition, and trial testimony 2022**

5. United States District Court, Southern District of New York
   *In re: Mylan N.V. Securities Litigation, Case No. 1:16-CV-07926*
   **Report and deposition 2021**

6. United States District Court, Southern District of New York
   *Abu Dhabi Investment Authority v. Mylan N.V., et al., Case No. 1:20-CV-01342*
   **Report and deposition 2021**

7. United States of America Department of the Treasury, Office of the Comptroller of the Currency
   *In the Matter of Rohan Ramchandani, Case No. OCC AA-EC-2017-2*
   **Reports and deposition 2021**

8. United States of America Department of the Treasury, Office of the Comptroller of the Currency
   *In the Matter of Richard Usher, Case No. OCC AA-EC-2017-3*
   **Reports and deposition 2021**

9. United States District Court, Middle District of Florida
   *In re: Disposable Contact Lens Antitrust Litigation*, Case No. 3:15-md-2626-J-20JRK
   **Reports, depositions, and hearing testimony 2017, 2018 & 2020**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

10. Court of Chancery of the State of Delaware
    *Preston Hollow Capital LLC v. Nuveen LLC et al.*, Civil Action No. 2019-0169-SG
    **Reports, deposition, and trial testimony 2019**

11. United States District Court, District of Vermont
    *Garret Sitts, et al., v. Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC,*
    Case No. 2:16-cv-00287-CR
    **Reports and deposition 2018 & 2019**

12. United States District Court, Northern District of California
    *FTC v. Qualcomm, Inc.,* Civil Action No. 17-cv-0220
    **Report, deposition, and trial testimony 2018 & 2019**