Karma M. Giulianelli (SB# 184175)
John M. Hughes (*pro hac vice*)
Joseph W. Doman (*pro hac vice*)
karma.giulianelli@bartlitbeck.com
john.hughes@bartlitbeck.com
joe.doman@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Mark L. Levine (*pro hac vice*)
Robert B. Tannenbaum (*pro hac vice*)
Luke C. Beasley (*pro hac vice*)
mark.levine@bartlitbeck.com
robert.tannenbaum@bartlitbeck.com
luke.beasley@bartlitbeck.com
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

*Attorneys for Defendant Align Technology, Inc.*

Additional Counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>Defendant. | CASE NO. 3:21-CV-03269-VC<br><br>**DEFENDANT ALIGN TECHNOLOGY, INC.'S RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT WITH ALIGN TECHNOLOGY, INC.**<br><br>**[PUBLIC REDACTED]**<br><br>Hearing Date: December 12, 2024<br>Hearing Time: 2:00 p.m.<br>Judge: Hon. Vince Chhabria<br>Location: Courtroom 4 – 17th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I.    The new Vivera retainer coupon provides additional value to class members and does not implicate Court's competition concerns .............................................................. 2

II.    The Invisalign coupon will likely have negligible impact on Align's sales and will have no negative effects on competition in the aligner industry. ........................................ 5

    A.    Align offered the Invisalign coupon to assist a subset of SDC customers who potentially received inadequate or harmful treatment from SDC and to bridge the gap with Plaintiffs during negotiations. ............................................. 5

    B.    The Invisalign coupon will have a negligible impact on Invisalign sales. ............. 7

    C.    The Invisalign coupon would have negligible effects on aligner competition and, if anything, enhance price competition for the class members seeking retreatment. ................................................................................ 9

CONCLUSION .................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ................................................................................................... 11

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ........................................................................................ 6

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) .................................................................. 9, 10

# INTRODUCTION

On September 18, 2024, the Court denied preliminary approval of the parties' settlement agreement and identified four key issues to be addressed.[1] Plaintiffs' Renewed Motion for Preliminary Approval of Amended Class Action Settlement[2] addressed all four issues. Align files this response in support of Plaintiffs' Renewed Motion to further address issue number 1: the propriety Invisalign coupons as a complementary component of a substantial, eight-figure cash settlement and whether the coupons will affect competition with respect to aligners and retainers.

To assist the Court in evaluating those issues, Align provides additional insights into the Vivera retainer coupons and the Invisalign treatment coupons and the minimal effects Align expects the coupons to have on Align's overall sales. In particular, Align is submitting the declaration of Edward A. Snyder, Ph.D., the William S. Beinecke Professor of Economics and Management at the Yale School of Management to address the Court's concerns as to whether the Invisalign coupons could have an effect on competition in the aligner industry.[3] Professor Snyder concludes that the Invisalign coupons will have no harmful effects on competition in the aligner industry and that, if anything, the coupons would enhance price competition for the class members who elect to supplement or correct the treatment provided by SmileDirectClub. He also concludes that there are no competitive concerns with the Vivera coupons, particularly because of Align's low market share in retainers. Professor Snyder will also be available to testify at the preliminary approval hearing to answer any questions the Court may have.

---

[1] ECF No. 624, Order Denying Motion for Preliminary Approval of Class Settlement.
[2] ECF No. 628.
[3] Ex. 1, Declaration of Edward A. Snyder, Ph.D. ("Snyder Decl.").

While the Court's questions were specific to the Invisalign coupon that was in the original (and amended) settlement, Align first addresses the new Vivera retainer coupon that was added in the amended settlement.

I.   **The new Vivera retainer coupon provides additional value to class members and does not implicate Court's competition concerns.**

After the Court's denial of preliminary approval of the original settlement agreement, the parties reengaged in settlement discussions and revisited a prior demand from Plaintiffs to offer an additional coupon that could be used by class members on Vivera retainers. As a result of these negotiations, Align agreed to amend the settlement agreement to provide an additional $50 per class member in coupons that can be used to purchase Vivera retainers.[4]

The Vivera coupons provide additional value to potentially all class members. As explained in Plaintiffs' renewed motion, all patients who have undergone orthodontic teeth straightening, regardless of modality, *i.e.*, clear aligners or wire-and-bracket braces, are recommended to use retainers.[5] This is due to the nature of orthodontic teeth straightening, which is accomplished by applying constant gentle forces, including rotational, lateral, and vertical forces, on the teeth over a sufficient period of time to physically move the teeth through the bones that surround the teeth roots below the surface of the gums. According to the American Association of Orthodontists, retainers are "essential for stabilizing the teeth" after the completion of this orthodontic straightening process because they "hold your teeth in their new positions while bone tissue rebuilds around them."[6] Patients can be prescribed two main types of retainers: Hawley retainers that are made of wire and a hard, plastic-like material, or clear

---

[4] ECF No. 628, 1, n.4.
[5] ECF No. 628, 4-5.
[6] https://aaoinfo.org/whats-trending/taking-care-of-retainers/

retainers, often referred to as "Essix" retainers, that resemble clear aligners.[7] Patients are recommended to wear retainers for a lifetime[8] and because clear retainers wear out over time, they must be replaced "at least annually."[9]

Thus, all 1.4 million class members who had their teeth straightened with SmileDirectClub clear aligners require multiple retainers over many years to preserve the results from their treatments. Prior to going bankrupt and ceasing business operations, SmileDirectClub serviced these class members by selling retainers through a subscription model that sent replacement retainers every six months.[10] These class members must now go elsewhere to purchase retainers and to have doctors supervise their ongoing treatment. The Vivera coupons give them the option to purchase Align's high quality retainers at a discounted price.

The Vivera coupons do not implicate the Court's stated concerns about coupons for products that Align is allegedly "the dominant player in the market."[11] The retainer industry has a strikingly different composition than the aligner industry ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To start, unlike aligners, which are Class II medical devices, orthodontic retainers are Class I medical devices, which may be marketed in the U.S. without premarket clearance or approval by the FDA.[12] This classification allows a multitude of manufacturers to participate in the retainer market. While all of the manufacturers

---

[7] *Id*.
[8] https://aaoinfo.org/whats-trending/will-i-need-to-wear-retainers/
[9] Ex. 2, Essex Appliance Revisited, by G.J. Anbuselvan et al., NJIRM 2012, Vol. 3(1), January/March.
[10] Ex. 3, SDC Website, Don't Forget Your Retainers!
[11] Align maintains that there is not a separate clear aligner market, only an overall teeth straightening market that includes both braces and clear aligners. Align does not have market power in the teeth straightening market, as indicated by its declining market share of approximately 10-15% in 2022. Ex. 1, Snyder Decl., ¶¶ 26, 27.
[12] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpcd/classification.cfm?id=DYJ

that produce braces or aligners also make retainers (including but not limited to ORMCO, 3M, Dentsply Sirona, Straumann Group, Great Lakes Dental Technologies, and Align), individual dentists and orthodontists also may order retainers from local labs or manufacture retainers in their offices via 3D printing or thermoforming.[13] Also, as noted above, retainers are sold not only to teeth straightening patients, braces and clear aligners alike, but also to patients of dental general practitioners for non-orthodontic purposes, such as to prevent teeth grinding in patients with temporomandibular disorder.[14]

As a result, [15] ████████████████████████████[16]

The parties' amended settlement to add Vivera coupons therefore increases value to class members while avoiding the Court's concerns about coupons for products in markets where Align has alleged market dominance.

---

[13] Ex. 1, Snyder Decl., ¶ 26.
[14] Ex. 1, Snyder Decl., ¶ 27.
[15] *Id.*
[16] *Id.*

**II.     The Invisalign coupon will likely have negligible impact on Align's sales and will have no negative effects on competition in the aligner industry.**

   **A.     Align offered the Invisalign coupon to assist a subset of SDC customers who potentially received inadequate or harmful treatment from SDC and to bridge the gap with Plaintiffs during negotiations.**

Before addressing the Court's concerns about the propriety and impact of the Invisalign coupons, Align provides background on the purpose of the Invisalign coupons and how the parties came to agree upon the coupons as a way to bridge an impasse over the primary cash component of the settlement.

After months of settlement negotiations that were aided by nationally renowned mediators, the parties were close on a cash settlement, but each side had gone as far as they could. Align refused to pay more to settle what it views as a very weak case. While antitrust cases, with the prospect of trebled damages, can present serious risk for any defendant, Plaintiffs' case has a number of structural flaws that make it a longshot in front of a jury and therefore dramatically reduces its settlement value. Chiefly, Plaintiffs' case, when distilled down, is that SmileDirectClub—a company that never once turned a profit, ▬▬▬▬▬▬▬ from 2016 to 2022,[17] and ultimately filed for bankruptcy leading to liquidation—somehow charged supracompetitive prices and reaped supracompetitive profits.[18] That's a tough sell to any jury in America, to say the least. But even aside from the paradox of the bankrupt monopolist, Plaintiffs' case suffered fundamental flaws. For example, whether at summary judgment, at trial, or on appeal, Align is confident that this case would be judged under the proper rule-of-reason

---

[17] Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 2-3.
[18] Plaintiffs' rebuttals—that SDC's unprofitability was driven by its "decision to invest" in marketing and that SDC could have cut its marketing costs "if it wanted to" without losing customers all while charging hundreds of dollars less for its aligners without going bankrupt much, much sooner—are nonsensical. ECF No. 628 at 19.

standard and that Plaintiffs' *per se* claim would be dismissed because the Align-SDC deal unambiguously resulted in explosive output growth for direct-to-consumer aligner sales and aligner sales overall.[19] And under the rule of reason, Align is confident that a finder of fact would determine that the Align-SDC deal had massive procompetitive effects—including output of SDC's low-cost aligners increasing by 3,000% per month[20]—and that the deal resulted in no anticompetitive harm because the restrictive covenant did not affect SDC's prices.

To bridge the gap on cash consideration, Align proposed an Invisalign coupon to help class members who either could not complete treatment due to SmileDirectClub's bankruptcy or who were dissatisfied with the quality of the treatment provided by SmileDirectClub. Align did not offer the coupons as way to increase its own sales. Align has concerns about the quality of care provided by SmileDirectClub to its customers based on practices that SmileDirectClub did not disclose to its patients or Align, which were chronicled in a 2022 arbitration between Align and SmileDirectClub. Specifically, the arbitrator found that SmileDirectClub's "aligner program is managed by various employees – not doctors – and there is minimal, if any, doctor engagement after approval [of treatment]."[21] Most alarmingly, SDC had a "second opinion practice" that "no one from SDC could explain or justify," that "when a potential SDC consumer is rejected for treatment by the [assigned doctor] such as for gum disease or a serious cavity," SDC "shifted" the case to a "second [assigned doctor]" and "[i]f the second [assigned doctor]

---

[19] The output enhancing Align-SDC deal, centered around a vertical supply agreement, is manifestly not within the "small group of restraints are unreasonable *per se* because they always or almost always restrict competition and decrease output." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021).

[20] Defendant Align Technology Inc.'s Opposition to Motion for Class Certification, ECF No. 562 at 9, n.46.

[21] *See* Ex. 4, at 18-19, Final Arbitration Award dated July 15, 2022 in *SDC Financial, LLC and SmileDirectClub, LLC v. Align Technology, Inc.*, Case 01-20-0005-1541 (the "Swift Award").

rejects the case, it is shifted to a third [assigned doctor]. In neither situation is the second or third doctor advised a previous doctor had rejected the case, including the reasons for the rejection. And the consumer is never informed of this practice, i.e., that one or two other doctors had rejected her treatment."[22] All told, "more than 120,000 customers received second or third opinions (unbeknownst to them and to the second and/or third ELP)."[23]

Based on these and other revelations in its arbitration against SDC, Align has concerns that a number of class members received inadequate treatment from SmileDirectClub that was not properly supervised by doctors and that many customers who were treated under SDC's "second and/or third opinion" practice despite serious contraindications for aligner treatment could have been harmed by SmileDirectClub aligners and thus may need remedial aligner therapy. Potential negative consequences posed by undertaking treatment with one of the above-referenced contraindications could include: (i) issues in the patient's bite, (ii) tooth fracture, chipping, and/or loss, (iii) tooth instability, (iv) tooth misalignment, (v) issues with tooth eruption or intrusion, (vi) bone resorption, or (vii) gingival recession. Existing conditions such as Temporomandibular Joint Syndrome ("TMJ") could also be exacerbated. As a result of these concerns and to reach a deal with Plaintiffs, Align offered Invisalign coupons to defray the cost of remedial orthodontic treatment for class members desiring such treatment and opt for Invisalign as opposed to other options such as braces or aligners from other companies.

**B.    The Invisalign coupon will have a negligible impact on Invisalign sales.**

In addition to the amended agreement's coupon for Vivera retainers, Align will continue to offer class members a coupon for Invisalign treatment. For the reasons stated above, the Invisalign coupon may provide great value to a subset of class members who need remedial or

---

[22] *Id.* at 19-20.
[23] *Id.* at 20.

follow-on orthodontic treatment and can no longer seek recourse from SmileDirectClub because the company filed for bankruptcy and ceased business operations.

The coupon will be valuable to class members who claim it. Although difficult to predict, Align expects that fewer than 6.6% of the eligible class members will ultimately redeem the coupons.[24]

First, orthodontic teeth straightening is almost categorically a one-and-done purchase. Once a patient has successfully had his or her teeth straightened, there is seldom a reason to repurchase the same treatment, save for scenarios where the patient has not used retainers as recommended by orthodontists to preserve results (other than the limited number of SDC customers who may seek retreatment, as discussed above). According to survey research published in the *Journal of the American Dental Association* analyzing experiences with DTC aligners found that 6.6% of respondents visited a dentist or orthodontist due to side effects experienced.[25] Even if all of the 6.6% of the 1.4 million class members who had side effects were to seek retreatment and all of them opted to purchase Invisalign using the coupons (as opposed to braces or aligners from Align's plethora of competitors), that would result in 92,400 incremental Invisalign purchases. To put that in context, ███████████████████████████████████████████████████████████████████████████████████████████████.[26] The result of all of the 6.6% of class members seeking retreatment through the Invisalign coupon would be an increase in Align's aligner sales of only 92,400 aligner sales over the two-year period proposed in the settlement agreement, ███████████████████

---

[24] Ex. 1, Snyder Decl., ¶¶ 20-22.
[25] Ex. 1, Snyder Decl., ¶ 21; Wexler, Anna, Nagappan, Ashwini, Beswerchij, Andrew, and Rebekah Choi, "Direct-to-Consumer Orthodontics: Surveying the User Experience," Journal of the American Dental Association, August 2020, Vol. 151, No. 8, pp. 625-36 at p. 5.
[26] Ex. 1, Snyder Decl., ¶ 22.

███████████████████████████.[27] Since only some class members would want retreatment and because some of those class members have already been retreated, and because many of the remaining subset of class members who will seek retreatment will do so with competing products such as DTC aligners, other in-office aligners, or braces, the increase in Align's Invisalign sales is likely to be substantially smaller than this amount.[28]

The comparatively small number of expected sales underscores that the coupon is not intended as a boon to Align, but instead to provide financial assistance to class members who may need follow-on or remedial teeth straightening and actual doctor supervision and opt to be treated by an Invisalign-provider doctor.

    **C.**    **The Invisalign coupon would have negligible effects on aligner competition and, if anything, enhance price competition for the class members seeking retreatment.**

As discussed above, a relatively low number of the 1.4 million class members will be expected to seek retreatment via any modality—braces or aligners. Crucially, the Invisalign coupon will at the very most affect just competition for retreatment purchases among this subset of class members. The Invisalign coupon will have no effects on the broader, much larger remaining market for clear aligners specifically or teeth straightening generally. That is because the teeth straightening industry involves one-and-done purchases, which is starkly different than tech and other industries typified by repeat buyers and thus susceptible to network effects.[29] Network effects is the phenomenon where "the value of a service increases as the number of users increases." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 780 (N.D. Cal. 2022). In tech and other markets where network effects are prominent, an antitrust concern can arise because the

---

[27] *Id*.
[28] Ex. 1, Snyder Decl., ¶¶ 19-22.
[29] Ex. 1, Snyder Decl., ¶¶ 16-17, 24.

network effects can create high barriers to entry. *See id.* Here, there are no such concerns. A limited number of class members seeking retreatment who opt for Invisalign for their second round of teeth straightening will have no effect on other consumers for aligners or the broader teeth straightening market.[30] The Invisalign coupon therefore could not and will not reinforce Align's alleged market power.[31]

If anything, for the subset of class members who elect to seek retreatment, the coupon will *enhance* price competition for aligners. While Align is alleged to have market power in the separate doctor channel for clear aligners, it is undisputed that consumers have a multitude of other teeth straightening options, including purchasing braces or other companies' clear aligners in the doctor or DTC channel.[32] In the doctor channel, doctors (not the braces or clear aligner manufacturers) set the ultimate price to consumers for teeth straightening.[33] Indeed, doctors sell competing teeth-straightening products and they exert substantial control over which teeth-straightening product is recommended and eventually sold to patients. Thus, even with the $300 Invisalign coupon, class members will have options to purchase these competing products at competing prices. The natural effect of a $300 Invisalign coupon will be that potential consumers can either purchase Invisalign for $300 less than doctors' advertised price, or they could shop that reduced Invisalign price for further price concessions from doctors offering competing braces or clear aligners.[34] And as Plaintiffs correctly point out in the Renewed Motion, the Invisalign coupon does not discount its lab fee below its costs, and thus there is no risk of

---

[30] *Id.*, ¶¶ 16-17.
[31] Ex. 1, Snyder Decl., ¶ 24.
[32] *Id.*, ¶ 23.
[33] *Id.*
[34] *Id.*

predatory pricing that would disadvantage competing aligner manufacturers.[35] As the Supreme Court has instructed for decades, lower prices, above predatory levels, present no risk of antitrust injury, but is instead "the very essence of competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990).

In short, the Invisalign coupon will affect a small fraction of the overall clear aligner or teeth straightening markets, and the only effects expected would be a procompetitive increase in price competition or lower Invisalign prices for a small subset of consumers. Because the Invisalign coupon presents no threat of anticompetitive harm to the overall aligner market and because it could provide meaningful value to the subset of customers seeking retreatment, it would be entirely appropriate for the Court to approve the Invisalign coupon component of the class settlement.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Renewed Motion for Preliminary Approval of Amended Class Action Settlement with Align Technology, Inc.

---

[35] ECF No. 628 at 3.

| | |
|---|---|
| DATED: November 12, 2024 | BARTLIT BECK LLP |
| | By: */s/ Mark Levine* |

              **BARTLIT BECK LLP**
              Karma M. Giulianelli (SB# 184175)
              John M. Hughes (*pro hac vice*)
              Joseph W. Doman (*pro hac vice*)
              karma.giulianelli@bartlitbeck.com
              john.hughes@bartlitbeck.com
              joe.doman@bartlitbeck.com
              1801 Wewatta Street, Suite 1200
              Denver, CO 80202
              Telephone: (303) 592-3100
              Facsimile: (303) 592-3140

              Mark L. Levine (*pro hac vice*)
              Robert B. Tannenbaum (*pro hac vice*)
              Luke C. Beasley (*pro hac vice*)
              mark.levine@bartlitbeck.com
              robert.tannenbaum@bartlitbeck.com
              luke.beasley@bartlitbeck.com
              54 West Hubbard Street, Suite 300
              Chicago, IL 60654
              Telephone: (312) 494-4400
              Facsimile: (312) 494-4440

              **PAUL HASTINGS LLP**
              James M. Pearl (SB# 198481)
              jamespearl@paulhastings.com
              1999 Avenue of the Stars, 27th Floor
              Los Angeles, CA 90067
              Telephone: (310) 620-5700
              Facsimile: (310) 620-5899

              Thomas A. Counts (SB# 148051)
              Abigail H. Wald (SB# 309110)
              tomcounts@paulhastings.com
              abigailwald@paulhastings.com
              101 California Street
              Forty-Eighth Floor
              San Francisco, CA 94111
              Telephone: (415) 856-7000
              Facsimile: (415) 856-7100

Case No. 3:21-cv-03269-VC-    -12-    ALIGN'S RESPONSE TO PLS.' RENEWED
                    MOT. FOR PREL. APPROVAL OF
                    CLASS ACTION SETTLEMENT

    Adam M. Reich (SB# 274235)
    Michael C. Whalen (*pro hac vice*)
    adamreich@paulhastings.com
    michaelcwhalen@paulhastings.com
    71 South Wacker Drive, 45th Floor
    Chicago, IL 60606
    Telephone: (312) 499-6000
    Facsimile: (312) 499-6100

    Michael F. Murray (*pro hac vice*)
    michaelmurray@paulhastings.com
    2050 M Street, N.W.
    Washington, DC 20036
    Telephone: (202) 551-1700
    Facsimile: (202) 551-1705

    Noah Pinegar (*pro hac vice*)
    noahpinegar@paulhastings.com
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 318-6000
    Facsimile: (212) 319-4090

    *Attorneys for Defendant Align Technology, Inc.*