# EXHIBIT 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SIMON AND SIMON, PC d/b/a CITY SMILES; and VIP DENTAL SPAS, individually and on behalf of other similarly situated, | 3:20-cv-03754-VC |
| Plaintiffs, | |
| v. | |
| ALIGN TECHNOLOGY, INC., | |
| Defendant. | |
| MISTY SNOW, individually and on behalf of other similarly situated, | 3:21-cv-03269-VC |
| Plaintiffs, | |
| v. | |
| ALIGN TECHNOLOGY, INC., | |
| Defendant. | |

**EXPERT REPORT OF EDWARD A. SNYDER, PH.D.**

**MAY 5, 2023**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I.   INTRODUCTION ............................................................................................... 1
     A.  Qualifications ............................................................................................. 1
     B.  Assignment ................................................................................................ 2
     C.  Allegations ................................................................................................. 3

II.  APPROACH ...................................................................................................... 5
     A.  Competing Explanations ........................................................................... 5
     B.  Claims of Anticompetitive Exclusion Require Rigorous Analysis ........... 6
     C.  Framework for Anticompetitive Exclusion ............................................... 9
     D.  Plaintiffs' Experts' Approaches to Analyzing Anticompetitive Exclusion ................. 12
     E.  Summary Points ........................................................................................ 14

III. SUMMARY OF CONCLUSIONS ................................................................. 15
     A.  Overarching Conclusion .......................................................................... 15
     B.  Nine Supporting Conclusions .................................................................. 15

IV.  INDUSTRY ANALYSIS .................................................................................. 19
     A.  Products .................................................................................................... 19
         1.  Aligners ............................................................................................. 19
         2.  Scanners ............................................................................................ 23
         3.  The Interface Between Aligners and Scanners .................................. 26
         4.  The Economic Relationship Between Aligners and Scanners ............ 29
     B.  Demand for Aligners ................................................................................ 31
         1.  Consumer Demand ............................................................................. 31
         2.  Dentists and Orthodontists - Derived Demand .................................. 33
         3.  Demand uncertainty .......................................................................... 33
     C.  Demand for Scanners ............................................................................... 34
     D.  Supply of Aligners and Scanners ............................................................ 36
         1.  Aligner Suppliers ............................................................................... 36
         2.  Scanner suppliers ............................................................................... 42
     E.  Time Series Information ........................................................................... 44
         1.  Aligner Prices .................................................................................... 44
         2.  Scanner Prices ................................................................................... 47
         3.  Output of Aligners ............................................................................. 48
         4.  Output of Scanners ............................................................................ 50

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

     5.  Share of Dental Providers Providing Doctor-Directed Aligners ............................ 52

  F.  Implications, Insights, and Conclusions ......................................................... 53

**V.  ECONOMIC ANALYSIS OF THE AT-ISSUE CONDUCT ........................... 54**

  A.  Termination of Interoperability (TOI) was Economically Rational for Align and Did Not Anticompetitively Exclude Competitors ................................................. 55

     1.  Context of the TOI ........................................................................... 55

     2.  The "Refusal to Deal" Claim ........................................................... 56

     3.  Implementation of the Profit-Sacrifice Test ..................................... 57

  B.  The Fusion Program Did Not Anticompetitively Exclude Competitors ........................ 64

     1.  The Fusion Program – Terms and Scope ......................................... 64

     2.  The Fusion Program Passes the Bundled Price-Cost Test and Did Not Anticompetitively Exclude Equally Efficient Rivals ........................... 68

     3.  Plaintiffs' Economic Experts' Analyses of the Fusion Program on Aligner Competitors are Fundamentally Flawed ........................................... 72

     4.  Dr. Vogt's Analysis of the Fusion Program on Scanner Competition is Flawed .... 76

  C.  Other Alleged De Facto Exclusive Discounts Did Not Anticompetitively Exclude Competitors ................................................................................................. 77

     1.  Alleged De Facto Exclusive Discounts – Terms and Scope ................... 77

     2.  None of the Alleged De Facto Exclusive Discounts Anticompetitively Excluded Competitors ...................................................................... 81

     3.  Plaintiffs' Experts' Analysis of Allegedly De Facto Exclusive Contracts are Fundamentally Flawed ...................................................................... 84

  D.  Exclusivity Clauses in Certain Align Contracts and Discount Programs did not Anticompetitively Exclude Competitors ......................................................... 86

     1.  Plaintiffs' Experts' Analysis of Exclusivity Clauses are Fundamentally Flawed ... 93

     2.  Efficiencies from Discount and Marketing Programs ........................... 94

  E.  Summary ..................................................................................................... 95

**VI.  DR. SINGER'S AND DR. VOGT'S APPROACHES TO INJURY AND DAMAGES ARE UNRELIABLE ................................................................................ 96**

  A.  Injury and Damages ..................................................................................... 96

  B.  Specification of the But-For World .................................................................. 97

  C.  Methods ...................................................................................................... 99

  D.  Dr. Singer's Analyses of Damages from the Alleged Antitrust Injury ...................... 101

     1.  Summary of Dr. Singer's Approach to Estimating Damages ................... 101

  E.  Evaluating Dr. Singer's Overcharge Models ...................................................... 107

1.    Dr. Singer's Overcharge Models Do Not Reliably Isolate the Difference Between Actual And But-For Prices ......................................................... 108

2.    Dr. Singer's Overcharge Models Are Not Robust to Minor Modifications .......... 114

3.    Dr. Singer's Overcharge Models Produce Nonsensical Results ........................... 121

F.    Dr. Vogt's Direct Purchaser Overcharge Analysis ...................................................... 122

G.    Dr. Vogt's Analysis of Damages from the Alleged Antitrust Injury is Unreliable ..... 126

H.    Dr. Vogt's Pass-On Analysis Is Unreliable ................................................................ 135

1.    Summary of Dr. Vogt's Approach to Estimating Pass-On ................................... 135

2.    Framework for Evaluating Dr. Vogt's Approach to Estimating Pass-On ............. 137

3.    Dr. Vogt's Estimates of Pass-On Are Unreliable ................................................ 138

**VII.  ALIGN DOES NOT HAVE MARKET POWER IN PROPERLY DEFINED ANTITRUST MARKETS............................................................................................. 149**

A.    Market Definition and Market Power ......................................................................... 150

B.    The Teeth Straightening Product Market and Align's Lack of Market Power ............ 151

1.    Doctor-Directed Aligners, DTC Aligners, and Braces are Functional Substitutes 151

2.    Documentary Evidence Is Consistent with Doctor-Directed Aligners, DTC Aligners, and Braces Being in the Same Antitrust Market .................................... 154

3.    Dr. Singer's and Dr. Vogt's Hypothetical Monopolist Tests Are Flawed ............. 161

4.    The Brown Shoe Factors are Consistent with Doctor-Directed Aligners, DTC Aligners, and Braces Being in the same Antitrust Market .................................... 167

5.    Align Does Not Have Market Power in the Teeth Straightening Market ............... 172

C.    Align Does Not Have Market Power in the Scanner Market ........................................ 174

D.    Economic Outcomes Are Consistent with Align's Lack of Market Power in Teeth Straightening and Scanners ......................................................................................... 180

# I.  INTRODUCTION

## A.  Qualifications

1.  I am the William S. Beinecke Professor of Economics and Management at the Yale School of Management.  My primary expertise is Industrial Organization ("IO"), the field of economics that deals most directly with pricing and distribution of products, interactions among competitors, contracting practices, vertical integration, and antitrust issues.  My research draws on relevant theory, investigates real-world behavior, and is predominantly empirical in nature.  I conducted three scholarly projects on antitrust policy and enforcement with Thomas E. Kauper, Professor of Law Emeritus at the University of Michigan Law School and former Assistant Attorney General in charge of the Antitrust Division, US Department of Justice.  I have been an Editor of the *Journal of Law and Economics*.

2.  I earned my MA in Public Policy and PhD in Economics from the University of Chicago.  My PhD thesis focused on price-fixing and examined enforcement of Section 1 of the Sherman Antitrust Act by the US Department of Justice; this involved reviewing over 200 price-fixing cases.  Over the course of my academic career, I have taught courses on microeconomics, the application of IO to business, and economic analysis of major policy issues, which I co-taught for nine years with Gary S. Becker (Nobel Prize Laureate) and Kevin Murphy (Clark Medalist and winner of the MacArthur "Genius" Award).  I currently teach *Economic Analysis of High-Tech Industries,* and am developing a new course, *Stakeholders and Capitalism.*

3.  I began my professional career in 1978 with the Antitrust Division of the US Department of Justice as a Staff Economist to the National Commission to Review Antitrust Laws and Procedures.  I was a Staff Economist in the Antitrust Division on a full- and part-time basis until 1984, working on antitrust investigations in a wide range of product markets involving manufacturers, service providers, distributors, and retailers.

4.  I began my academic career in 1982 at the University of Michigan Business School, where over time I was promoted to Chair of Business Economics and Public Policy, appointed Director of the Davidson Institute (1992–1995), and appointed Senior Associate Dean (1995–

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1998).  From 1998 to 2019, I served as Dean of three business schools: University of Virginia's Darden School, University of Chicago's Booth School, and Yale School of Management.  In those roles, I was responsible for academic programs, budget, the professional staff, finances, and strategy.  I also oversaw the hiring, evaluation, and promotion of faculty in different areas, including economics, finance, accounting, strategy, marketing, and operations management.

5.    I have been retained as an economics expert in a wide range of antitrust cases, including matters concerning pharmaceuticals, consumer products, transportation services, financial services, professional services, entertainment, and high-tech industries.

### B.  Assignment

6.    Counsel for Align Technology, Inc. ("Align") have asked me to evaluate Plaintiffs' claims that Align monopolized the markets for aligners and scanners.  I have also been asked to review and evaluate the expert reports of Dr. Hal Singer ("Singer Report")[1] and Dr. William Vogt ("Vogt Report"),[2] focusing primarily on their analyses and conclusions regarding Align's alleged monopolization.

7.    In executing my assignment, I have directed employees of Analysis Group, Inc., an economic research and consulting firm, to assist me.  I am being compensated at an hourly rate of $1,400 for time spent on this matter and I receive compensation based on the professional fees of Analysis Group.  No compensation is contingent on the nature of my findings or on the outcome of this litigation.

---

[1]    Expert Report of Hal J. Singer Ph.D, March 10, 2023, *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas, et al., v. Align Technology, Inc.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-03754-VC; Errata to Expert Report of Hal J. Singer Ph.D, March 29, 2023, *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas, et al., v. Align Technology, Inc.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-03754-VC ("Singer Report").

[2]    Expert Report of William B. Vogt, Ph.D., March 10, 2023, *Misty Snow, et al., v. Align Technology, Inc.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC ("Vogt Report").

8.   Appendix A provides my Curriculum Vitae and Appendix B provides a list of my expert testimony within the past four years.  The documents, materials, and other information I have relied upon in conducting my analysis and forming my opinions are listed in Appendix C.

### C.  Allegations

9.   This matter involves claims that Align engaged in anticompetitive conduct related to its sales of scanners and aligners that correct malocclusions in patients.

10.   The Direct Purchaser Plaintiffs (DPPs) seek certification of a proposed class defined as follows:

> All persons or entities in the United States that purchased Invisalign Aligners and/or iTero Scanners directly from Defendant Align Technology, Inc. during the period beginning January 1, 2019 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are (a) Defendant, its subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.[3]

11.   The End Payor Plaintiffs (EPPs) seek certification of a Nationwide Injunctive Relief Class defined as follows:

> All persons or entities in the United States that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners acquired for personal use during the period beginning July 1, 2018 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.[4]

The EPPs also propose 10 "State Indirect Purchaser Classes":

> All persons or entities that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign Treatments that used any of the following types of Invisalign products - "Comprehensive", "Moderate", "GO", "Teen", "Assist Product Tracking", "Lite", "Express Ten", "Multi-stage Comprehensive", or "Assist" treatment - while residing in a relevant state, acquired for personal use during the period beginning July 1, 2018 until such time as the anticompetitive conduct alleged herein

---

[3]   Singer Report, ¶ 4.

[4]   Vogt Report, ¶ 17.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

has ceased (the "Class Period").  The relevant states are: Arizona, California, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, North Carolina, and Oregon.[5]

12.  DPPs allege that Align has engaged in anticompetitive conduct in the manufacture and sale of two products: (i) aligners, which Plaintiffs define as "custom-manufactured, transparent, removable dental aligners made from clear plastic or similar materials,"[6] and (ii) scanners, which Plaintiffs define as "hand-held digital intra-oral scanners designed for ordering Aligners."[7]

13.  According to Dr. Singer, economics expert for the DPPs, the "Challenged Conduct" consists of: Align's termination of interoperability ("TOI") between 3Shape's TRIOS Scanners and Align's Invisalign Aligners in the US; Align's bundled-rebate programs such as the "Fusion" program; and contracts, which he characterizes as "exclusionary", between Align and Dental Practices.[8]

14.  Similarly, EPPs allege that Align's termination of interoperability, exclusionary contracts, and the Fusion bundled-rebate program are the "key components" of "Align's [alleged] anticompetitive Scheme … to monopolize the scanner and aligner markets."[9]  Dr. Vogt, economics expert for EPPs, describes the challenged conduct as Align conditioning "scanner and aligner discounts to dentists and DSOs on their agreement to only sell Invisalign treatment

---

[5]  Vogt Report, ¶ 17.

[6]  Amended Class Action Complaint, *Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al.*, v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-03754-VC, August 14, 2020 ("Amended DPP Complaint"), ¶ 95.

[7]  Amended DPP Complaint, ¶ 102.

[8]  Singer Report, ¶ 3.  In their complaint, DPP Plaintiffs list five components to the alleged "anticompetitive scheme." The two components Dr. Singer does not include are: "the 'Advantage Program,' which effectively forces Dental Practices to use iTero to obtain non-penalty prices for Invisalign that they need to offer patients a competitive price for Aligner treatments" and "the design of iTero and Invisalign such that the products operate as a *de facto* integrated product bundle that penalizes Dental Practices who utilize competing products." Dr. Singer's components (2) and (3) are broader than the equivalent claims in the complaint which limits the alleged exclusionary contracts to contracts with two dental services organization (Heartland Dental and Aspen Dental) and limits the allegedly exclusionary bundled-discount programs to the "Fusion Program" (Amended DPP Complaint, ¶¶ 11, 51).

[9]  Fourth Amended Class Action Complaint, Misty Snow, et al., v. Align Technology, Inc., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, October 3, 2022 ("Fourth Amended EPP Complaint"), ¶ 12.

to their patients (and refuse to sell competing clear aligner brands)."[10]  Dr. Vogt also states that other contracts required *de facto* exclusivity.[11]

15.  Thus, Plaintiffs' economic experts claim that Align illegally excluded rival suppliers of aligners and scanners through four types of conduct:

   i.  Termination of interoperability (TOI):  Align's decision to stop accepting scans from 3Shape scanners in the US for Invisalign aligner orders starting February 2018.

   ii.  The Fusion program:  A discount program that conditions discounts on the price of scanners on purchasing additional aligners from Align.

   iii.  De facto exclusive discounts:  Discount programs that allegedly have the effect of requiring a dental practice to buy most or all of its aligners from Align.

   iv.  Explicitly exclusive contracts: Contracts that explicitly require a dental practice to only buy aligners from Align.

## II.    APPROACH

### A.  Competing Explanations

16.  My approach is to apply principles from economics and Industrial Organization.  This requires conducting an industry analysis to identify important features of the industry. As throughout social science, when evaluating the validity of various claims, it is often useful to identify competing hypotheses and then conduct relevant inquiries.

---

[10]   Vogt Report, ¶ 6.  Dr. Vogt includes seven discount programs in his analyses that were not explicitly mentioned in the complaint, including (1) Bracket Buy Back Promotion (credit for doctors who substitute metal braces for Invisalign), (2) Elite Doctor Program  (discounts and exclusive pricing on products for earning a threshold of Advantage points), (3) Go Forward Promotion (discounts on Invisalign Go cases, contingent on a practice's number of accepted cases), (4) GP Accelerator Program (incremental discounts on Invisalign, contingent on reaching volume and program milestones), (5) Reengage/AACA Program (Invisalign discounts, contingent on Advantage points earned), (6) Tipping Growth Accelerator (credit for advancing  in the Advantage program), and (7) Welcome Back Program (Advantage points awarded to practices who use Align's products after using competitors').  See Vogt Report, ¶ 306.

[11]   Vogt Report, ¶ 6.  The EPPs also alleged a conspiracy between Align and Smile Direct Club to divide and allocate the product submarket of aligners sold directly to consumers by eliminating Align as a competitor, with the intended effect of raising, maintaining, or stabilizing the prices of aligners sold directly to consumer purchasers in the United States and its territories.  I do not address this allegation in this report and understand that the conspiracy allegation will be addressed in separate expert reports.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

17. In this matter, there are two alternative explanations for Align's ongoing success in selling aligners and scanners. One is that Align's success is due to several factors including its quality products, its reputation and brand name capital, effective marketing, the support it provides to dental offices, and attractive pricing programs that benefit its customers. The other explanation is that the conduct summarized above has resulted in anticompetitive exclusion of rival suppliers of aligners and scanners. According to this monopolization explanation, rival sellers that are equally or more efficient have been unable to secure sales and competition has been harmed, with the result that prices for scanners and aligners are higher than they would be in a but-for world in which Align had not engaged in the specified conduct.

### B. Claims of Anticompetitive Exclusion Require Rigorous Analysis

18. Claims of *anticompetitive exclusion* based on pricing practices and other conduct require rigorous analysis for four important reasons.

19. First, exclusion of rivals is a natural outcome of competition. In a market context where individual customers choose a single supplier to serve their needs, it follows directly that all suppliers, except the one selected by an individual customer, fails to gain that sale. In a market context where individual customers selected a small number of suppliers, a practice known as multi-sourcing, similar logic applies, i.e., all suppliers other than the small number of selected suppliers failed to gain sales to a given individual customer. Thus, competition generates outcomes whereby some suppliers win sales and others do not. The failures of some suppliers to win sales to individual customers and groups of customers do not, by themselves, constitute a basis for claims of anticompetitive exclusion.[12]

---

[12] Bernheim, B. Douglas and Randal Heeb, "A Framework for the Economic Analysis of Exclusionary Conduct," Chapter 1 in *The Oxford Handbook of International Antitrust Economics*, Volume 2, edited by Roger D. Blair and D. Daniel Sokol, Oxford University Press, 2015, pp. 3-39 ("Bernheim and Heeb, 2015"), at p. 20 ("Antitrust policy seeks to limit anticompetitive conduct without chilling legitimate competitive activity. Where exclusion is concerned, the similarities between procompetitive and anticompetitive conduct render that objective especially challenging. In some sense, all competitive conduct involves exclusion: the losing party is excluded from making the sales won by the prevailing party. Because exclusion of that form can motivate firms to better serve consumers' interests by lowering prices and improving quality, it is essential to define the scope of suspect conduct much more narrowly.").

20. Second, suppliers are motivated to offer discounts for reasons that have nothing to do with excluding rivals.[13]  Indeed, when (i) a monopoly supplier (who faces no competition) sells to a buyer with the typical downward sloping demand, and (ii) the supplier's marginal costs are below its average costs, then both supplier and the buyer will both be better off with a pricing arrangement whereby the price that the buyer pays for additional units – the so-called *marginal price* – is lowered.  The combination of substantial fixed costs and low marginal cost is especially relevant in situations where situations where innovative firms have invested in new technologies and product designs.  According to basic economics principles, in these contexts total welfare for sellers and consumers is increased when sellers offer an initial price and lower marginal prices for purchases above a threshold.  <u>Compared to the alternative of the seller charging a single price, pricing schemes with lower marginal prices are efficiency enhancing and generate *first-order gains* for consumers.</u>

21. Third, in contexts where a supplier is in competition with rivals, discounted prices and lower marginal prices also generate *first-order gains* for consumers and thereby forward a primary objective of antitrust laws.  These gains are realized whether the incumbent retains the customer, or a rival displaces the incumbent.

22. Fourth, overall harm to consumers can occur if the first-order gains are offset by a reduction in competition.  In this regard, a technically sophisticated economics literature indicates that, under limited conditions, firms with established market positions may be able to take actions that result in *anticompetitive exclusion*, whereby on net consumers can be worse off due to a

---

[13]  See, for example, Murphy, Kevin M., Snyder, Edward A., and Robert H. Topel, "Chapter 5: Competitive Discounts and Antitrust Policy," *The Oxford Handbook of International Antitrust Economics*, Volume 2, Oxford University Press, 2015, pp. 89-119 ("Murphy, Snyder, Topel, 2015"), at p. 94 ("[Q]uantity commitment contracts and associated discounts from 'list' prices are natural outcomes of the competitive process, as sellers seek to increase sales.  These increases in sales naturally occur at the expense of rivals.  Key […] is that the typical seller does not face perfectly elastic demand for its product.  As a result, almost all sellers in modern wholesale and retail markets have some control over the prices they charge—they do not simply 'take' prices as given but instead have pricing strategies in which chosen prices exceed incremental costs.  Simple linear pricing ('here's my price, buy what you want') leaves unrealized gains from trade and, therefore, establishes incentives for buyers and sellers to devise ways to unlock them.").  See also, Topel, Robert H., "Contractual Discounts and Competition: Interpreting Unilateral Conduct under Section 2 of the Sherman Act," *International Journal of the Economics of Business*, February 2018, Vol. 25, No. 1, pp. 131–146, at p. 133.

lessing of competition.[14]  The "Raising Rivals Cost" (RRC) literature cited by Dr. Singer and Dr. Vogt began with a prominent article by Salop and Scheffman (1983).[15]  An essential idea of RRC is that if an incumbent offered rebates, then in some market contexts, e.g., where buyers need to buy one of the incumbent's products, rivals may have difficulty securing sales and thus competition could be impaired.[16]  Importantly, this theoretical literature has been refined over time, including by authors who contributed to the early expositions.  Salop and Scheffman (1987) clarified that RRC strategies yield ambiguous results in terms of downstream prices, the effects on rivals' profitability, and total welfare.[17]  Other contributions have emphasized the gains to consumers from pricing tactics that can be characterized as exclusionary.[18]  Scheffman and Higgins (2003) concluded that the challenge with claims that

---

[14]  There is a closely related literature on anticompetitive exclusion from vertical integration, which is understood to yield various gains (reducing transactions costs, encouraging relationship-specific investments, and eliminating double marginalization).  These benefits can, however, be offset when the conditions for anticompetitive exclusion result in a lessening of competition that ultimately harms consumers.  The recently abandoned Vertical Merger Guidelines  (4) state: "[T]he concern is that the merged firm could profitably use its supply of an input (the related product) to weaken the competitive constraint it faces from rivals in the downstream market (the relevant market)."  United States Department of Justice and the Federal Trade Commission, "Vertical Merger Guidelines, June 30, 2020, available at https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf, at p. 4.

[15]  Salop, Steven C. and David T. Scheffman, "Raising Rivals' Costs," *The American Economic Review*, May 1983, Vol. 73, No. 2, pp. 267-271, at p. 267 ("Predatory pricing doctrine focuses on conduct that lowers revenues. Alternatively, a firm can induce its rivals to exit the industry by raising their costs. Some nonprice predatory conduct can best be understood as action that raises competitors' costs.").

[16]  Salop, Steven C., "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," *Antitrust Law Journal*, October 2017, Vol. 81, pp. 371-421 ("Salop, 2017"), at p. 372 ("However, unlike the "explicit coercion" in these contracts, [conditional pricing practices] induce the near-exclusivity with the 'promise' of lower prices or payments that are 'conditional' on the customer's willingness to forego some purchases from competitors.").

[17]  Salop, Steven C. and David T. Scheffman, "Cost-Raising Strategies," *The Journal of Industrial Economics*, September 1987, Vol. 36, No. 1, pp. 19-34, at p. 24 ("Proposition 2. Profitable cost-raising strategies may result in a decrease in price if the predator has market power in the output market." and "Because an increase in [cost-raising parameter] alpha has an ambiguous effect on price and fringe output, it is probably not surprising that the effect of an increase in alpha on fringe 'profits' (inframarginal rents) is also ambiguous.") and p. 26 ("Proposition 5. In general, increasing [cost-raising parameter] alpha has an ambiguous effect on partial equilibrium welfare, even if price rises, when the predator has classical market power.").

[18]  Murphy, Snyder, Topel, 2015, at p. 98 ("[I]n *any* situation where the uncommitted price would exceed marginal cost—which for practical purposes means always— there are mutual gains for a buyer and a seller from an agreement that offers a discount in exchange for a buyer's commitment to purchase more.  Put differently, absent transactions costs or barriers to contracting, simple linear pricing is not an equilibrium outcome of the competitive process.").  See also, Scott-Morton, Fiona M., "Contracts that Reference Rivals," *Antitrust*, Vol. 27, No. 3, 2013, pp. 72-79 ("Scott-Morton, 2013"), at pp. 72-73 ("I will focus on what I call contracts that reference

rely on RRC is to "credibly distinguish between 'competition on the merits' and anticompetitive conduct…"[19]  The term *competition on the merits* refers to circumstances where rival suppliers have the opportunity to compete for customers, even if that means offering substantial discounts to be competitive with incumbent sellers.  Such rivalry and the competitive constraints that result are the essence of competition.

### C.  Framework for Anticompetitive Exclusion

23.  Given the reasons identified above, it is essential to rigorously assess Plaintiffs' claims of anticompetitive exclusion and take into account the fundamental point that lower prices yield first-order gains to consumers.  Regarding the gains from discounting, it is important to recognize that Align's rivals also offer discounts, and some offer so-called bundled discounts. Just as it would be wrong to condemn their practices, it would be wrong to condemn Align's discounting practices unless it is clear that the conditions for potential anticompetitive

---

rivals, or CRRs. These are contracts containing material terms that are contingent not only on the prices or quantities transacted between the parties to the contract, but also on the prices, quantities, or other terms of the relationship between one of the parties and product market rivals of the other. […]  The competitive effects of a particular CRR depend on the specific provisions of the CRR and the market circumstances.  Not all CRRs cause competitive harm.  For instance, observing that a buyer has bought exclusively from one seller does not necessarily lead to the conclusion that the arrangement caused any harm.  Sellers may, for example, compete by bidding for exclusives on the basis of one or more terms (such as price, quality, service offerings, or timeliness). Under such circumstances, multiple sellers may be offered the option of bidding for all of the buyer's business, and the buyer may, as a consequence, find it possible to extract all the surplus from the transaction by exclusively buying from one seller. The classic economic models predict no harm in these circumstances."); DeGraba, Patrick, Greenlee, Patrick, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," September 2017 ("DeGraba et al., 2017"), pp. 1-14, at p. 14 ("[C]onditional pricing practices […] have been defined as pricing strategies in which a seller conditions its prices on factors such as volume, the set of products purchased, or the buyer's share of purchases from the seller.  This set of strategies—richer than uniform pricing—can have welfare-enhancing or competition-reducing effects relative to uniform pricing.").

[19]  Scheffman, David T. and Richard S. Higgins, "Twenty Years of Raising Rivals' Costs: History, Assessment, and Future," *George Mason Law Review*, Vol. 12, January 2003, pp. 371-387, at p. 373.  See also, Scheffman, David T. and Richard S. Higgins, "Chapter 3: Raising Rivals' Costs," *The Oxford Handbook of International Antitrust Economics*, Oxford University Press, 2015, Volume 2, pp. 62-71 ("Scheffman and Higgins, 2014"), at p. 65 ("It probably cannot be stressed enough that raising rivals' costs or exclusion is not necessarily anticompetitive.  In concentrated markets, competition is necessarily rivalry—that is, competitors are well aware that their rivals' actions affect them and vice versa.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

exclusion are exist.  Furthermore, as a threshold matter, I understand that volume discounts are usually lawful.[20]

24. In a context where an established supplier sells two complementary products, e.g., scanners and aligners, whether anticompetitive exclusion could occur as a result of discount schemes and other alleged conduct involves consideration of several factors, including:

    i.    Whether the established seller has a product that buyers must purchase as opposed to a case where buyers have choices to purchase both products from rival suppliers;

    ii.    Whether the established supplier sells products at prices that are below relevant cost measures;

    iii.    The scale requirements for viable firms;

    iv.    Whether the durations of discount schemes and contracts embedding them are long and thereby secure customers for long periods of time;

    v.    Whether the terms of such contracts are enforced;

    vi.    Whether the share of customers with exclusive contracts is large relative to the minimum efficient scale for rivals to compete effectively; and

    vii.    Whether the market for the goods or services is growing, flat, or declining.[21]

---

[20] Various legal decisions appear to me, as a non-lawyer, to reflect the principle that discounts in most circumstances do not prevent customers from considering other suppliers.  See, for example, *Western Parcel Express v. United Parcel Service of America, Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) ("volume discount contracts are legal under antitrust law ... [b]ecause the contracts do not preclude consumers from using other ... services." (citing Fedway Assocs., Inc. v. United States Treasury, 976 F.2d 1416, 1418 (D.C. Cir. 1992))) and *Federal Trade Commission v. Qualcomm, Inc.*, 969 F.3d 974, 1003-04 (9th Cir. 2020) ("conditional agreements that provide 'substantial discounts to customers that actually purchase[ ] a high percentage of their ... requirements from' a firm are not exclusive dealing arrangements, de facto or actual, unless they 'prevent[ ] the buyer from purchasing a given good from any other vendor.'" quoting Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP, 592 F.3d 991, 996-97 (9th Cir. 2010)).

[21] Greenlee, Patrick, and David Reitman, "Distinguishing competitive and exclusionary uses of loyalty discounts," *The Antitrust Bulletin*, Vol. 50, Issue 3, Fall 2005, pp. 441-463, at pp. 442-443 ("The first step is to classify some of the challenged loyalty programs in terms of the structure of the affected market(s), The second step is to examine how loyalty rebates can be used as a competitive strategy within these various market contexts. This provides the necessary backdrop for analyzing exclusionary loyalty programs; before building a fence between pro-competitive and anticompetitive loyalty programs, it helps to know the lay of the land on both sides. [...] a test that does a good job of delineating exclusionary uses in one market context may provide misleading answers in another context, and vice versa. No single model can cover the range of situations in which loyalty rebates have been used.").  See also, Scheffman and Higgins, 2014, at p. 64 ("Care must be taken in assessing the potential net effects of actions that increase costs to take into account the totality of the costs and benefits of the increase in costs. For example, if a firm incurs costs to improve its product and in order to compete effectively rivals must also incur costs to improve their products, quality-adjusted output rises. That, of course, is competition—not anticompetitive cost raising. Similarly, if a firm takes actions that improve its production processes, resulting in lowering its costs relative to its rivals, that generally would be competitive."); Carlton,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

25. Regarding the first factor, the focus is on whether buyers have viable alternatives to the established seller.[22] Here, dental providers' alternatives may include buying (a) both scanners and aligners from Align, (b) buying both scanners and aligners products from a single rival, e.g., Dentsply Sirona, (c) using PVS impression technology instead of scanners, and (d) matching supplies of the two products from rival suppliers, e.g., buying a 3Shape scanner and aligners from 3M.[23]

26. The second factor calls for an analysis of the relationship between prices and costs. If an established supplier sells at prices above marginal costs or average variable costs, then an equally efficient rival can compete for customers without incurring losses.[24] If, however, an established supplier is selling at prices below marginal costs or average variable costs, then these sales reduce profits. In the latter case, the question follows whether the supplier is attempting to discourage rivals who might be less able to absorb the losses. The relationship between prices and costs is particularly relevant for evaluating claims that volume discounts or bundled discounts have an exclusionary effect on rivals. As explained below, the analysis focuses on whether an equally efficient rival can cover its variable costs on so-called *contestable sales*, which include (i) sales to new customers, (ii) sales to customers who are not participants in any discount program, and (iii) sales to customers who met their primary

---

Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, Fourth Edition, 2015, at pp. 295-296 ("In most markets, firms compete not just on price but also along many other product dimensions, such as quality, reliability, research and development, and promotional activity. […] Paying to improve quality has two important effects. First, it raises the firm's fixed cost and perhaps its marginal cost of production if a higher-quality good costs more to produce. Second, it attracts customers who were previously buying a lower-quality good. […] As market size s increases, firms have an incentive to compete by improving the quality of their product. To raise quality, a firm must incur larger sunk costs, a circumstance that reduces the incentive for additional firms to enter the industry […] As a result, as market size increases, concentration no longer necessarily falls.").

[22] In the famous *United Shoe Machinery* case United Shoe faced little or no competition for some of the machines it sold to shoe manufacturers. But for other machines and for inputs used with the machines, United Shoe faced competition. *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295 (D. Mass. 1953), at 335 ("In most of those large supply fields it is too plain for argument that United has not achieved a share of the market which prima facie indicates a monopoly. On the evidence most favorable to the Government, for example, United has only 15% of the market for shoe boxes, 25 to 29% of the market for wood heels, 30% of the market for lasts, perhaps 49% of the market for all shanks, roughly 25% of the market for box toes, and perhaps 44% of the market for clicking dies. With respect to shoe boxes, wood heels, lasts and box toes there are other important competitors who plainly limit such market power as defendant has.").

[23] This list does not include options involving multi-sourcing from the established supplier and rivals.

[24] Sales at prices that exceed marginal cost and average variable costs increase a firm's profits or lower its losses.

suppliers purchase requirements and, therefore, are unincumbered regarding additional purchases.

27. The other five factors bear on the issue of whether rival suppliers have opportunities to compete for a sufficient volume of customers to achieve an efficient scale. The relevance of the incumbent's share of customers for the products at any point in time depends on the duration of the contracts and whether the contracts are enforced. The potential for exclusion depends crucially on whether rival suppliers need to reach a substantial scale to be viable for the long term. The scale required for viability depends on the upfront costs—for example, research and development, investment in manufacturing, and investments in distribution—being large. Market growth—or the absence thereof—influences whether anticompetitive exclusion can occur. In a growing market, rival firms have the opportunity to compete for the flow of new customers as well as existing customers.[25]

28. Analysis of these last five factors may indicate that there is no potential for anticompetitive exclusion even with explicit tying arrangements whereby buyers must purchase two complementary goods from the same supplier, either because of contractual terms or a specialized interface. Copiers and ink cartridges provide a good example. While Hewlitt Packard has the largest share of copier sales globally, buyers have viable choices. The fact that buyers replace copiers and buy new copiers on an ongoing basis means that rival suppliers have opportunities to compete for these *contestable* sales. Similar logic applies to discounting schemes in situations where either few buyers are "locked in" to particular discounts or those discount agreements are of limited duration.

### D. Plaintiffs' Experts' Approaches to Analyzing Anticompetitive Exclusion

29. Dr. Singer's and Dr. Vogt's approaches to analyzing whether the challenged conduct anticompetitively excluded competitors are flawed, unreliable, and often at odds with the economic literature. Their claims are based on assumptions rather than analysis or actual gathered facts. Neither of their reports includes a proper industry analysis, which, in my view,

---

[25] For example, John Sutton studied the relation between market concentration and market growth (Sutton, John, *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration*, MIT Press, 1991).

is a necessary step when applying Industrial Organization principles. As a result, their analyses of the at-issue conduct proceed without relevant insights about how the industry is performing, including important time-series information about prices, output, and ongoing entry. Further, to my understanding, the record does not include the types of evidence that often are marshalled to buttress claims of anticompetitive exclusion, i.e., I do not find evidence of rival scanner or aligner suppliers saying that they could not compete economically with Align or evidence that dental providers could not purchase aligners or scanners from competitors because of exclusivity requirements from Align.

30. In focusing on the at-issue conduct, Dr. Singer assumes that a contract is "exclusionary" if it is the type of contract that could potentially prevent Align's rivals from competing for customers.[26] Such a definition is meaningless because, as I explained, all sales by one supplier exclude rivals. To advance the analysis, one must apply the relevant economic tests to determine whether contracts in fact result in anticompetitive exclusion. Dr. Single does not do so, however, and his approach is not supported by the economics literature he cites for support.

31. Dr. Vogt does no analysis of the first-order gains from the discounts and lower marginal prices offered by Align. More problematic, Dr. Vogt offers no framework for assessing whether anticompetitive exclusion has occurred or could occur in this context. His subsection titled *Framework for Exclusive Dealing* is a less than 2-page discussion of an example with an odd assortment of assumptions and imaginations in a context where, it appears, the key incentive for discounting marginal prices is absent from his discussion. In his scenario where an entrant may have to offer a 20 percent discount compared to the 10 percent discount of the incumbent, Dr. Vogt assumes that the entrant "may be excluded" and "may be unable to counterbid."[27] This conjecture underscores Dr. Vogt's lack of a framework.

32. Most peculiar in Dr. Vogt's discussion is this claim:

> Unless the entrant can immediately take 100% market share from the entrant [sic], the conditional exclusivity discount will impose some cost on the rival.[28]

---

[26] Singer Report, ¶ 143.

[27] Vogt Report, ¶ 697.

[28] Vogt Report, ¶ 699.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

While I presume that Dr. Vogt meant to say "from the incumbent", this statement is not supported by any antitrust literature. Under no circumstances could one claim that the inability of an entrant to take 100 percent of the market somehow constitutes anticompetitive exclusion. Nor does Dr. Vogt's statement square with common sense. Competition does not require that an equally efficient rival should be able to secure all of the market or even all of another firm's sales. Entrants can be a competitive constraint on the incumbent even when they gain relatively small market shares.

33. If Dr. Singer's and Dr. Vogt's findings about anticompetitive foreclosure from alleged *de facto* exclusive dealing and terminating Invisalign interoperability with 3Shape were correct, I would expect to see widespread evidence in the record in this case in the form of documents and testimony of scanner and/or aligner companies who state that they are unable to compete economically with Align—not merely failing to win sales from some customers. Merely theorizing that Align's conduct could exclude rivals instead of applying an economic framework to actual facts gathered is flawed and unreliable. This is particularly true given the volume of evidence that, contrary to Dr. Singer's and Dr. Vogt's findings, competing aligner and scanner companies grew their sales and more companies entered the industry, creating even more alternatives for doctors and patients alike, as well as the ability of Plaintiffs to pursue evidence from these types of companies.

### E.  Summary Points

34. Analysis of claims of anticompetitive exclusion should proceed with caution given that consumers gain from discounts and lower marginal prices. In this context, there are two competing explanations for Align's success. One is that Align has constantly developed innovative products, and that Align supplies aligners and scanners on terms that are attractive to customers. The alternative hypothesis of anticompetitive exclusion is that equally efficient rivals are prevented from competing for sufficient sales volumes to be viable and, as a result, competition has been harmed.

35. An important step in assessing whether anticompetitive exclusion can occur is to analyze the choices that buyers have and the opportunities that rivals have to make sales. Another important step is to analyze the relationship between prices, including marginal prices, and

costs.  If an established seller is charging prices below marginal costs or average variable costs and, therefore, incurring losses on some sales, indicates that the seller expects some other benefit, such as limiting competition over the long term.

36.    The central question in evaluating claims of anticompetitive exclusion is whether equally efficient rival suppliers have the opportunity to compete for enough buyers to reach an efficient scale.  If they do so, they provide a competitive constraint.  Analyses of factors such as the share of buyers that participate in discount programs and their durations are important to distinguishing between the two competing hypotheses concerning Align's success.

## III.    SUMMARY OF CONCLUSIONS

### A.  Overarching Conclusion

37.    Based on my economic analysis, I conclude that Align did not engage in an anticompetitive scheme to monopolize the markets that include aligners or scanners.  Industry analysis confirms that the basic conditions for potential anticompetitive exclusion are not present.  As indicated by the evidence on requests for FDA approvals for new products, suppliers of aligners and scanners continue to innovate, and entry is ongoing.  Indeed, the record of successful entry and ongoing entry is inconsistent with Plaintiffs' claims that competitors are anticompetitively excluded from selling aligners and scanners.  Buyers have many options to purchase Align's products.  Align's contracts, discount programs, and termination of interoperability with 3Shape scanners did not prevent rival suppliers of aligners or scanners from competing for sales to a sufficiently large number of dental practices.  The record provides no evidence of below-cost pricing by Align.  Therefore, there is no claim that rivals would have to incur losses to secure customers.  The record further indicates that demand for both products was growing, which provides further opportunities for rival suppliers to compete.

### B.  Nine Supporting Conclusions

38.    *First,* aligners and intraoral scanners are innovative technologies that are changing how dentists and orthodontists treat patients with malocclusion.  Align pioneered the development and marketing of aligners, which in turn spurred demand for scanners.  Both products have experienced rapid innovation, growth in sales, growth in adoption, and significant entry of new

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

manufacturers in recent years. Among the many recent entrants include well-capitalized and well-established dental suppliers. Industry performance, as indicated by time-series information on output and prices, has been excellent.

39. ***Second,*** Align's termination of interoperability with 3Shape's TRIOS scanner was economically rational for Align. Dr. Singer and Dr. Vogt claim to apply the profit sacrifice test, but incorrectly limit their analysis to Invisalign aligner sales. Indeed, their analyses and the evidentiary record demonstrate that there was no profit sacrifice by Align, even in the short run and without taking into account the issues associated with the patent litigation concerning the question of whether 3Shape's scanners infringed on Align's patents. Moreover, limiting the degree of integration—and therefore having a more closed system—does not mean that the system faces no competition. One dimension of competition is choosing of how open or closed to make a product. This is reflected in the varying degrees of interoperability other scanners have with competitors' aligners, and the proprietary file formats some scanners use with integrated software and equipment. PVS also remains an industry standard for creating dental impressions and physical impressions can be digitally scanned for ordering aligners and other products.

40. ***Third,*** Align's Fusion bundled discount program, a program that accounts for less than ten percent of scanner sales, did not anticompetitively exclude competing aligner and scanner firms from the market. There is no evidence of below-cost pricing with Fusion. Even at the highest aligner and scanner discount rates offered, Invisalign and iTero were both priced above average variable costs, therefore equally efficient competing aligner and scanner firms could compete with Align on prices for every customer. Moreover, few dental providers received the maximum aligner or scanner discounts, which provided further opportunities for rivals to compete for customers. While Dr. Singer and Dr. Vogt reject an analysis comparing discounted prices to average variable costs, they fail to properly analyze the effect of Fusion discounts using their preferred RRC framework.[29]

---

[29] Salop, 2017, at pp. 401-402 ("While the predatory pricing paradigm requires a price-cost test, the RRC foreclosure paradigm would take a more conventional rule of reason approach to evaluating whether or not consumers are harmed on balance. The analysis would evaluate the CPPs as input and/or customer foreclosure

41. **Fourth,** Align's discount programs alleged to confer *de facto* exclusivity on Align, did no such thing and did not result in anticompetitive exclusion. The discount programs are of short duration and there is no evidence of below-cost pricing. Dr. Singer and Dr. Vogt assume, rather than demonstrate, that these programs were illegal. Dr. Singer and Dr. Vogt do not establish that the criteria for discount programs to be anticompetitive under their preferred RRC framework are met. The criteria are clearly not met, and Align's discounts do not raise rivals' cost or prevent Align's rivals from competing for customers. Indeed, the record shows that dentists and other providers had many options to secure supplies, and that they made different decisions about suppliers, including not purchasing from Align.

42. **Fifth,** the exclusivity clauses in a handful of Align's contracts with certain Dental Service Organizations ("DSOs") and the terms of some of Align's discount programs did not prevent other aligner and scanner suppliers from competing for these customers. The exclusivity clauses were frequently short-lived or easily canceled, often applied only to marketing competing aligners, often only applied to whether dental providers were searchable on Invisalign.com's "Find a Doctor Tool," and did not prevent doctors from using competing products. Further, the exclusivity present in a handful of contracts was efficiency enhancing. Dr. Singer and Dr. Vogt again fail to properly analyze the effect of the exclusivity clauses on competitors and instead assume that exclusivity clauses caused anticompetitive exclusion of competitors in two distinct product markets.

43. **Sixth,** taken together, Align's challenged conduct did not cause anticompetitive exclusion. Even combining the alleged anticompetitive exclusion from Fusion, Align's 2018 contract with Heartland, and DSO contracts that contained exclusivity clauses, the shares of sales involved

---

and evaluate the likely impact on consumers and competition. This does not mean that courts should rely on simple-minded foreclosure rates. The analysis of the two variants of foreclosure instead would evaluate whether the rival likely would be significantly foreclosed in the sense of suffering significantly higher costs or limitations on its capacity, output and ability to expand efficiently. […] At the same time, the fact that one or more rivals suffer from foreclosure does not automatically imply that there is consumer harm. The rule of reason analysis under the RRC paradigm also would evaluate 'power over price,' whether the foreclosure likely would permit the defendant to achieve, enhance, or maintain market power that could lead to consumer harm. This step also moves the analysis beyond the measuring of simple foreclosure rates. Consumer injury might be prevented if there were sufficient competition with other non-foreclosed competitors or other products. The rule of reason also evaluates the various types of cognizable consumer efficiency benefits from the conduct in order to determine the net effect on consumer welfare.").

is below Dr. Singer and Dr. Vogt's own thresholds for anticompetitive exclusion, with a maximum of approximately 18 percent of Invisalign revenue in January 2022. The lack of anticompetitive exclusion is indicated by the large number of rivals gaining sales and by ongoing new entry.

44. **Seventh,** Dr. Singer's regressions for estimating damages are unreliable. They are not consistent with the theory of harm, are not robust to reasonable modifications, and produce nonsensical results.

45. **Eighth,** Dr. Vogt's yardstick method for estimating damages is unreliable. His approach for estimating the direct overcharge is almost entirely untethered to the allegations and relies on an invalid benchmark. His estimates of pass-on rates are fundamentally flawed because they do not control for the products being sold and focus on average pass-on rates without investigating the distribution of consumer prices. Correcting these mistakes demonstrates that a significant fraction of individual end payers would be uninjured even if, contrary to the evidence, direct purchases had paid overcharges.

46. **Ninth,** my analysis showing that Align did not cause anticompetitive exclusion does not rely on how the relevant antitrust markets are defined. Nevertheless, I find that Align does not have market power in the relevant markets. In addition to competing with other brands of doctor-directed aligners, Invisalign aligners compete with traditional wire-and-bracket braces and DTC aligners in the teeth straightening product market. Align's market share in the teeth-straightening market has declined over time and was approximately 10 to 15 percent in 2022. This market share, combined with other evidence of robust competition, demonstrates the Align did not have market power. While PVS remains an important alternative to scanners, Align does not have market power even assuming a market for scanners. The evidence for no market power includes strong competition from other scanners, successful entry by new scanners, volatility in sales shares from year to year, and Aligns' share of scanner sales being less than 50 percent on average.

47. In sum, my analysis shows:

   i. The necessary conditions for anticompetitive exclusion, e.g., a large share of customers under contract for long durations, are not present.

   ii. Align's prices are not below its costs.

    iii.  The share of Align's customers who had agreed to discount programs that potentially prevented them from purchasing from other suppliers is low.

    iv.  Align's rivals had abundant opportunities to compete for customers.

    v.  Plaintiffs' experts' analyses of alleged anticompetitive exclusion and damages are unreliable.

48. My conclusions above do not depend on whether Plaintiffs' preferred market definitions are accepted or whether, for example, a SSNIP test is passed or not.  Whatever the market definition, to evaluate Plaintiffs claims of anticompetitive exclusion one needs to assess the relationship between prices and costs and to assess whether rivals to an established supplier have ample opportunities to compete for a sufficient number of customers in the short and longer runs.

## IV.    INDUSTRY ANALYSIS

49. This industry analysis (a) develops an understanding of the aligner and scanner products, including how they are differentiated and innovations over time; (b) explains demand for the products by dental providers and consumers, including relevant substitutes; and (c) identifies important features of the supply side, including numbers of suppliers and the evidence on entry. Given that the products of interests – aligners and scanners – are complements, it is important to understand the roles of doctors in using information produced by scanners and PVS technology to "submit" orders for customized aligners, which are in turn supplied in "cases" to address their patients' needs.  For the same reason, it is important to understand the technological interface between scanners and aligners.

### A. Products

50. Innovation by Align led to the creation and development of the modern aligner industry, which has helped spur the adoption and development of intraoral scanners.

### 1. *Aligners*

51. The *Journal of the American Dental Association* describes for patients the "two main approaches" used to straighten teeth—including "crooked teeth", "teeth with spaces between

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

them", "teeth that do not fit together comfortably when you bite down", and "narrow smiles"[30]—as follows:

**Braces**

Braces are brackets, either metal or tooth colored, that are glued to the front or back of your teeth.  They are connected with a wire.  Over time, the wire is tightened to move the teeth. Braces can be used with rubber bands as well.  Patients who wear braces typically come to the office every 4 to 6 weeks to have the wire or rubber band placement adjusted. […]

**Aligners**

Aligners are thin plastic trays that move teeth slowly […] When using aligners, your dentist or orthodontist will first obtain a digital scan of your mouth, either by using a camera designed for use in your mouth (an intraoral camera) or by making a mold of your mouth, which is then digitally scanned. The computer uses the digital scan to create a treatment plan that moves your teeth from their existing position to the desired position. For each movement on the treatment plan, an aligner is made. You wear these aligners in the order they are given to you, changing them periodically, to increase the pressure on your teeth and move them into a new smile. You can take the aligners out, but it is recommended that you only remove them when eating or brushing your teeth.[31]

52.  The Cleveland Clinic distinguishes between four different types of braces:[32]

  i.  *Metal braces*, the traditional braces using "stainless steel bands, brackets and wires" with "[t]iny elastic bands called ligatures" to "keep the wire firmly in place."

  ii.  *Ceramic braces* are similar to metal braces but "the brackets, wires and ligatures are tooth-colored, so they blend in with your smile."

  iii.  *Lingual braces* are also similar to metal braces, but "they go on the back surfaces of your teeth instead of the front," making the braces less visible to others.

---

[30]  Mark, Anita M., "For the Patient: Straightening Your Smile," *The Journal of the American Dental Association,* January 2023, Vol. 154, Issue 1, p. 98 ("Fixing these problems can not only improve your smile but also help prevent dental problems like cavities and gum disease and may improve speech and chewing. Two main approaches used to improve these smiles are braces and plastic trays, called aligners.").

[31]  Mark, Anita M., "For the Patient: Straightening Your Smile," *The Journal of the American Dental Association,* January 2023, Vol. 154, Issue 1, p. 98.

[32]  The Cleveland Clinic, "Teeth Braces," available at https://my.clevelandclinic.org/health/treatments/24601-teeth-braces ("There are several different types of braces. The type that's best for you depends on a few factors, including the kind of issue you have, the severity of your condition and your personal preferences.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

iv. *Self-ligating braces* "look similar to traditional metal braces" but "instead of ligatures…self-ligating braces use a built-in system to hold the archwire in place."

53. Aligners and braces can both be used for most teeth straightening needs.[33]  While braces can treat some types of malocclusion that aligners cannot, aligners can treat close to 90 percent of all cases of malocclusion.[34]

54. Since the introduction of Invisalign in 1998, aligner technology has improved with advances in materials, production techniques, and treatments.  Align highlights these seven innovations on its website:[35]

> 2005:  Introduction of express treatment, which provided "new options for simple tooth straightening."

> 2009:  The use of attachments, which are small bumps adhered to the patients' teeth that the aligners grip.[36]

> 2011:  The integration of the iTero scanner into Align's aligner technology.

> 2013:  Introduction of patented "SmartTrack" material.

> 2016:  Introduction of weekly aligner changes instead of two-week changes to allow faster treatment.

> 2017:  Treatment of "mandibular advancement" for "improving the bite and appearance of the chin."

---

[33]  American Orthodontics Association, "Braces vs. Clear Aligners," January 30, 2019, available at https://aaoinfo.org/whats-trending/braces-vs-clear-aligners/, ("Most orthodontic problems can be successfully treated using braces"); Align Technology, "Treatable Cases," available at https://www.invisalign.com/provider/digital-transformation/treatable-cases, ("Invisalign clear aligner therapy has demonstrated success in treating Class I, II, and III malocclusions. From simple tooth movement to more complex cases, Invisalign technology can help you achieve your clinical goals").

[34]  Form 10-K 2022. Align Technology, Inc., 2022, available at https://investor.aligntech.com/static-files/eb70ffbf-1126-4422-94fc-8fa110079497, p. 6.

[35]  Align Technology, "Your Digital Invisalign Experience," available at https://www.invisalign.com/invisalign-digital-experience.

[36]  Dexter, Amanda, "Invisalign Attachments: What Are They, How Do They Work & Are They Noticeable?" Dentaly.com, January 3, 2023, available at "https://www.dentaly.org/en/invisalign-invisible-braces/invisalign-attachments/ ("Invisalign attachments work by allowing the aligners to grip the teeth better so they can apply more pressure. For the attachment to work, it is bonded to the centre of the tooth that needs particular adjustments. the next aligner tray is then made tighter around this tooth and attachment to enable greater pressure and therefore better movement in the desired direction.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2018:  Introduction of Invisalign First product for use in growing children.

55.  Such product innovations are important when evaluating changes in prices over time because the products themselves are changing.  Even if the price of a product does not change, but the product is improved, economists would consider that a decrease in the quality-adjusted price.[37]

56.  Aligner products differ along several dimensions including the manufacturing process, how they are ordered, the number of aligners provided, the treatment planning method, and the type of conditions they can treat.  The products offered by aligner suppliers differ on several dimensions, including in appearance, material, and receptivity to attachment/buttons. Invisalign (Align), Clarity (3M), ClearCorrect (Straumann), SureSmile (Dentsply Sirona), and Spark (Envista) aligners all offer attachments, while Reveal (Henry Schein) aligners do not.[38] These companies advertise different materials used in their aligners, including SmartTrack for Invisalign, ClearWear for Reveal, ClearQuartz for ClearCorrect, TruGen for Spark, and Essix plastic for SureSmile.[39]

57.  Align has developed several differentiated product offerings.  Figure 1 lists selected Invisalign products that can treat different levels of malocclusion and provide different numbers of aligners.

---

[37]  Besanko, David and Ronald R. Braeutigam, *Microeconomics*, John Wiley & Sons, Inc., 2011, Fourth Edition, p. 41 ("Figure 2.13 Quality-Adjusted Prices of Computers and Peripheral Equipment, 1988-2008. This is the graph of a price index showing how the average price of a computer of similar capability changed over time. The index is scaled to equal 100 at the end of 1988. By 2008, the price index had fallen to about 10.").

[38]  Align Technology, "Your Digital Invisalign Experience," available at https://www.invisalign.com/invisalign-digital-experience; 3M, "3M Clarity Aligners Flex + Force: More Materials, More Treatment Options," available at  https://multimedia.3m.com/mws/media/2063190O/innova-article-1-two-trays-english.pdf; Somers, Jamie L., "Engagers (Also Known As Attachments)," Straumann Group, available at https://support.clearcorrect.com/hc/en-us/articles/203836198-Engagers-also-known-as-Attachments-; Dentsply Sirona, "Using Attachments,", available at http://docs. suresmile.com /suresmile_webhelp/treatment_planning/Using_Attachments htm.; Ormco Corporation, "Frequently Asked Questions," available at https://sparkaligners.com/en-us/faq; Henry Schein Orthodontics, "Frequently Asked Questions," available at https://revealclearaligners.com/faqs/.

[39]  Align Technology, "Your Digital Invisalign Experience," available at https://www.invisalign.com/invisalign-digital-experience; Henry Schein Orthodontics, "Why Reveal," available at https://revealproviders.com/why-reveal/; Straumann Group, "About the Aligners," available at https://www.straumann.com/clearcorrect/us/en /patients/about-the-aligners.html; Ormco Corporation, "The Spark Difference," available at https://sparkaligners.com/en-us/spark-difference; Dentsply Sirona, "Your SureSmile," available at https://www.suresmile.com/en-us/your-suresmile/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 1: Comparison of Selected Invisalign Products**

|  | Malocclusion | Number of Aligner Sets |
|---|---|---|
| **Comprehensive** | Moderate to Severe | Unlimited |
| **Moderate** | Mild to moderate | Up to 20 |
| **Lite** | Mild to moderate | Up to 14 |
| **Express** | Very mild to mild | Up to 7 |
| **Express 5** | Very mild to mild | Up to 5 |

Source: Invisalign, "Invisalign Product Portfolio," available at https://cloud.news.aligntech.com/productportfolio.

### 2. Scanners

58. Dental impressions are imprints or models of the teeth or gum structure that a dental provider uses to design a treatment plan by observing elements such as the fit of dental arches and the size of teeth and gums.[40] In addition to teeth straightening, dental impressions are used for a range of dental restorations including crowns, bridges, implants, porcelain veneers, dentures, teeth whitening trays, athletic mouth guards, night guards, and sleep apnea oral appliances.[41] According to the Cleveland Clinic, there are two methods of taking dental impressions:[42]

---

[40] Cleveland Clinic, "Dental Impressions," April 2022, available at https://my.clevelandclinic.org/health/diagnostics/22671-dental-impressions ("Dental impressions are imprints of your teeth, gums or other structures inside of your mouth. […] These models show your dentist how your dental arches fit together, as well as the size and relationship of your teeth and gums.").

[41] Cleveland Clinic, "Dental Impressions," April 2022, available at https://my.clevelandclinic.org/health/diagnostics/22671-dental-impressions ("Dental impressions are used for a wide range of dental restorations and oral appliances, including: Dental crowns. Dental bridges. Dental implants. Porcelain veneers. Dentures. Clear aligners. Retainers. Teeth whitening trays. Sports mouth guards. Night guards (for teeth grinding). Sleep apnea oral appliances.").

[42] Cleveland Clinic, "Dental Impressions," April 2022, available at https://my.clevelandclinic.org/health/diagnostics/22671-dental-impressions ("When making dental impressions, your healthcare provider may use traditional dental putty or digital dental impressions. While the outcomes are similar, the procedures are different.").

**Traditional dental putty (commonly referred to as PVS)**:

[H]ealthcare provider a dispenses putty-like dental impression material into plastic or metal trays. Next, they'll place the trays over [the] teeth. After a minute or two, the dental impression material sets and hardens. Finally, [the] healthcare provider removes the trays (and impression material) from [the patient's] mouth. [The] impressions are then sent to a dental laboratory. There, a technician will pour stone into [the] dental impressions to create a cast of [the patient's] mouth.

**Digital dental impressions (obtained via scanners)**:

[…] During this procedure, [the] healthcare provider uses a digital handheld wand to capture thousands of pictures of [the patient's] teeth and gums. As [the] healthcare provider passes the wand over [the] teeth, images of [the patient's] mouth will come up on a computer screen. Next, the computer software will stitch the images together, creating a digital, 3D representation of [the] dental arches.

[The] healthcare provider […] then electronically deliver[s the] photo files to a dental lab.

59. It is estimated that approximately 25 to 30 percent of dentists with general practices had a scanner by 2020.[43]  As seen in Figure 2, in the third quarter of 2016, approximately half of Invisalign cases were ordered by PVS.  By the first quarter of 2022, that number dropped precipitously to approximately 10 percent.

---

[43]  Bednar, Jason, "Dentsply Sirona, Inc.," Piper Sandler, June 2020, at p. 20 ("That being said, we do still see plenty of runway in the U.S. and all international markets for continued uptake of DI systems as we estimate no more than ~25-30% of GPs in the most penetrated geographies have a full CAD/CAM or standalone DI system.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 2: Invisalign Orders Using PVS, by Quarter**



Source: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

During the same period, the share of dental providers that submitted all of their Invisalign orders with PVS fell from approximately 77 percent in the third quarter of 2016 to approximately 34 percent in the first quarter of 2022.[44]

60. As with aligners, there has been significant innovation in digital intraoral scanners in recent years. In 2013, Align launched the Invisalign Outcome Simulator, which allowed patients to visualize how their teeth would look after Invisalign treatment.[45] In 2015, Align launched the iTero Element scanner, which provided "faster scan speed, accuracy, intuitive operation and exceptional visualization capabilities";[46] in 2018, Align introduced the iTero Element 2

---

[44] See backup calculation.

[45] Align Technology, "Who we are," available at https://www.aligntech.com/about#who ("The chairside application, powered exclusively by the iTero scanner, now allows doctors to help patients visualize how their teeth may look at the end of their Invisalign treatment.").

[46] Align Technology, "Who we are," available at https://www.aligntech.com/about#who.

scanner, which has 25 percent faster scan processing and a faster start up time than the iTero Element;[47] and in 2019, Align launched the iTero Element 5D scanner, which included near-infrared imaging technology to help detect cavities.[48]

61.    Scanners are differentiated on several dimensions, including the size and weight of the handheld component of the scanner (the wand); the scanning technology; the scan speed, accuracy, and quality; and additional features such as having a touchscreen, remote control, wireless connectivity, and high-definition photos.[49]

62.    Software offerings can also differentiate scanners from one another.  Some scanners can integrate fully with the dental practice management software to streamline communication with patients and dental labs (e.g., Carestream CS3600 and CS3500) while others do not support that capacity.[50]

### 3.    The Interface Between Aligners and Scanners

63.    Dental providers who use scanners submit orders for aligners that are customized to the individual patient need by either: (i) submitting a scan file directly from the scanner to the aligner company,[51] or (ii) by exporting the scan file in the industry-standard STL format and sending that file to an aligner supplier that supports such a process.[52]

---

[47]    Align Technology, "iTero Element 2 Intraoral Scanner," available at https://itero.com/our-solutions/itero-element-2 ("25% faster scan processing [footnote in original reads "With the iTero Element 2 as compared to the iTero Element, and based on comparison of 40 Invisalign scans and 40 restorative scans with 3 prep teeth processed by each: iTero Element and iTero Element 2."] and a faster start up time [footnote in original reads " As compared to the iTero Element, and based on comparison of 40 start up times between each: iTero Element and iTero Element 2."]"); Align, "Who we are," available at https://www.aligntech.com/about#who.

[48]    Align Technology, "The iTero Element 5D Imaging System," available at https://itero.com/our-solutions/itero-element-5d ("The first 3D intraoral scanner with Near-Infrared Imaging (NIRI) technology to aid your diagnostic workflow. Aids in detection and monitoring of interproximal caries above the gingiva in real time."); Align Technology, "Who we are," available at https://www.aligntech.com/about#who.

[49]    ALIGNAT-PURCH00003427–452 (iTero Competition Overview, March 2018), at 431 and 433.

[50]    ALIGNAT-PURCH00369619-635 (Align Intraoral Scanners Competitive Review, 2018), at 631.

[51]    To submit a scan directly, the scanner and aligner technology need to be integrated, sometimes referred to as interoperability.

[52]    3M, "3M True Definition Scanner – Frequently Asked Questions," available at https://multimedia.3m.com/mws/media/921859O/3m-true-definition-scanner-faq.pdf. ("You may then share the STL file with any third-party provider that accepts industry-standard STL files."); Deposition of Christopher Puco, former Senior Vice

64.  Figure 3 shows which scanners can be used to order aligners by these two methods for a non-exhaustive list of scanners and aligner brands.

**Figure 3: Integration Between Aligners and Scanners**

✓    indicates integration such that the scanner sends files directly to the aligner supplier

✓*   indicates integration only available between Invisalign and Omnicam scanner

.stl   indicates that aligners can be ordered with scans produced by the scanner in STL format

dna   indicates that the aligner brand does not accept files in STL format from the listed scanner

| Aligner Brand | Align | Envista | Straumann | Dentsply Sirona | 3DISC | Medit | 3M | Planmeca | 3Shape |
|---|---|---|---|---|---|---|---|---|---|
| Clarity | .stl | ✓ | .stl | .stl | .stl | .stl | ✓ | .stl | ✓ |
| ClearCorrect | .stl | .stl | ✓ | .stl | .stl | ✓ | .stl | .stl | ✓ |
| Invisalign | ✓ | dna | dna | ✓* | dna | dna | ✓ | dna | dna |
| Reveal | .stl | .stl | .stl | ✓ | .stl | ✓ | .stl | ✓ | ✓ |
| SLX | .stl | .stl | .stl | ✓ | .stl | ✓ | .stl | ✓ | ✓ |
| SmileDirectClub | dna | ✓ | dna | dna | dna | dna | dna | dna | dna |
| Spark | .stl | .stl | .stl | .stl | .stl | .stl | .stl | .stl | ✓ |
| SureSmile | .stl | ✓ | .stl | ✓ | .stl | .stl | .stl | .stl | ✓ |

Sources: Company websites and press releases.  See backup for details.

65.  As indicated, most scanners can be used to order most aligners.  Align's iTero scanner can be used to take digital impressions for ordering any aligner brand that accepts STL files.[53]  It also shows that many scanners are interoperable with more than one aligner brand.  Hence, along with having many options for scanners, dental providers have many options for submitting orders.  Referring to the column marked "Align", a dentist office using Align's iTero could submit orders for aligners to Align or to at least seven other suppliers using the standard STL file interface.

---

President of the Americas at Align, February 28, 2023, at 71:24-72:2 ("[…] any scanner you just take an STL file off the scanner and you can submit to anyone. That's what ClearCorrect was doing all the time."); Deposition of Joseph Hogan, CEO of Align, January 13, 2023, at 57:11-24 ("…Well, if you take an iTero scanner, I know you can take an STL from an iTero scanner and send it to a competitor of ours and they can make aligners from it.").

[53]  Deposition of Sherwin Matian, General Dentist at VIP Dental Spas, January 8, 2023, at 31:6-32:7; Deposition of Leon Rasovsky, Vice President of Digital Transformation at Align, January 26, 2023, at 29:4-7 ("Q: […] Is it possible to export a iTero scan in the STL file format? A. It is.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

66. I understand that Plaintiffs are not challenging Align's integrated system;[54] however, Dr. Singer states that "the closed platform appears to have facilitated Align's ability to 'lock in' Dental Practices to the Align family of products and amplify the alleged anticompetitive effects of the Challenged Conduct."[55]  Invisalign and iTero are not a "closed" system, since iTero scanners can be used to order non-Invisalign aligners that accept STL files and Invisalign can be ordered without an iTero.  Competing aligner companies teach dental providers to use the STL export feature to submit iTero scans for ordering their competing aligner rather than Invisalign.[56]  In 2022, more than one-third of Invisalign-ordering dental providers submitted all of their Invisalign orders with PVS.[57]

67. Furthermore, the integration of Invisalign and iTero scanners yields efficiencies.  According to Align's Vice President of Global Business Development, Strategy, Analytics, and Insights, Mu Li, Align's ability to innovate across hardware, software, and services gives Align a competitive advantage to bring the best experience and clinical efficacy to doctors.[58]  The benefits of integration are demonstrated by other integrated scanner-aligner systems, including 3Shape and ClearCorrect's integrated system.  3Shape's TRIOS scanners have a pre-installed ClearCorrect treatment option, "seamlessly pairing the trusted solutions of ClearCorrect and 3Shape."[59]  According to 3Shape, the benefits of this integration include a "simplified …

---

[54]   Singer Report, ¶ 96.

[55]   Singer Report, ¶ 96.

[56]   See, for example, Somers, Jamie L., "How to Submit Cases with an iTero Scanner Tutorial," ClearCorrect, available at https://support.clearcorrect.com/hc/en-us/articles/4404214285847-How-to-Submit-Cases-with-an-iTero-Scanner-Tutorial; SureSmile, "SureSmile Protocol: iTero Orthodontic Scanner," available at https://www.suresmile.com/wp-content/uploads/sites/35/uploads/2016/07/DOC-500368-6-protocol-iTero.pdf; Reveal, "iTero Scanner Instructions (Two Approaches)," available at https://revealclearaligners.eu/wp-content/uploads/2021/05/M2151_Itero_STLExportInstructions_Reveal_final.pdf.  Approximately 73 percent of Envista Spark aligner cases for which digital impressions were submitted were sent from an iTero scanner.  EHC-000196.

[57]   See backup calculation.

[58]   See, for example, Deposition of Mu Li, Vice President of Global Business Development, Strategy, Analytics and Insights at Align Technology, December 20, 2022, at 209:13-22 ("You go on to say: We should look at it in the context of a lab strategy. Ungrouping an Align value prop to individual pieces, treatment planning software materials by itself loses the synergistic element and dilutes our competitive advantage. What's the competitive advantage that you're referring to in that email? A. Our ability to innovate across hardware/software services to bring the best experience and clinical efficacy to doctors.").

[59]   3Shape, "ClearCorrect & 3Shape: Engineered for Smiles," available at https://www.3shape.com/en/integrations/clearcorrect.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

workflow" and "increase[d] … case acceptance."[60]  Other scanners also use proprietary file formats for scans used for interoperable services and equipment, while maintaining the capability of exporting STL files.[61]  For example, Denstply accepts STL, PDF, and 3D files, but also accepts DXD and RST files.

68.  Regardless of whether Invisalign and iTero are a "closed" system, Align still competes with other firms for sales.  Integrated systems compete, both with other integrated systems, like 3Shape and ClearCorrect's, and with aligner and scanner companies separately.

### 4. *The Economic Relationship Between Aligners and Scanners*

69.  Except for bundled scanner-aligner offerings, which I address below, while scanners complement aligner treatment, it is not necessary to purchase one to make use of the other.  Invisalign existed for years before iTero was used to send a scan for aligner treatment.[62]  In early 2013, about 80 percent of Invisalign cases were submitted with physical dental impressions.[63]  Align continues to accept PVS submissions for configuring Invisalign cases,[64]

---

[60]  3Shape, "ClearCorrect & 3Shape: Engineered for Smiles," available at https://www.3shape.com/en/integrations/clearcorrect.

[61]  "Scanner Comparison Chart," available at https://www harrisondentalstudio.com/img/DI-Comparison-Chart.pdf.

[62]  Deposition of Lisa Barry, Global Director of iTero Certified Pre-Owned Solutions, December 14, 2022, at 158:9-14, "Align bought Cadent in 2011. And Cadent is the company that developed iTero. iTero has always been a restorative scanner. When it came to Align, they added on...software so that it could do both. It could be dual. It could do restorative; it could do orthodontia."

[63]  Align Technology, "Financial Results Q4 and Fiscal 2013," available at https://investor.aligntech.com/static-files/e6aabde6-7e16-4f2b-bf04-6b272fce0eb4, slide 18 (Digitally Submitted Invisalign Cases in early 2013 were about 20% worldwide).

[64]  See, Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 125:21-23 ("Q. […] Does Align accept PVS impressions for Invisalign cases in the US today? A. Yes, we do."); Deposition of William Simon, DMD, Owner of Simon and Simon, January 20, 2023, at 35:1-15 ("Q. But PVS is still used in your offices for various purposes? MR. RADICE: Objection. You can answer. THE WITNESS: Yes. BY MR. PEARL: Q. Is PVS still used to prescribe Invisalign in either the City Smiles or Sonrisa office? MR. RADICE: Objection. You can answer. THE WITNESS: Rarely."); 36:14-22 ("Q. So there are patients that might get Invisalign using PVS at Sonrisa? A. On a very limited basis. Q. When you say limited, can you give me an estimate of numbers? A. Less than three a year. Q. Approximately how many Invisalign cases does Sonrisa have per year? A. Less than five.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and according to a recent American Dental Association survey, nearly half of American dental practices take only physical dental impressions such as with PVS.[65]

70.     Importantly, product bundles (e.g., scanners and aligners, scanners and related services) are common.     For example, Dentsply Sirona offers a discounted price of $35,000 for a Primescan scanner if a dental provider "commit[s] to 24 SureSmile cases for one year."[66]     3Shape has participated in several different offerings.     3Shape worked with Henry Schein on a TRIOS scanner-Reveal aligner bundle.[67]     Schein, which resells 3Shape TRIOS scanners, offered a rebate of up to $7,500 for customers that purchased a TRIOS and spent $15,000 per year for three years on qualifying dental supplies.[68]     3Shape advertises a bundled scanner-milling machine offering that "creates a fully integrated setup for seamless, super-fast and predictable – scanning > design > milling – same-day workflow for dental professionals."[69]     Planmeca offers an imaging bundle through which a dental provider purchases a Planmeca 3D unit (for 3D dental imagining) and gets a Planmeca Emerald S at an $8,500 discount plus an intraoral x-ray machine or HD sensor for free.[70]     In 2022, Dentsply Sirona also offered an imaging bundle that provided CEREC software for Primescan for free with the purchase of Primescan

---

[65]    See, Revilla-Leon, Marta, et al., "Intraoral scanners: An American Dental Association Clinical Evaluators Panel survey," *Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, pp. 669-670, at p. 669; Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023, at 64: 2-20 ("Q: The headline in the larger type says, 'ADA study finds 53% of surveyed practices using an intraoral scanner'...And that implies that 47 percent, or almost 50 percent of American dentists are using only PVS to take physical dental impressions; right?...A: It was -- yes, that's correct.").

[66]    See Dentsply Sirona, "National PDC 2020 Promotions," March 2022, available at https://assets.dentsplysirona .com/flagship/en_ca/2021folder/webbooklet/CAN-DS-WB-PDC-2022-EN.pdf.  Dentsply also offered a "DW World 2020 Promotion" in which practices that purchase a Primescan intraoral scanner for $44,995 and sign up for an educational event received a $7,500 instant rebate on the Primescan, "up to $20,000 in rebates on qualifying purchases," a Suresmile starter kit that includes a free case, and various other discounts ("Primescan Savings," 2020, available at https://assets.dentsplysirona.com/flagship/en-us/DIM-DS-World-Promo-Flyer.pdf).

[67]    3Shape_Antitrust_Simon_00359117-126 (3Shape Henry Schein Presentation), at 125.

[68]    HS_001544 (Henry Schein 3Shape Integrate Program Promotion).

[69]    3Shape, "Ultimate CAD/CAM chairside solution with 3Shape and Ivoclar ProgaMill One," February 20, 2020, available at https://www.3shape.com/en/news/2020/ultimate-cad-cam-chairside-solution-with-3shape-and-ivoclar-progamill-one.

[70]    Planmeca, "Save now with our current promotions," available at https://www.planmeca.com/na-promotions/ ("Purchase a Planmeca 3D unit, (Planmeca Viso G5 or G7, Planmeca ProMax 3D Classic, Plus, or Mid) and get one Planmeca Emerald S intraoral scanner for $8500 USD off the suggested MSRP, and the choice of one free Planmeca ProX intraoral X-ray or one free Planmeca ProSensor HD sensor system.").

and Axeos (an extraoral imaging machine).[71]  Envista has offered a Dexis (formerly Carestream) scanner to customers for free in exchange for a commitment to purchase a set number of Spark aligner cases during a 12-month period.[72]  Envista has marketed similar offers instead offering a free Medit scanner for a commitment to purchase Spark aligners.[73]

## B. Demand for Aligners

### 1. Consumer Demand

71. Consumer demand for aligners largely comes from teens and adults.  There is steady flow of teens who could benefit from aligners, as children reach the age at which teeth straightening is frequently considered.  There is a large stock of adults who could benefit from aligners because aligners were not available as a treatment for most adults in the US when they were teens.

72. The large number of adults who could benefit from aligner treatment is reflected in estimates of the *total addressable market*, or TAM, for teeth straightening (clear aligners and braces).  A 2018 internal Align slide deck reported a TAM estimate for the US of 250 million individuals, of which approximately 30 percent were estimated to be considering treatment, while approximately 1.7 percent (4.18 million people) were receiving treatment.[74]

---

[71] "Axeos + Primescan AC Bundle & Save Program Terms and Conditions," available at https://www .dentsplysirona.com/content/dam/master/regions-countries/north-america/usa/product-categories/cad-cam-chairside-dentistry/cerec-promotions/CER-EN-US-2022-Full-Terms-and-Conditions-Axeos-Primescan-AC-Bundle.pdf ("Customers who purchase both an Axeos and a Primescan AC may be eligible to receive CEREC software ($34,995 value) with their purchase for no additional charge.").

[72] EHC-000182 (Ormco Dexis IS & Spark Agreement); EHC-000183-184 (DEXIS Carestream Dental IOS Scanner Offers), at 183 ("Purchase a CS Scanner (3600/3700/3800) at MSRP, start up Spark cases and get reimbursed for the complete CS purchase price"); EHC-000185 (Ormco Rebate Agreement).

[73] EHC-000197-198 (Medit Rebate Program).

[74] ALIGNAT-PURCH00298236-286 (Align Product Portfolio and Promotions, October 26, 2018), at 243.  See also Envista "Investor Access @ Envista Summit," February 24, 2023, available at https://investors.envistaco .com/download/2023-02-24+-+Investor+Access+%40+Envista+Summit+-+Final.pdf at 10 ("Less than 0.5% of people with malocclusion are being treated annually…~10% of people with malocclusions could benefit and afford treatment").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

73. Consumers who could benefit from aligners are differentiated based on several factors, including their age, the type and severity of teeth straightening needed, their preferences for different teeth straightening products, and their dental insurance.[75]

74. Consumer demand has been driven, in part, by marketing. Align spent $88.4 million on advertising and media in 2018 and $220 million in 2022.[76] In May 2017, ahead of patent expiration, Align launched a comprehensive marketing campaign "designed to challenge metal braces as the status quo for straightening teen teeth."[77] Align has partnerships with five professional sports franchises within the NBA, NFL, NHL, and MLS, and with US Ski & Snowboard, the governing body of ski and snowboard sports in the US.[78] Invisalign is the NFL's "Official Clear Aligner Sponsor" and was an official sponsor of Super Bowl LVII.[79]

75. Aligners are available to consumers through two main *distribution channels*: (i) doctor-directed, where a dentist or orthodontist takes impressions of or scans the patient's teeth,

---

[75] Align Technology, "Treatable Cases," available at https://www.invisalign.com/provider/digital-transformation /treatable-cases; MetLife, "Considering Clear Aligners? How Dental Insurance Can Help Pay the Costs," October 19, 2020, available at https://www.metlife.com/stories/dental-insurance/clear-aligners-how-dental-insurance-can-help/, ("MetLife's dental plans may cover clear aligners, provided a licensed professional is providing the care or monitoring the care").

[76] Form 10-K 2022. Align Technology, Inc., 2022, available at https://investor.aligntech.com/static-files/eb70ffbf-1126-4422-94fc-8fa110079497, p. 70; Form 10-K 2018, Align Technology, Inc., 2018, available at https://investor.aligntech.com/static-files/1d251dbf-c454-4bc4-bf29-060981eac3ff, p. 69.

[77] Align Technology, "Align Technology Launches Invisalign Brand Marketing Campaign to Challenge Metal Braces as the Status Quo," May 9, 2017, available at https://investor.aligntech.com/static-files/60d76d80-3d41-4a54-9742-1d6c3e1d6c1a.

[78] Dosh, Kristi, "Invisalign's Partnership with The NFL Gives Doctors and Consumers New Options," *Forbes*, August 3, 2020, available at https://www.forbes.com/sites/kristidosh/2020/08/03/invisaligns-partnership-with-the-nfl-gives-doctors-and-consumers-new-options/?sh=36cc988e79fe ("Last year, Invisalign went wide with its sports marketing strategy, becoming the 'Official Smile' partner of five professional sports franchises across the NBA, NFL, NHL and MLS."); Align Technology, "Align Technology's Invisalign Brand is the Official Smile Partner of U.S. Ski & Snowboard," March 25, 2021, available at https://investor.aligntech.com/news-releases/news-release-details/align-technologys-invisalign-brand-official-smile-partner-us-ski ("Align Technology, Inc. (Nasdaq: ALGN), makers of the Invisalign clear aligner system, today announced a partnership with U.S. Ski & Snowboard, making the Invisalign brand the Official Smile of U.S. Ski & Snowboard, the Olympic national governing body of ski and snowboard sports in the United States.").

[79] Dosh, Kristi, "Invisalign's Partnership with The NFL Gives Doctors and Consumers New Options," *Forbes*, August 3, 2020, available at https://www.forbes.com/sites/kristidosh/2020/08/03/invisaligns-partnership-with-the-nfl-gives-doctors-and-consumers-new-options/?sh=36cc988e79fe; "Align Technology is an official sponsor of this year's Super Bowl," *Dental Tribune*, February 10, 2023, available at https://www.dental-tribune.com /news/align-technology-is-an-official-sponsor-of-this-years-super-bowl/ ("As part of the effort to increase awareness of its Invisalign brand among football fans worldwide, Align Technology has become an official sponsor of the upcoming Super Bowl.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

assesses whether aligners would meet the needs of the potential consumer, and, if so, implements a treatment plan, and (ii) direct-to-consumers (DTC), whereby suppliers sell customized aligners directly to consumers based on a physical impression that a consumer does themselves or based on a digital scan taken in a store. Some companies offer a hybrid approach that involves the consumer visiting a doctor for the initial evaluation and treatment planning, but receiving the aligners directly from the company.[80] DTC aligners tend to treat less complicated malocclusions because a visit to a dental provider is needed for some advanced aligner treatments, such as using attachments that are bonded to the consumer's teeth.

### 2. Dentists and Orthodontists - Derived Demand

76. For companies selling doctor-directed aligners, demand comes from the dentists and orthodontists that provide aligners to their patients. Economists refer to this as derived demand because doctor demand ultimately derives from consumers' demand for aligners.[81]

77. Doctors nevertheless generate demand by offering aligners to their patients. Offering aligners and generating interest from patients requires doctors to invest in products and know-how, for example learning how to match patients with treatment plans. These investments are typically ongoing because of the constant innovation in aligners and scanners.

### 3. Demand uncertainty

78. Overall, demand for aligners has been growing due to several factors including innovations allowing aligners to treat a wider array of malocclusion; improved speed and effectiveness of aligner treatment; increasing numbers of dental providers offering aligner treatment; and increased consumer awareness of aligners.[82]

---

[80]   Candid, "How Candid Works," available at https://www.candidco.com/ ("(01) Start with a Pro: Use our Doctor Locator to find a CandidPro doctor near you (02) Your aligners, delivered: You'll get your full set of aligners, your CandidMonitoring materials, and premium whitening foam.").

[81]   Hubbard, R. Glenn and Anthony Patrick O'Brien, Microeconomics, Pearson, 2019, Seventh Edition, p. 564 ("A derived demand for a factor of production depends on the demand for the good the factor produces").

[82]   See, for example, "Dental Update - Survey Says: Demand Strengthens in 2Q, with Improving Outlook Supporting a Rise in Practitioner Sentiment," Credit Suisse, July 21, 2021, at pp 39-40 ("The clear aligner outlook has impressively rebounded, with respondents who currently utilize clear aligners expecting +8.6%

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

79. Despite this growth, there remains significant demand uncertainty for companies like Align. Rapid innovation makes it difficult to anticipate how the industry will evolve, including the significance of DTC sales and the potential for in-office 3D printing of aligners.

80. The record indicates that Align evaluated their strategies for selling iTero and Invisalign aligners on an ongoing basis.[83]  Basic choices included the products to offer, the doctors to market to, how best to use discounting to increase sales, and how to most effectively market Invisalign to consumers.

### C. Demand for Scanners

81. Scanner demand is driven by dentists and orthodontists, many of whom have switched from PVS to digital impressions.  But there is significant growth potential as only approximately half of US dental practices have scanners.[84]  Demand growth has been driven by lower-priced scanner options, specialized applications, and quicker innovation cycles.[85]

---

weighted average growth over the next twelve months [...]. Demand growth per practitioner office is typically also supplemented by new doctor additions, supporting case volume growth longer term. [...] A vast majority of practitioners believe greater focus on aesthetics along with increased advertising and marketing campaigns directed at the consumers by Align Technology and certain direct to consumer companies (e.g. SmileDirectClub) are driving this increase.").

[83]  Deposition of Simon Beard, Align EVP for the Americas, December 22, 2022, at 85:02-10 ("Q. Was that Align's strategy at the time? A. I don't recall it was, no. It was certainly a discussion. I wouldn't -- I wouldn't really call it a strategy. There was certainly consideration. Like I said earlier, there's lots of discussion going on, and those discussions have always been ongoing about, you know, partnering with our companies, not partnering with other companies, looking for value."); Deposition of Raphael Pascaud, Former Align Chief Marketing Officer, March 2, 2023, at pp.102:07-103:02  ("Q. So that's discussing the strategy from a few years back, right? And we discussed that earlier today, right? A. That was a -- that was a current strategy. Q. Well, you described that as our initial strategy, right? A. Which is still initial, and still ongoing strategy. Q. Okay. A. Until we changed that strategy. Q. Well, so down -- a few lines down, you say, '... we feel we have to review our position again,' right? A. So, I explained that our initial strategy is what it is, but, as we develop our thinking, especially as we try to expand beyond orthodontists into the GP area, and provide more value to the GPs, then there's a question of whether or not we should review our position again.").

[84]  See, Revilla-Leon, Marta, et al., "Intraoral scanners: An American Dental Association Clinical Evaluators Panel survey," *Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, pp. 669-670 at p. 669 ("Does your practice currently use an intraoral scanner (IOS)? Yes: 53% No: 47%"); Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023, p. 64: 2-20 ("Q. [T]he headline in the larger type says, 'ADA study finds 53% of surveyed practices using an intraoral scanner'...And that implies that 47 percent, or almost 50 percent of American dentists are using only PVS to take physical dental impressions; right?...A. It was -- yes, that's correct.").

[85]  Bednar, Jason, "Dentsply Sirona, Inc.," Piper Sandler, June 2020, at p. 20 ("Driving this growth in the [digital impression] segment of the market has been a number of factors, including 1) more attractive price points for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

82. Scanners are used for a variety of purposes, including ordering clear aligners. For example, iTero software supports doctors in restorative dentistry in several ways. Before treatment begins, doctors can use the patient-facing *Invisalign Outcome Simulator* to visually represent the end result of the treatment.[86] iTero also has an *Occlusogram* application, which models patients' bite, highlighting points of contact, to indicate potential issues and to help patients and doctors evaluate treatment options together.[87] During treatment, near-infrared imaging (NIRI) technology, first available on iTero Element 5D, enables doctors to detect and monitor tooth decay to provide better preventative and restorative oral care.[88] Further, iTero's *TimeLapse* function combines scans to show changes in patients' condition over time, a valuable feature for monitoring progress and communicating with patients.[89]

83. Some dental practices own more than one brand of scanner. For example, a survey conducted for Align showed that 21 percent of dentists and orthodontists who owned a 3Shape scanner also owned another brand of scanner.[90] Similarly, an Align internal document shows that some orthodontists that actively order Invisalign own more than one brand of scanners.[91] Kerri Kling,

---

these systems vs. full CAD/CAM systems […], 2) specialized applications […], and 3) quicker innovation cycles […].").

[86] Align Technology, "Align Technology Introduces Invisalign Outcome Simulator Pro, Next Generation Patient Communication Tool Featuring In-Face Visualization Of A Patient's Potential Future Smile In Minutes," May 19, 2022, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-introduces-invisalign-outcome-simulator-pro ("Align Technology, Inc. ("Align") (Nasdaq: ALGN) […] today introduced Invisalign Outcome Simulator Pro, the next generation of its advanced patient communication tool. This enables doctors to show patients their potential new smile after Invisalign treatment, using in-face visualization and/or 3D dentition view, all done chairside in minutes.").

[87] Align Technology, "iTero Scanner Tutorial: Occlusogram," available at https://www.youtube.com/watch?v= x4RWiRuS9PY.

[88] Align Technology, "Expand Restorative Treatments With iTero Scanners," iTero.com, 2022, available at https://itero.com/grow-your-practice/restorative ("iTero scanners have always driven restorative capabilities forward, powering over 10 million restorations through an innovative open system, integrated advanced diagnostic tools that support patient diagnosis, and continuous commitment to improved speed, accuracy, and scanning experience.").

[89] Frey, Scott, "iTero TimeLapse Technology," The Ortho Cosmos, June 14, 2017, available at https://theorthocosmos.com/itero-timelapse-technology/ ("This feature takes historical scan data and compares it to the current scan in a visual manner, allowing patients see [sic] changes in their tooth wear, tooth movement, and changes in gingiva over time.").

[90] ALIGNAT-SNOW00155100 - 5117 (Survey conducted for 3Shape, April 2017) at 5112-5113.

[91] ALIGNAT-PURCH00783094 – 3196 (2019 Professional Tracker) at 3138 ("This is penetration so #s can equal more than 100% since doctors can have more than one scanner.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Vice President of the Align Laboratory Channel and Strategic Accounts, confirmed that "some doctors have […] every scanner available on the market," and while most doctors have one scanner "many orthodontists have multiple scanners."[92]

### D. Supply of Aligners and Scanners

#### 1. *Aligner Suppliers*

84. Having created and developed clear aligner products, Align is the industry leader. But over two dozen aligner suppliers compete for sales.[93] With off-the-shelf options for 3D printing,[94] thermoforming,[95] and treatment planning,[96] entrants can be profitable at a small scale. In recent years, it has become easier and cheaper to start an aligner firm because of these off-the-shelf hardware and software and easily accessible videos on YouTube explaining the process.[97] Figure 4 lists 29 aligner brands marketed in the US and includes reports when they launched and whether they are distributed through dentists and other providers, DTC, or both.

---

[92] See ALIGNAT-PURCH00955987 (Deposition of Kerri Kling, Vice President of Align Laboratory Channel and Strategic Accounts, October 10, 2019, at 226:1-5 ("Yes. Doctors -- some doctors have, like, every scanner available on the market. Typically, a doctor will - the majority of doctors today in the marketplace have one scanner, although many orthodontists have multiple scanners.")).

[93] Weir, Tony, "Clear Aligners in Orthodontic Treatment," *Australian Dental Journal*, March 2017, Vol. 62, No. 1, pp. 58-62 at p. 58 ("An internet search reveals at least 27 different clear aligner products currently on offer for orthodontic treatment.").

[94] See, for example, formlabs, "Form 3B+," available at https://dental formlabs.com/products/form-3b/; Photocentric, "Liquid Crystal Magna," available at https://photocentricgroup.com/lcmagna/.

[95] See, for example, Alvy Dental, "Automated Thermoforming Machine for Dental Aligner," available at https://www.alvydental.com/products/automated-thermoforming-machine-for-dental-aligners?_pos=1&_psq=ther&_ss=e&_v=1.0 (it can thermoform up to 4,320 aligners a day); Hamer, "Automated Dental Thermoforming," available at https://hamer-pack.com/packaging-solutions/clear-aligners/ (offering machines that thermoform between 100 and 1,300 aligners/hour).

[96] See, for example, My Exceed, "In-Office Aligners," available at https://exceed-ortho.com/in-office-aligners/ ("3D treatment simulation can be viewed on patients' phones.").

[97] See, for example, Houston Prosthodontic Specialists, "How Does Invisalign Work? by Total Image Dental," YouTube, August 16, 2014, available at https://www.youtube.com/watch?v=gDnDJX03Mxw; Casa City Smile Dental Clinic, "Invisalign Manufacturing Process English," YouTube available at https://www.youtube.com/watch?v=vsR0_wTR2a8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Figure 4: Selected Aligner Brands

| | Company | Aligner Brand | Country Where Headquartered | Year Launched | Treatment Category |
|---|---|---|---|---|---|
| 1. | Align Technologies | Invisalign | USA | 1998 | Doctor-directed |
| 2. | ClearPath | ClearPath | USA | 2008 | Doctor-directed |
| 3. | Straumann | ClearCorrect | Switzerland | 2009 | Doctor-directed |
| 4. | Ormco | Insignia Clearguide System | USA | 2012 | Doctor-directed |
| 5. | SnapCorrect | SnapCorrect | USA | 2012 | DTC |
| 6. | SmileDirectClub | SmileDirectClub | USA | 2014 | DTC |
| 7. | Candid CO | Candid | USA | 2017 | Hybrid |
| 8. | TP Orthodontics | Refine Complete Aligner System | USA | 2017 | Doctor-directed |
| 9. | 3M | Clarity | USA | 2018 | Doctor-directed |
| 10. | Argen | Argen | USA | 2018 | Doctor-directed |
| 11. | Great Lakes | Smart Moves | USA | 2018 | DTC |
| 12. | Henry Schein | SLX | USA | 2018 | Doctor-directed |
| 13. | Dentsply Sirona | SureSmile | USA | 2018 | Doctor-directed |
| 14. | AlignerCo | AlignerCo | USA | 2019 | DTC |
| 15. | Dentsply Sirona | Byte | USA | 2019 | DTC |
| 16. | Envista | Spark | USA | 2019 | Doctor-directed |
| 17. | Henry Schein | Reveal | USA | 2019 | Doctor-directed |
| 18. | OrthoFX | OrthoFX | USA | 2019 | Doctor-directed |
| 19. | Strayt | Strayt | USA | 2019 | DTC |
| 20. | 2Usmiles | 2Usmiles | USA | 2020 | DTC |
| 21. | DenMat | OrthoClear | USA | 2020 | DTC |
| 22. | NewSmile | NewSmile | Canada | 2020 | DTC |
| 23. | CDB Corporation | HIT Clear Aligner | USA | 2021 | Doctor-directed |
| 24. | Oral Image | QuickAligners | USA | 2021 | DTC |
| 25. | Quip | Quip | USA | 2021 | Hybrid |
| 26. | Aligner32 | Aligner32 | USA | 2022 | DTC |
| 27. | Key Dental Technologies, LLC | MyClearALIGN Dental Aligner System | USA | 2022 | Doctor-directed |
| 28. | Smileie | Smileie | USA | 2022 | DTC |
| 29. | uLab Systems | uSmile | USA | 2022 | Doctor-directed |

Note: Ormco launched Spark aligners in 2019. Ormco is one of Envista's operating companies.

Source: Company websites and press releases.  See backup for details.

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Additionally, many dental labs offer aligner products.[98]  Some manufacturers supply private label aligners for other companies to market under their chosen trade name.[99]  And other companies sell 3D printing equipment to allow doctors to create their own aligners.[100]

85. Several aligner suppliers listed in Figure 4 are part of major companies, including 3M (a multinational conglomerate with an oral care division),[101] Dentsply Sirona (the largest manufacturer of professional dental products in the world),[102] Envista (a global company with more than 30 dental brands),[103] Henry Schein (a multinational distributor of dental and medical products, and a member of the S&P 500 index),[104] and Straumann (a global dentistry and orthodontic company).[105]

86. Entry from different sources continues.  Angel Align announced the US launch of its Angel Aligner product in April 2023 in conjunction with the *American Academy of Orthodontics*

---

[98]  See, for example, Deposition of Mu Li, Vice President of Global Business Development, Strategy, Analytics and Insights at Align Technology, December 20, 2022, at 59:21-22 ("[T]here are a lot of dental labs that can provide clear aligners."); ULab Systems, "ULab Systems," available at https://www.ulabsystems.com/; Dandy, "Dandy Clear Aligner Lab," available at https://www meetdandy.com/clear-aligners/.

[99]  CDB0000001 (CDB Corporation transaction data); OI-PD-081921-931 (OralImageInc. Presentation, Claiming New Ground in the Blockbuster Clearn Orthodontic Aligner Market) at 930 ("We are manufacturing aligners as private brand/white label products for several clients.").

[100]  SprintRay, "3D Print Clear Aligner Models," available at https://sprintray.com/digital-dentistry/clear-aligners/ ("In-office fabrication of clear aligners using 3D printed models.").

[101]  3M, "About 3M Oral Care," available at https://www.3m.com/3M/en_US/oral-care-us/.

[102]  Dentsply Sirona, "Our Company," available at https://www.dentsplysirona.com/en-us/company/our-company html.

[103]  Envista, "About Us," 2023, available at https://envistaco.com/en/about-us.

[104]  Henry Schein, "About Henry Schein, Inc.," 2023, available at https://investor.henryschein.com/aboutus.  Henry Schein counts approximately 90 percent of US dental practices as active customers.  Henry Schein Overview FY 2022, February 16, 2023, available at https://investor.henryschein.com/static-files/1f473730-679a-48ba-b83e-db36219c5272, at p. 12.

[105]  Straumann, "Group Structure," 2023, available at https://www.straumann.com/group/en/home/investors/corporate-governance/group-structure html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2023 conference held in Chicago.[106]  Angel Align is the largest aligner manufacturer in China.[107]

87.  DSOs also sell their own brands of aligners:

    i.  Western Dental & Orthodontics, a DSO that markets itself as the "national industry leader in volume of orthodontic care provided to patients,"[108] uses its own brand of aligner, ClearArc in addition to braces.[109]  Henry Schein supplies aligners to Western Dental on a private label basis.[110]

    ii.  Aspen Dental, with more than 1,000 locations in the US,[111] uses its own brand of aligner, Motto.[112]  Aspen Dental launched Motto aligners in June 2021.[113]  Aspen does not manufacture its aligners,[114] but rather sources them from Dentsply Sirona as a white

---

[106]  See LinkedIn, "Angel Aligner," April 27, 2023, available at https://www.linkedin.com/feed/update/urn:li:activity:7057064854620155905/.

[107]  GlobeNewswire, available at https://www.globenewswire.com/news-release/2023/04/04/2641164/0/en/Angelalign-Technology-Accelerates-Globalization-as-the-Global-Invisible-Orthodontics-Market-Recovers.html.

[108]  Western Dental & Orthodontics, "About Us," available at https://www.westerndental.com/en-us/about-us.

[109]  Western Dental & Orthodontics, "Clear Braces & Clear Arc," available at https://www.westerndental.com/en-us/dental-services/braces-orthodontics/clear-braces.

[110]  HS(3754)_000815 (Henry Schein data showing sales of ClearArc aligners); ALIGNAT-PURCH00008483 (internal Align email regarding Western Dental iTero proposal/model); 3Shape_Antitrust_Simon_01076318-319 (internal 3Shape email regarding Western Dental TRIOS approval).

[111]  Aspen Dental, "The care you need, right now," available at https://www.aspendental.com/new/.

[112]  Aspen Dental, "Motto Clear Aligners," available at https://www.aspendental.com/mottoaligners.

[113]  BusinessWire, "Correcting and Replacing Aspen Dental Introduces Doctor-Guided and Tech-Driven Motto™ Clear Aligners – Giving Patients Their Tray One on Day One," June 15, 2021, https://www.businesswire.com/news/home/20210615005367/en/CORRECTING-and-REPLACING-Aspen-Dental-Introduces-Doctor-Guided-and-Tech-Driven-Motto%E2%84%A2-Clear-Aligners-%E2%80%93-Giving-Patients-Their-Tray-One-on-Day-One.

[114]  ALIGNAT-PURCH00158990 at 59007 ("Aspen Dental launching a white label brand MOTTO, supplied by Dentsply"); LinkedIn, "Jenna Blanton: Senior Category Manager, Clear Aligners, Aspen Dental," available at https://www.linkedin.com/in/jenna-blanton-99839315 ("Own Aspen Dental's explosive growth strategy for the white label product, Motto Clear Aligners.").

label/private label aligner.[115]  That reduced the volume of aligners Aspen orders from Align.[116]

88.  Additionally, DSOs use competing aligners:

    i.  Pacific Dental Services, one of "the country's leading dental support organizations…with more than 850 supported dental offices across the United States" partners with Envista, using Envista's Spark clear aligner product.[117]

    ii.  Risas Dental & Braces, which has practices in Nevada, Arizona, Texas, and Colorado, uses Henry Schein Reveal aligners.[118]

    iii.  Midwest Dental has many practices across several states, including Illinois, Iowa, Kansas, Minnesota, Missouri, and Wisconsin, which use Henry Schein Reveal Aligners in addition to Invisalign.[119]

    iv.  Camas Orthodontics, part of the Bluetree Dental DSO, uses Dentsply SureSmile aligners in addition to Invisalign.[120]

---

[115]  Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023, at 76:24-77:11 ("Do you remember why in March of 2021 you were writing this email to Simon Beard about Aspen Dental?  A. This looks like an internal proposal and evaluation in response to business trends with their launch of a white label product through Dentsply Sirona. Q. Could you explain what you meant by a white label product through Dentsply Sirona. A. Sure. Aspen Dental opted to pursue a partnership with Dentsply. Dentsply has a clear aligner product entitled SureSmile. Aspen Dental sought the partnership and executed with Dentsply to launch a white label version, a private label of SureSmile under the brand name Motto.").

[116]  Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023, at 77:12-15 ("Q. And did that result in Aspen decreasing the amount of aligners they were ordering from Invisalign?  A. Yes.").

[117]  "Envista and Pacific Dental Services Announce Extension of Implant, Imaging, and Clear Aligner Commercial Relationship," January 31, 2022, available at https://www.prnewswire.com/news-releases/envista-and-pacific-dental-services-announce-extension-of-implant-imaging-and-clear-aligner-commercial-relationship-301471850.html.

[118]  Risas Dental Brace, "Reveal Clear Aligners," available at https://risasdental.com/services/orthodontics/reveal-clear-aligners/; Risas Dental Brace, "Find a Location," available at https://risasdental.com/find-a-location/.

[119]  Midwest Dental, "Locations," available at https://midwest-dental.com/locations/; Midwest Dental Belvidere, "Clear Aligners in Belvidere, IL," available at https://midwest-dental.com/locations/illinois-dental-centers/belvidere-il/?reveal ("Introducing Reveal® - our new aligner solution that is super clear, comfortable, and affordable!"); Midwest Dental Appleton, available at https://midwest-dental.com/locations/wisconsin-dental-centers/appleton-wi/ (Includes Invisalign under the "Services" section of the webpage).

[120]  Camas Orthodontics, "Sure Aligners," available at https://camasorthodontics.com/invisalign#surealigners. Dentsply recently reported double-digit "strong growth in both SureSmile and Byte."  Dentsply Sirona, "Fourth Quarter 2022 Earnings and 2023 Outlook", February 28, 2023, available at https://investor.dentsplysirona.com/static-files/7e34c7c5-1b26-4dec-ac02-1955b80ec06a, at 10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

89.    The ongoing expansion in available Aligner treatments is reflected in Figure 5, which provides the numbers aligner devices approved by the US Food and Drug Administration (FDA) annually.

**Figure 5: FDA Approved "Aligner Product" Medical Devices**



Note: Count includes significant changes to the same product requiring the submission of a 510(k) notice.

Source: US Food & Drug Administration, "Devices@FDA," available at https://www. accessdata.fda.gov/scripts/cdrh/devicesatfda/index.cfm.

Since Invisalign was approved in 1998, the number of FDA-approved aligners has increased, with substantial increases since 2017.[121] In 2022 there were 19 FDA approvals for either completely new aligners in the US or a new release of an existing aligner. These recent

---

[121] US Food and Drug Administration, "Medical Device Databases – Premarket Notifications (510(k)s)," available at: https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases ("Medical device manufacturers are required to submit a premarket notification or 510(k) if they intend to introduce a device into commercial distribution for the first time or reintroduce a device that will be significantly changed or modified to the extent that its safety or effectiveness could be affected.").

approvals demonstrate continued interest in launching new aligners by companies not currently selling aligners in the US as well as by incumbents.

### 2. Scanner suppliers

90.   A large number of scanner suppliers market their products in the US.  Figure 6 shows nine selected scanner companies and their first and most recent scanner models.

**Figure 6: Selected Scanner Models**

| Company | Country Where Headquartered | Earliest Scanner Launch | Earliest Scanner | Latest Scanner Launch | Latest Scanner |
|---------|------------------------------|--------------------------|-------------------|------------------------|-----------------|
| Align | USA | 2011 | iTero | 2021 | iTero Element Plus Series |
| Dentsply Sirona | USA | 2009 | CEREC Bluecam | 2019 | CEREC Primescan |
| 3DISC | USA and France | 2017 | Heron IOS | 2023 | OVO |
| Envista | USA | 2013 | CS 3500 | 2022 | IS 3800W |
| Medit | South Korea | 2018 | Medit i500 | 2021 | Medit i700 |
| Planmeca | Finland | 2013 | PlanScan | 2019 | Emerald S |
| 3Shape | Denmark | 2011 | TRIOS | 2022 | TRIOS 5 |
| Shining 3D | China | 2019 | Aoralscan | 2021 | Aoralscan 3 |
| Straumann | Switzerland | 2015 | Dental Wings Intraoral | 2019 | Virtuo Vivo |

Sources: Company websites, documents, and press releases.  See backup for details.

91.   Many of the scanner manufacturers are the same well-established dental companies that manufacture aligners.  As shown in Figure 7, at least five companies (Align, Dentsply, Envista,

3M, and Straumann) sell both aligners and scanners.[122]  Of note, doctors can purchase scanners directly from manufacturers or through dental distributors.[123]

**Figure 7: Companies that Supply both Aligners and Scanners**

| Company | Aligner(s) | Scanner |
|---|---|---|
| Align | Invisalign | iTero |
| Dentsply Sirona | Suresmile; Byte | Primescan |
| Envista | Spark | Carestream |
| 3M | Clarity | True Definition |
| Straumann | ClearCorrect | Virtuo Vivo |

Note: 3M sold the True Definition platform to Midmark Corporation, a manufacturer and distributor of dental products, in April 2019 (3M, "3M True Definition Intraoral Scanner acquired by Midmark in US and Canadian Markets," April 1, 2019, available at https://www.3m.com/3M/en_US/dental-us/expertise/digital-dental-impressions/).

Sources: Company websites and press releases.  See backup for details.

92.  This analysis shows that doctors seeking to purchase a scanner can choose from a wide variety of options.  As new models are released, a doctor that owns a scanner can upgrade their current scanner, either by purchasing newer models of their current brand or by switching to a competing brand.  Switching brands can be facilitated by trade-in offers.  For example, 3Shape

---

[122]  Envista bought the Carestream Dental scanner business for roughly $600 million in 2022.  See, Envista, "Envista to Acquire Carestream Dental Intra-Oral Scanner Business," December 22, 2021, available at https://investors.envistaco.com/2021-12-22-ENVISTA-TO-ACQUIRE-CARESTREAM-DENTAL-INTRA-ORAL-SCANNER-BUSINESS; Envista, "Envista Completes Acquisition of Carestream Dental's Intraoral Scanner Business," April 20, 2022, available at https://investors.envistaco.com/2022-04-20-Envista-Completes-Acquisition-of-Carestream-Dentals-Intraoral-Scanner-Business.  Then, in December 2022, Medit was sold to a private equity firm for nearly $2 billion.  See, Al-Hassiny, Ahmad, "Medit To Be Sold For An Eye-Watering Amount," Institute of Digital Dentistry, December 2, 2022, available at https://instituteofdigitaldentistry.com /news/medit-to-be-sold-for-an-eye-watering-amount/; Yim, Hyunsu, "MBK Partners to acquire S.Korea's Medit for about $1.9 bln," Reuters, available at https://www.reuters.com/markets/deals/mbk-partners-acquire-skoreas-medit-about-19-bln-2022-12-30/.

[123]  For example, Straumann sells its own Virtuo Vivo scanner but also distributes 3Shape's TRIOS scanner.  Straumann Group, "3Shape TRIOS Intraoral Scanners," available at https://www.straumann.com/digital/us/en /home/equipment/io-scanners/3shape-trios.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

offered a trade-in program that provided credits for its TRIOS scanner when trading in Align's iTero scanner.[124]

### E. Time Series Information

#### 1. Aligner Prices

93.   Despite the many innovations described above, prices of aligners have fallen over time. Figure 8 shows the list prices as of January 1st of each year for top-selling Invisalign products.

**Figure 8: List Prices of Top-selling Invisalign Products by Year Between 2013–2022 As of January 1st**

| Product | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Assist | $1,299 | $1,349 | $1,349 | $1,349 | $1,425 | $1,525 | $1,599 | $1,659 | $1,659 | $1,659 |
| Comprehensive | $1,549 | $1,599 | $1,599 | $1,649 | $1,729 | $1,779 | $1,829 | $1,879 | $1,879 | $1,879 |
| Express | | | | | | | $ 699 | $ 709 | $ 709 | $ 709 |
| Express Five | $ 549 | $ 575 | $ 575 | $ 575 | $ 575 | $ 575 | $ 575 | $ 575 | $ 575 | $ 575 |
| Express Ten | $ 899 | $ 925 | $ 925 | $ 925 | $ 925 | $ 925 | $ 925 | $ 955 | $ 955 | $ 955 |
| Go | | | | | $1,199 | $1,199 | $1,199 | $1,299 | $1,299 | $1,299 |
| Lite | | | | | | $1,199 | $1,239 | $1,279 | $1,279 | $1,279 |
| Moderate | | | | | | | | $1,699 | $1,699 | $1,699 |
| Teen | $1,649 | $1,649 | $1,649 | $1,699 | $1,759 | $1,799 | $1,799 | $1,799 | | |

Source: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

94.   List price increases have been modest for Invisalign products.  As shown in Figure 9, list prices for their products have grown slower than the Consumer Price Index ("CPI").

---

[124]   Deposition of Lisa Barry, Global Director of iTero Certified Pre-Owned Solutions, December 14, 2022, at 121:02-05 ("A. So, you know, we have, you know, competitors like 3Shape and Sirona, right? They are offering. So we know at that time they are offering $7,000 off of their scanner for the iTero."); 3Shape_Antitrust_Simon_01336110-115, at 114 (the 2019 trade-in program provided a $8,600 credit when trading an iTero for a TRIOS 4, or a $5,900 credit when trading an iTero for a TRIOS 3).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 9: Percentage Increases in List Prices and CPI
of Top-selling Invisalign Products During the Period 2013-2022**

| Product | Start Year | End Year | % Increase in List Price | % Increase in CPI |
|---|---|---|---|---|
| Assist | 2013 | 2022 | 27.7% | 25.6% |
| Comprehensive | 2013 | 2022 | 21.3% | 25.6% |
| Express | 2019 | 2022 | 1.4% | 14.5% |
| Express Five | 2013 | 2022 | 4.7% | 25.6% |
| Express Ten | 2013 | 2022 | 6.2% | 25.6% |
| Go | 2017 | 2022 | 8.3% | 19.4% |
| Lite | 2018 | 2022 | 6.7% | 16.5% |
| Moderate | 2020 | 2022 | 0.0% | 13.0% |
| Teen | 2013 | 2020 | 9.1% | 11.1% |

Note:  The percentage increases in CPI differ because of the time period that is relevant for individual products.

Sources: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); Federal Reserve Bank of Saint Louis, "Consumer Price Index for All Urban Consumers: All Items in the US City Average," US Bureau of Labor Statistics, available at https://fred.stlouisfed.org /series/CPIAUCSL3.

95.  Importantly, the average prices paid by doctors are meaningfully below Align's list prices. Figure 10 shows average net prices from July 2016 to January 2022 for Invisalign Comprehensive, Align's top product.

**Figure 10: Invisalign Comprehensive List and Net Prices**



Source: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

96.    From the third quarter of 2016 to the first quarter of 2022, the average net prices of Invisalign's Comprehensive product *decreased* by 12.1 percent before adjusting for inflation.[125]  During this period, US consumer prices increased approximately 18 percent.[126]  Hence, real prices for Align's most important product decreased by approximately 25.5 percent.[127]  In addition, innovations in aligner technology over this period mean that quality-adjusted prices fell by even more.

---

[125]   See backup to Figure 10.

[126]   See backup to Figure 9.

[127]   1-[(1-0.121)/(1+0.18)] ≈ 0.255.

### 2. *Scanner Prices*

97. Like aligners, prices of scanners have generally been falling over time. For example, Figure 11 shows the median list price and average net prices for Align's iTero Element and iTero Element 2 scanners.

**Figure 11: List and Average Net Prices of
Element and Element 2 Scanners with a 1 Year Subscription**



Source: ALIGNAT-PURCH00932992 (Scanner Transaction Data).

As indicated, the average net prices of the Element scanner fell from the end of 2016 through the last quarter before the introduction of the Element 2, and the average net prices of the Element 2 either stayed relatively constant or fell from its introduction in 2018 to the end of the available transaction data in mid-2021. Of note, the average net price of the Element 2 fell when the list price was increased in early 2019.

### 3.  Output of Aligners

98.  Unit sales of aligners have increased over time.  This is a result of both increased sales of teeth-straightening products and aligners accounting for an increasing share of teeth-straightening sales.  This is illustrated in Figure 12, which shows estimated worldwide orthodontic treatment starts, aligner treatment starts, and the share of all treatment starts that are aligners.

**Figure 12: Estimated Treatment Starts by Method (Worldwide)**



Source: "Clear Aligner Market Model," Wolfe Research, March 11, 2021, Exhibit 58.

99.  A 2021 industry survey by Credit Suisse of 75 US dental practices in 19 different states showed that both orthodontists and GPs surveyed who utilized clear aligners expected an 8.6 percent growth in the demand for aligners over the next 12 months.[128]  According to the report, an important driver behind the increasing demand is the introduction of new treatment planning

---

[128]  Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021, at p. 39 ("The clear aligner outlook has impressively rebounded, with respondents who currently utilize clear aligners expecting +8.6% weighted average growth over the next twelve months.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

software offerings that make it easier for dentists who are in general practice to prescribe treatments that might have previously only been performed by orthodontists.[129]

100. Estimated worldwide sales for the top five clear aligner companies are shown in Figure 13.

**Figure 13: Estimated Sales of Selected Aligner Companies**

| | Worldwide Clear Aligner Revenue (in millions) | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Align | 895 | 1,204 | 1,560 | 1,967 | 2,067 |
| SmileDirectClub | 2 | 138 | 390 | 683 | 543 |
| Dentsply Sirona | - | - | 46 | 131 | 253 |
| Straumann | 18 | 27 | 43 | 68 | 90 |
| 3M | - | - | 14 | 41 | 63 |

Source: "Clear Aligner Market Model," Wolfe Research, March 11, 2021, Exhibit 59.

101. These sales estimates demonstrate several important insights about the global aligner segment: sales have grown rapidly over time, recent entrants have had success selling competing aligners, and an increasing share of sales is being made to Align's competitors. Sales estimates for Straumann, which introduced ClearCorrect aligners in 2006, show that an aligner manufacturer can achieve long-term viability with sales that are a small fraction of Align's, ranging from approximately 2 percent of Align revenue in 2016 to 4.4 percent of Align revenue in 2020.[130]

102. Further evidence on the scale requirements for suppliers to be viable comes from Great Lakes Dental Technology ("Great Lakes"). Great Lakes described itself as a company that designs, develops, manufactures, and markets "appliances and products for the orthodontic, dental, and sleep and airways markets," and as "one of North America's largest orthodontic

---

[129] Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021, at p. 38 ("Unsurprisingly, GPs are heavily weighted towards clear aligner offerings (~73%, ~in-line with 4Q), where we note teeth straightening treatment is in many cases a newer ancillary offering that has been made possible with treatment planning software improvements and other manufacturer investments.").

[130] See backup to Figure 13.

laboratories."[131] 

Additionally, private label aligner makers like CDB Corporation[135] can support newer aligner firms or established firms if demand exceeds their capacity.

103. The sales estimates in Figure 13 also provide insight into the relative growth of doctor-directed and DTC aligners. SmileDirectClub was the predominant supplier of DTC aligners, with the other aligner companies primarily selling doctor-directed aligners, so Figure 13 shows the impressive growth of sales in the DTC channel, while sales of doctor-directed aligners also continued to expand over the same period.

### 4. Output of Scanners

104. Annual sales of scanners have increased as a result of dental providers switching from PVS to scanners and increases in the number of dental providers. Figure 14 presents US sales reported in data produced by four scanner manufacturers (3Shape, Align, Dentsply, and Planmeca) and three scanner distributors (Benco, Henry Schein, and Patterson).

---

[131] Great Lakes Dental Technologies, "About Great Lakes," available at https://www.greatlakesdentaltech.com /about.

[132] ███████████████████████████████████████ US Food & Drug Administration, "510(k) Premarket Notification," available at https://www.accessdata fda.gov /scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K172765.

[133] ████████████████████████████ 8).

[134] ████████████████████████████████

[135] CDB, "Aligner," available at https://cdbcorp.net/beispielseite-2-2-2/; CDB0000001 (CBD Corporation transaction data) (reflecting aligner sales beginning in 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 14: US Sales of Scanners
Reported by Manufacturers 3Shape, Align, Dentsply, and Planmeca, and
Distributors Benco, Henry Schein, and Patterson**

| Manufacturer | Units Sold | | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| Align | 1,023 | 2,937 | 3,502 | 5,737 | 6,805 | 4,539 | **24,543** |
| Dentsply Sirona | 1,240 | 1,097 | 1,471 | 1,023 | 3,765 | 2,744 | **11,340** |
| 3Shape | 767 | 1,186 | 2,539 | 1,719 | 1,101 | 1,038 | **8,350** |
| Planmeca | 411 | 305 | 756 | 219 | 859 | 443 | **2,993** |
| Envista | - | 3 | 12 | 4 | 62 | 89 | **170** |
| Midmark | - | 105 | 172 | 42 | 15 | 6 | **340** |
| 3M | 273 | 219 | 10 | 13 | 2 | - | **517** |
| Other | 1 | 15 | 19 | | 14 | 41 | **88** |
| **Total** | **3,715** | **5,867** | **8,481** | **8,755** | **12,623** | **8,900** | **48,341** |

Sources: ALIGNAT-PURCH00932992 (Scanner Transaction Data); BENCO-0000003 (Benco transaction data); HS (3754)_000022 (Henry Schein transaction data); PCI-00003 (Patterson Dental transaction data); 3Shape_Antitrust_Simon_00230952 and 3Shape_Antitrust_Simon_00230954 (3Shape Transaction Data); DS000994 (Dentsply Sirona Transaction Data); PLANMECA_000078 (Planmeca Transaction Data).

105. While these data are not a record of all scanner sales in the US, they show that scanner sales have generally been increasing over time, with the top three manufacturers—Align, Dentsply, and 3Shape—each selling over a thousand units a year from 2016 to 2020. The data also show that between 2015 and 2020, approximately 24,000 non-iTero scanners were sold in the US.

106. This growth is conservative, as it does not include sales of Medit scanners. Medit entered the US in 2018 and grew rapidly, quickly reaching double-digit market share, without being interoperable with Invisalign.[136]

---

[136] Al-Hassiny, Ahmad, "Comparing Medit's new i700 Wireless vs i700 vs i600 vs i500 scanners," Institute of Digital Dentsitry, May 11, 2022, available at https://instituteofdigitaldentistry.com/cad-cam/comparing-medits-new-i700-wireless-vs-i700-vs-i600-vs-i500-scanners/; Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023, at 72:2-16 ("And the next bullet point says, 'Medit already at 14% MS in US whereas 3Shape is down 6% (we were at 27% in the US in 2017).' Do you see that there? A. Yes, I do. Q. And does 'MS' in that bullet point refer to market share? A. It does. Q. And is it fair to say that this bullet point shows that Medit gained 14 percent of the market share in the U.S. at this time period? A. It's -- yeah. It says that Medit, at that point, had 14 percent market share, yes.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

107. An American Dental Association survey in 2021 found that approximately 53 percent of American dental practices use scanners.  Additionally, 58 percent of scanner users reported that they had begun using a scanner within the past four years.[137]

### 5. *Share of Dental Providers Providing Doctor-Directed Aligners*

108. The share of dental providers offering aligners has also increased.  For example, Figure 15 estimates the share of dental providers ordering Invisalign each year from 2013 to 2021 by dividing the number of customers in Invisalign's transaction data by the total number of dental providers in the US.

**Figure 15: Estimated Share of Dental Providers
Ordering Invisalign in the US by Year**

| Year | Dental Providers Ordering Invisalign (in thousands) | Total Number of Dental Providers (in thousands) | Share of Providers Ordering Invisalign |
|------|------|------|------|
| 2013 | 24.6 | 162.4 | 15.2% |
| 2014 | 26.7 | 162.7 | 16.4% |
| 2015 | 28.3 | 165.4 | 17.1% |
| 2016 | 30.4 | 165.8 | 18.3% |
| 2017 | 32.9 | 167.7 | 19.6% |
| 2018 | 34.7 | 168.5 | 20.6% |
| 2019 | 37.0 | 169.1 | 21.9% |
| 2020 | 36.6 | 169.4 | 21.6% |
| 2021 | 39.1 | 170.2 | 23.0% |

Sources: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); ADA, "Supply of dentists in the U.S.: 2001-2021 (XLSX) (January 2022)," available at https://www.ada.org/resources/research/health-policy-institute/dentist-workforce.

---

[137] See, Revilla-Leon, Marta, et al., "Intraoral scanners: An American Dental Association Clinical Evaluators Panel survey*," Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, pp. 669-670 at p. 669 ("Ninety percent of respondents use IOSs for single tooth-supported crowns, and 58% began using IOSs less than 4 years ago."); Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023, p. 64: 2-20 ("Q: The headline in the larger type says, 'ADA study finds 53% of surveyed practices using an intraoral scanner'...And that implies that 47 percent, or almost 50 percent of American dentists are using only PVS to take physical dental impressions; right?...A: It was -- yes, that's correct.").

From 2013 to 2021, the share of dental providers ordering Invisalign increased by approximately 50 percent, from 15.2 percent to 23 percent.

### F. Implications, Insights, and Conclusions

109. The preceding industry analysis provides several relevant implications, insights, and conclusions:

   i.  <u>Consumer benefits from aligners are large and expanding.</u>  Consumers are benefiting from increased innovation, lower prices, higher quantities, increasing numbers of doctors providing aligners, increased access to DTC aligners, greater product differentiation to match their individual needs and preferences, and rivalry between suppliers.

   ii. <u>Industry performance is excellent.</u>  Both the aligner and scanner industries are growing, innovating, and consistently attracting new entrants.  Inflation-adjusted prices have declined and output has increased.

   iii. <u>Consumers have many options.</u>  Consumers can choose how they receive aligner treatment, whether directly from a doctor, from a DTC supplier, or from a hybrid model. Consumers can choose from a wide array of treatments that offer different degrees and types of teeth straightening.  Consumers can choose from a large number of aligner providers.

   iv. <u>Doctors have many options.</u>  Dentists and orthodontists can choose which aligners to offer their patients from a large number of firms.  Dentists and orthodontists can choose to supply one or more brands of aligners.  Similarly, Dentists and orthodontists can choose from a large number of scanners and can chose to purchase one or more different brands of aligners.  For example, Named Plaintiff Sherwin Matian has offered Invisalign and Candid aligners in his practice.[138]

   v.  <u>Nearly half of American dental practices still use only PVS to take dental impressions.</u> Hence, even as the share of aligners ordered with scanners has been increasing and the share of doctors only using PVS to order aligners has been falling, there is significant potential growth in scanner demand.[139]

---

[138] Deposition of Sherwin Matian, DDS, General Dentist at VIP Dental Spas, January 8, 2023, at 26:5-17 ("Q What other teeth straightening solutions have you prescribed or administered to your patients other than Invisalign? [...] A. Last year, I started providing Candid. [...] Q And how do you determine whether a patient is suitable for Candid versus Invisalign?  A I provide both options to the patient and allow the patient to make the decision of which aligner they want to go with.").

[139] See, Revilla-Leon, Marta, et al., "Intraoral scanners: An American Dental Association Clinical Evaluators Panel survey*," Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, pp. 669-670 at p. 669 ("91% of respondents are at least mostly satisfied.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

vi. <u>Align's share of aligner sales is declining.</u>  Align's worldwide share of aligner sales decreased from 97.1 in 2016 percent to 68.7 percent in 2020.[140]  In the US, even Dr. Singer's incomplete calculation – it is missing SDC and other key brands – shows that Align's share of aligner sales been declining since 2017.[141]

110.  The industry analysis does not yield any signs of anticompetitive exclusion.  To the contrary, it is particularly telling that entry of new products and FDA applications for future products continues.  Entrants and potential entrants anticipate existing and possible future states of the world.  If consumers and doctors were "locked up" by Align, and had been so for over four years now, firms would not make the investments needed to launch new aligner and scanner products.

111.  <u>In my opinion, the industry analysis by itself constitutes a strong basis to conclude that Align's competitors were not anticompetitively excluded by the at-issue conduct</u>.  Even though Align's innovations sparked development of aligners and scanners Align lacks a "must have" product for dental providers or for consumers.  This statement applies to both its scanners and its aligners.  Industry analysis confirms choices for consumers, choices for doctors, ongoing entry, ongoing innovation, falling prices, and increasing output.


## V.    ECONOMIC ANALYSIS OF THE AT-ISSUE CONDUCT

112.  This section provides a detailed economic analysis of Align's conduct.  I first address the termination of interoperability with 3Shape scanners.  I then analyze the Fusion Program and other discounts and programs that Plaintiffs characterize as *de facto* exclusionary conduct.  I also evaluate Align's 2018 contract with Heartland, Align's discount programs, and Align's DSO contracts with exclusivity clauses.

113.  The main insights from my analysis are that (i) the TOI did not represent a profit sacrifice by Align, (ii) the Fusion Program involved small shares of participating dental providers, (iii) none of Align's discount programs resulted in below-cost pricing, and (iv) Align's rivals have not been prevented from competing for sales of aligners and scanners.

---

[140]  "Clear Aligner Market Model," Wolfe Research, March 11, 2021, Exhibit 59.

[141]  Singer Report, Figure 2 on p. 24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### A. Termination of Interoperability (TOI) was Economically Rational for Align and Did Not Anticompetitively Exclude Competitors

114. In this subsection, I show that Align's revenues and profits increased following the TOI. I also show that Align's revenues and profits increased for the 1,186 doctors who had submitted Invisalign orders from 3Shape scanners prior to the TOI. Thus, the claims by Drs. Singer and Vogt that Align sacrificed profits – even in the short run – are wrong.

#### 1. Context of the TOI

115. Beginning in October 2016, doctors with 3Shape TRIOS scanners could submit orders for Invisalign cases.[142] In December 2017, Align announced that it was discontinuing the acceptance of digital scan submissions from 3Shape TRIOS Software, i.e., terminating the interoperability, effective January 31, 2018.[143] In its announcement, Align stated that 3Shape was infringing patents owned by Align and that the parties were engaged in litigation.[144]

116. Following the TOI, doctors in the US could no longer submit new Invisalign orders using a 3Shape scanner. Doctors that did not already have an iTero scanner, or an interoperable 3M or Dentsply Sirona scanner, therefore had several options: (i) submit Invisalign orders using PVS, (ii) purchase an iTero, (iii) switch to alternative suppliers of scanners and aligners. As indicated by the industry analysis, the third category includes several options. These various options demonstrate that limiting the degree of integration—and therefore having a more

---

[142]   Align Technology, "Align Technology Announces Fourth Quarter and Year Ended 2016 Results," January 31, 2017, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-announces-fourth-quarter-and-year-ended-2016 ("Align announced that 3Shape's TRIOS® Standard, TRIOS Color and TRIOS 3 scanners were qualified in Q4'16 for Invisalign case submission."); 3Shape, Press Releases, October 26, 2016, available at https://www.3shape.com/en/press ("First TRIOS® scan sent for Invisalign® Case Submission").

[143]   Align Technology, "Align Technology to Discontinue Acceptance of Digital Scan Submissions from 3Shape TRIOS Scanners in the United States, December 20, 2017, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-discontinue-acceptance-digital-scan-submissions ("Align Technology, Inc. (NASDAQ: ALGN) announced today that due to 3Shape's infringing conduct and the resulting litigation against Shape A/S of Copenhagen, Denmark and 3Shape Inc. of Warren N.J. (collectively '3Shape.'), the company terminated its Invisalign interoperability contract with 3Shape and will no longer be able to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners in the United States, effective January 31*, 2018.").

[144]   Align Technology, "Align Technology to Discontinue Acceptance of Digital Scan Submissions from 3Shape TRIOS Scanners in the United States, December 20, 2017, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-discontinue-acceptance-digital-scan-submissions.

closed system—does not mean that the system faces no competition.  One dimension of competition is choosing of how open or closed to make a product.  This is reflected in the varying degrees of interoperability other scanners have with competitors' aligners, and the proprietary file formats some scanners use with integrated software and equipment.[145]

### 2.  The "Refusal to Deal" Claim

117. Plaintiffs characterize the TOI as an anticompetitive "refusal to deal."[146]  In the antitrust economics literature, a refusal is "a unilateral or collective unwillingness to trade with a market participant."[147]  In this context, however, Align did not refuse to sell a product or service to one market participant that it sold to others.[148]  Align did not sell Invisalign interoperability, and after the TOI, Align continued to offer its products to all dental providers.[149]

118. Putting aside this important definitional issue, a primary economic test of whether a refusal to deal is anticompetitive is whether its purpose is to sacrifice short-term benefits to obtain higher

---

[145]  See Figure 3 and Section III.A.3.

[146]  Fourth Amended EPP Complaint, Section IV.D.

[147]  Orbach, Barak and Raphael Avraham, "Chapter 6: Squeeze Claims. Refusals to Deal, Essentials Facilities, and Price Squeezes," *The Oxford Handbook of International Antitrust Economics*, Oxford University Press, 2014, Volume 2, pp. 120-131 ("Orbach and Avraham, 2014"), at p. 121.

[148]  Stated differently, interoperability was not a service that Align made available for sale to others.

[149]  See, Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 122:6-11 ("Q. Mr. Kaza, you've worked at Align for about how long? A. Getting close to 24 years. Q. Did Align ever sell Invisalign interoperability at retail? A. No."); Kaza at 39:22-40:16; Deposition of Tim Mack, Former President of Marketing and Business Development at Align, February 24, 2023, at 22:6-23; Invisalign Aligner Case Submission Third-Party Intraoral Scanner Interoperability, https://www.aligntech.com /documents/scanner_interoperability.pdf.

profits in the long run from the exclusion of anticompetitive competition.[150]  This is referred to as the *profit sacrifice test*.[151]

### 3.    Implementation of the Profit-Sacrifice Test

119.  In implementing the test, I focus on (a) Align's overall revenues and profits from aligner and scanner sales, and (b) Align's revenues and profits from doctors using a 3Shape scanner to submit Invisalign orders prior to the TOI.  In principle, revenues and profits could change due to potential reductions in sales of Invisalign aligners and increased sales of Align's iTero scanners.

### a.    Align Profited from Termination of Interoperability in the Short Run

120.  Contrary to Dr. Singer's and Dr. Vogt's claims, Align did not sacrifice short-term revenues or profits by terminating interoperability with 3Shape scanners.  As shown in Figure 16, Align's US revenues grew from the third quarter of 2016 through the end of 2019.  Revenues increased by 7.8 percent from the fourth quarter of 2017, when the TOI was announced, to the second quarter in 2018.  Invisalign revenues alone increased from $181.9 million to $206.1 million (13.3 percent) from the fourth quarter of 2017 to the second quarter of 2018.

---

[150]  See, for example, Melamed, A. Douglas, "Exclusionary Conduct Under the Antitrust Laws: Balancing, Sacrifice, and Refusals to Deal," *Berkeley Technology Law Journal*, Vol 20, No. 2, Spring 2005, pp. 1247-1267 ("Melamed, 2005"), at p. 1255 ("[T]he sacrifice test asks whether the allegedly anticompetitive conduct would be profitable for the defendant and would make good business sense even if it did not exclude rivals and thereby create or preserve market power for the defendant.  If so, the conduct is lawful. If not—if the conduct would be unprofitable but for the exclusion of rivals and the resulting market power—it is anticompetitive."); at pp. 1255-56 ("[T]he sacrifice test […] compares the benefits and costs of the conduct in question to the defendants as follows.  The costs of the conduct are the incremental or avoidable costs incurred by the defendant as a result of the conduct, including opportunity costs.  In other words, they include the costs that the defendant would not incur but for the conduct.  The benefits of the conduct are variable cost savings realized by the defendant as a result of the conduct, revenues from additional units of goods or services sold by the defendant as a result of the conduct, increased revenues attributable to quality improvements, and the resulting increase in demand for the defendant's goods or services.  Benefits do not include the ability to charge higher prices or to shift the variable cost curve downward (because, for example, of a diminished need to provide customer services) as a result of the exclusion of rivals.").

[151]  See, for example, Singer Report, ¶ 246.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 16: Align's Revenues Before and After TOI**



Note:  The end of 3Shape interoperability was announced on December 20, 2017 and went
into effect on January 31, 2018.

Sources:  ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); ALIGNAT-
PURCH00932992 (Scanner Transaction Data).

121. Align's profits from aligner and scanner sales increased following the TOI, from a combined
total of $161.8 million in the fourth quarter of 2017 to $175.2 million in the second quarter of
2018.  US Invisalign gross profits, equal to net revenue minus costs of goods sold (COGS),
increased from $141.3 million in the fourth quarter of 2017 to $156.2 million in the second
quarter of 2018, as seen in Figure 17.  Compared to the same quarter in the prior year (to
account for seasonality in sales), US Invisalign profits in each quarter were higher from the
first quarter of 2018 to the first quarter of 2020, when the COVID-19 pandemic began.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 17: US Invisalign Profits from Q1 2017 to Q1 2022**

| Quarter | Profits (millions) | Change Relative To The Same Quarter In The Prior Year | |
|---|---|---|---|
| | | (millions) | (%) |
| Q1 2017 | 130.6 | | |
| Q2 2017 | 143.9 | | |
| Q3 2017 | 139.8 | | |
| Q4 2017 | 141.3 | | |
| Q1 2018 | 148.9 | 18.3 | 14.1% |
| Q2 2018 | 156.2 | 12.3 | 8.5% |
| Q3 2018 | 153.2 | 13.4 | 9.6% |
| Q4 2018 | 145.4 | 4.1 | 2.9% |
| Q1 2019 | 169.6 | 20.7 | 13.9% |
| Q2 2019 | 169.4 | 13.2 | 8.5% |
| Q3 2019 | 169.0 | 15.8 | 10.3% |
| Q4 2019 | 175.9 | 30.5 | 21.0% |
| Q1 2020 | 168.8 | -0.8 | -0.5% |
| Q2 2020 | 68.5 | -100.9 | -59.6% |
| Q3 2020 | 210.9 | 41.8 | 24.7% |
| Q4 2020 | 226.2 | 50.3 | 28.6% |
| Q1 2021 | 251.3 | 82.5 | 48.9% |
| Q2 2021 | 279.9 | 211.4 | 308.6% |
| Q3 2021 | 274.5 | 63.6 | 30.2% |
| Q4 2021 | 241.0 | 14.9 | 6.6% |
| Q1 2022 | 240.2 | -11.1 | -4.4% |

Note: Profits are calculated as net revenue less COGS for clear aligners.

Sources: ALIGNAT-PURCH00001891 (Consolidated Income Statement); Align 2021-2022 Quarterly and Annual Reports; ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

122. Figure 18 shows that Align's US gross profits from scanners and related services also increased substantially after the TOI. Profits increased by approximately 80 percent in the first quarter of 2018—the first full quarter after the termination of interoperability was announced—compared to the first quarter of 2017.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 18: US Scanner and Services Profits from Q1 2016 to Q1 2021**

| Quarter | Profits (millions) | Change Relative To The Same Quarter In The Prior Year | |
|---|---|---|---|
| | | (millions) | (%) |
| Q1 2016 | 6.0 | | |
| Q2 2016 | 10.1 | | |
| Q3 2016 | 15.2 | | |
| Q4 2016 | 20.0 | | |
| Q1 2017 | 11.4 | 5.4 | 89.5% |
| Q2 2017 | 12.9 | 2.9 | 28.6% |
| Q3 2017 | 16.3 | 1.1 | 7.4% |
| Q4 2017 | 20.5 | 0.6 | 2.9% |
| Q1 2018 | 20.5 | 9.1 | 80.1% |
| Q2 2018 | 19.0 | 6.0 | 46.7% |
| Q3 2018 | 27.2 | 10.8 | 66.3% |
| Q4 2018 | 26.5 | 6.0 | 29.0% |
| Q1 2019 | 29.6 | 9.1 | 44.4% |
| Q2 2019 | 40.1 | 21.1 | 111.0% |
| Q3 2019 | 39.2 | 12.1 | 44.4% |
| Q4 2019 | 35.0 | 8.5 | 32.1% |
| Q1 2020 | 22.9 | -6.7 | -22.6% |
| Q2 2020 | 13.4 | -26.7 | -66.5% |
| Q3 2020 | 34.3 | -4.9 | -12.6% |
| Q4 2020 | 41.8 | 6.8 | 19.4% |
| Q1 2021 | 42.2 | 19.3 | 84.4% |

Note: Profits are calculated as total revenue less COGS for scanners and services.

Source: ALIGNAT-PURCH00001212 (Scanner Gross Margin Summary).

123. Limiting the analysis of Align's profits to the Invisalign customers directly affected by TOI—the dental providers who submitted via 3Shape TRIOS scanners prior to TOI—also shows no short-term decrease in Align's revenue or profit. Figure 19 reports information about the 1,186 dental practices that submitted at least one Invisalign order with a 3Shape scanner in the year prior to the announcement of TOI ("3Shape submitters") and breaks them down into four categories based on their submissions after TOI.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 19: Dental Practices Switching from 3Shape Submissions
to PVS and iTero Submissions**

|  | Number of Dental Practices | Percentage of Dental Practices |
|---|---|---|
| Switched to iTero | 512 | 43.2% |
| Switched to PVS Only | 379 | 32.0% |
| Stopped Submitting | 290 | 24.5% |
| Switched to Sirona or 3M Only | 5 | 0.4% |
| **Total Number of 3Shape Submitters** | **1,186** | |

Notes: This analysis focuses on the period between December 20, 2016 to December 19, 2018 and to dental practices with at least one 3Shape submission in the year prior to the announcement of termination of interoperability, i.e., December 20, 2016 to December 19, 2017. Dental practices are counted as unique ship-to accounts.

Source: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

This analysis shows that while approximately 24 percent of 3Shape submitters chose to stop buying Invisalign after TOI, almost twice as many dental practices—approximately 43 percent—switched to Align's iTero scanners.

124. When Align analyzed Invisalign submissions from 3Shape doctors, it determined that a very small dip in cases was seasonal—Align announced the termination in mid-December, just ahead of a slower time as many doctors reduce their schedule around winter holidays.[152]

125. To assess the net effects on profits, I examine whether the increased profits from additional sales of iTero scanners outweighed the potential decrease in profits from reductions in Invisalign submissions. Figure 20 compares, therefore, estimated profits on Invisalign and iTero purchases for 3Shape submitters in the year after TOI to the year before TOI. Profits are estimated by multiplying product revenue by product-specific gross margins from Align's financial statements.

---

[152] Deposition of Christopher Puco, Former Senior Vice President of the Americas at Align, February 28, 2023, at 160:16-25 ("Q. Sitting here today do you know what the total number of NRs that were lost as a result of the termination of interoperability with 3Shape? A. I don't know an exact number. And if there were, I don't know that there were many at all. In the overall business, I don't -- I don't know that there were many in the overall business. Our business kept moving."). See also ALIGNAT-PURCH00503263 (3Shape Doctors Case Submissions), at 265 ("Q: Did interoperability cancellation change submission rates? A: Not much, if at all.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 20: Align's Revenues and Profits from 3Shape**
**Submitters Before and After the TOI**

| | Revenue (millions) | Profit (millions) |
|---|---|---|
| | Before Announcement: 12/20/2016 to 12/19/2017 | |
| Invisalign Submissions | $43.3 | $33.8 |
| iTero Purchases | $1.8 | $0.8 |
| Total | $45.1 | $34.6 |
| | After Announcement: 12/20/2017 to 12/19/2018 | |
| Invisalign Submissions | $45.2 | $33.7 |
| iTero Purchases | $9.2 | $2.9 |
| Total | $54.4 | $36.6 |
| **Growth Rate** | **20.8%** | **5.8%** |

Notes: Analysis is limited to primary orders. Scanners sales are recorded by month, so a sales is considered "before announcement" if it was purchased in 2017 and "after announcement if was purchased in 2018.

Sources: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); ALIGNAT-PURCH00932992 (Scanner Transaction Data); ALIGNAT-PURCH00001891 (Consolidated Income Statement); ALIGNAT-PURCH00001212 (Scanner Gross Margin Summary); and ALIGNAT-PURCH00932993 (US Account and Contact Information.xlsx); Align 2016 Quarterly and Annual Reports.

126. This analysis shows that Align's revenue from 3Shape submitters increased *both* from Invisalign submissions and from iTero sales following TOI. While Invisalign sales from 3Shape submitters increased after TOI, profits from these sales remained approximately the same between the two time periods due to a decrease in Invisalign gross profit margins, which Plaintiffs have not claimed is the result of TOI. While a proper analysis examines *total* Align profits, which shows no impact from TOI as seen above, for 3Shape submitters only, an estimated $0.1 million decrease in profits from sales of Invisalign (from $33.8 million to $33.7 million, due to a decrease in gross profit margin rather than a decrease in sales) was offset by a $2.1 million increase in profits from sales of iTero (from $0.8 million to $2.9 million). This

calculation is conservative in that it is limited to sales in the year after TOI was announced.[153] This analysis is also conservative in that I do not include the potential efficiencies of TOI from having more dental providers using iTero to order Invisalign. As discussed in Section IV.A.3, dental providers and consumers may benefit from a more closely integrated scanner and aligner system.

### b. *The Analyses of the TOI by Dr. Singer and Dr. Vogt are Flawed*

127. Dr. Singer and Dr. Vogt focused only on Invisalign sales made by dental providers who submitted via 3Shape TRIOS and ignored iTero sales.[154] While Dr. Vogt is silent on this issue, Dr. Singer states:

> The but-for-the-exclusion logic of the profit sacrifice test precludes examination of benefits stemming from decreased competition. Align's recovery of profits in the long run occurred as Align's market share increased for Scanners, gained from its anticompetitive behavior, led to increased sales of Aligner's [sic]. This recovery is irrelevant to the assessment of profit sacrifice in the process of excluding a rival, as successfully excluding a rival is likely to lead to long run gains directly from the exclusion.[155]

Dr. Singer's statement is wrong. The purpose of the profit-sacrifice test is to determine whether conduct could be anticompetitive. Dr. Singer's statement presumes that the TOI is anticompetitive and, based on that presumption, excludes the benefits that Align realized from the TOI. Dr. Singer's logic would automatically condemn a vast array of business conduct, including unilateral price increases.[156] As is often the case in real-world decision-making, the TOI was expected to have both positive and negative effects.[157] Some 3Shape submitters could

---

[153] See, for example, Vogt Report, ¶ 676 ("This analysis shows that, shortly after termination of interoperability, 3Shape docs exhibited a statistically significant increase in their order volume. Further, termination of interoperability had a statistically significant effect not only on the level of 3Shape doctors' order volume but also on the growth rate, i.e., following the termination of interoperability, the monthly growth of 3Shape doctors' order volume exhibited a statistically significant increase.")

[154] Singer Report, ¶¶ 241-250 and Vogt Report, ¶¶ 619-629.

[155] Singer Report, ¶ 250.

[156] By the Law of Demand, a price increase reduce purchases by some consumers. Dr. Singer's logic would focus only on these reduced sales without accounting for the increased revenues from the higher prices.

[157] The evidentiary record indicates that an Align executive discussed the net effects of the TOI. Deposition of Joseph Hogan, Align CEO, January 13, 2023, at 28:19-29:10 (Q. Well, I guess my question is -- and it may

switch to scanners supplied by other rivals, switch away from Invisalign, or switch to iTero scanners.  See Figure 3 and Figure 14.

128. In addition, Dr. Singer's statement concerning Align's "recovery of profits in the long run" misses the fact that Align's revenues and profits increased in the short run.

## B. The Fusion Program Did Not Anticompetitively Exclude Competitors

129. The Fusion Program clearly did not and could not cause anticompetitive exclusion.  The share of US dental providers participating in the program was small, less than 2 percent in a given year.[158]  Even the share of iTero sales to dental providers in the Fusion Program was small, never more than 10 percent in a given year.[159]  The duration of the program was three years, which means that on average, one third of even the small number of participating doctors would have the option to not continue.  Rivals were not prevented from competing *ex ante* for doctors who were considering the Fusion Program.  Even for those participating in the Fusion Program, its design allowed rivals to compete *ex post* for sales that were contestable, i.e., sales above the relevant annual targets.  While the actual discounts from the Fusion program varied, the issue of whether net prices exceeded costs is not a close call.

### 1. The Fusion Program – Terms and Scope

130. Align's Fusion Program ("Fusion") allows dental providers to receive discounts on their purchases of iTero Scanners if they purchase a minimum number of Invisalign cases each year

---

seem obvious to you, but, you know, just for the record and -- A. Yeah, sure. Q. -- clarity -- that when you made that decision, did you determine that it was in the best interests of the company to go ahead and terminate interoperability with 3Shape? A. I certainly did. Q. Were you concerned or was part of your calculus concern about whether and how customers who owned -- Invisalign customers who owned a 3Shape scanner would be affected by the agreement -- A. Yes, that was -- Q. -- and by the termination of the agreement? A. Yes, it was a concern of mine. Those customers are doctors, and the doctors are, you know, our customer base, and those relationships are very important to us."); pp.29:23 – 30:01 ("Q. Did you discuss the decision to terminate interoperability with 3Shape with other members of the EMC? A. I did."); p.175:08-13 ("Q. Do you recall having discussions with [Raphael Pascaud] at this point about the business decision of whether to terminate interoperability? A. I know that discussion was going on not just with Raph, but, you know, with the region leaders and just us internally. It obviously was a big decision.").

[158]  See backup calculation.

[159]  See backup calculation.

for three years.[160]  Align has introduced multiple versions of the Fusion program which differ in their target audiences (i.e., eligible participants), total discount, and incremental case requirements, but all have the same structure:  If dental providers meet their targets for the year, they do not have to pay the full price of the Scanners; however, if they do not reach their yearly targets, Align invoices them for the full installment payments for that year.[161]  For example, a dental practice enrolled in the DSO Fusion program could receive a $15,000 discount off the iTero scanner, with a list price of $29,999, if it sold at least 60 incremental Invisalign cases over three years, in addition to its baseline cases for each of those three years.[162]  For each year that the dental practice meets its Invisalign case target, it pays $5,000 less for its iTero scanner than it pays if the practice does not meet its target.[163]

131. During the period 2017-2021, between 0.8 percent and 4.8 percent of active iTero scanners were in the Fusion Program, as shown in Figure 21.

---

[160]  See, for example, ALIGNAT-PURCH00614646-650 (Fusion Promotion Agreement), at 646 ("The Customer agrees to undertake a target number of incremental Fusion Invisalign Cases per iTero Element scanner purchased under an associated Fusion Purchase Contract, above the Baseline Cases, measured over yearly time periods over the Term (with the first year beginning on the Baseline Cases Start Date (that year and then each subsequent year being a "Year")), and which quantity of Fusion Invisalign Cases shall be ClinCheck® accepted under their own Customer ID (and are undertaken by them) per iTero Element scanner in the volumes in the table below.").

[161]  See, for example, ALIGNAT-PURCH00614646-650 (Fusion Promotion Agreement), at 647 ("If the Customer has submitted Case Submissions under one or more of their Customer IDs associated with the purchase of Scanners in a particular Year at or above the cumulative total of the applicable Yearly Target for all Scanners purchased under the associated Fusion Purchase Contract, then Align will release Customer from the obligation to pay the applicable Year's Installment Payment for all Scanners purchased under the associated Fusion Purchase Contract within 30 days of the end of that particular Year. If the Customer's number of Case Submissions under the Customer IDs associated with the purchase of the Scanners in a particular Year is below the cumulative total of the applicable Yearly Target for all Scanners purchased under the associated Fusion Purchase Contract, then the Customer's resulting obligation to pay shall be a prorated amount of the applicable Year's Installment Payment for all Scanners purchased under the associated Fusion Purchase Contract, which will be based on the difference between the Yearly Target and the number of actual Case Submissions submitted in the applicable Year (the 'Shortfall').").

[162]  ALIGNAT-SNOW00515919-925 (DSO Fusion Update & FAQs), at 921 ("Discounts of $15k with 60 case commitment or $10k with 48 case commitment over 3 year term."); ALIGNAT-SNOW00515927-935 (DSO Fusion Commercial Promotion Summary), at 927.

[163]  ALIGNAT-SNOW00515927-935 (DSO Fusion Commercial Promotion Summary), at 927.

**Figure 21:  Share of Active Scanners in the Fusion Program**

| Year | Total Number of Active Scanners | Number of Active Scanners in Fusion Program | Percentage of Active Scanners in Fusion Program |
|------|-------|-------|-------|
| 2017 | 10,214 | 84 | 0.8% |
| 2018 | 15,263 | 448 | 2.9% |
| 2019 | 20,827 | 761 | 3.7% |
| 2020 | 24,441 | 1,103 | 4.5% |
| 2021 | 27,218 | 1,318 | 4.8% |
| **Total** | **34,380** | **1,526** | **4.4%** |

Sources: ALIGNAT-PURCH00932992 (Scanner Transaction Data); ALIGNAT-PURCH00932993 (US Account and Contact Information.xlsx); ALIGNAT-PURCH00932994 (Scanner Cases Data); and ALIGNAT-PURCH01932039 (US Fusion Contracts.xlsx).

132. The Fusion Program offered discounts if the buyer purchases multiple products (i.e., a bundle) from the same seller.[164]  Such "bundled discounts" are generally "viewed as an efficient means of competing that raises no antitrust concern."[165]  In fact, "[b]undled discounting can allow businesses to achieve economies of scope, […] reduce transaction costs, induce existing customers to try new product or service offerings, […]."[166]

133. When firms, either individually or collectively,[167] compete at offering the full range of products in the bundle, such bundle-to-bundle competition can be "ferocious" and can lead "to

---

[164] See, for example, OECD, "Roundtable on Bundled and Loyalty Discounts and Rebates- United States," July 1, 2008 ("OECD, 2008"), at p. 2 ("The practice of sellers offering discounts contingent upon a buyer's purchase of two or more products is very common and generally benefits consumers."). Note that Fusion also includes a volume component, as dental providers are required to purchase a minimum number of Invisalign cases each year to receive the iTero discount. See, for example, ALIGNAT-PURCH00614646-650 (Fusion Promotion Agreement).

[165] OECD, 2008, at p. 3.

[166] OECD, 2008, at p. 3.

[167] Hovenkamp, Herbert J. and Erik Hovenkamp, "Complex Bundled Discounts and Antitrust Policy," *Buffalo Law Review*, July 2009, Vol. 57, No. 4, pp. 1227-1266, at p. 1231 ("[T]he other rival need not offer the defendant's full product line. If two or more competitors collectively produce the entire contents of the bundle, they will be able to match the dominant firm's pricing.")  See also, Murphy, Topel, Snyder, 2014, at p. 113 ("In many cases, a particular plaintiff who complains of exclusion may produce only a small portion of the product lines that led to the seller's discount policy, so the [contestable quantity] for that particular rival actually is small. […]  But

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the lowest profits."[168]  As I have emphasized, <u>several important rivals (Dentsply Sirona, Envista, and 3M) sell both aligners and scanners</u>.  Moreover, as described above, rivals offered their own bundles.  For example, Dentsply Sirona competed by offering a bundled discount whereby doctors pay a discounted price of $35,000 on its Primescan scanner if they "commit to 24 SureSmile cases for one year."[169]  3Shape worked with Henry Schein on a TRIOS scanner-Reveal aligner bundle;[170] and Envista offered a Dexis (formerly Caresteam) scanner to customers for free in exchange for a commitment to purchase a set number of Spark aligner cases during a 12-month period.[171]  Even suppliers that do not manufacture scanners may offered a bundled discount.  For example, Dandy, a dental lab that manufactures aligners,[172] offers a "free 3Shape TRIOS intraoral scanner" to qualifying dental providers using their lab services.[173]

134. A standard economic test for whether a bundled discount could be anticompetitive is the "bundled price-cost test," which is also called a "discount attribution test."[174]  As explained in

---

the [contestable quantity] relevant for antitrust scrutiny is the number of units open to competition from all rivals […] Narrowly specialized plaintiffs should not enjoy preferred status in making antitrust claims, just as plaintiffs that do not meet consumer acceptance should not.  […]  Then competition […] is "bundle-to-bundle"—including the possibility that buyers or their agents may create virtual bundles from combinations of sellers, including the plaintiff.").

[168] Nalebuff, Barry, "Competing Against Bundles," *Incentives, Organization, and Public Economics: Papers in Honour of Sir James Mirrlees*, Oxford University Press, 2000, pp. 323-336, at p. 328. See also, p. 332.

[169] Dentsply Sirona, "National PDC 2020 Promotions," March 2022, available at https://assets.dentsplysirona.com/flagship/en_ca/2021folder/webbooklet/CAN-DS-WB-PDC-2022-EN.pdf.  Dentsply also offered a "DW World 2020 Promotion" in which practices that purchase a Primescan intraoral scanner for $44,995 and sign up for an educational event received a $7,500 instant rebate on the Primescan, "up to $20,000 in rebates on qualifying purchases," a SureSmile starter kit that includes a free case, and various other discounts.  See Dentsply, "Primescan Savings," 2020, available at https://assets.dentsplysirona.com/flagship/en-us/DIM-DS-World-Promo-Flyer.pdf.

[170] 3Shape_Antitrust_Simon_00359117-126 (3Shape Henry Schein Presentation), at 125.

[171] EHC-000182 (Ormco Dexis IS & Spark Agreement); EHC-000183-184 (DEXIS Carestream Dental IOS Scanner Offers), at 183 ("Purchase a CS Scanner (3600/3700/3800) at MSRP, start up Spark cases and get reimbursed for the complete CS purchase price"); EHC-000185-187 (Ormco Rebate Agreement).

[172] Dandy, "Dandy Clear Aligner Lab," available at https://www.meetdandy.com/labs/clear-aligners/.

[173] Dandy, "Get a FREE TRIOS Intraoral Scanner," available at https://www meetdandy.com/get-free-scanner-lp/ ("With Dandy, you get everything you need to take your practice digital, including: A FREE 3Shape TRIOS intraoral scanner.").

[174] For example, Ninth Circuit in (*Cascade Health Solutions v. PeaceHealth*, 502 F.3d 895, 909 (9th Cir. 2007)) stated:

my research, under this test, "all of the discounts on noncontestable elements of the bundle are attributed to (subtracted from) the price of contestable units."[175,176]  An attributed price below incremental or marginal cost would suggest that discounts might be unprofitable to the seller unless the seller has other motives, such as exclusion of competitors from the market.[177] [178]

### 2. The Fusion Program Passes the Bundled Price-Cost Test and Did Not Anticompetitively Exclude Equally Efficient Rivals

135. To evaluate whether the Fusion Program could anticompetitively exclude rival aligner suppliers that do not also sell scanners, I perform a bundled price-cost test for Align's Invisalign Comprehensive treatment, which accounts for 74 percent of its revenues from aligner sales and between 59 percent and 73 percent of case starts from 2013 to 2022.[179]  To test whether equally efficient aligner companies could compete with the Fusion scanner

---

…[T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival is who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter.  Thus, a plaintiff who challenges a package discount as anticompetitive must prove that, when the full amount of the discounts given by the defendant is allocated to the competitive product or products, the resulting price of the competitive product or products is below the defendant's incremental cost to produce them.  This requirement ensures that the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient producer of the competitive product or products.

The Court further held that "the appropriate measure of costs for our cost-based standard is average variable cost."

[175]  To the extent that these tests can produce false results, they may reduce sellers' incentives to provide procompetitive discounts.  See, Murphy, Snyder, Topel, 2015, p. 93.

[176]  As stated by Bernheim and Heeb, 2015, p. 18:

Antitrust concerns related to bundling tend to arise most often in practice when a seller offers a discount on a good over which it has monopoly power, conditional upon the customer purchasing a sufficient volume of a product for which rivals provide close substitutes. As in the case of predatory pricing, the seller limits a customer's purchases from rivals by "buying" the customer's contested business; in this case, it compensates the buyer through the contingent discount on the monopolized good rather than through an unconditional discount on the contested good.

[177]  Murphy, Snyder, Topel, 2015, p. 93 ("By this rule, a finding that the net price is below incremental cost would suggest that discounts might be unprofitable to the seller absent some other motive, which might include exclusion.").

[178]  Murphy, Snyder, Topel, 2015, p. 93.  See also p. 116 ("Beyond the attribution test, the [2007 Antitrust Modernization Commission] ('AMC') suggested two other necessary conditions for antitrust liability. Condition (2) is that 'the defendant is likely to recoup these short-term losses' and condition (3) is that 'the bundled discount or rebate program has had or is likely to have an adverse effect on competition').

[179]  Vogt Report, ¶ 754 ("While Align offers a range of clear aligner products, comprehensive treatment accounts for 69% of its unit volume and 74% of its dollar volume."); Singer Report, Table 9.

discount, I allocate the scanner discount a dental practice receives from participating in the Fusion Program to the incremental Invisalign sales the practice needs to make to receive the discount, and evaluate whether this discounted price is above Align's cost of goods sold for aligners.  I note that this is a conservative implementation of the bundled price-cost test because to receive the discount the dental practice needs to make not just the incremental sales, but also the baseline level of sales.[180]  This calculation is also conservative because it does not consider that many dental practices do not meet the Fusion requirement each year and therefore do not receive the full discount.[181]

136. An example of the bundled price-cost test is shown in Figure 22 and described below.

---

[180] For example, a dental practice that currently sells 10 cases a year and receives a scanner discount conditional on selling 5 additional cases.  For that reason, I allocate all of the at-risk to the 5 units.  However, the practice must sell 15 cases to earn the discount and this practice has the option of purchasing all 15 cases it anticipates selling the following year from a competing aligner company.  Therefore, up to 15 cases represent contestable sales for rival aligner suppliers.  If the discount is allocated to all 15 cases, then the per unit discount would be lower and the net price would be higher.

[181] ALIGNAT-PURCH00401847-889 (iTero Fusion 2.0 Presentation, Q1 2021), at 855 ("Avg Discount Charged Back to Customer […] $3,192").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 22: Bundled Product Price-Cost Test**

| | |
|---|---:|
| Comprehensive List Price in 2019 | $1,879 |
| Highest Advantage + NLP Discount | 44% |
| Net Price After 44% Discount | $1,052 |
| | |
| Fusion Discount | $15,000 |
| Total Required Incremental Aligner Sales Across Three Years | 60 |
| Fusion Discount Per Incremental Sale | $250 |
| | |
| **Net Price After Advantage and Allocated Fusion Discounts** | **$802** |
| | |
| Aligner COGS in 2019 | $342 |
| | |
| **Does the Net Price after all Discounts Exceed Costs?** | **Yes** |

Sources: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); ALIGNAT-PURCH00001891 (Consolidated Income Statement); ALIGNAT-SNOW00098687-692 (Fusion Promotion Agreement between Align and Swanky Smiles).

137. The test is performed in three steps:

    i.  I identify the price net of all discounts for an Invisalign Comprehensive treatment. To be conservative, I assume that the dental practice receives the highest discounts on Invisalign offered under Align's "Advantage" and "NLP" discount programs.[182] Before accounting for the Fusion Program, this implies a 44 percent discount off the $1,879 list price of Invisalign in 2019, resulting in a net price of $1,052.

    ii. I then subtract the maximum Fusion discount per incremental aligner available under the DSO Fusion program, which provides a $15,000 discount on the iTero scanner conditional on the purchase of 60 additional aligners. The implied discount of $250 per incremental aligner reduces the net price to $802. This allocation is conservative, because allocating the $15,000 Fusion discount to all aligner sales (base requirement plus incremental requirement) and not simply allocating across incremental aligner sales would result in an even lower discount per aligner and a higher aligner net price.

    iii. I compare this discounted price to Align's average cost of goods sold (COGS) per aligner in 2019. In 2019, Align's average COGS per aligner was $342. This is lower than the net price with attributed discounts of $802.

---

[182] Fewer than seven percent of Invisalign cases have a discount of greater than 44 percent and more than one third have *no* discount. See backup calculation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

138. This last step shows that equally efficient competing aligner companies can profitably compete with a Fusion discount equal to $250 even when it is combined with high discounts on Invisalign. In fact, the test shows that even with discounts per aligner of $600, the highest Fusion discount offered,[183] equally efficient aligner companies with costs of $342 could compete against Align's $452 net price. Therefore, the Fusion Program does not anticompetitively exclude potential aligner competitors that do not also manufacture aligners.

139. Two other aspects of the Fusion Program should be noted. First, the program did not require exclusivity with Align. Dental practices that made sales in excess of the requirements to receive the Fusion discount were able to purchase aligners from competitors without losing the Fusion discount. More than two-thirds of customers with Fusion contracts purchased more aligners than required in at least one year during the program. In these cases, the median number of aligners purchased in excess of the requirements was approximately 30 aligners per year.[184]

140. Second, as shown in Figure 23, customers participating in the Fusion Program accounted for only 12.4 percent of Invisalign sales in 2022, which is, of course, an even smaller share of total aligner sales.

---

[183] Vogt Report, ¶ 296.

[184] A customer is considered to have purchased more aligners than required if a provider purchased at least five more aligners than required in at least one year during the Fusion Program. Only customers with case counts and requirements for at least one completed year are included in this analysis. See backup calculation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 23: Share of Invisalign Sales Ordered by Customers Participating in Fusion**

| Year | Total Invisalign Orders | Total Invisalign Orders by Dentists in Fusion Program | Percentage of Invisalign Orders by Dentists in Fusion Program |
|------|------|------|------|
| 2017 | 514,098 | 1,169 | 0.2% |
| 2018 | 624,575 | 18,501 | 3.0% |
| 2019 | 710,227 | 33,685 | 4.7% |
| 2020 | 716,856 | 56,583 | 7.9% |
| 2021 | 1,085,172 | 118,363 | 10.9% |
| 2022 | 254,193 | 31,411 | 12.4% |
| **Total** | **3,905,121** | **259,712** | **6.7%** |

Sources: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data); ALIGNAT-PURCH01932039 (US Fusion Contracts.xlsx).

141. Lastly, while the Fusion Program could not have caused anticompetitive exclusion, it did generate discounts for participating doctors and, assuming some rate of pass on, their patients. The record indicates that total scanner discounts under the Fusion Program amounted to approximately $4.0 million from September 10, 2017 to October 7, 2022.[185]

### 3. Plaintiffs' Economic Experts' Analyses of the Fusion Program on Aligner Competitors are Fundamentally Flawed

#### a. Dr. Singer's Analysis

142. Although Dr. Singer refers to the Fusion Program as a "bundled discount,"[186] he does not perform a bundled price-cost test to assess whether the discount program could have caused anticompetitive exclusion. Nor did he account for the first-order consumer gains from the discounts. Instead, Dr. Singer asserts that "any Invisalign sold in conjunction with a Fusion program…[is] exclusionary."[187] He claims that the Fusion Program anticompetitively excluded the sale of aligners because "the Fusion program allowed Align to impose a penalty price on Class members that did not buy enough Invisalign Aligners following a Fusion sale,

---

[185] See backup calculation.

[186] See, for example, Singer Report, ¶ 129.

[187] Singer Report, ¶ 155.

equal to the pro-rated value of the discount if the practice failed to sell sufficient Invisalign products in a given year."[188]  Dr. Singer claims that this has "the effect of removing an Aligner customer from the reach of rival sellers."[189]

143. Dr. Singer's analysis does not conform to basic economics.  Most competing aligner companies also sell scanners and therefore can, and at least some do, bundle the sales of scanners and aligners.  For those aligner competitors that do not sell scanners, the bundled price-cost test above shows that the Fusion discounts did not anticompetitively exclude potential aligner competitors and therefore did not remove aligner customers from the reach of rival sellers.[190]

144. Dr. Singer is also incorrect to characterize the program as imposing a penalty price.  A discount program may be considered to impose a penalty on non-participants if the non-discounted price is set higher than customers are generally willing to pay.  In such instances, one would observe that few, if any, customers pay the non-discounted price.  This is not the case with the Fusion Program.  As shown in Figure 24, one quarter of customers purchased iTero scanners at list prices, more than half pay more than 83 percent of list price—the amount a Fusion participant will pay if they miss two years of required incremental sales, and more than 80 percent pay more than 67 percent of list price.  The latter is the amount a Fusion participant would pay if one year of required incremental sales were not made.  Furthermore, Dr. Singer's approach would condemn all bundled discounts as exclusionary and anticompetitive, ignoring the obvious consumer benefits from lower prices.

---

[188]  Singer Report, ¶ 155.

[189]  Singer Report, ¶ 155.

[190]  Even companies that do not sell both aligners and scanners have made commercial arrangements by which to offer a bundle.  3Shape and Straumann worked together to "create a valuable clear aligner bundles [sic] to enable sales for both parties."  3Shape_Antitrust_Simon_00418087-106 (Clear Aligner Bundle – ClearCorrect and 3Shape), at 089.  See also, 3Shape_Antitrust_Simon_00528325-383 (Straumann & 3Shape Executive Meeting), at 378 (TRIOS-ClearCorrect bundle).  Dental lab Dandy offers a free 3Shape TRIOS scanner in exchange for a committed number of purchases of other products.  Dandy, "Get a FREE TRIOS Intraoral Scanner," available at https://www.meetdandy.com/get-free-scanner-lp/; 3Shape_Antitrust_Simon_00643511-513 (Email exchange between 3Shape executives about Dandy); 3Shape_Antitrust_Simon_01021279 (Email exchange between 3Shape executives about Dandy's free scanner promotion).  Dandy provides aligners in addition to various restorations such as crowns, bridges, and implants.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 24: Share of Dental Practices by Percentage of List Price Paid for iTeros**

| % of List Price Paid | Share of Dental Practices |
| --- | --- |
| 100% (Full price) | 24.5% |
| ≥ 83% | 54.1% |
| ≥ 67% | 82.4% |

Source: ALIGNAT-PURCH00932992 (Scanner Transaction Data).

145. In addition to his flawed logic, Dr. Singer's calculations are flawed. Dr. Singer assumes that all Invisalign sales made three years after the purchase of an iTero to a dental provider in the Fusion Program to be exclusionary. However, as explained, once a participating dental provider meets the annual target, the provider could purchase from any aligner supplier. Dr. Singer's calculation overstates his definition of exclusionary sales.

### b. Dr. Vogt's Analysis

146. Dr. Vogt performed a bundled price-cost test and concluded that marginal prices under the Fusion Program are not below relevant cost measures: "If the entirety of the [Fusion] discount is applied in the in-office clear aligner market" it "does not bring the price of Invisalign below Align's cost …"[191] Nevertheless, Dr. Vogt claims that Fusion anticompetitively excludes competing aligner companies:[192]

> While the Fusion program did not bring aligner prices below clear aligner cost, it did significantly raise the cost of acquiring business from doctors participating in the Fusion program, such that it can be considered a form of *de facto* exclusive dealing.

---

[191] Vogt Report, ¶ 717.

[192] Dr. Vogt also argues that anticompetitive exclusion from bundled discounts is distinct from interoperability exclusion:

> To estimate the overlap between interoperability foreclosure and foreclosure from bundled discounts, I consider the percentage of Fusion orders which were placed by doctors which used 3Shape during the interoperability period. I estimate that an aggregate 8.6% of total orders placed under the Fusion Program, from quarter 2 of 2018 onwards, were placed by doctors who used 3shape during interoperability. As such, I consider foreclosure from interoperability to be distinct from foreclosure from bundled discounts. (Vogt Report, ¶ 742)

> By his own calculation, 8.6 percent of the Invisalign orders he claims are anticompetitively excluded by Fusion are orders he also considers to be excluded by termination of interoperability, which contradicts his conclusion that the two types of alleged anticompetitive exclusion are distinct.

This alone is sufficient to foreclose at least a portion of competition in the relevant market.[193]

Dr. Vogt argues that:

…the only way a competitor can compete for the business of doctors participating in the Fusion program is to offer a price that is *at least* $250 less expensive than the price they pay for Invisalign.[194]

If, in addition, the incumbent raises the [competitor's] costs by $250, this shifts the entrant's supply curve up …, decreasing its output and raising the price it charges for its product. This price increase and quantity decrease benefits the incumbent since some of the lost business flows to it, but it harms consumers via the higher price.[195]

147. This argument misses the core purpose of the test. The net price after all discounts is above costs. So, rivals can offer prices for contestable units that cover their costs and thereby contribute to profits. Dr. Vogt's analysis also ignores ex ante competition from the many competing aligner companies that also sell scanners. A doctor considering the Fusion discount program when purchasing an iTero in 2020 may also have considered purchasing a Primescan scanner and SureSmile aligners to take advantage of the discount being offered by Dentsply Sirona.[196]

148. Like Dr. Singer, Dr. Vogt does not take into account the value of the Fusion Program's discounts to doctors and patients. Dr. Vogt attempts to argue that this price competition is harmful because it lowers competitors' supply of aligners by imposing a $250 cost on competitors. By Dr. Vogt's logic, if Align lowered its Invisalign list prices, it would raise rivals' costs and therefore harm consumers. Dr. Vogt cites to no academic literature to support this argument.[197]

---

[193]   Vogt Report, ¶ 716.

[194]   Vogt Report, ¶ 722.

[195]   Vogt Report, ¶ 726.

[196]   See Section V.B.1.

[197]   Further discussion of Dr. Vogt's raising rivals' costs argument is in section VIII.C, below.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 4. *Dr. Vogt's Analysis of the Fusion Program on Scanner Competition is Flawed*

149. Align presented a price–cost analysis in 2020 when assessing the performance of Fusion Program from its inception in Q3 2017 to Q1 2020. Align found that the average net selling price of a scanner purchased through the Fusion program was $22,948, while the average cost of the scanners was $14,000.[198] Therefore, Align's analysis indicated that iTero scanners were priced more than 50 percent above costs.

150. Dr. Vogt uses different information. Dr. Vogt relies on an Align analysis that estimated the contribution margin for scanners sold in North America between 2017 and 2019.[199] Using this document, Dr. Vogt calculated the average variable cost per scanner to be $17,624 in 2017, $15,007 in 2018, and $15,359 in 2019. Regarding prices, Dr. Vogt assumed that the typical discounted price of an iTero purchased under the Fusion Program was $14,999.[200] This price does not reflect the average discounted price customers initially paid for iTero scanners under the Fusion Program. Align calculated that the average selling price under Fusion was substantially higher at $19,756. In addition, Dr. Vogt did not account for the fact that not all customers meet the 3-year case requirements. Align calculated that $3,192 of discounts were charged back to customers, which is how it arrived at a net price of $22,948.[201]

151. On this flawed basis, Dr. Vogt claims that the Fusion Program reduced iTero prices below costs.[202]

---

[198]  ALIGNAT-PURCH00401847-889 (iTero Fusion 2.0 Presentation, Q1 2021), at 855.

[199]  Vogt Report, ¶ 739, citing NA Trended P&L.xlsx (ALIGNAT-SNOW00802865).

[200]  ALIGNAT-SNOW00098687-691 (Fusion Agreement Between Swanky Smiles and Align), at 692 ("Installment 1 […] $14,999").

[201]  ALIGNAT-PURCH00401847-889 (iTero Fusion 2.0 Presentation, Q1 2021), at 855.

[202]  Vogt Report, ¶¶ 733-741

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C. Other Alleged De Facto Exclusive Discounts Did Not Anticompetitively Exclude Competitors

#### 1. Alleged De Facto Exclusive Discounts – Terms and Scope

152. Dr. Singer and Dr. Vogt identify several other Align discount programs as "exclusive" even though they do not include exclusivity terms in their contracts. Dr. Vogt refers to these as *de facto* exclusive because they have a discount tied to using an iTero scanner or are a volume discount:

   i. A discount for submitting Invisalign cases using an iTero scanner.[203] This includes four discount promotions that provided either a $25 or $10 discount on eligible Invisalign cases submitted using an iTero.[204] Note that, to the extent that the customers did not already own iTero scanners by which to submit qualifying Invisalign cases, these are bundled discounts.[205]

   ii. A volume discount.[206] Dr. Singer concludes that these contracts "amount to exclusive dealing contracts" because they "contained language that prevented Dental Practices from diverting patients to rival Aligners or required Dental Practices to convert a percentage of their Aligner sales to Invisalign ('share of chair')."[207] He identifies three programs as *de facto* exclusive volume discounts:

      a. Next Level Provider (NLP) Promotion, which provided a maximum 4 percent additional discount to dental providers who achieve at least 30 percent growth in their Advantage points or at least a 30 percent share of chair conversion rate.[208]

---

[203] Described as "a requirement that the discounted sale use an iTero Scanner" or "an additional discount on Invisalign Aligners purchased through an iTero Scanner" (Singer Report, ¶ 156).

[204] The four programs are: (1) iTero Q1 Case Submission Promotion: provided a $25 discount on eligible Invisalign cases submitted through iTero scanners from March 1, 2018 to March 31, 2018 (ALIGNAT-PURCH00288160-8164 (Align iTero Q1 Case Submission Promotion Summary), at 8160); (2) New iTero First-Time Purchase Case: provided a $25 discount on eligible Invisalign cases submitted through iTero Element through June 30, 2018 by first time iTero purchasers who purchased between March 1, 2018 and March 31, 2018 (ALIGNAT-PURCH00288166-8171 (Align New iTero First Time Case Promo Summary), at 8166); (3) $10 iTero discount for Heartland: provided a $10 discount on eligible Invisalign cases submitted using an iTero scanner from April 1, 2018 through April 1, 2023 to Heartland Dental doctors (ALIGNAT-PURCH00878462-8469 (Amendment No. 1 to the Enterprise Account Group Discount Program, Heartland Dental) at 8467); and (4) iTero discount for Smile Doctors: provided a $25 discount on eligible Invisalign treatments submitted through iTero scanners (ALIGNAT-PURCH00825445).

[205] Singer Report, ¶ 133.

[206] Described as "a requirement to convert a percentage of a customer's Aligner patients to Invisalign" (Singer Report, ¶ 156).

[207] Singer Report, ¶ 123.

[208] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292.

This program could provide an additional discount to dental providers with Platinum or higher Advantage status who receive at least a 28 percent discount on eligible Invisalign cases.[209] Under the Advantage growth bonus discount, if a dental provider achieves a 30-39.9% semi-annual points growth, they receive an additional 2% discount; if they achieve a 40-49.9% or greater than a 50% points growth, they receive an additional 3% or 4% discount, respectively.[210] If instead, the provider opts into share of chair, they receive an additional 1-4% additional discount if at least 30-60+% of the provider's clear aligner patients use Invisalign.[211] To obtain the share of chair discount, the provider must achieve growth semi-annually.[212]

b. Volume Discount Program, which provided volume discounts to dental providers in the Key Practice Pricing ("KPP") program prior 2018.[213] The KPP program provided discounts of 0-40 percent depending on the number of Invisalign treatments sold in a given quarter.[214] For example, if a dental provider sold between 0 and 7 qualifying Invisalign treatments, they received a 0 percent discount, but if they sold 100 or more qualifying treatments, they would receive a 40 percent discount.[215]

c. DSO (SOC) Bonus Discount Low Stage Promotion, which provided discounts for "convert[ing] a percentage of patients to Invisalign."[216]

153. Dr. Vogt also characterizes Align's 2018 contract with Heartland Dental, a DSO, as exclusive.[217] The Heartland contract, which was an amendment to a 2016 contract, had a number terms which Dr. Vogt summarizes as follows:

…Heartland would (1) purchase a minimum of ▮ iTero at a price of ▮ each (inclusive of 5 years of software and subscription fees); (2) be eligible for locked-in

---

[209] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 299.

[210] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292.

[211] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292.

[212] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292.

[213] Letter from Adam Reich, Paul Hastings, to Hope Brinn, Berger Montague, *Simon and Simon, PC, et al. v. Align Technology, Inc.*, U.S.D.C. N.D. Cal. Case No. 3:20-cv-03754-VC, December 13, 2022, p. 6; ALIGNAT-PURCH01319229-230 (Key Practice Pricing Promotion).

[214] ALIGNAT-PURCH01319229-230 (Key Practice Pricing Promotion).

[215] ALIGNAT-PURCH01319229-230 (Key Practice Pricing Promotion).

[216] Dr. Singer identifies this promotion as *de facto* exclusive because it provided discounts for "convert[ing] a percentage of patients to Invisalign." I have not located any terms and conditions for this promotion. If presented with terms and conditions, I reserve the right to update my analysis accordingly. See Backup to Singer Report (Contract Attribute Indicators_2016-2022.xlsx).

[217] Vogt Report, ¶ 54.

pricing on various types of Invisalign treatment; and (3) receive rebates of up to ███ for meeting annual growth goals.[350] The term sheet also included a "2.5 yr contract 'touch point'" at the mid-point of the contract, and committed Heartland to ███ growth in the 2.5 year period starting March 1, 2018 in order to maintain locked-in pricing.[218]

154. I disagree with Dr. Singer's and Dr. Vogt's claims. The existence of a discount does not mean that buyers are prevented from purchasing scanners or aligners from rival suppliers. Dental practices are not prevented from doing so before accepting a discount from Align. Nor are they prevented after they accept a discount from Align. Put simply, Align's rivals were not prevented from competing against Align's discounted prices.

155. The at-issue discount programs are examples of "conditional pricing practices" ("CPPs"),[219] whereby, as a 2017 paper by FTC economists explains, "price is conditioned on quantities or shares."[220] Quantity or volume discounts are "practices in which pricing is linked to purchasing a specified quantity."[221] Economists note that quantity discounts "are common and often efficient because they can enable economies of scale or cost-justified price discrimination."[222] Market share discounts, or, in the context at issue "share of chair" discounts, are CPPs based on the share of a customer's purchases "that comes from a particular seller."[223]

156. It is helpful to observe that CPPs may share similarities with exclusionary practices. For example, "an exclusive contract can be viewed as a special type of market-share discount – namely one in which [1] the customer pays the discounted price only when it purchases 100 percent of its needs from the supplier, and [2] the undiscounted price is set sufficiently high

---

[218] Vogt Report, ¶ 323, citing to ALIGNAT-SNOW00145271-273 (Heartland Dental Align Term Sheet) and ALIGNAT-SNOW00825435-442 (Amendment No. 1 to the Enterprise Account Group Discount Program).

[219] DeGraba Patrick, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," September 2017 ("DeGraba et al., 2017"), at p. 2 ("Conditional pricing practices (CPPs) include a broad range of pricing strategies employed by many firms in the economy, including firms with large market shares and those with small shares. This broad range of practices includes, among others: all-units and other quantity-based discounts, bundling, and market-share discounts.").

[220] DeGraba et al., 2017, footnote 1.

[221] DeGraba et al., 2017, footnote 2.

[222] Scott-Morton, 2013, footnote 4.

[223] DeGraba et al., 2017, footnote 2.

that the customer would purchase zero units at that price."[224]  Notably, none of the discount programs that Plaintiffs experts label as *de facto* exclusive satisfies either of the two conditions above.

157. Consistent with the framework provided in Section II, CPPs may be anticompetitive if rivals cannot achieve economies of scale and scope.[225]  In addition, if discounted prices are below-cost, CPPs may harm competition.  Neither condition is present here.  Firms continue to enter and grow, and Align's discount programs did not result in below cost pricing.

158. Plaintiffs' experts nevertheless argue that CPPs can be anticompetitive even if discounted prices are above cost and cite the RRC literature as support.[226]  According to the RRC approach as described in an article Dr. Singer and Dr. Vogt cite, the issue with CPPs may lie in the conditions rather than in the price levels because "as a result of the conditions, the resulting prices can exceed the competitive benchmark price that would occur in the 'but-for world' without the CPPs."[227]  This implies that "[t]he analysis would evaluate the CPPs as input and/or customer foreclosure […]"[228]  Notably, according to this article, "this does not mean that courts should rely on simple-minded foreclosure rates."  Rather, the analysis should "evaluate whether the rival likely would be significantly foreclosed in the sense of *suffering significantly higher costs or limitations on its capacity, output and ability to expand efficiently*"[229] (emphasis added).  The use of the term "significantly foreclosed" matches the important issue I have identified, i.e., whether the combination of relevant factors, e.g., the shares of

---

[224]  DeGraba et al., 2017, at p. 3.

[225]  DeGraba et al., 2017, footnote 22 ("The economic theories presented […] typically explain how in certain settings various pricing strategies can be used to fully exclude a rival firm and generate competitive harm.  The basic logic of these theories continues to hold if the exclusion is only partial, provided that the resulting denial of scale makes the rival firm a less robust competitor (that is, increases its marginal costs).").

[226]  See, for example, Singer Report, ¶¶ 146-150 and Vogt Report, ¶ 180.  See also Salop, 2017 (cited by Dr. Singer and Dr. Vogt in their discussions of RRC), at p. 399, ("Conditional discounts may lead to lower *nominal* prices.  But the attached conditions also can raise rivals' costs and erect barriers to entry.  Once these exclusionary effects are taken into account, particularly in monopoly or dominant firm markets, even the nominally discounted prices may exceed the *unconditional* prices that would be charged in the market if the CPPs were prohibited by antitrust law." [emphasis in original]).

[227]  Salop, 2017, at p. 400.

[228]  Salop, 2017, at p. 401.

[229]  Salop, 2017, at p. 401 [emphasis added].

participating customers, the durations of the programs, and market growth, establishes the conditions where anticompetitive exclusion could result.  As my industry analysis and economic analysis demonstrates, those conditions do not exist in this context.

### 2. None of the Alleged De Facto Exclusive Discounts Anticompetitively Excluded Competitors

#### a. Discounts for Submitting Invisalign Orders with an iTero Do Not Anticompetitively Exclude Competitors

159. Dr. Singer classifies four programs as exclusionary that provide either $10 or $25 discounts on orders of aligners that submitted using an iTero scanner.  He categorizes these discounts as "bundling," but does not perform the standard bundled price-cost test.  No formal calculation is needed because it is clear from the small size of these discounts that competing aligner companies could lower their prices to compete with this discount and therefore these discounts do not anticompetitively exclude competitors.[230]

#### b. Align's Volume Discount Programs Do Not Anticompetitively Exclude Competitors

160. Volume discount programs offered by Align can also be known as "quantity commitment discounts (QCDs)." [231]   Research has shown that QCDs almost always have a clear procompetitive rationale, including economies of scale and scope, promotional incentives for retailers, inducing customers to try new products, customer convenience, and price discrimination based on differences in customer demand elasticities.[232]   However, under certain conditions, the effect of commitment discounts can be to harm competition if the harms are "disproportionate" to the benefits.[233]  That is not the case here.

161. In addition to the obvious procompetitive benefits, these contracts do not anticompetitively exclude competition because they are not long-lasting, non-binding, and the discounted prices

---

[230]  The evaluation of Fusion demonstrated that a $600 discount per Invisalign Comprehensive treatment was not exclusionary even for a dental provider receiving a separate 44 percent discount on Invisalign.

[231]  Murphy, Snyder, Topel, 2015, at p. 89.

[232]  Murphy, Snyder, Topel, 2015, at p. 93.

[233]  Murphy, Snyder, Topel, 2015, at pp. 91, 93.

can be matched by competitors. Specifically, NLP includes options for (i) discounts based on the providers "share-of-chair", and (ii) discounts based on growth of sales.[234] Points accrue over a six-month period and depending on sales over those six months, the dental provider obtains an additional 1 to 4 percent discount on Invisalign.[235] If dental providers do not achieve the growth or share-of-chair targets, then they do not receive this additional minimal discount. Nothing in the program terms required a dental provider to exclusively use Invisalign or notify Align if it chooses to supply other aligners.[236] Even in the version of the NLP program with a share-of-chair-type discount, Align did not offer any additional incremental discounts after a doctor reached 60.1% of orthodontic case starts in a practice – a dental practice could receive the maximum discount under the NLP program while still purchasing 39.9% of its orthodontic appliances from other suppliers.[237] In addition, Align did not price Invisalign below cost, as seen in Figure 22, so other competitors could have matched Align's NLP pricing.

162. KPP was a volume discount program that predated the Advantage Program, which began in 2018.[238] Both programs offered discounts of up to 40 percent depending on the number of qualifying Invisalign treatments purchased in a six-month period.[239] Similar to NLP, providers did not have to opt out of the KPP Program and could stop purchasing Invisalign at any time. Furthermore, with discounts lower than NLP, Align did not price below cost, so competitors could have matched Align's pricing.

---

[234] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292 ("Plus default into Advantage growth bonus discount…Or opt into SoC.").

[235] ALIGNAT-PURCH00755291-299 (NLP to Advantage Transition, September 12, 2018), at 292 ("Semi-annual Advantage tier pricing […] 25%-35% growth → 1% bonus disc […] 30%-39.9% → 2% bonus disc; 40%-49.9% → 3%; 50% → 4%").

[236] See, for example, ALIGNAT-PURCH01824091 (executed agreement for Next Level Provider Program with Conversion Rate Discount); ALIGNAT-PURCH01824097 (executed agreement for Next Level Provider Program with Practice Growth Accelerator Discount).

[237] See, for example, ALIGNAT-PURCH01824091 (executed agreement for Next Level Provider Program with Conversion Rate Discount).

[238] Letter from Adam Reich, Paul Hastings, to Hope Brinn, Berger Montague, *Simon and Simon, PC, et al. v. Align Technology, Inc.*, U.S.D.C. N.D. Cal. Case No. 3:20-cv-03754-VC, December 13, 2022, p. 6.

[239] ALIGNAT-PURCH01319229-230 ("Key Practice Pricing Promotion," July 1, 2015), at 229; ALIGNAT-PURCH00286966-7028 (NA Advantage & Discount Programs Review), at 6976.

### c.  Align's 2018 Contract with Heartland did not Anticompetitively Exclude Competitors

163. Align's 2018 contract with national DSO Heartland did not contain exclusivity provisions. Heartland could switch to using other aligner suppliers at any time.[240]  In fact, the contract likely facilitated competition from competing aligner companies because iTero scanners can be used to submit orders for most competing aligners,[241] and the contract included sale of a large number of iTero scanners to Heartland at discounted prices.  This ensured that many Heartland dental practices would have a scanner that could be used to order aligners.   In addition, sales to Heartland accounted for only 3.6 percent of Invisalign sales.[242]

164. The record indicates that Heartland weighed many options available to it and considered its "leverage."[243]  Heartland expected of a wave of new aligner suppliers before entering the 2018 agreement, but saw Invisalign as "proven" and the "gold standard."[244]  A key stakeholder within Heartland wrote "[w]e have several options of how to go forward on scanners/aligners including as-is (buy some or a lot more iTero's), partnering with other companies (like 3Shape, 3M, Straumann) and various hybrid approaches."[245]  Even after the 2018 contract was signed, Heartland dentists evaluated options, including TRIOS and Primescan scanners.[246]  One leader

---

[240]  ALIGNAT-SNOW00145271-273 (Heartland Dental Align Term Sheet).  See also Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023, at 94:5-7 ("Q. So there was never an exclusive clause with Heartland?  A. There was not.") , 148:4-6 ("Is Align's contract with Heartland Dental exclusive? A. It is not.").

[241]  See Section IV.A.3.

[242]  Sales are calculated from March 15, 2018, the start of the Heartland contract, to March 31, 2022, the end of the Invisalign transaction data.  See backup calculation.

[243]  See HD00008-009 (Internal Heartland Dental email titled "Align update"), at 008 ("Our leverage. Given our already close and important relationships with new entrants like 3M, Danaher, Straumann, and 3Shape, we can continue to purchase largely from a single provider like Align or work towards a hybrid solution for both the scanners and aligners.  [N]ote we have 3Shape scanners highly success [sic] today and we have doctors who use Straumann's ClearCorrect.").

[244]  HD00437-440 (Internal Heartland Dental email titled "Heartland workflow on iTero"), at 437.

[245]  HD00376-377 (Internal Heartland Dental email titled "3Shape and Align"), at 376.

[246]  HD00693 (Internal Heartland email titled "Is iTero really a good scanner for restorative?"); HD00735-736 (Internal Heartland email titled "Multiple Scanner Brands in office"), at 736.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

wrote, while expressly contemplating that some Heartland practices would use multiple scanners at one, "we will always be looking at competitive products as they evolve."[247]

### 3. Plaintiffs' Experts' Analysis of Allegedly De Facto Exclusive Contracts are Fundamentally Flawed

165. Dr. Singer simply assumes that certain contracts have the *potential* to exclude competitors. He does not, however, test whether they meet the economic conditions to be exclusionary and relies on Align's description of the contracts as locking in customers to support his opinion that these contracts are exclusionary. For example, Dr. Singer states that "Align internally self-described that the purpose of these contractual restraints was to 'lock in' a Dental Practice's loyalty and 'lock out' rivals from the Aligner and Scanner Markets. This behavior is consistent with exclusive dealing (or exclusionary practices generally) that economists typically associate with the foreclosure of critical share of key consumers…"[248]

166. Dr. Vogt's analysis of Align's 2018 contract with Heartland is similarly lacking in economic analysis. Dr. Vogt's analysis amounts to stating the terms of the contract and relying on Align executives' description of the contract as "locking in" Heartland.[249] Dr. Vogt does not assess whether the terms of the contract anticompetitively excluded competing aligner companies.

167. Dr. Singer and Dr. Vogt both claim that RRC theory supports their conclusion that Align's challenged discounts are exclusionary. Dr. Singer states:

> Economists analyze exclusionary conduct under a "raising rival's costs" framework. The logic of the framework proceeds as follows: If exclusionary conduct totally or partially "forecloses" competitors from access to either critical inputs or customers— thereby raising their costs directly, or indirectly by denying the rival economies of scale—then the rivals must raise their prices or reduce their output relative to a world where they had access to those inputs and customers.[250]

And Dr. Vogt states:

---

[247] HD00735-736 (Internal Heartland email titled "Multiple Scanner Brands in office"), at 735.

[248] Singer Report, ¶ 123, citing ALIGNAT-PURCH00143594-597, a four-page slide deck from the second half of 2016 where each page is labeled "NA Market Update".

[249] Vogt Report, ¶¶ 320-326.

[250] Singer Report, ¶ 147.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

These kinds of conditional pricing practices, often focused on exclusivity, therefore can lead to foreclosure because they may allow a dominant firm to increase their profits by restraining enough of the market to prevent rivals from becoming as efficient as they otherwise would have been. Because they are less efficient, rivals will have a higher per-unit cost, and will have to, in turn, price their products higher. Therefore, rivals will be unable to constrain dominant firm prices as much as they could have in the absence of the conditional pricing practice.[251]

168. As these quotes acknowledge, RRC theory establishes that various types of discounts may anticompetitively exclude competitors, not that these discounts always anticompetitively exclude rivals. These quotes note two ways that conduct can raise rivals' costs, by denying competitors access to "critical inputs or customers" or by denying competitors "economies of scale." For example, denying a rival access to a material needed for manufacturing the product can raise the rival's costs by forcing them to switch to more expensive production techniques. A competitor can be denied economies of scale if they are anticompetitive excluded from such a large share of the market that what remains is not enough to achieve the size needed to operate efficiently. Neither criterion is, however, met here. Align's at-issue contracts do not deny competitors any critical inputs, nor do they deny competitors access to customers. It is significant in this regard that Align does not have a policy of only supplying customers that agree to exclusively purchase clear aligners from Align. Several Align executives testified that Align has never withheld sales of Invisalign or iTero at list prices.[252] In fact, most of Align's

---

[251] Vogt Report, ¶ 186.

[252] See, Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 122:15-20 ("Q. Did Align ever refuse a sale of Invisalign at its list price of which you're aware? A. No. Q. Did Align ever refuse a sale of iTero at its list price of which you're aware? A. No."); Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023, 146:1-6 ("Q. Are you aware of Align ever refusing to sell iTero at its list price to any customer? A. Absolutely not. Q. Are you aware of Align ever refusing to sell Invisalign at its list price to any customer? A. No, I'm not."); Deposition of Lisa Barry, Global Director of iTero Certified Pre-Owned Solutions, December 14, 2022, at 110:18 ("we have sold at list price"). Dr. Matian of Plaintiff VIP Dental Spas testified that he faced no retaliation for purchasing a competing aligner product, Candid. Deposition of Sherwin Matian, General Dentist at VIP Dental Spas, January 8, 2023, at 28:10-22 ("Okay. Did you receive any specific price increase from Align as a result of prescribing Candid that you're aware of? A No. Q Did you receive any diminution in service from Align as a result of prescribing Candid? A Not that I'm aware of. Q Did you receive -- did anything negative happen to your practice that you're aware of that resulted from you prescribing Candid? … A: Not that I'm aware of."); Deposition of William Simon, Owner of Simon & Simon, January 20, 2023, at 64:6-65:3 ("Q. Did Align change its Invisalign pricing to Simon & Simon as a result of it using ClearCorrect? A. I don't recall. Q. Do you have any reason to believe it did? A. I don't. Nor do I have any reason to believe it didn't. Q. Did Align ever discuss with you your use of ClearCorrect? A. No. Q. Did Align ever discuss with anyone at Simon & Simon that you're aware of, Simon &

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

customers do not receive the discounts that Plaintiffs challenge.  These discounts therefore cannot be characterized as punitive or a tax on non-compliance.

### D. Exclusivity Clauses in Certain Align Contracts and Discount Programs did not Anticompetitively Exclude Competitors

169. Dr. Singer and Dr. Vogt identify discount program terms and conditions and DSO contracts as having exclusivity clauses.  The actual clauses included in these contracts are as follows:

    i. "In Good Standing" Provisions: These provisions specify that providers must "maintain good standing" to be on the list of searchable providers on Invisalign.com's "Find a Doctor" tool.  One way to lose good standing is "diversion of prospective patients into non-Invisalign treatment."[253]

    ii. Exclusivity in Marketing:  These clauses specify that Invisalign must be the exclusive clear aligner the dental provider or organization promotes and/or markets.[254]

    iii. Exclusivity in Purchasing and Selling Aligners: These clauses specify that the dental provider or organization must exclusively offer clear aligners from Align.[255]

170. All of these programs are optional and none has a required duration.  Violating the "In Good Standing" provisions would remove the doctor from the "Find a Doctor" tool on Invisalign.com.  There is no evidence that inclusion in Invisalign's "Find a Doctor" tool is

---

Simon's use of ClearCorrect? A. Not that I'm aware of. Q. So sitting here today, you can't think of anything specifically that Align did to Simon & Simon as a result of its use of a competitive clear aligner? MR. RADICE: Objection. You can answer. THE WITNESS: I have no knowledge of any such activity.")

[253] See, for example, ALIGNAT-PURCH01970731-738 (Special Markets Group Provider Growth Program, Aspen Dental), at 735 ("In order for Invisalign providers to be listed within the Find a Doctor tool, Invisalign providers must maintain good standing, as solely determined by Align. Not maintaining good standing may include without limitation, non or untimely payments, misuse of Invisalign brand, violation of Align's art and advertising guidelines, diversion of prospective patients into non-Invisalign treatment, questionable business practices or other similar items.").

[254] See, for example, ALIGNAT-SNOW00765024-032 (Enterprise Account Group Discount Program, Heartland Dental), at 024 ("During the Program Period, Align will be Dental Service Organization's primary supplier for clear aligner product, and Align's clear aligner product will be the only clear aligner product that is promoted through Dental Service Organization's marketing efforts to its supported locations and doctors and to patients publicly.").

[255] See, for example, ALIGNAT-PURCH00755902-909 (Reingage/AACA Program Summary, July 1, 2019), at 902 (dental provider must "commit[] to not using any competitive clear aligner or retainer marketing materials in their office and to not using competitive clear aligners or retainers for the duration of the Program.").

sufficiently valuable to compel a dental provider to maintain exclusivity, or that this provision was enforced.[256]

171. Dr. Singer and Dr. Vogt identify two contracts of the second category because they include exclusivity language regarding promotion and marketing of other clear aligners.[257] The contracts clearly specify that the dental providers do not need to exclusively provide Invisalign. The 2020 Smile Doctors contract states that the "Doctor shall retain the sole and exclusive discretion to recommend and provide dental or orthodontic services to any individual according to Doctor's own professional and clinical judgment" and "[t]his is not an exclusive arrangement … Doctor may recommend third-party orthodontic products and services to these individuals."[258] Similarly, the MB2 contract states "nothing in this agreement obligates any Dental Organization doctor to prescribe Invisalign treatment… Nothing herein is intended to interfere with any Dental Organization doctor's professional judgement or decision-making."[259] Dr. Singer also identifies a 2018 contract with Heartland, but the contract states:

███████████████████████████████████████████████████████████████████████████
██████████████████████████████████████, "[260]

---

[256] I understand that this provision was intended to prevent the switching of patients who requested Invisalign to other aligners. See Deposition of Joseph Megan, Align's Global Retainers Business Lead, February 23, 2023, 106:9-107:7 ("Q. Okay. If this term was in a contract, would that mean a doctor's not allowed to sell aligners from other brands? A. No. I wouldn't say this prevents them from selling other brands of aligners. Q. Isn't that diversion of prospective patients? A. Well, they -- they may get -- they may get patients into their office who don't even know what Invisalign is or don't even mention Invisalign, and so I wouldn't say that's a prospective Invisalign patient. And -- and also, you know, I -- we wouldn't even really know -- Q. Okay. A. -- if it was a prospective patient and if it did go into a non-Invisalign treatment. So it's -- you know, so they -- I think at the end of the day . . . on the patient that doesn't come in asking for Invisalign, they can do whatever they want. And on the patient that does ask for Invisalign, you know, yes, this term's here, but we -- we don't really know what they do with that patient. We didn't -- as far as I recall, we didn't police any of this.").

[257] Align's contract with the DSO MB2 and its 2020-2021 contract with Smile Doctors both contain the language "dental organization independently and voluntarily elects to exclusively market and promote clear aligners from Align." ALIGNAT-PURCH01968912-924 (Special Markets Group Discount Program, MB2), at 912; ALIGNAT-PURCH01968976-984 (Amendment 2 to the Special Markets Group Provider Discount Program, Smile Doctors LLC), at 976.

[258] ALIGNAT-PURCH01968976-984 (Amendment 2 to the Special Markets Group Provider Discount Program, Smile Doctors LLC), at 980.

[259] ALIGNAT-PURCH01968912-924 (Special Markets Group Discount Program, MB2), at 912.

[260] ALIGNAT-SNOW00765024-032 (Enterprise Account Group Discount Program, Heartland), at 024 [emphasis added].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

172. Dr. Singer and Dr. Vogt also identify discount programs and DSO contracts that include exclusivity clauses regarding Invisalign purchases.  For example, the Reingage/AACA Program terms and conditions state that the dental provider must "commit to not using any competitive clear aligner or retainer marketing materials in their office and to not using competitive clear aligners or retainers for the duration of the Program"[261] and Align's contract with My Orthos states:[262]

> Dental Organization independently and voluntarily elected to offer its patients clear aligners exclusively from Align. Dental Organization understands and agrees the discounts afforded to it under this Special Markets Group Provider Growth Program are based on that Dental Organization purchasing clear aligners exclusively from Align, and achieving the minimum Qualifying Treatments targets as set forth below.

173. Figure 25 summarizes the eight Align discount programs with such clauses.

---

[261]  ALIGNAT-PURCH00755902-909 (Reingage/AACA Program Summary, July 1, 2019), at 902.

[262]  ALIGNAT-PURCH01968930-940 (Special Markets Group Provider Growth Program, My Orthos, November 2, 2020), at 939.

**Figure 25: Discount Programs with Exclusivity Clauses**

| Program | Summary | Start Date | End Date |
|---|---|---|---|
| Bracket Buy Back Promotion | $300 per Invisalign case discount for doctors who substitute metal braces for Invisalign. | 11-May-20 | 31-Dec-21 |
| Elite Doctor Program | Discounts and exclusive pricing on Invisalign, retainers, and scanners for earning 1 million+ Advantage points in 12 months. | 1-Jul-20 | 31-Dec-22 |
| Go Forward | Discounts of 8% or 18% on Invisalign Go cases, depending on the number of ClinCheck accepted cases. | 1-Jul-20 | 30-Jun-21 |
| GP Accelerator | Incremental discounts of 8-40% on eligible Invisalign cases depending on volume milestones and contingent on doctors advancing at least one Advantage tier. | 1-Jan-20 | 30-Jun-21 |
| Marketplace Development Pilot | Five practices receive Invisalign at 40% off and one iTero scanner for $19,999 to jump start their new retail establishments, contingent upon their meeting an annual purchase commitment of 300 eligible cases. | 1-Jul-18 | 1-Mar-20 |
| Reengage/AACA | GPs who complete training receive an incremental discount of 3-4%, depending on Advantage tier status. Can earn an additional 1% rebate if doctor jumps one Advantage tier in 6-month program period. | 1-Jul-19 | 30-Jun-21 |
| Tipping Growth Accelerator | Credit equal to incremental Advantage tier advancement if the dentist advances at least one Advantage tier in the applicable period. | 1-Jul-19 | 30-Jun-21 |
| Welcome Back | Doctors are awarded 1,000 Advantage points per competitors' product sold during preceding 3-month period. Additionally, select Invisalign products are offered at a discount. | 1-Mar-21 | 30-Jun-21 |

Sources: See backup for sources.

174. Half of the eight discount programs with exclusivity clauses in their terms and conditions were effective for a year or less. Significantly, dental providers could stop participating in any of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the programs at any time.[263]  The discounts did not deny competitors access to critical inputs, customers, or the scale needed to compete.  There is no suggestion that equally efficient rivals had to offer prices below costs to compete for sales.

175. Figure 26 indicates that the DSO contracts involve a small number of participants for limited time periods.

---

[263] See ALIGNAT-PURCH00747133-135 (Bracket Buy Back Program 2020 Terms and Conditions); ALIGNAT-PURCH00580758-761 (Align Technology Terms and Conditions For Elite Doctor Program), at 758; ALIGNAT-PURCH00759698-701 (Go Forward Program 2020 Terms and Conditions); ALIGNAT-PURCH01965812-816 (Marketplace Development (Advanced Commitment Pricing Test Model)); ALIGNAT-PURCH00026657-661 (Reingage Pilot Program Terms and Conditions); ALIGNAT-PURCH00023143-148 (Tipping Growth Accelerator Pilot Program Terms and Conditions); ALIGNAT-PURCH000329400-406 (Welcome Back Program 2020 Terms and Conditions).

**Figure 26: DSOs with Contracts with Exclusivity Clauses**

| Program | Start Date | End Date |
|---|---|---|
| ███ | 1-Jul-20 | 30-Jun-23 |
| ██ | 1-Jan-20 | 31-Dec-22 |
| ███ | 17-Jan-21 | 31-Dec-23 |
| ████ | 23-Dec-20 | 22-Dec-23 |
| ██ | 1-Jan-21 | 31-Dec-23 |
| █████ | 1-Apr-21 | 31-Dec-24 |
| ███ | 30-Oct-20 | 30-Mar-24 |



Sources:

176. The maximum percent of Invisalign revenue to dental providers in DSOs with exclusivity clauses was 4.2 percent in the first quarter of 2022, as seen in Figure 27.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



177. A maximum of 1.0 percent of dental providers who purchased Invisalign in a given quarter were members of a DSO with contracts with exclusivity clauses. The exclusivity clauses in these seven DSO contracts are therefore insufficient to anticompetitively exclude competitors.

178. 

---

264 Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023, 151:2-6 ("Q. Is there any system for monitoring whether exclusivity provision in a DSO correct is being fulfilled? A. Admittedly, no. There's no way for us to monitor. It's more subjective."); Deposition of Mu Li, Align VP Of Global Business Development, Strategy, Analytics, and Insights, December 20, 2022, 142:15-20 ("We don't – you know, scanners produce STL files, and they are either sent directly to a lab or downloaded, extracted as STL file. It could then become any file you can send and use however you want. So there's – it's really no way of enforcing kind of the exclusivity of where the scan goes.").

265 Align executives stated that Align has never brought up anything related to exclusivity with customers, since ultimately, the choice of aligner that gets used is up to the doctor. Deposition of Martin Pater, Align Senior Manager of Pricing, December 22, 2022, 23:2-18 ("Q. Has Align ever offered promotional programs that include requirements that dentists not use competing clear aligners? … A. We've – we've never -- never enforced any -- any clauses like that. Q. For the record, for time purposes I will say that when I ask a question about time, I'm referring to -- such as ever, I'll be referring to the time during which you worked at Align. I'm

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████

### 1. *Plaintiffs' Experts' Analysis of Exclusivity Clauses are Fundamentally Flawed*

179. As discussed above, claims of anticompetitive exclusion based on pricing practices and other conduct require rigorous analysis. Dr. Singer simply assumes that exclusivity clauses, entered into voluntarily, anticompetitively excluded rivals, and he states that "exclusive contracts are exclusionary on their face."[267] Dr. Singer's cursory approach ignores the well-understood principles that the degree of anticompetitive exclusion depends on factors such as the length of the contract, the ability to cancel the contract, and whether contractual terms are enforced.[268] Dr. Singer fails to analyze these factors or support his claim that the clauses raised rivals' costs.

180. Dr. Vogt states that contracts with exclusivity clauses "raised rivals costs and had the effect of weakening competition between Align and new entrants in the market."[269] Dr. Vogt also claims that "[e]xclusive contracts can exclude as-efficient competitors even when prices are not predatory."[270] But his example to justify his claim assumes that customers would purchase

---

not asking you for a period prior to that. What do you mean by "never enforced?["] A I've never seen an instance where we've ever brought up anything related to exclusivity with the customer."); Deposition of Simon Beard, Align EVP for the Americas, December 22, 2022, 113:3-7 ("So when we're talking about exclusivity, we're just referring to really a commitment to the next – an executive level that they, you know, that they'll, you know, support the use of Invisalign. But ultimately, it's the doctor's choice.").

[266]  For example, Dr. Mark Lowe purchased both ClearCorrect aligners and Invisalign every quarter from the first quarter in 2017 to the third quarter in 2021 except for one, even though he was in programs with exclusivity clauses (Ortho Tipping in 2021 and iTero Q1 Case Submission Promotion in the first half of 2018) and allegedly de facto exclusivity (Volume Discount Program in 2017 and 2018). Other examples of dentists that purchased ClearCorrect aligners and Invisalign while enrolled in at-issue contracts include Dr. David Ostreicher, Dr. Richard Jacobson, and Dr. Jared Theurer. See backup calculation.

[267]  Singer Report, ¶ 149.

[268]  Jacobson, Jonathan M., "Exclusive Dealing, 'Foreclosure,' and Consumer Harm," Antitrust Law Journal, Vol. 70, 2002, pp.312-369, at pp. 351-352 ("Two related factors long recognized as bearing significantly on the likely effect of an exclusive dealing agreement are the agreement's duration and the terms on which termination may be accomplished.")

[269]  Vogt Report, ¶ 690.

[270]  Vogt Report, ¶ 692.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

an equal amount of the incumbent and entrant's products. Many dental practices exclusively sell competing aligners or exclusively use competing scanners, demonstrating that this assumption does not apply. Even with inapplicable assumptions, Dr. Vogt oddly concludes that exclusivity discounts "can foreclose competition even if the discount itself is above cost and even if competitors are still able to enter the market."[271]

### 2. *Efficiencies from Discount and Marketing Programs*

181. The record provides evidence of efficiency-enhancing gains from various contracts between Align and its customers.[272] Align advertises Invisalign through various sources, including television, social media, and allowing doctors to use the Invisalign brand in their own marketing.[273] Such advertising is targeted to reach end consumers,[274] who may then ask their dentist or orthodontist about Invisalign or turn to the Invisalign doctor locator service to find a local provider. Such advertising is subject to free-riding by providers who benefit from greater demand but who switch patients to rival aligners.[275]

---

[271] Vogt Report, ¶ 700.

[272] These gains would also apply to de facto exclusivity, although for the reasons above I do not find de facto exclusivity present.

[273] Align Technology, "Align Technology Expands Its 'Invis Is' Consumer Advertising Campaign With New Creative and Influencers Focused on Teens, Moms, and Young Adults [Press Release]," May 14, 2021, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-expands-its-invis-consumer-advertising-campaign ("[New campaigns] build on the 2020 campaign and include new mom and young adult targeted TV spots, influencer-led YouTube and social media content, and digital advertising campaigns to engage teens and young adults where they spend their digital time.").

[274] Align Technology, "Align Technology Expands Its 'Invis Is' Consumer Advertising Campaign With New Creative and Influencers Focused on Teens, Moms, and Young Adults [Press Release]," May 14, 2021, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-expands-its-invis-consumer-advertising-campaign ("[New campaigns] build on the 2020 campaign and include new mom and young adult targeted TV spots, influencer-led YouTube and social media content, and digital advertising campaigns to engage teens and young adults where they spend their digital time.").

[275] 3Shape_Antitrust_Simon_00394034-042 (Medical Technology – Greater New York Dental Day – Key Takeaways), at 036 ("In speaking with ALGN on this topic yesterday, our sense is that management is increasingly focusing on renewed OTC efforts and especially on efforts that would focus the patient on making sure they (the patient) are receiving true lnvisalign brackets and aren't being switched into cheaper alternatives by dentists/orthos who may be using a bait-and-switch advertising strategy."). As one customer recounted from a competing aligner brand: "[3M] think they can ride the Invisalign marketing spend by given the doctor a cheaper alternative with a project just as good. In their view: White coat + 3M brand overcomes the Invisalign ask from the patient." HD00120-121 (Internal Heartland Dental email titled "3M – Clarity"), at 121.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E. Summary

182. Considering the at-issue conduct as a whole, my analysis has demonstrated that Align did not anticompetitively exclude competitors from sales of aligners or scanners.  The TOI did not sacrifice profits.  Indeed, Align benefited from the reduction in operability even without considering the patent litigation and efficiencies.  There is no evidence of below-cost pricing for any of the bundled or volume discounts.  I understand that all of the programs, which generated large first-order gains for consumers, could be cancelled at any time.[276]  The Fusion Program and the DSO contracts (including Align's contract with Heartland) attracted buyers who accounted for 19 percent of Invisalign sales or less in a quarter.[277]

183. Align's rivals have had ample opportunities to compete for existing Align customers and new customers.  They could, of course, compete for sales before buyers entered into the Fusion Program and the discount programs or DSO contracts, i.e., on an ex-ante basis.  They also had the opportunity to compete on an ex-post basis, i.e., for sales after buyers entered into the program given that, for example, the Fusion Program allowed buyers who had reached their yearly targets to order from rival aligner suppliers and still receive the discount on their scanners.  The record provides evidence of rivals, e.g., Straumann (maker of ClearCorrect aligners) and Great Lakes Dental, being viable suppliers of aligners at relatively small scale. ███████████████████████████████████████████████████████████ ████████████████████████████████████████.[278]  The record also includes evidence of rapid gains in market share, e.g., Medit, by new scanner manufacturers.

---

[276] Deposition of Martin Pater, Align Senior Manager of Pricing, December 22, 2022, 175:15-176:10 ("Q. For all of these programs that we talked about, GP Accelerator, AP 360, Teen 360, Staff Discount, Teen Guarantee, Up and Comer, Next Level Partnership, Private Practice Contracting Pilot, Tipping Growth, Teen Awareness [sic], SSG, Elite Doctors, Bracket Buy Back, and Reingage AACA, were doctors ever required to join those programs? A. No. Q. Were doctors who did join those programs ever required to stay in those programs? A. No. Q. Did doctors who joined those programs retain discretion to prescribe whatever treatments they would like? A. Yes. Q. And I believe you had said that Align never enforced that language that Mr. Pierce had asked you about earlier regarding competitive clear aligner products and competitive aligner marketing materials; is that correct? A. That's correct."); 183:1-5 ("Q. Okay.  And the Advantage Program, are doctors required to participate that that program? A. No, they are not. Q. Are doctors free to leave that program? A. Yes, they can opt out.").

[277] See backup calculation.

[278] CDB, "Aligner," available at https://cdbcorp.net/beispielseite-2-2-2/; CDB0000001 (CBD Corporation transaction data) (reflecting aligner sales beginning in 2021).

184. Dentists and other buyers have options to purchase aligners and scanners from multiple suppliers, several of whom offer both products, or manufacture their own aligners. Many of Align's customers buy at list prices and therefore have no financial disincentive to buying products from Align's rivals. The dental providers who used 3Shape's scanner to submit orders for Invisalign products had multiple options. The data on FDA approvals indicate that buyers have yet greater options in the near term.

185. Lastly, I emphasize that the programs Dr. Singer considers exclusionary provided discounts to customers of at least $674 million from January 2019 to March 2022 and the programs Dr. Vogt considers exclusionary provided discounts to customers of at least $361 million from July 2018 to March 2022.[279]

## VI. DR. SINGER'S AND DR. VOGT'S APPROACHES TO INJURY AND DAMAGES ARE UNRELIABLE

### A. Injury and Damages

186. Antitrust injury is a yes or no determination. If individuals paid higher prices for an aligner or scanner in the *actual world* (with the alleged conduct) than the prices they would have paid in *but-for world* (absent the alleged conduct), then individuals suffered injury. Conversely, if the prices paid in the actual world are less than, or equal to, the prices they would have paid in the but-for world, then the individuals did not suffer injury.

187. Conditional on an individual purchaser suffering antitrust injury, the amount of damages on a specific purchase is the *overcharge*, measured by the difference between the actual price and the but-for world price:

$$\text{Overcharge} = \text{Price in Actual World} - \text{Price in But–For World}$$

If an individual purchaser pays $2,000 in the actual world and would have paid $1,800 in the but-for world, then the overcharge is $200, which may be expressed as a 10 percent difference.

---

[279] See backup calculation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## B. Specification of the But-For World

188. In specifying the but-for world, the guiding principle is to remove only the alleged conduct and its effects. This corresponds to the concept of *ceteris paribus*, meaning that factors unrelated to the alleged conduct should be held constant.

189. Regarding the conduct to be removed, Plaintiffs allege that the TOI and various discount programs and contracts with customers that included discounts are illegal. Plaintiffs claim that the conduct anticompetitively excluded Align's aligner and scanner competitors, allowing Align to raise prices above what they would have been absent the allegedly exclusionary conduct.

190. A properly constructed but-for world must therefore consider how Align would have priced in the absence of the alleged exclusionary conduct. A but-for world should specify (a) how Align would change its list prices and when, and (b) how discounts would change. This important task for Plaintiffs should take into account what kinds of discounts would not be anticompetitive in the but-for world and how Align would adjust its pricing. For example, if the Fusion Program, with its conditional discounts on iTero scanners, were removed from the but-for world, it would not be in Align's interests to offer the same discounts.[280]

191. Put somewhat differently, is important to evaluate how Align would have adjusted not just the at-issue discounts, but also list prices and discounts that are not at-issue. Some Align customers received at-issue discounts, others received discounts that are not at issue, and yet others paid list prices and received no discounts. The importance of such differences can be explained more concretely using a hypothetical with three customers, each of which purchased $120,000 dollars of products from Align valued at list prices. Customer A received $30,000 dollars of at-issue discounts, Customer B received $30,000 of other discounts, and Customer C received no discounts. Customers A and B therefore paid a net price of $90,000 and Customer C paid a net price of $120,000, for total net sales of $300,000.

---

[280] See, for example, Bernheim and Heeb (2015), p. 13 ("Any provisions in an arrangement between the market leader and a customer that restrict the customer's freedom to do business with other vendors leaves the customer worse off, ceteris paribus. The customer will not enter into such an agreement voluntarily unless the market leader compensates it for that loss, thereby sacrificing profits.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

192. Figure 28 shows the actual-world in the upper left-hand corner and three different but-for worlds in the other quadrants. In each but-for world, each customer buys the same products, but the issue of injury differs across the three specifications.

**Figure 28: Hypothetical Example of Variation in Injury in the But-For World**

| Actual World | | | | | But-For World #1: All Harmed | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Customer | | | | | Customer | | | |
| | A | B | C | Total | | A | B | C | Total |
| List Price | 120 | 120 | 120 | 360 | List Price | 110 | 110 | 110 | 330 |
| At-Issue Discounts | 30 | | | 30 | At-Issue Discounts | | | | 0 |
| Other Discounts | | 30 | | 30 | Other Discounts | 25 | 35 | | 60 |
| **Net Price** | **90** | **90** | **120** | 300 | Net Price | **85** | **75** | **110** | 270 |

| But-For World #2: Customer A Not Harmed | | | | | But-For World #3: Customer C Not Harmed | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Customer | | | | | Customer | | | |
| | A | B | C | Total | | A | B | C | Total |
| List Price | 100 | 100 | 100 | 300 | List Price | 120 | 120 | 120 | 360 |
| At-Issue Discounts | | | | 0 | At-Issue Discounts | | | | 0 |
| Other Discounts | | 30 | | 30 | Other Discounts | 40 | 50 | | 90 |
| Net Price | **100** | **70** | **100** | 270 | Net Price | **80** | **70** | **120** | 270 |

   i. In but-for world #1 in the upper-right quadrant, Align lowers list prices, eliminates the at-issue discounts, and introduces other discounts. The combination of changes means that each customer pays lower net price than the price paid in the actual world.

   ii. In but-for world #2 in the lower-left quadrant, the at-issue discounts are eliminated, other discounts stay the same, and list prices are decreased. The combination of changes means that Customer A would not have suffered antitrust injury, but Customers B and C would have suffered injury.

   iii. In but-for world #3 in the lower-right quadrant, list prices are unchanged and discount programs are increased. This combination of changes means that Customers A and B would have suffered injury, but Customer C would not.

193. In sum, the specification of the but-for world is important and average effects can mask differences in whether customers suffered injury. I note that timing of price changes between the actual world and but-for world may also be relevant. In this regard, Dr. Singer and Dr. Vogt both assume that there was a delay between when the at-issue conduct anticompetitively

excluded competitors and when Align raised its prices.  Dr. Singer concludes that "the record evidence indicates that the anticompetitive price effects of the Challenged Conduct would not be instantly felt by purchasers," and he assumes the conduct takes one year to raise prices.[281] Dr. Vogt does not assume a specific delay between the at-issue conduct and Align's price increases, but he finds that Invisalign prices were inflated starting in July 2018.

## C. Methods

194. Several economic methods may be useful in assessing whether purchasers suffered antitrust injury and the overcharges they paid.  These include *before-during* regression models, as offered by Dr. Singer, and benchmark analyses, like Dr. Vogt's.

195. A regression model is a common statistical tool that "enables one to uncover the relationship between a dependent variable (the outcome being modeled, such as prices) and one or more explanatory variables (the potential influences on the dependent variable, such as anticompetitive conduct, supply factors including costs or capacity, and demand factors)."[282] Regression models attempt to isolate the effect of a single factor by controlling for other factors that are changing at the same time.  According to the American Bar Association, "when correctly implemented, econometric techniques [such as regression models] can isolate and measure the effect of a single explanatory factor—such as the impact of the alleged conduct— on the economic outcomes that are relevant when estimating damages."[283]

196. A benchmark analysis "compares the outcome of interest (e.g., price) in the affected market to that same outcome in an unaffected benchmark market."[284]  Benchmarks may come from sales of the same product in different time periods, in different geographies, or from related product markets.  Benchmarking may be "particularly useful if there are inadequate data for the before

---

[281] Singer Report, ¶ 193.

[282] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, p. 123.

[283] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, pp. 123-124.

[284] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, p. 186.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

period, so that a before-during approach cannot reliably be performed."[285]  According to the American Bar Association:[286]

> The benchmark market (or markets) can be a different geographic area or a different end-use market, although when using a different end-use market it can be particularly challenging to control sufficiently for all of the differences between the markets.  The key is that the benchmark markets, however chosen, were unaffected by the alleged anticompetitive conduct. Further, the benchmark and affected markets should be characterized by sufficiently comparable economic conditions (at least after controlling for observable factors) such that prices in those markets would have been identical had there been no anticompetitive behavior.

Given the challenges of controlling for differences that are unrelated to the alleged conduct, I favor using multiple benchmarks.

197. The main criteria to determine whether a particular method is reliable include the following:

    i.  The method should accurately reflect the theory of harm.

    ii.  The but-for world should be specified properly so that the method isolates the effects of the alleged conduct.

    iii.  Control variables should be included in the analysis to account for factors that are unrelated to the alleged conduct.

    iv.  The analysis should use sound data.

    v.  Statistical and econometric principles should be followed.

    vi.  The results should be robust to small changes in the specification and changes in the data used for the estimation.

    vii. The method should not generate false positives and non-sensical results.

198. In matters involving class certification, an additional issue is highly relevant:  Do estimates of the average overcharges represent common evidence of injury?  A well-specified method that meets the criteria identified above may not represent common proof of injury because the average overcharge masks cases of no injury.  This is not surprising because a regression

---

[285] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, p. 186.

[286] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, p. 186.

estimates central tendencies. Potential lack of commonality may relate to groups of consumers, time periods, and individuals who differ based on various characteristics. There are accepted methods for testing whether an average overcharge is proof of common, class-wide injury.[287]

### D. Dr. Singer's Analyses of Damages from the Alleged Antitrust Injury

199. In this subsection I evaluate Dr. Singer's approach to estimating damages to DPPs from the at-issue conduct. I first describe carefully Dr. Singer's regression models and then evaluate their reliability. I find that Dr. Singer's damages analysis fails to reliably estimate the difference between actual and but-for prices, is not robust to reasonable changes, and produces nonsensical results.

### 1. Summary of Dr. Singer's Approach to Estimating Damages

200. Dr. Singer presents a total of four regressions that estimate average overcharges for Invisalign products and iTero scanners using two different models:

i. The "TOI Model", which claims to test whether Align's TOI in isolation caused overcharges on the two products;[288] and

ii. The "Exclusivity Share Model", which claims to test whether the share of dental practices "locked in" to Invisalign and iTero scanners due to the alleged challenged conduct (TOI, exclusionary contracts, and bundled rebate programs) caused overcharges on the two products.[289]

### a. The TOI Model

201. Dr. Singer describes his TOI Model as follows:

My first overcharge model tests the hypothesis that, holding other relevant factors constant, Align's TOI resulted in inflated Invisalign prices. The dependent variable to be explained is the average price (after discounts) of a particular Invisalign transaction.

---

[287] See, for example, Cremieux, Pierre, Ian Simmons, and Edward A. Snyder, "Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis," *George Mason Law Review*, Vol. 17, No. 4, pp. 939-967.

[288] Singer Report, ¶¶ 176, 189.

[289] Singer Report, ¶¶ 177, 190.

> The key independent variable of interest ("TOI") captures if the transaction occurred before or one year after the TOI went into effect….[290]

Dr. Singer estimates the model separately for aligners and scanners.

### i. Aligner TOI Model

202. Each observation in Dr. Singer's regression is a direct purchase of an individual Invisalign treatment for a patient by a dental practice.  Over the period January 2013 to March 2022,[291] there are approximately 5.3 million such observations in the Invisalign transaction data.[292]

203. The dependent variable is the log of the price paid by the dental practice for an Invisalign treatment.  After July 1, 2016, this is the price net of discounts and rebates.  Prior to July 1, 2016, the price is the list price minus certain rebates that are available starting in September 2015.[293]  Before September 2015, the price is the list price.

204. The conduct variable – the variable of interest – is a so-called *dummy variable* that takes on the value of 0 in the before period defined as ending in 2018 and 1 in the during period starting in 2019.  The TOI model therefore *assumes* that TOI influenced prices approximately one year after termination was announced (in December 2017) and implemented (at the end of January 2018).  Because the dependent variable is logs, the estimated coefficient on the conduct variable is approximately equal to the average overcharge in percentage terms.  (An estimated coefficient of 0.067 would correspond to a 6.5 percent overcharge.)[294]

205. The control variables Dr. Singer uses to "hold … other relevant factors constant" are:[295]

    i. Invisalign cost of goods sold divided by Invisalign revenue each quarter.

    ii. The sum of Align's research and development spending and marketing expenses since 2010, measured each quarter.

---

[290]  Singer Report, ¶ 189.

[291]  Singer Report, ¶ 154.  Dr. Singer incorrectly states that the data end March 2023, not 2022.

[292]  Singer Report, Table 15 on p. 96.

[293]  See backup to Singer Report (1-3_Import_Advantage_Rebate_Data.do).

[294]  Where overcharge % = ln[coeff+1].  See Singer Report, footnote 410.

[295]  Singer report, ¶¶ 196-198.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

    iii. The average income in the county of the dental practice ordering the aligners.

    iv. Dummy variables for the type of scan used to order the aligners. There are five types of scan: PVS or one of four scanners – 3M, 3Shape, Dentsply Sirona, or iTero.

    v. Dummy variables for the ten different Invisalign products: Assist, Comprehensive, Express Five, Express Seven, Express Ten, Go, Lite, Moderate, Multi-Stage Comprehensive, and Teen.

    vi. Approximately 48,000 dummy variables for each unique customer.[296]

    vii. A linear time trend.

206. Dr. Singer's TOI Model for Invisalign yields a coefficient of 0.074 on the conduct variable of TOI, which implies that Invisalign net prices would have been 7.1 percent lower had Align not terminated interoperability with 3Shape.[297] To estimate aggregate damages, Dr. Singer applies this percentage markup to total sales during the period January 2019 to March 2022.

### *ii. Scanner TOI Model*

207. Dr. Singer's TOI Model regression for scanners is similar to the regression for aligners, with the following differences:

    i. The dependent variable is the log of the average net price of scanners. Unlike customized aligners, transactions may be purchases of more than one scanner, so it is necessary to calculate the average price of the scanners in a single transaction. There are approximately 30,000 iTero transactions in the data, which span from April 2013 to June 2021.

    ii. There is no control variable for average income in the purchaser's county.

    iii. In place of dummy variables for the type of scan, there are dummy variables for the type of buyer, either a reseller (such as a DSO or financing company) or a SmileDirectClub purchaser.

    iv. In place of the dummy variables for the type of Invisalign product, there are dummy variables for the iTero model being sold (Dual, iOC, iTero, iTero Element, iTero Element 2, iTero Element 5D, or iTero Element Flex).

---

[296] See Backup to Singer Report (T16_T19_T24_T26_AppT2-5_Aligner Regression Results.xlsx).

[297] Singer Report, ¶ 235. Where overcharge % = ln[coeff+1]. See Singer, fn 410.

   v.  There are dummy variables for the service package included with the scanner.  Service packages can be one, two, three, or five years.

   vi.  No dummy variables for customers are included because, according to Dr. Singer, "many Dental Practices make only a single purchase of an iTero Scanner, rendering use of customer fixed effects inappropriate."[298]

208.  When Dr. Singer estimates the TOI Model for iTero, he finds that the coefficient on TOI is 0.073, which would implies that net prices would have been 7.0 percent lower had Align not terminated interoperability with 3Shape.[299]  To estimate damages, Dr. Singer applies this average overcharge total sales during the proposed class period of January 2019 to March 2022.

### b.  Dr. Singer's Exclusivity Share Model

209.  Dr. Singer describes his Exclusivity Share Model as follows:

   My second model is identical [to the TOI Model] except for a change in the key independent variable.  This model tests the hypothesis that, holding other factors constant, the share of Dental Practices "locked in" to the Align family of products (as measured by the iTero Exclusivity Share) is positively associated with Align's prices for Invisalign.  The key independent variable of interest ("Exclusivity Share") is the share of Invisalign order volume submitted through Dental Practices that only use an iTero Scanner.[300]

   Dr. Singer estimates the regression model separately for aligners and scanners.

### i.  Aligner Exclusivity Share Model

210.  Dr. Singer calculates the Exclusivity Share" as the Invisalign sales on a monthly basis ordered by doctors who only use an iTero scanner (with or without also ordering via PVS) divided by all Invisalign sales ordered with a scanner (i.e., ignoring sales ordered with PVS).  Dr. Singer claims the Exclusivity Share measures "Align's ability to lock in Dental Practices to the Align family of products."  Like the TOI variable, the Exclusivity Share variable is also lagged one year, implying that changes in exclusivity share take a year to affect Align's prices.

---

[298]  Singer Report, ¶ 206.

[299]  Singer Report, ¶ 211.

[300]  Singer Report, ¶ 190.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

211. Because Exclusivity Share is not a measure of Align's at-issue conduct, Dr. Singer must predict how the Exclusivity Share would be different absent the at-issue conduct. To do so, he estimates a second regression that explains the Exclusivity Share, the dependent variable, as a function of the following variables:[301]

    i. Dr. Singer's estimate of "the share of all U.S. Invisalign sales foreclosed through an exclusionary or bundling contract," which I will refer to as the "At-Issue Exclusive Contract Share."

    ii. Dummy variables for the periods during which 3M's True Definition scanner and Dentsply Sirona's Omnicam scanner were interoperable with Invisalign (after March 2014 and June 2015, respectively).

    iii. 3Shape's share of US Invisalign submissions.

The regression is estimated using 103 monthly observations from September 2013 to March 2023.[302]

212. Dr. Singer uses the results of this second regression to estimate the but-for Exclusivity Share if the At-Issue Exclusive Contract Share were zero and 3Shape's share of US Invisalign submissions were the same as its share in the rest of the world. Interoperability between 3Shape scanners and Invisalign was not discontinued in the rest of the world and the share of Invisalign submissions outside the US increased over time, to approximately 12 percent in 2021.[303] Figure 29 shows Dr. Singer's actual and but-for Exclusivity Shares.

---

[301] Singer Report, ¶¶ 183, 185, and 186.

[302] Dr. Singer also proposes an alternative regression for predicting Exclusivity Share that uses a dummy for 3Shape interoperability in place of 3Shape's share of US Invisalign submissions (Singer Report, ¶¶ 182-184). Dr. Singer does not use this approach when he generates the primary damages estimates he reports.

[303] Singer Report, Figure 17 on p. 91.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 29: Dr. Singer's Actual and But-for Exclusivity Shares**



Source: Singer Report, Table 14 on p. 91.

213. Dr. Singer then replaces the actual values of the Exclusivity Share with his estimated but-for Exclusivity Share, yielding an estimate that Invisalign prices would have been 10.0 percent lower during the Class Period absent the at-issue conduct.[304] Dr. Singer then applies his average overcharge to net revenue during the class period (not including rebates) to obtain his damages estimate.

### ii. Scanner Exclusivity Share Model

214. Dr. Singer's Exclusivity Share Model regression for scanners is similar to the regression for aligners, with the same six changes made for the scanner version of his TOI Model. Dr. Singer calculates the overcharge for scanners the same as for aligners, using his estimate of the but-for exclusivity share. Dr. Singer estimates that iTero prices would have been 11.8 percent lower during the Class Period absent the at-issue conduct.[305]

---

[304] Singer Report, ¶ 202.

[305] Singer Report, ¶ 211.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E. Evaluating Dr. Singer's Overcharge Models

215. Economists have developed widely recognized standards for evaluating the reliability of regressions used to estimate average overcharges.[306]  At a high level, these standards – based on the criteria identified at the beginning of this Section – involve ensuring that the econometric model is reliable.  As explained below, Dr. Singer's regression models do not "work" for three main reasons.

216. First, his models do not reliably isolate the difference between the actual and but-for prices. Put differently, the regression should match the theory of harm and isolate the effects of the at-issue conduct.

217. Second, his models fail important *sensitivity analyses* and thus do not yield results that are robust to minor changes in the regression equation or the underlying data.[307]  Indeed, leading experts in econometrics recognize that "good papers in the empirical social sciences contain sensitivity analysis,"[308] and "the issue of robustness … is of vital importance."[309]  In this step, I assess whether Dr. Singer's overcharge estimates change in meaningful ways when minor, common-sense modifications are made to his analytical approach.

218. Third, Dr. Singer's models yield results that are inconsistent with common sense and economic logic.  Economists are also expected to explain whether their estimated effects are sensible given the institutional setting, economic theory, and prior academic research.  A regression

---

[306]  Regression analysis is a statistical tool for evaluating the relationships between a so-called dependent variable and so-called explanatory variables. See, for example, Greene, William H. *Econometric Analysis*, Prentice Hall, 2012, p. 12 ("The linear regression model is the single most useful tool in the econometricians kit… it is the lens through which relationships among variables are usually viewed."). See also, Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, South-Western, 2009, Fourth Edition ("Wooldridge (2009)"), p. 22 ("The simple regression model can be used to study the relationships between two variables.").

[307]  Wooldridge (2009), p. 677 ("Good papers in the empirical social sciences contain sensitivity analysis. Broadly, this means you estimate your original model and modify it in ways that seem reasonable. Hopefully, the important conclusions do not change.").  See also, Leamer, Edward E., "Sensitivity Analyses Would Help," *American Economic Review*, June 1985, Vol. 75, No. 3, p. 308 ("We must insist that all empirical studies offer convincing evidence of inferential sturdiness. We need to be shown that minor changes in the list of variables do not alter fundamentally the conclusions, nor does a slight reweighting of observations, nor correction for dependence among observations, *etcetera*, *etcetera*.").

[308]  Wooldridge (2009), p. 677.

[309]  Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," 2000, pp. 417-469, at p. 432.

estimate that "is statistically significant but has a counterintuitive sign … might be revealing a problem with the data or the econometric method."[310]

### 1. Dr. Singer's Overcharge Models Do Not Reliably Isolate the Difference Between Actual And But-For Prices

219. Dr. Singer's regression models do not isolate the effects of the alleged conduct for these reasons:

    a. The TOI model and Exclusivity Share Model do not distinguish between the effect of the at-issue conduct on list prices, at-issue discounts, and not-at-issue discounts;

    b. The Exclusivity Share Model fails to account for benefits from the at-issue discounts that accrued before 2019.

    c. The TOI Model fails to account for the other at-issue conduct;

    d. The Exclusivity Share Model does not measure "Lock In" as Dr. Singer claims;

    e. The TOI Model and Exclusivity Share Model are based on untested assumptions, e.g., that average overcharges do not vary by product or time period.

### a. The Models Do Not Distinguish Between the Effect of the At-Issue Conduct on List Prices, At-Issue Discounts, and Not-At-Issue Discounts

220. Dr. Singer's models attempt to estimate the effect of the at-issue conduct on average net prices. As I explained above, to determine whether individual direct purchasers were harmed, it is insufficient to estimate the average effect on net prices. Dr. Singer's model is therefore incapable of demonstrating whether each potential member of the DPP class was harmed.

221. In fact, under reasonable assumptions, it is possible to identify a portion of the proposed DPP class that could not have been harmed on their purchases of Invisalign, even accepting the results of Dr. Singer's models. Dr. Singer claims that the at-issue conduct did not affect prices until January 2019, noting that "Align raised the effective price on Invisalign through a discount reduction in 2019 Q1 and through a list price increase in 2019 Q3."[311] Unless all

---

[310] Wooldridge (2009), p. 683.

[311] Singer Report, ¶ 193 ("As explained above, Align's price announcements, and the data confirm, that Align raised the effective price on Invisalign through a discount reduction in 2019 Q1 and through a list price increase

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

purchases made at list price in the actual world would have received discounts in the but-for world, which is both implausible and not something Dr. Singer argued, any purchase made at list prices until the first list price increase for that product after January 1, 2019 would not have included an overcharge.[312]  Dr. Singer's model does not account for this and applies the same overcharge to all transactions regardless of whether they were discounted or at list price.

222.  Figure 30 shows the list prices for Invisalign products from January and July 2019 along with the percent increase in list prices.  There were no further list price increases until January 2023.[313]

### Figure 30: List Price Increases of Top-selling Invisalign Products
### January 2019 to July 2019

| | Jan 2019 | Jul 2019 | | |
| | | | List Price Increase | |
| Product | List Price ($) | List Price ($) | ($) | (%) |
|---|---|---|---|---|
| Assist | 1,599 | 1,659 | 60 | 3.8% |
| Comprehensive | 1,829 | 1,879 | 50 | 2.7% |
| Express | 699 | 709 | 10 | 1.4% |
| Express Five | 575 | 575 | 0 | 0.0% |
| Express Ten | 925 | 955 | 30 | 3.2% |
| Go | 1,199 | 1,299 | 100 | 8.3% |
| Lite | 1,239 | 1,279 | 40 | 3.2% |
| Teen | 1,799 | 1,799 | 0 | 0.0% |

Notes: There are no subsequent price increases from July 2019 through March 2022; Moderate launched in October 2019 at $1,699.

Source: ALIGNAT-PURCH00932995-3105 (Invisalign Transaction Data).

223.  There are two groups of transactions that would not have been impacted by the at-issue conduct:

---

in 2019 Q3.  Moreover, the internal Align data I reviewed on Scanner submissions indicate that Align monitored the share case submissions *retroactively*, rather than prospectively.  Accordingly, the Challenged Conduct variables are delayed to allow for Align's pricing power to come into effect after Dental Practices have adjusted their behavior to the Challenged Conduct." (emphasis in the original)).

[312]  If not-at-issue discounts were not affected by the at-issue conduct, then purchases that received only not-at-issue discounts would also not have paid an overcharge.

[313]  ALIGNAT-PURCH01974421 (2023_2022 Product Portfolio Pricing_USD List Prices.xlsx).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

i.  Purchases of Comprehensive, Assist, Express, Express Ten, Lite, and Moderate made at list prices before July 1, 2019.

ii. Purchases of Express Five made at list prices until 2023, when its list price was increased.[314]

iii. Purchases of Teen at list prices until it was discontinued in 2020.[315]

224. Members of the proposed DPP class that only made purchases in these three groups during the class period therefore would not, along with others, have suffered injury as alleged.  There are nearly 3,000 such members of the proposed DPP class, which is approximately 5.4 percent of the proposed class.[316]  If some, but not all, of these class members would have received discounts in the but-for world (despite receiving none in the actual world), determining which class members were harmed would likely require individual inquiry.

### b.  The Exclusivity Share Model does not Account for Benefits from the At-Issue Discounts that Accrued Before 2019

225. Dr. Singer's Exclusivity Share Model fails to properly account for the benefits of the at-issue discounts that occurred in the actual world but would not be received in the but-for world.  This is important because the at-issue discount programs started prior to 2019, which is the start of the class period.  According to Dr. Singer's theory of harm, the overcharges during the class period are the result of discounts that occurred prior to the class period.  Importantly, those discounts would be lower in Dr. Singer's but-for world.

226. Consider, for example, a doctor who purchased Invisalign Comprehensive in 2018 and 2019 as part of a discount program with an exclusivity commitment.  According to Dr. Singer's theory, the discounts the doctor received in 2018 led Align to raise prices in 2019.  Dr. Singer includes the higher but-for price paid in 2019 in his damages calculation but does not offset the harm with the benefits the doctor received in 2018.  He is therefore overestimating the harm to the DPP class.

---

[314] ALIGNAT-PURCH01974421 (2023_2022 Product Portfolio Pricing_USD List Prices.xlsx).  See also Figure 30.

[315] See Figure 8.

[316] See backup calculation.

### c.  The TOI Model Fails to Account for the Other At-Issue Conduct

227. Dr. Singer claims that the TOI Model "assesses the effect of TOI in isolation,"[317] but it cannot do so because this approach fails to account for the alleged effects of the other at-issue conduct. Because the TOI Model uses a "dummy variable", it simply estimates the difference in average prices before and after January 1, 2019, controlling for the changes in the other explanatory variables.[318]  The other explanatory variables do not include any measures of the allegedly exclusive contracts.[319]  This means the effect of TOI on prices estimated by Dr. Singer's TOI model includes possible effects of the other at-issue conduct on prices in 2019 and later years.[320]  The TOI model is not a reliable method, however, for estimating the effect of both TOI and the other at-issue conduct because the model cannot match Plaintiffs' theory of harm.[321]  A dummy-variable model produces the same estimate of damages regardless of what conduct is considered to be anti-competitive.

### d.  The Exclusivity Share Model Does Not Measure "Lock In"

228. The Exclusivity Share Model is premised on measuring the effect on prices of the "the share of Invisalign orders that are sourced from Dental Practices that are 'locked in' to the Align family of products,"[322] which Dr. Singer refers as the "Exclusivity Share."  Dr. Singer claims that Exclusivity Share is the "share of Invisalign customers that rival Aligner manufacturers cannot reach."[323]  But Dr. Singer's measure for "lock in" is simply "the percentage of

---

[317]  Singer Report, ¶ 176.

[318]  Singer Report, ¶ 176 ("[The first model] measures whether prices on Invisalign and iTero were higher after the implementation of the TOI than in the period before it, controlling for all other factors that might have affected prices."); ¶ 189 ("The key independent variable of interest ('TOI') captures if the transaction occurred before or one year after the TOI went into effect (explained below).").

[319]  According to Dr. Singer, a significant share of total aligner sales was "foreclosed" by an Align "exclusionary contract" starting in 2017.  He estimates the annual "foreclosure share" from 2017 to 2022 to be: 32.3%, 33.5%, 20.0%, 34.8%, 47.1%, and 51.0% (Singer Report, Table 7 on p. 76).

[320]  More precisely, it measures the average difference between (1) the effect of the other at-issue conduct on prices after 1/1/2019 and (2) the effect of the other at-issue conduct on prices before 1/1/2019.

[321]  Similarly, Dr. Vogt's model is untethered to the allegations, as his model cannot separately identify damages stemming from TOI or the specific at-issue contracts.  See Section VI.G.a.

[322]  Singer Report, ¶ 177.

[323]  Singer Report, ¶ 178.

Invisalign order volume that comes from Dental Practices who use exclusively iTero Scanners (and no other Scanners) to order Invisalign."[324]   Specifically, the Exclusivity Share is calculated as follows:

i.    Remove all sales of Invisalign submitted with PVS.

ii.   For the remaining sales, identify customers that only submit orders using an iTero.  This means they did not submit orders with any of the non-iTero interoperable scanners: 3Shape scanners, 3M's True Definition scanner, and Dentsply Sirona's Omnicam scanner.

iii.  Add up the value of all orders from the iTero-only submitters and divide by the total value of all the sales submitted with a scanner.

229.   This does not measure "lock in" or "share of Invisalign customers that rival Aligner manufacturers cannot reach."  Most importantly, dental practices that do not participate in any discount programs with exclusionary language are not locked-in to using iTero for ordering Invisalign and can be reached by rival aligner manufacturers, yet may choose to only order Invisalign using an iTero in which case they will be erroneously counted as locked-in by Dr. Singer.  In addition, "Exclusivity Share" does not measure "lock in" for at least the following reasons:

i.    Dental practices that own other scanners are not locked in to using Align products. Observing that a dental practice only submitted Invisalign orders with an iTero does not mean that the practice does not have other scanners.  As shown in Section IV.C, some dental practices own multiple scanners.

ii.   Dental practices that submit Invisalign orders with PVS are not locked in to using Align products.  Dr. Singer excludes these sales from his analysis.  As shown in Section IV.A.2, a substantial number of dental practices only submitted with PVS.  These providers are completely ignored in Dr. Singer's calculation of Exclusivity Share.

iii.  [325]

---

[324]   Singer Report, ¶ 178.

[325]   Deposition of Sherwin Matian, DDS, General Dentist at VIP Dental Spas, January 8, 2023, at 31:6-8 ("Q. Do you use your iTero scanner for prescribing Candid?  A. Correct.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████

    iv. Dental providers that participate in allegedly exclusionary contracts order competing aligners (see Section V.D).

230. Because Exclusivity Share does not measure the "share of Invisalign customers that rival Aligner manufacturers cannot reach,"[327] the results of Dr. Singer's Exclusivity Share Model do not measure the effect of the at-issue conduct and therefore are unreliable estimates of the alleged overcharge.

### e. The Models are based on Untested and Unjustified Assumptions

231. Dr. Singer's TOI and Exclusivity Share Models contain many untested and unjustified assumptions, including:

    i. In the Exclusivity Share Model, Dr. Singer assumes that the at-issue conduct affects the "exclusivity share" with a one-year lag. He then further assumes that the "exclusivity share" affects average net prices with a one-year lag. As a result, Dr. Singer's Exclusivity Share model assumes that it takes two years, not one, for the at-issue conduct to affect prices. He does not explain why allegedly exclusive contracts in January 2019 would affect Align's pricing decisions in January 2021.

    ii. Dr. Singer assumes that prices are affected by Align's cumulative spending on marketing and R&D over time. If one includes such a variable, it is standard to account for the likelihood that marketing and R&D depreciate over time.[328] (Marketing from 10 years ago is expected to have less effect than marketing from this year.) Dr. Singer's approach assumes that marketing and R&D from many years ago is just as important as marketing and R&D today. He does not justify departing from standard practice in this way.

    iii. As noted above, discounts received for Invisalign purchases are only available from July 2016 on. Dr. Singer nevertheless uses prices from prior to July 2016 in his regression analysis. Dr. Singer is therefore assuming, for example, that the relationship between his explanatory variables and *list* prices in 2013 and 2014 is the same as the

---

[326]  STRAUMANN00001739 (Straumann ClearCorrect Transaction Data).

[327]  Singer Report, ¶ 178.

[328]  Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, Fourth Edition, at p. 274 ("...valuing problems arise for advertising and research and development (R&D) for the same reason as for capital: All have lasting impacts on either a firm's demand or its costs. … A better approach is to calculate the advertising cost based on the interest rate and the annual decline in the economic value of the advertising.").

relationship between the explanatory variables and *net* prices in 2019 and 2020.  Dr. Singer does not justify this assumption.

232. These untested assumptions undermine the credibility of his regression model.

### *2. Dr. Singer's Overcharge Models Are Not Robust to Minor Modifications*

233. The results of Dr. Singer's overcharge models change in meaningful ways when reasonable minor modifications are made to them.  These modifications include (a) estimating the effect of the alleged conduct product-by-product instead of overall, (b) assuming a different lag between the alleged conduct and its effect on prices, and (c) using a more accurate measure of Dr. Singer's "Exclusivity Share."

### *a. Estimation by Product*

234. Dr. Singer's TOI and Exclusivity Share Models assume that the conduct has the same effect on prices of each Invisalign and iTero product.  Given the divergences in list and net prices, this restriction should be investigated. A common-sense sensitivity analysis is to allow the effect of TOI and Exclusivity Share to vary by product.[329]  Another is to estimate Dr. Singer's model separately for each product.

235. Among the multiple sensitivity analyses I conducted, I present the results from (i) estimating Dr. Singler's model separately for each Invisalign product listed in Figure 31, and (ii) estimating Dr. Singer's model for each iTero product listed in Figure 32.

---

[329] Dr. Singer investigates this issue in his backup materials but does not present the results in his report.  Singer Report, ¶ 201.

**Figure 31: Dr. Singer's Invisalign Regressions
Estimated by Product**

| | *TOI Model* | *Exclusivity Share Model* | *Damages Period Transactions* | |
|---|---|---|---|---|
| **All Products** | 0.074*** | 0.619*** | | |
| | **TOI x Product Coefficients** | **Share x Product Coefficients** | **#** | **%** |
| **Assist** | 0.045*** | 0.209*** | 50,724 | 2% |
| **Comprehensive** | 0.053*** | 0.532*** | 1,979,008 | 72% |
| **Express** | 0.060*** | -0.031 | 68,601 | 2% |
| **Express Five** | 0.280*** | 1.695*** | 50,185 | 2% |
| **Express Ten** | 0.085*** | 0.402*** | 81,046 | 3% |
| **GO** | 0.008*** | 0.536*** | 105,580 | 4% |
| **Lite** | 0.052*** | 0.393*** | 243,694 | 9% |
| **Moderate** | | -0.026 | 137,390 | 5% |
| **Multi-stage Comprehensive** | 0.229*** | 1.849*** | 46,344 | 2% |
| **Other** | -0.055*** | -2.240*** | 2,064 | 0% |
| **Teen** | 0.090*** | -1.010*** | 38 | 0% |

Note: Asterisks denote levels of statistical significance. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

Source: Backup to Singer Report.

236. Estimating the models separately by Invisalign treatment results in:

    i.   <u>Negative</u> effects for Teen in the Exclusivity Share Model and for the "other" product category in both the TOI and Exclusivity Share Models;

    ii.   No statistically significant effect for Express and Moderate in the Exclusivity Share Model; and

    iii.   Lower estimate effects for most of the remaining products, including for Comprehensive, which accounts for over 70 percent of transactions in the damages period.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 32: Dr. Singer's iTero Regressions
Estimated by Product**

| | *TOI Model* | *Exclusivity Share Model* | *Damages Period Transactions* | |
|---|---|---|---|---|
| **All Products** | 0.073*** | 0.763*** | | |
| | **TOI x Product Coefficients** | **Share x Product Coefficients** | **#** | **%** |
| **iTero Element** | −0.083*** | −1.496*** | 810 | 5% |
| **iTero Element 2** | 0.049*** | −0.004 | 9,568 | 63% |
| **iTero Element 5D** | | 1.535*** | 4,486 | 30% |
| **iTero Element Flex** | 0.162*** | 1.771*** | 336 | 2% |

Note: Asterisks denote levels of statistical significance. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

Source: Backup to Singer Report.

237. These results include the following:[330]

   i.  A <u>negative</u> estimated overcharge on iTero Element; and

   ii. No statistically significant effect in the Exclusivity Share Model and a smaller estimated effect in the TOI Model for iTero Element 2 (which accounts for over 60 percent of scanner sales during the damages period) when estimated by product.

238. Given these findings, it bears emphasis that <u>Dr. Singer restricted his regression models to yield the same average overcharge for all products</u>.  Allowing the effects of TOI and Exclusivity Share to vary across products shows that the regressions cannot be applied to different products. Re-estimations of his models demonstrate that many products have no overcharges or even negative overcharges.  Hence, Dr. Singer's regressions are not robust.

   **b.  *Assuming Different Lags between Alleged Conduct and Raised Prices***

239. Dr. Singer's models rely on a 12-month lag between TOI and Exclusivity Share and Align raising its prices.  Dr. Singer claims that he lags the key independent variables "because the record evidence indicates that the anticompetitive price effects of the Challenged Conduct

---

[330] These results are limited to iTero models available after January 1, 2019.

would not be instantly felt by purchasers."[331]  Dr. Singer provides limited support for this assumption that only discusses TOI, but his results are highly dependent on assuming a 12-month lag.

240. To demonstrate the effect of making different assumptions, Figure 33 shows the results of estimating the TOI Model with lags of 0, 3, 6, 9, or 12 months.

**Figure 33:  Dr. Singer's TOI Regression for Invisalign by Lagged Number of Months**

| | Months Lag Applied to TOI | | | | |
|---|---|---|---|---|---|
| | **0** | **3** | **6** | **9** | **12** |
| | | | | | *Dr. Singer's Estimate* |
| **TOI** | -0.006*** | 0.003*** | 0.019*** | 0.053*** | 0.074*** |
| **Aligner COGS (% of Rev)** | 0.219*** | 0.173*** | 0.080*** | -0.085*** | -0.084*** |
| **ln(Cumulative Marketing & R&D)** | -0.028*** | -0.031*** | -0.013*** | 0.060*** | 0.137*** |
| **ln(County Avg. Income)** | 0.018*** | 0.017*** | 0.016*** | 0.011*** | 0.003*** |
| **Scanner = 3M** | 0.016*** | 0.017*** | 0.020*** | 0.026*** | 0.030*** |
| **Scanner = 3Shape** | -0.041*** | -0.038*** | -0.032*** | -0.022*** | -0.017*** |
| **Scanner = Sirona** | 0.014*** | 0.014*** | 0.016*** | 0.019*** | 0.022*** |
| **Scanner = iTero** | -0.030*** | -0.030*** | -0.029*** | -0.027*** | -0.025*** |
| **Linear Time Trend** | -0.001*** | -0.001*** | -0.002*** | -0.004*** | -0.006*** |
| **Constant** | 7.357*** | 7.394*** | 7.309*** | 6.919*** | 6.488*** |

Note: Asterisks denote levels of statistical significance. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

Source: Backup to Singer Report.

241. These results demonstrate the fragility of Dr. Singer's results:

  i. The finding of a large effect of TOI on prices depends on assuming long lag. He would have found essentially no effect of TOI on prices if he had assumed no lag or a three-month lag.

  ii. The estimate effect of Aligner COGS and cumulative marketing and R&D spending flip from positive to negative or negative to positive as the lag increases from zero months to twelve months.

---

[331] Singer Report, ¶ 193.

These re-estimations raise serious concerns about the process Dr. Singer went through to select the regression model that he presented.  If he considered but rejected various alternatives similar to the re-estimations I conducted, then his regression models should not, in my view, be accepted.  The very meaning of statistical significance depends on social scientists not choosing among similar models that yield divergent results.  In general, it is wrong to try multiple models and "test" until one gets the desired result.

242. Dr. Singer's TOI model for iTero is similarly not robust. Figure 34 shows the coefficient on TOI with a range of lags from no lag to twelve months.

<strong>Figure 34: Dr. Singer's TOI Coefficient by Lagged Number of Months,<br>Scanner Regression</strong>



Note: Asterisks denote levels of statistical significance. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

Source: Backup to Singer Report.

There appears to be no relationship between the lag and the coefficient, unlike in the Invisalign regression.  The results of Dr. Singer's TOI model for iTero are highly dependent on a precise twelve-month lag.

### c.    Refinements to Exclusivity Share

243. Dr. Singer's Exclusivity Share calculation does not measure "lock in", as discussed above.  At a minimum, Dr. Singer should have included orders of Invisalign made using PVS.  PVS can be used to order all competing aligners and is a significant ordering method throughout the relevant period.  To test the sensitivity of Dr. Singer's models to the inclusion of PVS in the Exclusivity Share, I recalculated the Exclusivity Share including PVS sales in the denominator. Dr. Singer's Exclusivity Share and the alternative including PVS are shown in Figure 35.

**Figure 35: Dr. Singer's iTero Exclusivity Share**



Source: Backup to Singer Report.

This figure shows that the estimate of the "Exclusivity Share" over time is dramatically different when PVS is included in the denominator.

244. To illustrate the sensitivity of Dr. Singer's models, Figure 36 and Figure 37 show how the results for Invisalign and iTero change if the alternative Exclusivity Share is used and the unsupported 12-month exclusivity lag is removed.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 36: Dr. Singer's Aligner Exclusivity Share Overcharge Model
Without Lag and as a Percent of All Invisalign Sales**

| | *Dr. Singer's Estimate* | *Revised* |
|---|---|---|
| | **Lagged Exclusivity Share of Scans** | **Exclusivity Share of Scans+PVS** |
| **Exclusivity Share** | 0.619*** | −0.392*** |
| **Aligner COGS (% of Rev)** | 0.396*** | 0.526*** |
| **ln(Cumulative Marketing & R&D)** | 0.237*** | 0.001 |
| **ln(County Avg. Income)** | 0.007*** | 0.021*** |
| **Scanner = 3M** | 0.035*** | 0.032*** |
| **Scanner = 3Shape** | −0.013*** | −0.025*** |
| **Scanner = Sirona** | 0.022*** | 0.014*** |
| **Scanner = iTero** | −0.003*** | 0.000 |
| **Linear Time Trend** | −0.007*** | 0.000** |
| **Constant** | 5.037*** | 7.160*** |

Note: Asterisks denote levels of statistical significance. *** p<0.01, ** p<0.05, * p<0.1.

Source: Backup to Singer Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 37: Dr. Singer's Scanner Exclusivity Share Overcharge Model
Without Lag and as a Percent of All Invisalign Sales**

| | *Dr. Singer's Estimate* | *Revised* |
|---|---|---|
| | **Lagged Exclusivity Share of Scans** | **Exclusivity Share of Scans+PVS** |
| **Exclusivity Share** | 0.763*** | -0.522*** |
| **Scanner COGS (% of Rev)** | -0.744*** | -0.770*** |
| **ln(Cumulative Marketing & R&D)** | -0.410*** | -0.429*** |
| **Buyer = Reseller** | -0.045*** | -0.045*** |
| **Buyer = SDC** | 0.227*** | 0.225*** |
| **Product = iOC** | -0.137*** | -0.159*** |
| **Product = iTero** | -0.128*** | -0.164*** |
| **Product = iTero Element** | 0.138*** | 0.038* |
| **Product = iTero Element 2** | 0.122*** | 0.033 |
| **Product = iTero Element 5D** | 0.459*** | 0.357*** |
| **Product = iTero Element Flex** | 0.002 | -0.093*** |
| **Service = 24 Months** | 0.090*** | 0.126*** |
| **Service = 36 Months** | 0.190*** | 0.191*** |
| **Service = 60 Months** | 0.310*** | 0.309*** |
| **Linear Time Trend** | -0.001 | 0.004*** |
| **Constant** | 13.055*** | 13.938*** |

Note: Asterisks denote levels of statistical significance. *** $p<0.01$, ** $p<0.05$, * $p<0.1$.

Source: Backup to Singer Report.

245. In both models, making these changes results in *negative* estimated overcharges from the at-issue conduct.

### 3. Dr. Singer's Overcharge Models Produce Nonsensical Results

246. It is important for analyses to be consistent with common sense and economic logic. Dr. Singer's overcharge models are not, as they produce nonsensical results:

    i. The TOI Model for Invisalign and the TOI Model and Exclusivity Model for iTero all find that higher costs lead to lower prices.[332]

---

[332] Singer Report, Table 16 on p. 97 and Table 18 on p. 100.

    ii. The TOI Model and Exclusivity Model for iTero both find that higher cumulative marketing and R&D spending leads to lower prices.[333]

247. These results contradict basic economics.  Higher costs and increased marketing and R&D should lead to higher prices.  This is evidence that the effects estimated by these models—including the effect of the alleged conduct—cannot be interpreted as the causal effect of these factors on prices.

### F.  Dr. Vogt's Direct Purchaser Overcharge Analysis

248. In this subsection, I summarize Dr. Vogt's method for estimating average overcharges to direct purchasers.  Dr. Vogt describes his approach as follows:

> To calculate the class-wide damages arising from Align's foreclosure of competition in the US plastic aligner market, I compare the prices paid by consumers in the actual, historical world for plastic aligners to the prices consumers would have paid in a but-for world in which Align had not engaged in the foreclosure.[334]

Thus, Dr. Vogt uses *benchmarking* to estimate the prices consumers would have paid in a but-for world.  As noted by Dr. Vogt, "[i]n a benchmarking approach, the but-for world's price movements are constructed from the price movements of a benchmark (or analogue) product."[335]

249. Dr. Vogt chooses dental implants as a benchmark for Invisalign for reasons discussed below.  He then calculates an index for dental implants and an index for Invisalign following what he calls "competitive entry." [336]   The quarterly differences between these two indices are multiplied by the total Invisalign sales to obtain the direct purchaser overcharge.  His implant price index begins the first quarter of 2012.[337]  To construct his Invisalign index, Dr. Vogt calculates a "cumulative quarterly chain Fisher price index composed of Align's aligner

---

[333] Singer Report, Table 18 on p. 100.

[334] Vogt Report, ¶ 745.

[335] Vogt Report, ¶ 58.

[336] Vogt Report, ¶ 782.

[337] Vogt Report, ¶ 787.  Since the implant data is only available on an annual basis, Dr. Vogt first interpolates quarterly values using the "Denton-Cholette temporal disaggregation method with mean conversion."  See Vogt Report, ¶ 785.

product offerings" (all product categories except for Express Five and Express) beginning in the first quarter of 2018.[338]

250. In justifying his selection of dental implants as a benchmark, Dr. Vogt states:

> Because the dental implants market is, in important respects, analogous to the in-office clear aligner market, but is distinguished by a greater degree of competition and absence of the conduct challenged here, I believe it is a reliable benchmark for the in-office clear aligner market.[339]

Dr. Vogt cites these similarities between implants and aligners:[340]

- They have similar manufacturers, including Straumann, Dentsply-Sirona, and Henry Schein;

- Manufacturers of dental implants and clear aligners both sell to dental practices and DSOs;

- Intra-oral scanners are involved in the order process and digital workflow; and

- Both dental implants and clear aligners saw patent expiry, followed by competitive entry.

251. In implementing his approach, Dr. Vogt compares the path of prices for dental implants beginning in 2012 with the path of prices for aligners beginning in 2018.[341]  These start dates match to when he claims "competitive entry" occurred.[342]

252. Figure 38 shows Dr. Vogt's comparison of his Invisalign price index to his dental implant price index.  "Quarter 0" corresponds to the first quarter of 2012 for dental implants and the first quarter of 2018 for aligners.

---

[338]  Vogt Report, ¶ 758.

[339]  Vogt Report, ¶ 563.

[340]  Vogt Report, ¶ 560.

[341]  Dr. Vogt states that this approach allows him to focus on changes in discount amounts *within* products and Advantage Program discount tiers rather than across all transactions.  He states: "I consider that doctors [in the but-for world] would be in the same advantage tier in the but-for world as they were in reality, but that enhanced competition would drive each tier of the program to have larger discounts. I concluded that both would be true."  Vogt Report, ¶ 777.

[342]  Vogt Report, ¶ 782.

**Figure 38: Dr. Vogt's Comparison of Invisalign Price Index and Implant Price Index**



Source: Vogt Report, Figure 61, p. 269.

253. The orange line is Dr. Vogt's Invisalign price index and the blue line is his dental implant price index. According to Dr. Vogt, the gray shaded region difference between these two indices measures the overcharges in percentage terms. Figure 39 summarizes Dr. Vogt's "damages quantum" calculation.

**Figure 39: Dr. Vogt's Estimate of the Direct Purchaser Invisalign Overcharge**

| Quarter | Quarters Since Entry | Price Index | | Damage Quantum |
|---|---|---|---|---|
| | | Invisalign | Total Implants | |
| 2018 Q1 | 0 | 100.00% | 100.00% | 0.00% |
| 2018 Q2 | 1 | 99.39% | 99.48% | 0.00% |
| 2018 Q3 | 2 | 98.67% | 98.53% | 0.14% |
| 2018 Q4 | 3 | 99.56% | 97.13% | 2.43% |
| 2019 Q1 | 4 | 103.47% | 95.30% | 8.17% |
| 2019 Q2 | 5 | 102.93% | 94.02% | 8.91% |
| 2019 Q3 | 6 | 104.66% | 93.28% | 11.37% |
| 2019 Q4 | 7 | 103.49% | 93.10% | 10.39% |
| 2020 Q1 | 8 | 105.39% | 93.47% | 11.92% |
| 2020 Q2 | 9 | 105.17% | 93.35% | 11.81% |
| 2020 Q3 | 10 | 103.72% | 92.75% | 10.97% |
| 2020 Q4 | 11 | 103.69% | 91.66% | 12.03% |
| 2021 Q1 | 12 | 104.12% | 90.09% | 14.03% |
| 2021 Q2 | 13 | 104.21% | 88.93% | 15.28% |
| 2021 Q3 | 14 | 105.46% | 88.18% | 17.28% |
| 2021 Q4 | 15 | 104.30% | 87.85% | 16.45% |
| 2022 Q1 | 16 | 105.57% | 87.93% | 17.64% |

Source: Vogt Report, Table 13, p. 270

254. To explain, note that in four quarters after the first quarter of 2012, dental implants were priced 95.30 percent of their Q1 2012 price. Four quarters after the first quarter of 2018, Invisalign was priced 103.47 percent of its Q1 2018 price. Had Invisalign prices fallen at the same rate as dental implant prices, they would have been on average 8.17 percent lower (103.47% - 95.30%) in that quarter.

255. Figure 40 shows Dr. Vogt's calculation of his classwide overcharge.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 40: Dr. Vogt's Estimate of Class-Wide Overcharges**

| Quarter (1) | Class Notional (2) | Quantum (3) | Class Overcharge (4) = (2*3) |
|---|---|---|---|
| 2018 Q1 | $ 41,232,181 | 0.00% | $ - |
| 2018 Q2 | $ 67,621,003 | 0.00% | $ - |
| 2018 Q3 | $ 67,064,676 | 0.14% | $ 91,387 |
| 2018 Q4 | $ 64,001,660 | 2.43% | $ 1,552,995 |
| 2019 Q1 | $ 74,102,367 | 8.17% | $ 6,054,025 |
| 2019 Q2 | $ 75,378,981 | 8.91% | $ 6,716,370 |
| 2019 Q3 | $ 76,070,820 | 11.37% | $ 8,651,424 |
| 2019 Q4 | $ 78,233,146 | 10.39% | $ 8,128,267 |
| 2020 Q1 | $ 75,947,968 | 11.92% | $ 9,050,334 |
| 2020 Q2 | $ 32,823,122 | 11.81% | $ 3,877,452 |
| 2020 Q3 | $ 91,413,190 | 10.97% | $ 10,024,393 |
| 2020 Q4 | $ 100,257,978 | 12.03% | $ 12,058,576 |
| 2021 Q1 | $ 108,612,064 | 14.03% | $ 15,241,441 |
| 2021 Q2 | $ 119,329,532 | 15.28% | $ 18,232,650 |
| 2021 Q3 | $ 119,141,710 | 17.28% | $ 20,588,313 |
| 2021 Q4 | $ 108,499,049 | 16.45% | $ 17,851,431 |
| 2022 Q1 | $ 107,585,389 | 17.64% | $ 18,978,146 |
| 2022 Q2 | $ 107,585,389 | 17.64% | $ 18,978,146 |
| 2022 Q3 | $ 107,585,389 | 17.64% | $ 18,978,146 |
| 2022 Q4 | $ 107,585,389 | 17.64% | $ 18,978,146 |
| Total: | $ 1,730,071,000 | 13.20% | $ 214,031,644 |

Source: Vogt Report, Table 20 on p. 311

256. To calculate aggregate direct purchaser damages, Dr. Vogt multiplies the "damages quantum" by the total Invisalign net sales to EPP Class. Since the Invisalign transaction data end in the first quarter of 2022, Dr. Vogt holds estimated damages constant for the last three quarters of 2022.

### G. Dr. Vogt's Analysis of Damages from the Alleged Antitrust Injury is Unreliable

To assess Dr. Vogt's approach and results, I consider two questions: First, does Dr. Vogt's approach match Plaintiffs' theory of harm? Second, are implant prices after 2012 a valid benchmark for aligner prices after 2018?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### a.  Dr. Vogt's Model Is Not Tied to the At-Issue Conduct

257. Plaintiffs claim two measures of at-issue conduct: TOI and "explicit or de facto exclusive dealing agreements," and Dr. Vogt identifies several programs as "explicit or de facto exclusive dealing agreements."[343]  Yet, Dr. Vogt's approach does not match to the specific allegations.  By benchmarking to another product, his model produces the same damages regardless of the specific allegations.  He cannot separately identify the damages stemming from the TOI or the specific at-issue contracts.

### b.  Dental Implants are an Inappropriate Benchmark for Invisalign

258. Benchmarks can be used by economists to estimate antitrust damages.[344]  That said, it is unusual to pick a benchmark as well as a time period that is so far removed from the at-issue time period for the conduct, and often economists rely on multiple benchmarks.  But putting those issues aside, according to the ABA, an appropriate benchmark should face "comparable supply and demand conditions."[345]  The economic evidence demonstrates that neither supply

---

[343]  Vogt Report, ¶ 190-194.

[344]  Hovenkamp, Herbert, *Federal Antitrust Policy: The Law of Competition and Its Practice*, West Publishing Co., 1994, Fifth Edition, Section 17.5b.

[345]  The ABA states:

> In selecting the benchmark, economists attempt to identify a competitive product that faces comparable supply and demand conditions, because the comparison should control for factors other than anticompetitive behavior that could have caused the product's price to vary over time. Unfortunately, it is often difficult to identify a product that experiences sufficiently similar supply and demand relationships as the product that is the focus of the antitrust complaint. When there are substantial differences in the economic forces that determine the benchmark product's price, the use of the benchmark may introduce biases that undermine the value of the comparison.

> Regardless of the estimation approach used, however, it is important to ensure that the approach controls for any differences between the benchmark used and the relevant market and time frame under consideration.

> [Because] the yardstick approach looks to a different market, one may need to examine changes in economic conditions over time or across markets, the plaintiff's circumstances, or other variables which could affect prices, sales, and profits.

American Bar Association Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, 2005, p. 214; American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, 2017, Third Edition, pp. 95, 232.

conditions nor demand conditions were comparable for dental implants after 2011 and aligners after 2017.

### i. Supply Conditions

259. The differences in concentration – the number and size of firms – between dental implants and aligners is stark.  Before 2012, numerous companies supplied dental implants for many years. Before 2018, however, only three companies supplied aligners: Align, ClearCorrect, and SDC.[346]

260. According to the Antitrust Division of the US Department of Justice, the standard way to measure concentration is the Herfindahl-Hirschman Index (HHI), [347] which measures concentration by summing the square of individual firm market shares.  Figure 41 provides the shares of sales for dental implants in 2007 and the shares of sales for aligners in 2017.  With these data one can calculate the HHIs for dental implants and for aligners.

---

[346]  Both of Align's rivals were subject to patent infringement suits by Align.  Align Technology, "Align Technology Files Lawsuits Against ClearCorrect," February 28, 2011, available at https://investor.aligntech.com/static-files/e5f2ef80-87cd-4d5d-b514-31fae58bd294; Align Technology, "Align Technology Files Patent Infringement and False Advertising Lawsuit Against SmileCareClub, Sharper Image, and Brookstone," October 22, 2015, available at https://investor.aligntech.com/static-files/54407035-0086-431f-b740-125447c31dba.

[347]  US Department of Justice, "Herfindahl- Hirschman Index," July 31, 2018, available at https://www.justice.gov/atr/herfindahl-hirschman-index ("The term "HHI" means the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 41: Dental Implant Supplier Shares in 2007 and
Aligner Supplier Shares in 2017**



Sources: ALIGNAT-SNOW00037768-856 (CODEX Report, 2018); "Clear Aligner Market
Model," Wolfe Research, March 11, 2021.

261. <u>The HHI for dental implants in 2007 is approximately **2210** whereas the HHI for aligners in 2017 is **7932**.</u>[348]  According to the antitrust authorities, the supply of dental implants is *unconcentrated* while the supply of aligners is *highly concentrated*.[349]  With this important difference in supply conditions, one cannot assume that average price of aligners after 2018 will move like the average prices of dental implants after 2012 in Plaintiffs' but-for world.

---

[348] This assumes, as Plaintiffs allege, that aligners constitute a distinct relevant product market.  I address this below.

[349] See US Department of Justice, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, Section 2.1.3.  The Agencies generally classify markets into three types:

- Unconcentrated Markets: HHI below 1500
- Moderately Concentrated Markets: HHI between 1500 and 2500
- Highly Concentrated Markets: HHI above 2500

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

262. Dr. Vogt recognizes this crucial difference in concentration, but does nothing to control for it.[350]  Dr. Vogt also recognizes differences in the role of patents and licensing.[351]  Yet again, Dr. Vogt does nothing to control for differences in the roles of patents and licensing. Consistent with the ABA guidelines, the lack of controls in Dr. Vogt's benchmark analysis renders it unreliable.

263. Another important difference in supply conditions concerns the timing of entry.  Figure 42 and Figure 43 provide the relevant information.

**Figure 42: Timeline of Aligner Entry**



Source: Vogt Report, Figure 30, p. 201; Vogt Report, ¶ 782.

---

[350] He states, "[A]s early as 2004, 2 years before the beginning of patent expiry, three companies collectively held the same market share that Align unilaterally held in the in-office clear aligner market."  Vogt Report, ¶ 576. As further noted in the 2018 CODEX Report on which Dr. Vogt relies, "[t]here were 4 players for implants at the beginning, but the aligner market only has one important player at the moment, Invisalign."  ALIGNAT-SNOW00037768- 856 (CODEX Report, 2018), at 856; Vogt Report, Figure 28.

[351] "One of the key patents [for dental implants] … was for the Screw-Vent, created by Dr. Gerald Niznick.  This patent was issued in 1990, and ran until October 2007. During the lifetime of the patent, this was licensed to several companies."  Vogt Report, ¶ 572. Dr. Vogt states that "no single firm held a position of unilateral dominance in the implants market in the past twenty years."  Vogt Report, ¶ 561.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 43: Timeline of Dental Implant Entry**



Source: ALIGNAT-SNOW00037768-856 (CODEX Report, 2018); Vogt Report, ¶ 782.

As indicated, substantial entry into dental implants came before the period Dr. Vogt used as a benchmark for aligners. By contrast, the timing of substantial entry into aligners was during the benchmark period. Again, Dr. Vogt's benchmarking lacks any controls for this supply-side factor.

### ii. Demand Conditions

264. Demand conditions between aligners and implants are not comparable:

    i. Unlike dental implants, Invisalign is a branded product that is heavily marketed to end customers. For example:

        a. In May 2017, ahead of patent expiration, Align launched a comprehensive multi-million dollar marketing campaign for Invisalign.[352]

---

[352] Align Technology, "Align Technology Launches Invisalign Brand Marketing Campaign to Challenge Metal Braces as the Status Quo," May 9, 2017, available at https://investor.aligntech.com/static-files/60d76d80-3d41-4a54-9742-1d6c3e1d6c1a ("Align Technology, Inc. (NASDAQ: ALGN) today announced that it has launched a comprehensive, multi-million dollar marketing campaign for its Invisalign® brand designed to challenge metal braces as the status quo method for straightening teen teeth.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

    b.  In 2019, Invisalign became the "Official Smile" partner for five professional sports franchises across the NBA, NFL, NHL, and MLS,[353] and is the NFL's "Official Clear Aligner Sponsor."[354]

    c.  In 2022, Align spent $222 million on advertising and media costs.[355]

  ii.  In part due to this marketing and promotion, consumers often prefer Invisalign or another brand aligner, but are likely indifferent between different implant brands.[356]

  iii.  Aligners require treatment planning software, as well as manufacturing of the physical aligner product.  I understand that dental implants do not require a similar accompanying software solution.[357]

  iv.  Aligners are 100 percent customized to a specific patient whereas dental implants can be ordered off-the-shelf.[358]

  v.  While aligners can be used by patients without any inputs, dental implants require abutments and crowns.[359]  Abutments can be made by the same company as the implant

---

[353] Dosh, Kristi, "Invisalign's Partnership with The NFL Gives Doctors and Consumers New Options," *Forbes*, August 3, 2020, available at https://www.forbes.com/sites/kristidosh/2020/08/03/invisaligns-partnership-with-the-nfl-gives-doctors-and-consumers-new-options/?sh=36cc988e79fe ("Last year, Invisalign went wide with its sports marketing strategy, becoming the 'Official Smile' partner of five professional sports franchises across the NBA, NFL, NHL and MLS.").

[354] Dosh, Kristi, "Invisalign's Partnership with The NFL Gives Doctors and Consumers New Options," *Forbes*, August 3, 2020, available at https://www.forbes.com/sites/kristidosh/2020/08/03/invisaligns-partnership-with-the-nfl-gives-doctors-and-consumers-new-options/?sh=36cc988e79fe ("Align Technology […] has decided to go all in with the NFL and become the league's 'Official Clear Aligner Sponsor'.").

[355] Form 10-K 2022, Align Technology, Inc., available at https://investor.aligntech.com/static-files/eb70ffbf-1126-4422-94fc-8fa110079497, p. 70.

[356] Deposition of Mu Li, Vice President of Global Business Development, Strategy, Analytics and Insights at Align Technology, December 20, 2022, at 50:17-51:7 ("Q. Please explain what you mean by competitor response approaches.  A. …We compete by having a premium brand and that has significant consumer awareness and preference, and we'll continue to invest in that brand.").  Competing aligner companies have recognized the differentiation of Invisalign based upon its superior quality.  In competitive analysis entitled the "Source of Truth," Dentsply described Invisalign as the "Most advanced – Best; faster & predictable."  DS000199 (Spreadsheet with competitive analysis).

[357] ALIGNAT-SNOW00037768-856 (CODEX Report, 2018) at 777 ("To place implants, the dentist needs surgical components, prosthetic components and a tool kit.  CBCT and/or IO data, treatment planning software and surgical guides can optionally be used as part of a digital workflow.").

[358] See, for example, Henry Schein Dental, "Implants," available at https://www.henryschein.com/us-en/dental/c/surgical-implant-products/implants; Straumann, "Implant Solutions," available at https://shop.straumann.com/us/en_us/Implant-Solutions/c/cat_stmn_implsol.

[359] ALIGNAT-SNOW00037768-856 (CODEX Report, 2018) at 777.

(with potential for bundling) or a different company, while crowns are typically fabricated by laboratories.[360]

vi. While some dental service providers decide to associate their practices with Invisalign to generate greater demand, there is no such analog for dental implants.[361]

265. As a result of these different demand conditions, the assumption that average prices of aligners after 2018 will move like the average prices of dental implants after 2012 is unsupported. Dr. Vogt benchmarking makes no attempt to control for these differences. The lack of demand side controls makes Dr. Vogt's conclusions unreliable.

### c. Use of Dental Implants as a Benchmark is Not Conservative

266. In this subsection, I address whether Dr. Vogt's benchmarking is conservative. Dr. Vogt claims that it is conservative for two reasons:[362]

i. "[P]rior to patent expiry, there were several 'premium' competitors active in the implant market" and since the aligner market was "less competitive" Dr. Vogt would "expect greater price declines in the in-office clear aligner market than the implants market."

ii. "[I]ncreased competition in the implants market took the form of a new 'value' segment, i.e., vertically inferior competitive entry" but in the aligner market, some aligners "were reported to be equivalent to Invisalign on several clinical metrics," which Dr. Vogt concludes would "exert a greater downward pressure on prices than a value segment."

267. Neither of these features make using dental implants as a benchmark conservative.

i. Regarding the existence of other "premium" dental implants being available prior to 2012, this simply demonstrates that the nature of competition is significantly different for implants than it is for aligners. Dr. Vogt's argument also fails to account for the many other differences between implants and aligners that I have outlined, which could

---

[360] For example, Straumann is a supplier of both implants and abutments. ALIGNAT-SNOW00037768-856 (CODEX Report, 2018) at 823. See also available at Cleveland Clinic, "Dental Crowns," https://my .clevelandclinic.org/health/treatments/10923-dental-crowns ("It usually takes two to three weeks — sometimes longer — for a dental lab to make your new crown.").

[361] See, for example, HD00560-561 (Email between Heartland Executives about continuing to work with Align), at 560 ("As the industry leader in dentistry, I think we want to continue to associate with other leaders in the field") and HD00111-113 (Email between Heartland Directors about Implants and Guidance Dental), at 111 ("we are collecting data on the volumes ordered by brand from each DTL – trying to understand generic vs. premium brand volumes") .

[362] Vogt Report, ¶ 595.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

easily explain why prices of aligners would fall more slowly than prices for implants after entry.

ii. Regarding the role of a "value" segment in implants, this again shows the significantly different competitive dynamics.  Moreover, it is just as easy to argue that competition from equivalent products would exert a lesser, rather than greater, downward pressure on prices than a value segment, because similar products might be priced similarly, while a "value" segment provides a cheaper product.

268. Dr. Vogt has not provided the analysis that would be required to establish that using dental implants as a benchmark for Invisalign is conservative, especially given the dramatic differences in the supply and demand conditions for each product.

269. In addition to the features of the implant industry, Dr. Vogt also claims that price declines in the pharmaceutical market after generic entry are consistent with his dental implant benchmark being conservative.[363]    Comparing price changes after entry of additional aligner manufacturers to price changes after the entry of a generic pharmaceutical does not make economic sense because pharmaceuticals and clear aligners have fundamentally different market structures.  First, generic pharmaceuticals are, by definition, considered equivalent to the brand drug.[364]  There is no such equivalence between Invisalign and competing clear aligners.[365]  Related, generic pharmaceuticals benefit from state automatic substitution laws.  Because of these laws, the pharmacist filling a prescription can or must substitute a lower-priced generic for the branded product (unless the prescribing doctors indicates that no such

---

[363] Vogt Report, ¶ 597.  See also Conti, Rena M. and Ernst R. Berndt, "Specialty Drug Prices and Utilization After Loss of U.S. Patent Exclusivity, 2001-2007," *National Bureau of Economic Research*, Working Paper No. 20016, March 2014; Berndt, Ernst R. and Murray L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, October 2010, Vol. 18, No. 2, pp. 177-201; Wiggins, Steven N. and Robert Maness, "Price Competition in Pharmaceuticals: The Case of Anti-Infectives," *Economic Inquiry*, April 2004, Vol. 42, No. 2, pp. 247-263.

[364] According to the US Food and Drug Administration, "compared to the brand-name (or innovator) medications, the proposed generic medications: contain the same active/key ingredient; have the same strength; use the same dosage form (for instance, a tablet, capsule, or liquid); and use the same route of administration (for instance, oral, topical, or injectable)."  See United States Food and Drug Administration, "Generic Drugs: Overview & Basics," April 21, 2023, available at https://www.fda.gov/drugs/generic-drugs/overview-basics.

[365] See Section IV.A.1.

substitution should be made).[366]  Automatic substitution generates significant demand for generic products, which then typically results in generic pharmaceuticals quickly capturing the majority of sales.  Where there is not automatic substitution, for example over-the-counter pharmaceuticals ("OTC"), brand products continue to be sold in large volumes and at a significant premium to store-brand or unbranded generics.[367]  Without equivalent products and automatic substitution, it makes no economic sense to compare price changes after entry of new aligner competitors to entry of a generic pharmaceutical.[368]

### H.  Dr. Vogt's Pass-On Analysis Is Unreliable

#### 1.  Summary of Dr. Vogt's Approach to Estimating Pass-On

270. Dr. Vogt presents two types of evidence in his analysis of pass-on: "documentary evidence" and "empirical analyses quantifying how changes in prices charged by Align for Invisalign impact the prices that dentists charge for Invisalign."[369]  His bottom-line conclusion is that

---

[366]  Automatic substitution permits or requires pharmacists to substitute a brand drug with a generic version of that drug when dispensing a prescription, depending on state law. See, for example, Vivian, Jesse C., "Generic-Substitution Laws," *U.S. Pharmacist*, June 2008, Vol. 33, No. 6, pp. 30-34, at p. 32 ("All states in the U.S. have laws addressing generic substitution to one degree or another.  There are "positive formulary" states, which identify generics that can be substituted, and there are "negative formulary" states, which list drugs that cannot be substituted.").

[367]  A study of OTC headache remedies found that the generics were sold at an average discount of 60 percent off the brand price (calculated as 1 – Price ratio), but that the brand still retained 47 percent of the sales (calculated as 1 – store-brand share).  Bronnenberg, Bart J., et al., "Do Pharmacists Buy Bayer? Informed Shoppers and the Brand Premium," The Quarterly Journal of Economics, July 2015, Vol. 130, No. 4, pp. 1669-1726, at Table 1.

[368]  Furthermore, Dr. Vogt errs by comparing changes in the average price of branded and generic drugs to changes in the price of Invisalign.  If these products were comparable, which they are, it would make sense to compare changes in the price of just the brand drug after generic entry to changes in the price of Invisalign.  The literature on generic entry finds conflicting evidence on whether brand prices rise or fall after generic entry. See, for example, Frank, Richard G. and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics & Management Strategy*, Vol. 6, No. 1, 1997, pp. 75-90, at p. 75 ("…brand-name prices increase after generic entry."); Grabowski, Henry G. and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *The Journal of Law and Economics*, October 1992, Vol. 35, No. 2, pp. 331-350, at p. 347 ("The pioneering firms did not attempt to deter entry through their pricing strategies. Rather, in most cases, the firms continued to increase their prices at the same rate as prior to entry."); Caves, Richard E., Whinston, Michael D., and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers: Microeconomics*, 1991, at p. 44 ("The innovator's price declines with the number of generic entrants, but the rate of decline is small…").

[369]  Vogt Report, ¶¶ 801-802.

dental practices pass-on changes in their costs at nearly 100 percent.  Given the individualized nature of dental practices and the margins, I find this result implausible on its face.  The only other similar pass-on rate I have seen is for retail groceries, which operate on thin margins.

271. Dr. Vogt reviews three types of documentary evidence:

   i.  Documents from "industry participants" that "recognize and advertise that practitioners pass-on costs and cost-saving to end-consumers."[370]

   ii.  "Documentary evidence from Align" that "reflects an understanding that" a markup of three to four times the cost of treatment materials "is widespread among dentists and orthodontists."[371]

   iii.  Documents showing that when Align introduced new products, it accounted for the industry markup.[372]

272. Dr. Vogt performs three empirical analyses using data from four sources (DSOs Smile Brands, Aspen Dental, and PepperPointe, and OrthoFi, "a practice management software operator"):[373]

   i.  <u>An analysis using Invisalign and OrthoFi data</u>.[374]  Dr. Vogt first runs a regression that predicts prices doctors paid Align for Comprehensive lab fees (i.e., doctor's prices) from the OrthoFi data using Invisalign Comprehensive quarterly order volumes from the Invisalign transaction data and year.  Since Dr. Vogt cannot identify the dental practices in the OrthoFi data, he limits the Invisalign transaction data to the zip codes that OrthoFi indicates its practices are located.  After predicting doctors' prices, he fits a second regression model that estimates patient price (from the Invisalign transaction data) as a function of this predicted doctor price.

   ii.  <u>An analysis using Smile Brands data</u>.[375]  Dr. Vogt runs a regression model estimating prices Smile Brands dental practices charged patients as a function of Invisalign price (from the Invisalign transaction data), provider type (dentist or orthodontist), quarterly fixed effects, and zip code fixed effects.  His model is aggregated across all providers to the quarter-, zip code-, provider type-level.

---

[370] Vogt Report, ¶ 808.

[371] Vogt Report, ¶ 817.

[372] Vogt Report, § L.5.4.

[373] Vogt Report, ¶ 846.

[374] Vogt Report, ¶¶ 846, 1015.

[375] Vogt Report, ¶¶ 861-864, 1017.

iii. <u>An analysis using all four data sources</u>.[376] Dr. Vogt combined the monthly data from OrthoFi, Smile Brands, Aspen Dental, and PepperPointe, limited the data to 2018 on, and estimated the prices doctors charged patients as a function of prices doctors paid Align and data source indicators. Dr. Vogt interpreted the coefficient on doctor price as the pass-through rate.

273. Using these methods, Dr. Vogt calculates pass-on rates from 86 percent to 99.8 percent.[377] In other words, at his upper bound, Dr. Vogt finds that when the price of Invisalign increases $100, dental providers charge their customers $99.80 more for treatments.

### 2. Framework for Evaluating Dr. Vogt's Approach to Estimating Pass-On

274. Economic analysis of pass-on in this context seeks to measure how dental practices change prices of individual products in response to a change in the cost of those products. For example, if Align raises the list price of a treatment by $100, do dental practices that pay list prices increase their prices to patients, and, if so, by how much. Of note, observing that products with higher costs also have higher prices is not sufficient to infer that a change in costs will be passed on to consumers.[378]

275. Given that most patients who would be members of the proposed EPP class will have only purchased Invisalign once,[379] it is also important to establish whether dental practices make pass-on decisions in a common, consistent manner. The fact that dental practices charge large average markups for treatments, as indicated by the evidence cited by Dr. Vogt, does not eliminate the possibility that pass on decisions are made consistently. Nor does observing that dental practices charge different prices to patients for the same treatment eliminate the possibility that pass on decisions are made consistently. Such evidence does indicate, however,

---

[376] Vogt Report, ¶¶ 866-871.

[377] Vogt Report, ¶ 847.

[378] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, 2017, p. 269 ("Generally, estimation of the damages to indirect purchasers will begin by estimation of the damages to the direct purchaser, i.e., the overcharge. Then the analysis will shift to how such an overcharge was 'passed on' down the distribution chain, which will often be expressed in terms of a percentage (i.e., '100 percent pass-on' or '50 percent pass-on'). The harm to any particular plaintiff can therefore be calculated as the product of the overcharge and the pass-on from those entities above the plaintiff in the distribution chain ('upstream pass-on') and, if any, below the plaintiff in the distribution chain ('downstream pass-on').").

[379] In contrast, most insurers who are members of the class will likely have provided reimbursements for multiple purchases of Invisalign products.

that dental providers have pricing flexibility, with which they may make different pass-on decisions in response to changes in their costs.

276. For example, a dental provider who typically charges $3,000 for Invisalign Comprehensive treatment, but sometimes offers a discounted price of $2,500, could respond to an increase in the price of Invisalign Comprehensive by keeping the typical price and the discounted prices the same, but offering the discounted price less often. That doctor would thereby pass on the cost increase only to patients who were not offered the discount after the price increase. In such situations, it would not be possible to determine which patients bore the increase in the price of the treatment to the dental provider without individually analyzing each such dental practices' discounting decisions and each of their customer's purchasing decisions. The qualitative evidence Dr. Vogt presents discusses general patterns in prices and costs and what doctors do, or claim to do, on average. This evidence is not sufficient to establish that doctors pass on increases in the cost of Invisalign to each of their patients.

### 3.   Dr. Vogt's Estimates of Pass-On Are Unreliable

277. I now turn to the quantitative evidence Dr. Vogt presents. I show that none of Dr. Vogt's analyses of pass-on rates demonstrate that dental practices change their prices when the cost of Invisalign changes. To the contrary, when properly analyzed, <u>the data Dr. Vogt relies on demonstrates that dental practices do not pass on Invisalign cost increases to many of their patients</u>. This means a significant fraction of the patients would not be injured even if, contrary to the evidence, the alleged conduct caused all direct purchasers to pay overcharges on their Invisalign purchases.

278. Dr. Vogt makes three errors:

   a.   Dr. Vogt's analyses estimate average relationships between prices and costs that do not capture actual pass-on decisions;

   b.   Dr. Vogt's analyses do not account for changes in product mix, which in the context of ongoing innovation is important; and

   c.   Where it is possible to account for the product mix, Dr. Vogt's analyses obscure the fact that the prices charged to most consumers did not change when the cost of Invisalign to the doctor changed.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I discuss each flaw in turn.

### a. Dr. Vogt's Analysis of OrthoFi Data Does Not Show that Cost Increases to Doctors Cause them to Increase the Prices they Charge Patients

279. The available OrthoFi data do not contain the cost of Invisalign to the dental practice and it is not possible to infer the cost for individual patient treatments from the Invisalign data.[380] To estimate pass-on, Dr. Vogt therefore estimates the average relationship in the Invisalign data between order volume and the cost to the dental practice of Invisalign Comprehensive and the average relationship in the OrthoFi data between order volume and the price charged to customers for Invisalign Comprehensive. Dr. Vogt finds that higher-volume doctors tend to pay lower prices to Align for Comprehensive and to charge their patients lower prices for Comprehensive.[381] Quantifying this relationship, he estimates a pass-on rate of 99.8 percent.

280. As discussed above, average relationships between prices and costs are not sufficient to infer average pass-on rates for changes in costs or to infer that costs are passed on in a common manner. For example, consider the information in Figure 44 showing average patient prices and case volume for selected dental practices in the OrthoFi data.

---

[380] Vogt Report, ¶ 849 ("OrthoFi provided transaction data with Practice Ids for the participating dental/orthodontic practices. These data show the patient price and transaction date, but not the lab fee that the doctor paid Align for Invisalign. Further, these Practice IDs do not match any ID in the Invisalign invoice data. Finally, OrthoFi did not provide any geographic information, such as zip code, on which to merge with the Invisalign invoice data. I therefore cannot merge-in Invisalign lab fees from the invoice data into the OrthoFi data at the practice level.").

[381] Vogt Report, ¶ 852 ("In short, high-volume doctors both received lower Invisalign lab fees, and consequently charged lower patient prices for Invisalign treatment.").

**Figure 44: Average Comprehensive Patient Price and Case Volume
By Quarter for Selected Dental Practices**



Source: Backup to Vogt Report.

281. Each circle represents the combination of average prices and quarterly case volume for a dental practice. This figure shows examples of dental practices that did not consistently charge patients less when their volume of sales was higher. If Dr. Vogt's theory is correct, and these dental practices received lower prices from Align when their volume of sales was higher, then this analysis strongly suggests that these dental practices are not making the pass-on decisions that Dr. Vogt would have expected.

282. Dr. Vogt's analysis of the OrthoFi data estimates average relationships between prices and costs. Dr. Vogt did not test whether this average relationship reflects the change in patient prices that individual dental practices make in response to changes in the cost of Invisalign, nor did he test whether any such average pass-on relationship applies in a common way to all dental practices.

### b. Dr. Vogt's Smile Brands Analysis Does Not Account for Changing Product Mix

283. Dr. Vogt's Smile Brands analysis matches average prices to consumers from data produced by Smile Brands to average Invisalign prices to Smile Brands dental practices from the Invisalign

transaction data. The data from the two companies' data are matched by quarter, shipping zip code, and whether the provider is a dentist or orthodontist. Using the matched data, Dr. Vogt uses a regression to estimate a pass-on rate of 86.1 percent.[382]

284. Dr. Vogt's analysis does not, however, account for differences in the products being ordered by Smile Brands' dental practices over time. For example, Figure 45 summarizes the aligner transactions associated with orthodontists in zip code 90744 (Wilmington, CA) for the quarters Q2 2018, Q3 2019, and Q4 2020. Dr. Vogt matched data from four Align invoices to data from 3 Smile Brands customer contracts.[383]



285.

286. Figure 46 presents two ways to estimate pass-on using this data. The method on the left-hand side correctly controls for the product being sold, whereas the method on the right-hand side

---

[382]  Vogt Report, Table 17 on p. 299.

[383]  The cost on each invoice and price on each patient contract was identical within the quarter, so these amounts are also equal to the average costs and prices incorporated into the Vogt regression for these groupings.

incorrectly infers pass-on rates from the differences in prices and costs across different products.

**Figure 46: Implied Pass-On from Aligner Transactions in Selected Quarters for Smile Brands Orthodontists in Wilmington, CA**



Source: Backup to Vogt Report.

287. The analysis on the lefthand side of Figure 46 just considers sales of Invisalign Comprehensive and finds no pass-on: The cost of Invisalign Comprehensive to the orthodontists in Wilmington decreased 2.7 percent from $1,387.62 in Q2 2018 to $1,350 in Q4 2020, but in both quarters the Smile Brand orthodontists in Wilmington charged patients $4,000 for their Invisalign treatments.

288. The analysis in the righthand side incorrectly combines sales of Invisalign Comprehensive and Invisalign Lite and finds significant pass-on: The Invisalign Comprehensive purchased from Align in Q4 2020 cost over 30 percent more than the Invisalign Lite purchased from Align in Q3 2019. ██████████████████████████████████████████ ████████████████████████████████████████ By not accounting for the products sold in each quarter, this analysis would mistakenly find significant pass-on of costs even where none exists.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

289. Dr. Vogt's analysis using the Smile Brands data does not control for product mix, so it effectively amounts to estimating average pass-on from both types of cost changes illustrated in Figure 46.[384]

290. Although the Smile Brands data do not contain information sufficient to identify specific products in each patient contract, the number of months in the contract can be used to approximate the type of product. Specifically, I estimate Dr. Vogt's Smile Brands regression after limiting to Align invoices that Dr. Vogt identifies as Invisalign Comprehensive and patient contracts with a duration of 12+ months, based on the average Invisalign Comprehensive treatment duration.[385] This allows for an estimate of average pass-on for this flagship product.

291. Figure 47 demonstrates the effects of this re-estimation of Dr. Vogt's analysis.

---

[384] This example discusses how changes in product mix muddle the interpretation of average cost and average price across quarters while holding zip code and provider type constant. The same concern applies to the interpretation of average cost and average price holding a different grouping constant. For example, comparing across zip codes while holding the quarter and provider type constant.

[385] According to the American Dental Association, the average Invisalign treatment length is 12 to 18 months. See ADA Marketplace, "Say Cheese! 7 Advantages of Invisalign Over Traditional Braces," available at https://marketplace.ada.org/blog/dental-marketing/say-cheese-7-advantages-of-invisalign-over-traditional-braces/ ("Depending on the type of correction you want, you are likely to wear Invisalign for a period ranging from 12-18 months.").

**Figure 47: Dr. Vogt's Smile Brands Pass-Through Model
Limited to Invisalign Comprehensive**

|  | *Dr. Vogt's Estimate* **All Products** | *Revised* **Comprehensive Only** |
|---|---|---|
| Pass-Through Rate | 0.861*** | 0.280 |
|  | (0.098) | (0.191) |
| Orthodontist Dummy | 487.002† | 470.356 |
|  | (253.514) | (375.027) |
| Quarterly Fixed Effects | Yes | Yes |
| Zip Code Fixed Effects | Yes | Yes |
| Observations | 1915 | 1620 |
| R2 | 0.047 | 0.003 |

Note: † $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$.

Source: Backup to Vogt Report.

292. <u>By controlling, even imperfectly, for the product mix over time, the estimate of pass-on falls to less than 30 percent and is no longer statistically different from zero.</u>  This demonstrates that many Smile Brands dental practices did not pass-on changes in Invisalign costs to their customers.  As suggested above, I find the lower estimated pass-on rate to be more plausible in a context where dental providers charge high price-cost markups and are expected to charge different prices for the same treatment.

### c.  *Dr. Vogt's Analysis of Average Pass-on Ignores the Fact that Prices were Stable for Many Patients*

293. Dr. Vogt did not investigate whether doctors charge customers the same prices before and after changes in the cost of Invisalign to the doctor.  In this section I show that the PepperPointe and Smile Brands data show that dental providers charge many individual patients the same prices that are observed before and after changes in the cost of Invisalign.  This suggests that many

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consumers would not have been injured assuming that Align had overcharged all direct purchasers.[386]

### i.  Analysis of PepperPointe Data

294.  Data from PepperPointe contains information on both the cost of each Invisalign treatment to the dental practice and the price changed to the customer for that treatment.[387]  This provides an opportunity to review PepperPointe's pricing of a specific product over time and assess any changes in pricing when the cost paid to Align changed.

295.  The data cover the period June 2019 through September 2022, and most observations are for Invisalign Comprehensive treatment.[388]  During this period, the cost that PepperPointe paid Align for Invisalign Comprehensive was relatively stable – with constant list pricing but a changing mix of incentives.   PepperPointe consistently received the "Volume Discount Program DSO" of $751.6 but also received the "NLP DSO High Stage Bonus Discount" for an additional $79.86 off during most of the second quarter of 2021.[389]

296.  [390]  The data in the Figure shows prices just for patients that did not receive a discount from PepperPointe.

---

[386]  The Aspen Dental data are not sufficient to link costs and prices between specific transactions.  However, the Align data indicate that the costs paid by Aspen for Invisalign Comprehensive and Invisalign Moderate were stable throughout the available data period.  Because Aspen's costs did not vary, it is not possible to investigate whether Aspen passed on cost changes to all of its customers.

[387]  Specifically, the PepperPointe data contain a field called "Invoice" that can be used to link each patient contract to a "InvoiceNumber" and associated transaction details in Align's data.

[388]  Although the data include contracts for multiple products, 87 percent were for Invisalign Comprehensive treatment.

[389]  See backup to Figure 48.

[390]  ($1,110.39 – $1,195.04) / $1,195.04 ≈ -7.08%.  The $1,110.39 and $1,195.04 costs listed here reflect the "Amount" field recorded in PepperPointe's data. These costs are 6% higher than the "InvoiceAmount" of $1,047.54 and $1,127.40 recorded in the Align data. The difference appears to reflect Kentucky's sales tax rate.

**Figure 48:** 

297. ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████ This analysis, while not determinative, strongly suggests that PepperPointe is not making the pass-on decisions that Dr. Vogt would have expected.

298. Figure 49 expands the analysis to show prices paid by all customers in these periods, regardless of whether they received a discount. ████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████



299. These results are not consistent with PepperPointe charging all patients a lower price when its cost fell. Instead, they demonstrate that many patients pay the same price when costs change. This suggests that even if, contrary to the evidence, Align imposed illegal overcharges on all PepperPointe purchases of Invisalign, many PepperPointe customers would not have been injured.

*ii. Analysis of Smile Brands Data*

300. As noted above, the data from Smile Brands are not sufficient to match, on a transaction by transaction the prices paid by Smile Brands orthodontists for aligners and the prices that these dental providers charged their patients. However, prices of Align sales of Invisalign Comprehensive to Smile Brands can be compared to the prices Smile Brands charged patients

for 12-month or longer treatments, which are likely to represent Invisalign Comprehensive treatment.

301. Figure 50 plots the distribution of prices over time that Smile Brands paid to Align for Invisalign Comprehensive treatments with a separate point for each invoice.



302. Although prices vary across invoices, two prices are pervasive. 

303. Figure 51 plots the distribution of patient prices for 12-month or longer contracts over time with a separate point for each contract. 

**Figure 51: Smile Brands Patient Prices by Contract Date**
**12-Month or Longer Invisalign Contracts**
**April 8, 2015 – December 30, 2021**



Notes: Each translucent circle represents a single patient contract.  Available data include
  contracts active during 2017, 2019, or 2021.

Source: Backup to Vogt Report.

304. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ This is further evidence suggesting that dental provides do not

make pass-on decisions in a manner consistent with Dr. Vogt's predictions.


## VII.   ALIGN DOES NOT HAVE MARKET POWER IN PROPERLY DEFINED ANTITRUST MARKETS

305. My industry analysis in Section IV and economic analyses of the at-issue conduct in Section

V establish that that Align did not anticompetitively exclude competitors.  My conclusion in

this regard does not rely on how the relevant antitrust markets are defined or whether Align

has market power.

306. Nevertheless, in this section I address the views offered by Dr. Singer and Dr. Vogt that (i)

*doctor-directed aligners* are in a separate antitrust market from both DTC aligners and braces,

(ii) Align has market power in the proposed doctor-directed aligner market, (iii) "scanners that permit the export of digital imaging files for Aligner manufacturing" are a relevant antitrust product market, and (iv) Align has market power in the proposed scanner market.

307. In contrast to Drs. Singer and Vogt, the proposed doctor-directed aligners market is not a valid antitrust market. Whether scanners constitute a relevant market can be debated, but it is clear that PVS represents an important competitive constraint if that proposed market is considered. Regarding Drs. Singer and Vogt's conclusions regarding market power, my analysis indicates that Align lacks market power in the teeth straightening market and in their proposed market for scanners.

## A. Market Definition and Market Power

308. As the Federal Trade Commission states, "In the most general terms, a product market in an antitrust investigation consists of all goods or services that buyers view as close substitutes."[391] Market definition therefore involves determining which products can reasonably be used interchangeably. Interchangeability of use can be viewed as having two components: functional substitutability—can the product perform the same function—and economic substitution—are consumers willing to substitute the products at competitive market prices.

309. Market power is the ability to "charge supracompetitive prices over a sustained period of time."[392] Economic substitutes constrain the ability of a firm to assert market power by raising or maintaining prices to a supracompetitive level or reducing output.[393] When assessing whether a firm has market power, economists may consider "direct evidence" (actual proof

---

[391] See, for example, United States Federal Trade Commission, "Guide to Antitrust Laws – Markets," available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/markets. See also, Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, Pearson, 2015, p. 670 ("Product B is a *demand substitute* for A if an increase in the price of A causes consumers to use more B instead.").

[392] American Bar Association, "Monopoly Power," *Monopolization and Dominance Handbook*, 2011, p. 59.

[393] American Bar Association, *Pharmaceutical Industry Antitrust Handbook*, 2018, Second Edition, p. 160 ("In defining the relevant product market, the premise underlying the traditional approach is that the existence of one or more close economic substitutes for a product will constrain the ability of the firm selling that product to exercise market power-i.e., to raise or maintain prices above the competitive level, reduce output, or engage in other anticompetitive conduct.").

that a firm charged supracompetitive prices through restricted output) [394] or "indirect evidence." [395]

### B. The Teeth Straightening Product Market and Align's Lack of Market Power

310. In contrast, I conclude that doctor-direct aligners, DTC aligners, and braces are products within the broader teeth-straightening product market and show that Align does not have market power within this market.

311. My analysis proceeds in five steps:  First, I demonstrate that doctor-directed aligners, DTC aligners, and braces are functional substitutes.  Second, I show that the documentary evidence is consistent with these products being in the same antitrust market.  Third, I explain why Dr. Singer's and Dr. Vogt's hypothetical monopolist test are flawed.  Fourth, I show that the so-called *Brown Shoe* Factors are consistent with a teeth-straightening product market.  Lastly, I estimate Align's market share within the teeth-straightening market and conclude that Align does not have market power.

#### 1. Doctor-Directed Aligners, DTC Aligners, and Braces are Functional Substitutes

312. As discussed in the industry analysis, aligners and braces are functional substitutes for most patients.  Both aligners and braces perform the same function of applying force to teeth to move them into the desired position.  While braces can treat some types of malocclusion that

---

[394] American Bar Association, *Pharmaceutical Industry Antitrust Handbook*, 2018, Second Edition, p. 166 ("Although courts predominantly rely upon the relevant market analysis to determine market share and the presence of market power, some courts evaluate market power by examining direct forms of proof, such as evidence of supracompetitive prices, barriers to entry, abnormally large profit margins, output restrictions, or sub-competitive quality or service."), p. 63 ("Monopoly power may be established through either direct evidence-evidence that a firm exercises actual control over prices or output, or has the ability to exclude competitors-or indirect evidence of such power").

[395] American Bar Association, "Monopoly Power," *Monopolization and Dominance Handbook*, 2011, at p. 63 ("Monopoly power may be established through either direct evidence-evidence that a firm exercises actual control over prices or output, or has the ability to exclude competitors-or indirect evidence of such power").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

aligners cannot, aligners can treat close to 90 percent of all cases of malocclusion.[396]  The functional substitutability of aligners and braces is supported by the evidentiary record:

i.   The straightforward observation that aligners are now used to straighten teeth for patients that previously would have received braces.

ii.  Named DPP Plaintiff City Smiles states on its website that "the big difference" between aligners and metal braces is "the clear factor," not a difference in function.[397]  Another Plaintiff, VIP Dental Spa lists advantages over braces on its website, including "fewer appointments," "shorter visits," "no impact on your diet," "'fast' and 'quick' options available," and "easy to clean," but no difference in the teeth straightening function.[398]

iii. Named Plaintiffs in the EPP case acknowledged that braces and aligners are alternative treatments and considered braces before choosing aligners.[399]

iv.  Align has offered promotions meant to encourage potential users of braces to opt for Invisalign instead.  Such promotions only make sense for Align to offer because its aligners are functional substitutes for metal braces.  For example, Align offers a Bracket Buy Back (BBB) promotion "intended to help … Doctors ease the transition [from braces] to higher Invisalign adoption."[400]

---

[396]  See also Form 10-K 2022. Align Technology, Inc., 2022, available at https://investor.aligntech.com/static-files/eb70ffbf-1126-4422-94fc-8fa110079497, p. 6.

[397]  City Smiles, "Invisalign," available at http://www.citysmilesonline.com/cosmetic-dentistry-invisalign.

[398]  VIP Dental Spa, "Invisalign," available at https://www.vipdentalspas.com/invisalign-west-hollywood-ca.

[399]  Deposition of Jaime Gooch, EPP Class Representative, January 31, 2023, at 40:7-12 ("Q. Are you aware of other ways that you can get your teeth straight other than Invisalign? A. I am aware. Q. What are those other ways? A. Braces is an alternate option to the invisible aligners."); Deposition of Justin Michael Hansen, EPP Class Representative, February 10, 2023, at 38:5-13 ("Q. Were you not able to see the price of Invisalign in advance of purchasing? A. I was unable to compare it to similar products. Q. And why is that? A. Via the method going through the orthodontist, Invisalign -- they are an Invisalign partner, so for the teeth-straightening, the only option was metal braces or Invisalign."); Deposition of Cecilia Garay, EPP Class Representative, January 27, 2023, at 33:9-18 ("Q. Did you consider getting regular braces?  A. I did.  Q. Did you ever receive braces?  A. No.  Q. Why did you ultimately decide not to get braces?  A. The ortho that I went to, had the consultation with -– he recommended the Invisalign for me, not the regular braces.").  Deposition of Elisabeth J. Skibba, EPP Class Representative, January 26, 2023, at 29:8-11 ("Q. Did you consider wire and bracket braces to fix your teeth?  A. I did, but I also was in my 30s and wanted clear aligners."); Deposition of Katie Campbell, EPP Class Representative, January 23, 2023, pp. 77:1-7 ("Q. You said that you considered different options of needing to correct the alignment with your periodontist. What other options did you consider? A. I considered clear aligners versus braces, traditional braces.").

[400]  ALIGNAT-PURCH00747133-136 (Bracket Buy Back Program 2020 Terms and Conditions), at 133.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

     v.   Dental insurers generally do not distinguish between aligners or braces for purposes of orthodontic coverage.[401]

313. Aligners provided in-office by dental services providers are functional substitutes for DTC aligners.  The evidentiary record is clear on this point:

     i.   Align advertises that Invisalign can "fix nearly all common teeth-straightening and bite issues, from simple to complex."[402]

     ii.   SDC markets its DTC aligners based on their advantages relative to Invisalign products.[403]

     iii.   Named Plaintiff Katie Campbell, who used Align aligners also considered SDC aligners "[b]ecause it was an option to straighten my teeth."[404]

     iv.   Orthodontists frequently encourage patients to seek out in-office alternatives to DTC, arguing that they can treat all the same conditions, but with greater supervision and customization.[405]

314. Products that perform the same function and are viewed as substitutes by users and other industry participants are functional substitutes.

---

[401] For example, Aetna states that "[t]here are no documents that reflect coverage specifically for Aligner Products or Braces Products as both categories are treated the same under Orthodontics." *Misty Snow v. Align Technology, Inc.*, Subpoena for documents directed to Aetna Inc., United States District Court, Northern District of California, 21-03269, at p. 4.  Delta Dental of Massachusetts stated that "documents maintained by DDM do not differentiate between Aligner Treatments and Braces Products." *Misty Snow v. Align Technology, Inc.*, Subpoena for documents directed to Delta Dental of Massachusetts Inc., United States District Court, Northern District of California, 21-03269, at p. 6.

[402] Invisalign, "FAQ," Align, available at https://www.invisalign.com/frequently-asked-questions ("Is Invisalign treatment right for me?  […]Our innovations and technological advancements make it possible to fix nearly all common teeth-straightening and bite issues, from simple to complex — all without interrupting your busy life.").

[403] SDC, "SmileDirectClub vs. Invisalign: What's the difference?," SDC, available at https://smiledirectclub.com /blog/smiledirectclub-vs-invisalign/.  SDC, "Why SmileDirectClub?," SDC, available at https://smiledirectclub .com/why-smile-direct-club.

[404] Deposition of Katie Campbell, EPP Class Representative, January 23, 2023, at p.88:08-24 ("Q. And you said you considered other clear aligner brands. What clear aligner brands did you consider? A. I was open to any other options that were available to me. I -- SmileDirectClub, I believe is the name. That was one that I knew of. I didn't really do much research into it. I just spoke with the orthodontist about it. Q. How did you hear about SmileDirectClub? A. TV commercials. Q. Why did you consider SmileDirectClub? A. Because it was an option to straighten my teeth.").

[405] Section VII.B.2.a.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 2. *Documentary Evidence Is Consistent with Doctor-Directed Aligners, DTC Aligners, and Braces Being in the Same Antitrust Market*

315. Dr. Singer and Dr. Vogt both point to documentary evidence in claiming that DTC aligners and braces are not in the same antitrust market as doctor-direct aligners[406],[407]  Contrary to these analyses, I find that the documentary evidence is consistent with doctor-directed aligners, DTC aligners, and braces being in the same antitrust market.

### a. *Evidence Regarding Economic Substitutability Between Doctor-Directed Aligners and DTC Aligners*

316. Dr. Singer argues that DTC aligners are not economic substitutes for doctor-directed aligners because DTC aligners treat different misalignment cases than doctor-directed aligners and are different prices for patients.[408]  Dr. Vogt similarly claims that DTC aligners and doctor-directed aligners are in different markets.[409]

317. These claims do not account for product differentiation in doctor-directed aligners and the substitutability between DTC aligners and doctor-directed products that treat less severe forms of malocclusion.[410]  Dr. Singer and Dr. Vogt claim that there is little overlap between DTC and doctor-directed aligners, because DTC aligners tend to treat less severe dental conditions and cost less to consumers, yet their evidence for this mostly consists of comparing all Invisalign cases, the majority of which are Invisalign Comprehensive cases, to SDC's aligners.[411]  While certain doctor-directed aligners, such as Invisalign Comprehensive and ClearCorrect "Unlimited," can treat more severe cases than DTC brands can, other doctor-directed products

---

[406]  Singer Report, Sections I.A.2.e-f and Vogt Report, Sections G.1, G.3.

[407]  Dr. Singer also points to high barriers to entry and internal Align documents as evidence he claims shows that doctor-directed aligners are in a separate antitrust market.  I address this evidence in the evaluation of the Brown Shoe factors.

[408]  Singer Report, ¶¶ 64, 65, and 67.

[409]  Vogt Report, ¶ 424.

[410]  Differentiated products can be in the same antitrust market.  In fact, products in most markets are differentiated from each other.  For instance, Pepsi and Coca-Cola or a Honda sedan and Nissan sedan may well be in the same market, but they are differentiated from each other based on consumer preferences, branding, and product features.  See, for example, W. and Jeffrey M. Perloff, Modern Industrial Organization, Pearson, Fourth Edition, 2015, at pp. 226-227 ("[P]roducts are differentiated because consumers think they differ… [M]any consumers strongly prefer Coke to Pepsi or vice versa, yet they have trouble differentiating them by taste.").

[411]  Singer Report, ¶¶ 64-65, 67; Vogt Report, ¶¶ 400-414.

are closer substitutes for DTC brands.  For example, Invisalign Express and Invisalign Express 5 treat very mild to mild cases, Invisalign Lite treats mild to moderate cases,[412] and ClearCorrect "Mini" and "One" plans treat very mild cases.[413]  <u>The fact that Invisalign introduced less expensive treatments for less severe malocclusions as a means of competing against DTC rivals, is, in itself, strong evidence that doctor-directed aligners are not a valid product market</u>.

318.   Some doctor-directed aligners are priced similarly to DTC aligners.  For example, SDC's sales data for 2022 show that it charged list prices ranging from $1,400 to $3,190.[414]  New Mouth, a dental consumer advice provider, also reported prices within that range for SDC and other DTC brands: SDC: $2,050; Byte: $1,999 to $2,399; SnapCorrect: $1,749 to $1,940; and New Smile: $1,495 to $1,595.[415]  These DTC prices are in line with reported patient prices for simpler doctor-directed products.  For instance, the Consumer Guide to Dentistry, another dental consumer advice provider, estimated that Invisalign Express can cost in a range from $1,800 to $3,500 and ClearCorrect Limited costs $2,500 to $3,500.[416]  Forbes estimated a somewhat lower price range for Invisalign Express of $1,500 to $2,000, as well $1,200 to $1,800 for Invisalign Express 5.[417]

---

[412]  Invisalign, "Invisalign Product Portfolio," available at https://cloud news.aligntech.com/productportfolio.

[413]  Somers, Jamie, "ClearCorrect's Treatment and Pricing Options," ClearCorrect, available at https://support .clearcorrect.com/hc/en-us/articles/4402074198807-ClearCorrect-s-Treatment-Pricing-Options.

[414]  SDC_SNOW_00000001 (SDC sales data).  See backup calculation.

[415]  Hill, Alyssa, "How Much Do Clear Aligners Cost?," New Mouth, March 8, 2023, available at https://www newmouth.com/orthodontics/treatment/clear-aligners/cost/.

[416]  Consumer Guide to Dentistry, "Invisalign Express & Invisalign Teen," available at https://www .yourdentistryguide.com/invisalign-express/; Consumer Guide to Dentistry, "ClearCorrect: How Does it Work and What Does it Cost?," available at https://www.yourdentistryguide.com/clearcorrect/.

[417]  Borst, Heidi, "How Much Does Invisalign Cost?," Forbes, updated April 25, 2023, available at https://www .forbes.com/health/body/invisalign-cost/.  Dentaly, another dental consumer advice provider, reported an estimate of the cost of Invisalign Express between the Consumer Guide to Dentistry's and Forbes's: $1,500 to $2,500. Napitu, Amanda, "Invisalign Lite: Cost, Eligibility, and Before and After Results," Dentaly, updated Februaruy 26, 2023, available at https://www.dentaly.org/us/invisalign-invisible-braces/invisalign-lite/.

319. The simpler doctor-directed product also have short treatment periods, which mirror the generally shorter treatment periods for DTC aligners.[418]

320. Competition between doctor-directed aligners and DTC aligners is also documented in analyst reports, dental provider advertising, and internal Align documents.  For example, a 2021 Credit Suisse survey of dental practitioners showed that many of them considered DTC aligners a competitor that could or was affecting their prices and volume.[419]  While a few practitioners responded that DTC offerings have a positive impact on their business, their reasoning was generally that DTC marketing and treatments would help grow aligner sales overall, which is consistent with DTC and doctor-directed aligners competing for customers.[420]  A 2019 Credit Suisse report noted similar concerns from practitioners and noted a general "concern[] over competition, DTC concepts, and [average sale prices]," and how these factors would affect Align.[421]  A 2021 Wolfe Research report noted that Align had been losing market share to DTC providers and projected it would continue to do so, noting that "improvements in scanning

---

[418] Somers, Jamie L., "ClearCorrect's Treatment and Pricing Options," ClearCorrect, available at https://support .clearcorrect.com/hc/en-us/articles/4402074198807-ClearCorrect-s-Treatment-Pricing-Options.  Invisalign, "Invisalign Product Portfolio," available at https://cloud news.aligntech.com/productportfolio; ALIGNAT-SNOWS1_0086279-301 (Product Strategy for Driving Consumer Engagement & Experience), at 281 ("There are other players however, that are creating new business models and going directly to consumers (DTC). These DTC brands are emphasizing not only low cost offerings, but also more convenient, faster treatment services"); Howley, Elaine K., "Invisible Braces: In Office vs. Of the Shelf," U.S. News Health, March 18, 2022, available at https://health.usnews.com/health-care/patient-advice/articles/invisible-braces-guide. ("[M]ost of SmileDirectClub's patients complete treatment in four to six months. Byte offers a similar timeline. Candid says its patients are usually done in four to 12 months. Invisalign takes on average 12 to 18 months").

[419] Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021, at p. 48 (Doctors stated that DTC aligners "Will probably take business away"; "Takes business away from practitioner"; "are decreasing case acceptance by in-office practitioners"; and brought "Competition with cheaper products despite less comparable result.").

[420] Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021, at p. 48 ("More consumer awareness … good advertisement for clear aligners … Have increased business due to free marketing and due to patients coming in for re-dos … Patients come to us when they're unhappy with results … Generates interest …. Have repaired many cases of damage caused by SDC … Patient awareness and fixing DTC cases").

[421] Wright, Erin Wilson, Katie Tryhane, and George Engroff, "Dental Update," Credit Suisse, July 2019, at p. 2 ("While ALGN remains well ahead in terms of innovation, some practitioners are seemingly worried about DTC concepts gaining traction in the marketplace, while others view greater marketing efforts around clear aligner solutions may drive acceptance of the solution more broadly, thereby benefitting the doctor-directed market, as well. While concerns over competition, DTC concepts, and ASPs will remain overhangs, we view there is room for several players in a highly underpenetrated clear aligner market. ALGN is well ahead in terms of innovation, and we await further traction in recently launched products.").

technology, remote monitoring, treatment planning, and AI could shift the market meaningfully, particularly toward a DTC or remote model."[422]

321. Regarding advertising by dental providers, a simple Google search for "DTC vs in-office aligners," turns up numerous orthodontists' websites with titles like "Why You Should Choose an Orthodontist over DTC Aligners" or "The Benefits of Choosing an Orthodontist Vs. DTC Aligners."[423] Orthodontists encourage patients considering DTC aligners to opt for in-office aligners instead, touting benefits such as more customized treatment plans and closer supervision from orthodontists.[424] Orthodontists also claim that in-office aligners can be as cost-efficient as DTC aligners.[425]

322. Align documents also indicate that its doctor-directed aligners compete with DTC products for sales. For example, Align personnel in 2019 acknowledged that Align faced a "considerable increase in clear aligner competition at the low end segment (very minor tooth movement),"

---

[422]  Wolfe Research, "Clear Aligner Market Model," March 11, 2021, p. 3.

[423]  See, for example, Vermette Orthodontics, "Why You Should Choose an Orthodontist over DTC Aligners," September 30, 2020, available at https://vermetteortho.com/why-you-should-choose-an-orthodontist-over-dtc-aligners/; Dudley Smiles, "The Benefits of Choosing an Orthodontist Vs. DTC Aligners," December 31, 2020, available at https://www.dudleysmiles.com/the-benefits-of-choosing-an-orthodontist-vs-dtc-aligners/; Fagala DDS, MDS, Kyle, "The 5 Reasons to Pick an Orthodontist over DTC Aligners," Saddle Creek Orthodontics. January 10, 2020, available at https://saddlecreekortho.com/the-5-reasons-to-pick-an-orthodontist-over-dtc-aligners/.

[424]  Boggan, Brandon, "Choosing Between Direct-to-Consumer (DTC) Aligners and Orthodontist-Provided Aligners: A Comprehensive Guide," Ortho South, available at https://www.orthosouth.com/choosing-between-direct-to-consumer-dtc-aligners-and-orthodontist-provided-aligners-a-comprehensive-guide ("The initial evaluation differs between Direct-to-Consumer aligners and orthodontist-provided aligners. Orthodontists will comprehensively evaluate the patient's teeth, bite, and jaw and take detailed impressions or scans of the patient's teeth to create custom-made aligners. …Orthodontists provide ongoing care and adjustments to ensure that the aligners are working properly and that treatment is progressing as expected."). Fagala, Kyle, DDS, MDS, "The 5 Reasons to Pick an Orthodontist over DTC Aligners," Saddle Creek Orthodontics, January 10, 2020, available at https://saddlecreekortho.com/the-5-reasons-to-pick-an-orthodontist-over-dtc-aligners/ ("Supervision throughout the process … Customized Treatment Plans.").

[425]  Vermette Orthodontics, "Why You Should Choose an Orthodontist over DTC Aligners," September 30, 2020, available at https://vermetteortho.com/why-you-should-choose-an-orthodontist-over-dtc-aligners/ ("Direct-to-consumer aligners can seem like an inexpensive and simple way to straighten your smile without leaving home, but they can end up costing more in the long run when you consider all the potential risks associated with them."). Fagala, Kyle, DDS, MDS, "The 5 Reasons to Pick an Orthodontist over DTC Aligners," Saddle Creek Orthodontics, January 10, 2020, available at https://saddlecreekortho.com/the-5-reasons-to-pick-an-orthodontist-over-dtc-aligners/ ("[M]any qualified orthodontists are actually able to compete with the cost and time that most DTC companies claim, anyway! For example, SCO offers a variety of affordable treatment options for patients of all ages, along with flexible payment plans and automatic bank drafts. We'll also check with your insurance company for any orthodontic benefits.").

due to competition with DTC and other sources.[426]  As a result, it lowered the price of its Express 5 product to "allow Align to continue to play in the low end."[427]  One Align employee lamented that the result of competition from DTC and others "is a race to the bottom in terms of price."[428]

323.  Notably, the Align documents Dr. Singer and Dr. Vogt cite that suggest a small effect of DTC aligners on Align's sales are primarily from 2016 through 2018, when DTC aligners were new products.[429]  These same documents, however, indicate that Align did not conclude that it could not or did not compete with SDC.  Instead, one theme of several of these documents was that SDC had developed an effective marketing strategy that was increasing adoption of both in-office and DTC aligners, indicating that customers considered in-office aligners to be substitutes for DTC aligners.[430]  The cited documents, moreover, did not concede DTC customers to SDC, but discussed strategies Align could pursue to attract more of SDC's customer base.[431]

---

[426]  ALIGNAT-SNOW00332894-896 (internal Align email thread titled "Simple cases – NA's approach"), at 895-896.

[427]  ALIGNAT-SNOW00332894-896 (internal Align email thread titled "Simple cases – NA's approach"), at 896.

[428]  ALIGNAT-SNOW00332894-896 (internal Align email thread titled "Simple cases - NA's approach"), at 896.

[429]  SDC, which "spearheaded" the development of the DTC channel according to Credit Suisse, was founded in 2014, and had only achieved $2 million in annual revenue by 2016.  Figure 4;Figure 13; Credit Suisse, "SmileDirectClub – Setting Things Straight: Initiate Outperform," October 2019, at p.15 ("over the past several years, SDC has spearheaded efforts in the DTC market, which bypasses in-person doctor visits altogether in an attempt to democratize the clear aligner landscape, providing a more cost effective and convenient offering. SDC remains the market leader in the DTC market with 95% share, albeit with several start-ups in the emerging DTC space.").  Vogt Report, for example, ¶¶ 408-409 (citing 2016 Align documents); ¶¶ 411-412 (citing 2017 Align emails), ¶ 413 (citing a 2018 study).  Singer Report, ¶ 67 (citing Align 2017 emails).

[430]  ALIGNAT-SNOW00111865-912 (Align presentation discussing consumer survey results) at 912 ("SDC's advertising spend is a strong force to compete against: We are getting drowned out and undermined by SDC's heavy spending/advertising, and could be missing out on potential new customers.").  ALIGNAT-SNOW00912379-381 (2017 Align emails discussing SDC research) at 380 ("That being said, at the national level, given the amount that SDC is spending on DTC, I can't imagine that they are not helping us by raising overall clear aligner awareness. Given that we both accelerated our media spend in 2017, it's difficult to isolate the net impact of each company's efforts.").

[431]  ALIGNAT-SNOW00111865-912 (Align presentation discussing consumer survey results) at 912 ("Additional investment in advertising will be needed to compete with SDC for this share of the market. …Those consumers who did not choose SDC were swayed by the perceived risk associated with 'DIY orthodontics' and a fear that something could go wrong. Amplifying this message might help Invisalign capture a portion of the SDC share. … As important as a lower-cost product offering is one with a fixed monthly payment plan. Consumers

### b.  Economic Substitutability Between Doctor-Directed Aligners and Braces

324. Similar to his argument that DTC aligners do not compete with doctor-directed aligners, Dr. Singer claims that brace are not economic substitutes for doctor-directed aligners "because of differences in required training, customer base, aesthetic, hygiene, treatment duration, and cost (both Dental Practice costs and patient costs)."[432]  However, the evidence demonstrates that none of these factors prevent in-office aligners from competing with braces.

325. Braces are economic substitutes with doctor-directed aligners, especially for higher-end treatments.  Invisalign Express may not be a close substitute for metal braces in a lot of instances, but Invisalign Comprehensive, which can treat all but a small percentage of the conditions braces can treat, is a closer substitute.  This economic substitutability is reflected in pricing:  Invisalign Comprehensive covers a similar range of prices as braces.[433]  Available industry publications offer estimates of braces pricing such as $2,500-$7,500,[434] $3,000-7,000,[435] and $3,000-$7,500,[436] for metal braces.  Similarly, news and industry publications

---

perceive Invisalign pricing to be not only expensive, but also mysterious and unpredictable, and this holds a portion of them back from moving forward with treatment.").

[432]  Singer Report, ¶ 57.

[433]  Dr. Singer argues that the cost of metal braces to dentists and orthodontists is significantly lower than aligners. His comparison of the cost of materials does not capture the true economic cost of providing the two services due to different labor requirements between providing metal braces and clear aligners.  In addition, given that the patient is the end consumer, the patient price is a more informative measure when considering the willingness of patients to substitute between the two products.  I therefore focus on the patient price in this analysis. See Singer Report, ¶ 61.

[434]  Asmussen, Natalie, "How Much Do Braces Cost a Month? Price Comparison of Different Types," Dentaly, available at https://www.dentaly.org/us/adult-braces/braces-cost-a-month/ ("You might pay anywhere from $2,500 to $7,500 total for traditional braces.").

[435]  Oral-B, "How Much Do Braces Cost?," available at https://oralb.com/en-us/oral-health/life-stages/braces/how-much-do-braces-cost/; Impress, "How much do braces cost? Price of braces in the USA in 2023," available at https://smile2impress.com/us/blog/how-much-do-braces-cost-usa.

[436]  Yetman, Daniel, "How Much Do Braces Cost?," Healthline, April 1, 2021, available at https://www.healthline.com/health/average-cost-of-braces#cost-with-insurance.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

estimate that Invisalign Comprehensive can come with patient prices in the range of $4,500 to $8,000 or $5,000 to $8,000.[437,438]

326. Unsurprisingly, given the similarity in prices and uses between at least high-end doctor-directed aligners and braces, there is evidence of consumers substituting between the two. Section VII.B.1 demonstrated that consumers often discuss and consider both aligners and braces with their dentist or orthodontist, and also cited evidence that Align pursued promotional campaigns intended to encourage substitution from braces to its aligners.

327. Dr. Vogt claims that a 2015 Align internal analysis of demand for its products shows that Align's prices were not competitively constrained by the prices of metal braces and the products are therefore in separate antitrust markets.  Dr. Vogt emphasizes three points from the 2015 study:[439]

    i. "Align's 2015 prices were either profit maximizing or could profitably sustain a SSNIP [small but significant nontransitory increase in price];"

    ii. "The introduction of a new clear aligner product would increase the elasticities facing Align such that it became profit-maximizing to reduce prices; and "

    iii. "A new, price-discounted, clear aligner product would take volume from Invisalign without substantially affecting braces."

328. However, none of these statements shed any light on the central economic question relevant to determining the relevant product market under the hypothetical monopolist framework he claims to be using.  It is not unusual for firms to adjust pricing up or down periodically to maintain optimal pricing, and having prices already at the optimal level in no way suggests that a firm has monopoly power.  Moreover, firms in a differentiated product market have the

---

[437] Borst, Heidi, "How Much Does Invisalign Cost?," Forbes, updated April 25, 2023, available at https://www.forbes.com/health/body/invisalign-cost/; Big Smile Dental, "Invisalign Cost," October 12, 2022, available at https://bigsmiledental.com/blog/invisalign-cost/; Chin, Kevin, DDS, "Invisalign cost – the why and what to expect," City of Angels Dentistry, November 7, 2019, available at https://www.cofadentistry.com/blog/invisalign-cost.

[438] Figure 44 uses data on selected dental practices to show that there is a wide range of patient prices for Invisalign Comprehensive, with most cases costing between $4,000 and $8,000.  In addition, a 2018 Align survey reported an average patient price for Invisalign Comprehensive of $5,315, and ClearCorrect's comprehensive treatment as $4,617.64.  See ALIGNAT-PURCH00057795-831 (Clear Aligner Market Tracker, Q1 2020), at 818.

[439] Vogt Report, ¶ 381.

ability to set prices above marginal costs and can be forced to lower them when faced with additional competition.[440]  Finally, while Dr. Vogt claims that the Align study indicates that a new aligner product might "take volume from Invisalign without substantially affecting braces," the study indicates that metal braces would also lose sales to aligners.  This is notably not a SSNIP test – it does not measure the change in sales for a specific change in price – and thus does not indicate whether any such loss of sales would be enough that a hypothetical monopolist would choose not to raise prices.

### 3. Dr. Singer's and Dr. Vogt's Hypothetical Monopolist Tests Are Flawed

329.  Dr. Singer and Dr. Vogt both conduct Hypothetical Monopolist Tests (HMT) and the related SSNIP Tests in support of their view that doctor-directed aligners alone constitute an antitrust market.  A HMT is commonly used in market definition and is intended to identify the narrowest product market in which a hypothetical monopolist for all production in that market would profitably be able to increase price by a *small but significant amount for a sustained period of time* (SSNIP).[441]  If, on the other hand, such an increase in price would cause enough consumers to substitute away from goods in the proposed market that it would be unprofitable

---

[440]  See, for example, Kaplow, Louis and Carl Shapiro, *Handbook of Law and Economics*, Volume 2, Edited by A. Mitchell Polinsky and Steven Shavell, 2007, Elsevier B.V., p. 1085 ("In general, however, we know that a firm faces highly elastic demand if its rivals offer very close substitutes, so the Bertrand theory predicts larger markups when the products offered by the various firms are more highly differentiated").  See also, US Department of Justice, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act," May 11, 2009, available at https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2 ("Market power is a seller's ability to exercise some control over the price it charges. In our economy, few firms are pure price takers facing perfectly elastic demand.  For example, the unique location of a dry cleaner may confer slight market power because some customers are willing to pay a little more rather than walk an extra block or two to the next-closest dry cleaner.  Economists say the dry cleaner possesses market power, if only to a trivial degree.  Virtually all products that are differentiated from one another, if only because of consumer tastes, seller reputation, or producer location, convey upon their sellers at least some degree of market power.  Thus, a small degree of market power is very common and understood not to warrant antitrust intervention.").

[441]  US Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, at pp. 8-10 ("The Agencies use the hypothetical monopolists test to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms… [T]he test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products… likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms.").

for the hypothetical monopolist to raise prices, then the test fails and substitute products must be added to define a relevant market.[442]

330. In this section I explain why each of Dr. Singer's and Dr. Vogt's hypothetical monopolist test analyses is flawed and therefore fails to demonstrate the doctor-directed aligners are a separate antitrust market.

### a. Dr. Singer's Hypothetical Monopolist Test

331. As part of his HMT test, Dr. Singer performs a "critical elasticity analysis"[443] by estimating the demand elasticity (a measure of how much its sales would decline if it raised prices by one percent) a hypothetical monopolist for aligners would have to face for it to be indifferent between raising prices by five percent and not raising prices at all. This critical elasticity is then be compared to an estimate of the actual demand elasticity for aligner products. If aligners are determined to face an elasticity higher than the critical elasticity, then that would imply it would not be profitable for a hypothetical monopolist of aligners to raise prices by five percent because too many consumers would shift away from aligners. If, on the other hand, aligners are determined to face an elasticity lower than the critical elasticity, then it would be profitable for the hypothetical monopolist to raise prices by five percent.

332. Dr. Singer calculates the critical elasticity, $E_c$, with the formula:

$$E_c = \frac{1}{(m + p)}$$

Where $m$ is Align's margin on aligners and $p$ is the size of the price increase being considered. Dr. Singer is considering a five percent price increase, so $p$ is 0.05. As a proxy for the margin that a hypothetical monopolist would face, Dr. Singer estimates that Align's margin is 0.75. The critical elasticity, $E_c$, for a five percent price increase is therefore 1 / (0.75 + 0.05), which

---

[442] US Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, pp. 8-10 ("The hypothetical monopolist's incentive to raise prices depends both on the extent to which customers would likely substitute away from the products in the candidate market in response to such a price increase and on the profit margins earned on those products.").

[443] Singer Report, Section I.A.2.a

equals 1.25.[444]  This means that Dr. Singer's critical elasticity analysis will find that aligners are a relevant product market if the elasticity of demand for aligners is less than 1.25.  Dr. Singer calculates the actual own-price elasticity of Invisalign to be 1.21 and therefore concludes that aligners are a relevant product market, separate from traditional braces.

333. One central flaw renders Dr. Singer's analysis completely uninformative.  When calculating the hypothetical monopolist's elasticity of demand, Dr. Singer uses a log-linear regression model meant to assess how Align's (as a proxy for all aligners) sales change when its prices change.  Dr. Singer correctly notes that merely estimating the statistical relationship between sales and prices would lead to a biased elasticity estimate.[445]  Such an estimate would capture not only the causal impact of price changes on sales (the elasticity that Dr. Singer intends to measure) but also the impact that unobservable shifts in demand may have on both price and quantity.  For instance, if, over the sample period, demand for aligners were increasing in general, then, all else equal, both prices and sales would tend to increase.  In this case, the statistical relationship between price and quantity would be positive – as the price goes up, consumers buy more.  It would, of course, be a mistake to interpret that relationship as causal.  Raising prices should not lead customers to purchase aligners.  Thus, a regression directly estimating the relationship between price and quantity would not provide a reliable estimate of the demand elasticity for aligners.

334. Dr. Singer attempts to address this problem using a two-stage least squares (TSLS) approach using an instrumental-variable to obtain an unbiased estimate.  Such a TSLS approach seeks to use some other factor (called an "instrumental variable") that influences price without otherwise influencing demand.  Using just the portion of price changes attributable to the instrumental variable, it is theoretically possible to get an unbiased estimate of elasticity.  However, this approach requires the expert to identify a valid instrumental variable, and as I show below, Dr. Singer's proposed instrumental variable is not valid.

335. As one economic authority puts it, a valid instrumental variable is one that "is correlated with the causal variable of interest [in this case, the price of aligners], but uncorrelated with any

---

[444]  Singer Report, ¶¶ 38-39.

[445]  Singer Report, ¶ 41.

other determinants of the dependent variable [in this case, the quantity of aligners sold]."[446] It is easy to see why Dr. Singer would have thought that Align's costs could make a valid instrument.  Economic theory would predict that, all else equal, some portion of any increase in Align's costs would be passed through to consumers as higher prices – that would satisfy the requirement that costs are correlated with prices.[447]  And it is not immediately obvious whether costs are correlated with any of the other determinants of aligner sales.

336. It is in this second requirement, however, that Dr. Singer's proposed instrumental variable fails. The results of the first stage of Dr. Singer's TSLS, shown in Figure 52, illustrate that there is a strong *negative* correlation between Align's costs and prices.

**Figure 52: Dr. Singer's First Stage Regression Results**

| Dependent Variable: *ln* (Invisalign Price) | |
|---|---:|
| *ln* (Align Costs) | -0.08*** |
|  | (0.00) |
| Constant | 7.56*** |
|  | (0.01) |
| Observations | 1,055,648 |

Note: Robust standard errors in parentheses. *** p<0.01.

Source: Backup materials to the Singer Report.

337. Specifically, Dr. Singer's first stage regression shows that a one percent increase in Align's costs is associated on average with a .08 percent *decrease* in price.  This cannot reflect the causal impact of Align's costs on its prices because economic theory indicates that relationship is positive.  That this relationship is, instead, negative indicates that there are other factors, omitted from this regression analysis, that influence both Align's costs and its prices.

---

[446] Angrist, Joshua D. and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, Princeton University Press, March 2008, at p. 85.

[447] See, for example, Krugman, Paul, *Economics*, Worth Publishers, 2009, Second Edition, at p. 75 ("An increase in the price of an input makes the production of the final good more costly for those who produce and sell it.  So producers are less willing to supply the final good at any given price, and the supply curve shifts to the left.").

338. Thus, Dr. Singer's choice of instrument, costs, fails to do the job. Its significant (negative) correlation with price indicates that the regression is not properly specified, e.g., that it suffers from the omission of relevant variables. Explained differently, Dr. Singer's instrumental variable is not exogenous. As one econometrics textbook explains: "If the instruments are not exogenous, then TSLS is inconsistent: The TSLS estimator converges in probability to something other than the population coefficient in the regression."[448] The same source also makes clear that "[i]nvalid instruments produce meaningless results."[449] This is what has happened with Dr. Singer's elasticity estimates. His regression analysis has produced meaningless results that do not shed light on the actual elasticity faced, either by Align, or by a hypothetical monopolist for clear aligners.

### b.  Dr. Vogt's Hypothetical Monopolist Test

339. To perform his SSNIP test, Dr. Vogt uses data from Gaidge, an orthodontic practice management software company.[450] The Gaidge data report monthly observations from May 2017 to May 2022 of the number and average price of braces and aligner starts across all Gaidge locations. For example, in May 2017, the Gaidge data report 27 braces starts with an average price of $5,406 and 9 aligner starts with an average price of $5,293.[451] Dr. Vogt notes that in March 2019, the average price of braces rose by 3.6 percent and the average price of aligners fell by 1.7 percent relative to February 2019. Dr. Vogt claims that the resulting change in relative prices constitutes a "SSNIP" of roughly five percent.[452]

340. With these data, Dr. Vogt performs a regression analysis in which he estimates the statistical relationship between metal braces or aligner starts and three explanatory variables: (i) a linear trend, (ii) an indicator variable equal to one in the period after the price change, which he calls the "SSNIP," and (iii) an interaction of (i) and (ii) estimating a linear trend in the period after

---

[448]  Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, Pearson Addison Wesley, 2007, Second Edition, p. 443.

[449]  Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, Pearson Addison Wesley, 2007, Second Edition, p. 439.

[450]  Vogt Report, ¶ 384.

[451]  See backup calculation.

[452]  Vogt Report, ¶ 385.

the price change.  Dr. Vogt finds that there was not a statistically significant change in starts or the trend in starts for braces or aligners following the price change and concludes that the "SSNIP caused no significant diversion from braces to Aligners."[453]

341. There are several flaws in this analysis that render Dr. Vogt's SSNIP test uninformative.

342. First, the Gaidge data do not provide information on the types of braces and aligner treatments being sold or on the providers included in the data.  Changes in average prices could therefore be due to changes in the types of treatments being sold over time or changes in the doctors included in the data.

343. Second, Dr. Vogt's approach assumes that any change (or lack thereof) in quantity following a March 2019 price change must be the causal impact of the price change on quantity demanded. But, as I noted in the discussion of Dr. Singer's elasticity regression,[454] there is no basis for this assumption.  It is equally plausible that any difference in relative prices before and after March 2019 was the result of shifts in demand for braces and aligners.  For example, demand would have shifted due to increased adoption of aligners and any impact the COVID-19 pandemic had on demand.[455]  Dr. Vogt's regression analysis makes no attempt to control for the impact of changes in demand on changes in relative pricing.  As a result, his regression estimates are biased, and therefore uninformative.  Contrary to Dr. Vogt's claims, his analysis does not constitute a SSNIP test of how much quantity changes in response to a change in price.

344. Third, Dr. Vogt reports that the estimated effect of the observed relative increase in the price of braces is not statistically different from zero.  He does not, however, report whether the data are sufficient to rule out a positive effect on the change in sales of aligners, which is the more natural hypothesis.  The 95 percent confidence interval around his estimate for the "SSNIP" parameter cannot rule out the possibilities that sales declined by 5 aligners per month or that they increased by 2 per month.  Compared to the monthly average of 11.26 aligner sales per

---

[453]  Vogt Report, ¶ 391.

[454]  Section VII.B.3.a.

[455]  Figure 12 shows increased aligner adoption over time.  While I do not estimate the impact of the COVID-19 pandemic on demand, examples such as the decline in worldwide orthodontic cases in 2020 in Figure 12 and the decline in brace and aligner starts that Dr. Vogt's Figure 10 reports in May 2020, as well as common sense, suggest that the COVID-19 pandemic influenced demand for teeth straightening products.

month in his data, his analysis is unable to rule out anything from a 44 percent decrease or 17 percent increase in aligner sales following a five percentage point change in the relative prices of braces and aligners.[456]  Thus, Dr. Vogt is correct when he concludes that his analysis shows no statistically significant change in aligner or braces volumes,[457] but he does not acknowledge that his analysis fails to rule out substantial changes in those volumes.

345.  Fourth, the point estimate of the effect of the five percent *increase* in the price of braces relative to the price of aligners is to *decrease* sales of aligners.  This is contrary to the expected effect. While this point estimate is not statistically significant, the finding of a relatively large negative point estimate undermines the credibility of the analysis and is consistent with there being missing demand or supply variables.

### 4.  The Brown Shoe Factors are Consistent with Doctor-Directed Aligners, DTC Aligners, and Braces Being in the same Antitrust Market

346.  Seven *Brown Shoe* factors can be evaluated when determining whether products belong in the same product market.[458]  The seven factors are: (a) the product's peculiar characteristics and uses, (b) unique production facilities, (c) distinct customers, (d) distinct prices, (e) sensitivity to price changes, (f) specialized vendors, and (g) industry or public recognition of the submarket as a separate economic entity.[459]

---

[456]  Likewise, in his regression looking at braces starts, Dr. Vogt's regression cannot rule out the possibility of a decrease in braces case starts of 13 or an increase of nearly 12 per month.  Compared to the monthly average of 28.64 braces case starts per month, his analysis is unable to rule out either a 45 percent decrease or a 42 percent increase in braces case starts. I derive confidence intervals for Dr. Vogt's aligner and braces estimates by multiplying the standard errors on the SSNIP coefficient in Dr. Vogt's Table 3 (1.791 and 6.277 respectively) by +/- 1.96 and adding them to the coefficients (-1.465 and -0.603 respectively). Monthly average aligner and brace starts are calculated from the Gaidge data file produced with Dr. Vogt's report, which reports 687 and 1,747 aligner and brace starts over a 61-month period.

[457]  Vogt Report, ¶ 391.

[458]  *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

[459]  *Brown Shoe Co. v. United States*, 370 U.S. 294, Supreme Court of United States, June 25, 1962, ¶ 325 ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

347. Dr. Vogt claims that these factors indicate that doctor-directed clear aligners are a relevant product market.[460] My analysis of the factors shows that they instead support the broader teeth-straightening product market.

### a. Peculiar characteristics and uses

348. According to Dr. Vogt, the first factor of the *Brown Shoe* analysis "speaks to whether [two or more] products are practically interchangeable."[461] Dr. Vogt claims that doctor-directed aligners and braces have the same use in treating malocclusion, but they have distinct characteristics—such as comfort, speed of treatment, and appearance—and therefore are not interchangeable.[462] Aligners and braces are not just used for the same purpose—neither is used for any other purpose. Moreover, these differences in characteristics do not make braces and aligners not interchangeable.[463] As I discussed above, doctor-directed aligners and braces are both functional substitutes and considered as economic substitutes by many consumers and dental providers.

349. Similarly, Dr. Vogt claims that doctor-directed aligners and DTC aligners are not practically interchangeable because they are provided to the customer differently and differences in product characteristics "means that the two types of aligners vary in the severity and types of treatment for which they can be used."[464] As I discussed above, doctor-directed aligners and DTC aligners are both functional substitutes and considered as economic substitutes by many consumers and dental providers.

---

[460] Vogt Report, Section G.4 ("The Brown Shoe Method Also Shows that the In-Office Clear Aligner Market is a Relevant Market.").

[461] Vogt Report, ¶ 429.

[462] Vogt Report, ¶¶ 435-438.

[463] Additionally, braces have undergone significant developments to offer options for improved aesthetics and comfort, such as clear braces, that are comparable to aligners. Cleveland Clinic, "Clear Braces," July 25, 2022, available at https://my.clevelandclinic.org/health/treatments/23568-clear-braces.

[464] Vogt Report, ¶¶ 439-442.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### b.  Unique production facilities

350. According to Dr. Vogt, the second *Brown Shoe* factor speaks to seller substitution and potential barriers to entry.[465]  While braces are manufactured in different facilities than aligners, both products are available to consumers through orthodontists and therefore a significant fraction of sellers can easily substitute between the two products.  Regarding barriers to entry within aligners, Dr. Vogt claims that "there are substantial barriers to entering the [doctor-directed] clear aligner market."[466]  Whatever the size of the barrier to entering the aligner market, dozens of firms have successfully passed that barrier and sell aligners, both to dental practices and directly to consumers.

### c.  Distinct customers

351. Dr. Vogt argues that "consumers do not view [doctor-directed] clear aligners as interchangeable with traditional wires and brackets,"[467] pointing to testimony from named plaintiffs, Align internal documents, and Align advertising.  Similarly, with respect to DTC aligners, Dr. Vogt states that the customer bases for doctor-directed aligners and DTC aligners "are distinct and minimally overlapping," pointing to differences in average demographics and Align research in 2016 estimating the degree to which SDC might affect Invisalign sales.[468]  As I showed above, testimony from other named plaintiffs, Align documents, and various other sources show that many customers and dental providers do consider DTC aligners and braces to be substitutes for doctor-directed aligners.  Moreover, both named Plaintiffs VIP Dental Spas and City Smiles actively target for aligner treatment patients that might otherwise be candidates for braces.[469]  VIP Dental Spas' website includes: "Current orthodontic treatments

---

[465]  Vogt Report, ¶¶ 443-452.

[466]  Vogt Report, ¶ 454.  Dr. Singer similarly claims that high barriers to entry protect Align's monopoly power in the aligner market (Singer Report, Section 1.A.2.d).

[467]  Vogt Report, ¶ 462.

[468]  Vogt Report, ¶¶ 466-468.

[469]  Deposition of Sherwin Matian, General Dentist at VIP Dental Spas, January 8, 2023, at 40:6-18 ("Q. And one of the features that you – that you advertise for Invisalign is that it's less bulky than braces; is that right? A. Correct. Q. So one of the categories of patients that you're – you're targeting are patients that otherwise might get braces; is that fair? ATTORNEY RADICE: Objection. You can answer. THE WITNESS: Yeah. BY ATTORNEY PEARL: Was that a yes? A. Yes."); William Simon Deposition 54:2-11 ("Q. And as part of the

in West Hollywood allow you to choose brackets that are made of clear or metallic material."[470] Those patients that seek braces by setting an appointment with Dr. Matian are then offered aligners[471] because Dr. Matian has "never performed braces."[472]

### d. Distinct prices

352. Dr. Vogt claims that "prices of in-office clear aligners are higher than prices for other types of teeth straightening treatment."[473]   However, as discussed in Section VII.B.2, Dr. Vogt's comparison of average doctor-directed aligner prices to DTC and braces prices masks the fact that doctor-directed aligners include a wide range of products that overlaps with the prices for braces.[474]  The cheaper doctor-directed aligner products, which tend to treat a similar range of dental conditions as DTC aligners, have prices in the range of many DTC products.  Similarly, more expensive doctor-directed aligner products such as Invisalign Comprehensive, which can treat a similar range of dental conditions to metal braces, tends to carry prices in the range of, but on average slightly lower than metal braces.

### e. Sensitivity to price changes

353. Dr. Vogt states that his SSNIP test showed that doctor-directed aligner customers are not sensitive to changes in the price of braces.[475]  However, his analysis is flawed, as discussed in

---

[470]   marketing, City Smiles states, 'Straight teeth without the braces.' Do you see that? A. I see that. Q. Are some of the patients that City Smiles is marketing to patients who otherwise might get braces or wires and brackets? MR. RADICE: Objection. You can answer. THE WITNESS: Yes.").

[470]   VIP Dental Spa, "Orthodontics West Hollywood, CA," available at https://www.vipdentalspas.com /orthodontics-west-hollywood-ca.

[471]   Deposition of Sherwin Matian, General Dentist at VIP Dental Spas, January 8, 2023, at 132:13-23 ("Q. So this is advertising to people who would otherwise want braces to come into VIP Dental Spas; is that right? ATTORNEY RADICE: Objection. You can answer. THE WITNESS: For a consultation to see if clear brackets or met – metallic brackets are a good option for them. BY ATTORNEY PEARL: Q. Or aligners? A. It – if the patient prefers, yeah.").

[472]   Deposition of Sherwin Matian, General Dentist at VIP Dental Spas, January 8, 2023, at 19:24-20:3 ("Q. Have you ever prescribed braces in your practice? A. As in have I ever done braces? Q. Yes. A. I've never performed braces.").

[473]   Vogt Report, ¶ 473.

[474]   See Figure 8.  See also SD0000233-299 (Smile Doctors Financial Agreements) (Smile Doctors braces ranging from $5000-$7540); SD0000219-232 (Smile Doctors aligners ranging from $6045-$7045).

[475]   Vogt Report, ¶ 478.

Section VII.B.3.b above.  Additionally, Dr. Vogt says that Align was not concerned with low DTC aligner prices because DTC aligners are for more minor types of malocclusion.[476]  Yet contrary to the assertion that lower DTC prices do not constrain the price of Invisalign, the documentary record shows that Align constantly competed with DTC aligners and actively considered the effects of DTC pricing.  For example, Align expanded their product portfolio to add lower-priced products, and conducted promotions to help doctors capture segments of customers who might otherwise choose DTC treatment.  These promotions included making products eligible for Advantage points, having an Invisalign SWIFT promotion price ceiling pilot program, and offering promotional pricing for the retreatment of DTC patients using Invisalign.[477]  These actions all demonstrate Align's intentional consideration of DTC aligner pricing as competition.

## f.  *Specialized vendors*

354. Dr. Vogt states that different companies to manufacture doctor-direct aligners, DTC aligners, and braces.[478]  Several important companies (Envista, 3M, and Henry Schein, and Align and Dentsply), however, have supplied both DTC and doctor-directed aligners.[479]  Moreover, doctors sell both doctor-direct aligners and braces to consumers.

---

[476]  Vogt Report, ¶ 477

[477]  ALIGNAT-PURCH01494639-660 (Low Stage Product Opportunity), at 644; ALGN_SWFT0083483-487 (Letter from Align introducing Pilot for Invisalign Swift) at 485 ("[…] Align will test a limited pilot program to evaluate a new way to address the rapidly expanding market for clear aligners. […] This is a true pilot program in a limited geography which includes Invisalign Swift, a new treatment option appropriate for mild and moderate malocclusion."); ALIGNAT-SNOWS1_0069888-929 (Low Stage – EMC Discussion Document), at 902; ALIGNAT-PURCH00484111-115 (Project Skyline Pilot Program Summary), at 111 ("[A] doctor facing initiative that supports doctor treatment of unsatisfied DTC (Direct to Consumer orthodontic treatment) patients to be treated with Invisalign clear aligners.").

[478]  Vogt Report, ¶¶ 482-484.

[479]  Envista, "Specialty Products and Technology," available at https://envistaco.com/en/specialty-products-technology#ormco; 3M, "Clarity Products," available at https://www.3m.com/3M/en_US/p/c/dental-orthodontics/?Ntt=clarity; Henry Schein, "Orthodontic Supplies," available at https://www.henryschein.com/us-en/dental/c/orthodontic; ALIGN0029675-701 (Amended and Restated Strategic Supply Agreement between Align and SDC), at 675 ("Align would manufacturer and sell Club Aligners (as defined herein) to SmileCareClub and SmileCareClub would purchase such Club Aligners from Align."); Figure 4.

### g. *Industry or public recognition of the submarket as a separate economic entity*

355. According to Dr. Vogt, this factor "asks whether there is evidence of industry or public recognition of a separate market."[480]  Dr. Vogt claims that Align's internal documents recognize doctor-directed aligners as a distinct market or submarket from other teeth straightening treatments.[481]  However, in other contexts, industry participants' public messaging and internal documents have indicated the contrary – that Align's doctor-directed aligners competed with both DTC products and braces.  For instance, Align's own consumer messaging has targeted braces as competition, just as SDC has directly compared aligners to Invisalign and braces on its website, demonstrating a consideration of them as competition.[482]  Additionally, even though Align's internal documents list "major competitors" as other doctor-directed aligners, such evidence reflects how Align distributes its products.  It makes sense that Align would focus on brands who market to the same customers, doctors, and dental professional trade shows.  This does not mean that Align did not also consider braces and DTC aligners as substitutes for end consumers.

### 5. *Align Does Not Have Market Power in the Teeth Straightening Market*

356. Dr. Singer and Dr. Vogt point to Align's high margins as evidence of Align's market power for aligners.[483]  However, high profit margins alone are not indicative of market power.[484]  As

---

[480]  Vogt Report, ¶ 485.

[481]  Vogt Report, ¶ 489-495.  Dr. Singer similarly claims that record evidence shows that Align considered other aligner manufacturers as its competitors (Singer Report, Section 1.A.2.g).

[482]  ALIGNAT-PURCH01355391 (Email between Align executives on consumer messaging) ("W&B are still our primary competitor, with over 85% market share.  As a result, we must continue to position ourselves as a better alternative to braces."); Invisalign, "Invisalign aligners straighten teeth…," available at https://www.invisalign.com (Align notes that Invisalign aligners straighten teeth "faster than braces" and "more comfortably than braces"); SmileDirectClub, "Why SmileDirectClub?" available at https://smiledirectclub.com/why-smile-direct-club (SmileDirectClub compares its Aligners to Invisalign and "metal braces.").

[483]  Singer Report, ¶ 74. Vogt Report, ¶ 540.  Dr. Singer also claims that his econometric analysis showing a purported overcharge provides "direct evidence" of Align's market power over aligners.  See Singer Report, Section I.A.1.  As I explain in Section VI.B, Dr. Singer's overcharge analysis is unreliable.  It therefore does not provide evidence that Align has market power.

[484]  See, for example, "Competition and Monopoly: Single-Firm Conduct under Section 2 of the Sherman Act, Chapter 2," US Department of Justice, May 11, 2009, available at https://www.justice.gov/archives/atr

one prominent source explains: "the presence of a gap between price and marginal cost is perfectly consistent with the conclusion that the market is behaving in a competitive fashion, given the presence of fixed costs and product differentiation."[485]  It is important to recognize that high price-cost margins are common when individual firms make substantial investments to develop and market their products.[486]

357. SDC's margins, moreover, suggest that Align's margins are not at all unique within the industry, and do not indicate market power.  Align's gross margin on Invisalign is often around

---

/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, at p. 29 ("Short-run price-cost margins are not, however, of much use in determining whether a firm has monopoly power. Monopoly power requires that the firm be able profitably to charge prices high enough to earn a supernormal return on its investment. It is not clear how much price must exceed short-run marginal cost before there is monopoly power. Depending on the size of the firm's fixed costs, even a significant margin between price and short-run marginal cost may be insufficient to earn even a normal return. Indeed, a firm should not be found to possess monopoly power simply because it prices in excess of short-run marginal cost and hence has a high price-cost margin.").

[485]  Kaplow, Louis and Carl Shapiro, *Antitrust*, Handbook of Law and Economics, 2007, Vol. 2, at p. 1089 ("Once again, however, it is important to keep in mind that the existence of technical market power does not imply antitrust liability. As is familiar, price discrimination generates greater seller profits yet may well be benign or even favorable on average for consumers. Moreover, the resulting profit margins are often necessary to cover fixed costs, as in models of monopolistic competition. If there are no barriers to entry so that the resulting margins merely provide a normal rate of return on capital, the presence of a gap between price and marginal cost is perfectly consistent with the conclusion that the market is behaving is a competitive fashion, given the presence of fixed costs and product differentiation. Furthermore, in our preceding example of multinational pharmaceutical companies, the margins provide the reward for costly and risky research and development to create and patent new drugs.").

[486]  Kaplow, Louis and Carl Shapiro, *Antitrust*, Handbook of Law and Economics, 2007, Vol. 2, at p. 1089 ("Moreover, the resulting profit margins are often necessary to cover fixed costs, as in models of monopolistic competition. If there are no barriers to entry so that the resulting margins merely provide a normal rate of return on capital, the presence of a gap between price and marginal cost is perfectly consistent with the conclusion that the market is behaving is a competitive fashion, given the presence of fixed costs and product differentiation. Furthermore, in our preceding example of multinational pharmaceutical companies, the margins provide the reward for costly and risky research and development to create and patent new drugs."); Bork, Robert, J. Gregory Sidak, "The Misuse of Profit Margins to Infer Market Power," *Journal of Competition Law & Economics*, September 2013, Vol. 9, No. 3, pp. 511–530, at 512 ("The European Court of Justice, for example, has observed that a 'low profit margin is not inconsistent with a monopoly situation, just as high profits can be consistent with a situation of effective competition.' Supracompetitive profits may result from a factor other than market power, such as superior management. Furthermore, in industries with high sunk investment, high profit margins are consistent with a dynamically competitive market. Using a firm's profit data to infer market power might therefore lead a court or competition authority to the wrong conclusion.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

71 percent.[487]  Meanwhile SmileDirectClub's gross margin is often at 70 percent or more, reaching 76 percent.[488]

358. Dr. Singer and Dr. Vogt also point to Align's high share of sales of doctor-directed aligners as evidence of Align's market power in that proposed product market.[489]  In the broader teeth-straightening market, Align's share of sales is low, consistent with Align not having market power.  For example, in 2018 Align estimated that it had a 15 percent share of the US orthodontia market. [490]  This is consistent with the worldwide aligner share of teeth straightening treatments shown in Figure 12, which shows that aligners have never exceeded 30 percent of all teeth straightening starts in a year.  Thus, even if all clear aligners sold were Align aligners, Align's market share would be below 30 percent, well below thresholds that the FTC and DOJ report are commonly used to determine monopoly power.[491]

### C.  Align Does Not Have Market Power in the Scanner Market

359. Dr. Singer concludes that "Scanners that permit the export of digital imaging files for Aligner manufacturing" are a relevant antitrust product market.[492]  He also states that Align's high market share and high barriers to entry are evidence that Align wields market power in the

---

[487]  See Align Technology, "Unaudited Condensed Consolidated Statements of Operations," 2022, available at https://investor.aligntech.com/static-files/bb399940-21b1-42e2-8faf-dffa8a254ce4.

[488]  See SmileDirectClub, "Earnings Presentation," 2022, available at https://investors.smiledirectclub.com/static-files/a242d5e0-2e88-44f1-80a0-7b937e7ba8a3, slide 26.

[489]  Singer Report, ¶¶ 86-88; Vogt Report, Figure 16, ¶ 537.

[490]  ALIGNAT-PURCH00597451-477 (Align Progress Review, October 26, 2018), at 59 (showing that approximately 15 percent of people using a teeth straightening product were using Invisalign: 0.61 million people out of 4.18 million total using any of Invisalign, a "competitor," or metal braces).

[491]  See, for example, Federal Trade Commission, "Monopolization Defined," available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined, at p.1 ("Courts look at the firm's market share, but typically do not find monopoly power if the firm (or a group of firms acting in concert) has less than 50 percent of the sales of a particular product or service within a certain geographic area. Some courts have required much higher percentages.").  See also, Department of Justice, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 2," available at https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, at p. 22 ("Thus, as a practical matter, a market share of greater than fifty percent has been necessary for courts to find the existence of monopoly power.").

[492]  Singer Report, ¶ 75.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

scanner market.[493]  Dr. Vogt similarly concludes that scanners "that are capable of ordering clear aligner products from Invisalign or its competing in-office clear aligner brands" are a relevant antitrust product market.[494]  He also claims that Aligns market share and high margins are evidence that Align has market power in the scanner market.

360.  Before explaining why the evidence shows that Align does not have market power in the scanner market, I note that while this market does not include PVS impressions, PVS is an important alternative to scanners for ordering aligners.  PVS impressions are functional substitutes for scanners.  Physical dental impressions have always been used to order Invisalign cases and are still used today.[495]  When Align measured the technical quality of competing scanners for interoperability, it measured them against PVS as the "gold standard."[496]  Notably, when Align terminated interoperability with 3Shape in the US, nearly a third—32 percent—of the TRIOS Invisalign submitters switched to PVS impressions for submitting Invisalign cases.[497]  During 2017, PVS submissions for Invisalign cases constituted more than half of submissions.[498]  In 2021, a study in the *Journal of the American Dental Association* estimated

---

[493]  Singer Report, Section 1.A.2.c and d.  Dr. Singer also claims his overcharge analysis is direct evidence that Align has market power.  For the reasons discussed in Section VI, I find the overcharge analysis to be flawed and unreliable.

[494]  Vogt Report, ¶ 497.

[495]  Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 125:21-23 ("Q. […] Does Align accept PVS impressions for Invisalign cases in the US today?  A. Yes, we do.").

[496]  Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 124:09-125:10 ("Q. When the True Definition scanner was qualified for Invisalign interoperability, was it compared to something?  A. Yes, it was.  Q. And what was the True Definition scanner compared to?  A. It was compared to PVS impressions.  Q. Why was the True Definition scanner compared to PVS impressions during the qualification of it for Invisalign interoperability?  A. There's -- so there's, you know, two reasons for that.  One is each scanner has its own pros and cons in terms of, you know, what they capture and how they capture the data in the mouth.  So they need to be compared against a neutral sort of a gold standard, and the best gold standard we can find even today is PVS impressions because we know -- we know that they are repeatable.  The second is also somewhat a similar reason, because we have -- through the history of the company, we have obvious experience with probably millions of PVS impressions.  We know how they behave, what their accuracy and resolution is, and what kind of output we can produce from that.  So it's a known quantity against which -- and a neutral reference against which we can compare.").

[497]  See Figure 19.

[498]  ALIGNAT-PURCH01544915-916 (Email regarding cases received by type of scan), at 916; Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023, at 120:4-10 ("Q. What's your understanding of what Exhibit 1135 depicts about the number of Invisalign submissions from PVS

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that nearly half of American dental practices use only physical dental impressions.[499]  Thus, PVS impressions are clearly an important alternative to scanners for many doctors and including PVS in the relevant market would significantly lower iTero's estimate market shares.

361.  There are several reasons why Dr. Singer's and Dr. Vogt's evidence does not support an inference that Align has market power:

    i.  As discussed above, high price-cost margins are not by themselves indicative of market power.

    ii.  Contrary to Dr. Singer's claim of high barriers to entry, there has been substantial entry and innovation in recent years.  Figure 6 shows that at least 10 manufacturers have introduced new scanner products since 2017.

    iii.  Other scanner companies have grown and achieved significant market share.  For example:

        a.  Dentsply Sirona's sales have grown since launching its new Primescan scanner in 2019.

        b.  3Shape has averaged approximately 17 percent share of scanner sales.[500]

        c.  Envista, which bought the Carestream Dental scanner business in 2021 for approximately $600 million,[501] was selected by SmileDirectClub as its intraoral

---

impressions relative to Invisalign scans submitted from 3Shape TRIOS scanners? ATTORNEY BRINN: Object to form. A. It's many times bigger. PVS is many times bigger.").

[499]  See, Revilla-Leon, Marta, et al., "Intraoral Scanners: An American Dental Association Clinical Evaluators Panel survey," *Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, at p. 669; Deposition of John Cusack, General Manager of 3Shape North America business, at 64:2-20 ("Q: The headline in the larger type says, 'ADA study finds 53% of surveyed practices using an intraoral scanner'…And that implies that 47 percent, or almost 50 percent of American dentists are using only PVS to take physical dental impressions; right?...A: It w– -- yes, that's correct.").

[500]  See Figure 53.

[501]  Envista, "Envista to Acquire Carestream Dental Intra-Oral Scanner Business," December 22, 2021, available at https://investors.envistaco.com/2021-12-22-ENVISTA-TO-ACQUIRE-CARESTREAM-DENTAL-INTRA-ORAL-SCANNER-BUSINESS; Envista, "Envista Completes Acquisition of Carestream Dental's Intraoral Scanner Business," April 20, 2022, available at https://investors.envistaco.com/2022-04-20-Envista-Completes-Acquisition-of-Carestream-Dentals-Intraoral-Scanner-Business.

scanner partner.[502]  Looking ahead, Envista anticipates "above market growth" in the high single-digits for its intraoral scanner.[503]

d.  Medit began selling its scanner in the US in 2018,[504] gained traction quickly, and reached a double-digit market share in the US within approximately two years of entry.[505]  Medit positioned itself as a value brand, at a lower price point than Dentsply, 3Shape, or Align.[506]  3Shape noted Medit's growth in its internal strategic planning and described it as "explosive."[507]

iv.  Dr. Vogt calculates the market share for Align's iTero scanners as the estimated share of aligner orders ordered using an iTero.[508]  By focusing on the percentage of scans taken using iTero scanners, rather than the share of scanner sales, Dr. Vogt's approach merely reflects the aligner market share.  The relevant measure for scanner market is share of scanner sales, not the percentage of scans.

v.  Dr. Singer's first estimate of market share is the proportion of scanners owned by dentists and orthodontists who are "active submitters" of Invisalign orders.  This is a biased measure, exaggerating iTero's share, as it only considers doctors ordering Invisalign.

362.  The last measure of market power Dr. Singer puts forward calculates scanner shares directly using scanner sales data produced in this matter.[509]  Figure 53 presents similar shares calculated using the same data.

---

[502]  SmileDirectClub, LLC, "SmileDirectClub Selects Carestream Dental as Intraoral Scanner Partner," February 24, 2022, available at https://www.globenewswire.com/en/news-release/2022/02/24/2391431/0/en /SmileDirectClub-Selects-Carestream-Dental-As-Intraoral-Scanner-Partner.html

[503]  Envista "Investor Access @ Envista Summit," February 24, 2023, available at https://investors.envistaco.com /download/2023-02-24+-+Investor+Access+%40+Envista+Summit+-+Final.pdf, at 7, 11.

[504]  See Figure 6.

[505]  Deposition of John Cusack, General Manager of 3Shape North America Business, March 16, 2023, at 72:2-16 ("And the next bullet point says, 'Medit already at 14% MS in US whereas 3Shape is down 6% (we were at 27% in the US in 2017).' Do you see that there? A. Yes, I do. Q. And does 'MS' in that bullet point refer to market share? A. It does. Q. And is it fair to say that this bullet point shows that Medit gained 14 percent of the market share in the U.S. at this time period? A. It's -- yeah. It says that Medit, at that point, had 14 percent market share, yes.").

[506]  3Shape_Antitrust_Simon_00005015-5037 (Review of the Intraoral Scanners at IDS 2019), at 25.

[507]  3Shape_Antitrust_Simon_00669726-755 (Email regarding 3Shape 3-year plan) at 753.  The same 3Shape analysis notes "Dentsply Sirona doing well both globally and in [the] US due to Primescan trade-ups."

[508]  Vogt Report, ¶ 542.

[509]  Singer Report, Figure 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 53: US Sales of Scanners
Reported by Manufacturers 3Shape, Align, Dentsply, and Planmeca, and
Distributors Benco, Henry Schein, and Patterson**

| Manufacturer | Units Sold | | | | | | |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Overall |
|---|---|---|---|---|---|---|---|
| Align | 28% | 50% | 41% | 66% | 54% | 51% | **51%** |
| Dentsply Sirona | 33% | 19% | 17% | 12% | 30% | 31% | **23%** |
| 3Shape | 21% | 20% | 30% | 20% | 9% | 12% | **17%** |
| Planmeca | 11% | 5% | 9% | 3% | 7% | 5% | **6%** |
| Envista | 0% | 0% | 0% | 0% | 0% | 1% | **0%** |
| Midmark | 0% | 2% | 2% | 0% | 0% | 0% | **1%** |
| 3M | 7% | 4% | 0% | 0% | 0% | 0% | **1%** |
| Other | 0% | 0% | 0% | 0% | 0% | 0% | **0%** |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

Sources: ALIGNAT-PURCH00932992 (Scanner Transaction Data); BENCO-0000003
(Benco transaction data); HS (3754)_000022 (Henry Schein transaction data); PCI-00003
(Patterson Dental transaction data); 3Shape_Antitrust_Simon_00230952 and
3Shape_Antitrust_Simon_00230954 (3Shape Transaction Data); DS000994 (Dentsply
Sirona Transaction Data); PLANMECA_000078 (Planmeca Transaction Data).

Figure 53 shows that iTero's shares have averaged no more (and likely less) than 51 percent, and only exceeded 54 percent for one year, in 2018.

363. Importantly, these data include all sales of Align scanners, but do not capture all sales of other scanners. Missing are sales by manufacturers other than 3Shape, Align, Dentsply, and Planmeca and sales that were made by distributors other than Benco, Henry Schein, and Patterson. Consequently, Figure 53 overestimates Align's share of scanner sales in the US. For example, 3Shape estimated that Medit's market share in 2019 was 14 percent.[510] Adjusting

---

[510] Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023, at 72:2-16 ("And the next bullet point says, 'Medit already at 14% MS in US whereas 3Shape is down 6% (we were at 27% in the US in 2017).' Do you see that there? A. Yes, I do. Q. And does 'MS' in that bullet point refer to market share? A. It does. Q. And is it fair to say that this bullet point shows that Medit gained 14 percent of the market share in the U.S. at this time period? A. It's -- yeah. It says that Medit, at that point, had 14 percent market share, yes.").

for this missing 14 percent of sales alone would lower Align's 2019 market share from 54 percent to 46 percent.[511]

364. Sales data therefore suggest that Align's market share is around the 50 percent threshold that the FTC and DOJ report are commonly found to be necessary for market power, and likely below that threshold when adjusting for missing sales.[512]  Market shares alone do not determine whether firms can exercise market power by raising their prices meaningfully above the competitive level.  High market share will not confer market power if the threat of current or potential competitors and innovators makes it impossible for a firm with high market share to charge higher prices without losing too many customers to other firms.[513]

365. The structure of the scanner market is consistent with Align being unable to exercise market power within its current price range.  These competitive dynamics led to reductions in iTero's market share.  iTero has only achieved its relatively high market share recently, jumping from 41 percent to 66 percent from 2017 to 2018 (using the overestimates from Figure 53).  That increase coincided with iTero's launch of a new scanner product, and so the increase in share reflects, in part, doctors switching to a new product.[514]  Since then, Align's share eroded to 54 percent and then 51 percent in 2019 and 2020 (shares which are likely overestimated by 8 percentage points due to missing Medit sales).  These fluctuations in sales, in contrast to a

---

[511]  $.54 \times .86 = .4644$.

[512]  See, for example, Federal Trade Commission, "Monopolization Defined," available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined, p. 1 ("Courts look at the firm's market share, but typically do not find monopoly power if the firm (or a group of firms acting in concert) has less than 50 percent of the sales of a particular product or service within a certain geographic area. Some courts have required much higher percentages.").  See also, Department of Justice, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 2," available at https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, p. 3 ("Thus, as a practical matter, a market share of greater than fifty percent has been necessary for courts to find the existence of monopoly power.").

[513]  Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, Fourth Edition, p. 668 ("Market shares are imperfect indicators of market power, so additional analysis of the economic conditions is necessary before one can reach a conclusion about market power.  For example, if entry is easy, then the industry pricing is severely constrained regardless of whether an existing firm has a large market share.  Similarly, the presence of factors that make it difficult to maintain a cartel is relevant (Chapter 5).").

[514]  See Section IV.A.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

more stable market share, are consistent with the conclusion that Align is vulnerable to competition from lower-priced or higher-quality competing products.

366. A final factor that limits Align's power in the scanner market is the fact that that market is still growing. Equity Analysts have noted that more dentists and orthodontists will likely use scanners in the future. For instance, a 2019 Credit Suisse report referenced an estimate that only 30 percent of dental practitioners had scanners at that time, and claimed that left "ample runway to growth."[515] A 2020 Piper Sandler report highlighted recent growth in the scanner segment, but added "we do still see plenty of runway in the U.S. and all international markets for continued uptake of [digital impression] systems as we estimate no more than ~25-30% of GPs in the most penetrated geographies have a full CAD/CAM or standalone [digital impression] system."[516] A 2021 Credit Suisse report echoed the expectation for increased scanner usage: "Going forward, we continue to look for incremental innovation in the marketplace that may support accelerated adoption for digital dentistry."[517] This still-untapped demand along with the proliferation of current and potential competitors makes it likely that Align will lose further market share unless it competes vigorously on price and quality.[518]

### D. Economic Outcomes Are Consistent with Align's Lack of Market Power in Teeth Straightening and Scanners

367. If, as Dr. Singer and Dr. Vogt claim, Align had market power in their asserted markets for aligners and scanners, economic theory indicates that evidence of that market power would arise in the functioning of those markets. For instance, a firm with market power would be expected (all else equal) to increase or maintain its market share and prices, and their industry

---

[515] Wright, Erin Wilson, Katie Tryhane, and George Engroff, "Dental Update," Credit Suisse, July 2019, at p. 18 ("According to Henry Schein, less than 30% of dental practitioners have a scanner in their offices currently, and it believes more practitioners will eventually have multiple scanners, leaving ample runway to growth.").

[516] Bednar, Jason, "Dentsply Sirona, Inc.," Piper Sandler, June 2020, at p. 20.

[517] Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021, at p. 31.

[518] See also, 3Shape_Antitrust_Simon_00669726-755 (Email regarding 3Shape 3-year plan) at 747 (estimating US scanner adoption of roughly 52% by 2022), 755 (identifying intraoral scanners as the "fastest growing segment" of dental equipment); Envista, "Envista to Acquire Carestream Dental Intra-Oral Scanner Business," December 22, 2021, available at https://investors.envistaco.com/2021-12-22-ENVISTA-TO-ACQUIRE-CARESTREAM-DENTAL-INTRA-ORAL-SCANNER-BUSINESS (describing its $600 million acquisition as in line with a "focus on the fastest growing segments of the dental market" and "high growth, high margin.").

might be expected to see limited entry of new competitors and limited innovation.[519]  In this section I demonstrate that there is no such evidence that aligners or scanners exist in a market in which one firm predominates.  Instead, the economic outcomes in both aligners and scanners are consistent with Align not having market power.

368.  First, one sign that a firm enjoys market power is that it can increase or maintain its share of sales.  If Align's market power discouraged competition, it would enjoy an advantage in maintaining or increasing its sales.  Instead, Figures 13 and 14 show firms like Dentsply Sirona and SDC are increasing their sales of aligners and scanners more rapidly than Align.  Similarly, Figure 53 shows that iTero's share of scanner sales declined from a peak of 66 percent in 2018 to 51 percent in 2020.  Importantly, iTero's share decline coincided with Dentsply Sirona's launch of its high-end Primescan scanner, which Piper Sandler has called "market-leading."[520]

369.  Second, perhaps the most fundamental issue is whether Align has the ability to increase (or avoid decreasing) prices to customers.  The evidence indicates otherwise.  The average net price for Align's flagship product, Comprehensive, has declined in recent years, even while inflation has driven prices for many consumer goods up substantially.  Align's list prices have generally grown no faster than inflation in recent years.[521]  Likewise, the average price paid for Align's iTero scanners has declined over time.[522]  This decline in prices is doubly inconsistent with the behavior of a firm with market power given that demand for clear aligner products has increased substantially over time, which, all else equal, would encourage suppliers to increase, not decrease prices.

370.  Third, entry is another indicator of whether a firm has market power that can be sustained.  The evidence from my industry analysis established that many new competitors have entered in recent years.  For instance, Figure 4 shows that at least 18 aligner brands have launched since

---

[519]  Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization*, Pearson, 2015, Fourth Edition, p. 668 ("Market shares are imperfect indicators of market power, so additional analysis of the economic conditions is necessary before one can reach a conclusion about market power. For example, if entry is easy, then the industry pricing is severely constrained regardless of whether an existing firm has a large market share.").

[520]  Bednar, Jason, "Dentsply Sirona, Inc.," Piper Sandler, June 2020, at p. 17.

[521]  See Section IV.E.1.

[522]  See Section IV.E.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2014.  Consistent with that, Figure 5 shows that the large majority of new aligner products approved by the FDA have been non-Align products, especially in recent years since Align's patents have begun to expire.  Figure 13 shows that firms like Dentsply Sirona and SDC went from zero or near-zero revenue in 2016 to earning over $500 million and $250 million in annual revenue respectively by 2020.

371. The record is similar for scanners.  Figure 6 shows that nine non-Align scanner products have launched since 2019.  While Figure 14 shows that 3Shape's sales have declined since 2017, it also shows that Dentsply Sirona has dramatically increased its sales since launching a new scanner product in 2019.

372. Finally, market power might be reflected in a lack of innovation.  An incumbent firm with entrenched market power may both discourage other firms from innovating and have less incentive themselves to invest in developing or improving products.  The aligner industry, however, has been characterized by important innovations in recent years.  These innovations have resulted in aligner products that straighten teeth more quickly, can treat a greater variety of dental conditions, and can serve a growing set of patients such as children.[523]  Similarly, scanner products have come to market with greater processing speed and additional capabilities.[524]

Edward A. Snyder

Edward A. Snyder

May 5, 2023

---

[523] See Section IV.A.1.

[524] See Section IV.A.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# APPENDIX A
# CURRICULUM VITAE

## EDWARD A. SNYDER

### CONTACT INFORMATION

email:  tsnyder@yale.edu
office tel.:  203-432-6037
website:  http://edwardasnyder.com

regular mail:                                        express mail:

  Yale School of Management              Yale School of Management
  P.O. Box 208200                                165 Whitney Avenue
  New Haven, CT 06520-8200             New Haven, CT 06520

### EDUCATION

B.A., Colby College, 1975 (Economics, Government)

M.A., University of Chicago, 1978 (Public Policy)

Ph.D., University of Chicago, 1984 (Economics)

### CURRENT APPOINTMENTS

**Yale School of Management**
William S. Beinecke Professor of Economics and Management

- *Research*:
  - o Industrial Organization, Antitrust and Competition Policy, Law & Economics, Management, Analysis of High-Tech Industries

  *Teaching*:

  - o "Economic Analysis of High-Tech Industries"
  - o "Analysis of Global Competition Law" (co-taught with Pierre Cremieux and Fiona Scott Morton); Fall 2013 and Fall 2014.
  - o "Field Project in Commercial Real Estate Development" (co-taught with Roland Betts); Fall 2015.
  - o Guest lecturer for "Antitrust Law" (Yale Law School); Spring 2019.

**Yale Department of Economics**
Professor of Economics (Secondary Appointment)

**Global Network for Advanced Management**
Founder and Chair of the Steering Committee (2013 to Present)

PREVIOUS APPOINTMENTS

**Yale School of Management**
Indra K. Nooyi Dean and William S. Beinecke Professor (July 2011 – June 2019)

*Decanal Responsibilities*:  Overall academic, financial, and administrative leadership of
Yale School of Management (Yale SOM)

*Major achievements and initiatives*:

- Conception and development of the Global Network for Advanced Management (GNAM), a network of 32 top business schools.
- Conception and introduction in 2012 of the Master of Advanced Management – a one-year degree program, post-MBA, for students from GNAM member schools; introduction in 2017 of Master of Management Studies, a one-year degree program with multiple tracks of study.
- Introduction of the Global Studies Requirement and Global Studies Accounts for all MBAs and MAM students.
- New Leadership Curriculum for all MBAs and MAM students.
- Establishment of the Initiative for Organizational Performance.
- Launch of school-wide initiatives on Asset Management, Healthcare, and Sustainability.
- Development and introduction of Foundational Courses for Yale Masters-level students and Yale College students.
- Build-out of Yale SOM's Entrepreneurship Program and appointment of Inaugural Director of Entrepreneurship Programs.
- Substantial increase in scholarship support for Masters-level students.
- Led establishment of Yale Center Beijing in 2014 and responsible for subsequent management of the Center.
- Establishment of the Yale SOM Council of Global Advisors.
- Increased levels of alumni involvement; the highest percentage of annual giving by alumni of any Yale academic unit.
- Eight consecutive years of operating surpluses (FY2012 – FY2019).

*School and University Service*:

- Member of the Yale University Cabinet (2013 – 2017).
- Member of the Yale University Cabinet Steering Committee (2016 – 2017).
- Member of the Yale School of Management Board of Advisors (2011 – 2019).
- Member of Yale SOM's Appointments, Curriculum, and Strategy Committee (2014 – 2017).
- Member of the Yale University Carbon Task Force (2015 – 2016).

**University of Chicago, Booth School of Business**
Dean and George Shultz Professor of Economics (July 2001 – June 2011)

*Decanal Responsibilities:*  Overall academic, financial, and administrative leadership of
the school.

*Teaching responsibilities:*  Economic Analysis of Major Policy Issues (co-taught with
Gary S. Becker and Kevin M. Murphy).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Editor*:  Journal of Law & Economics (2002 – 2009)

*Major achievements and initiatives:*

- o Dramatic increases in the number of endowed faculty professorships, endowed faculty fellowships, and the endowments in research and teaching centers.
- o Nine years of 17.1% annual growth of MBA scholarship support.
- o Naming of the school with unrestricted funds provided by David Booth – the largest gift ($300m) to the University of Chicago and the largest gift ever to a business school.
- o Increased the school's endowment from approximately $200m in 2001 to over $500m, independent of the Booth gift.
- o Substantial improvements in the influence, visibility, and recognition of the school, including improved rankings, e.g., BusinessWeek #1 rankings in 2006, 2008, and 2010, and Economist #1 rankings in 2006 and 2009.
- o Improvements in the quality and diversity of the MBA classes.
- o Large increases in support for PhD students, including dramatic increases in endowment for PhD program.
- o Established the Global Advisory Board, with Councils for Asia; the Americas; and Europe, Middle East, and Africa.
- o Oversaw the launch of the Initiative on Chicago Price Theory, which became the Becker Center.
- o Developed funding for the Fama-Miller Center.
- o Successfully moved the School's Europe Campus from Barcelona to London.
- o Moved into the school's new campus (Harper Center) in Hyde Park on time and on budget.
- o Developed first-of-kind positioning advertising campaign by a business school.
- o Appointments of two women to decanal positions.
- o Elimination of debt on three facilities.
- o Cumulative operating surpluses of $100.4m over nine-year period.

*University Service:*

- o Member, Academic Leadership Group (July 2001 – June 2010).
- o Oversight Responsibilities for two University Centers (Stigler Center and Becker Center).
- o Member, Provost Ad Hoc Tenure Review Committees (2002 – 2010).
- o Member, Board of Directors, Argonne National Laboratories (July 2008 – June 2010).
- o Member of various Dean and VP Search Committees (2003 – 2009).
- o Advisory work on University's globalization efforts (2007 – 2010).
- o Member, Social Sciences Deans Group, (2009 – 2010).

**University of Virginia**
Dean and Charles C. Abbott Professor of Business Administration (July 1998 – June 2001)

*Decanal Responsibilities:*  Overall academic, financial, and administrative leadership of the Darden School.

*Major achievements and initiatives:*

- o First MBA Program growth in 24 years.
- o Increase in nine-year capital campaign from $98m to $212m.

A-3

- o Establishment of Batten Institute in 1999.
- o Established Financial Self-Sufficiency for the Darden School, eliminating reliance on unrestricted state support.
- o Completion of Phase II of new Darden Grounds.
- o Increased diversity of MBA classes.
- o Appointments of two women to decanal positions.
- o Appointments of two African-Americans to faculty positions.
- o Innovative programs on e-business with global partners.
- o Established program partnerships with University of Michigan and University of California at Berkeley.

**University of Michigan**
Senior Associate Dean, University of Michigan Business School (1995 – 1998)

*Responsibilities*:  MBA Programs (full-time, evening, global), BBA Program, and Masters of Accounting Program.  Managed School international programs and corporate relationships.  Oversight of Admissions & Student Services and the Office of Career Development.  Significant responsibility for faculty recruitment and development.  Member of School's Executive Committee.

*Major achievements and initiatives:*

- o Global initiatives including International Multi-disciplinary Action Program (IMAP) and Brazil node of Global MBA program.
- o Integration of admissions and career development functions.
- o Rationalization of real estate curriculum.

Director, Davidson Institute at the University of Michigan Business School (1992 – 1995)

*Responsibilities*:  Executive and academic leadership to establish a legally independent Institute focused on business and public policy issues in transition economies and emerging markets.

*Major achievements and initiatives:*

- o Developed corporate relationships in China, Central Europe, India, and Russia, and with U.S. firms committed to operating in transition economies.
- o Major research initiative on bank privatization in Central Europe and Russia.
- o Design and development of in-company projects involving teams of Master's-level students working in transition economies.
- o Design and delivery of executive education programs for managers from transition economies.
- o Progressive increases in outside funding contributing to a $3m quasi-endowment for the Institute.

Chair, Business Economics and Public Policy (1992 – 1995)

*Responsibilities*:  Curriculum and staffing of BBA and MBA courses.  Faculty development of group of 11 faculty members specializing in business economics.

Faculty Member (1982-1994)

*Responsibilities*:  MBA Core course coordinator of *Applied Microeconomics* (four years).  Design and development of *Competitive Tactics,* a course analyzing competition and

cooperation among firms; marketing and distribution of products; and related antitrust issues.

Member, Board of Directors, Davidson Institute (focusing on transition economies and emerging markets) (1995 – 1998)

Member, Executive Committee, Tauber Manufacturing Institute, University of Michigan (1996 – 1998)

Member, Executive Committee, Erb Institute (focusing on environmental management), University of Michigan (1996 – 1998)

Research Consultant, Federal Home Loan Bank Board / U.S. Senate Committee on Banking (1989)

Consultant, Antitrust Division, U.S. Department of Justice (1982-1985)

**University of Chicago**

John M. Olin Visiting Associate Professor, Center for the Study of the Economy and the State (1991 – 1992)

**Antitrust Division, U.S. Department of Justice**

Economist (1978 – 1982; intermittent service through 1985)

Staff Economist, National Commission to Review Antitrust Laws and Procedures (1978 – 1979)

PUBLICATIONS

Articles in Journals:

"The Vast Space in which the Vertical Merger Guidelines Lived," The Antitrust Bulletin, *forthcoming*, Issue 3, September 2022.

"Enforcement of Anti-Collusion Laws Against Domestic and Foreign Firms" (Co-author: Pierre Cremieux), Journal of Law & Economics, Vol. 59 (November 2016), pp. 775-803.
Reprinted in Concurrences, No.4-2017.

"Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis", (Co-authors: Pierre Cremieux and Ian Simmons), The George Mason Law Review, Summer 2010, pp. 939-967.

"Bank Privatization in Transitional Economics: A General Framework with Application to Hungary's Magyar Kulkereskedelmi Bank Transaction", (Co-authors: Karen Schnatterly, Roger C. Kormendi, and Christopher Jereb), The Financier, vol. 5, No. 2 & 3 (1998), pp. 6-23.

"Allocation of Litigation Costs--American and English Rules," (Co-author: James W. Hughes) in The New Palgrave Dictionary of Economics and the Law, ed. Peter Newman, Macmillan Publishers Ltd, vol. 51 (1998), pp. 51-56.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Transactional Structures of Bank Privatizations in Central Europe and Russia," (Co-author Anna Meyendorff), Journal of Comparative Economics, (August 1997), pp. 5-30.

"Privatization and Performance of the Czech Republic's Komercni Banka," (Co-author: Roger C. Kormendi), Journal of Comparative Economics, (August 1997), pp. 97-128.

"Litigation under the English and American Rules: Theory and Evidence," (Co-author: James W. Hughes), Journal of Law & Economics, vol. 38 (April 1995), pp. 227-250.

"United States v. United Shoe Machine Corporation: On the Merits," (Co-author: Scott E. Masten), Journal of Law & Economics, vol. 36 (April 1993), pp. 33-70.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds., (Edward Elgar Publishing, Ltd., London), 1995, pp. 588-625.
Reprinted in Case Studies in Contracting and Organization, S. Masten, ed., (Oxford University Press), 1996, pp. 224-254.
Reprinted in Journal of Reprints for Antitrust Law and Economics, issue on Landmark Antitrust Decisions Revisited, 26, 1997, pp. 643-680.
Reprinted in Pricing Tactics, Strategies, and Outcomes, (M. Waldman & J. Johnson, ed.). Cheltenham, UK: Edward Elgar Publishing. 2007

"Misuse of the Antitrust Laws: The Competitor Plaintiff," (Co-author: Thomas E. Kauper), Michigan Law Review, vol. 90, (December 1991), pp. 551-603.
Reprinted in The Journal of Reprints for Antitrust Law and Economics, vol. 25, no. 2, (1995), pp. 657-709.

"The Costs of Organization," (Co-authors: Scott E. Masten and James W. Meehan, Jr.), Journal of Law, Economics, and Organization, vol. 7, (Spring 1991), pp. 1-25.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds., (Edward Elgar Publishing, Ltd., London), 1995, pp. 119-143.

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (Co-author: James W. Hughes) Journal of Law, Economics, and Organization, vol. 6, (Fall 1990), pp. 345-380.

"The Effect of Higher Criminal Penalties on Antitrust Enforcement," Journal of Law & Economics, vol. 33, (October 1990), pp. 439-462.

"The Design and Duration of Contracts: Strategic and Efficiency Considerations," (Co-author: Scott E. Masten) Law and Contemporary Problems, vol. 52 (Winter 1989), pp. 63-85.

"The Origins and Resolution of the Thrift Crisis," (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong) Journal of Applied Corporate Finance, vol. 2 (Fall 1989), pp. 85-100.

"Vertical Integration in the U.S. Auto Industry: A Note on the Influence of Transactions Specific Assets," (Co-authors: Scott E. Masten and James W. Meehan, Jr.) Journal of Economic Behavior and Organization, vol. 12 (October 1989), pp. 265-73.

"New Insights into the Decline of Antitrust Enforcement," Contemporary Policy Issues, vol. 7 (October 1989), pp. 1-18.

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn from Claims Data?" (Co-author: James W. Hughes) <u>Journal of Business & Economic Statistics</u>, vol. 7, (October 1989), pp. 423-431.

"Evaluating Medical Malpractice Reforms," (Co-author: James W. Hughes) <u>Contemporary Policy Issues</u>, vol. 7, (April 1989), pp. 83-98.

"An Inquiry into the Efficiency of Private Antitrust Enforcement," (Co-Author: Thomas E. Kauper), <u>Georgetown Law Journal</u>, vol. 74, (April 1986), pp. 401-469.

"Efficient Assignment of Rights to Sue for Antitrust Damages," <u>Journal of Law & Economics</u>, vol. 28, (May 1985), pp. 469-482. Reprinted in <u>The Journal of Reprints for Antitrust Law and Economics</u>, vol. 25, no. 2, (1995), pp. 969-982.

Books / Articles in Books and Volumes:

"Competitive Discounts and Antitrust Policy," (Co-authors: Kevin M. Murphy and Robert H. Topel), <u>The Oxford Handbook of International Antitrust Economics</u>, Volume 2, (2015), edited by Roger D. Blair and D. Daniel Sokol, Chapter 5, pp. 89-119.

"Five Easy Questions", Ch.2.3, in <u>Leadership Development for a Global World: The Role of Companies and Business Schools</u>, J.Canals (ed.), Palgrave Macmillan Ltd. Houndmills, Basingstoke, London 2012, pp. 145-160.

<u>Globalization of Management Education: Changing International Structures, Adaptive Strategies, and the Impact on Institutions</u>, (Co-authors: Chair of AACSB Taskforce Robert F. Bruner, et al.), Emerald Group Publishing, (2011).

"Social Learning and Transaction Cost Economics," <u>Advances in Strategic Management</u>, A. Huff and J. Walsh, eds., (1997), pp. 223-228.

<u>Crisis Resolution in the Thrift Industry</u>, (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong), Kluwer Academic Press, (1989).

"Private Antitrust Cases That Follow on Government Cases," (Co-author: Thomas E. Kauper) in <u>Private Antitrust Enforcement: New Learning and New Evidence</u>, ed. Lawrence J. White, M.I.T. Press, (1988), pp. 329-370.

"Minimizing Waste Water Treatment Costs at the Plant Level," (Co-author: Dan Yaron) in <u>Environmental Policy</u>, vol. II, ed. George Tolley, et al., Ballinger Publishing Co., (1983), pp. 115-136.

<u>Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws and Procedures</u>, (January 1979), co-authored Chapter 11 on Insurance.

Working Papers / Research in Progress:

"The *Sealy* Antitrust Litigation: Testing the Free Rider Hypothesis," (Co-author: Michael J. Moore), November 2020.

"Amazon's Three Lines of Business (Co-authors: Marley Hughes, Jason Canaday, and Pierre Cremieux), April 2022.

"How Amazon Became Amazon," (Co-author: (Co-authors: Marley Hughes, Jason Canaday, and Pierre Cremieux), March 2022.

Book Reviews:

Confessions of an Economic Hit Man, John Perkins, (Berrett Koehler, 2004), Journal of Economic Literature, vol. 43 (December 2005), pp. 1063-1065.

Concentration and Price, ed. Leonard W. Weiss, (M.I.T. Press, 1989), Journal of Economic Literature, vol. 30 (September 1991), pp. 1205-1207.

Impact Evaluations of Federal Trade Commission Vertical Restraints Cases, ed. Robert H. Lande, et al., (Federal Trade Commission, 1984), Journal of Economic Literature, vol. 24 (December 1986), pp. 47-48.

Other Publications:

"Exponential Alliance" (Co-authors: David Bach and Camino de Paz), BizEd, (July/August 2017), pp. 18-27.

"Five Good Questions" CFO Insights (May 14, 2015).

"The Future of §2 Enforcement and the Analysis of Dominant Firms" 2010 Antitrust Section Symposium: New York State Bar Association, pp. 12-23.

"A New Approach to Antitrust Class Certification," (Co-authors: Pierre Cremieux and Ian Simmons), Law 360, (June 14, 2010).

Brief of Amici Curiae Antitrust Law and Business School Professors, and Economists, In support of Petition for a Writ of Certiorari, *National Football League, et al. v. Ninth Inning, Inc. et al*. (Ninth Circuit Court of Appeals, April 8, 2020).

Amicus Brief from Group of Antitrust Economists in Support of Defendants-Appellees, In re: Effexor XR Antitrust Litigation, No. 15-1184 (3rd Cir. February 23, 2016).

Amicus Brief from Group of Antitrust Economists to the U.S. Court of Appeals for the Third Circuit, filed May 10, 2016, regarding Wellbutrin XL Antitrust Litigation (E.D. Pa. September 23, 2015).

Amicus Brief from Group of Antitrust Economists to the U.S. Court of Appeals for the Third Circuit, filed December 21, 2015, regarding Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Company, et al., 2:12-cv-03824 (E.D. Pa. April 16, 2015).

*In Re. DAP Antitrust Litigation*, Expert Report, The Antitrust Litigation Course, American Bar Association (Antitrust Section), Mock Trial in U.S. District Court for E.D. of Pennsylvania, MDL. Docket No. 1999, (October 4-5, 2007).

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed August 24, 2006, regarding *Weyerhaeuser Co., v. Ross-Simmons Hardwood Lumber Co., Inc.*, 411 F.3d (9th Cir. 2005).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed March 24, 2006, regarding *William Twombly, et al., v. Bell Atlantic Corporation*, et al., 313 F. Supp. 2d 174 (S.D.N.Y. October 7, 2003); *William Twombly, et al., v. Bell Atlantic Corporation, et al*., 425 F.3d 99 (2nd Cir. 2005).

Amicus Brief of Antitrust Economists in *People of the State of NY v. Actavis plc and Forest Laboratories, LLC* (14-4624), filed January 15, 2015; matter on appeal for the U.S. District Court for the SDNY (Civil Action No. 1:14-07473).

"Bank Privatizations in Central Europe and Russia," <u>Davidson Institute Report to the U.S. Department of Treasury</u>, (March 1996).

"Director's View," <u>The Davidson Window</u>, vol.1, (Winter 1994), pp. 1-2; vol.1, (Summer 1994), pp. 1-2; vol. 1, (Spring 1995), pp. 1-2.

"Transitions in Expertise," <u>The Journal of the International Institute</u>, (Winter 1994), (July/August 2017), pp. 6-8.

<u>Crisis Resolution in the Thrift Industry: Beyond the December Deals</u>. (Co-authors: Roger C. Kormendi, Victor L. Bernard, and S. Craig Pirrong), Report of the Mid America Institute, (March 1989).


Popular Press:

"Are we being Stupid about COVID-19?" The Hill, (November 10, 2020).

"Is Flattening the Curve Bad for Health" co-author L.S. Dugdale, The Hill, (March 26, 2020).

"How to Build Bridges across an Organization," *Financial Times*, (August 4, 2019).

"Yale SOM's Ted Snyder on the Durability of The M7, MBA Application Declines & More," *Poets and Quants*, (June 24, 2019).

"A Different Degree of Disruption," *Biz@HKUST*, pp. 22-25, (June 2019).

"Statistics and Sports: Deflategate," Analysis Group, 2015 Year in Review.

"Dean of the Year: The Three-Peat Change Agent," *Poets and Quants*, (December 16, 2015).

"10 Business Schools to Watch in 2016," *Poets and* Quants, (December 16, 2015).

"Faculty and students call for calmer tone in campus protests," *Wall Str*eet *Journal*, (December 3, 2015).

"IIM-B students can opt for lessons from Yale, Berkeley, and other top Business schools," *Prep Sure* (November 19, 2015).

"Research top priority for IIM-B," *Live Mint*, (December 2, 2015).

"Global meet for business students concludes," *Hindu*, (November 18, 2015).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"IIMB Students to Gain Global Exposure," *New Indian Express*, (November 18, 2015).

"Berkeley Haas becomes 28th school in Yale's Global Network," *Financial Times*, (November 5, 2015).

"How Yale is beginning to crack into the elite B-school ranks," *Fortune*, (December 17, 2014).

"Businessweek's 2014 Winners and Losers," *Poets and Quants*, (November 14, 2014).

"Is Michigan State Really Better Than Yale?" *New York Times*, (August 7, 2012).

"Yale Redefines What It Means to Be Global," *Wall Street Journal*, (June 7, 2012).

"Can 'Ted' Snyder Work His Magic on Yale's School of Management?" *Poets & Quants*, (February 8, 2012).

"Yale's Big, Audacious Global Bet," *Poets and Quants*, (February 8, 2012).

"Q&A with Edward Snyder, Dean, Yale School of Management," *Business Standard, Mumbai*, p. 12, (November 8, 2011).

"If You Get the People Right, They Build the School," *Financial Times*, (October 17, 2011).

"Turnaround Specialist to Take on Yale," *Wall Street Journal*, (June 3, 2010).

"The Subtle Strategist," *Financial Times*, (April 11, 2010).

"Student ≠ Customer," *Nytimes.com, Room for Debate*, (January 4, 2010).

"2016 Olympics," *Chicago Tribune*, (September 17, 2009).

"The Party's Over: The Coming Business School Shake-out," *BusinessWeek.com*, (April 2, 2009).

"Global Learning for a Truly Integrated MBA," *Financial Times*, (February 19, 2009).

"Driven Mad by Traffic Congestion," *Business Week Chicago*, (April 2008).

"The Market's Place," *Chicago Tribune*, (August 12, 2007).

"Advocating a Carbon Tax," CNBC Europe, (February 19, 2007).

"Are B-Schools Slacking Off?" *Business Week*, (February 11, 2007).

"The Quiet American?" *Global Focus*, Vol. 1, No. 2, (2007).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Dean's Column: The Toughest and the Best Advice," *Financial Times*, (May 15, 2006).

"On MBAs," *Financial World*, London, (September 2005).

"Are Business Schools Becoming Global," *India Times*, (August 2005).

"Global Challenge," *The Guardian*, London, (August 4, 2005).

"Vigorous Competition Better than any Oath," *Handelsblatt.com*, (September 4, 2003).

"Playing the Game the American Way," *Budapest Business Journal*, (July 9, 1993).

"An English Reform of American Law," *Wall Street Journal*, (August 9, 1991).


Business School Cases and Class Materials:

One-Pagers on IO concepts (n=14)

Briefs related to High-Tech Industries (n=12)

Alternative Tools to Influence Market and Non-Market Behavior.

W.R. Grace Co.'s Zonolite Licensee Program: How to Exploit Two Related Monopolies and Improve Economic Efficiency.

Job Risk.

Pricing Decisions: Custom Limousines.

The Choice of Technologies.

Mimicking the S&P 500.

Human Capital, Work, and Leisure.  Co-author: Scott E. Masten.

Sugar Quotas.  Co-author: Edward J. Mitchell.


GRANTS AND FELLOWSHIPS

Yale School of Management Summer Research Grants to study private and public antitrust enforcement (2019).

Grants from University of Virginia Darden School's Batten Institute and University of Chicago Booth School of Business for major extension of previous research, 2009–10.  Resulted in "Napsterizing Pharmaceuticals: Access, Innovation, and Welfare" (January 2011).

Grants from Aventis Pharmaceuticals, University of Chicago Graduate School of Business, University of Virginia Darden School, and Bates College 2000–01.  Resulted in "Napsterizing Pharmaceuticals: Access, Innovation, and Consumer Welfare," NBER Working Paper (October 2002).

BT Grant of funds and equipment to the University of Michigan Business School to deliver educational modules using new technologies (November 1995).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S. Department of Treasury Grant to the Davidson Institute to study bank privatizations in Central Europe and Russia. Co-investigator: Roger C. Kormendi (June 15, 1995 – December 31, 1995).

Bradley Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (July 1, 1989 – June 30, 1990).

RGK Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (July 1, 1989 – June 30, 1990).

University of Michigan Office for the Study of Public and Private Institutions Research Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (Summer 1989).

Robert Wood Johnson Foundation Grant to study the effects of tort reforms on medical malpractice litigation.  Co-investigator: James W. Hughes (June 1, 1987 – December 31, 1988).

Earhart Foundation Grant to study the effects of the Supreme Court's *Brunswick* decision on private antitrust litigation (Summer 1986).

University of Michigan Business School Summer Research Grants to study private and public antitrust enforcement and other law and economics issues (1984, 1985, 1989, 1990, 1992, and 1993).

University of Chicago, Committee on Public Policy Studies Fellowship (1978).


## INVITED PAPERS, LECTURES, CONFERENCE PRESENTATIONS, PUBLIC TESTIMONY*

* In this section I include information regarding my testimony and briefings in public settings.  Please refer to <u>edwardasnyder.com</u> for information regarding my consulting testimony in various litigations.

"Five Objectives for Yale SOM," Keynote, 2022 Yale US – China Distinguished Colloquium, April 22, 2022.

"High Tech Industries: China and the US," Yale Center Beijing, March 11, 2021.

"The Anti-Globalization Narrative and Implications for Management Education," Keynote address at Zhejian University School of Management 40th Anniversary Forum (November 1, 2020), http://www.cma.zju.edu.cn/en/school/videos.aspx.

"Value of Networks in Times of Increased Frictions," Keynote address at the Annual Meeting of the Academy of International Business, (June 26, 2018).

"Global Innovation: China and the World," Remarks at Fortune Brainstorm Tech International panel, (December 5, 2017).

"The Anti-Globalization Narrative: Implications for Business Schools," Keynote speech at Deusto Business School's Centenary Celebration, (January 17, 2017).

"The Anti-Globalization Narrative," Keynote speech at the 6th International Business School Shanghai Conference, hosted by Antai College of Economics and Management, Shanghai Jiao Tong University, (October 17, 2016).

"Crafting Strategic Relationships," panel at the 2016 AACSB International Conference and Annual Meeting (ICAM) (with Kai Peters, Chief Executive, Ashridge Business School), (April 5, 2016).

Remarks at the Yale Law School's Corporate Law Center Advisory Board Dinner, (March, 8, 2016).

"Global Antitrust Enforcement," Keynote at the Antitrust Law Section Annual Meeting, New York State Bar Association (NYSBA), (January 28, 2016).

"Past, Present, and Future of Business Education," Keynote speech at Fudan University School of Management's Partnership Deans Gathering, (November 5, 2015).

Keynote speaker at the 6th Indian Management Conclave, (July 29, 2015).

"Globalizing Business Schools: The New Frontier," Closing Keynote speech at the Graduate Management Admission Council (GMAC) Leadership Conference, Fort Lauderdale, FL, (January 24, 2014).

Keynote speaker at The Rotman School's Future of Business Education Conference, Toronto, Canada, (November 5, 2013).

"Antitrust Enforcement in the EU and US: An Empirical Assessment of the Influence of Protectionism," invited paper (with Pierre Cremieux), American Law and Economics Association, Vanderbilt University Law School, (May 17, 2013).

"Emerging Markets and Business School Strategies," Invited moderator, International Conference and Annual Meeting for The Association to Advance Collegiate Schools of Business, (April 9, 2013).

"Turkey as a Pivotal Country in the Global Economy," Presentation to DEıK, Foreign Economics Relations Board, Istanbul, Turkey, (November 30, 2012).

"Management Challenges in the Global Economy," Presentation to faculty, students and staff at Renmin University of China School of Business, Beijing, China, (March 2012).

"The Management Education Industry," AACSB Annual Deans Conference Plenary Session with Deans Christine Poon, Joseph Thomas, and Andrew Policano, Phoenix, AZ, (February 20, 2011).

"U.S. Business Schools and the MBA: A Long Perspective," EFMD Annual Meeting of Deans and Directors, Lyon, France, (January 25, 2011).

"Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis," George Mason 13th Annual Symposium on Antitrust Law, (February 4, 2010); Analysis Group Seminar, New York, NY, (October 20, 2010).

"Digging Out of the Deficit," Executive Roundtable Panel Discussion with Governors Tim Pawlenty (MN), Donald Carcieri (RI), Mark Sanford (SC), Robert McDonnell (VA), and John Kasich, Candidate for Governor (OH), Cincinnati, OH, (September 20, 2010).

"Corporate Governance," Inside Counsel's 10th Annual Super Conference, invited panel,

Chicago, IL, (May 25, 2010).

"The Future of §2 Enforcement," Antitrust Law Section Annual Meeting, New York State Bar Association (NYSBA), (January 28, 2010).

"Global Antitrust Enforcement," Center for Public Studies, Santiago, Chile, (September 2009).

"Globalization of Management Education," Plenary Speaker at AACSB Annual Deans Conference, San Francisco, CA, (February 5, 2009).

"The Role of Economic Experts in Class Certification in the United States," The American Bar Association Section of Antitrust Law Trial Practice Committee, (June 17, 2008).

"How to Use Economics," Illinois Agricultural Leadership Seminar, Chicago, IL, (August 2006).

"Are Business Schools Becoming Truly Global?" with Dean Santiago Iñiguez, AACSB Dean's Conference, San Diego, CA, (February 6, 2006).

"Strategic Choices in a Global Environment," Presentation with Dean Santiago Iñiguez. European Foundation for Management Development Deans' Conference, Rotterdam School of Management, The Netherlands, (January 26, 2006).

"How to Use Economics," Distinguished Alumni Presentation, Colby College, (October 2005).

"Hatch-Waxman and Public Policy Toward Pharmaceuticals," Presentation at Summer 2002 Conference for Western Attorneys General, (2002).

Congressional Briefing, "Hatch-Waxman Reconsidered: How Best to Promote Prescription Drug Innovation and Affordability," sponsored by the Alliance for Health Reform and supported by the National Institute of Health Care Management, (June 13, 2002).

Combined Federal Trade Commission and Department of Justice Hearings on Competition and Intellectual Property Policy, presentation of testimony on Hatch-Waxman and Public Policy Toward Pharmaceuticals, (March 2002).

Graduate Business Conference, Johnson Graduate School of Management, Cornell University, invited panel, The Future of Management Education, (March 2001).

"Economics and Government Policy," Panel Discussion with Edward P. Lazear, Randall S. Kroszner, and Lawrence H. Summers, Honoring Gary S. Becker: A Conference, Chicago, IL, (February 11, 2001).

New York State Bar Association, invited panel on Indirect Purchaser Litigation in Antitrust, New York, NY, (January 2001).

University of Virginia, E-Summit's Plenary Session, (November 1999).

European Association of Comparative Economics, Annual Conference, invited panel, Bank Privatization, Grenoble, France, (September 1996).

University of Chicago, Conference on Tort Reform, Commentator for Steven Shavell, (June 1996).

U.S. Department of Treasury, Davidson Institute, "Banks in Transition: Investment Opportunities in Central Europe and Russia," New York, NY, (May 1996).

U.S. Department of Treasury, Davidson Institute, "Bank Privatization in Central Europe and Russia," Budapest, Hungary, (April 1996).

American Law and Economics Association, invited paper (with Greg Niehaus), "Damage Schedules in the Products Liability System and the Efficiency of Consumption Choices," (May 1994).

American Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (January 1994).

University of Michigan Presidential Forum on *Constituting International Expertise: Who, What, Where Why, How?*, "Transitions in Expertise," (October 1993).

American Law and Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (May 1992).

Western Economic Association, 100 Years of the Sherman Act, invited paper (with Thomas E. Kauper), "Misuse of the Antitrust Laws," (June 1990).

Western Economic Association, Applied Microeconomics, invited paper, "Aftermath of the *Sealy* Antitrust Litigation," (June 1990).

Law and Society Association, invited paper (with James W. Hughes), "The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (June 1989).

Duke University, Conference on the Law and Economics of Contracting, invited paper (with Scott E. Masten), "The Design and Duration of Contracts: Strategic and Efficiency Considerations," (April 1988).

U.S. Senate Banking Committee, testimony based on research paper ("The Origins and Resolution of the Thrift Crisis"), (February 1988).

Georgetown University, Conference on Private Antitrust Enforcement, invited paper (with Thomas E. Kauper), "An Inquiry into the Efficiency of Private Antitrust Enforcement," (November 1985).

Hoover Institution, Conference on Antitrust and Economic Efficiency, invited paper, "Efficient Assignment of Rights to Sue for Antitrust Damages," (August 1984).

SEMINARS AND OTHER PRESENTATIONS

Yale School of Management, Problems with Global Antitrust Enforcement (February 2016).

Vanderbilt Law School, American Law & Economics Association (May 2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

University of Chicago
Applied Price Theory Workshop (May 1984, October 1984, and October 2002).
Economics and Legal Organization Workshop (October 1990, January 1992, and May 1992).

University of Virginia, e-Summit (November 1999).

U.S Treasury (February 1996).

Davidson Institute Research Seminar Series (April 1995).

University of Michigan, Center for Chinese Studies (October 1994).

Young Presidents Organization, Asia Region Meetings (February 1994).

Confederation of Indian Industries, CEO Forum (February 1994).

Harvard University Law School, Law and Economics Seminar (April 1993).

George Mason University Law School, Law and Economics Seminar (October 1992).

University of Illinois, Industrial Organization Workshop (April 1992).

Georgetown University Law School, Law and Economics Workshop (November 1991).

Cornell University Law School (April 1991).

University of Southern California, Applied Micro Workshop (October 1990).

University of California at Los Angeles, Industrial Organization Workshop (October 1990).

Virginia Polytechnic Institute, Economics Department Seminar (November 1989).

Ohio State University, Industrial Organization Seminar (May 1988), Microeconomic Theory Workshop (October 1986).

Federal Trade Commission (October 1988, October 1992).

Western Economic Association (July 1987, July 1988, June 1990, and July 1996).

Duke University, Center for the Study of Business Regulation (November 1986 and December 1992).

Colby College (May 1985, February 1992, and March 1996).

U.S. Department of Justice, Antitrust Division (May 1985, May 1986, May 1987, November 1989, and May 1991).

Washington University, Industrial Organization Workshop (March 1985).

University of Michigan,
Industrial Organization Workshop (February 1984, April 1985, September 1986, January 1988, and March 1988).

Law and Economics Seminar (October 1989, April 1990, and January 1992).

PH.D. THESIS COMMITTEE SUPERVISION

Alowin M. Th. L. Moses, "A Model of Voucher Privatization" (University of Michigan, 1996).

Vijay Singal, "Efficiency Versus Market Power in Mergers: Evidence from the Airline Industry" (University of Michigan, 1992).

David E. Weinstein, "Essays on Japan's Trade and Industrial Structure" (University of Michigan, 1991).

Debra J. Holt, "Understanding Strategic Choice: The Statistical Analysis of Experimental Games" (University of Michigan, 1990).

David J. Denis, "Asymmetric Information and the Market for Seasoned Equity Offerings: Theory and Evidence" (University of Michigan, 1988).

Amy J. Broman, "The Impact of Federal Income Tax Policy on the Charitable Contributions Behavior of Households" (University of Michigan, 1987).

James W. Hughes, "Tort Reforms and Medical Malpractice Litigation" (University of Michigan, 1986).

Barton L. Lipman, "Delaying or Deterring Entry: A Game-Theoretic Analysis" (University of Michigan, 1985).


BOARDS, ASSOCIATIONS, TASK FORCES, AND CONSULTING

Member, MIT Corporation's Visiting Committee for the Sloan School of Management.

Chair, Review Committee, Hong Kong University of Science and Technology, Business School (Spring 2019).

Member, Committee for Economic Development of the Conference Board (CED).

Chair or Member, AACSB Accreditation Review Committees, including:
Wharton Business School,* University of California, Berkeley (Haas), University of California, Los Angeles (Anderson), MIT Sloan, Columbia Business School, Georgetown (McDonough), HEC Paris, Fudan School of Business, and Stanford Graduate School of Business.*  (*Multiple reviews)

Member, Board of Directors, KemperSports, KemperLesnick

Member, Board of Trustees, Colby College (2012 – 2018).

Member, International Advisory Committee, School of Business, Renmin University of China (2018-2020).

Member, 3rd Advisory Board of Antai College of Economics and Management, Shanghai Jiao Tong University (November 2015 – October 2018).

Member, Board of Directors, Argonne National Laboratories, (July 2008 – June 2010).

Former Member, American Law and Economics Association.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# APPENDIX B

# EDWARD A. SNYDER EXPERT TESTIMONY IN THE PAST FOUR YEARS

1.  United States District Court for the District of Colorado
    *United States of America v. Jayson Jeffrey Penn, et al., Criminal Action No. 20:CR-152-PAB*
    **Trial testimony 2022**

2.  United States District Court for the District of Columbia
    *United States of America v. Bertelsmann SE & CO. KGaA, Penguin Random House, LLC, ViacomCBS, INC. and Simon & Schuster, Inc., Civil Action No. 1:21-cv-02886*
    **Report, deposition, and trial testimony 2022**

3.  United States District Court, Southern District of New York
    *In re: Mylan N.V. Securities Litigation, Case No. 1:16-CV-07926*
    **Report and deposition 2021**

4.  United States District Court, Southern District of New York
    *Abu Dhabi Investment Authority v. Mylan N.V., et al., Case No. 1:20-CV-01342*
    **Report and deposition 2021**

5.  United States of America Department of the Treasury, Office of the Comptroller of the Currency
    *In the Matter of Rohan Ramchandani, Case No. OCC AA-EC-2017-2*
    **Reports and deposition 2021**

6.  United States of America Department of the Treasury, Office of the Comptroller of the Currency
    *In the Matter of Richard Usher, Case No. OCC AA-EC-2017-3*
    **Reports and deposition 2021**

7.  United States District Court, Middle District of Florida
    *In re: Disposable Contact Lens Antitrust Litigation*, Case No. 3:15-md-2626-J-20JRK
    **Reports, depositions, and hearing testimony 2017, 2018 & 2020**

8.  Court of Chancery of the State of Delaware
    *Preston Hollow Capital LLC v. Nuveen LLC et al.*, Civil Action No. 2019-0169-SG
    **Reports, deposition, and trial testimony 2019**

9.  United States District Court, District of Vermont
    *Garret Sitts, et al., v. Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC*, Case No. 2:16-cv-00287-CR
    **Reports and deposition 2018 & 2019**

10. United States District Court, Northern District of California
    *FTC v. Qualcomm, Inc.,* Civil Action No. 17-cv-0220
    **Report, deposition, and trial testimony 2018 & 2019**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix C
# Materials Relied Upon

## Expert Reports (including associated backup materials, work papers, and cited documents)

### Plaintiff Experts

Expert Report of Dr. Jay S. Grossman, D.D.S., March 8, 2023.

Expert Report of Hal J. Singer Ph.D., March 10, 2023.

Expert Report of William B. Vogt, Ph.D., March 10, 2023.

Errata to Expert Report of Hal J. Singer Ph.D., March 29, 2023.

## Depositions (including exhibits)

Deposition of Cecilia Garay, EPP Class Representative, January 27, 2023.

Deposition of Christopher Puco, Former Senior Vice President of the Americas at Align, February 28, 2023.

Deposition of Elisabeth J. Skibba, EPP Class Representative, January 26, 2023.

Deposition of Jaime Gooch, EPP Class Representative, January 31, 2023.

Deposition of John Cusack, General Manager of 3Shape North America business, March 16, 2023.

Deposition of Joseph Hogan, CEO of Align, January 13, 2023.

Deposition of Joseph Megan, Align's Global Retainers Business Lead, February 23, 2023.

Deposition of Justin Michael Hansen, EPP Class Representative, February 10, 2023.

Deposition of Katie Campbell, EPP Class Representative, January 23, 2023.

Deposition of Leon Rasovsky, Vice President of Digital Transformation at Align, January 26, 2023.

Deposition of Lisa Barry, Global Director of iTero Certified Pre-Owned Solutions, December 14, 2022.

Deposition of Martin Pater, Align Senior Manager of Pricing, December 22, 2022.

Deposition of Mu Li, Vice President of Global Business Development, Strategy, Analytics and Insights at Align Technology, December 20, 2022.

Deposition of Raphael Pascaud, Former Align Chief Marketing Officer, March 2, 2023.

Deposition of Sherwin Matian, DDS. General Dentist at VIP Dental Spas, January 8, 2023.

Deposition of Simon Beard, Align EVP for the Americas, December 22, 2022.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Deposition of Srini Kaza, Senior Vice President of Product Research and Development at Align, February 3, 2023.

Deposition of Tim Mack, Former President of Marketing and Business Development at Align, February 24, 2023.

Deposition of Trent Ritter, US iTero Global Manager, January 31, 2023.

Deposition of William Simon, DMD, Owner of Simon and Simon, January 20, 2023.

## Legal Documents

### Complaints

Amended Class Action Complaint, *Simon and Simon, PC d/b/a City Smiles; and VIP Dental Spas, et al., v. Align Technology, Inc*., United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-03754-VC, August 14, 2020.

Fourth Amended Class Action Complaint, *Misty Snow, et al., v. Align Technology, Inc*., United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03269-VC, October 3, 2022.

### Other Court Documents

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

*Cascade Health Solutions v. PeaceHealth, 502 F.3d 895 (9th Cir. 2007).*

*Federal Trade Commission v. Qualcomm, Inc*., 969 F.3d 974, 1003-04 (9th Cir. 2020).

Letter from Adam Reich, Paul Hastings, to Hope Brinn, Berger Montague, *Simon and Simon, PC, et al. v. Align Technology, Inc*., U.S.D.C. N.D. Cal. Case No. 3:20-cv-03754-VC, December 13, 2022.

Re: *Misty Snow v. Align Technology, Inc*., Subpoena for documents directed to Aetna Inc., United States District Court, Northern District of California, 21-03269.

Subpoena for documents directed to Delta Dental of Massachusetts Inc., United States District Court, Northern District of California, 21-03269.

*United States v. United Shoe Machinery Corp*., 110 F. Supp. 295 (D. Mass. 1953).

*Western Parcel Express v. United Parcel Service*, 190 F.3d 974 (9th Cir. 1999)

## Analyst Reports

Bednar, Jason, "Dentsply Sirona, Inc.," Piper Sandler, June 2020.

Credit Suisse, "SmileDirectClub – Setting Things Straight: Initiate Outperform," October 7, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Wolfe Research, "Clear Aligner Market Model," March 11, 2021.

Wright, Erin Wilson and Katie Tryhane, "Dental Update," Credit Suisse, July 2021.

Wright, Erin Wilson, Katie Tryhane, and George Engroff, "Dental Update," Credit Suisse, July 2019.

Wright, Erin Wilson, Tryhane, Katie, Cristofides, Haley, and Matthew Urbik, "Clear Aligner Market Primer," Credit Suisse, October 21, 2019.

## Academic Literature

### Articles

Berndt, Ernst R. and Murray L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, October 2010, Vol. 18, No. 2, pp. 177-201.

Bork, Robert, J. and Gregory Sidak, "The Misuse of Profit Margins to Infer Market Power," *Journal of Competition Law & Economics*, September 2013, Vol. 9, No.3, pp. 511–530.

Bronnenberg, Bart J., et al., "Do Pharmacists Buy Bayer? Informed Shoppers and the Brand Premium," *The Quarterly Journal of Economics*, July 2015, Vol. 130, No. 4, pp. 1669-1726.

Caves, Richard E., Whinston, Michael D., and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers: Microeconomics*, 1991.

Conti, Rena M. and Ernst R. Berndt, "Specialty Drug Prices and Utilization After Loss of U.S. Patent Exclusivity, 2001-2007," *National Bureau of Economic Research*, Working Paper No. 20016, March 2014.

Cremieux, Pierre, Ian Simmons, and Edward A. Snyder, "Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis," *George Mason Law Review*, Vol. 17, No. 4, pp. 939-967.

DeGraba, Patrick, Greenlee, Patrick, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," *U.S. Federal Trade Commission*, September 2017.

Frank, Richard G., and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics & Management Strategy*, 1997, Vol. 6, No. 1.

Grabowski, Henry G. and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, October 1992, Vol. 35, No. 2, pp. 331-350.

Greenlee, Patrick, and David Reitman, "Distinguishing competitive and exclusionary uses of loyalty discounts," *The Antitrust Bulletin*, Fall 2005, Vol 50, Issue 3.

C – 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Hovenkamp, Herbert J. and Erik Hovenkamp, "Complex Bundled Discounts and Antitrust Policy," *Buffalo Law Review*, July 2009, Vol. 57, No. 4, pp. 1227-66.

Jacobson, Jonathan M., "Exclusive Dealing, 'Foreclosure,' and Consumer Harm," *Antitrust Law Journal*, 2002, Vol. 70, No. 2, pp.312-369.

Leamer, Edward E., "Sensitivity Analyses Would Help," *American Economic Review*, June 1985, Vol. 75, No. 3, pp. 308-313.

Mark, Anita M, "For the Patient: Straightening Your Smile," *The Journal of the American Dental Association*, January 2022, Vol. 154, No. 1, p. 98.

Melamed, A. Douglas, "Exclusionary Conduct Under the Antitrust Laws: Balancing, Sacrifice, and Refusals to Deal," *Berkeley Technology Law Journal*, Spring 2005, Vol 20, No. 2, pp. 1247-1267.

Revilla-Leon, Marta, et al., "Intraoral Scanners: An American Dental Association Clinical Evaluators Panel Survey," *Journal of the American Dental Association*, August 2021, Vol. 152, No. 8, pp. 669-670.

Salop, Steven C. and David T. Scheffman, "Cost-Raising Strategies," *The Journal of Industrial Economics*, September 1987, Vol. 36, No. 1, pp. 19-34.

Salop, Steven C. and David T. Scheffman, "Raising Rivals' Costs," *The American Economic Review*, May 1983, Vol. 73, No. 2, pp. 267-271.

Salop, Steven C., "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," *Antitrust Law Journal*, October 2017, Vol. 81, pp. 371-421.

Scott-Morton, Fiona M., "Contracts that Reference Rivals," *Antitrust*, Summer 2013, Vol. 27, No. 3, pp. 72-79.

Scheffman, David T. and Richard S. Higgins, "Twenty Years of Raising Rivals' Costs: History, Assessment, and Future," *George Mason Law Review*, January 2003, Vol. 12, pp. 371-387.

Shi, Cynthia, et. al., "Clear Aligners Brands and Marketing Claims: An Overview of Available Information on the Web," *Australasian Orthodontic Journal*, June 2022, Vol. 38, No. 2, pp. 252-262.

Topel, Robert H., "Contractual Discounts and Competition: Interpreting Unilateral Conduct under Section 2 of the Sherman Act," *International Journal of the Economics of Business*, February 2018, Vol. 25, No. 1, pp. 131–146.

Vivian, Jesse C., "Generic-Substitution Laws," *U.S. Pharmacist*, June 2008, Vol. 33, No. 6.

Weir, Tony, "Clear Aligners in Orthodontic Treatment," *Australian Dental Journal*, March 2017, Vol. 62, No. 1, pp. 58-62.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Wiggins, Steven N. and Robert Maness, "Price Competition in Pharmaceuticals: The Case of Anti-Infectives," *Economic Inquiry*, April 2004, Vol. 42, No. 2, pp. 247-263.

**Books**

American Bar Association Section of Antitrust Law, Econometrics in Antitrust, "Econometrics: Legal, Practical, and Technical Issues," 2005.

American Bar Association Section of Antitrust Law, "Monopolization and Dominance Handbook," 2011.

American Bar Association Section of Antitrust Law, "Pharmaceutical Industry Antitrust Handbook," 2018, Second Edition.

American Bar Association Section of Antitrust Law, "Proving Antitrust Damages: Legal and Economic Issues," 2017, Third Edition.

Angrist, Joshua and Jorn-Steffen Pischke, *Mostly Harmless Econometrics*, Princeton University Press, 2008.

Bernheim, B. Douglas and Randal Heeb, "Chapter 1: A Framework for the Economic Analysis of Exclusionary Conduct," *The Oxford Handbook of International Antitrust Economics*, Vol. 2, edited by Roger D. Blair and D. Daniel Sokol, Oxford University Press, 2015.

Besanko, David and Ronald R. Braeutigam, *Microeconomics*, John Wiley & Sons, Inc., 2011, Fourth Edition.

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, Fourth Edition.

Greene, William H., *Econometric Analysis*, Prentice Hall, 2012.

Hovenkamp, Herbert, Federal Antitrust Policy: *The Law of Competition and Its Practice*, West Publishing Corporation, 1994, Fifth Edition.

Hubbard, R. Glenn and Anthony Patrick O'Brien, *Microeconomics*, Pearson, 2019, Seventh Edition.

Kaplow, Louis and Carl Shapiro, *Handbook of Law and Economics*, Vol. 2, edited by A. Mitchell Polinsky and Steven Shavell, 2007.

Krugman, Paul, *Economics*, Worth Publishers, 2009, Second Edition.

Murphy, Kevin M., Snyder, Edward A., and Robert H. Topel, "Chapter 5: Competitive Discounts and Antitrust Policy," *The Oxford Handbook of International Antitrust Economics*, Vol. 2, edited by Roger D. Blair and D. Daniel Sokol, Oxford University Press, 2015.

Nalebuff, Barry, "Competing Against Bundles," *Incentives, Organization, and Public Economics*, Oxford University Press, 2000.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Orbach, Barak and Raphael Avraham, "Chapter 6: Squeeze Claims. Refusals to Deal, Essentials Facilities, and Price Squeezes," *The Oxford Handbook of International Antitrust Economics*, Vol. 2, Oxford University Press, 2015.

Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence,* Federal Judicial Center, 2000, Second Edition.

Scheffman, David T. and Richard S. Higgins, "Chapter 3: Raising Rivals' Costs," *The Oxford Handbook of International Antitrust Economics*, Vol. 2, Oxford University Press, 2015.

Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, Pearson Addison Wesley, 2007, Second Edition.

Sutton, John, *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration*, MIT Press, 1991.

Wooldridge, Jeffrey M., Introductory *Econometrics: A Modern Approach*, South-Western, 2009, Fourth Edition.

## Bates Stamped Documents

| | |
|---|---|
| 3Shape_Antitrust_Simon_00005015-5037 | ALIGNAT-PURCH00026657 |
| 3Shape_Antitrust_Simon_00230952 | ALIGNAT-PURCH000329400-406 |
| 3Shape_Antitrust_Simon_00230954 | ALIGNAT-PURCH00143594 |
| 3Shape_Antitrust_Simon_00359117 | ALIGNAT-PURCH00158990 |
| 3Shape_Antitrust_Simon_00394034-042 | ALIGNAT-PURCH00286966-7028 |
| 3Shape_Antitrust_Simon_00418087 | ALIGNAT-PURCH00287919-925 |
| 3Shape_Antitrust_Simon_00528325 | ALIGNAT-PURCH00288160-8164 |
| 3Shape_Antitrust_Simon_00643511 | ALIGNAT-PURCH00288166-8171 |
| 3Shape_Antitrust_Simon_00669726-755 | ALIGNAT-PURCH00298236-286 |
| 3Shape_Antitrust_Simon_01021279 | ALIGNAT-PURCH00369619-635 |
| 3Shape_Antitrust_Simon_01076318 | ALIGNAT-PURCH00401847-899 |
| 3Shape_Antitrust_Simon_01336110-115 | ALIGNAT-PURCH00484111-115 |
| ALGN_SWFT0083483-487 | ALIGNAT-PURCH00484302-311 |
| ALIGN0029675-701 | ALIGNAT-PURCH00503263 |
| ALIGNAT-PURCH00001212 | ALIGNAT-PURCH00580758 |
| ALIGNAT-PURCH00001891 | ALIGNAT-PURCH00597451-477 |
| ALIGNAT-PURCH00003427–452 | ALIGNAT-PURCH00614646-650 |
| ALIGNAT-PURCH00008483 | ALIGNAT-PURCH00734612-617 |
| ALIGNAT-PURCH00023143 | ALIGNAT-PURCH00734636-643 |

| | |
|---|---|
| ALIGNAT-PURCH00742808-815 | ALIGNAT-PURCH01974421 |
| ALIGNAT-PURCH00742817-823 | ALIGNAT-SNOW00037768-856 |
| ALIGNAT-PURCH00747133-136 | ALIGNAT-SNOW00098687-692 |
| ALIGNAT-PURCH00755291-299 | ALIGNAT-SNOW00111865-912 |
| ALIGNAT-PURCH00755902-909 | ALIGNAT-SNOW00145271-273 |
| ALIGNAT-PURCH00759698 | ALIGNAT-SNOW00155100-117 |
| ALIGNAT-PURCH00783094-196 | ALIGNAT-SNOW00306106-114 |
| ALIGNAT-PURCH00799164 | ALIGNAT-SNOW00332894-896 |
| ALIGNAT-PURCH00825445 | ALIGNAT-SNOW00515919-925 |
| ALIGNAT-PURCH00826157-170 | ALIGNAT-SNOW00515927-935 |
| ALIGNAT-PURCH00878462-469 | ALIGNAT-SNOW00588022-028 |
| ALIGNAT-PURCH00932992 | ALIGNAT-SNOW00621720-731 |
| ALIGNAT-PURCH00932993 | ALIGNAT-SNOW00744800-803 |
| ALIGNAT-PURCH00932994 | ALIGNAT-SNOW00747395-397 |
| ALIGNAT-PURCH00932995-3105 | ALIGNAT-SNOW00765024-032 |
| ALIGNAT-PURCH00955987 | ALIGNAT-SNOW00799182-192 |
| ALIGNAT-PURCH01319229-230 | ALIGNAT-SNOW00802865 |
| ALIGNAT-PURCH01355391 | ALIGNAT-SNOW00825435 |
| ALIGNAT-PURCH01494639-660 | ALIGNAT-SNOWS1_0069888-929 |
| ALIGNAT-PURCH01544915-916 | ALIGNAT-SNOWS1_0086279-301 |
| ALIGNAT-PURCH01824091 | BENCO-0000003 |
| ALIGNAT-PURCH01824097 | CDB0000001 |
| ALIGNAT-PURCH01932039 | DS000199 |
| ALIGNAT-PURCH01960722-726 | DS000994 |
| ALIGNAT-PURCH01968912-924 | EHC-000182 |
| ALIGNAT-PURCH01968930-941 | EHC-000183 |
| ALIGNAT-PURCH01968941-949 | EHC-000185 |
| ALIGNAT-PURCH01968976 | EHC-000196 |
| ALIGNAT-PURCH01968976-984 | EHC-000197 |
| ALIGNAT-PURCH01968994-9006 | GLDT000001-052 |
| ALIGNAT-PURCH01970731-738 | HD00008 |
| ALIGNAT-PURCH01974401-411 | HD00111 |
| ALIGNAT-PURCH01974412-420 | HD00120 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| HD00376 | PCI-00003 |
| HD00437 | PLANMECA_000078 |
| HD00560 | PURCH01965812-816 |
| HD00693 | SD0000219-232 |
| HD00735 | SD0000233-299 |
| HS (3754)_000022 | SDC_SNOW_00000001 |
| HS (3754)_000815 | SNOW00912379-381 |
| HS_001544 | STRAUMANN00000001 |
| LSE00000879 | STRAUMANN00001739 |
| OI-PD-081921-931 | |

## Other Publicly Available Documents

### Websites

3DISC, "Heron IOS integrates the Reveal Digital Ecosystem," available at https://docs.3disc.com/reveal.html.

3DISC, "Our Company," available at https://3disc.com/our-company/.

3M News Center, "3M Digital Oral Care Unveils New 3M True Definition Scanner," available at https://news.3m.com/2014-08-01-3M-Digital-Oral-Care-Unveils-New-3M-TM-True-Definition-Scanner.

3M, "3M Clarity Aligners Flex + Force," available at https://multimedia.3m.com /mws/media/2063190O/innova-article-1-two-trays-english.pdf.

3M, "3M True Definition Intraoral Scanner acquired by Midmark in US and Canadian Markets," April 1, 2019, available at https://www.3m.com/3M/en_US/dental-us/expertise/digital-dental-impressions/.

3M, "3M True Definition Scanner Frequently Asked Questions," 2010, available at https://cdn.vivarep.com/contrib/vivarep/media/pdf/2_6480_0071022100MidmarkTDFAQ A1719_20200106192339719.pdf.

3M, "About 3M Oral Care," available at https://www.3m.com/3M/en_US/oral-care-us/.

3M, "Clarity Products," available at https://www.3m.com/3M/en_US/p/c/dental-orthodontics/?Ntt=clarity.

3Shape, "3Shape Launches All-New TRIOS 5 Wireless Intraoral Scanner," September 21, 2022, available at https://www.3shape.com/en/press/2022/3shape-launches-all-new-trios-5-wireless-intraoral-scanner.

3Shape, "Clear Aligner Providers," available at https://www.3shape.com/en/integrations/clear-aligner-providers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

3Shape, "ClearCorrect & 3Shape: Engineered for Smiles," available at https://www.3shape.com/en/integrations/clearcorrect.

3Shape, "Press Releases," October 26, 2016, available at https://www.3shape.com/en/press.

3Shape, "Ultimate CAD/CAM Chairside Solution with 3Shape and Ivoclar ProgaMill One," February 20, 2020, available at https://www.3shape.com/en/news/2020/ultimate-cad-cam-chairside-solution-with-3shape-and-ivoclar-progamill-one.

ADA Marketplace, "Say Cheese! 7 Advantages of Invisalign Over Traditional Braces," available at https://marketplace.ada.org/blog/dental-marketing/say-cheese-7-advantages-of-invisalign-over-traditional-braces/.

Al Hassiny, Ahmad, "Aoralscan 3 Intraoral Scanner Review," Institute of Digital Dentistry, May 9, 2022, available at https://instituteofdigitaldentistry.com/ios-reviews/aoralscan-3-scanner-review-the-latest-ios-by-shining-3d/.

Al-Hassiny, Ahmad, "Comparing Medit's New i700 Wireless vs i700 vs i600 vs i500 scanners," Institute of Digital Dentsitry, May 11, 2022, available at https://instituteofdigitaldentistry.com/cad-cam/comparing-medits-new-i700-wireless-vs-i700-vs-i600-vs-i500-scanners/.

Al-Hassiny, Ahmad, "Medit i500 Review," Institute of Digital Dentistry, December 2, 2019, available at https://instituteofdigitaldentistry.com/cad-cam/medit/medit-i500-review.

Al-Hassiny, Ahmad, "Medit i700 Review," Institute of Digital Dentistry, July 22, 2021, available at https://instituteofdigitaldentistry.com/ios-reviews/medit-i700-review/.

Al-Hassiny, Ahmad, "Medit To Be Sold For An Eye-Watering Amount," Institute of Digital Dentistry, December 2, 2022, available at https://instituteofdigitaldentistry.com/news/medit-to-be-sold-for-an-eye-watering-amount/.

Al-Hassiny, Ahmad, "Virtuo Vivo Intraoral Scanner Review 2022 Update," Institute of Digital Dentistry, September 2022, available at https://instituteofdigitaldentistry.com/ios-reviews/straumann-virtuo-vivo-intraoral-scanner-review/.

Align Technology, "Align Technology Announces Fourth Quarter and Year Ended 2016 Results," January 31, 2017, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-announces-fourth-quarter-and-year-ended-2016.

Align Technology, "Align Technology Announces Interoperability with Cadent Intra Oral Scanner for Use With Invisalign," May 13, 2011, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-announces-interoperability-cadent-intra-oral.

Align Technology, "Align Technology Announces The iTero Element Plus Series Next Generation of Scanners and Imaging Systems," February 3, 2021, available at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

https://investor.aligntech.com/news-releases/news-release-details/align-technology-announces-itero-element-plus-series-next.

Align Technology, "Align Technology Completes Acquisition of Intra-oral Scanning Leader Cadent," May 2, 2011, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-completes-acquisition-intra-oral-scanning.

Align Technology, "Align Technology Expands Its 'Invis Is' Consumer Advertising Campaign With New Creative and Influencers Focused on Teens, Moms, and Young Adults [Press Release]," May 14, 2021, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-expands-its-invis-consumer-advertising-campaign.

Align Technology, "Align Technology Files Lawsuits Against ClearCorrect," February 28, 2011, available at https://investor.aligntech.com/static-files/e5f2ef80-87cd-4d5d-b514-31fae58bd294.

Align Technology, "Align Technology Files Patent Infringement and False Advertising Lawsuit Against SmileCareClub, Sharper Image, and Brookstone," October 22, 2015, available at https://investor.aligntech.com/static-files/54407035-0086-431f-b740-125447c31dba.

Align Technology, "Align Technology Introduces Invisalign Outcome Simulator Pro, Next Generation Patient Communication Tool Featuring In-Face Visualization Of A Patient's Potential Future Smile In Minutes," May 19, 2022, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-introduces-invisalign-outcome-simulator-pro.

Align Technology, "Align Technology Launches Invisalign Brand Marketing Campaign to Challenge Metal Braces as the Status Quo," May 9, 2017, available at https://investor.aligntech.com/static-files/60d76d80-3d41-4a54-9742-1d6c3e1d6c1a.

Align Technology, "Align Technology to Discontinue Acceptance of Digital Scan Submissions from 3Shape TRIOS Scanners in the United States," December 20, 2017, available at https://investor.aligntech.com/news-releases/news-release-details/align-technology-discontinue-acceptance-digital-scan-submissions.

Align Technology, "Align Technology's Invisalign Brand is the Official Smile Partner of U.S. Ski & Snowboard," March 25, 2021, available at https://investor.aligntech.com/news-releases/news-release-details/align-technologys-invisalign-brand-official-smile-partner-us-ski.

Align Technology, "Invisalign Aligner Case Submission Third-Party Intraoral Scanner Interoperability," November 7, 2019, available at https://www.aligntech.com/documents/scanner_interoperability.pdf.

Align Technology, "Who We Are," available at https://www.aligntech.com/about#who.

Align, "Expand Restorative Treatments With iTero Scanners,", 2022, available at https://itero.com/grow-your-practice/restorative.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Align, "FAQ," available at https://www.invisalign.com/frequently-asked-questions.

Align, "Invisalign aligners straighten teeth…," available at https://www.invisalign.com.

Align, "Invisalign Express & Invisalign Teen," Consumer Guide to Dentistry, available at https://www.yourdentistryguide.com/invisalign-express/.

Align, "Invisalign Product Portfolio," available at https://cloud.news.aligntech.com/productportfolio.

Align, "iTero Element 2 Intraoral Scanner," available at https://itero.com/our-solutions/itero-element-2.

Align, "iTero Scanner Tutorial: Occlusogram," available at https://www.youtube.com/watch?v=x4RWiRuS9PY.

Align, "The iTero Element 5D Imaging System," available at https://itero.com/our-solutions/itero-element-5d.

Align, "Treatable Cases," available at https://www.invisalign.com/provider/digital-transformation/treatable-cases.

Align, "Your Digital Invisalign Experience," available at https://www.invisalign.com/invisalign-digital-experience.

Alvy Dental, "Automated Thermoforming Machine for Dental Aligner," available at https://www.alvydental.com/products/automated-thermoforming-machine-for-dental-aligners?_pos=1&_psq=ther&_ss=e&_v=1.0.

American Dental Association, "Supply of dentists in the U.S.: 2001-2022," April 2023, available at available at https://www.ada.org/resources/research/health-policy-institute/dentist-workforce.

American Orthodontics Association, "Braces vs. Clear Aligners," January 30, 2019, available at https://aaoinfo.org/whats-trending/braces-vs-clear-aligners/.

Asmussen, Natalie, "How Much Do Braces Cost a Month? Price Comparison of Different Types," Dentaly, available at https://www.dentaly.org/us/adult-braces/braces-cost-a-month/.

Aspen Dental, "Motto Clear Aligners," available at https://www.aspendental.com/mottoaligners.

Aspen Dental, "The Care You Need, Right Now," available at https://www.aspendental.com/new/.

Barkho, Garbriela, "Why Quip Is Launching a Teeth Aligning Service," ModernRetail, May 18, 2021, available at https://www.modernretail.co/retailers/why-quip-is-launching-a-teeth-aligning-service/.

Big Smile Dental, "Invisalign Cost," available at https://bigsmiledental.com/blog/invisalign-cost/.

BioSpace, "uLab Expands Business Opportunities as Growth Accelerates in Clear Aligner Devices," November 22, 2022, available at https://www.biospace.com/article/releases/ulab-expands-business-opportunities-as-growth-accelerates-in-clear-aligner-devices/.

Boggan, Brandon, "Choosing Between Direct-to-Consumer (DTC) Aligners and Orthodontist-Provided Aligners: A Comprehensive Guide, Ortho South, available at https://www.orthosouth.com/choosing-between-direct-to-consumer-dtc-aligners-and-orthodontist-provided-aligners-a-comprehensive-guide.

Borst, Heidi, "How Much Does Invisalign Cost?," Forbes, updated April 25, 2023, available at https://www.forbes.com/health/body/invisalign-cost/.

Burdeos, Johna, "NewSmile Review," Forbes Health, January 27, 2023, available at https://www.forbes.com/health/body/newsmile-review/.

BusinessWire, "Correcting and Replacing Aspen Dental Introduces Doctor-Guided and Tech-Driven Motto™ Clear Aligners-Giving Patients Their Tray One on Day One," June 15, 2021, available at, https://www.businesswire.com/news/home/20210615005367/en/CORRECTING-and-REPLACING-Aspen-Dental-Introduces-Doctor-Guided-and-Tech-Driven-Motto%E2%84%A2-Clear-Aligners-%E2%80%93-Giving-Patients-Their-Tray-One-on-Day-One.

Camas Orthodontics, "Sure Aligners," available at https://camasorthodontics.com/invisalign#surealigners.

Candid, "How Candid Works," available at https://www.candidco.com/.

Casa City Smile Dental Clinic, "Invisalign Manufacturing Process," YouTube, available at https://www.youtube.com/watch?v=vsR0_wTR2a8.

CDB, "Aligner," available at https://cdbcorp.net/beispielseite-2-2-2/.

Chin, Kevin, DDS, "Invisalign Cost the Why and What to Expect," available at https://www.cofadentistry.com/blog/invisalign-cost.

Cision PR Newswire, "Envista and Pacific Dental Services Announce Extension of Implant, Imaging, and Clear Aligner Commercial Relationship," January 31, 2022, available at https://www.prnewswire.com/news-releases/envista-and-pacific-dental-services-announce-extension-of-implant-imaging-and-clear-aligner-commercial-relationship-301471850.html.

City Smiles, "Invisalign," available at http://www.citysmilesonline.com/cosmetic-dentistry-invisalign.

Clarius, Aaron, "Aligner32 Clear Aligners - Complete Review," NewMouth, February 15, 2023, available at https://www.newmouth.com/orthodontics/treatment/clear-aligners/aligner32/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Clarius, Aaron, "Smileie Aligners Review," NewMouth, December 16, 2022, available at https://www.newmouth.com/orthodontics/treatment/clear-aligners/smileie/.

ClearCorrect, "Deeper Integration with Our Partner Brands," 2023, available at https://www.straumann.com/clearcorrect/us/en/doctors/digital-workflow.html.

Cleveland Clinic, "Clear Braces," July 25, 2022, available at https://my.clevelandclinic.org/health/treatments/23568-clear-braces.

Cleveland Clinic, "Dental Crowns," https://my.clevelandclinic.org/health/treatments/10923-dental-crowns.

Cleveland Clinic, "Dental Impressions," April 2022, available at https://my.clevelandclinic.org/health/diagnostics/22671-dental-impressions.

Dandy, "Dandy Clear Aligner Lab," available at https://www.meetdandy.com/labs/clear-aligners/.

Dandy, "Get a Free TRIOS Intraoral Scanner," available at https://www.meetdandy.com/get-free-scanner-lp/.

DenMat, "DenMat Receives FDA 510K and Enters the Orthodontic Clear Aligner Business," February 20, 2020, available at https://www.denmat.com/blog/denmat-receives-fda-510k-enters-orthodontic-clear-aligner-business.html.

Dental Community, "Carestream Dental CS 3500 Intra-Oral Scanner," July 31, 2015, available at https://www.dentalcommunity.com.au/news/carestream-dental-cs-3500-intra-oral-scanner--fast-portable-affordable-open/a8d0ca7f-18df-4732-12f0-54f8794e0fcc.

Dental Products Report, "Dentsply Sirona Unveils SureSmile Aligners," September 17, 2018, available at https://www.dentalproductsreport.com/view/dentsply-sirona-unveils-suresmile-aligners.

Dental Products Report, "Henry Schein Introduces Proprietary SLX Clear Aligner System," May 4, 2018, available at https://www.dentalproductsreport.com/view/henry-schein-introduces-proprietary-slx-clear-aligner-system.

Dental Products Report, "New Intraoral Scanner Challenges The Dental Market in 2017-Heron IOS," February 21, 2017, available at https://www.dentalproductsreport.com/view/new-intraoral-scanner-challenges-dental-market-2017-heron-ios.

Dental Products Report, "Planmeca Launches Emerald S Intraoral Scanner," October 2019, available at https://www.dentalproductsreport.com/view/planmeca-launches-emeraldtm-s-intraoral-scanner.

Dental Tribune, "3DISC Reinvents The Intra-Oral Scanner With OVO," March 13, 2023, available at https://www.dental-tribune.com/c/3disc-imaging/news/3disc-reinvents-the-intra-oral-scanner-with-ovo/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dental Tribune, "Align Technology is an official sponsor of this year's Super Bowl," Dental Tribune, February 10, 2023, available at https://www.dental-tribune.com /news/align-technology-is-an-official-sponsor-of-this-years-super-bowl/.

Dentistry Today, "SmileDirectClub Selects Carestream Dental As Intraoral Scanner Partner," March 1, 2022, available at https://www.dentistrytoday.com/smiledirectclub-selects-carestream-dental-as-intraoral-scanner-partner/.

Dentistry Today, "The Primescan Intraoral Scanner and SureSmile Clear Aligners Give Patients The Smiles They've Always Wanted," May 4, 2021, available at https://news.dentsplysirona.com/en/local-news/us/2021/primescan-intraoral-scanner-and-suresmile.html.

Dentsply Sirona, "Axeos + Primescan AC Bundle & Save Program Terms and Conditions," available at https://www.dentsplysirona.com/content/dam/master/regions-countries/north-america/usa/product-categories/cad-cam-chairside-dentistry/cerec-promotions/CER-EN-US-2022-Full-Terms-and-Conditions-Axeos-Primescan-AC-Bundle.pdf.

Dentsply Sirona, "Company Info," available at https://www.dentsplysirona.com/en-us/company.html.

Dentsply Sirona, "Dentsply Sirona Extends Its Digital Universe With Primescan Connect," September 2022, available at https://investor.dentsplysirona.com/node/28236/pdf.

Dentsply Sirona, "National PDC 2020 Promotions," March 2022, available at https://assets.dentsplysirona.com/flagship/en_ca/2021folder/webbooklet/CAN-DS-WB-PDC-2022-EN.pdf.

Dentsply Sirona, "Never Stop Being Prime With CEREC," available at https://assets.dentsplysirona.com/flagship/en/explore/cerec/brochures/CER-brochure-Never-stop-being-prime-with-CEREC-EN.pdf.

Dentsply Sirona, "New Intraoral Scanner "Primescan" from Dentsply Sirona Impresses Users," February 4, 2019, available at https://news.dentsplysirona.com/en/business-units/cad-cam/2019/new-intraoral-scanner-from-dentsply-sirona--primescan-perfects-d.html.

Dentsply Sirona, "Our Company," available at https://www.dentsplysirona.com/en-us/company/our-company.html.

Dentsply Sirona, "Primescan Savings," 2020, available at https://assets.dentsplysirona.com/flagship/en-us/DIM-DS-World-Promo-Flyer.pdf.

Dentsply Sirona, "Using Attachments,", available at http://docs. suresmile.com /suresmile_webhelp/treatment_planning/Using_Attachments.htm.

C – 14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dentsply Sirona, "Your Comprehensive Clear Aligner Solution," 2020, available at https://www.dentsplysirona.com/content/dam/flagship/en/explore/orthodontics/suresmile-aligner/placeholder/ORT-brochure-SureSmile-Aligner-Your-Practice-Your-Patient.pdf.

Dentsply Sirona, "Your SureSmile," available at https://www.suresmile.com/en-us/your-suresmile/.

DEXIS, "DEXIS Launches New DEXIS IS Intraoral Scanning Portfolio," October 20, 2022, available at https://dexis.com/en-us/blog/dexis-launches-new-dexis-is-intraoral-scanning-portfolio.

Dexter, Amanda, "Invisalign Attachments: What Are They, How Do They Work & Are They Noticeable?" Dentaly, January 3, 2023, available at "https://www.dentaly.org/en/invisalign-invisible-braces/invisalign-attachments/.

Dosh, Kristi, "Invisalign's Partnership with The NFL Gives Doctors and Consumers New Options," Forbes, August 3, 2020, available at https://www.forbes.com/sites/kristidosh/2020/08/03/invisaligns-partnership-with-the-nfl-gives-doctors-and-consumers-new-options/?sh=36cc988e79fe.

Dudley Smiles, "The Benefits of Choosing an Orthodontist Vs. DTC Aligners," December 31, 2020, available at https://www.dudleysmiles.com/the-benefits-of-choosing-an-orthodontist-vs-dtc-aligners/.

Envista, "About Us," 2023, available at https://envistaco.com/en/about-us.

Envista, "Envista Completes Acquisition of Carestream Dental's Intraoral Scanner Business," April 20, 2022, available at https://investors.envistaco.com/2022-04-20-Envista-Completes-Acquisition-of-Carestream-Dentals-Intraoral-Scanner-Business.

Envista, "Envista to Acquire Carestream Dental Intra-oral Scanner Business," December 2021, available at https://investors.envistaco.com/2021-12-22-envista-to-acquire-carestream-dental-intra-oral-scanner-business.

Envista, "Investor Access @ Envista Summit," February 24, 2023, available at https://investors.envistaco.com/download/2023-02-24+-+Investor+Access+%40+Envista+Summit+-+Final.pdf.

Envista, "Specialty Products and Technology," available at https://envistaco.com/en/specialty-products-technology#ormco.

Fagala, Kyle, DDS, MDS, "The 5 Reasons to Pick an Orthodontist over DTC Aligners," Saddel Creek Orthodontics, January 10, 2020, available at https://saddlecreekortho.com/the-5-reasons-to-pick-an-orthodontist-over-dtc-aligners/.

Formlabs, "Form 3B+," available at https://dental.formlabs.com/products/form-3b/.

Frey, Scott, "iTero TimeLapse Technology," The Ortho Cosmos, June 14, 2017, available at https://theorthocosmos.com/itero-timelapse-technology/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Gawel, Richard, "Carestream Intraoral Scanners Now Integrated With 3M Oral Care Portal," Dentistry Today, December 24, 2018, available at https://www.dentistrytoday.com/products/carestream-intraoral-scanners-now-integrated-with-3m-oral-care-portal/.

GlobeNewswire, "Angelalign Technology Accelerates Globalization as the Global Invisible Orthodontics Market Recovers," April 4, 2023, available at https://www.globenewswire.com/news-release/2023/04/04/2641164/0/en/Angelalign-Technology-Accelerates-Globalization-as-the-Global-Invisible-Orthodontics-Market-Recovers.html.

Great Lakes Dental Technologies, "About Great Lakes," available at https://www.greatlakesdentaltech.com/about.

Hamer, "Automated Dental Thermoforming," available at https://hamer-pack.com/packaging-solutions/clear-aligners/.

Harrison Dental Studio, "Scanner Comparison Chart," available at https://www.harrisondentalstudio.com/img/DI-Comparison-Chart.pdf.

Henry Schein Dental, "Implants," available at https://www.henryschein.com/us-en/dental/c/surgical-implant-products/implants.

Henry Schein Orthodontics, "Why Reveal," available at https://revealproviders.com/why-reveal/.

Henry Schein, "About Henry Schein, Inc.," 2023, available at https://investor.henryschein.com/aboutus.

Henry Schein, "Fully Integrated Scanners," Reveal, 2023, available at https://revealproviders.com/digital-ecosystem/.

Henry Schein, "Intraoral Scanners for Digital Impressions," 2023, available at https://henryscheinequipmentcatalog.com/cad-cam/intraoral-scanners.

Henry Schein, "Orthodontic Supplies," available at https://www.henryschein.com/us-en/dental/c/orthodontic.

Henry Schein, "Reveal Clear Aligners: Doctor Frequently Asked Questions," available at https://revealproviders.com/faqs/.

Henry Schein, "Scanner Integrations," SLX, 2023, available at https://slxclearaligners.com/scanner-integrations/.

Henry Schein, Overview FY 2022, February 16, 2023, available at https://investor.henryschein.com/static-files/1f473730-679a-48ba-b83e-db36219c5272.

Hill, Alyssa, "Candid Aligners Review," NewMouth, March 14, 2023, available at https://www.newmouth.com/orthodontics/treatment/clear-aligners/candid/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Hill, Alyssa, "How Much Do Clear Aligners Cost?," New Mouth, March 8, 2023, available at https://www.newmouth.com/orthodontics/treatment/clear-aligners/cost/.

Houston Prosthodontic Specialists, "How Does Invisalign Work? by Total Image Dental," YouTube, available at https://www.youtube.com/watch?v=gDnDJX03Mxw.

Howley, Elaine K., "Invisible Braces: In Office vs. Of the Shelf," U.S. News Health, March 18, 2022, available at https://health.usnews.com/health-care/patient-advice/articles/invisible-braces-guide.

Impress, "How much do braces cost? Price of braces in the USA in 2023," available at https://smile2impress.com/us/blog/how-much-do-braces-cost-usa.

Inside Dentistry, "DWIO Scanning System," October 2015, Vol. 11, No. 10, available at https://www.aegisdentalnetwork.com/id/2015/10/dwio-scanning-system.

Invisalign Aligner Case Submission Third-Party Intraoral Scanner Interoperability, November 7, 2019, available at https://www.aligntech.com/documents/scanner_interoperability.pdf.

Key Dental Technologies, "Key Dental Technologies," available at https://keydentaltechnologies.com/.

LinkedIn, "Angel Aligner," April 27, 2023, available at https://www.linkedin.com/feed/update/urn:li:activity:7057064854620155905/.

LinkedIn, "Jenna Blanton: Senior Category Manager, Clear Aligners, Aspen Dental," available at https://www.linkedin.com/in/jenna-blanton-99839315.

Medit, "About Medit," available at https://www.medit.com/about-us.

MetLife, "Considering Clear Aligners? How Dental Insurance Can Help Pay the Costs," October 19, 2020, available at https://www.metlife.com/stories/dental-insurance/clear-aligners-how-dental-insurance-can-help/.

Midwest Dental Appleton, available at https://midwest-dental.com/locations/wisconsin-dental-centers/appleton-wi/.

Midwest Dental Belvidere, "Clear Aligners in Belvidere, IL," available at https://midwest-dental.com/locations/illinois-dental-centers/belvidere-il/?reveal.

Midwest Dental, "Locations," available at https://midwest-dental.com/locations/.

My Exceed, "In-Office Aligners," available at https://exceed-ortho.com/in-office-aligners/.

Napitu, Amanda, "Invisalign Lite: Cost, Eligibility, and Before and After Results," Dentaly, updated Februaruy 26, 2023, available at https://www.dentaly.org/us/invisalign-invisible-braces/invisalign-lite/.

Oral Image, "About Us," available at https://oralimage.com/about-us/.

Oral-B, "How Much Do Braces Cost?," available at https://oralb.com/en-us/oral-health/life-stages/braces/how-much-do-braces-cost/.

Ormco, "Frequently Asked Questions," available at https://sparkaligners.com/en-us/faq.

Ormco, "The Spark Difference," available at https://sparkaligners.com/en-us.

Orthodontic Products, "3Shape TRIOS Wins 'Best of Class' Award for 5th Year In a Row," August 30, 2017, available at https://orthodonticproductsonline.com/practice-products/imaging/intraoral-scanners/3shape-trios-wins-best-class-award-5th-year-row/.

Orthodontic Products, "Carestream Dental's CS 3600 Intraoral Scanner Receives Suresmile Certification," October 24, 2017, available at https://orthodonticproductsonline.com/treatment-products/brackets-wires/wires/carestream-dentals-cs-3600-intraoral-scanner-receives-suresmile-certification/.

Photocentric, "Liquid Crystal Magna," available at https://photocentricgroup.com/lcmagna/.

Planmeca, "Company," available at https://www.planmeca.com/company/.

Planmeca, "Save Now with Our Current Promotions," available at https://www.planmeca.com/na-promotions/.

Reveal, "iTero Scanner Instructions (Two Approaches)," available at https://revealclearaligners.eu/wp-content/uploads/2021/05/M2151_Itero_STLExportInstructions_Reveal_final.pdf.

Risas Dental Brace, "Find a Location," available at https://risasdental.com/find-a-location/.

Risas Dental Brace, "Reveal Clear Aligners," available at https://risasdental.com/services/orthodontics/reveal-clear-aligners/.

Shining 3D, "Aoralscan 3 - The New Intraoral Scanner by SHINING 3D," September 2021, available at https://www.shining3d.com/news/aoralscan-3-the-new-intraoral-scanner-by-shining-3d-2/.

Smile Prep, "2Usmiles Review," June 17, 2022, available at https://smileprep.com/2usmiles-review/.

Smile Prep, "Strayt Clear Aligners Review," June 22, 2022, available at https://smileprep.com/strayt-aligners-review/.

SmileDirectClub, "Earnings Presentation," 2022, available at https://investors.smiledirectclub.com/static-files/a242d5e0-2e88-44f1-80a0-7b937e7ba8a3.

SmileDirectClub, "SmileDirectClub vs. Invisalign: What's the Difference?," available at https://smiledirectclub.com/blog/smiledirectclub-vs-invisalign/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SmileDirectClub, "Why SmileDirectClub?" available at https://smiledirectclub.com/why-smile-direct-club.

SmileDirectClub, LLC, "SmileDirectClub Selects Carestream Dental as Intraoral Scanner Partner," February 24, 2022, available at https://www.globenewswire.com/en/news-release/2022/02/24/2391431/0/en/SmileDirectClub-Selects-Carestream-Dental-As-Intraoral-Scanner-Partner.html.

Smileie, "Home," available at https://www.smileie.com.

Somers, Jamie L., "Engagers (Also Known as Attachments)," Straumann Group, available at https://support.clearcorrect.com/hc/en-us/articles/203836198-Engagers-also-known-as-Attachments-.

Somers, Jamie L., "How to Submit Cases with an iTero Scanner Tutorial," ClearCorrect, available at https://support.clearcorrect.com/hc/en-us/articles/4404214285847-How-to-Submit-Cases-with-an-iTero-Scanner-Tutorial.

Somers, Jamie, "ClearCorrect's Treatment and Pricing Options," ClearCorrect, available at https://support.clearcorrect.com/hc/en-us/articles/4402074198807-ClearCorrect-s-Treatment-Pricing-Options.

Somers, Jamie., "Intraoral Scanning," ClearCorrect, available at https://support.clearcorrect.com/hc/en-us/articles/4407083930391-Intraoral-Scanning.

SprintRay, "3D Print Clear Aligner Models," available at https://sprintray.com/digital-dentistry/clear-aligners/.

Straumann, "3Shape TRIOS Intraoral Scanners," available at https://www.straumann.com/digital/us/en/home/equipment/io-scanners/3shape-trios.html.

Straumann, "About the Aligners," available at https://www.straumann.com/clearcorrect/us/en/patients/about-the-aligners.html.

Straumann, "Contact Us," available at https://www.straumann.com/group/us/en/home/about/contact-us.html.

Straumann, "Digital Dental Equipment: Scanners, Milling, and 3D Printing," 2023, available at https://www.straumann.com/en/dental-professionals/products-and-solutions/cares-digital-solutions/equipment.html.

Straumann, "Group Structure," 2023, available at https://www.straumann.com/group/en/home/investors/corporate-governance/group-structure.html.

Straumann, "Implant Solutions," available at https://shop.straumann.com/us/en_us/Implant-Solutions/c/cat_stmn_implsol.

SureSmile, "SureSmile Protocol: iTero Orthodontic Scanner," available at https://www.suresmile.com/wp-content/uploads/sites/35/uploads/2016/07/DOC-500368-6-protocol-iTero.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The Cleveland Clinic, "Teeth Braces," available at https://my.clevelandclinic.org/health/treatments/24601-teeth-braces.

U.S. Food & Drug Administration, "510(k) Premarket Notification," available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K172765.

U.S. Food & Drug Administration, "Devices@FDA," available at https://www.accessdata.fda.gov/scripts/cdrh/devicesatfda/index.cfm.

U.S. Food & Drug Administration, "Generic Drugs: Overview & Basics," April 21, 2023, available at https://www.fda.gov/drugs/generic-drugs/overview-basics.

U.S. Food & Drug Administration, "Medical Device Databases-Premarket Notifications (510(k)s)," available at: https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases.

ULab Systems, "ULab Systems," available at https://www.ulabsystems.com/.

"Ultra-Fast, Powder-Free Scanning," British Dental Journal, May 11, 2013, Vol. 214, No. 9, p. 477, available at https://www.nature.com/articles/sj.bdj.2013.473.

Vermette Orthodontics, "Why You Should Choose an Orthodontist over DTC Aligners," September 30, 2020, available at https://vermetteortho.com/why-you-should-choose-an-orthodontist-over-dtc-aligners/.

VIP Dental Spa, "Invisalign," available at https://www.vipdentalspas.com/invisalign-west-hollywood-ca.

VIP Dental Spa, "Orthodontics West Hollywood, CA," available at https://www.vipdentalspas.com/orthodontics-west-hollywood-ca.

Western Dental & Orthodontics, "About Us," available at https://www.westerndental.com/en-us/about-us.

Western Dental & Orthodontics, "Clear Braces & Clear Arc," available at https://www.westerndental.com/en-us/dental-services/braces-orthodontics/clear-braces.

Yetman, Daniel, "How Much Do Braces Cost?," Healthline, April 1, 2021, available https://www.healthline.com/health/average-cost-of-braces#cost-with-insurance.

Yim, Hyunsu, "MBK Partners to Acquire S.Korea's Medit for about $1.9 bln," Reuters, available at https://www.reuters.com/markets/deals/mbk-partners-acquire-skoreas-medit-about-19-bln-2022-12-30/.

Your Dentistry Guide, "ClearCorrect: How Does it Work and What Does it Cost?," Consumer Guide to Dentistry, available at https://www .yourdentistryguide.com/clearcorrect/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Financial Reports**

Align Technology, "Financial Results Q4 and Fiscal 2013," available at https://investor.aligntech.com/static-files/e6aabde6-7e16-4f2b-bf04-6b272fce0eb4.

Align Technology, "Form 10-K 2016," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714917000009/algn-20161231x10k.htm.

Align Technology, "Form 10-K 2018," available at https://investor.aligntech.com/static-files/1d251dbf-c454-4bc4-bf29-060981eac3ff.

Align Technology, "Form 10-K 2021," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714922000011/algn-20211231.htm.

Align Technology, "Form 10-K 2022," available at https://investor.aligntech.com/static-files/eb70ffbf-1126-4422-94fc-8fa110079497.

Align Technology, "Form 10-Q June 30, 2016," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714916000060/algn-20160630.htm.

Align Technology, "Form 10-Q June 30, 2021," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714921000054/algn-20210630.htm.

Align Technology, "Form 10-Q March 31, 2016," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714916000051/algn-20160331.htm.

Align Technology, "Form 10-Q March 31, 2021," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714921000027/algn-20210331.htm.

Align Technology, "Form 10-Q March 31, 2022," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714922000036/algn-20220331.htm.

Align Technology, "Form 10-Q September 30, 2016," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714916000065/algn-20160930.htm.

Align Technology, "Form 10-Q September 30, 2021," available at https://www.sec.gov/Archives/edgar/data/1097149/000109714921000073/algn-20210930.htm.

Align Technology, "Unaudited Condensed Consolidated Statements of Operations," 2022, available at https://investor.aligntech.com/static-files/bb399940-21b1-42e2-8faf-dffa8a254ce4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dentsply Sirona, "Fourth Quarter 2022 Earnings and 2023 Outlook," February 28, 2023, available at https://investor.dentsplysirona.com/static-files/7e34c7c5-1b26-4dec-ac02-1955b80ec06a.Envista, "Form 10-K 2019," available at https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=114813361&type=PDF&symbol=NVST&companyName=Envista+Holdings+Corporation&formType=10-K&dateFiled=2020-02-21&CK=1757073.

## Government Documents

Federal Reserve Bank of Saint Louis, "Consumer Price Index for All Urban Consumers: All Items in the U.S. City Average," U.S. Bureau of Labor Statistics, available at https://fred.stlouisfed.org/series/CPIAUCSL.

Federal Trade Commission, "Guide to Antitrust Laws-Markets," available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/markets.

Federal Trade Commission, "Monopolization Defined," available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined.

Organization for Economic Cooperation and Development, "Roundtable on Bundled and Loyalty Discounts and Rebates- United States," 2008.

U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

U.S. Department of Justice and the Federal Trade Commission, "Vertical Merger Guidelines, June 30, 2020, available at https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf.

U.S. Department of Justice, "Competition and Monopoly: Single-Firm Conduct under Section 2 of the Sherman Act, Chapter 2," September 2008, available at www.usdoj.gov/atr/public/reports/236681.htm.

U.S. Department of Justice, "Herfindahl- Hirschman Index," July 31, 2018, available at https://www.justice.gov/atr/herfindahl-hirschman-index.

U.S. Department of Justice, "Horizontal Merger Guidelines, Section 2.1.3," available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

U.S. Food & Drug Administration, "510(k) Premarket Notification ClearCorrect," available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K082556.

U.S. Food & Drug Administration, "510(k) Premarket Notification My ClearALIGN Dental Aligner System," available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K221475.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S. Food & Drug Administration, "Re: K180346," February 19, 2019, available at
https://www.accessdata.fda.gov/cdrh_docs/pdf18/K180346.pdf.

U.S. Food & Drug Administration, "Re: K210613," June 4, 2021, available at
https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210613.pdf.

U.S. Food & Drug Administration, "Re: K211537," October 26, 2021 available at
https://www.accessdata.fda.gov/cdrh_docs/pdf21/K211537.pdf.