UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| MISTY SNOW, individually and on behalf of others similarly situated,<br>                                        Plaintiff,<br>            v.<br>ALIGN TECHNOLOGY, INC.,<br>                                        Defendant. | Case No: 3:21-cv-03269 |

**REBUTTAL REPORT OF WILLIAM B. VOGT, Ph.D.**
**In Support of Class Certification and Merits**

**June 30, 2023**

Table of Contents

**A. Summary of Opinions** ............................................................. **7**

**A.1.    In-Office Clear Aligners Is a Relevant Antitrust Market** ................. **8**

**A.2.    Within the Relevant Market, Align Possesses Market Power** .......... **9**

**A.3.    Align Abused its Power to Substantially Foreclose the Relevant Market** ......................................................................................... **12**

A.3.1.    Termination of Interoperability Constitutes an Anticompetitive Refusal to Deal ............................................................................................................... 13

A.3.2.    Align's Exclusive Dealing was Effective at Foreclosing the Relevant Market 15

**A.4.    The Implants Market in 2012 Is an Appropriate Benchmark for the In-Office Clear Aligner Market in 2018** ................................................ **18**

**A.5.    Harm Is Common to the Proposed Class, Regardless of When the Benchmark Begins** ............................................................................ **21**

**A.6.    Dentists and Orthodontists Commonly Pass-on Invisalign Lab Fees 23**

**A.7.    Insurance Does Not Constrain Pass-Through to Patients** ............. **27**

**A.8.    End-Payer Patients Were Commonly Harmed By Align's Challenged Conduct** ........................................................................................... **29**

**B. In-Office Clear Aligners Is a Relevant Antitrust Market** ...................... **29**

**B.1.    The Gaidge Data Shows that Braces and In-Office Clear Aligners Form Distinct Product Markets** ....................................................... **30**

**B.2.    Align's Own SSNIP Test Shows that the In-Office Clear Aligner Market is a Relevant Antitrust Market** ............................................ **38**

**C. Align Possesses Market Power** ............................................................ **40**

**C.1.    Dr. Snyder Contradicts His Own Analysis of Market Definition and Power** ............................................................................................... **40**

**C.2.    Align's Profits Are Direct Evidence of Market Power** ................... **40**

**C.3.    SmileDirectClub's Profits Show that In-Office and Direct-to-Consumer Markets are Distinct, Not that Align Lacks Market Power** .. **43**

**D. The Challenged Conduct Substantially Foreclosed the Market for In-Office Clear Aligners** ........................................................................ **44**

**D.1.    Termination of Interoperability Substantially Foreclosed the Relevant Market** .............................................................................. **45**

D.1.1.    Termination of Interoperability 'Made No Economic Sense' But For Its Anticompetitive Effects ........................................................................................ 45

D.1.2.    Dr. Snyder's Profit Sacrifice Test is Conceptually Flawed and Contradicts

His Own Description of the Industry ................................................ 46
D.1.3.    Dr. Snyder's Implementation of the Profit Sacrifice Test is Insufficient ..... 48
D.1.4.    Dr. Snyder Contradicts Align's Own Profit Sacrifice Analysis ..................... 51
D.1.5.    Dr. Snyder's Analysis of iTero Profits is Demonstrably Incorrect ............... 55

**D.2.       The Fusion Program Satisfies a Discount-Attribution Test ............ 57**

**D.3.       Align's Exclusive Dealing Substantially Foreclosed the In-Office Clear Aligner Market ........................................................................ 60**

D.3.1.    Exclusive Dealing Can Foreclose Competition ............................................. 60

D.3.2.    Dr. Snyder's Sub-Division of the Exclusive Dealing Does Not Materially Affect Results ............................................................................................... 64

D.3.3.    The Duration of Align's Exclusive Dealing Did not Prevent its Anticompetitive Effects ................................................................................. 66

D.3.4.    Align's Exclusive Dealing was Effective .......................................................... 71

D.3.5.    Align's Exclusive Dealing Was Not Pro-Competitive ...................................... 77

**D.4.       Dr. Stiroh and Dr. Snyder Ignore My Analysis that Competing Clear Aligners Were Functionally Interchangeable And, on Some Dimensions, Preferred to Invisalign ....................................................................... 77**

**E. The Implants Market is a Fitting Competitive Benchmark for the In-Office Clear Aligner Market ............................................................... 78**

**E.1.       The Implants Benchmark Should Start in 2012, not 2007 .............. 79**

E.1.1.    Both Dr. Snyder and Dr. Stiroh Ignore that Align Itself Used the Implants Market as a Benchmark, Looking at Changes in 2012 and 2013 ..................... 79

E.1.2.    Dr. Stiroh Ignores My Original Analysis that Dental Implant Patents Continued to Expire Through 2013 ................................................................. 84

E.1.3.    Highly Cited Implant Patents Expired in 2012–2013 ................................... 85

E.1.4.    The Same Firms Entered the Implant and Aligner Markets ......................... 89

**E.2.       Supply and Demand Characteristics are Similar Between the Implant and Aligner Markets .................................................................. 91**

E.2.1.    Dr. Snyder's Analysis of Different "Supply" Conditions is Novel ................. 92

E.2.2.    The Implant and In-Office Clear Aligner Markets Face Similar Demand Conditions .................................................................................................... 93

E.2.3.    Intra-Oral Scanners Were Important in Both the Implant and Aligner Markets ........................................................................................................ 96

E.2.4.    Macroeconomic Differences Cannot Explain Invisalign's Pricing and Do Not Affect the Validity of the Implants Benchmark .............................................. 99

**E.3.       It Is Best Practice in Economics to Combine Generic (Value) and Branded (Premium) Prices Following Patent Expiry .......................... 101**

**E.4.       Brand Recognition Cannot Explain Invisalign's Pricing and Foreclosure ............................................................................................. 105**

**F. Harm Is Common to the Proposed Classes ....................................... 108**

**F.1.       The Majority of Invisalign Pricing Can be Explained by Advantage**

    Tier and Product ............................................................ 110

**F.2.    All Groups of Invisalign Direct Purchasers Paid Inflated Prices Because of the Challenged Conduct ........... 112**

    F.2.1.   DSOs and Advantage Non-Participants Paid Inflated Prices Because of the Challenged Conduct ......................................................... 113

    F.2.2.   The Challenged Conduct Caused Common, Classwide Harm Even Starting the Benchmark in 2007 and Dropping Exclusive DSOs ................... 115

    F.2.3.   DSOs That Agreed to Exclusivity Paid Inflated Prices Because of the Challenged Conduct ......................................................... 117

**F.3.    Summary of Evidence on Classwide Common Impact ................ 119**

**G. Anticompetitive Overcharge Was Commonly Passed-Through to End-Payer Patients ........................................................... 120**

**G.1.    The Rate of Passthrough I Observe is Consistent with the Structure of the Dental Market and Economic Theory.......................... 120**

**G.2.    Dr. Snyder and Dr. Stiroh Do Not Address the Qualitative Evidence of Pass-Through ............................................................ 123**

**G.3.    Dr. Snyder and Dr. Stiroh Do Not Address My Multi-Provider Panel Regression Finding Statistically Significant Pass-Through ............... 125**

**G.4.    ** ████████████████████████████████████ ..126

**G.5.    Dr. Snyder's Smile Brands Analysis is Flawed ............................ 134**

**G.6.    The PepperPointe Data Shows Statistically Significant Pass-Through, Consistent with My Original Findings .................. 138**

**G.7.    Insurance Does Not Constrain Pass-Through to End-Payer Patients 143**

    G.7.1.   The Delta Dental Data Shows that End-Payer Patients Bore the Overcharge 144

    G.7.2.   The Aspen Dental Data Shows that End-Payer Patients Bore the Overcharge 146

**G.8.    Summary of Pass-Through Evidence ........................................ 151**

**G.9.    Damages for Named Indirect Purchaser Plaintiffs ...................... 152**

**Materials Cited................................................................ 154**

**1. Published Literature ...................................................... 154**

**2. Depositions ................................................................ 155**

**3. Other Documents/Websites .............................................. 156**

**4. Bates Stamped Documents .............................................. 157**

**List of Figures**

Figure 1: SSNIP Estimates and Confidence Intervals, Using Order Shares and Controlling for COVID-19 ................................................................................................................................ 36
Figure 2: Braces vs Aligners Average Patient Fees and Monthly Case Starts, Gaidge.................... 37
Figure 3: Align Analysis of Future Opportunities from Interoperability with TRIOS.................... 50
Figure 4: Align's February 2018 Profit Sacrifice Analysis ............................................................... 53
Figure 5: Align's March 2018 Profit Sacrifice Analysis .................................................................... 55
Figure 6: Share of Exclusive Invisalign Doctors Paying List Price .................................................. 63
Figure 7: Share of Invisalign Orders Agreeing to Exclusivity .......................................................... 65
Figure 8: Share Of In-Office Clear Aligner Market Agreeing To Exclusivity ................................. 66
Figure 9: Share of Doctors Exclusively Ordering Competing Aligners .......................................... 72
Figure 10: Jared Theurer Did Stop Buying ClearCorrect After Enrolling in the Exclusive GP Accelerator Program ........................................................................................................................... 75
Figure 11: Richard Jacobson was foreclosed by termination of interoperability ............................ 76
Figure 12: CODEX Report Volume Analysis, Starting 2013 ............................................................ 82
Figure 13: CODEX Report Pricing Analysis, Starting 2013 ............................................................ 83
Figure 14: Dental Implant Components .............................................................................................. 86
Figure 15: Three Most Cited Dental Implant Patents ...................................................................... 87
Figure 16: Timeline of Implant Patent Expiry .................................................................................. 88
Figure 17: Comprehensive Pricing, Colored by Advantage Tier ................................................... 111
Figure 18: Distribution of Comprehensive Prices by Year and Tier .............................................. 112
Figure 19: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants, Starting the Benchmark in 2012 ...................................................................................................... 113
Figure 20: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants, Starting the Benchmark in 2007 ...................................................................................................... 114
Figure 21: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants (Split), Starting the Benchmark in 2007 .......................................................................................... 115
Figure 22: Damage Quantum, 2007 Benchmark .............................................................................. 116
Figure 23: Harm to Exclusive DSOs, 2012 Reference Period ......................................................... 118
Figure 24: Dr. Snyder's Example of ███████████ ................................................................. 129
Figure 25: Dr. Snyder's Cherry-Picked ███████████ in the Amended ███████████ . 130
Figure 26: Pass-Through Using New ███████████ ............................................................. 132
Figure 27: Testing Dr. Snyder's Attempted Comprehensive Composition ..................................... 137
Figure 28: Share of Delta Dental Plans with Either Annual or Lifetime Maximums ..................... 145
Figure 29: Aspen Lab Fees and Patient Prices .................................................................................. 147
Figure 30: Aspen Invisalign Product Mix ......................................................................................... 148
Figure 31: "Personal" Payments in Aspen Data, After Insurance .................................................. 149
Figure 32: Insurer/Patient Payment Split in Aspen Data ................................................................ 150

### List of Tables

Table 1: Updated Gaidge SSNIP Test, Using Order Shares and Accounting for COVID-19............ 35
Table 2: Profit Sacrifice Regression ........................................................................ 49
Table 3: Profit Sacrifice on iTero Sales to TRIOS Docs ................................................ 57
Table 4: Total iTero Costs, Including Previously Unallocated Expenses ......................... 59
Table 5: Discount Programs with Exclusivity Clauses, Copied From Snyder Report Figure 25..... 67
Table 6: Class Damages, 2007 Benchmark........................................................... 117
Table 7: Panel Pass-Through Model, Only Looking At Dr. Snyder's Cherry-Picked ███████
Practices .................................................................................................. 131
Table 8: Multi-Provider Panel of Pass-Through ....................................................... 133
Table 9: PepperPointe Regressions...................................................................... 141
Table 10: Estimated Lab Fee and Damages by Named Plaintiff.................................152

## A.    Summary of Opinions

(1)    In my opening report, I wrote that:

*following the expiration of 40 of Align's key patents and despite the entry of 6 new competitors, Align was nevertheless able to:*

*• Consistently maintain a market share in excess of 60%.*

*• Increase Invisalign prices by approximately 5%.*

*• Maintain and, in some periods, increase its gross and operating margins on clear aligners above 70 and 40% respectively.*

*Based on examples from the dental equipment and pharmaceutical industries and based on standard economic analysis of the effects of entry, a pattern of declining prices, margins, and/or market shares is expected for a dominant firm faced with expiring patents and entry. The contrary pattern in the clear plastic aligner industry is surprising.*

*This surprising pattern raises concern that competition in this industry has been impaired.*[1]

(2)    Neither Dr. Stiroh nor Dr. Snyder dispute that it is unusual for a firm to *maintain* prices, profits, and market share following patent expiry.[2] Nor do they dispute that Align instead *increased* both prices and its market share following patent expiry.

(3)    In my rebuttal report, I address the arguments raised by Dr. Stiroh and Dr. Snyder in their oppositions to my opening report.[3] I do so using both previously produced data/documents and certain data produced after filing my opening report. In summary, I maintain and affirm my original conclusions that:

- In-office clear aligners constitute a relevant antitrust market.

- Within the relevant market, Align possesses market power.

---

[1] *See* March 10, 2023, Expert Report of William B. Vogt (hereinafter "Vogt Report" or "Opening Report") ¶¶ 22–24.

[2] In some cases, an incumbent may maintain high prices post-expiry, but the literature finds they proceed to lose substantial market share as a consequence, as discussed in Section E.4. I am unfamiliar with any example in the economic literature of a firm maintaining both price and market share following patent expiry.

[3] *See* May 5, 2023 Expert Report of Edward A. Snyder, Ph.D (hereinafter "Snyder Report"); May 5, 2023 Expert Report of Lauren J. Stiroh, Ph.D (hereinafter "Stiroh Report").

- Align abused that power to substantially foreclose competition.

- The dental implants market in 2012 is an appropriate competitive benchmark.

- All (or virtually all) members of the proposed class were harmed.

- Dentists and orthodontists commonly pass-on (or "pass-through") Invisalign lab fees.

- Insurance does not constrain pass-through to end-payer patients.

**(4)**    I summarize each of these points in more detail below.

## A.1.    In-Office Clear Aligners Is a Relevant Antitrust Market

**(5)**    In my opening report, I presented two SSNIP tests, both of which found that in-office clear aligners are a distinct market from braces:

- A SSNIP test I performed using data produced by Gaidge, an orthodontic practice management software, which found that a 5% increase in the price differential between braces and aligners led to no statistically significant substitution.

- Align's own demand elasticities analysis, which found that Align could profitably sustain a SSNIP and that new, less-expensive clear aligners would compete with Invisalign but not braces—putting the two in separate markets.

**(6)**    Dr. Snyder criticizes each of these while failing to perform any alternative SSNIP test or any quantitative analysis indicating that consumers substitute braces and aligners. Further, his criticisms are unconvincing because:

**(7)**    **First**, Dr. Snyder's criticism of my SSNIP test using the Gaidge data is overwrought. Here, the reasonable conclusion to draw from the statistically insignificant level of substitution between braces and aligners that I found when applying the SSNIP test in my opening report is that there is no evidence that meaningful levels of substitution occurred. In addition, Dr. Snyder does not meaningfully address my analysis of the lack of substitution that occurred when Align did implement a price increase in the spring of 2019, which further supports my conclusions regarding market definition.

**(8)**    **Second**, I perform 6 additional regressions to evaluate a SSNIP test on the Gaidge data to directly address Dr. Snyder's criticisms. These models differ from my original approach because I look to braces share of total treatment volume, rather than the nominal volume itself, and add explicit controls for

COVID-19. Both improve the model given outliers and time variance in the data, and their implementation substantially reduces the standard error and confidence interval in the SSNIP test.

**(9)** As a result, I find that we are 95% confident that a 5% price difference between braces and aligners led to, *at most*, 2.6% substitution when accounting for COVID-19 (as Dr. Snyder claims is necessary). I therefore affirm my original conclusion that the Gaidge data shows in-office clear aligners and braces form distinct product markets.

**(10)** **Third**, Dr. Snyder appears to misunderstand Align's own demand elasticities analysis. He claims (A) it is common for firms to periodically adjust pricing, so Align's analysis indicates very little; and (B) that Align's analysis "[did] not measure the change in sales for a specific change in price— and thus does not indicate whether any such loss of sales would be enough that a hypothetical monopolist would choose not to raise prices."[4]

**(11)** However, it appears that Dr. Snyder misread (or misunderstood) Align's analysis. Align explicitly analyzed Invisalign profits and found they would increase if Align increased prices—in other words, that demand for Invisalign was sufficiently inelastic to profitably sustain a SSNIP. Align's analysis also found that a hypothetical new clear aligner product, priced at a specific 39.4% discount to Invisalign, would only cause 4% of braces volume (*i.e.*, 4% of customers) to shift to clear aligners. I make both arguments in my opening report, and Dr. Snyder does not directly acknowledge or address either.

**(12)** In short, because Dr. Snyder fails to perform his own SSNIP test, ignores basic statistical principles, and appears to misread Align's demand elasticities analysis, I find his criticisms unconvincing. Further, I implement additional models to directly address his criticism of my opening SSNIP on the Gaidge data, and again find no (or virtually no) substitution between aligners and braces. I therefore maintain my conclusion that in-office clear aligners constitute a distinct antitrust market separate from braces.

## A.2.  Within the Relevant Market, Align Possesses Market Power

**(13)** In my opening report, I find that Align has market power. I reach this conclusion on the basis that Align was able to maintain both substantially unchanged gross and operating profit margins following patent expiry. Profits in the period in which a firm is protected by its patents indicate the rate of monopoly profits. Align's ability to maintain those margins after patent expiry is direct evidence of market power. Dr. Snyder disagrees, arguing that profits

---

[4] Snyder Report ¶ 328.

alone do not show market power and that Align has none.

**(14)**   Dr. Snyder makes internally contradictory statements regarding Align's market power. In Section VI.G of his report, Dr. Snyder argues (as I discuss in more detail below) that the dental implants market is a poor benchmark for Invisalign because it faces different supply conditions—namely that the implants market was highly competitive whereas Align, by contrast, held a dominant share (88.6%) of the clear aligner market.[5] Later, however, in Section VII.B, Dr. Snyder makes precisely the opposite argument—that there is no such thing as a clear aligner market, and that Align has no market power within what Dr. Snyder characterizes as a broader teeth-straightening market that encompasses in-office aligners, aligners sold directly to consumers, and braces.[6]

**(15)**   In other words, when it is suitable to his conclusions regarding damages, Dr. Snyder opines that Align has market power. When suitable to his conclusions regarding market definition, Align does not.

**(16)**   Setting this contradiction aside, I turn to Dr. Snyder's substantive arguments regarding market power. First, he argues that Align's near 70% gross margins were not unique, and therefore not evidence of market power. He makes this point by invoking SmileDirectClub's gross margins, which similarly reached 70% to 76%.

**(17)**   However, that both Align and SmileDirectClub maintained profit margins in excess of 70% is in fact strong evidence that they do not compete with each other on price and occupy separate markets (respectively aligners sold in-office and sold direct-to-consumer), consistent with my market definition analysis. If consumers were elastic between Align and SmileDirectClub, either firm would have a strong incentive to offer small reductions in price (and therefore margin) to increase volume and nominal profits. The fact that this did not happen is evidence that they exist in different markets.[7]

---

[5] Snyder Report ¶ 258–65. Notably, Dr. Snyder relies on a March 2021 "Clear Aligner Market Model" finding that Align had a share of the clear aligner market even higher than the market share I estimate in my opening report. *Compare* Vogt Report ¶¶ 530–40.

[6] Snyder Report ¶¶ 347, 358.

[7] It may also be that Align and SmileDirectClub chose not to compete on price, potentially because of cartel conduct, *i.e.*, an agreement not to compete. I understand that Plaintiffs allege separately that Align and SmileDirectClub agreed to a market allocation scheme whereby Align agreed not to compete in the direct to consumer market, thus allowing SDC to raise prices for direct to consumer aligners above competitive levels. While these allegations are not the subject of my report here, I note that this conduct is likely to result in the high profit margins Dr. Snyder identifies. In any event, SmileDirectClub's margins should not be assumed a priori to represent a competitive benchmark.

**(18)**  Second, Dr. Snyder opines that profits may not be evidence of market power due to product differentiation and/or substantial fixed costs which a firm must recover. That is, firms may deviate price from cost because they either (A) sell differentiated products or (B) have fixed costs which otherwise competitive pricing would not recover. Neither argument is satisfactory.

**(19)**  Patents exist to allow innovator firms to recover upfront fixed costs and therefore incentivize innovation, *i.e.*, patents grant firms a temporary monopoly for the express purpose of recovering fixed costs. Once a patent expires and those costs have been recovered, prices and margins typically decline. This is why Align's ability to maintain profit margins following patent expiry is so unusual, and thus direct evidence of market power: it defies a well-established pattern in previously patent protected industries (including dental implants and generic drugs).

**(20)**  Moreover, market power is defined as the ability of a firm to deviate price from cost. This is why economists measure market power using a Lerner Index, which is (essentially) a price-cost margin. Dr. Snyder's assertion that profits do not indicate market power therefore runs contrary to the way in which economists define "market power" in the first instance.

**(21)**  As I explain in more detail in this report, one of the reasons a firm may possess market power is because of its differentiation. Market power always stems from inelastic demand, and one reason demand may be inelastic is that buyers have a strong preference for a good's differentiated characteristics (and thus will continue to consume it even when prices increase). Indeed, product market definition is, on some level, simply an exercise in defining the amount of product differentiation that would give a hypothetical monopolist market power.

**(22)**  As economists have long recognized, simply possessing market power is not an antitrust concern. However, using that power to exclude competitors is. More directly, the fact that a firm possesses market power due to its product differentiation does not, in itself, raise antitrust concerns. But exploiting consumers' inelastic demand for a differentiated product *in order to* exclude competitors does.

**(23)**  The fact that clear aligners are differentiated from braces is an important reason Align has market power. Dr. Snyder's contention that such differentiation undermines market power therefore makes little sense and appears to confuse the concept of market power with abuse of dominance.

### A.3.    Align Abused its Power to Substantially Foreclose the Relevant Market

**(24)**   In my opening report, I analyze two types of conduct challenged by Plaintiffs:

- Align's decision to terminate interoperability with 3Shape's TRIOS scanner, evaluated as a refusal to deal; and

- Align's exclusive (or *de facto* exclusive) dealing with dentists and orthodontists, which consisted of (1) the "Fusion" Program and (2) numerous Align programs conditioned on express or *de facto* Invisalign exclusivity, including exclusive contracts with dental services organizations (or "DSOs"), individual promotions requiring agreement to exclusivity, and a scanner sales agreement with the DSO Heartland Dental, then the largest in the country, that Align's CFO, John Morici, described as "[b]asically a 5 year exclusive deal with Heartland to provide iTero and Invisalign" that "[l]ocks [Heartland] up[.]"[8]

**(25)**   In my opening report, I present extensive documentary evidence indicating that (a) Align terminated interoperability because 3Shape would facilitate doctors' ability to order competing clear aligners, and thus erode Align's monopoly market power;[9] and (b) that Align implemented its various discount programs, including the Fusion program,[10] with the aim of foreclosing competing clear aligner companies.[11]

**(26)**   Below I summarize my analyses and conclusions regarding these programs, as well as my response to Dr. Stiroh's and Dr. Snyder's criticisms of them.

---

[8] *See* Vogt Report ¶¶ 324–25.

[9] *See generally* Vogt Report § F.1. For example, in March 2017, Align executive Kerri Kling wrote: "Why not consider turning off all future 3rd party connectivity to Invisalign. Grandfather what we have and just shut the future down. These guys are a huge threat on the [clear aligner] business because they are in these GP offices every day with their distributor reps." *See id.* ¶ 262 (citing ALIGNAT-SNOW00437799 at -799).

[10] *See generally* Vogt Report § F.3. For example, a slide in a July 2017 Align presentation specifies that a purpose of the Fusion program was to "block new clear aligner entrants in [Fusion] customers for 3 years." *See id.* ¶ 301 (citing ALIGN0061048 at p.37).

[11] *See generally* Vogt Report § F.4.1. For example, in a December 2019 email discussing a pilot version of one of these programs, an Align employee wrote that "this pilot should be a good test to see if we can increase production amongst this group while also twarting [sic] off competitive aligners and 3D printing/low stage threats." *See id.* ¶ 312 (citing ALIGNAT-PURCH01798923 (PX 184) at -923). In a June 2019 email exchange regarding another program, John Morici, Align's CFO, wrote to Joseph Hogan, Align's CEO, of the program: "I'm good with the partnership Joe. We are trading price for growth. But unlike other programs, it looks like we have good visibility on growth targets and I like the exclusivity." Mr. Hogan responded: "Great John. Me Too." *Id.* ¶ 312 (citing ALIGNAT-SNOW00869077).

### A.3.1. Termination of Interoperability Constitutes an Anticompetitive Refusal to Deal

(27) In my opening report, I present three analyses of Align's refusal to deal, *i.e.*, its termination of interoperability, with 3Shape:

- Qualitative analysis that termination of interoperability "made no economic sense" but-for its anticompetitive effects—underpinned by documentary evidence that Align *expected* a profit sacrifice and nonetheless continued with termination in given the longer-term risks to Invisalign's dominance posed by doctors' rapidly increasing TRIOS use.

- Econometric analysis demonstrating that, as expected by the profit sacrifice test, termination of interoperability led to a long-term diversion of competing clear aligners to Invisalign.

- A profit sacrifice test showing that Align gave up short-term profits for long-term anticompetitive gains—evidenced by both my own analysis and Align's contemporaneous analysis that Align in fact *realized* a profit sacrifice as a result of termination.

(28) Dr. Snyder does not address or acknowledge the first or second of the analyses above. Instead, he presents his own profit sacrifice test, which (he claims) demonstrates that Align immediately profited from termination of interoperability. To arrive at this result, Dr. Snyder makes three changes to his profit sacrifice analysis as compared with my own:

- He looks at all Invisalign sales, regardless of whether a doctor ever used TRIOS;

- He performs no formal econometrics and makes no attempt to control for the general upward time-trend in Invisalign sales, *i.e.*, he does not assess whether there was a statistically significant difference in sales trend before and after termination of interoperability; and

- He includes in his profit sacrifice analysis not only Invisalign profits, but also profits on iTero scanners sold to previously TRIOS doctors.

(29) In essence, Dr. Snyder observes a chart displaying all of Align's gross Invisalign profits, sees it increase following termination of interoperability and, on that basis, concludes there was no profit sacrifice. I find this method uncompelling for several reasons.

(30) **First**, it is not obvious why a profit sacrifice analysis should consider all Invisalign sales instead of those affected by termination of interoperability. If

doctors who never used TRIOS (and never would have used TRIOS) increased order volume following termination of interoperability for reasons unrelated to termination, there is no reason to attribute that profit gain to the refusal to deal. Yet that is precisely what Dr. Snyder does.

**(31)** **Second**, even if one accepts Dr. Snyder's argument that it is all Invisalign orders, not just those directly affected by termination of interoperability, that matter for purposes of assessing profit sacrifice, an economist still must isolate any change in profits attributable to a refusal to deal from changes caused by exogenous factors. Dr. Snyder does not do this. As a result, his analysis makes no attempt to control for precisely that which Dr. Snyder purports to analyze: lost profits.

**(32)** When I do control for the time-trend in Invisalign gross profits, I find that Align's gross profit on Invisalign grew slower in the 5 quarters following termination of interoperability than in the 5 quarters during interoperability. This slowdown was worth $57.35 million in foregone profits. Consistent with the profit sacrifice test, I also find that profits increased in the long-term.

**(33)** **Third**, Dr. Snyder's analysis is contradicted by Align's contemporaneous internal analysis of termination of interoperability. In February and March 2018, Align analyzed if termination of interoperability led to a decrease in net receipts for TRIOS doctors. It did so by comparing year-on-year volume *(i.e.,* comparing February 2018 with February 2017), directly controlling for the "seasonality" Dr. Snyder alludes to in his report. Doing so, Align found that termination of interoperability had a negative effect on Invisalign order volume that persisted at least through March 2018. In other words, Align concluded that there was a short-term profit sacrifice resulting from termination of interoperability.

**(34)** **Fourth**, Dr. Snyder's decision to include iTero profits in his profit sacrifice is both misleading and inappropriate because:

- Antitrust tests usually do not consider "out-of-market" effects (*i.e.,* effects on product sales in a separate market from the one at issue), and Dr. Snyder presents no evidence that profit sacrifice tests are unique in that respect.

- Because Align sold iTero scanners to former TRIOS docs at an up to 50% discount off list price, these transactions fell below operating cost. I therefore find that Align consequently sold iTeros to TRIOS doctors at an operating *loss* of $1 million.

- Even setting these concerns aside, the $2.9 million in iTero profit Dr. Snyder attributes to termination of interoperability is

14

insufficient to cover the minimum $3.5 million in profit on Invisalign sales that Align sacrificed. That is, even if we accept all of Dr. Snyder's arguments regarding iTero, there was still a *net* profit sacrifice.

**(35)** None of Dr. Snyder's arguments affect my ultimate conclusion that termination of interoperability constituted a net profit sacrifice, and each contain their own factual flaws.

### A.3.2. Align's Exclusive Dealing was Effective at Foreclosing the Relevant Market

**(36)** In my opening report, I show that the effect of Align's exclusive dealing was widespread, and that its exclusive dealing contracts collectively covered up to 47% of Invisalign orders, or 30% of the in-office clear aligner market by the second quarter of 2021. Dr. Snyder does not dispute the scope of Align's exclusive dealing, nor does he provide a comprehensive analytical framework for considering it. Instead, he argues (A) that Align's exclusive dealing was too short in duration to be effective and (B) that Align could not enforce its exclusivity provisions. In other words, the thrust of Dr. Snyder's argument is that, while exclusive dealing generally can be foreclosing (and thus anticompetitive), Align's exclusive dealing was not.

**(37)** I disagree with Dr. Snyder's contention; Align's exclusive dealing was not a special case void of any foreclosing, much less anticompetitive, effects. His arguments contains a mix of conceptual and factual flaws. I begin by considering the duration of Align's exclusive dealing.

**(38)** **First,** Dr. Snyder inaccurately claims that the majority of Align's exclusive dealing was effective for a year or less. In truth, only two of the eight programs I identify in my report as exclusive lasted for a year or less, and in total Align offered the exclusive dealing programs at issue for a period of slightly over two years. Even if Dr. Snyder's statement was true, he fails to define the difference between "short" and "long" term contracts. Without such a definition, Dr. Snyder's arguments are not falsifiable—any contract which is not indisputably "long" term could be inaccurately categorized as "short" term and therefore absolved of antitrust scrutiny.

**(39)** **Second,** at his deposition, Dr. Snyder explained the conditions under which, in his view, even short-term exclusive dealing can be anticompetitive. Specifically, he explained that short term exclusive dealing contracts can have anticompetitive effects when markets exhibit high switching costs and that, more broadly, (1) "the strength of ex ante competition beforehand"; (2) the aggregate share of the market covered by exclusive contracts; and (3) a firm's

market power are all relevant to assessing exclusive dealing contracts.[12] Accepting for the sake of argument Dr. Snyder's framing, I find that all of these features characterize the in-office clear aligner market.

**(40)** In operating a closed ecosystem for its iTero product, Align created high switching costs for doctors. No commonly used scanner other than iTero can order Invisalign in the United States, and iTero cannot readily be used to order any competing aligners.

**(41)** Consequently, if a doctor agrees to exclusively order Invisalign, the only scanner that doctor is likely to use is an iTero. If, at the end of the exclusive period, this doctor would like to purchase competing aligners, they would likely need to purchase a new intra-oral scanner, which can cost tens of thousands of dollars. This creates a very literal switching cost for doctors and would extend the anticompetitive effect of short-term exclusive dealing in the way that Dr. Snyder describes.

**(42)** Notably, had Align never terminated interoperability, these switching costs may have been much smaller and potentially non-existent. Because 3Shape's TRIOS scanner *was* integrated with a variety of clear aligner manufacturers, doctors could easily switch brand without incurring switching costs. By terminating interoperability with TRIOS, Align took this option off the table.

**(43)** In other words, Align's refusal to deal and exclusive dealing were mutually re-enforcing practices; Align's refusal to deal creates switching costs that, consistent with Dr. Snyder's own testimony, can exacerbate the anticompetitive effects of exclusive dealing.

**(44)** In addition, because of Align's patents, the in-office clear aligner market had an incumbent monopolist firm (Align) facing limited competition at the time Align began introducing its many exclusive dealing contracts with DSOs and individual dentists. Again, even Align's own expert admits that such features are likely to worsen the anticompetitive effects of exclusive dealing, even when short in duration.

**(45)** Moving beyond theory, I empirically show that Align's exclusive dealing was effective. Using the ProVoice data analyzed in my opening report, I find that:

- The share of doctors ordering any competing aligner fell sharply after Align began its exclusive dealing. In Q4 2019, 39% of practices ordered at least one competing aligner. By Q2 2020, this had fallen to 27.7%, a decline of 29%.

---

[12] June 27, 2023 Dep. of Edward Snyder at 168:15–171:25, 172:17–25.

- Similarly, the share of doctors ordering ClearCorrect fell by 57.5% during Align's exclusive dealing, from 13.4% in Q2 2019 to just 5.7% in Q2 2020.

**(46)**



**(47)** In summary, the in-office clear market has the characteristics that Dr. Snyder opines are likely to make exclusive dealing anticompetitive, even when short in duration—namely high switching costs and weak *ex ante* competition. As a result, the effect of Align's exclusive dealing is observable in the data: 29% fewer doctors ordered competing aligners and even Dr. Snyder's cherry-picked examples show foreclosure when properly analyzed.

---

[13] Dr. Snyder identifies *just four* doctors in ClearCorrect invoice data produced by the company Straumann, which makes ClearCorrect, to support his claim that Align's exclusive dealing contracts were not effective.

### A.4. The Implants Market in 2012 Is an Appropriate Benchmark for the In-Office Clear Aligner Market in 2018

**(48)** Having established that Align possessed market power and abused that power to exclude competitors, I evaluate harm to the proposed class using one of the two widely accepted methods in class-action antitrust cases: benchmarking.

**(49)** Specifically, I compare price changes following patent expiry for Invisalign to an index of dental implant prices starting in 2012. I find that Invisalign prices *rose* by approximately 5%, contrary to the 12% *decline* anticipated by the implants benchmark.

**(50)** As I explained in my opening report and in more detail here, the implant benchmark I chose is not arbitrary. Instead, it is the same benchmark Align itself chose when, in 2018, it commissioned a report from the consultancy CODEX Partners to analyze the effect of increased competition in the implants market beginning between 2006 and 2012—and, critically, its implications for the aligner market. The CODEX Report is based on substantial industry research—including interviews with the CEO of Straumann and senior executives of key implant industry participants—and finds substantial price declines in the implant market following competitive entry.

**(51)** Dr. Stiroh and Dr. Snyder argue that my choice of the implants benchmark is inappropriate. Between their reports, they make 5 basic contentions:

- Invisalign and implants face different supply conditions—namely that the implants market was competitive even before patent expiry whereas the clear aligner market is and always has been highly concentrated.

- Invisalign and implants face different demand conditions—namely that Invisalign has strong brand recognition and loyalty whereas implants do not.

- The periods 2018-2022 and 2012-2016 were marked by different macroeconomic conditions which undermine the benchmark.

- Even if the implants benchmark is proper, it should commence in 2007 (when a significant implant-related patent expired) rather than 2012.

- Even if the implants benchmark is proper, we should look to changes in "premium" prices alone, rather than a market average.

**(52)** As a general matter, these arguments ignore that the dental implants market,

and the 2012–2013 period in particular, is originally Align's choice of benchmark, not mine. As I discuss in detail here and in my opening report, Align's consultant found the implants market sufficiently similar to the clear aligner market that it prepared an exhaustive, 88-page report analyzing this market—and the implications, for Align, of developments in it.

**(53)** I also find Dr. Stiroh and Dr. Snyder's discussion of differences between these markets unconvincing for several reasons:

**(54)** **First**, Dr. Snyder's argument that greater competition in the implants market (as compared with the clear aligner market) makes it a poor benchmark is misguided. The fact that there was competition in the implants market even before the reference period suggests that it is a conservative benchmark. This is because greater competition generally leads to lower prices, so that the greater competition in the "pre" period in the implants market would lead to lower "pre" prices and consequent smaller price declines upon patent expiry and competitive entry. Dr. Snyder's argument would *only* be relevant if greater competition in the implants market before 2012 caused *higher* prices.[14]

**(55)** **Second**, my benchmarking approach adequately considers brand recognition.[15] As Dr. Stiroh herself argues, value and premium implants are functionally interchangeable. Starting in 2012, value implants took substantial market share from premium implants, causing prices to decline, but consumers continued to buy premium implants in substantial volumes. If, as Dr. Stiroh claims, value and premium implants are functionally interchangeable, this dynamic is hard to explain without some brand preference in the implants market. In other words, the dental implants market reflects the sort of brand effects that Dr. Snyder raises concern over.

**(56)** Further, contrary to Dr. Stiroh and Dr. Snyder's assertions, consumers in pharmaceutical markets also exhibit strong preference for branded drugs— and yet those markets saw greater price declines than either the in-office clear aligner market or the dental implant benchmark following patent expiry.

**(57)** Both Dr. Stiroh and Dr. Snyder also point to automatic substitution laws (*i.e.,* laws requiring generic substitution) to claim that generic entry renders branded drugs irrelevant—and that, more broadly, the lack of comparable

---

[14] In other words, there would have to be some reason to believe that greater *pre*-existing competition in the implant market would in turn lead to *greater* price declines following competitive entry as compared with the less competitive clear aligner market. This is contrary to both intuition and economic theory.
[15] As discussed below, I understand that, in his rebuttal report, Dr. Jay Grossman also addresses many of the demand conditions Dr. Snyder argues are unique to the implants market.

laws mandating aligner substitution render my comparisons between generic patent expiry and aligner patent expiry unreliable. While it is true that automatic substitution laws exist, Dr. Snyder and Dr. Stiroh's argument runs contrary to decades of economic literature. As I explain in more detail later on:

- Published literature cited in my original report *pre-dates* widespread automatic substitution laws and still finds significant price-declines upon patent-expiry;

- Published literature finds that automatic substitution laws have limited efficacy;

- Published literature spanning 30 years finds that consumers have a strong and persistent preference for branded drugs—even after automatic substitution laws are introduced.

**(58)** Despite consumers' preference for branded drugs, generics gain market share and reduce prices following patent expiry. This illustrates a basic fact of economics: consumers like brands, but they also like lower prices. Holding brand recognition constant, greater competition is expected to (and historically has) reduced prices.

**(59)** In addition, arguments that consumers have a strong preference for the Invisalign brand fail to consider that other products which attempted to compete post patent expiry were preferred on a variety of dimensions. Further, I understand that Dr. Grossman intends to opine that brand loyalty is not a strong consideration for his patients, and that they are generally open to following his clinical recommendations. This would allow doctors to steer patients into less expensive but functional interchangeable competing aligner treatments.

**(60)** **Third**, because of this substitution from branded (premium) to generic (value) products after patent expiry, looking to price changes in premium products alone is well understood to understate consumer benefits from patent expiry. Published literature on patent expiry in pharmaceutical markets and the Bureau of Labor Statistics' Consumer Price Index calculation explicitly find economists should combine branded and generic prices after patent expiry to accurately reflect these gains (*i.e.*, price drops). Because substitution of this nature never occurred in the in-office clear aligner market, I compare premium and value prices in my use of the implants benchmark to Invisalign prices.

**(61)** **Fourth,** the only tangible difference in macroeconomic conditions between the 2018-2022 and 2012-2016 periods that Dr. Stiroh points to is Covid-19.

Yet, as I explained in my opening report in Appendix 2, Covid-19 had a fleeting effect on Invisalign demand that led to no long-run increase in cost that could explain Invisalign's pricing.[16]

**(62)** **Fifth**, Dr. Stiroh's contention the implants benchmark should begin in 2007 rather than 2012 ignores two important facts, both of which I raised in my opening report. Dr. Stiroh does not acknowledge or address either.

- The "screw-vent" patent, which expired in 2007, was not the only important patent in the implants market subject to ongoing protection. Instead, the second and third most cited dental implant patents expired in 2012 and 2013 respectively. These patents pertained to other aspects of the dental implant system not covered by the screw-vent patent.

- The same set of competitors that entered the in-office clear aligner market around 2018 also entered the value segment of the implant market around 2012.

**(63)** Ultimately, neither Dr. Stiroh nor I are experts in patent law or enforcement. I simply observe that, in 2012–2013, the second and third most cited dental implant patents expired, competitors entered the market, and prices fell— precisely as economists expect to happen following patent expiry.

**(64)** There are two independent reasons that 2012, rather than 2007, is the proper year to begin the implants benchmark: this is the year that there was (1) patent expiry in the dental implant industry and (2) competitive entry of specific firms of interest. In my view, either provides a robust basis to look to the dental implants market, starting in 2012, as a point of comparison with the clear aligner market in 2018.

## A.5.  Harm Is Common to the Proposed Class, Regardless of When the Benchmark Begins

**(65)** Dr. Stiroh argues that, even if one accepts the implants market as an appropriate benchmark, harm is not common to the proposed class. Critically, her argument relies on starting the implants benchmark in 2007—that is, for *even a single group of purchasers to be unharmed*, Dr. Stiroh must assume as her premise that the benchmark can only begin in 2007.[17] In other words,

---

[16] In deposition, Dr. Stiroh went so far as to argue that there is no way to evaluate differences in macroeconomic conditions, and that a benchmark is not an appropriate tool to analyze classwide harm. I find these arguments at odds with widely accepted economic approaches to evaluating classwide harm.

[17] This is because the damages quantum is substantially higher for the period following 2012 compared to the period following 2007, which is in turn attributable to the fact that there were steeper price declines in the implant market in the latter period.

Dr. Stiroh implicitly concedes that if the implants benchmark begins in 2012, as I elsewhere demonstrate it should, virtually all proposed class members are harmed. As I explained above, starting the benchmark in 2007 is not the best choice for measuring the effect of competitive entry, which is the very purpose of the benchmark analysis

**(66)** In my opening report, I argued that harm was common to the proposed class because Invisalign prices increased for every Advantage tier and product in the proposed class. I also demonstrated that prices were correlated by at least 75% across products and by 91% across tiers.

**(67)** In my rebuttal, I further explain why I analyzed commonality this way. In Section F.1, I show that even plotting a unique point for every transaction, Align's 2019 price increase is visible when coloring the data by Advantage tier. Moreover, Advantage tier and product alone can explain 75% of variation in the Invisalign invoice data. My finding that prices increased and were highly correlated across Advantage tiers is therefore directly relevant to assessing classwide harm.

**(68)** Notably, Dr. Stiroh does not contest these facts. She instead argues that two groups of purchasers not in that analysis—DSOs and non-participants in the Advantage program—saw declining prices. This argument is misleading for two reasons:

- **First**, combining DSOs and non-participants inaccurately shows declining prices for non-participants in the Advantage program— even though these participants saw the largest price increase of any group of purchasers.

- **Second**, the moderate price declines of these purchasers were still less than expected by the implants benchmark—regardless of whether it commences in 2012 or 2007. Consequently, these purchasers were harmed regardless of when one starts the benchmark reference period.

**(69)** Dr. Stiroh also argues that one group of purchasers, DSOs that agreed to exclusivity with Align, saw greater price declines than expected in the implants benchmark starting in 2007. Once again, and critically, this argument relies on starting the benchmark in 2007. If the benchmark begins in 2012, these purchasers were harmed by up to 8.5%.

**(70)** Moreover, DSOs that agreed to exclusivity accounted for just 6% of class transaction volume. This is the only group of purchasers Dr. Stiroh specifically claims were uninjured in her revised version of the analysis. Therefore, even accepting Dr. Stiroh's argument that (1) these classmembers are unharmed

and (2) that the benchmark should begin in 2007, approximately 94% of the class is still harmed.

(71)   In Section F.2.2 of my rebuttal, I therefore recalculate classwide harm instead using the 2007 reference period in the implants market as the benchmark. Doing so, I find that classwide harm remains significant at $100 million after filtering for the indirect purchaser states and applying pass-through.[18]

(72)   In summary, I find that classwide harm remains significant at approximately $100 million and, at most, 6% of purchasers were unharmed regardless of the reference period used for the benchmark.

## A.6.   Dentists and Orthodontists Commonly Pass-on Invisalign Lab Fees

(73)   As a general principle of economics, 100% pass-through is expected under perfect competition. Depositions in this case, record evidence, and Dr. Stiroh's *own report* all consistently emphasize that doctors face strong competition from one another. This competition creates incentives for doctors to pass-on cost savings by offering lower prices in order to win share from their competitors. As a result, doctors also must increase patient prices with Invisalign lab fees or swallow a loss.

(74)   Indeed, both documentary evidence and depositions in this case indicate that doctors pass-on Invisalign lab fees to their customers at a minimum of a 1:1 rate as a result of inter-doctor competition. In fact, two direct purchaser plaintiffs testified at their depositions that they pass-on Invisalign lab fees. For example, Dr. Sherwin Matian testified:

- Q: When Align raises its price to you, do you automatically raise the price that you charge to your patients?

- A: I wouldn't say automatically, but it . . . ends up being passed on to the patient eventually.

- Q: Have you raised your prices every time Align has raised its prices?

- A: Eventually I have raised my prices.[19]

(75)   Neither Dr. Stiroh nor Dr. Snyder acknowledge or address extensive

---

[18] I apply the ███████████████ used in my original report for both consistency and because my further analysis in this rebuttal corroborates this figure. For example, I find statistically significant ███████████, the ██████ Similarly, I find ███████████████ in the PepperPointe data, the ████████████████ ████████ - even after accounting for product effects.

[19] January 8, 2023, Dep. of Sherwin Matian, DDS, at 66:9–23.

qualitative evidence of passthrough, which I describe in Sections L.5.2-L.5.4 of my opening report—all of which strongly indicates a near 100% pass-through rate. Further, between them, they only perform 4 regressions formally analyzing pass-through. Half of these fail to account for geographic or time-based fixed effects—which Dr. Stiroh herself opines are important to control for—while the remainder arbitrarily delete data.

**(76)** Between my opening report and this rebuttal report, I have used 4 different data sets to present multiple pass-through regressions. All find statistically significant pass-through greater than 50% (robust to heteroskedasticity and autocorrelation), and the majority find statistically significant pass-through above 80% (also robust to heteroskedasticity and autocorrelation), when considering geographic or time-based effects.

**(77)** Dr. Snyder and Dr. Stiroh criticize my pass-through models using the SmileBrands and ▮▮▮▮ data, claiming neither possess sufficient information to accurately assess pass-through, but both agree that the PepperPointe data is suitable for analyzing pass-through. In particular, the PepperPointe data is the only dataset with transaction level pricing for both Invisalign lab fees and patients in addition to Invisalign variant details.

**(78)** Using the ▮▮▮▮▮▮▮▮, I perform a simple panel regression model with two-way fixed effects for practice location and month (effects neither Dr. Stiroh nor Dr. Snyder consider in the ▮▮▮▮▮▮▮ in addition to product effects. Doing so, I find statistically significant pass-through in the range of 50-90%—fully consistent with my opening report—and robust to Dr. Snyder's criticism that I do not account for product effects.

**(79)** More directly, I use the ▮▮▮▮▮▮ to show that pass-through remains robust to product effects, using the only data set that even Dr. Snyder and Dr. Stiroh admit is sufficiently detailed to analyze pass-through.[20] In other words, the product effects Dr. Snyder points to do not materially affect pass-through.

**(80)** I also directly consider Dr. Snyder's criticism of my pass-through analysis on the ▮▮▮ and SmileBrands data sets.

## SmileBrands

**(81)** To analyze the SmileBrands data, I aggregated transactions by quarter and zip code to merge with the Invisalign invoice data. Doing so, I found statistically

---

[20] While I do not agree that the other datasets used to analyze passthrough lack sufficient detail or granularity, I perform this analysis of the PepperPointe data to demonstrate that, even crediting Dr. Snyder's and Dr. Stiroh's criticisms of that data, my passthrough findings are robust and consistent with one another.

significant 86% pass-through. Dr. Snyder contends that the SmileBrands data does not delineate Invisalign product types (*e.g.*, "Comprehensive", "Moderate", "Teen"), and therefore that the pass-through I measure in fact just reflects the different price levels of these product types.

**(82)**  As a threshold matter, it is not obvious that this argument is material. The fact that dentists charge different patient prices for different Invisalign product types is consistent with high pass-through, and the documentary evidence demonstrates that dentists price by charging patients a mark-up on that lab fee.

**(83)**  Even accepting Dr. Snyder's argument at face value, his proposed "solution" suffers from (1) a clear data selection error and (2) the arbitrary deletion of 9% of the relevant data. Specifically, Dr. Snyder attempts to identify all "Comprehensive" treatments[21] in the SmileBrands data (which are not otherwise identifiable by type) by limiting his analysis to only those SmileBrands transactions with a contract length 12 months or longer. Doing so, he identifies 91% of SmileBrands orders as "Comprehensive." But this result is demonstrably inaccurate for two reasons:

- Contract length could refer to the duration of a patient's payment plan, rather than treatment length. For example, some SmileBrands transactions record a 1-month contract length, but I am unfamiliar with any Invisalign treatment that only lasts one month. This could instead be the result of patients paying up front for their treatment. In other words, Dr. Snyder assumes that every contract length of 12 months or more is for Comprehensive treatment, without considering whether other treatment types have similar (12+ month) contract terms or whether, more broadly, there is any relationship between contract length and treatment length.

- Consistent with this, in the Invisalign invoice data,[22] only 64% of SmileBrands transactions were for Comprehensive treatment, whereas Dr. Snyder's approach (based on contract length) results in the finding that 91% of SmileBrands transactions were Comprehensive. This alone renders Dr. Snyder's analysis unreliable, as it suggests he has misclassified at least 27% of the data.

---

[21] "Comprehensive" is a type of Invisalign treatment, alongside other types of treatment like "Teen" or "Moderate." Treatments are differently priced and vary in duration. Comprehensive is the most commonly sold.

[22] The Invisalign invoice data records Align's transactions with dentists and orthodontists, including DSOs like SmileBrands. Consequently, I can refer to this invoice data to see the specific treatment types (Comprehensive, Moderate, etc.) SmileBrands ordered from Invisalign.

**(84)**    In other words, Dr. Snyder's attempt to identify Comprehensive treatment using contract length as a proxy, and thus to refute my analysis, is conceptually flawed and empirically misidentifies at least a quarter of the SmileBrands data. This sort of measurement error is well understood to bias regression results, so his finding of statistically insignificant pass-through in this data are unsurprising and should be viewed with skepticism.[23]

███████

**(85)**    In my opening report, I analyzed data produced by ███████ by using practice volume as an instrument for price (*i.e.*, by correlating volume sold with price charged). This was necessary because the ███████ available to me at the time I submitted my opening report was anonymized,[25] and thus could not be merged with the Invisalign invoice data—that is, ███████ ████████████████████████████████████████████. Using volume as an instrument for price, I found that high volume practices (which we expect to have lower Invisalign lab fees due to the advantage program) also charged lower patient prices, consistent with pass-through one would expect in this market.

**(86)**    Rather than model the data himself, Dr. Snyder identifies two dental practices in the ███████ that saw significant variation in their volume without any associated change in their patient price and concludes, from this, that pass-through does not appear to occur. But this could be true for at least two reasons. First, these practices, as Dr. Snyder contends, may not pass-on Invisalign lab fees. Alternatively, it could be that volume is a good, but imperfect, instrument for price. In other words, there could be variation in these practices' volume that is not correlated with their Invisalign lab fee but that is nevertheless consistent with pass-on (for example, it could be that these practices already reached the highest Advantage tier, and further variation in volume came with no further discounts).

---

[23] As previously explained, to properly evaluate Dr. Snyder's claim that pass-through results disappear when accounting for product effects—the intended (albeit unsuccessful) thrust of his analysis of the ███████ ███—I turn the ███████ and instead find that pass-through is robust to product effects and consistent with the findings in my opening report.

[24] ████████████████████████████████████████████████████████████████████

[25] Specifically, ████████████████████████████████████████████████ ███████████████████ i produced a supplemental dataset that includes zip code information by practice. This information allows me to reasonably identify the doctors/practices in ███████ and perform a more detailed passthrough analysis.

**(87)** To assess these possibilities, I turn to data produced after my opening report. Specifically, on June 16th, 2023, ██████████████████████████████ █████████████ . ████████████████████████████ ███████████████████████████████████████ ████████████████ This new data set thus allows me to directly assess if the two practices Dr. Snyder cherry-picks in fact passed-on price changes. They do.

**(88)** I identify these two practices by matching patient ids between the original and ███████████████ . I then match the data for these practices to the Invisalign invoice data by month and zip code. Based on this analysis I find that both, contrary to Dr. Snyder's analysis, have a statistically significant pass-through rate of 99%—almost precisely the same finding as in my opening analysis of the ████████ . In sum, all Dr. Snyder demonstrates in his analysis of the ████████████ is that volume is a good, but imperfect, instrument for Invisalign lab fee.[26]

**(89)** More generally, I use the ███████████████████████ to perform a new multi-provider panel of pass-through using all sufficiently granular data sets available to me. I aggregate the █████████████████████████ ██████████████ by quarter and zip code, merge with the Invisalign invoice data, and model pass-through using a two-way fixed effects model accounting for heteroskedasticity and autocorrelation. Doing so, I find statistically significant pass-through in the range of 70-89%, consistent with the findings in my opening report.

**(90)** In sum, I reaffirm my conclusion, based on both qualitative and quantitative evidence—including multiple datasets from which I obtain consistent results—that dentists and orthodontists pass-through Align's lab fees at high rates, consistent with what economics predicts of the competitive market in which these doctors operate.

## A.7.  Insurance Does Not Constrain Pass-Through to Patients

**(91)** Dr. Stiroh argues that—even if there was an overcharge, and even if that overcharge was commonly passed-through in patient prices—the existence of insurance benefits means that it is impossible disentangle harm among class members. Specifically, she argues that patients with a flat copay requirement are unharmed unless Invisalign prices would fall below that copay. She also argues that insurers are unharmed when dental insurance plans have a maximum benefit below the cost of treatment. On this Dr. Stiroh and I critically agree.

---

[26] Due to the ████████████████████████ I received in June, 2023, I no longer rely on the volume instrument to analyze the ████████████ .

**(92)** As a threshold matter, Dr. Stiroh misunderstands the proposed class definition. The proposed class only includes patients who acquired Invisalign treatment for their own personal use and excludes insurers.[27] The fact that insurers are unharmed when plans have a lifetime or annual maximum is therefore not relevant to assessing classwide common impact. On the contrary, maximum orthodontic benefits in dental plans mean that patients in the proposed class bear virtually all the anticompetitive harm.

**(93)** Where Dr. Stiroh and I diverge is that she makes no attempt to quantify how often dental plans have an annual or lifetime maximum—despite having access to data produced in April 2023, *after* my opening report but before her opposition.

**(94)** Specifically, in 

**(95)** Rather than perform any data analysis, Dr. Stiroh points to MetLife's Direct Referral Dental Plan, which has a flat copay of $1,695 for comprehensive treatment. She claims that, unless the price of Invisalign treatment were to fall below that copay, patients with this plan are unharmed. She then looks to the Aspen data to argue that, even if the price declines predicted in my original report occurred, patient prices would remain above this threshold.

**(96)** 

---

[27] The proposed class definition consists of "all persons or entities in the United States that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners acquired for personal use." Consistent with that class definition, I have been instructed by counsel that the class consists only of individuals who purchased Invisalign for their own personal use. Therefore, while I show that much of Dr. Stiroh's analysis on insurance is internally contradictory, we agree that insurers do not bear the brunt of damages. Instead, patients do.

**(97)** In total, I find that insurance does not prevent pass-through to end-payer patients because:

- Most patients did not receive any insurance benefit for their Invisalign treatment.

- Of those that did receive insurance, 97.5% had an annual or lifetime maximum benefit.

- Only 0.8% of patients had a dental benefit which might mitigate their harm, but even many of these would still be harmed, only at a rate constrained by their coinsurance.

## A.8. End-Payer Patients Were Commonly Harmed By Align's Challenged Conduct

**(98)** In summary, I find that Align possessed market power within the in-office clear aligner market, and that it abused that power to exclude competitors via its refusal to deal and exclusive dealing.

**(99)** As a consequence of this foreclosure, 94-100% of doctors paid supercompetitive lab fees to Align, inflated up to 10%-18%, which were commonly passed through to end-payer patients at a statistically significant rate of 80-100%. Due to annual/lifetime maximums in dental insurance plans, *at least* 99.2% of end-payer patients fully bore this cost.

**(100)** In the remainder of this report, I further explain the quantitative analysis and documentary evidence underpinning my opinions.

## B. In-Office Clear Aligners Is a Relevant Antitrust Market

**(101)** In my opening report, I concluded that the in-office clear aligner market was a relevant antitrust market on the basis that:

- Qualitative evidence indicates that aligners and braces are not substitutes, *i.e.,* the in-office clear aligner market satisfies the *Brown Shoe* factors.[28]

---

[28] I note that Dr. Snyder offers his own *Brown Shoe* analysis at Section VII.B.4 of his report. Though I do not specifically address this portion of his report here, I stand on the *Brown Shoe* analysis set forth in my opening

- Align's own analysis and industry discussion indicates that direct-to-consumer aligners cannot treat the same severity of cases as in-office aligners.

- Align's own analysis found that, where SmileDirectClub opened its direct-to-consumer storefronts, there was no negative effect on Invisalign demand.

- Analysis Align commissioned found that demand for Invisalign was inelastic such that Align could profitability sustain a SSNIP.

- That same analysis Align commissioned found that new, less-expensive, aligners would compete with Invisalign, not braces.

- Finally, a SSNIP test I perform on the Gaidge data shows no statistically significant substitution between aligners and braces given a 5% price differential that emerged in March 2019.

**(102)** Dr. Snyder does not offer his own SSNIP test. Nor does he provide any other quantitative evidence that consumers substitute aligners and braces. He instead criticizes my own SSNIP tests, but, in the process, indicates a misunderstanding of my analysis, statistical hypothesis testing, and market definition. I turn to each of the two SSNIP tests in my opening report below.

### B.1.    The Gaidge Data Shows that Braces and In-Office Clear Aligners Form Distinct Product Markets

**(103)** In my opening report, I perform a SSNIP test to show that in-office aligners and braces (or "wires and brackets") are in distinct markets.[29] Gaidge, an orthodontic practice management software, provides data on patient fees and volumes for braces and clear aligners. In March 2019, I observe an increase in the average price of braces, concurrent to a decline in clear aligners' fees, with a resulting gap of about 5%, which is a common change for a SSNIP test. The data indicates that the relative increase in braces' pricing did not prompt a shift of volumes to aligners.

**(104)** I conclude that there was no visible or statistically significant substitution between the two products and that they accordingly form separate markets. I further corroborate these findings with a regression analysis confirming my initial hypothesis of no statistically significant substitution.

**(105)** Dr. Snyder contends that there are several technical flaws in the SSNIP regression model I present in Section G.2 of my opening report. His first

---

report and the qualitative evidence discussed there, which I maintain is consistent with the conclusions I reach about market definition.

[29] Vogt Report § G.2.

critique is that the Gaidge data lacks sufficient detail regarding the types of braces and aligner treatments being sold or on the providers included in the data and that, therefore, price and volume averages could capture compositional changes rather than price changes for any given product.[30]

**(106)** Such differences are theoretically possible. However, Dr. Snyder presents no evidence—beyond his conjecture—that they actually occurred, much less that they occurred in a way that would undermine my analysis.

**(107)** Dr. Snyder proceeds to criticize the model for failing to control for external shifts in demand. To illustrate the latter, he mentions increased adoption of aligners (which is actually captured by the "period" time-trend variable, as I explain in my opening report at paragraph 391) and the COVID-19 pandemic, which had not yet occurred in the period considered for the SSNIP, *i.e.*, March 2019. According to Dr. Snyder, this would render the SSNIP test uninformative on the response of demand to changes in price.

**(108)** According to Dr. Snyder, the negative "SSNIP" estimated coefficient is "contrary to the expected [positive] effect" between the price of braces and the sales of aligners, which, in his view, undermines the reliability of the analysis.[31] Thus, Dr. Snyder interprets my regression as a cross-price elasticity analysis to estimate the substitutability between two products in the same market. Notably, this is not actually what my analysis tested (as explained below), and the estimated coefficient was statistically insignificant, so its sign (positive/negative) means little.

**(109)** Put more simply, statistical insignificance just means we find no evidence that the true relationship between two variables is different from 0—as Dr. Snyder himself argues later in his report discussing the Smile Brands pass-through data.[32]

**(110)** Dr. Snyder's claim that my model fails to control for increased adoption of aligners is incorrect. This is in fact captured by the "period" time-trend variable. As I explain in paragraph 391 of my opening report, "[t]here was a statistically significant relationship between aligner volume and time, showing that demand for clear aligners was generally growing during the relevant period, but there was no commensurate downward trend in braces volume that would indicate substitution. Further, the upward time-trend in aligner volume predated the March 2019 SSNIP and was not affected by it, as

---

[30] *See* Snyder Report ¶ 342.
[31] Snyder Report ¶ 345.
[32] *Compare* Snyder Report ¶ 292.

shown by the statistically insignificant interaction term."[33]

**(111)** In other words, my model not only accounted for the growth rate of clear aligners, it also deliberately tested if that growth rate changed following the March 2019 SSNIP—and found it did not. Dr. Snyder's incorrect claim that I did not control for increased adoption of aligners thus betrays a fundamental misunderstanding of my SSNIP test.

**(112)** Dr. Snyder next contends that my regression estimates are "biased" because they do not attempt to "control for the impact of changes in demand on changes in relative pricing."[34] Here, Dr. Snyder appears to misunderstand the purpose of my analysis. I do not claim to provide a precise estimate of the cross-price elasticity between braces and aligners, nor is a precise estimate always necessary to perform a SSNIP test. Therefore, his claim that my estimates are "biased" misses the mark. I do not rely on any regression estimates that could be biased in the way Dr. Snyder describes.

**(113)** Instead, I look at an *actual* small but significant non-transitory increase in price that occurred in March 2019, then test if it had any statistically significant effect on volume.[35] I find it did not. Dr. Snyder thus appears to confuse bias with statistical significance. These are two distinct concepts and only one is relevant to my analysis.

**(114)** It is possible that, absent an increase in the price of braces, volume would have shifted to clear aligners. However, I have seen no evidence to support this, nor does Dr. Snyder identify any external demand "shock", *i.e.*, an unexpected event that dramatically increased or decreased demand for braces, that could explain this. In his report, Dr. Snyder alludes to the impact of COVID-19.[36] But the impact of COVID-19 on relative demand, if any, is not relevant to my SSNIP test, as the data I analyze is from 2019—before the pandemic began.

**(115)** The SSNIP I studied occurred quickly, with braces prices increasing in the space of just one month, then stabilizing at their new higher level.[37] For an external "demand" shock to explain this, such a shock would have to coincide perfectly in timing, duration, and scale with the price increase and only

---

[33] *See* Vogt Report ¶ 391.
[34] Snyder Report ¶ 343.
[35] *See* Vogt Report. ¶¶ 384-392.
[36] *See* Snyder Report ¶ 343 ("It is equally plausible that any difference in relative prices before and after March 2019 was the result of shifts in demand for braces and aligners. For example, demand would have shifted due to increased adoption of aligners and any impact the COVID-19 pandemic had on demand.").
[37] *See* Vogt Report ¶ 388.

32

impact braces, not aligners—such that the price increase had precisely zero effect on volume. While such events are, in principle, possible, Dr. Snyder identifies no concrete examples of such an event in this case. Absent any evidence that there was such shock, Dr. Snyder's criticisms are unconvincing and largely irrelevant to my actual analysis.

**(116)** Dr. Snyder next argues that my regression analysis is faulty because it "fails to rule out substantial changes" in the sales volumes of braces and clear aligners.[38] Specifically, in his critique of my regression, Dr. Snyder computes confidence intervals for the model's "SSNIP" coefficient, which I show was statistically insignificant at the 90% level. Based on this, Dr. Snyder asserts that "[my] analysis is unable to rule out anything from a 44 percent decrease or 27 percent increase in aligner sales" following the considered price increase. Accordingly, he argues that my analysis "fails to rule out substantial changes in those volumes."

**(117)** The SSNIP test presented in my opening report did have wide confidence intervals. This is common when regression results are statistically insignificant. The proper interpretation of this result is that the data contain little evidence that demand for braces fell after the SSNIP.

**(118)** The Federal Judicial Center's Reference Guide on Statistics states that:

*The correct interpretation of the p-value can therefore be summarized in two lines:*

*p is the probability of extreme data given the null hypothesis.*

*p is not the probability of the null hypothesis given extreme data*

**(119)** Here, the null hypothesis is that the SSNIP had no effect on consumer substitution. The p-value therefore shows the probability of the observed data if braces and aligners are in different markets. Because the p-value was above the typical confidence thresholds used in statistics, I fail to reject the null hypothesis, *i.e.*, I find no evidence that consumers substituted following the SSNIP.[39]

**(120)** To directly address Dr. Snyder's criticisms, I estimate 6 further models on the Gaidge data to evaluate a SSNIP test, making two important changes:

- **First**, I analyze braces share of total starts. A model focusing on shares more directly tests the hypothesis of substitution and is also more statistically powerful here. The test (and associated

---

[38] *See* Snyder Report ¶ 344.
[39] *See* Opening Report ¶¶ 391-392.

confidence intervals) Dr. Snyder criticizes are imprecise because of substantial month-to-month variability in the data. However, as it turns out, this variability is much lower for shares than it is for the number of starts. This is because the variability in braces starts and aligner starts is strongly correlated—months in which braces starts are high strongly tend also to be months in which aligner starts are high.  Looking to share of orders rather than nominal order volume thus leads to lower variability in the data. In backup, I show that the residual deviation from time trend was 88% correlated between aligners and braces.

- **Second**, I directly account for COVID-19 alternatively by (1) adding a fixed effect for COVID, and (2) simply removing the data points for March-May 2020 most affected by COVID.

**(121)** Table 1: Updated Gaidge SSNIP Test, Using Order Shares and Accounting for COVID-19below, displays the results of this analysis:

## Table 1: Updated Gaidge SSNIP Test, Using Order Shares and Accounting for COVID-19

| | With COVID Observations | | | | Dropping COVID Observations | |
| --- | --- | --- | --- | --- | --- | --- |
| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 |
| (Intercept) | 79.5%*** | 79.7%*** | 79.7%*** | 79.7%*** | 79.7%*** | 79.7%*** |
| | [78.2%, 80.7%] | [77.3%, 82.1%] | [78.6%, 80.9%] | [77.3%, 82.1%] | [78.5%, 80.8%] | [77.3%, 82.1%] |
| period | -0.2%*** | -0.2%+ | -0.2%*** | -0.2%+ | -0.2%*** | -0.2%+ |
| | [-0.2%, -0.1%] | [-0.4%, 0.0%] | [-0.2%, -0.1%] | [-0.4%, 0.0%] | [-0.2%, -0.1%] | [-0.4%, 0.0%] |
| **SSNIP** | **-0.6%** | **-0.9%** | **0.8%** | **0.9%** | **0.5%** | **0.5%** |
| | **[-3.8%, 2.7%]** | **[-5.7%, 3.9%]** | **[-0.9%, 2.5%]** | **[-2.2%, 3.9%]** | **[-1.2%, 2.2%]** | **[-2.6%, 3.5%]** |
| period × SSNIP | | 0.0% | | -0.0% | | 0.0% |
| | | [-0.2%, 0.2%] | | [-0.2%, 0.2%] | | [-0.2%, 0.2%] |
| COVID | | | -23.8%*** | -23.8%*** | | |
| | | | [-24.5%, -23.2%] | [-24.5%, -23.2%] | | |
| Num.Obs. | 61 | 61 | 61 | 61 | 58 | 58 |
| R2 | 0.452 | 0.452 | 0.857 | 0.857 | 0.761 | 0.761 |
| R2 Adj. | 0.433 | 0.423 | 0.850 | 0.847 | 0.752 | 0.748 |
| RMSE | 0.03 | 0.03 | 0.02 | 0.02 | 0.02 | 0.02 |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | | |

**(122)** Across all models, I find that the SSNIP reduced braces share of orders by, at most, -0.9% at point estimates. Using the 95% confidence intervals and controlling for COVID-19, the greatest substitution away from braces in response to the SSNIP is to reduce braces share by 2.6%.[40] Notably, contrary to Dr. Snyder's postulation, accounting for COVID-19 indicates that that SSNIP had a *smaller* effect on demand.

---

[40] Because braces accounted for 76% share of orders in March 2019, this 2.6% would still only account for 3.4% of braces volume ($3.4\% = \frac{2.6\%}{76\%}$). Under these circumstances given a 5% increase in price, a 3.4% decline in volume would be profitable.

**(123)** In Figure 1, I plot the distribution of estimates and associated confidence intervals for the SSNIP tests presented in Table 1: Updated Gaidge SSNIP Test, Using Order Shares and Accounting for COVID-19

Figure 1: SSNIP Estimates and Confidence Intervals, Using Order Shares and Controlling for COVID-19



**(124)** In short, looking to order shares and accounting for COVID, I find with 95% confidence that the order share for braces fell by, at most, 2.6% given a 5% differential price increase. I therefore conclude that in-office clear aligners form a distinct relevant market from braces.

**(125)** More broadly, one can simply look at the evolution of prices and volume to see the SSNIP had no effect on substitution, as shown below in Figure 2 (re-copied from my opening report):

Figure 2: Braces vs Aligners Average Patient Fees and Monthly Case Starts, Gaidge[41]



**(126)** I noted this point in my opening report:

*In March 2019 the average price of braces treatment rose by $209 while the price of aligner treatment fell by $96. In percentage terms, the average price for full braces treatment rose by 3.61%, while aligner prices fell by 1.65%. In total, the gap in their prices grew by about 5.25%, and 5% is a common price change to analyze in a SSNIP test.*

*The price divergence between aligners and braces led to no visible substitution between aligners and braces. When their prices diverged by over $300, the average number of braces treatments per practice rose by 3 per month, and the average number of aligner treatments rose by 1.*

*In other words, when the price of braces increased relative to clear aligners, the volume of both products increased, and braces in fact increased more. This is inconsistent with consumers substituting from braces to aligners in light of a small but significant increase in price.*[42]

**(127)** Dr. Snyder does not dispute these facts.

## B.2.  Align's Own SSNIP Test Shows that the In-Office Clear Aligner Market is a Relevant Antitrust Market

**(128)** Section G.1 of my opening report presents results from an analysis on price elasticity of demand commissioned by Align in 2015. The consultancy performing the study found that:

- Across age and malocclusion sub-groups, Align could profitably sustain a SSNIP.

- The hypothetical introduction of a new, less expensive, clear aligner would put downward pressure on Align's prices, but would have virtually no effect on the demand for braces. That is, less expensive clear aligners would compete with Invisalign but not braces—putting the two in separate markets.

**(129)** As I explain in my opening report, the findings of this study support the conclusion that aligners and braces are in distinct markets.

**(130)** Dr. Snyder offers two criticisms of my discussion of this study. First, Dr. Snyder argues that:

*It is not unusual for firms to adjust pricing up or down periodically to maintain optimal pricing, and having prices already at the optimal level in no way suggests*

---

[42] Vogt Report ¶¶ 385-87.

*that a firm has monopoly power.*[43]

**(131)** Dr. Snyder's point here is unclear. If firms did not periodically adjust prices, there would scarcely be any data with which to perform a SSNIP test. In other words, Dr. Snyder points to the very data economists rely on to perform SSNIP tests to suggest such data's mere existence undermines the results of those tests. Indeed, if a firm could profitably sustain a SSNIP, economists would very much expect them to do so, as it would increase their profit.

**(132)** Second, Dr. Snyder goes on to argue:

*Finally, while Dr. Vogt claims that the Align study indicates that a new aligner product might "take volume from Invisalign without substantially affecting braces," the study indicates that metal braces would also lose sales to aligners. This is notably not a SSNIP test – it does not measure the change in sales for a specific change in price – and thus does not indicate whether any such loss of sales would be enough that a hypothetical monopolist would choose not to raise prices.*[44]

**(133)** Based on this statement, it appears that Dr. Snyder did not carefully review the elasticities analysis in the 2015 Align study referenced above. As I explain in my opening report, this study did in fact examine the effect of a specific change in price. Specifically, the 2015 study concludes that "use of [braces] remains relatively steady **across System X prices**."[45] As I further explained, the study also found that "[e]ven for severe adult cases, only 4% of buyers would substitute braces for System X **at a price of $999, a 39.4% discount** of Invisalign's then net-price."[46]

**(134)** In Section G.1.2 of my opening report, I explain how the 2015 Align study did in fact evaluate if an Invisalign price increase would be profitable—and concluded that it would be, *i.e.*, that Align could profitably sustain a SSNIP in four of seven age and clinical complexity groups.[47] The study also explicitly found (1) that an Invisalign price increase would not cause profit-reducing substitution to braces and (2) that braces customers would not substitute to cheaper clear aligners.[48]

**(135)** Given these findings, it is unclear how or why Dr. Snyder concludes that the 2015 Align study is not, in effect, a SSNIP test—or at a minimum highly probative of whether the in-office clear aligner market is the relevant market

---

[43] Snyder Report ¶ 328.
[44] Snyder Report ¶ 328.
[45] Vogt Report ¶ 371 (emphasis added).
[46] *Id.* (emphasis added).
[47] *See* Vogt Report ¶¶ 362-365.
[48] *Id.* ¶¶ 369-371.

here.

**(136)** To summarize, I conclude that there is a relevant market for in-office clear aligners that is distinct from the market for braces. This conclusion is based on not only my own SSNIP test, but also on a SSNIP test conducted by Align's own consultant in 2015. It is particularly noteworthy that Dr. Snyder fails to provide any alternative SSNIP test—or, for that matter, any quantitative analysis.

## C.    Align Possesses Market Power

## C.1.    Dr. Snyder Contradicts His Own Analysis of Market Definition and Power

**(137)** In Section VI.G.b., Snyder argues that the implants market in 2007 was more competitive than the aligner market in 2017 because the aligner market was heavily concentrated and Align held a dominant position. On this basis, he contends that the implants market is a poor benchmark for aligner market. I directly address this contention in Section E.

**(138)** Separately, in Section VII, Snyder argues that there is no such thing as an in-office clear aligner market and that Align possesses no market power.

**(139)** These cannot both be true.

**(140)** As Dr. Snyder explains, "perhaps the most fundamental issue is whether Align has the ability to increase (or avoid decreasing) prices to customers."[49]  As I explain below, Align had the power to do both, which it exercised.

## C.2.    Align's Profits Are Direct Evidence of Market Power

**(141)** In Section H.1 of my opening report, I find that Align held market power in the in-office clear aligner market. In support of this, I show that Align was able to maintain the same profit margins it enjoyed during patent protection following patent expiry and competitive entry.

**(142)** Dr. Snyder argues that Align does not have market power. In support of this, he argues that evidence of profit margins is not enough to conclude that a firm has market power. He points to investment in marketing and development as a plausible explanation of Align's high margins. Dr. Snyder also cites Kaplow and Shapiro for the claim that profit margins "are often necessary to cover

---

[49] Snyder Report ¶ 369.

fixed costs" and thus are consistent with a competitive market.[50]

**(143)** Moreover, Dr. Snyder reaches the conclusion that Align does not have market power in the teeth straightening market.[51] This is based on the claim that the same unique market—a "teeth straightening market"—encompasses aligners, braces and DTC aligners, and that Align has just a 15% share in that market. While Dr. Snyder's insistence that Align lacks monopoly power relies on this broader market definition, as discussed above, he provides no SSNIP of his own and his criticism of my SSNIP and Align's SSNIP are unconvincing.

**(144)** I partially agree with Dr. Snyder that, at times, it can be difficult to draw inferences of monopoly market power solely from profit margins, but I disagree with his overly broad characterization of the issue.

**(145)** Sometimes, we cannot tell if profit margins are that of a monopolist or oligopolistic differentiated competitors. However, in this case, the period when Align had a protected monopoly due to its patents shows us what a monopoly profit margin looks like. As I demonstrate in my opening report, Align's profit margins remained constant following patent expiry. As Dr. Snyder himself argues, Align's total profits increased following patent expiry.[52]

**(146)** The ability of a firm to increase or, at a minimum, maintain the same profits it enjoyed during patent protection is unequivocal evidence of market power. I make this point in my opening report, but Dr. Snyder does not acknowledge or address it.

**(147)** Dr. Snyder's reference to differentiated products is also confusing. Economists typically refer to market power as a gradient with degrees rather than a binary, *i.e.*, they generally do not simply determine that a company either has or does not have market power. This is indeed the logic of the Lerner Index, which calculates a price-cost margin where market power is continuously measured as the percentage deviation from cost.

**(148)** Further, economists understand that product differentiation may be the reason a firm has market power. Ultimately, market power always stems from a lack of consumer price elasticity. If that inelasticity arises because consumers strongly desire characteristics of a particular product (*i.e.*, clear, plastic, removable aligners rather than visible, metal, irremovable braces), this can give a firm market power and would squarely fall within the idea of

---

[50] Snyder Report ¶ 356 n.485.
[51] Snyder Report ¶¶ 356–58.
[52] Snyder Report ¶¶ 121–22.

"differentiation." Indeed, product market definition is, on some level, simply defining the level of differentiation that gives a hypothetical monopolist market power.

**(149)** In making these arguments, Dr. Snyder seems to have forgotten the purpose of assessing market power in an antitrust case, confusing it with foreclosure analysis. He quotes Kaplow and Shapiro for the proposition that "the presence of a gap between price and marginal cost is perfectly consistent with the conclusion that the market is behaving in a competitive fashion, given the presence of fixed costs and product differentiation."[53] But a close review of this quote reveals that Kaplow and Shapiro are referring to competitive distortions, not market power. Dr. Snyder confuses a "market ... behaving in a competitive fashion" with a lack of market power.

**(150)** Indeed, Kaplow and Shapiro make this point explicitly, stating that "it is important to keep in mind that the existence of technical market power does not imply antitrust liability."[54] Dr. Snyder admits as much in his footnotes, so I find his portrayal of market power in the body of his report to constitute, at best, a confused misreading of the literature.

**(151)** As Kaplow and Shapiro note, a markup above marginal costs can be necessary given certain fixed costs. But it would be unusual that as high as a 70% mark-up above cost (*i.e.,* Align's gross margins) would be necessary for Align, particularly since Align has had over 20 years to recover such fixed costs. Indeed, the purpose of patent protection is to help firms recover fixed costs associated with innovation. Once patents expire and firms have recovered costs, we expect prices to fall to reflect both increased competition and the recovery of fixed costs. That did not happen in the in-office clear aligner market. Again, this is why it is so notable that Align was able to maintain the same profit margins before and after patent expiry.

**(152)** Moreover, Dr. Snyder has presented no evidence that this 70% mark-up was necessary to cover any particular fixed costs, so his argument is essentially conjecture. More to the point, I examine both gross and operating margins (which include many fixed costs) in my opening report and find that both were consistent with Align possessing market power.[55] Dr. Snyder does not address my analysis of operating margins at any point.

---

[53] Snyder Report ¶ 356 (quoting Kaplow, Louis and Carl Shapiro, Antitrust, *Handbook of Law and Economics*, 2007, Vol. 2, available at https://faculty.haas.berkeley.edu/shapiro/antitrust2007.pdf, at p. 1089).

[54] Luis Kaplow and Carl Shapiro, Antitrust, *Handbook of Law and Economics*, 2007, Vol. 2, available at https://faculty.haas.berkeley.edu/shapiro/antitrust2007.pdf, p. 1089.

[55] *See* Vogt Report § H.1.

**(153)** In other words, Dr. Snyder is correct that market power alone does not establish anticompetitive conduct, but he is confused in arguing that product differentiation undermines market power and that profit margins do not indicate market power. His own citations and footnotes contradict this argument, as does the general consensus among economists.

**(154)** I do not dispute that market power alone cannot establish antitrust injury. This is why I spend the following sections of my report examining the challenged conduct and establishing a damage model.

**(155)** Most simply put, it does not matter if some portion of Align's market power stems from its product differentiation. This is still market power. What matters is if Align used its market power (whatever its source ) to exclude competitors.

## C.3.   SmileDirectClub's Profits Show that In-Office and Direct-to-Consumer Markets are Distinct, Not that Align Lacks Market Power

**(156)** Dr. Snyder further argues that Align's "71 percent" margins were "not at all unique" by referring to SmileDirectClub ("SDC"), which also often had margins in the range of 70-75%.[56] I note that SmileDirectClub's conduct is separately at issue in this case, and that Plaintiffs allege that Align and SmileDirectClub conspired, in violation of Section 1 of the Sherman Act, to monopolize the market for direct-to-consumer ("DTC") clear aligners by entering into an agreement whereby Align was prohibited from competing in the DTC market. In any event, SDC's margins should not be assumed *a priori* to represent a competitive comparison point.

**(157)** Instead, SDC's margins are further evidence that the markets for in-office clear aligners and DTC clear aligners are distinct. I find it improbable that two firms would "compete" in the same market and both achieve 70%+ margins. For such substantial margins to be sustainable over the course of more than 5 years without price competition eroding them, I would be concerned that either there is coordination between the firms or that they exist in distinct markets. Indeed, plaintiffs in this case allege both to be true.

**(158)** For example, at a 70% gross margin, SmileDirectClub has a substantial incentive to take Invisalign customers by offering lower prices. If consumers really did substitute between Invisalign and SmileDirectClub (*i.e.,* if in-office and direct-to-consumer aligners were in the same market) then SmileDirectClub could gain customers by offering small price reductions that would still leave it with a substantial gross margin. If Align and

---

[56] Snyder Report ¶ 357.

SmileDirectClub competed in the same market, this would be the profit maximizing strategy.

**(159)** Consider the logic of a SSNIP test. It asks a very simple question: can a firm profitably raise price (by a small but significant amount) above the competitive level without substantial diversion to candidate competitors? Both SmileDirectClub and Align have already deviated prices more than 70% above cost, which is the competitive equilibrium price.

**(160)** If these two companies are in the same market (and lack market power), why has neither sacrificed some margin to gain volume? For Dr. Snyder's contention to be true, both firms would have to have deliberately chosen not to compete over an extended period of time.

**(161)** In summary, Dr. Snyder's contention that SmileDirectClub's 70-75% profit margins are evidence of competition is highly unusual even setting aside Plaintiffs' market allocation allegations (which are not at issue in this report).

## D.    The Challenged Conduct Substantially Foreclosed the Market for In-Office Clear Aligners

**(162)** My opening report analyzed two types of conduct challenged by Plaintiffs:

- Align's decision to terminate interoperability with 3Shape's TRIOS scanner, evaluated as a refusal to deal; and

- Align's exclusive (or *de facto* exclusive) dealing with dentists and orthodontists, which consisted of (1) the "Fusion" Program and (2) numerous Align programs conditioned on express or *de facto* Invisalign exclusivity, including exclusive contracts with dental services organizations (or "DSOs"), individual discount promotions requiring agreement to exclusivity, and a scanner sales agreement with the DSO Heartland Dental, then the largest in the country, that Align's CFO, John Morici, described as "[b]asically a 5 year exclusive deal with Heartland to provide iTero and Invisalign" that "[l]ocks [Heartland] up[.]"[57]

**(163)** I concluded that termination of interoperability 'made no economic sense' but-for its anticompetitive effects, amounted to a profit sacrifice, and had quantifiable foreclosing effects on the market.

**(164)** I similarly found that Align's Fusion program raised rivals' costs and brought iTero prices below certain measures of cost, thereby excluding rivals.

---

[57] *See* Vogt Report ¶¶ 324–25.

**(165)** Finally, I conclude that Align's exclusive dealing contracts collectively covered 47% of Invisalign orders, or 30% of the in-office clear aligner market by quarter 2 of 2021.

**(166)** In his opposition, Dr. Snyder disagrees with my conclusion that any of these caused anticompetitive foreclosure. In this rebuttal, I discuss each of Dr. Snyder's arguments in turn, and affirm my original conclusion that Align substantially foreclosed the in-office clear aligner market.

**(167)** I begin by analyzing Align's refusal to deal via termination of interoperability.

## D.1.  Termination of Interoperability Substantially Foreclosed the Relevant Market

### D.1.1.  Termination of Interoperability 'Made No Economic Sense' But For Its Anticompetitive Effects

**(168)** As I explain in my opening report in Section K.2, termination of interoperability, at a minimum, represented a risk to Align. It could increase long-term profits by imposing barriers to doctors ordering competing aligners, or it could push doctors out of the Align ecosystem entirely.

**(169)** Indeed, even if the profit-sacrifice of termination of interoperability was immediately outweighed by anticompetitive financial benefits (profit gains), which I do not concede, this profit gain would still rely on the anticompetitive effects of refusal to deal. In other words, termination of interoperability can only have been profit increasing (or even profit neutral) if it produced some foreclosing effect—that is, if it diverted volume and sales to Align that would have otherwise gone to competitors. Dr. Snyder does not address or acknowledge this argument.

**(170)** Prior to termination of interoperability, internal Align analysis weighed the risks associated with refusal to deal. For example, Align chose to only terminate interoperability in the United States, maintaining interoperability elsewhere globally. Align made this decision after carefully comparing TRIOS usage across jurisdictions and concluded that the risk/reward ratio was too high in countries other than the United States.[58]

**(171)** Furthermore, prior to termination, Align described the 3Shape partnership as "nothing but positive,"[59] and its own internal analysis found that TRIOS doctors ordered more Invisalign than PVS doctors—but less than iTero

---

[58] *See, e.g.*, Vogt Report ¶¶ 629-635, 640.
[59] ALIGNAT-PURCH01551611 (PX 430).

doctors.[60] Termination therefore represented a risk that doctors would either switch back to PVS or cease ordering Invisalign entirely—instead of buying an iTero and diverting aligner demand to Invisalign.

**(172)** Align employees explicitly discussed and weighed this risk in the context of terminating interoperability, and nonetheless decided to proceed with the refusal to deal.[61]

**(173)** In summary:

- Termination of interoperability created risks that doctors would exit the Align ecosystem rather than diverting demand to Invisalign.

- The record in this case indicates that Align employees explicitly discussed and recognized this risk, even finding it to be prohibitively high in countries other than the United States.

- Align nonetheless chose to terminate interoperability in the United States.

**(174)** Given these facts, the only economically logical conclusion is that Align expected a long-run foreclosing effect from termination of interoperability that would, eventually, outweigh any short-term lost profits and associated risks. In other words, qualitative evidence strongly indicates that termination of interoperability 'made no economic sense' but-for its foreclosing effects. As I show in the next section, Align was correct.

### D.1.2.  Dr. Snyder's Profit Sacrifice Test is Conceptually Flawed and Contradicts His Own Description of the Industry

**(175)** In Section K.2 of my opening report, I conclude that termination of interoperability resulted in a short-term profit sacrifice because some doctors who used TRIOS to order Invisalign during the interoperability period stopped ordering Invisalign entirely. I further conclude that Align eventually recouped these lost profits when doctors switched from TRIOS scanners to iTero scanners, and thus increased their Invisalign order volumes relative to the volumes that would be expected in the but-for world, *i.e.*, a world in which doctors continued to use TRIOS scanners to order competing clear aligners as well as Invisalign.

**(176)** In his report, Dr. Snyder offers two main critiques of my analysis. First, he

---

[60] Vogt Report ¶¶ 636–37.
[61] Vogt Report ¶ 639. Further, as I note in my opening report, evidence suggests that some senior employees appear to have dissented from this decision. *See id.* ¶ 634.

asserts that a profit sacrifice test should examine all of Align's sales, not just those directly affected by termination of interoperability.[62] His basis for this argument is unclear and questionable.

**(177)** Second, Dr. Snyder also asserts that "limiting the analysis of Align's profits to the Invisalign customers directly affected by TOI [termination of interoperability]—the dental providers who submitted via 3Shape TRIOS scanners prior to TOI—also shows no short-term decrease in Align's revenue or profit."[63] As I explain below in Section D.1.4, this assertion is based on inconclusive depositions and is at odds with Align's own analysis of 3Shape doctors' order volume immediately following termination of interoperability. In this section, I focus on Dr. Snyder's first assertion—that a profit sacrifice test should consider all doctors (even those who never used 3Shape's TRIOS scanner.)

**(178)** A profit sacrifice test is intended to compare a company's actual profits to its profits in a world but-for the refusal to deal. Here, if refusal to deal only impacts a portion of Align's sales, then we must conclude that the unaffected sales are the same in both reality and the but-for world. This means that a profit sacrifice test does not and should not include doctors who never used and never would have used 3Shape's TRIOS scanner to order Invisalign.

**(179)** Consider a doctor who exclusively used iTero both before, during, and after interoperability. If that doctor's Invisalign order volume increased 25% from 2017 to 2018, there would be no reason to attribute that increase to termination of interoperability.

**(180)** This could happen for any number of reasons unrelated to termination. For example, if completely exogenous market growth increased sales for doctors who never used 3Shape and never would have, no reasonable analysis would attribute that growth to Align's refusal to deal. In other words, it is irrelevant to a profit sacrifice test.

**(181)** Taken to its logical extreme, under Dr. Snyder's approach, termination of interoperability could *completely erase* all $18 million of Invisalign gross profit coming from 3Shape submitters—*i.e.,* the profit previously generated by *every* TRIOS doctor in the Align ecosystem. But so long as entirely unrelated market growth increased gross profits by at least $18.01 million, Dr. Snyder would conclude there was no profit sacrifice as a result of termination of interoperability.

---

[62] *See* Snyder Report ¶¶ 120-22.
[63] Snyder Report ¶ 123.

**(182)** As Dr. Snyder himself emphasizes, the clear aligner market was indeed growing both before and during the relevant period.[64] It is therefore improper attribute *the entirety* of that growth, as Dr. Snyder does, to Align's refusal to deal.

**(183)** As I explain below, there are standard and widely accepted econometric techniques to account for such relationships, which Dr. Snyder makes no attempt to implement.

### D.1.3.  Dr. Snyder's Implementation of the Profit Sacrifice Test is Insufficient

**(184)** In Section V.A.3.a of his report, Dr. Snyder looks to a chart of Align's gross profits, observes an increase in those profits, and, on that basis alone, concludes that termination of interoperability did not result in a profit sacrifice. In doing so, he makes no attempt to isolate the effect of Align's refusal to deal from other potentially confounding factors. Even if Dr. Snyder were correct in looking at the entirety of Align's gross profit, rather than just the profit actually affected by termination of interoperability, he would still need to account for any pre-existing and unrelated trends in its growth.

**(185)** Align's gross profits were consistently growing both before and after termination of interoperability.[65]  To meaningfully estimate lost profits, therefore, we must separate the effect of termination of interoperability from the growth that was likely to have occurred regardless. This is the same rationale for constructing prices in the but-for world.

**(186)** For example, if profits consistently grew 5% every quarter, but following some shock they only grew at 1%, one would be unlikely to conclude the shock increased profits by 1%. Instead, the far more plausible conclusion is that the shock slowed the growth rate of profits from 5% to 1%.

**(187)** In other words, when data exhibits an upward time trend (as did Align's profits), economists would typically de-trend the data or examine if there were significant changes in its growth rate. It is well understood that failing to account for such time trends produces unreliable results—this is indeed one of the first things taught in econometrics classes and is a tenet of basic econometrics. While there are many ways to analyze data with time-trends, Dr. Snyder attempts none of them.

---

[64] *See* Snyder Report ¶¶ 98–99.
[65] Snyder Report ¶ 121 & Figs. 17, 18 ("US Invisalign gross profits . . . increased from $141.3 million in the fourth quarter of 2017 to $156.2 million in the second quarter of 2018 . . . . Compared to the same quarter in the prior year (to account for seasonality in sales), US Invisalign profits in each quarter were higher from the first quarter of 2018 to the first quarter of 2020 . . . .").

**(188)** To rectify this, I apply simple and widely accepted econometric techniques to compare the short- and long-term effects of termination of interoperability on Align's total gross profit.

**(189)** As shown below in Table 2 in the "Short-Term" columns, I find that, in the five quarters following termination of interoperability, there was a statistically significant *decrease* in the growth rate of Invisalign gross profit. In the same period, there was no statistically significant effect on iTero gross profit (either positive or negative) though it did decline in the quarter immediately coinciding with termination.

Table 2: Profit Sacrifice Regression

| | Short-Term[1] | | Long-Term[2] | |
|---|---|---|---|---|
| | Invisalign 1 | iTero 1 | Invisalign 2 | iTero 2 |
| Time | $ 22.19M*** | $ 3.06M | $ 7.02M*** | $ 1.09M*** |
| | ($ 1.56M) | ($ 2.26M) | ($ 663k) | ($ 198k) |
| Termination of Interoperability | $ -4.52M | **$ -2M** | $ 22.39M | $ 8.24M |
| | ($ 11.84M) | ($ 6.85M) | ($ 23.56M) | ($ 5.67M) |
| Time Since Termination | **$ -11.47M*** | $ 2.9M | **$ 12.62M*** | **$ 3.73M*** |
| | ($ 3.54M) | ($ 2.68M) | ($ 2.48M) | ($ 629k) |
| Num.Obs. | 10 | 10 | 43 | 43 |
| R2 | 0.979 | 0.865 | 0.902 | 0.907 |
| R2 Adj. | 0.969 | 0.798 | 0.895 | 0.900 |
| RMSE | 7092725.64 | 4608079.86 | 53746935.45 | 11910765.09 |

[1] Short-Term is 2016 Q4 to 2019 Q1 (5 Quarters Before & After TOI)
[2] Long-Term is 2012 Q1 to 2022 Q3 (The Full Period For Which I Have Gross-Profit Data)
+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

**(190)** Intuitively, this means that Align's *gross profits on Invisalign grew more quickly in the 5 quarters during interoperability than in the 5 after*. Over the course of 5 quarters, this difference amounted to $57.35 million in foregone profits. I note that while this estimate is quite large, it is conservative

49

compared with documentary evidence from the time. For example, as shown below in Figure 3, internal Align analysis found that, because of 3Shape's prevalence among GPs, the "overall market opportunity could be $3.75B - $5B:"[66]

Figure 3: Align Analysis of Future Opportunities from Interoperability with TRIOS[67]



**(191)** Despite this substantial perceived opportunity, Align chose to terminate interoperability.

---

[66] ALIGNAT-SNOW00131707 at -08. Notably, the analysis below was sent by Abhishek Ganguly, a senior Align executive, to Joseph Hogan, Align's CEO, on September 13, 2016, as part of an "elevator pitch" discussing "the 3Shape opportunity." *Id.* at -07.

[67] ALIGNAT-PURCH001 09211.

**(192)** I also repeat the same model but instead look to the long-term[68] and find the opposite effect—displayed above in Table 2 in the "Long-Term" columns. Specifically, I expand the regression to look at the full set of gross-profit data (2012–2022), rather than just the quarters immediately surrounding termination, and find that termination of interoperability had a statistically significant and *positive* effect on the growth of Invisalign and iTero profits *in the long run* worth $12.62 million per quarter.

**(193)** In other words, following termination of interoperability, Invisalign gross profit saw a statistically significant negative deviation from trend, while iTero profit saw no statistically significant change. Looking instead to the long run, the opposite is true: termination was associated with an increase in the growth rate of Align's gross profits.

**(194)** This model speaks directly to the question fundamental to a profit sacrifice test: did the refusal to deal sacrifice short-term profits for long-term monopoly profits? Using a simple model based on the same data Dr. Snyder cites—but does not model—I find that it did.

**(195)** As noted above, I do not endorse Dr. Snyder's decision to analyze all of Align's gross profits in assessing profit sacrifice. However, applying basic econometric techniques, even this data confirms the findings in my opening report: that termination of interoperability led to a short-term profit sacrifice followed by a long-term profit gain.

### D.1.4.  Dr. Snyder Contradicts Align's Own Profit Sacrifice Analysis

**(196)** Dr. Snyder asserts in his report that, when Align itself "analyzed Invisalign submissions from 3Shape doctors, it determined that a very small dip in cases was seasonal—Align announced the termination in mid-December, just ahead of a slower time as many doctors reduce their schedule around winter holidays."[69] In support of this claim, Dr. Snyder relies on just two pieces of record evidence: (1) an excerpt from the February 28, 2023 deposition of Align executive Chris Puco; and (2) a February 2018 Align presentation analyzing 3Shape doctors' case submissions.[70] Neither supports the conclusion that Align *did not* sacrifice profits as a result of TOI. To the contrary, Dr. Snyder's conclusions are at odds with other record evidence and Align's quantitative analysis.

---

[68] For purposes of this analysis, I define "long term" as 2012 Q1 to 2022 Q3.

[69] Snyder Report ¶ 124.

[70] *See* ALIGNAT-PURCH00503263. In my analysis here, I rely on a version of the same document produced to *Snow* Plaintiffs with the bates number ALIGNAT-PURCH01603659.

**(197) First,** Dr. Snyder cites the following deposition testimony by Mr. Puco:

- Q. Sitting here today do you know what the total number of NRs [Net Receipts] that were lost as a result of the termination of interoperability with 3Shape?

- A. I don't know an exact number. And if there were, I don't know that there were many at all. In the overall business, I don't -- I don't know that there were many in the overall business. Our business kept moving.[71]

**(198)** It is unclear how or in what way the quoted testimony supports Dr. Snyder's conclusion that Align's loss of Invisalign submissions from former TRIOS submitters (*i.e.*, those doctors using TRIOS scanners to submit Invisalign cases) can be attributed to a seasonal change. Further, a close reading of Mr. Puco's testimony reveals that he could not speak to Align's analysis at any level of detail, including any attempts to control for seasonality in the data:

- Q: Were you aware of efforts by Align to determine – to control for the effects of seasonality when analyzing the data of lost net receipts?

- A: I don't know what you mean by affecting control. What we would do is understand our numbers. We would understand the seasonality. We would bake that into our projections. And I think the investment community at large understood, you know, the seasonalities in business. Right? We wouldn't try to mask it or cover it up, if that's what you are asking.

- Q: No, that's not what I was asking. I'm just wondering whether you're aware of any efforts to, when analyzing your own data, to control for the effects of seasonality by how you compare – how you compare the current post-termination-of-interoperability data to previous Align data?

- A: Well, there's a number of ways to slice the data up. But at the end of the day it's just the whole number that matters to the organization. So if I did a hundred the year before and I did a hundred this year, I'm on par. I didn't grow. If I did a hundred last year and 150, I grew quite well. So that would be the top-line review. Of course we broke it down by customer at that time and would have looked at everything. Still I'm sure they do. There were a number of doctor groups based on the level of submission, based on how they submitted. Based on all kinds of things. It got quite complicated.[72]

---

[71] February 28, 2023 Dep. of Christopher Puco at 160:16–25.
[72] *Id.* at 161:20–163:9.

**(199) Second,** Dr. Snyder cites to a February 6th, 2018, Align internal presentation titled "3Shape Doctors Case Submissions." Notably, Dr. Snyder does not discuss this presentation in any detail, and instead quotes (in a footnote) just two lines of text from a single slide that state: "Q: Did interoperability cancellation change submission rates? A: Not much, if at all."[73]

**(200)**　　　Dr. Snyder's selective quoting of this analysis presents a misleading view of its conclusions. Indeed, the same slide quoted by Dr. Snyder goes on to state that there was in fact a "short-term negative impact [from TOI], but recovery was quick"[74]:

Figure 4: Align's February 2018 Profit Sacrifice Analysis[75]



Q: Did interoperability cancellation change submission rates?
A: Not much, if at all.

- Highlighted area shows potential, short-term negative impact, but recovery was quick.

- 3Shape accounts have not had a major positive or negative impact on NA volumes.

**(201)** Further, later in the same presentation, Align explicitly notes the risk of further profit loss, stating that there was a "risk" that the "817 [TRIOS] providers" who had not yet replaced their TRIOS scanners with an iTero would "move to PVS, stop submissions or seek a competitive digital workflow."[76] Align's February 2018 analysis is therefore consistent with and indeed corroboration of my conclusion the profit sacrifice and foreclosure analysis in my opening report.

---

[73] *See* Snyder Report ¶ 124 n.152 (quoting ALIGNAT-PURCH00503263 at -265).
[74] ALIGNAT-PURCH01603661.
[75] ALIGNAT-PURCH01603661.
[76] ALIGNAT-PURCH01603664.

**(202)** Critically, Dr. Snyder's claims are also contradicted by a later, more detailed quantitative analysis of TOI that Align performed in late March of 2018, or approximately two months after the presentation on which Dr. Snyder relies (which was created in early February). This analysis, which I discuss in my opening report—and which Dr. Snyder nowhere addresses in his own report—directly accounted for any supposed seasonality, broke the analysis into different "doctor groups," and nonetheless explicitly found a profit sacrifice associated with termination of interoperability.[77]

**(203)** Specifically, following termination of interoperability, Align compared Invisalign submissions from 3Shape doctors in February and March of 2018 to their submissions in February and March of 2017. To any extent there is predictable seasonal fluctuation in Invisalign sales, it would be accounted for in this analysis by directly comparing the same season of one year to the prior year. As noted above, this more granular analysis was performed in late March of 2018, or approximately two months after the presentation on which Dr. Snyder relies.

**(204)** Align's analysis found that year-on-year volume for 3Shape doctors *decreased* in February 2018. This only began to reverse in March 2018, and even then, only for doctors who switched to iTero, and by less than the decrease in February. In other words, Align found that, for at least 3 months following termination of interoperability, Invisalign order volume was down for 3Shape doctors. I presented this evidence in Figure 36 of my opening report, which shows the year-over-year change in "net receipts", or Invisalign orders, for TRIOS users:

---

[77] *See* Vogt Report ¶¶ 626–27 (citing ALIGNAT-SNOW00486389).

Figure 5: Align's March 2018 Profit Sacrifice Analysis[78]



**(205)** Dr. Snyder is silent on this evidence. In summary, for the reasons above, his analysis of profit sacrifice is unreliable and contradictory to Align's own findings.

### D.1.5. Dr. Snyder's Analysis of iTero Profits is Demonstrably Incorrect

**(206)** Dr. Snyder also argues that to correctly evaluate whether there was a profit sacrifice from termination of interoperability, one must consider the effect of termination on both Invisalign and scanner sales.[79] In Section 3.a of his report, he therefore calculates the gross profit on iTero sales to formerly TRIOS doctors and puts this number at $2.9 million.

---

[78] Source: ALIGNAT-SNOW00486389–ALIGNAT-SNOW00486391.
[79] *See* Snyder Report ¶¶ 125–26.

**(207)** There are three issues with this analysis:

- **First**, antitrust analysis would not typically consider "out-of-market" effects, and I have seen no literature to suggest that profit sacrifice tests are an exception (nor has Dr. Snyder cited to any). In evaluating a refusal to deal affecting the aligner market, one would therefore not typically net-out effects in the scanner market. Further, a company's willingness to sacrifice profits in one market to make those profits up in another is both (a) itself evidence of market power in the first market and, more broadly (b) would, if accepted as a valid application of the profit sacrifice test, bless anticompetitive behavior simply by virtue of the fact that a company offers products in separate markets that are often sold together. For example, anticompetitive bundling arrangements can entail sacrificing profits in one market which are `made-up` in another. Even if the bundle is net profitable, it can fail a discount-attribution test and exclude competitors.

- **Second**, Align sold iTero scanners to former TRIOS doctors at a substantially discounted price that fell below operating costs. Considering this, I find that Align made an operating *loss* of $1 million on scanners sold to TRIOS doctors.

- **Third**, even accepting both Dr. Snyder's conceptual argument and his estimation, $2.9 million in scanner profits is inadequate to offset the at least $3.5 million (potentially up to $57.35 million) in Invisalign sales that Align lost stemming from termination of interoperability.[80] That is, *even if we include* Dr. Snyder's estimated $2.9 million in profits from iTero sales in the profit sacrifice calculation, termination of interoperability resulted in a net loss (profit sacrifice) for Align in the short run.

**(208)** To encourage doctors to remain in the Align ecosystem and switch to iTero following termination of interoperability, Align offered a promotion to Invisalign-trained providers who (a) purchased a TRIOS scanner after April 28, 2016, through which they (b) submitted at least one Invisalign clear aligner case before December 18, 2017. This program reduced the price of an iTero Element scanner to just $14,999, or half of the Element's $29,999 list price, for the majority of TRIOS doctors.[81] Align documents indicate that, as of January 2018, at least 350 doctors had taken advantage of this promotion,

---

[80] The $3.5 million profit sacrifice stems from my original report, where I sum the profit on Invisalign sales by doctors who exited the Align ecosystem in the first quarter of 2018 (Vogt Report ¶ 625). I note that this is conservative in comparison to assessing all Invisalign sales, as Dr. Snyder advocates, but including a time trend, as I opine is necessary – where I find a profit sacrifice greater than $50 million as explained in Section D.1.3.

[81] ALIGNAT-SNOW00739990.

or a majority of the doctors who switched to iTero in Dr. Snyder's data.[82]
Further, this is likely a conservative estimate, as the discount—which was
originally intended to run through January 31, 2018—was extended through
March 31, 2018.[83]

**(209)** This, at a minimum, means that the margin on these sales was substantially
smaller than Align's average scanner margin when it sells iTeros at $29,999.
More to point, I find that Align had an operating *loss* on iTero scanners sold
to former TRIOS doctors in 2018:

Table 3: Profit Sacrifice on iTero Sales to TRIOS Docs[84]

| Scanners Sold to Trios Docs | Average Scanner Price for Trios Docs | Cost Per Scanner | | Total Profit (Sacrifice) | |
|---|---|---|---|---|---|
| | | Gross | Operating | Gross | Operating |
| 562 | $    16 356 | $    11 118 | $    18 178 | $    2 943 716 | $    (1 024 073) |

*All Figures for the Period 2018*

**(210)** After accounting for all operating expenses, I find that Align sold iTero
scanners to former TRIOS doctors at a loss of approximately $1 million. This
indicates, at a minimum, that iTero sales did not "subsidize" or otherwise
offset lost sales of Invisalign after termination. It is also consistent with
Align's other predatory behavior aimed at excluding competitors, which I turn
to below.

### D.2.  The Fusion Program Satisfies a Discount-Attribution Test

**(211)** Dr. Snyder states that the average selling price of an iTero under the Fusion
Program was $19,756, or $22,948 after accounting for customers which did
not meet the 3-year case requirements, substantially higher than the $14,999
indicative price outlined in the Fusion contracts.[85] Dr. Snyder then addresses
only one of my methods for estimating long run average incremental cost
(LRAIC), failing to consider or acknowledge my other measures. Notably,
using these other measures of cost, even accepting Dr. Snyder's re-estimation
of Fusion prices, the iTero Fusion price remains below cost for some or all
years across 2017 to 2020. Without acknowledging these, Dr. Snyder asserts

---

[82] ALIGNAT-PURCH01493848.
[83] ALIGNAT-SNOW00739990.
[84] Source: ALIGNAT-PURCH00932993, ALIGNAT-PURCH00932992, ALIGNAT-SNOW00001915. I
identify former TRIOS doctors who switched to iTero following the methodology from Figure 20 of the
Snyder Report.
[85] Snyder Report ¶ 150. Dr. Snyder relies on Align's internal calculations at ALIGNAT-PURCH00401847-889
(iTero Fusion 2.0 Presentation, Q1 2021), at 855.

my methodology is unreliable.

**(212)** In particular, Dr. Snyder only considers my estimation of long run average incremental cost using Align's estimated contribution margin but does not address my estimation using operating cost per scanner.[86] Long run average incremental cost is distinct from marginal cost because it includes costs that vary in the long run, but not over a short period of time. Consequently, operating costs may be relevant to LRAIC (and therefore a price cost test) but not marginal cost. For example, administrative costs may be invariable in the short-term, but flexible in the long-run.

**(213)** Using Align's reported revenue and operating margins for its scanner segment, I calculated the operating cost of an iTero scanner to be $20,974 for 2017, $18,178 for 2018, $19,381 for 2019, and $24,828 for 2020.[87] Thus, the price used by Dr. Snyder—$19,756—would be below this measure of cost for 2017 and 2020, while the price (including chargebacks) would be below cost for 2020.

**(214)** Further, Dr. Snyder fails to consider or acknowledge the evidence that even operating costs are a potentially conservative metric. In its annual financial statements, Align reports costs that are not specifically allocated to either of its clear aligner or scanner segments, which include "…costs related to IT, facilities, human resources, accounting and finance, legal and regulatory, and other separately managed general and administrative costs."[88] Such costs may be variable in the long-run (and therefore relevant to LRAIC and a price-cost test) but invariable in the short-term (and therefore irrelevant to marginal cost).

**(215)** As part of its ITC proceedings in 2017, Align underwent an exercise to allocate these costs to its business segments, with Align's CFO submitting a declaration that approximately 30% of Align's previously unallocated expenditures are attributable to iTero scanners and relatable software.[89]

**(216)** Dr. Snyder fails to address Align's own estimation of additional costs to its scanner segments, which, if added to operating costs, bring the cost of an iTero substantially above the Fusion price used by Dr. Snyder, with or without the chargebacks.

**(217)** For clarity, I present these additions to the calculated operating cost per

---

[86] *See* Vogt Report ¶¶ 736–37, Table 11.
[87] Vogt Report ¶¶ 736–37, Table 11.
[88] Vogt Report ¶ 740.
[89] Vogt Report ¶ 740; *see* February 9, 2023 Dep. of John Morici at 113–14.

scanner, having previously only mentioned the total unallocated expenses in footnote 702 of my original report.

### Table 4: Total iTero Costs, Including Previously Unallocated Expenses

| Year | Scanner Operating Margin | Calculated Operating Cost per Scanner | Estimated Unallocated Scanner Costs | Total Scanner Operating Cost | Total Operating Cost per Scanner |
|------|------|------|------|------|------|
| 2017 | 30 20% | $ 20 974 | $ 78 195 000 | $ 192 773 451 | $ 35 287 |
| 2018 | 36 00% | $ 18 178 | $ 103 461 900 | $ 279 477 869 | $ 28 863 |
| 2019 | 36 10% | $ 19 381 | $ 129 355 200 | $ 372 843 771 | $ 29 678 |
| 2020 | 25 90% | $ 24 828 | $ 143 077 800 | $ 417 605 090 | $ 37 768 |

**(218)** As shown in Table 4, including the publicly reported unallocated expenses using Align's own estimated ratio provides an operating cost per scanner between around $29,000 to $38,000 for the years 2017 to 2020. This is approximately $6,000 to $15,000 higher than the average Fusion iTero price including chargebacks of nearly $23,000 quoted by Dr. Snyder. Since the previously unallocated expenses likely contain a mixture of fixed and variable costs, this exercise intuitively calculates a price ceiling for the long run average variable incremental cost. However, I note that Align's CFO represented that the 30% estimate of the portion of unallocated expenses belonging to the scanner segment was conservative.[90]

**(219)** Dr. Snyder notes that not all practices meet the Fusion requirement each year, and hence any Fusion iTero price without including these chargebacks is conservative.[91] As a threshold matter, the fact that many practices fail to meet their Fusion requirement each year itself suggests that the requirements were so high as to amount to de facto exclusivity. This is fully consistent with and in fact evidence supporting the arguments made in my original report—contrary to Dr. Snyder's assertion that it undermines my analysis.

**(220)** Importantly, the typical Fusion scanner price was discounted up front, and the incremental Invisalign case requirements were set yearly, and often at a higher count for each consecutive year. Thus, the inclusion of an average chargeback figure in the cost of a Fusion iTero contract says nothing about when doctors first fail to meet the incremental case requirements, and therefore when competitors faced below-cost pricing.

**(221)** For example, a doctor could have the full discounted price for Year 1 and Year 2 of the program before failing to meet the incremental target in Year 3, meaning a competitor would still face below-cost pricing for two years.

---

[90] See Vogt Report ¶ 741 n.702 (citing February 9, 2023 Dep. of John Morici at 113–14).
[91] Snyder Report ¶ 135.

Notably, the $3,192 charge back figure used by Dr. Snyder is itself an estimate and extrapolated from only 1 year of data. The document he references states, with an asterisk, that this figure is "based on average customer charge backs after first year and assuming the same rate considers for next 2 years."[92]

**(222)** Nonetheless, both prices used by Dr. Snyder would be below cost for one to two years between 2017 and 2020 when considering operating costs, and for all years if Align's own allocation of unallocated expenses to the scanner segment is included, two measures which Dr. Snyder does not address or acknowledge in his opposition.

### D.3. Align's Exclusive Dealing Substantially Foreclosed the In-Office Clear Aligner Market

### D.3.1. Exclusive Dealing Can Foreclose Competition

**(223)** Dr. Snyder provides no framework for assessing exclusive dealing. While he explains at length his approach to volume discounts, so-called "QCDs," his own published work draws a distinction between such QCDs and explicit exclusive dealing. "[In QCDs], buyers may choose different price-share combinations . . . . At the extreme . . . a 100 percent share commitment **is less restrictive than oft-analyzed *exclusive dealing* contracts**, which would specify that S will be the exclusive supplier to B under all circumstances for the duration of the contract."[93]

**(224)** In other words, the same articles Dr. Snyder cites to in Section B of his report concede that explicit exclusive contracts are more pernicious in their anticompetitive effects than pure volume-based discounts.

**(225)** On this, Dr. Snyder and I at least partially agree. This is why my analysis focuses on exclusive dealing, rather than volume programs such as the Advantage program. To be clear, my opening report does not challenge Align's volume discounting programs. I consider that, in the but-for world, any volume discounting programs would still be in place, but Align would engage in no exclusive dealing—and consequently that Align would be forced to set lower net prices due to enhanced competition.

---

[92] ALIGNAT-PURCH00401847-889 (iTero Fusion 2.0 Presentation, Q1 2021), at 855.

[93] Kevin M. Murphy, Edward A. Snyder, and Robert H. Topel, "Chapter 5: Competitive Discounts and Antitrust Policy," *The Oxford Handbook of International Antitrust Economics*, Volume 2, Oxford University Press, 2015, available at https://www.econstor.eu/bitstream/10419/262652/1/wp250.pdf, pp. 89–119 (hereinafter, "Murphy, Snyder, Topel, 2015") (emphasis added).

**(226)** To be conservative, I focus my analysis of exclusive dealing on the discount programs Align itself identified as containing exclusivity provisions and on the DSO contracts that counsel identified as containing exclusivity provisions.[94] I do not offer an opinion that other programs were not exclusive.

**(227)** Of note, none of the Invisalign programs I identify as exclusionary in my opening report fall under the "QCD" framework Dr. Snyder describes - save potentially the Heartland contract. I find that, even excluding Heartland, Align's exclusive dealing substantially foreclosed competition and harmed consumers.

**(228)** While admitting that exclusive dealing is more anticompetitive than QCDs, Dr. Snyder provides no further analytical framework to analyze it. Dr. Snyder instead opines that Align's exclusive dealing did not cause anticompetitive harm, as it was short in duration and unenforceable.[95]

**(229)** In making these arguments, Dr. Snyder implicitly concedes that exclusive dealing *can* be anticompetitive and attempts to argue that this is a special case where it is not. As I explain in the following sections, Align's exclusive dealing is not special, and it produced the typically expected anticompetitive effects.

**(230)** Notably, Dr. Snyder claims in support of this that "Align [did] not have a policy of only supplying customers that agree to exclusively purchase clear aligners from Align, [nor that they] withheld sales of Invisalign or iTero at list prices."[96] However, even in cases where an entrant and incumbent can equally bid for exclusivity and share the same cost structure, the asymmetries between the entrant and incumbent can lead to exclusion. Costs which are "variable" differ between the incumbent and entrant. In economies with returns to scale, many of the incumbent's costs are fixed or sunk, but these same costs may be incremental for the entrant. Thus, the incumbent can set prices above marginal variable cost, but below a cost measure that includes fixed or sunk costs, such as the long run average incremental cost.

**(231)** Further, the incumbent and entrant are bidding for different outcomes, with the incumbent bidding to maintain a dominant position with supra-competitive profits while the entrant is bidding to compete with the

---

[94] I note that my analysis of the impact of these exclusive dealing contracts with DSOs is conservative. As explained in my opening report, Align documents indicate that Align either did or attempted to enter into agreements with additional DSOs that included an Invisalign exclusivity requirement. *See* Vogt Report ¶¶ 340−43.

[95] "A competitor can be denied economies of scale if they are anticompetitive excluded from such a large share of the market that what remains is not enough to achieve the size needed to operate efficiently. Neither criterion is, however, met here." Snyder Report ¶ 168.

[96] Snyder Report ¶ 168.

incumbent at a lower, competitive price. The profits at stake for the incumbent are thus higher than the entrants' gain from entering and competing. Hence the dominant incumbent can deprive the entrant from economies of scale by foreclosing a portion of the market.

**(232)** Finally, exclusive dealing can harm competition even if the entrant is less efficient than the incumbent. The less efficient entrant can have a marginal cost between the incumbent's marginal cost and the monopoly price. If it enters the market, it would be able to charge a price below the monopoly price (benefitting consumers)—thus forcing the incumbent to similarly reduce prices from the monopoly price to the entrant's marginal cost. Even if the entrant is less efficient than the incumbent, its entry still enhances the competitive process, reduces consumer prices, increases volume,[97] and unambiguously improves welfare. Notably, I made this argument in my opening report, and Dr. Snyder provided no reply to it in his opposition.

**(233)** Dr. Snyder notes that most practitioners did not receive a discount from the programs I have identified and therefore that exclusive dealing could not foreclose the relevant market. This argument reveals Dr. Snyder's unsound (and generally undefined) approach to evaluating exclusive dealing. Crucially, this does not mean these doctors were not held to the exclusivity terms of the contracts they signed, but rather that they did not meet the case or growth requirements in the relevant contract. In other words, these doctors agreed to exclusivity but nevertheless received no benefit in exchange.

**(234)** While Dr. Snyder claims that "many" doctors pay list price,[98] he makes no further attempt to precisely quantify this or distinguish between exclusive doctors and other doctors. I rectify this, finding that while the share of Invisalign orders placed at list price for these doctors was substantial before Align's termination of interoperability, it falls sharply post 2018. In the first quarter of 2018, which includes when interoperability was terminated, it falls from 43% to 25%. This falls to under 15% of orders by the beginning of 2021 and remains at that level through the beginning of 2022:

---

[97] Assuming demand is not perfectly inelastic.
[98] Snyder Report ¶ 184.

Figure 6: Share of Exclusive Invisalign Doctors Paying List Price



**(235)** In other words, even if Dr. Snyder is correct that paying list price undermines—in some unspecified way—my foreclosure framework, by 2020 only approximately 15% of orders placed by exclusive doctors were at list price.

**(236)** Further, I find that this 15% is itself further evidence that Align's exclusive dealing foreclosed a substantial portion of the market for in-office clear aligners. It is notable that Align was able to impose exclusivity terms on a portion of Invisalign orders and the wider aligner market without paying discounts to many of them, especially since Align was evidently capable of offering discounts without conditioning those discounts on exclusivity. To my knowledge, Align's largest discounting program, the Advantage program, does not and never has contained any exclusivity or de facto exclusivity terms or conditions.

**(237)** Put another way, Align separated exclusive dealing from its single largest discount program *by design*. In my opinion, this demonstrates that price *was not and could not have been* the primary mechanism of exclusion, and that the contracts must be evaluated as pure exclusive dealing. In this context, the as-efficient competitor test is simply irrelevant.

### D.3.2.  Dr. Snyder's Sub-Division of the Exclusive Dealing Does Not Materially Affect Results

**(238)** Dr. Snyder categorizes Align's exclusive dealing into the following groups:

*i. "In Good Standing" Provisions: These provisions specify that providers must "maintain good standing" to be on the list of searchable providers on Invisalign.com's "Find a Doctor" tool. One way to lose good standing is "diversion of prospective patients into non-Invisalign treatment…*

*ii. Exclusivity in Marketing: These clauses specify that Invisalign must be the exclusive clear aligner the dental provider or organization promotes and/or markets…*

*iii. Exclusivity in Purchasing and Selling Aligners: These clauses specify that the dental provider or organization must exclusively offer clear aligners from Align…*[99]

**(239)** He argues that two DSO contracts in my analysis contain the "Exclusivity in Marketing" clause—the 2020 Smile Doctors contract and the MB2 contract.[100] He also includes the 2018 contract with Heartland as identified by Dr. Singer.[101]

**(240)** Dr. Snyder argues that the "Exclusivity in Marketing" clause should not be considered exclusive because the contracts state that ultimately the doctor is allowed to use their professional judgement and can use third party orthodontic products instead. He further contends there is no evidence that inclusion in the "Find a Doctor" tool is "sufficiently valuable to compel a doctor to maintain exclusivity, nor that this provision was enforced."  Dr. Snyder then contradicts himself in his footnote, stating that he "understand[s] that this provision was intended to prevent the switching of patients who requested Invisalign to other aligners."

**(241)** In other words, Dr. Snyder argues that even though this clause was designed to stop diverting patients into non-Invisalign treatment, it is not exclusionary. I find this argument uncompelling and stand on my original evaluation of these contracts as a form of exclusive dealing. Nevertheless, even taking Dr.

---

[99] Snyder Report ¶ 169. Since Dr. Snyder's report also includes his rebuttal to Dr. Singer's Report, it is possible he did not intend to group the contracts I have considered in my analysis to necessarily fall under one of the categories he presents.

[100] Snyder Report ¶ 171. *See* ALIGNAT-PURCH01968976−84 (Smile Doctors contract); ALIGNAT-PURCH01968912−24 (MB2 contract).

[101] Snyder Report ¶ 171. Note that in my opening report, I discuss the 2018 contract with Heartland in a separate section (*see* Vogt Report Section F.4.3) from the other DSO exclusivity contracts I consider (*see id.* § F.4.4), but in my analysis of Invisalign Invoice Orders share covered by DSO exclusivity contracts I include Heartland (*see id.* § K.7).

Snyder's argument at face value and removing these three DSO contracts, my original analysis is substantially unaffected.

**(242)** Figure 7 shows that, after removing the three DSO contracts specified by Dr. Snyder, doctors who agreed to exclusivity account for 17% of Invisalign orders in quarter 3 of 2019. This steadily increases for the next seven quarters to 40% by quarter 2 of 2021:

Figure 7: Share of Invisalign Orders Agreeing to Exclusivity



**(243)** This translates to 11% of orders in the in-office clear aligner market in quarter 3 of 2019 and reaches 25% by quarter 2 of 2021, as shown below in Figure 8:

Figure 8: Share Of In-Office Clear Aligner Market Agreeing To Exclusivity



**(244)** In other words, even if one sets aside the QCDs and "exclusivity in marketing" programs that Dr. Snyder discusses, up to 25% of the in-office clear aligner market, and up to 40% of Invisalign sales, were covered by exclusive dealing contracts—which Dr. Snyder, in his published work, admits have stronger anticompetitive effects. In my expert opinion, this is a substantial enough portion of the market to cause anticompetitive harm to consumers. I will explain this in more detail below.

### D.3.3. The Duration of Align's Exclusive Dealing Did not Prevent its Anticompetitive Effects

**(245)** Dr. Snyder then argues that the programs identified with clauses for "Exclusivity in Purchasing and Selling Aligners" were short-lived and did not restrict competitors' "access to critical inputs, customers, or the scale needed to compete" nor that competitors had to offer prices below cost to compete.[102] By "Exclusivity in Purchasing and Selling Aligners" clause, Dr. Snyder refers to the non-DSO programs that I have considered as containing explicit exclusivity requirements in Sections F.4 and K.8 of my opening report.

**(246)** As a threshold matter, Dr. Snyder's claim that "[h]alf of the eight discount programs with exclusivity clauses in their terms and conditions were effective for a year or less"[103] is not obviously true. Looking to his own Figure 25 (copied below in Table 5), only two of eight programs ("Go Forward" and "Welcome Back") lasted for 12 months or less:

---

[102] Snyder Report ¶¶ 172–74.
[103] Snyder Report ¶174.

Table 5: Discount Programs with Exclusivity Clauses, Copied From Snyder Report Figure 25

| Program | Summary | Start Date | End Date |
|---|---|---|---|
| Bracket Buy Back Promotion | $300 per Invisalign case discount for doctors who substitute metal braces for Invisalign. | 11-May-20 | 31-Dec-21 |
| Elite Doctor Program | Discounts and exclusive pricing on Invisalign, retainers, and scanners for earning 1 million+ Advantage points in 12 months. | 1-Jul-20 | 31-Dec-22 |
| Go Forward | Discounts of 8% or 18% on Invisalign Go cases, depending on the number of ClinCheck accepted cases. | 1-Jul-20 | 30-Jun-21 |
| GP Accelerator | Incremental discounts of 8-40% on eligible Invisalign cases depending on volume milestones and contingent on doctors advancing at least one Advantage tier. | 1-Jan-20 | 30-Jun-21 |
| Marketplace Development Pilot | Five practices receive Invisalign at 40% off and one iTero scanner for $19,999 to jump start their new retail establishments, contingent upon their meeting an annual purchase commitment of 300 eligible cases. | 1-Jul-18 | 1-Mar-20 |
| Reengage/AACA | GPs who complete training receive an incremental discount of 3-4%, depending on Advantage tier status. Can earn an additional 1% rebate if doctor jumps one Advantage tier in 6-month program period. | 1-Jul-19 | 30-Jun-21 |
| Tipping Growth Accelerator | Credit equal to incremental Advantage tier advancement if the dentist advances at least one Advantage tier in the applicable period. | 1-Jul-19 | 30-Jun-21 |
| Welcome Back | Doctors are awarded 1,000 Advantage points per competitors' product sold during preceding 3-month period. Additionally, select Invisalign products are offered at a discount. | 1-Mar-21 | 30-Jun-21 |

**(247)** Over a nearly two-year period, the share of Invisalign orders by doctors participating in these programs amount to over 15% from quarter 3 of July 2019, up to 36% in quarter 2 of 2021, even though many of these individual programs are effective for a year or less, combined over the aggregate period, they covered doctors placing more than a third of Invisalign orders and were in effect for <u>over two years</u>.

**(248)** Further, Dr. Snyder testified in his deposition that, even when exclusive dealing is short in duration, it can still produce anticompetitive effects when

doctors face high switching costs:

- Q. In your opinion, can an exclusive dealing contract of short duration ever be anticompetitive?

- A. If there are really high switching costs, based on, for example, relationship-specific investments, the shortness of the duration may be tempered by switching costs. I hasten to add I don't see that here. I see switching in the contracts and programs. But that would be one thing that would temper the shortness of the duration.[104]

**(249)** However, Dr. Snyder does not explain where we should draw the line between short- and long-term exclusive dealing. Without a clear and widely accepted demarcation, any program that is not self-evidently "long"-term could be incorrectly absolved of antitrust scrutiny. In other words, without defining what "short" and "long"-run mean, there is no way to evaluate Dr. Snyder's claims and we run a substantial risk of false negative results.

**(250)** More directly, the in-office clear aligner market exhibits high switching costs of the nature Dr. Snyder discusses. Further, those switching costs were imposed by Align.

**(251)** Consider a doctor who agrees to exclusivity and uses an intra-oral scanner. They cannot use a TRIOS to order Invisalign because of Align's refusal to deal, so they must use an iTero. That iTero cannot easily be used to purchase any competing aligners either.

**(252)** Even once exclusivity ends, that doctor would either need to purchase another intra-oral scanner to order competing aligners or give up the benefits (which are not unique to iTero) associated with using an intra-oral scanner. In other words, they face a very literal switching cost which can reach tens of thousands of dollars.

**(253)** If doctors could order multiple clear aligners using their intra-oral scanner, switching costs might be low—but they can't. Because of Align's refusal to deal, iTero is the only widely used scanner capable of ordering Invisalign, and it does not support ordering competing products.

**(254)** The fact that iTero cannot readily be used to order competing aligners may not alone produce anticompetitive harm—but by Dr. Snyder's own testimony, it can extend the anticompetitive effects of exclusive dealing. That is, even if operating a closed ecosystem is not, itself, anticompetitive, exploiting

---

[104] June 27, 2023, Dep. of Edward Snyder at 172:17–25.

switching costs to impose exclusive dealing is.

**(255)** As a result, the effect of Align's exclusive dealing is likely to persist until doctors order a new intra-oral scanner, which may be well beyond the end of Align's exclusive dealing. Record evidence indicates the typical lifetime of an iTero scanner is at least three years, if not substantially longer: doctors regard scanners as significant capital expenditures (and thus generally own only one), thus making it unlikely they replace them regularly, and Align's own programs—most notably the Fusion program—are premised on the assumption that a doctor will own a scanner for at least three years.

**(256)** In other words, Align's refusal to deal and exclusive dealing were part of a multi-pronged and self-reinforcing strategy. Because of Align's refusal to deal, once doctors were in the Align ecosystem, they faced high costs to exit. Align could then benefit from these switching costs and impose exclusive contracts that would produce anticompetitive effects, even if they were short in duration. This conclusion is consistent with the qualitative evidence I identify in my report showing that Align designed many of these programs with the stated purpose of "thwarting" competitors or "ring fencing" customers, *i.e.*, preventing them from purchasing competitors' aligners.[105] Dr. Snyder does not address this evidence in his report.

**(257)** Further, Align's exclusive dealing meets the other criteria that Dr. Snyder set forth at his deposition when asked to explain those situations when, in his opinion, exclusive dealing contracts are anticompetitive—specifically, they (a) cover a large aggregate share of the market; (b) were entered into between dentists and a firm with market power (Align); and (c) were entered into, relatedly, at a time when there was little competition between Align and its rivals. At his deposition, Dr. Snyder explained:

- Q. Would you agree that exclusive dealing contracts have the potential to be anticompetitive under certain conditions?

- A. Under certain conditions, they can have anticompetitive effects. But it goes back to my commentary about you have to appreciate that exclusive dealing contracts yield first order gains that are known with certainty. That's why the buyer accepts the sole source requirement. But it is possible that exclusive dealing contracts individually can in effect accumulate to a situation where it's hard to get, if you're a rival supplier, access to sufficient numbers of customers. And that's the key condition for whether exclusive dealing contracts can reduce competition.

- Q. When you say "exclusive dealing contracts can accumulate,"

---

[105] *See* Vogt Report ¶ 312.

what do you mean by that?

- A. What I mean by that is an individual customer agrees to an exclusive dealing contract and gets first order gains. And if that were the only exclusive dealing contract in the world or in the industry, then that would stop the analysis. It's unlikely that that condition that I just referred to would be met. However, if a number of buyers enter into exclusive dealing contracts, and you add them all up, you may get a sufficiently large number of customers who have made these exclusive dealing commitments such that there's not room for rivals to find customers.

- Q. So would you agree, then, that the aggregate share of the market covered by exclusive dealing contracts is relevant to assessing their potential anticompetitive effect?

- A. That is one of the important factors. Another factor is the strength of the ex ante competition beforehand. Another factor is the duration of the exclusive dealing contract. And another factor – this is a third factor – is how that cumulative effect compares to the scale that a rival needs to achieve to be an effective competitor.

- Q. When you say that one of the important factors is the "strength of the ex ante competition beforehand," would you agree that where there is less competition beforehand, the potential exclusionary effect of an exclusive – or anticompetitive effect an exclusive dealing contract is heightened?

- A. That factor, I understand your question. I'd need to probably think about it a little bit. But that factor strikes me would affect the exclusive dealing contract potentially. But if you were to hold the exclusive dealing contract the same, the duration, the terms, the extent of discounts, and, you know, somewhat magically say that's a given but now you're going to reduce the ex ante competition, then I would agree with your question.

- Q. Would you agree that there is in at least some cases a relationship between a firm's market power and the likelihood that its exclusive dealing contracts will harm competition?

- A. Yes. It goes back to, I think, the analyses that I have conducted in the industry section with respect to the duration of these contracts. And I realize you're asking about exclusive dealing in the abstract. But the same kind of analysis I think is relevant. What is the share of business that is under exclusive dealing contracts? How long are they?[106]

---

[106] June 27, 2023 Dep. of Edward Snyder at 168:15–171:25.

**(258)** In other words, Dr. Snyder testified in deposition that, all else equal, exclusive dealing is more likely to produce anticompetitive effects when employed by a dominant firm in a market with weak *ex ante* competition. Because of Align's expiring patent protection, both characterize the in-office clear aligner market when Align introduced exclusivity. That is, exclusive dealing that coincided with the expiry of key patents would allow a dominant firm to benefit from weak *ex ante* competition (stemming from the prior period of patent protection) to foreclose the market.

**(259)** In the next section I show that Align's exclusive dealing had a clear and perceptible foreclosing effect on the market.

### D.3.4. Align's Exclusive Dealing was Effective

**(260)** Dr. Snyder goes on to argue that, even if exclusive dealing generally can be anticompetitive, in this particular case, Align's exclusivity clauses were non-enforceable and therefore ineffective.

**(261)** It would be odd for Align to impose contractual restrictions without any intention of enforcing them—particularly when such restrictions expose it to antitrust scrutiny.

**(262)** Further, unless Align's dentist counterparties were aware that it had no ability or intent to enforce exclusivity, the contracts would still produce anticompetitive effects. In other words, even if Align were "bluffing," it would be immaterial unless dentists called Align on that bluff. The documentary evidence Dr. Snyder cites to in no way indicates that Align's counterparties had this perception, or that it affected their behavior. Indeed, the quantitative evidence in this case demonstrates the contrary, as I explain below.

**(263)** To support his argument, Dr. Snyder also takes the position that Align's contracts could not have been exclusionary because it cannot be presumed that, but for the contracts, dentists would in fact have purchased competitors' products.[107] Dr. Snyder asserts that "[m]any dental practices exclusively sell competing aligners or exclusively use competing scanners."[108] However, he makes no effort to evaluate if this is true. In this rebuttal report, I evaluate this exact question and find that Dr. Snyder's assertion is false.

---

[107] Snyder Report ¶ 180 ("Dr. Vogt also claims that '[e]xclusive contracts can exclude as-efficient competitors even when prices are not predatory.' But his example to justify his claim assumes that customers would purchase. an equal amount of the incumbent and entrant's products. Many dental practices exclusively sell competing aligners or exclusively use competing scanners, demonstrating that this assumption does not apply.").

[108] *Id.*

**(264)** In my opening report, I used the ProVoice data to calculate market shares for Invisalign. This data has two pieces of information for each product—"Share of Patient Starts" and "Percent with At Least 1 Patient Start in Last Week." Using the latter, I estimate the share of practices who exclusively purchased competing aligners during the relevant period, as shown below in Figure 9:

Figure 9: Share of Doctors Exclusively Ordering Competing Aligners



*Doctors Not Ordering Invisalign Includes Doctors Exclusively Ordering Braces*

**(265)** In Figure 9 above:

- the red line shows the share of practices ordering at least one competing aligner or in-house product;

- the blue line shows the share of practices *not* ordering Invisalign;

- the yellow line shows the share of practices ordering ClearCorrect; and

- the orange line shows my estimate of the share of practices exclusively ordering a competing aligner.

**(266)** Consistently less than 20% of practices were not ordering Invisalign at all. Put another way, more than 80% of practices ordered Invisalign in any given quarter. This means that, *at most*, 15–20% of practices exclusively ordered competing clear aligners, assuming every single practice that did not order Invisalign did order a competitor. This is almost certainly an overestimate because many of the practices that did not order Invisalign may instead have ordered braces without ordering any other aligners.

**(267)** To refine my estimate of the share of practices exclusively ordering competing aligners, I therefore multiply the red and blue lines. In other words, if I know 35% of all practices ordered a competing aligner, I estimate that 35% of practices *not* ordering Invisalign ordered a competing aligner.[109]

**(268)** This shows that a mere 5–10% of practices were willing to exclusively switch to competing clear aligners.[110] Align's exclusive dealing with 25% of the market therefore imposes a very real burden on rivals that raises their costs and forecloses competition. Dr. Snyder's assertion that "[m]any dental practices exclusively sell competing aligners" is therefore not only baseless, but easily falsifiable with data that was readily available to him.

**(269)** Further, the effect of Align's exclusive dealing (beginning in Q3 2019) is plain to observe in the data:

- The share of doctors ordering any competing aligner fell sharply after Align began its exclusive dealing. In Q4 2019, 39% of practices ordered at least one competing aligner. By Q2 2020, this had fallen to 27.7%, a decline of 29%.

- Similarly, the share of doctors ordering ClearCorrect fell by 57.5% during Align's exclusive dealing, from 13.4% in Q2 2019 to just 5.7% in Q2 2020.

**(270)** These facts are difficult to square with Align's exclusive dealing being "unenforceable."

**(271)** Dr. Snyder states that the record "does not provide evidence that Align enforced these clauses," and cites the deposition of two Align employees for this claim.[111] But this testimony, even if true, does not change three basic facts: (1) Align *did* engage in exclusive dealing with a substantial portion of the market; (2) practices *were not* generally willing to exclusively switch to

---

[109] The remaining 65% only ordered braces.
[110] Even if my assumptions described above are inaccurate, an absolute maximum of 15–20% could have exclusively ordered competing aligners.
[111] Snyder Report ¶ 178.

competitors; and (3) demand *did fall* for competing products within a quarter of Align imposing exclusivity. These facts combined are what generate the foreclosure described in my opening report.



---

[112] Snyder Report ¶ 178 & n.266.

Figure 10: Jared Theurer Did Stop Buying ClearCorrect After Enrolling in the Exclusive GP Accelerator Program





Figure 11: Richard Jacobson was foreclosed by termination of interoperability



### D.3.5.  Align's Exclusive Dealing Was Not Pro-Competitive

**(279)** Finally, Dr. Snyder argues that Align's exclusive dealing contracts gave rise to "efficiencies."[113] However, the only efficiency Dr. Snyder identifies is that these contracts addressed a potential free-riding problem because dentists could, in principle, benefit from Align's advertising efforts, then convert patients to cheaper competitors.

**(280)** There are three flaws with this argument. First, by Dr. Snyder's own reasoning, Align was already an established brand. Such marketing efforts tend to be more important for new products which are building recognition. For an established product (as plastic aligners were), these free-riding problems are much smaller. Second, Dr. Snyder makes no attempt to quantify the value of these efficiencies. And third, this argument would, on its face, apply to *every* program Align offers, and would imply that an incumbent is justified in requiring exclusivity of its customers simply by virtue of the fact that it advertises its product.

**(281)** Typically, economists would weigh pro-competitive and anticompetitive effects to see which predominate. In my opening report, I calculated a dollar figure of slightly over $500 million in nationwide anticompetitive harm stemming from Align's foreclosure of the relevant market. Even if there are some negligible advertising efficiencies associated with exclusive dealing, Dr. Snyder has done nothing to show they outweigh this harm or given any reason to think that these efficiencies are, in any sense of the word, "large."

**(282)** Absent any such evidence, I find Dr. Snyder's analysis of "efficiencies" from exclusive dealing to be underdeveloped and unconvincing.

### D.4.  Dr. Stiroh and Dr. Snyder Ignore My Analysis that Competing Clear Aligners Were Functionally Interchangeable And, on Some Dimensions, Preferred to Invisalign

**(283)** In Section I.2 of my opening report, I identify documentary evidence supporting the conclusion that Align's dominance in the in-office clear aligner market was not due to competitors' failure to offer better and innovative products. Most notably, in 2019, research consultancy Wyckoff Partners produced a report—commissioned by Align—comparing products in the clear aligner market across a range of indicators.[114] Neither Dr. Snyder nor Dr. Stiroh address my analysis of this evidence—in particular, evidence that that orthodontists and GPs preferred certain competing clear aligner brands on

---

[113] Snyder Report ¶¶ 181–82.
[114] ALIGNAT-SNOW00136018.

multiple characteristics, including "quality of technicians" and customer service, and that certain of these brands were matching or exceeding Align on treatment quality and quality of "finish."

**(284)** As I explain in my opening report, the orthodontists and GPs interviewed in Wyckoff Partners' report preferred competing aligners on a number of dimensions. For example, SureSmile outperformed Align in "[q]uality of technicians" and in "[t]reatment plan quality," while 3M was perceived as a better competitor in "[p]redictability of complex cases" and in "[c]ustomer support." Further, the competitors identified in my opening report generally offer their products at lower prices than Invisalign,[115] with no compromise in quality.

**(285)** Dr. Snyder and Dr. Stiroh's failure to address this evidence is noteworthy because it supports the conclusion that Align's sustained dominance following patent expiry was due to anticompetitive foreclosure, rather than a failure of competition. Other firms entered, offered similar or better products, and set lower prices (as is expected post patent expiry), but were unable to erode Align's dominance—which, absent foreclosing conduct, is unusual following patent expiry.

**(286)** This is relevant both for the previously discussed foreclosure analysis and for damages. The inability of firms to gain share despite being functionally interchangeable with Invisalign and offering lower prices is what creates the classwide harm described in my opening report and, as I will proceed to explain, justifies my choice of damage model.

### E.  The Implants Market is a Fitting Competitive Benchmark for the In-Office Clear Aligner Market

**(287)** Section L of my opening report presents my approach for estimating a quantum of the overcharge by Align. In line with what the literature suggests,[116] I use a benchmarking approach whereby I compare Invisalign historical prices to dental implants prices. Section J.1 of my report explains why the dental implant market is a sensible benchmark for my analysis. I set the starting year for the Invisalign index in 2018, while I set the starting year for the implant price index in 2012. This is because key Align patents expired in 2017, while key patents in the implants market expired between 2007 and 2012–2013. In the implants market, the period after 2012–2013 was marked by competitive entry in the so-called "value" segment.

---

[115] *See* Vogt Report § I.1.
[116] *See* Vogt Report ¶ 747 n.706 (collecting authorities).

**(288)** Dr. Snyder and Dr. Stiroh criticize my use of the dental implants market as a competitive benchmark.[117] They contend that the dental implants market faces a distinct set of supply and demand conditions as compared with the in-office clear aligner market, and that this renders the implants market an unreliable benchmark. Dr. Stiroh additionally argues that, even assuming the implants market were a proper benchmark, one should start the comparison in 2007, not 2012, as I did in my opening report.[118]

## E.1.  The Implants Benchmark Should Start in 2012, not 2007

**(289)** There are two primary reasons to begin the implants benchmark in 2012 rather than 2007:

- Widely cited patents in the implants market continued to expire through 2013.
- The same set of firms that entered the in-office clear aligner market in 2018—namely, Straumann, Dentsply, and Henry Schein—entered the value segment of the implants market around 2012.

**(290)** Individually, either reason would be sufficient justification for the benchmark used in my original report. Taken together, they are strong evidence that starting the benchmark in 2012 is not only justifiable but necessary to accurately measure classwide harm.

**(291)** In the following sections, I analyze each of Dr. Stiroh and Dr. Snyder's opposition points to the implants benchmark in turn.

## E.1.1.  Both Dr. Snyder and Dr. Stiroh Ignore that Align Itself Used the Implants Market as a Benchmark, Looking at Changes in 2012 and 2013

**(292)** As explained in my opening report, in 2018, Align commissioned a report from CODEX Partners[119] that analyzed the dental implants market, specifically the effect of increased competition beginning between 2006 and 2012, as well as the implications for the aligner market. Generally, the report details how patents in the implant market began to expire in 2007 with the expiry of the so-called "screw-vent" patent. As I explain below, this wave of expiration continued through at least 2013.

---

[117] Snyder Report §VI.F; Stiroh Report § VIII.B.
[118] Stiroh Report ¶ 124; ¶¶ 129–34.
[119] ALIGNAT-SNOW00037768-ALIGNAT-SNOW00037856 (hereinafter, "CODEX Report").

**(293)** At this point, established industry players, including the same firms that entered the in-office clear aligner market, namely Straumann, Dentsply, and Henry Schein, expanded into the value segment of the implants market. When they did so, both premium and total market ASP fell.[120]

**(294)** The CODEX Report is based on substantial industry research, including interviews with five market experts—among them the CEO of Straumann and senior executives of Dentsply Sirona, Nobel Biocare, and Zimmer Biomet (all key implant industry leaders)—as well as extensive "desk research":



**(295)** Generally, in criticizing my use of the 2012 implants market benchmark, both

---

[120] *See generally* Vogt Report §§ J.1.2, J.1.3.

Dr. Stiroh and Dr. Snyder fail to acknowledge the CODEX Report, which looked at the implants market in 2012 and 2013 and concluded that "experts [expected] a development in the aligner market similar to the one in the implant market—namely the emergence of a value segment."[121]

**(296)** For example, in that same analysis, the CEO of Straumann remarked that "there will be a premium segment and a non-premium segment in the aligner market, just like in the implant market."[122]

**(297)** Further, neither Dr. Snyder nor Dr. Stiroh dispute that a value segment in the in-office clear aligner market never emerged, contrary to the CODEX Report's predictions.

**(298)** In the CODEX Report, Align's own consultant focused on changes in the implants market starting in 2012–2013, finding that precisely the same firms that were attempting to compete in the in-office clear aligner market (including, among others, Straumann and Henry Schein) entered the value segment of the implants market in 2012–2013:

*Since 2012, Straumann has entered the non-premium segment through the acquisition of non-premium implant companies.*[123]

*In 2013, Henry Schein expanded its private label implant offer with value products of BioHorizons and CAMLOG.*[124]

**(299)** Align's consultant ultimately linked the entry of these companies into the implants market to price declines, stating: "Therefore, the market prices for premium implants decreased . . . from 2013 to 2016."[125]

**(300)** Most importantly, the analysis of volume and prices in the CODEX Report starts not in 2007, but in 2013:

---

[121] ALIGNAT-SNOW00037856.
[122] ALIGNAT-SNOW00037856.
[123] ALIGNAT-SNOW00037820.
[124] ALIGNAT-SNOW00037848.
[125] ALIGNAT-SNOW00037774.

Figure 12: CODEX Report Volume Analysis, Starting 2013[126]



**(301)** Further, the analysis directly attributes price changes to competition from the value segment:

Figure 13: CODEX Report Pricing Analysis, Starting 2013[127]



**(302)** Dr. Stiroh argues that my choice of 2012 is arbitrary because, in 2007, the so-called "381 Patent" (or "screw-vent" patent) expired, after which two value implant suppliers, OSSTEM IMPLANT and Implant Direct, entered the market (by contrast, as I explain in my opening report, established industry players, including Straumann, Dentsply, and Henry Schein expanded into the value segment in 2012). Based on this, she concludes that "the pricing patterns observed for dental implants are not tied to the loss of patent protection or the initial entry to the value segment immediately after the loss of patent protection, but rather tied to the period when established industry players chose to expand their offerings and include a value option in their product line ups."[128]

**(303)** As a threshold matter, this point disregards the fact that, following a detailed

---

[127] ALIGNAT-SNOW00037798.
[128] Stiroh Report ¶ 139.

study that included, among other things, interviews of senior industry leaders, Align's own consultant chose 2012, rather than 2007, as the relevant period (or starting point) for analyzing price declines in the implant market.

**(304)** Moreover, as a matter of economics, I disagree with Dr. Stiroh's characterization that looking "to the period when established industry players chose to expand their offerings" is unreliable. The purpose of a competitive benchmark is to measure how prices would have changed in the but-for world as a result of stronger competition. Therefore, basing the benchmark on when the same competitors were active in two similar markets is entirely reasonable in my opinion. This is precisely how I measured harm in my opening report, and is consistent with Align's own analysis of the implants market.

**(305)** Thus, the benchmark presented in my opening report simply shows how prices would have changed in the in-office clear aligner market had Align's expectations come to fruition—specifically, had there been "a development in the aligner market similar to the one in the implant market."[129]

**(306)** In sum, this is not my choice of benchmark. It is Align's.

### E.1.2.  Dr. Stiroh Ignores My Original Analysis that Dental Implant Patents Continued to Expire Through 2013

**(307)** Dr. Stiroh's criticisms of my report focus on the expiration of one patent in the dental implants market in 2007: the screw-vent (or '381) patent. As explained in my opening report, this patent was issued in 1990 and ran until October 2007.[130]

**(308)** However, as I also explained in my opening report: (1) there were many patents in the dental implants market that continued to expire through 2013; and (2) following the expiration of these patents, there was an explosion of competition in the implant market.

*While implant patents began expiring with Dr. Niznick's screw-vent patent in 2007, there were many other patents in the implants market that industry spectators expected to affect competition. For example, a paper prepared for the Portland International Center for Management of Engineering and Technology 2014 conference titled "Forecasting Dental Implant Technologies Using Patent Analysis", constructed a dataset of dental implant patents using the USPTO database. It found that "twenty-four patents from 1992 to 1996 will expire." Given a lifespan of 17 years, these patents would expire between 2009 and 2013. I do*

---

[129] ALIGNAT-SNOW00037856.
[130] Vogt Report ¶ 572.

*not offer an opinion on the validity or importance of any of these patents, but I note that, **upon expiry, the market reacted as economists typically expect: competition increased and prices fell.***"[131]

**(309)** Dr. Stiroh offers no comment on, opposition to, or acknowledgement of this.

**(310)** Ultimately, neither Dr. Stiroh nor I are subject matter experts in patent law and enforcement. I simply observed the totality of the data and found that in 2012–2013:

- patents expired;

- the same firms that entered the in-office clear aligner market—namely, Straumann, Dentsply, and Henry Schein—entered the value segment of the implant market;

- the value segment grew precipitously; and

- consumer prices fell.

**(311)** Indeed, these are the same facts Align observed in its own comparative analysis of the implants market.

**(312)** In the following section, I provide a more detailed analysis of the patents that expired in 2012 and 2013. In short, I find that the second and third most cited dental implant patents did not expire until 2012–2013. These patents covered aspects of the overall dental implant system not included in the screw-vent patent, which expired in 2007. Following patent expiry in 2012 and 2013, the typical competition economists expect occurred in the dental implants market. I therefore affirm my original conclusion that it is not only reasonable but necessary to start the dental implants benchmark in 2012 to accurately assess harm.

### E.1.3.  Highly Cited Implant Patents Expired in 2012–2013

**(313)** As shown below in Figure 14, dental implants have three primary components: (1) the fixture, or "screw" (the subject of Dr. Niznick's 2007 patent); (2) the abutment, or "connector"; and (3) the artificial tooth, or "healing cap":

---

[131] Vogt Report ¶ 575.

Figure 14: Dental Implant Components[132]



**(314)** Dr. Niznick's screw-vent patent expired in 2007. However, frequently cited patents for both the abutment and healing cap did not expire until 2012–2013.

**(315)** In *"Patent landscape report on dental implants: A technical analysis"* published in the journal of Clinical Implant Dentistry and Related Research in October 2021, the authors discuss the three most cited dental implant patents:[133]

---

[132] Y-D Cho, W-J Kim, H-M Ryoo, Y Ku, "Patent landscape report on dental implants: A technical analysis." *Clin Implant Dent Relat Res.* 2021 ; 23(6): 857–63, 2021, available at https://onlinelibrary.wiley.com/doi/full/10.1111/cid.13048.

[133] Y-D Cho, W-J Kim, H-M Ryoo, Y Ku, "Patent landscape report on dental implants: A technical analysis." *Clin Implant Dent Relat Res.* 2021 ; 23(6): 857–63, 2021, available at https://onlinelibrary.wiley.com/doi/full/10.1111/cid.13048.

Figure 15: Three Most Cited Dental Implant Patents



| Category | Fixture | Abutment | Artificial tooth |
|---|---|---|---|
| Item | Screw-type dental implant anchor | Implant abutment systems, devices, and techniques | Stimulating healing cap |
| Structure | | | |
| Inventor | Niznick Gerald A. | Willoughby Andrew J. M. | Nickerson Bruce L., Patterson Chad J., Smolowitz Richard A. |
| Assignee | ZIMMER DENTAL INC. (Primary: CORE VENT CORP) | ADVANCED DENTAL TECHNOLOGIES INC. | IMPLA-MED INC. |
| Publication date | 1990-10-02 (Filed: 1988-08-10) | 1996-06-18 (Filed: 1993-12-23) | 1994-03-08 (Filed: 1992-12-14) |
| Total citing | 368 | 354 | 266 |
| Country | WO; EP; FR; US; AU; DE; CN | WO; EP; US; RU; KR; ES; NL; AU; DE; CN | WO; EP; US; ES; DE; CN |

WO, World Intellectual Property Organization; EP, European Patent Office; US, United States of America; DE, Germany; CN, China; FR, France; AU, Australia; RU, Russian Federation; KR, Republic of Korea; ES, Spain; NL, Netherlands;

**FIGURE 3**   Most cited patents. The most cited patents to date were screw-type dental implant anchors, implant abutment systems, devices, techniques, and stimulating healing cap in fixture, abutment, and artificial tooth categories

**(316)** The most cited is Dr. Niznick's screw-vent patent, but a close second—with only 3.8% fewer citations—is a patent for the implant abutment system, which was filed in 1993. This was five years after Dr. Niznick's patent was filed. Similarly, the third-most cited dental implant patent was filed four years after Dr. Niznick's patent. Intuitively, I would therefore expect these patents to expire 4–5 years after the screw-vent patent expired in 2007, which would be 2012–2013 and the same period when I begin the implant benchmark.

**(317)** As I am not a patent expert, I requested counsel confirm this information. They have informed me that:

- The second most cited dental implant patent, covering the abutment system, is US Patent #5,527,182. It expired ***December 23, 2013.***

- The third most cited dental implant patent covering, the healing cap, is US Patent 5,292,252. It expired ***December 14, 2012.***

**(318)** Dr. Snyder himself admits that the abutments and caps are also integral parts of implant treatment, stating that "while aligners can be used by patients

87

without any inputs, dental implants require abutments and crowns. Abutments can be made by the same company as the implant."[134] As shown below in Figure 16, important patents for these components of the implant system did not expire until 2012–2013:

Figure 16: Timeline of Implant Patent Expiry



**(319)** Starting the implants benchmark in 2012, the first full year of data before this patent expiry, is therefore not only reasonable but necessary to accurately calculate consumer harm. It was not until 2013 that the most cited patents spanning the *entire* dental implant system expired.

**(320)** It is consequently unsurprising that Dr. Stiroh finds smaller price declines following 2007 than 2012 in the dental implants market[135]—there was still substantial patent protection in this period that covered two-thirds of the implant system.

**(321)** While I am not a patent expert, the *economic* effect these patents had is an empirical question whose answer can be plainly observed in the implants data. Once the healing cap and abutment patents expired in 2012 and 2013:

- Competitors successfully entered the value segment of the implants market.

- The value segment increased by more than 50% from 2011 to 2016 to account for 50% of the total implants market volume.

- Prices fell nearly 19% by the end of 2022.[136]

---

[134] Snyder Report pp. 132–33.
[135] Stiroh Report ¶ 132.
[136] Vogt Report § J.1.3.

**(322)** Notably, none of these occurred in the in-office clear aligner market following patent expiry. This is a point neither Dr. Stiroh nor Dr. Snyder contests.

**(323)** Based on these facts, it is clear that the 2012 and 2013-expiring patents had important effects on competition. Focusing just on the 2007 expiration of the screw vent patent, as Dr. Stiroh does, is consequently bound to underestimate consumer harm.

**(324)** In her report, Dr. Stiroh replicates a price index for dental implants using my method, but changes only the "competitive entry" from 2012 to 2007; she then finds a price index decline of approximately 3% (in contrast to the 12% rate of decline I calculate).[137] However, Dr. Stiroh's failure to analyze or consider the expiration of other key patents renders her own analysis unreliable. Dr. Stiroh does not evaluate the effect of patent expiry, and during her preferred reference period dental implants still enjoyed substantial patent protection. Any results stemming from beginning the benchmark in 2007 are therefore misleading.

**(325)** In short, after the second and third most cited dental implant patents expired—and these patents covered important implant components *not* part of the patent that expired in 2007—the same firms entered the value segment of the implant market that attempted to enter the in-office clear aligner market.

### E.1.4. The Same Firms Entered the Implant and Aligner Markets

**(326)** Dr. Snyder argues that (1) there was competition in the implant market before 2012–2013; (2) there was little to no competition in the clear aligner market in 2017; and (3) this difference therefore renders unreliable my use of implants as a benchmark. Specifically, Dr. Snyder argues that "supply conditions" in the dental implant market are different from those in the in-office clear aligner market because "substantial entry into dental implants came before the period [I] used as a benchmark for aligners," while (he claims) "the timing of substantial entry into aligners was during the benchmark period."[138]

**(327)** However, Dr. Snyder's description of the in-office clear aligner market is in tension with the claims of Align's own dental expert, Dr. Cohanim[139], as well

---

[137] *See* Stiroh Report. ¶¶ 131–32.

[138] Snyder Report ¶ 263.

[139] *See* May 5, 2023 Expert Report of Dr. Babak "Bobby" Cohanim, D.D.S., M.S. (hereinafter "Cohanim Report"). Dr. Cohanim is a practicing orthodontist and Affiliate Professor of Orthodontics at the University of Washington. Cohanim Report ¶ 1.

as with Dr. Stiroh's description of competitive entry in the implants market.

**(328)** In his report, Dr. Cohanim states that, to his knowledge, "competing aligner products started entering the U.S. soon after introduction of Invisalign aligners in 1999, beginning with OrthoClear in 2004, which was followed by ClearCorrect in 2006. There was then a flurry of entries in the lower end of the market." Dr. Cohanim then goes on to note that "[s]ince 2017, **nearly all major dental and orthodontic** companies have started marketing their own brand of aligners."[140]

**(329)** Consistent with this, Dr. Stiroh describes the 2012 period in the implant market as "the period when **established industry players** chose to expand their offerings and include a value option in their product line ups."[141]

**(330)** As an initial matter, in combination, Dr. Cohanim's portrayal of competitive entry in the in-office clear aligner market and Dr. Stiroh's description of competition in the implants market offer another, independent explanation as to why it is proper to start the implant benchmark in 2012. While some competitors had entered prior, competition substantively increased in 2012 and 2018 in the implants and aligner markets respectively. In my expert opinion, this further affirms my original choice of when to start the benchmark.

**(331)** Dr. Cohanim's and Dr. Stiroh's accounts of competitive entry in the implants market are also difficult to reconcile with Dr. Snyder's. As noted above, Dr. Snyder criticizes my use of the implants benchmark by arguing, among other things, that there (1) *was* "substantial" competitive entry in the implants market prior to 2012 and (2) *was not* such entry in the in-office clear aligner market prior to 2017. But this argument ignores (a) Dr. Stiroh's description of 2012 as "the period when established industry players chose to expand their offerings" in the implant market; as well as (b) Dr. Cohanim's claim that there was a "flurry" of low-end market entrants in the in-office clear aligner market after 2006, followed by—in 2017—market entry by "nearly all major dental and orthodontic companies."

**(332)** Indeed, elsewhere in his report, Dr. Snyder appears to acknowledge that entrants to the implant market in 2012–2013 were "important rivals" to Align in the in-office clear aligner market. Specifically, in a later section of his report addressing market definition, he states that "[s]everal important rivals (Dentsply Sirona, Envista, and 3M) sell both aligners and scanners" and that "[s]everal important companies (Envista, 3M, and Henry Schein, and Align

---

[140] Cohanim Report ¶ 57 (emphasis added).
[141] Stiroh Report ¶ 129 (emphasis added).

and Dentsply) . . . have supplied both DTC and doctor-directed aligners."[142]

**(333)** Contemporaneous industry commentators noted similar findings. For example, in a report on Dentsply dated November 7, 2012, Stifel found that the implant market was "[shifting] toward lower cost (value, generic) implants."[143] And described Henry Schein entering the market as "[ushering] in another price sensitive competitor."[144]

**(334)** This is a further reason why I begin the implant benchmark in 2012. The implants market could be framed as a benchmark for dental patent expiry, or entry of certain firms which Dr. Snyder himself admits were "key" competitors of Align, or both. As I explained in my opening report, "the changes in the implant market between 2012 and 2016 provide a more direct comparison to the in-office clear aligner market since the entry rather than the patent expiry, per se, is the crucial feature."[145]

**(335)** In other words, economists typically care about patent expiry because it leads to competitive entry. I observe the same competitive entry in the implants market in 2012 as I observed in the in-office clear aligner market in 2018. I therefore begin the implants benchmark in 2012.

**(336)** Under either interpretation (patent expiry in 2012 and 2013 or competitive entry in the same period), I maintain my original conclusion that the implants market is an appropriate benchmark for counterfactual Invisalign prices but-for the challenged conduct.

## E.2. Supply and Demand Characteristics are Similar Between the Implant and Aligner Markets

**(337)** In my original report, I explain in detail the substantive similarities between the implants and in-office clear aligner markets, as well as why these similarities make it a compelling benchmark for assessing how prices would have declined but-for the anticompetitive conduct at issue in this case.[146] In the section below, I address Dr. Snyder and Dr. Stiroh's various objections to this analysis, including their argument that the implant market has unique supply and demand conditions, and reaffirm my conclusion that implants are a proper benchmark here.

---

[142] Snyder Report ¶ 354.
[143] ALIGNAT-SNOW00043790.
[144] ALIGNAT-SNOW00043791.
[145] Vogt Report ¶ 584.
[146] *See* Vogt Report Sec. J.

### E.2.1.  Dr. Snyder's Analysis of Different "Supply" Conditions is Novel

**(338)** Both Dr. Stiroh and Dr. Snyder criticize my use of the implants benchmark for failing to consider relevant supply and demand factors between the two. Notably, however, Dr. Stiroh does not enumerate any particular factors that problematize my analysis, or otherwise explain in detail why it is incorrect, and instead appears to contend only that such factors could hypothetically exist.[147] By contrast, in Section VI.G.b of his report, Dr. Snyder enumerates specific supply and demand conditions that (he asserts) are different in the implants market. I first turn to Dr. Snyder's arguments regarding supply conditions.

**(339)** Specifically, Dr. Snyder argues in relevant part that "the supply of dental implants is unconcentrated while the supply of aligners is highly concentrated." Dr. Snyder further contends that I "[recognized] this crucial difference in concentration, but [do] nothing to control for it."[148]

**(340)** However, the fact that two markets—*i.e.*, the subject market and the market being used as a comparison—face a distinct (but related) set of supply conditions is in fact the point of using a competitive benchmark for purposes of assessing what likely would have happened in a world but-for certain conduct. Indeed, a benchmark is specifically intended to contrast a relevant market in question with a more competitive comparator. The fact that the implants market was more competitive than the in-office clear aligner market both before and after patent expiry simply makes the benchmark conservative.

**(341)** Dr. Snyder does not explain how these differences might skew the results of my analysis or render them unreliable. Nor could he. As Dr. Snyder himself acknowledges, competition was greater in the implants market pre-patent expiry. This in turn makes the implant benchmark conservative because it means prices were—by virtue of greater preexisting competition—likely closer to the competitive level before patents expired. Consequently, I would expect price declines after patent expiry to be smaller in the implant market than in the in-office clear aligner market, all else equal. This line of reasoning is simple and intuitive but Dr. Snyder does not directly address or explain its flaws.

---

[147] Specifically, at paragraph 124 of her report, Dr. Stiroh states that "[d]ental implants have different demand and supply characteristics[.]" Later, at paragraph 134 of her report, Dr. Stiroh states that I "fail[] to account for differences in demand and supply factors that affect prices for dental implants and Invisalign during the time period [I] used for [my] price index comparison." But she nowhere substantiates or elaborates on these arguments.

[148] Snyder Report ¶¶ 261–262.

**(342)** Dr. Snyder also fails to explain how the inverse could be true—that is, how greater preexisting competition in the implants market might indicate it is *not* in fact a conservative benchmark. The fact that the implants market was more competitive after patent expiry is not disputed by Dr. Snyder. Thus, in evaluating Dr. Snyder's criticism, the relevant factor is the effect of greater competition during the *pre*-patent expiry period, *i.e.*, whether (and how) greater competition in the implant market during the pre-patent expiry period might cause higher pre-patent expiry prices and *smaller* price declines in the implant market than would be expected in the in-office clear aligner market.

**(343)** For these "supply" conditions (namely greater pre-expiry competition) to incorrectly inflate my damage estimate, they would have to cause pre-patent expiry prices to be higher.[149] Therefore, for Dr. Snyder's criticism to have merit, he would have to argue that the implants benchmark is inappropriate because greater competition in the implant market somehow lead to *higher* prices before patent-expiry. He does not explain why he believes that greater competition leads to higher prices in the implant market.

**(344)** To the extent Dr. Snyder is correct in identifying differences in the supply conditions of the implants and in-office clear aligner markets, those differences unambiguously point to the benchmark being conservative under widely accepted economic theory.

### E.2.2. The Implant and In-Office Clear Aligner Markets Face Similar Demand Conditions

**(345)** Dr. Snyder also asserts that I do not control for potential differences in demand conditions between implants and aligners, and therefore that the implants benchmark is an inappropriate comparator.[150] Specifically, Dr. Snyder asserts that I do not control for the following, which he contends are unique to aligners:

- Invisalign "is a branded product that is heavily marketed to end customers";

- Customers "often prefer Invisalign or another brand";

- Aligners "require treatment planning software" and "manufacturing of the physical aligner product";

- Aligners are "100 percent customized";

---

[149] The logic being that the more prices fall post-patent expiry, the great the damages I estimate, and price declines will be greater the higher pre-expiry prices are, all else equal.

[150] *See* Snyder Report. ¶¶ 264–65.

- Aligners can be used by patients "without any inputs"; and

- Certain dental service providers (or DSOs) "decide to associate their practices with Invisalign to generate greater demand."

**(346)** As a threshold matter, I understand that Dr. Jay Grossman refutes many of these points in his rebuttal report, which has been submitted contemporaneously with my own. I further understand that Dr. Grossman, a practicing dentist, has placed many implants over the course of his career and is thus familiar with their features, use, and pricing.

**(347)** More generally, while it is true that I do not control for demand in the same way one would add a covariate to a regression, the contention that the implant benchmark does not account for demand at all both misunderstands the point of a benchmark and fails to substantively engage with my methodology.

**(348)** Benchmarks "control" for demand by identifying an analogous market which faces similar conditions. As Dr. Stiroh admitted in her deposition, it is not possible to "plug in" demand conditions to a benchmark.[151] Despite this, benchmarks remain a widely accepted approach to damages in antitrust cases, a point Dr. Stiroh also conceded in her deposition.[152]

**(349)** The relevant question for purposes of economic analysis is therefore whether the implants and aligner markets faced adequately similar demand conditions during their respective reference periods. Having reviewed both the documentary and quantitative evidence, I find that they did. Namely, both saw increasing demand in a period of patent expiry and digitization; further, that demand was increasing for the same reasons across the two markets.

**(350)** This claim is supported not only by the CODEX Report, but by other industry analyses. For example, a June 13, 2016, research note regarding Dentsply Sirona by the investment bank Piper Jaffray states:

> *Over the long term, we believe **the dental implant market** is an attractive area that **will experience modestly accelerating growth, based on** favorable patient demographics, **increased procedure penetration rates, [and] more general practitioners restoring simple cases**.*[153]

---

[151] Asked at her deposition whether "as a matter of pure econometric technique, you cannot add a specific economic factor to a price index and show what -- what happens; is that correct?", Dr. Stiroh responded "I am not aware of a way to do that." June 7, 2023, Dep. of Lauren Stiroh at 185:5–185:9.

[152] *See* June 7, 2023, Dep. of Lauren Stiroh at 200:5–200:12 ("Q: ... besides benchmark analysis and regression analysis, are you aware of any other generally accepted methods for showing impact in an antitrust class action? A: To the best of my recollection and experience, the general categories of methods would be a regression analysis or comparison to a benchmark.").

[153] ALIGNAT-SNOW00043825 (emphasis added).

**(351)** These characteristics of the implant market are strikingly similar to conditions in the in-office clear aligner market—most notably, "increased procedure penetration rates" and "more general practitioners restoring simple cases." Indeed, in the same research note, Piper Jaffray went on to state that the implant and aligner markets were growing for similar reasons:

*Given the increasing number of practicing dentists, the average real net income per dentist has declined significantly since 2005 ... we believe that for dentists to compete in this environment, they will need to attract patients by investing in their practice to become more efficient and differentiated. Since dentists are in the business of making money, we believe to supplement their income, **it will become more common for general practitioners to sell clear aligners, [and] perform implant procedures**[.]"[154]*

**(352)** Align documents support this conclusion as well. Voluminous record evidence demonstrates that Align has long sought, and continues to seek, to drive Invisalign growth by driving "penetration" among general practitioners, who—prior to the advent of clear aligners—generally did not treat malocclusion. For example, according to a November 2018 Align "White Paper":

*There are almost 1.2 million GPs around the world – of which only 45K submitted an Invisalign case in the last 12 months, these GPs have an average utilization of 8.6 cases. This strategy will attempt to resolve the following equation[.] GPs are the largest potential access point for the 300M patients who could benefit from clear aligner therapy. Yet only approximately 30% of GPs are interested in providing this therapy as part of a comprehensive treatment. All dental industry players are focused on the GPs through their products and expansive sales organizations, usually supported by long-term relationships and attractive commercial deals. As these competitors enter the market with their own clear aligner solutions, they are concentrating the battle ground in the low complexity cases, where it is easier for them to compete, and where Invisalign is less differentiated. Our view is these large dental companies are working towards an easy to use E2E digital offering for GPs.[155]*

**(353)** Similarly, a 2021 Align "GP White Paper" states:

*We have made significant progress in the GP channel over the last three years, with a better understanding of GP's needs and how to support them. This may sound obvious, but it's a long way from where we started: treating GPs like low volume orthodontists and our view on segmentation was there were two types – 'Family GPs' and 'Restorative GPs'. In 2019 the GP channel grew at 25% driven by an increase in the number of submitters with utilization increasing less than 1% to 9.2.*

---

[154] ALIGNAT-SNOW00043831 (emphasis added).
[155] ALIGNAT-SNOW00640833.

*In H2 2020 growth bounced back strongly to 30% and for the first time growth was driven primarily by utilization (19% growth). While part of the growth in utilization can be attributed to targeting the right customers and onboarding less new customers in some regions, many GPs have been more open to growing their Invisalign business as they look for different sources of revenue in the new Covid environment.*[156]

(354) In sum, not only were the in-office clear aligner and implant markets both growing, they were growing for the same reasons. In my expert opinion, that, along with its other similarities to the aligner market, makes the dental implants market a strong benchmark.

(355) Furthermore, evidence indicates that implant and in-office clear aligner companies compete on similar dimensions. For example, both Piper Jaffray and the investment bank Stifel use similar language to describe competition in the implants market. Specifically, the same Piper Jaffray research note cited above states:

*Historically, premium [implant] manufacturers, such as Straumann and Nobel Biocare, maintained market-leading positions on the back of continued innovation, documented clinical research, differentiated solutions, excellent service, training/education and lifetime guarantees.*[157]

(356) Similarly, a November 2012 research note published by Stifel states:

*[market] share [in the implants market] is determined by many different factors such as product quality, cost, surgical success rates, ease of use, technical support, relationship with company sales rep, and referring clinician preference.*[158]

(357) These are highly similar to the dimensions on which in-office clear aligner companies compete.

### E.2.3. Intra-Oral Scanners Were Important in Both the Implant and Aligner Markets

(358) Another key similarity between the in-office clear aligner market and the implants market, which I discussed in my opening report—and that Dr. Stiroh and Dr. Snyder ignore—is the role of the digital workflow, *i.e.*, intra-oral scanners, in treating patients. In my opening report, I explained that:

*There are at least 27 published studies analyzing the role of intra-oral scanners in*

---

[156] ALGN_SWFT0093276.
[157] ALIGNAT-SNOW00043825.
[158] ALIGNAT-SNOW00043798.

*implant treatments. Further, some research has found that, similar to the in-office clear aligners market, intra-oral scanners improve patient outcomes and reduce doctor time. For example, Bragger and Joda (2015) found that "both impression protocols [digital and conventional] worked successfully for all study participants capturing the 3D implant positions. However, the digital technique emerges as the most preferred one according to patient-centered outcomes and was more time-effective compared to conventional impressions.*

*Similarly, Gallucci et al. found that "The digital scanning technique was more efficient than the conventional impression technique for single implant-supported restorations. Digital scans and CAD-CAM implant casts had accuracy comparable with that of conventional impressions and gypsum casts. Most participants preferred digital scans to conventional impressions."*

*Despite these similarities between the implants and in-office clear aligners markets, the implants market saw heightened competition in the years following patent expiry and competitive entry.*[159]

**(359)** These facts speak directly to the validity of the implants market as a benchmark for the aligner market but-for the challenged conduct. Neither Dr. Stiroh nor Dr. Snyder addresses or acknowledges them.

**(360)** Counsel informs me that one of the core allegations in this case is that Align leveraged its power in the scanner market to foreclose the aligner market. I have identified an analogous market that similarly employs intra-oral scanners, but in which there was no allegation of anticompetitive conduct. To assess how the aligner market would have developed but-for Align's refusal to deal, the implants market is therefore an ideal benchmark. The Align-commissioned CODEX Report itself linked changes in the implant market to "digitalization" associated with intra-oral scanners, stating:

*When the [aligner] patents expire, there will be a similar development as in the implant market. The **digitalization will definitely drive the development in these market areas**.*[160]

**(361)** The above quote links the growth of the value segment with "digitalization," *i.e.,* the intra-oral scanner workflow. The implants benchmark is therefore directly relevant to analyzing a world but-for termination of interoperability. Dr. Snyder's contention that the implants benchmark "Is Not Tied to the At-Issue Conduct"[161] is therefore at-odds with Align's own internal analysis.

---

[159] Vogt Report ¶¶ 567–69.
[160] CODEX Report at p. 88 (emphasis added).
[161] Snyder Report § VI.G.

**(362)** Further, Align's findings are, in no way, unique—other industry observers also noted that digitalization played a similar role in the implants market as the in-office clear aligner market. A June 2016 report on Dentsply by Piper Jaffray noted that:

*[W]e believe the intermediate opportunity [for Dentsply in the Implants Market] will be . . . designing an integrated digital work flow enabling same-day dentistry (only one dental visit).*[162]

**(363)** Using intra-oral scanners streamlined the implant workflow, giving dentists a competitive edge against competitors who still relied on physical impressions. That same note on Dentsply by Piper Jaffray explained:

*[W]ith advances in scanning technology, coupled with more powerful and capable software, dentists are now realizing the economic benefits of going digital. Since the basis of restorative dentistry [including implants] is to create accurate impressions, dentists can now improve overall workflow by scanning teeth and eliminating the need for physical molds. If a dentist is savvy enough, he can actually scan a patient's arch, mill a crown in the office, and complete a full restoration in a matter of hours. Without a scanner and mill, the process would include multiple patient visits and take weeks to complete.*[163]

**(364)** This is consistent with the documentary evidence in this case, as discussed in Section G.5 of my opening report.

**(365)** In other words, intra-oral scanners became an important dimension of inter-doctor competition and non-optional for many doctors. This led to the baseline conclusion that "digital dentistry is here to stay, and those who do not invest will likely be left behind."[164]

**(366)** Thus, reports on the dental industry clearly found that intra-oral scanners were an important input to both the in-office clear aligner and implant markets. In one market, Align leveraged its power and foreclosed competition. In the other, it did not. Using the dental implants market as a measurement of the aligner market but-for Align's refusal to deal is therefore a direct and proximate evaluation of consumer harm. I make this argument in my opening report, but neither Dr. Stiroh nor Dr. Snyder present any direct opposition to it.

---

[162] ALIGNAT-SNOW00043811.
[163] ALIGNAT-SNOW00043828.
[164] ALIGNAT-SNOW00043818.

98

### E.2.4.  Macroeconomic Differences Cannot Explain Invisalign's Pricing and Do Not Affect the Validity of the Implants Benchmark

**(367)** In Section L.3 of my opening report, I attribute the difference between Invisalign and implant prices to Align's misconduct. Said differently, I conclude that, but for Align's misconduct, Invisalign prices would have (conservatively) declined by the same measure observed in the implant market. However, at paragraph 133 of her report, Dr. Stiroh argues that this comparison is inappropriate because there is "no economic basis" to assume that the same "demand and cost factors that were at play between 2012 and 2016 in the dental implant market are comparable to those that were at play between 2018 and 2022 in the alleged clear aligner market."  In particular, Dr. Stiroh argues that:

*Macroeconomic conditions in those two time periods were fundamentally different, with the latter comprising the COVID-19 pandemic that not only disrupted the global supply chain but also resulted in increased volatility in the demand for clear aligners. Dr. Vogt does not control for any of those economic factors in his analysis.*[165]

**(368)** As the above excerpt makes clear, the only difference in macroeconomic conditions Dr. Stiroh identifies between these two periods is the Covid-19 pandemic. However, Dr. Stiroh makes no attempt to quantify the effect of the pandemic on pricing. By contrast, in my opening report, I did. And found it could not explain Invisalign's pricing.

**(369)** Specifically, in Appendix 2 of my opening report, I evaluated if any supply or demand shocks, including Covid-19, could explain Align's post-patent expiry price increases and found that they could not. The effect of Covid-19 on order volume and cost is brief, only lasting one quarter, and led to no sustained change in cost (positive or negative) that could explain Invisalign pricing.

**(370)** More directly, Invisalign increased prices in 2019, about a year prior to the Covid-19 pandemic. After that, prices remained largely consistent for the remainder of the relevant period. Invisalign's price increase therefore cannot have been caused by Covid-19 because it pre-dated the pandemic by approximately one year. I have seen no evidence that Align intended to reduce prices had there been no pandemic, nor does Dr. Stiroh or Dr. Snyder argue this would have happened.

**(371)** Given these undisputed facts, I see no evidence that Covid-19 had a sustained impact on pricing relevant to the benchmarking analysis. Dr. Stiroh does not

---

[165] Stiroh Report ¶ 133.

consider this work in my opening report nor provide any of her own quantitative analysis on the topic. Aside from Covid-19, Dr. Stiroh does not point to any other macroeconomic differences between the 2012–2016 period and the 2018–2022 period that could impact the benchmarking analysis.

**(372)** Dr. Stiroh also provides no way to account for those factors or explains whether analysis would even be feasible. Indeed, when asked at her deposition whether there "were there any specific macroeconomic conditions for the period 2018 and 2019 versus 2012 to 2016 that [she] identified as distinct", Dr. Stiroh responded that she "ha[s] not looked for them."[166] Similarly, when asked whether she did any work to "quantify the extent of difference in those macroeconomic conditions between the two time periods", Dr. Stiroh responded that she did not "have in mind what would be done to quantify them or what one would do with a quantification."[167]

**(373)** Dr. Stiroh's contention that there are macroeconomic differences between the two periods that render my implants benchmark unreliable is therefore without any evidentiary basis. It therefore does not impact my conclusions. Further, Dr. Stiroh's assertion that I failed to consider such differences is incorrect, as Dr. Stiroh does not acknowledge, much less consider, the work in Appendix 2 of my opening report.

**(374)** Furthermore, if credited, Dr. Stiroh's report and testimony together would require not only the rejection of my implants benchmark, but *all* such benchmarking analysis. As noted above, Dr. Stiroh opined that she "[doesn't] have in mind what could be done to quantify [macroeconomic conditions]" or even "what one would do with a quantification."[168] Dr. Stiroh also suggests that while macroeconomic differences may exist, an economist is helpless to identify their scale let alone adjust for them as part of a comparative analysis. The practical implication of this is that one could identify any macroeconomic difference, posit that it undermines the benchmark, and, by Dr. Stiroh's logic, refute the use of price behavior in one market to analyze or understand price behavior in another.

**(375)** In sum, Dr. Stiroh claims that there are macroeconomic differences between the 2012–2016 and 2018–2022 time periods that undermine my benchmark analysis but does not provide any quantitative evidence or identify any methodology to support her argument. The only concrete difference she points to is COVID-19, but critically omits that I explicitly accounted for this in my original analysis. She instead contradicts widely accepted practices in

---

[166] June 7, 2023 Dep. of Lauren Stiroh at 189:14–189:18.
[167] June 7, 2023 Dep. of Lauren Stiroh at 190:3–190:8.
[168] June 7, 2023 Dep. of Lauren Stiroh at 190:6–190:8.

economics and appears to dispute that benchmarks are ever appropriate tools for assessing classwide harm. These arguments lack foundation and therefore do not affect the conclusions I reach in my opening report.

### E.3. It Is Best Practice in Economics to Combine Generic (Value) and Branded (Premium) Prices Following Patent Expiry

**(376)** In Section L.3 of my opening report, I construct price indices for both Invisalign and implants and compare them. To construct a reasonable counterfactual, I average implant prices across the value and premium segments.[169] As I explain in my opening report, using the premium segment price alone to construct a price index for the implant market would disregard the fact that value competitors gained substantial market share by offering lower prices and benefitting consumers.[170] By contrast, Align increased both prices and market share following patent expiry—meaning there was no benefit to consumers from the "generic" competition I would expect to emerge following patent expiry. This is why I compare an index of Invisalign prices to an index of implant prices combining value and implant prices.

**(377)** Dr. Stiroh criticizes my choice in her report by suggesting that my index wrongly captures the shift of sales from the premium to the emerging value segment—*i.e.*, "that the decline in the average selling price for all dental implants is explained by sales shifting from the premium product to the value product, not by actual price declines of that magnitude in either category."[171] Dr. Stiroh therefore argues that my analysis overstates the decline in price observed in the implant market.[172]

**(378)** To illustrate this point, Dr. Stiroh presents two separate indices for premium and value implants and shows that while the total price index declined by 12% from 2012 to 2016, the premium index declined by approximately 2%.[173] Dr. Stiroh's argument relies on the critical assumption that value and premium implants should be separately accounted for, with "value" products being treated as a "new" product separate from "premium" products.

**(379)** Dr. Stiroh's argument that value and premium implants should be treated separately runs contrary to widely-accepted and published academic literature on patent expiry.

---

[169] Vogt Report ¶¶ 783–85.
[170] Vogt Report ¶¶ 790–91.
[171] Stiroh Report ¶ 136.
[172] Stiroh Report ¶ 136.
[173] Stiroh Report ¶¶ 136–38.

**(380)** In the 1990s, economists began to realize that the Bureau of Labor Statistics' (BLS) CPI (Consumer Price Index)[174] calculation was systematically skewed upward. In large part, this was due to how it treated "new" versions of "old" goods—particularly "new," generic goods that had entered the market following patent expiry. This spurred the development of substantial economics literature. Generally, this literature reached the same conclusion: the CPI had to change how it accounted for new goods because consumers' switch to cheaper generics was not being captured. Summarizing the issue in 2003 in the Journal of Economic Literature, Lebow and Rudd wrote:

*During the 1990s, the accuracy of the Consumer Price Index came under increased scrutiny, with several analysts judging that changes in the CPI tended to significantly overstate the rate of increase in the cost of living. Most prominently, the Advisory Commission to Study the Consumer Price Index estimate in 1996 that the CPI was then overstating increases in the cost of living by about 1.1 percentage points per year.*[175]

**(381)** As Griliches and Cockburn wrote in the American Economic Review in 1994:

*[T]here [were] several problems with the treatment of generics in the official price indexes . . . because they [were] linked in, rather than compared directly with the previously existing versions, and treated as entirely "new" goods, **none of the direct price decline experienced by those consumers who switch to generics [was] reflected in the official price indexes**.*[176]

**(382)** As a direct result:

*In January of 1995, the CPI changed its procedures for adding generic drugs to the index. Under the new procedure, a generic drug is permitted to replace the corresponding branded drug – with the two prices directly compared – six months after the branded drug's patent has expired; the probability that this substitution occurs is proportional to the generic's relative expenditure share.*[177]

---

[174] The CPI "is a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services. Indexes are available for the U.S. and various geographic areas." *See* U.S. Bureau of Labor Statistics, *Consumer Price Index*, available at https://www.bls.gov/cpi/#:~:text=The%20Consumer%20Price%20Index%20(CPI,U.S.%20and%20various%20geographic%20areas (last visited June 23, 2023).

[175] David E. Lebow and Jeremy B. Rudd, "Measurement Error in the Consumer Price Index: Where Do We Stand?", *Journal of Economic Literature*, 41 (1): 159–201, 2003, available at https://www.aeaweb.org/articles?id=10.1257/002205103321544729, p. 159.

[176] Zvi Griliches and Iain Cockburn, "Generics and New Goods in Pharmaceutical Price Indexes", *The American Economic Review*, vol. 84, no. 5, 1994, pp. 1213–32, available at http://www.jstor.org/stable/2117769, p. 1222 (emphasis added).

[177] David E. Lebow and Jeremy B. Rudd, "Measurement Error in the Consumer Price Index: Where Do We Stand?", *Journal of Economic Literature*, 41 (1): 159–201, 2003, available at https://www.aeaweb.org/articles?id=10.1257/002205103321544729 , p. 180.

**(383)** In other words, the accepted academic literature finds that averaging branded and generic prices is not only appropriate but necessary to accurately measure price changes. This is because generics are functionally interchangeable with branded products and the demarcation between the two is ultimately artificial. Pharmaceuticals are a well-known case of this, but the same is true in a range of markets, for example "white label" or "store brand" products that are made in the same factory and simply have a different label applied before distribution.

**(384)** Dr. Stiroh herself opines that premium and value implants are functionally interchangeable. In her report, Dr. Stiroh cites the CODEX Report for the proposition that value implants were essentially interchangeable with premium implants and the same quality as previously patented products:

*According to the CODEX report, dental professionals regard "premium" and "value" dental implants as products with little quality differentiation and, as a result, dental implant makers primarily compete by offering lower prices than their competitors. Specifically, the CODEX report notes that one of the reasons customers of dental implants switched from the premium segment to the value segment was the "maturity of technology."*[178]

**(385)** Critically, Dr. Stiroh goes on to conclude that "from an economic perspective, these factors (little perceived quality differential and increased competition from value implants) would be expected to lead to a decline in the market price for dental implants."[179]

**(386)** Using Dr. Stiroh's own logic, I conclude that the same reasoning that drove the BLS to combine generic and branded prices should apply to the implants market, and that "premium" and "value" prices should thus be averaged to assess price behavior in the implant market. This makes intuitive economic sense: if a dentist regards "premium" and "value" implants as substitutes for one another, and in fact substitutes the latter for the former, that doctor experiences a price decline—that is, he or she pays less for a functionally equivalent product. Therefore, if one wants to know the average price paid for implants over time, it would be uninformative (and in fact contrary to intuition) to separately calculate the price paid for "premium" and "value" implants.

**(387)** Indeed, this is why published literature evaluating the effect of patent expiry

---

[178] Stiroh Report ¶ 126.
[179] Stiroh Report ¶ 126.

on drug prices combines branded and generic prices.[180]

**(388)** In other words, substitution from premium to value implants was not an exogenous shock we would want to remove from the but-for world. It was a direct consequence of patent-expiry and heightened competition. Because the implants benchmark is designed to measure the effect of patent-expiry and heightened competition, it must, in some way, incorporate substitution from premium to value implants. Dr. Stiroh could propose an alternative method to averaging these, but does not. Her argument that such substitution should be ignored in its entirety is well understood in the literature to substantially understate the benefits of patent expiration.

**(389)** Given Align did not lose market share post-patent expiry—in fact its market share increased, contrary to what economists typically expect given patent expiry - I compare the indexed implants price directly to the Invisalign price index.

**(390)** In sum:

- The reason economists average branded and generic prices following patent expiry is because there is substantial substitution from brands to generics following patent expiry.

- Because the distinction between branded and generic products is largely artificial, this substitution represents a real benefit to consumers in the form of lower prices. Failing to average their prices would fail to accurately capture this benefit.

- As Dr. Stiroh herself opines, premium and value implants had "little quality differentiation."[181] It therefore makes sense to combine their prices when measuring the benefit of increased competition to implant customers.

- As I show in my original report, and as neither Dr. Stiroh nor Dr. Snyder dispute, Align was able to increase both prices and market share following patent expiry, *i.e.,* there was no substitution to functionally interchangeable competitors.

- Because erosion of branded market share benefits consumers after patent expiry, and because there was no 'brand erosion' in the in-office clear aligner market, I compare an index of Invisalign prices to an index of implant prices averaging premium and value segment prices.

---

[180] *See, e.g.,* Zvi Griliches and Iain Cockburn, "Generics and New Goods in Pharmaceutical Price Indexes", *The American Economic Review,* vol. 84, no. 5, 1994, available at http://www.jstor.org/stable/2117769.
[181] Stiroh Report ¶ 126.

**(391)** Dr. Stiroh's error here is in essence the same one the BLS made previously—and has since corrected. Further, I explicitly identify the above literature in my opening report,[182] but Dr. Stiroh nowhere responds to or acknowledges it.

## E.4.   Brand Recognition Cannot Explain Invisalign's Pricing and Foreclosure

**(392)** As I explain in Section J.3 of my opening report, the implants market constitutes a conservative counterfactual. This is consistent with academic studies showing greater price reductions in the pharmaceutical industry after generic entry relative to dental implants.

**(393)** In response, both Dr. Snyder and Dr. Stiroh argue that my comparison of pharmaceutical and implants products does not make economic sense given the different dynamics in their respective markets.[183] Specifically, Dr. Snyder argues that generics benefit from state automatic-substitution laws, and that "because of these laws, the pharmacist filling a prescription can or must substitute a lower-priced generic for the branded product [which leads to] generic pharmaceuticals quickly capturing the majority of sales."[184] Similarly, Dr. Stiroh argues that my comparison is "grossly misguided"[185], and adds that "unlike with clear aligners, automatic substitution laws in the pharmaceutical space generally render meaningless any brand recognition . . . of the reference product."[186]

**(394)** Generally, both Dr. Stiroh and Dr. Snyder overstate the role of automatic-substitution laws in pharmaceutical markets, and indeed contradict the published literature on the subject. There are at least four basic factual issues with their line of reasoning.

**(395)** **First**, widespread automatic substitution laws are relatively recent and post-date some of the literature I cited in my opening report. For example, the earliest article I cite to was Wiggins & Maness, which was written in 2004.[187] However, in 2006, "the majority of states [required] explicit patient

---

[182] *See* Vogt Report ¶ 791.
[183] Snyder Report ¶ 269; Stiroh Report ¶ 140.
[184] Snyder Report ¶ 269.
[185] Stiroh Report ¶ 140 ("Dr. Vogt's comparison to prices and substitution patterns of prescription pharmaceutical products after patent expiration is grossly misguided. Marketplace realities pertaining to the sale and dispensing of generic prescription drugs after the expiration of patents covering their branded reference drugs . . . are fundamentally different from marketplace realities in the alleged market for clear aligners.").
[186] Stiroh Report ¶ 142.
[187] *See* Vogt Report ¶ 598.

consent"[188] before pharmacists could substitute generics. Although their analysis predates most state automatic substitution laws, Wiggins and Maness found the largest price declines following patent expiry of all the articles cited in my opening report. As I explained in my opening report, Wiggins and Maness:

*[F]ound that the entry of new competitors significantly effects prices of anti-infective drugs: prices fall by up to 83% between the entry of the first competitor and the 15th competitor and decrease by another 52% when the number of players in the market goes beyond 40. By differentiating price effects by product type, i.e., branded and generic drugs, they observed that after patent expiration price competition is still high among three categories of players: the pioneer firm, producing the original branded drug; the innovative firms producing other branded drugs using the same active ingredient; and the other competitors producing generic alternatives.*[189]

**(396)** **Second**, Dr. Stiroh and Dr. Snyder fail to distinguish between laws that require pharmacists to substitute generics and laws which allow pharmacists to substitute generics. In addition, they fail to distinguish between laws that also require patient consent prior to substitution. As explained below, both these distinctions have important empirical implications. Specifically, some "automatic substitution" laws give the pharmacist unilateral discretion to substitute generics for branded products, while others still require patient consent, though the pharmacist may recommend substituting to the generic. The effect these regimes have on substitution are distinct, and not discussed in either Dr. Stiroh or Dr. Snyder's opposition.

**(397)** Neither Dr. Snyder nor Dr. Stiroh acknowledge or address these issues.

**(398)** **Third**, the fact that consumers continue to purchase branded drugs in substantial volumes following patent expiry has been well understood since at least the 1990s. For example, Griliches and Cockburn found that, even at 2–5x price premium to generics, branded drugs maintained 15–25% unit share three years after expiry.[190] Notably, this corroborates the foreclosure I estimated in my opening report, where I found that Invisalign typically maintained 60% market share, and substantively foreclosed 30% of the market. In the but-for world, this would leave it with around 30% market

[188] Yan Song and Douglas Barthold, 2018, "The effects of state-level pharmacist regulations on generic substitution of prescription drugs", *Health economics*, 27(11), 1717–1737, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6172151/.

[189] Vogt Report ¶ 599 (citing Steven N. Wiggins, Robert Maness, Price Competition in Pharmaceuticals: The Case of Anti-infectives, Economic Inquiry, Vol. 42, No. 2, April 2004, pp. 247–268).

[190] Zvi Griliches and Iain Cockburn, "Generics and New Goods in Pharmaceutical Price Indexes", *The American Economic Review*, vol. 84, no. 5, 1994, pp. 1213–32, available at http://www.jstor.org/stable/2117769.

share, similar to (and in fact slightly above) the market share of branded pharmaceuticals after patent expiry.

**(399)** **Fourth**, automatic substitution laws are generally understood to have only a marginal effect on generic substitution rates. An article published in the Journal of Health Economics by Yan Song and Douglas Barthold studied the effect of automatic substitution laws on branded market share. It found "that while the mandatory switching laws have little effect, the presumed consent laws reduce consumers' probability of purchasing brand name drugs by 3.2 percentage points."[191]

**(400)**     In short, Song and Barthold find that automatic-substitution laws did not impact branded market share. "Presumed consent" laws (which Dr. Stiroh and Dr. Snyder do not discuss) had some effect, but it was minor. Moreover, consumer preference for branded drugs persisted. Song and Barthold go on to note that:

*[I]t is well documented that consumers have a strong and persistent preference for brand name drugs (Ling, Berndt, and Kyle 2002, Beshears et al. 2013, Carrera and Villas-Boas 2013, Bronnenberg et al. 2015) and it is unclear which policies effectively increase consumption of generic, rather than brand name drugs.*[192]

**(401)** Dr. Stiroh and Dr. Snyder's reports contain little meaningful analysis of this subject; indeed, neither provide or cite to any empirical analysis regarding generic substitution. I note that the published literature directly and explicitly contradicts their assertions.

**(402)** This is of direct importance in evaluating the challenged conduct and harm to the proposed class. Dr. Stiroh and Dr. Snyder argue that, because Invisalign has strong "brand-recognition," implants and pharmaceuticals are poor comparisons.[193] But they ignore that even with FDA-certified bioequivalence and automatic substitution laws, consumers still purchase branded products in substantial volumes—consistent with my foreclosure estimation. Indeed, as the published literature notes, "it is well documented that consumers have a strong and persistent preference for brand name drugs."[194]

---

[191] Yan Song and Douglas Barthold, 2018, "The effects of state-level pharmacist regulations on generic substitution of prescription drugs", *Health economics*, 27(11), 1717–1737, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6172151/.

[192] Yan Song and Douglas Barthold, 2018, "The effects of state-level pharmacist regulations on generic substitution of prescription drugs", *Health economics*, 27(11), 1717–1737, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6172151/.

[193] Stiroh Report ¶ 128; Snyder Report ¶ 264.

[194] Yan Song and Douglas Barthold, 2018, "The effects of state-level pharmacist regulations on generic

**(403)** Despite this brand recognition, however, average consumer prices fell after patent expiry in both the implants and pharmaceutical markets. This is due to a simple fact of economics: consumers like trusted brands, but they also like lower prices. Holding brand-recognition constant, increased competition is generally expected to reduce prices, even if it does not eliminate the incumbent. In stark contrast, prices for Invisalign increased abnormally following patent expiry, without any associated reduction in market share.

**(404)** Dr. Snyder argues that "literature on generic entry finds conflicting evidence on whether brand prices rise or fall after generic entry."[195] While it is true that, sometimes, branded drugs maintain or increase prices following generic entry (further evidence that they remain important sellers), Dr. Snyder critically omits that this is *always* accompanied by a large shift in market share from the brand to generics. Had Align increased prices and subsequently lost substantial market share, this would be a very different case and perhaps Dr. Snyder would be correct. But it didn't; both Align's prices and market share increased following patent-expiry.[196]

**(405)** To be clear, following patent expiry in pharmaceutical markets, branded drugs typically lose substantial share to generic competitors and prices fall. But they do not, as Dr. Stiroh contends, become "irrelevant."[197] This is broadly consistent with my original description of the but-for world, in which Invisalign would retain a substantial market share.

## F.    Harm Is Common to the Proposed Classes

**(406)** In her report, Dr. Stiroh argues that, even if we accept the implants market as a satisfactory benchmark, not all proposed class members were harmed by the challenged conduct. She bases this conclusion on three (flawed) sub-arguments:

---

substitution of prescription drugs", *Health economics*, 27(11), 1717–1737, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6172151/.

[195] Snyder Report ¶ 269 n.368.

[196] In a footnote to his report, Dr. Snyder also argues that I err by comparing changes in the average price of branded and generic drugs, and that it would instead "make sense to compare changes in the price of just the brand drug after generic entry to changes in the price of Invisalign." Snyder Report ¶ 269 n.368. However, as I explain in Section E.3, published economic literature concludes that we must combine branded and generic prices, in some way, following patent expiry to accurately measure consumer gains. This is because substantial consumer benefit arises from substituting to generics (which are functionally interchangeable with brands)—and similar substitution did not happen in the in-office clear aligner market due to Align's foreclosing conduct.

[197] Stiroh Report ¶ 144 n.295.

- Invisalign pricing varied substantially within products[198];

- Some groups of purchasers, DSOs and non-participants in the advantage program, saw modest price declines[199]; and

- Specifically, DSOs that agreed to exclusivity saw greater price declines than expected in the implants benchmark starting in 2007.[200]

**(407)** As I explain in detail in the following sub-sections, each of these arguments is, at a minimum, incomplete and, at a maximum, misleading. Specifically, I show that:

- 75% of Invisalign pricing can be explained by Advantage tier and product effects. This is why, in my opening report, my analysis of commonality focused on Advantage tiers and products.[201] *See infra* Section F.1.

- Combining DSOs and non-participants in the Advantage program conceals that non-participants saw the largest price increase of any group of purchasers—again making Dr. Stiroh's claims misleading. *See infra* Section F.2.1.

- Even by Dr. Stiroh's own calculation, DSOs and non-participants in the Advantage program are harmed *regardless* of whether one starts the implants benchmark in 2007 or 2012. Dr. Stiroh's claim that their pricing trends undermine commonality is therefore misleading. *See infra* Section F.2.2.

- Even DSOs that agreed to exclusivity with Align were harmed when commencing the implants benchmark in 2012. Further, they account for just 6% of class transaction volume. Thus, even if these DSOs are unharmed when starting the benchmark in 2007, this would not more broadly undermine classwide common impact. *See infra* Section F.2.3.

**(408)**     In summary, I show that, starting the implants benchmark in 2012, all members of the proposed class are harmed by the challenged conduct. Even starting the index in 2007, at most a *de minimis* portion of Invisalign purchasers is unharmed. Consequently, harm is common to the proposed class regardless of when the implants benchmark begins.

---

[198] Stiroh Report ¶ 42, Figure 4.
[199] Stiroh Report ¶ 152, Figure 21.
[200] Stiroh Report ¶ 132, Figure 17.
[201] *See* Vogt Report § L.4.

## F.1.    The Majority of Invisalign Pricing Can be Explained by Advantage Tier and Product

**(409)** In Figure 4 of her report, Dr. Stiroh shows a scatterplot of Invisalign prices for comprehensive treatment. Based on this chart, she opines that "the sheer profusion of prices at almost every conceivable level, makes the chart appear as a solid block of color, even though the prices are plotted as an open circle."[202]

**(410)** This presents the misleading view that Invisalign pricing is impenetrably complicated. In reality, Invisalign pricing can largely be explained by just two characteristics—product and Advantage tier. Figure 17 below shows the Invisalign invoice data Dr. Stiroh presents in her Figure 4, but colored according to Advantage tier:[203]

---

[202] Stiroh Report ¶ 42.

[203] Figure 17 omits non-participants and DSOs, which are instead displayed in the proceeding Figure 18.

110

Figure 17: Comprehensive Pricing, Colored by Advantage Tier



**(411)** Even at this level of granularity, it is visible that most variation can be explained by Advantage tier. Further, it is also clear in the above figure that the price increase identified in my opening report is visible for each tier, even when showing a unique point for every transaction.

**(412)** Using basic regression analysis, I find that Advantage tier (including non-participants and DSOs) and product alone can explain 75% of variation in the Invisalign invoice data. This is why my analysis of commonality focused on price changes by Advantage tier and product.

**(413)** The transaction data can easily be broken down into 10 distinct sub-distributions, shown below in Figure 18. As I explain in my opening report and expand on below, each of these groups of customers was harmed by the challenged conduct.

Figure 18: Distribution of Comprehensive Prices by Year and Tier



**(414)** Between 2018 and 2022, the entire distribution of Invisalign prices increased for each and every Advantage tier and non-participants. For DSOs, the distribution was largely stationary—which is in and of itself surprising after patent expiry. This is the root of classwide common impact.

**(415)** As I will explain in more detail in the following section, there was *no* group of Invisalign purchasers that enjoyed the price declines economists would typically anticipate after patent expiry.

## F.2.  All Groups of Invisalign Direct Purchasers Paid Inflated Prices Because of the Challenged Conduct

**(416)** Dr. Stiroh breaks the Invisalign price index into two subgroups that she claims undermine commonality:

- All DSO/non-participants[204]; and
- DSOs who agreed to exclusivity with Align.

**(417)** In the following two sections, I show that, properly analyzed, both groups of purchasers were harmed by the challenged conduct.

### F.2.1.  DSOs and Advantage Non-Participants Paid Inflated Prices Because of the Challenged Conduct

**(418)** Tellingly, Dr. Stiroh does not actually compare the price index for DSOs/non-participants to the implants benchmark, starting either in 2012 or in 2007. Doing so, I find that group of purchasers is harmed regardless of when one starts the benchmark, as shown below in Figure 19 and Figure 20:

Figure 19: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants, Starting the Benchmark in 2012



**(419)** As shown in Figure 19, when starting the implants benchmark in 2012, DSOs

---

[204] "Non-participants" here refers to non-participants in the Advantage program.

and non-participants are unambiguously harmed. By the end of the class period, their damage quantum reached significant levels of up to 10% of purchase price. Using the 2012 benchmark, there is *no* group of unharmed Invisalign customers.

**(420)** Even starting the implants benchmark in 2007, as Dr. Stiroh advocates, DSOs and non-participants overpaid for their Invisalign treatment up to 4%:

Figure 20: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants, Starting the Benchmark in 2007



**(421)** In addition, Dr. Stiroh's combination of DSO & non-participants misleadingly shows falling prices for non-participants—who in fact saw the largest price *increase* of any group of purchasers, as shown in the redline in Figure 21.

Figure 21: Classwide Common Impact, Accounting for DSOs and Non-Advantage Participants (Split), Starting the Benchmark in 2007



**(422)** By March 2022, Invisalign prices for doctors who did not participate in the Advantage program increased by about 11%—more than any other group of purchasers either myself or Dr. Stiroh identify. Compared to anticipated price declines of 12% in the implant counterfactual, this means non-participants overpaid by about 23% by 2022. Yet, Dr. Stiroh concludes their price trend undermines commonality.

**(423)** In other words, by combining DSOs and non-participants, Dr. Stiroh repeats the very mistake she accuses me of and obscures the existence of classwide harm.

## F.2.2.  The Challenged Conduct Caused Common, Classwide Harm Even Starting the Benchmark in 2007 and Dropping Exclusive DSOs

**(424)** In addition to arguing that the implants benchmark should start in 2007, Dr. Stiroh argues that DSOs that agreed to exclusivity with Align were unharmed by the challenged conduct. I turn to this argument in more detail in the following Section F.2.3. Here, I evaluate classwide harm even if one accepts

Dr. Stiroh's critiques.

**(425)** Starting the implants benchmark in 2007, and dropping those DSOs that agreed to exclusivity, I find an average damage quantum of 8% (only down 5 points from the average 13.2% quantum using the 2012 benchmark) and that the damage quantum still reaches nearly 10% by the end of the class period. This is shown below in Figure 22:

Figure 22: Damage Quantum, 2007 Benchmark



Excluding DSOs who Agreed to Exclusivity with Align

**(426)** This results in nationwide damages (before pass-on) of $335.7 million, or $116.4 million in the indirect purchaser states. After pass-on, this falls to $289.01 million in nationwide damages, or $100.2 million in the indirect purchaser states. Moreover, I find that 94% of class transaction volume was harmed by the challenged conduct, and that the only purchasers who are unharmed are patients of the exclusive DSOs.

Table 6: Class Damages, 2007 Benchmark[205]

| Group | Notional | | Quantum | Pass-Through | Damages | |
|---|---|---|---|---|---|---|
| Class: | $ | 1,449,820,139 | 8.0% | 86.1% | $ | 100,230,192 |
| National: | $ | 4,183,499,133 | | | $ | 289,010,440 |

(427) In other words, whether one starts the benchmark in 2007 or 2012, classwide harm is over $100 million and at most a *de minimis* portion of the class is unharmed. Further, as I explain in the next section, even DSOs that agreed to exclusivity are harmed when the implants benchmark begins in 2012.

### F.2.3. DSOs That Agreed to Exclusivity Paid Inflated Prices Because of the Challenged Conduct

(428) Dr. Stiroh argues that those DSOs that agreed to exclusivity with Align were not harmed by the challenged conduct.[206] She recalculates the implant benchmark starting in 2007 and compares that to a Fisher index of prices specifically for the DSOs that agreed to exclusivity. Because these DSOs accounted for 6% of order volume, Dr. Stiroh concludes harm is not common to the proposed class.[207] Notably, this argument only holds water if one incorrectly starts the implant benchmark before all relevant patents expired, *i.e.*, in 2007.

(429) Comparing pricing for the exclusive DSOs to the correct implant benchmark starting in 2012, I find that they were harmed within 4 quarters after patent expiry/termination of interoperability, as shown below in Figure 23:

---

[205] I apply the ███████████████ used in my original report for both consistency and because my further analysis in this rebuttal corroborates this figure. For example, I find statistically significant ████████████ ████████████████ using the supplemental ██████████████, the ████████. Similarly, I find ████████████████████ the PepperPointe data, the ████████████████ ████████- even after accounting for product effects.

[206] Stiroh Report ¶ 112.

[207] Stiroh Report ¶ 132.

Figure 23: Harm to Exclusive DSOs, 2012 Reference Period



**(430)** Further, by Q1 2022, even the DSOs who agreed to exclusivity were harmed by slightly over 8% of their net transaction price. While their prices did fall by approximately 4%, this is far less than economists would typically expect following patent expiry. More directly, this is far less than the implants benchmark shows would have happened in the but-for world, where prices should have fallen by closer to 12%.

**(431)** The effect of this exclusive dealing was similar to the trade-off between short- and long-term profits analyzed under the profit sacrifice test. By offering discounts in 2018 and foreclosing the market, Align was able to secure its position and prevent future price erosion. This is an oft predicted result of exclusive dealing in the economic literature.

**(432)** Indeed, this is precisely the outcome predicted by my raising rivals cost analysis. As Dr. Stiroh's analysis attests, these DSOs agreed to exclusivity because it made them comparatively better off than their peers, thus creating the foreclosing effect I describe in Section K.13 of the opening report. However their pricing was still above what would prevail in the but-for world absent such foreclosure.

118

**(433)** Dr. Stiroh's contention that DSOs who agreed to exclusivity were not harmed relies on starting the implant benchmark in 2007. For the reasons above, *see* Section E.1.3, starting the benchmark in 2007 is an inappropriate approach because, in 2012–2013, (1) important patents expired and (2) there was substantial competitive entry in the implant market (similar to the aligner market in 2017).

**(434)** In sum, when the benchmark begins in 2012, all members of the proposed class are harmed.

## F.3.  Summary of Evidence on Classwide Common Impact

**(435)** I find that virtually all Invisalign purchasers paid an anticompetitive overcharge for their treatment during the relevant period, with the damage quantum reaching economically significant levels between 8–23% by March 2022—even considering exclusive DSOs.[208]

**(436)** Even when conservatively starting the implant benchmark in 2007, as Dr. Stiroh proposes, I find classwide harm of slightly over $100 million and that, at most, 6% of purchasers are unharmed.

**(437)** While the extent of the overcharge varies to some degree between purchasers, Dr. Stiroh's contention that some purchasers are unharmed is demonstrably incorrect when accurately comparing prices to the implants benchmark in 2012.

**(438)** The differential price changes Dr. Stiroh points to for some sub-groups of Invisalign customers only speak to the distribution of harm, not who is harmed. In the same way that I have calculated a separate damage quantum for each quarter, I could just as easily calculate a separate quantum for each group of purchasers.

**(439)** Put another way, using data and methods common to the proposed class, I can account for any differences between purchasers. In aggregate, the total number of harmed customers is substantively unaffected by such distributional effects—which can be easily included in my benchmarking approach, should the finder-of-fact deem it necessary.

---

[208] When starting the implant benchmark in 2012.

### G.   Anticompetitive Overcharge Was Commonly Passed-Through to End-Payer Patients

### G.1.   The Rate of Passthrough I Observe is Consistent with the Structure of the Dental Market and Economic Theory

**(440)** Both Dr. Snyder and Dr. Stiroh challenge my conclusion that the amount of pass-through of aligner prices from dentists to consumers can be calculated with common, classwide methods. In this section, I respond to their arguments and reaffirm my conclusion that there is a statistically significant and positive passthrough ranging from 86% to 99.8%.

**(441)** I begin by noting that both Dr. Snyder and Dr. Stiroh make general claims about pass-through that are contrary to the academic literature and documentary evidence in this case. As a general matter, Dr. Snyder describes "[my] bottom-line conclusion" to be that "dental practices pass-on changes in their costs at nearly 100 percent," a result he claims to "find . . . implausible on its face."[209] But Dr. Snyder provides no support for this assertion other than his own experience, stating in relevant part that "the only other similar pass-on rate [he has] seen is for retail groceries, which operate on thin margins."[210]

**(442)** Dr. Snyder's claim is contradicted by the fact that a 100% pass-through is predicted in the most basic models of competition; specifically, economic theory states that in a perfectly competitive market, firms price at marginal cost, and when marginal costs increase, such cost increases are passed through to the consumer 1:1 or at a 100% pass-through rate.[211] It is also noteworthy that Dr. Snyder concedes that a 100% pass-through rate is both possible and something he has previously observed in practice.

**(443)** Consistent with this, Dr. Stiroh herself opines that dentists face strong competition from other dentists in their area, stating: "Documents produced in this litigation indicate that dental professionals face competition from other providers serving patients in the same regions."[212] Dr. Stiroh goes on to cite the deposition of direct purchaser plaintiff Sherwin Matian, writing:

---

[209] Snyder Report ¶ 270.

[210] Snyder Report ¶ 270.

[211] As I explain in my opening report, "economic theory states that in a perfectly competitive market, firms price at marginal cost, and when marginal costs increase, such cost increases are passed through to the consumer 1:1 or at a 100% pass-through rate. Therefore, from a theoretical perspective, a 100% passthrough rate is reasonable and indeed expected in markets characterized by perfect competition." *See* Vogt Report ¶ 806 (citing Frank Verboven and Theon van Dijk, "Cartel Damages Claims and the Passing-On Defense," *J. Indus. Econ.* 57, (Sept. 2009)).

[212] Stiroh Report ¶ 157.

*Dr. Matian testified that he decreases "the price in order to be competitive with the other dentists in the area" and that he has to "be within the norm for the area." Dr. Matian also testified that he keeps abreast of what other competitors are charging by "[t]alking to colleagues, seeing different advertisements, patient feedback.*[213]

**(444)** Yet, contrary to Dr. Stiroh's intended purpose, Dr. Matian's testimony in fact confirms the conclusions I reach about the dental market and passthrough generally. When asked how he priced his treatments, for example, the first item Dr. Matian identified was lab cost—which is commonly how dentists refer to the fees they pay Align for Invisalign treatment.[214] It is possible Dr. Stiroh is unaware that 'lab costs' refer to Invisalign costs, as I otherwise find it difficult to understand how Dr. Stiroh interprets Dr. Matian's deposition as indicating a lack of pass-through. Indeed, with respect to passthrough, Dr. Matian specifically testified:

- Q: When Align raises its price to you, do you automatically raise the price that you charge to your patients?

- A: I wouldn't say automatically, but it . . . ends up being passed on to the patient eventually.

- Q: Have you raised your prices every time Align has raised its prices?

- A: Eventually I have raised my prices.[215]

**(445)** Consistent with this, Dr. William Simon, another direct purchaser plaintiff, also testified at his deposition in this case that he raises his pricing in part based on the cost of Invisalign lab fees:

- Q: So . . . your cost of providing the Invisalign service was the reason why you increased the price you charged to the patients for Invisalign?

- A: Yes.[216]

**(446)** Remarkably, Dr. Stiroh identifies Dr. Matian's deposition testimony as evidence that dentists do not pass-on the discounts they receive from Align. Yet in the testimony Dr. Stiroh cites, Dr. Matian in fact explains that he passed-on 100% of a price increase of *just $15* to his patients:

- Q: Can you give me one example sitting here today where you

---

[213] Stiroh Report ¶ 157.

[214] January 8, 2023 Dep. of Sherwin Matian, DDS at 29:16–30:24; *see* Stiroh Report ¶ 158 n.312; Cohanim Report ¶¶ 40, 57 (referring to Align's Invisalign charges as "lab fees" or "lab costs.").

[215] January 8, 2023 Dep. of Sherwin Matian, DDS at 66:9–23.

[216] January 20, 2023 Dep. of William Simon, DMD at 30:2–6.

> raised your price to the patient in response to an Align price increase?
>
> - A: I believe, as of recently, they added -- instead of raising their fees this time, they just added a $15 processing fee or something to the -- every case or something like that . . . now that they added another fee on top of the previous fee, I -- I ask the patient to pay that fee.[217]

**(447)** This testimony is fully consistent with, and in fact corroborative of, the pass-through analysis in my opening report, where I identified statistically significant pass-through in the range of 86–100%.

**(448)** Dr. Stiroh argues separately that "[v]ariation in the pricing of Invisalign across geographic areas and patients means that the price to end-customers may be invariant to the overcharge", and that "dentists may price Invisalign and other clear aligners up to the price that their markets will bear, and would not necessarily charge a lower price if they obtained a deeper discount or a price reduction lowering the cost of purchasing Invisalign from Align."[218]

**(449)** Contrary to Dr. Stiroh's claim that dentists charge what the "markets will bear", the testimony above indicates robust price competition between dentists. This competition creates strong incentives to pass-on lab fees. Facing a decrease in Invisalign prices, dentists have strong incentives to gain customers by offering lower prices than their competitors and may be forced to lower prices or lose customers by a competitor's price reduction. Facing a price increase, dentists will need to pass-on lab fees or swallow a loss. Consistent with this, at paragraphs 809–10 of my opening report, I collect documentary evidence of websites and marketing materials in which dentists explicitly state that they pass on both the costs, and any cost savings, of Invisalign in the form of the price that they charge patients for Invisalign treatment, including statements by dentists explicitly attributing cost-savings to their volume-based Invisalign discounts.

**(450)** Dr. Stiroh also opines that the degree of price competition and pass-through may vary by region,[219] but provides no evidence or quantitative analysis on this subject. By contrast, the pass-through models presented here and in my opening report cover a broad portion of the relevant geographic market and still find statistically significant pass-through even when including geographic fixed effects.

---

[217] January 8, 2023 Dep. of Sherwin Matian, DDS at 67:11–25.
[218] Stiroh Report ¶ 159.
[219] Stiroh Report ¶ 157.

**(451)** Additionally, I understand that Dr. Grossman opines in his rebuttal report that lab fees are indeed a significant consideration when setting and updating his patient fees. I also understand Dr. Grossman opines that he teaches his students to consider lab fees as a percentage of the final patient price during his lectures on dental economics. Given this testimony, a near-100% pass-through rate is not only reasonable but expected.

**(452)** In the following sections, I evaluate Dr. Snyder and Dr. Stiroh's arguments regarding pass-through. I begin by discussing several analyses in my opening report that neither address, then explain why their criticisms of other analyses do not affect my ultimate conclusion: that dental practices passed-on Invisalign lab fees to patients at a both statistically and economically significant rate.

## G.2.  Dr. Snyder and Dr. Stiroh Do Not Address the Qualitative Evidence of Pass-Through

**(453)** Dr. Snyder and Dr. Stiroh do not address, much less rebut, the extensive documentary evidence set forth in my opening report supporting the conclusion that there is a positive and significant pass-through rate from dentists to consumers.[220] This is an important point since the overcharge in Align's wholesale prices will have classwide impact on end-payer patients if the pass-through rate is anything greater than zero.

**(454)** As noted above and in my opening report, economic theory predicts that a pass-through rate of 100% is not only reasonable but expected in a competitive market.[221] In Section L.5.2 of my opening report, I present evidence of orthodontics practices and DSOs advertising how they are able to pass on cost savings to end customers thanks to their competitive operating costs and to volume based Invisalign discounts.

**(455)** Evidence from competitors in the direct-to-consumers market shows that dentists charged a retail price that amounted to as much as 3 times Invisalign wholesale price. Indeed, the "3x markup" of Invisalign is mentioned in SmileDirectClub website[222]:

---

[220] *See* Vogt Report §§ L.5.2–4. The sole reference to this qualitative evidence in Dr. Snyder's report is found in paragraph 276, where Dr. Snyder states: "The qualitative evidence Dr. Vogt presents discusses general patterns in prices and costs and what doctors do, or claim to do, on average. This evidence is not sufficient to establish that doctors pass on increases in the cost of Invisalign to each of their patients."

[221] Frank Verboven and Theon van Dijk, "Cartel Damages Claims and the Passing-On Defense," *J. Indus. Econ. 57*, Sept. 2009, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1486869.

[222] 'SmileDirectClub vs. Invisalign: What's the difference?', SmileDirectClub, accessed February 21, 2022, available at https://smiledirectclub.com/blog/smiledirectclub-vs-invisalign/.



**What is your budget?**

Your wallet is likely to be a lot happier with
SmileDirectClub, which costs 60% less than
Invisalign.[1] Our treatment is $2050 USD, so
you can get the smile you've always wanted
without the 3x markup[2] of Invisalign.
SmileDirectClub aligners are 100% made in
America at our state-of-the-art 3D printing
facility and are shipped directly to you all at
one time.

When it comes to payment, you have the
option to choose a one-time payment of
$2050 or SmilePay™. By choosing SmilePay,
you can get started with just $250 down
followed by 26 monthly payments of less than
$89/month,[3] a 100% approval rate financing
option without the hassle of a credit
check. We work directly with most insurance
providers and accept HSA, FSA, and
CareCredit. With that insurance savings, you
can expect to pay less than $975.[4]

**(456)** Internal documents indicate that Align was aware of an industry-wide markup
of 3 to 4 times the lab fee (*i.e.*, the cost practitioners bear to cover treatment
materials). Align employees also internalized this markup level when pricing
Invisalign Swift, a product launched in 2020 and designed to compete with
SmileDirectClub. At a 2022 deposition in connection with an arbitration
between Align and SmileDirectClub, Raj Pudipeddi, Align's Chief Marketing
and Business Development Officer, testified that dentists and orthodontists
sold Invisalign to patients "at 2.7 to three times whatever lab fee we [Align]
would set"[223], and that the Invisalign Swift price intended for patients was
roughly 3.18x the cost charged to practitioners. He explained: "[W]e were
thinking of a price of [$]2,650. By the time we actually launched, we went to
the price around 2,950 . . . we would sell at about 925 to doctors."[224]

**(457)** Internal Align documents show DSOs following similar markups. A July 2019
email written by Joe Hogan, Align's CEO, reports that the CEO of Heartland
Dental required a markup in the range of ▮▮▮▮▮ Invisalign price.[225] Similarly,

---

[223] Pudipeddi Dep. Tran. January 7, 2022 (*SDC Financial LLC v. Align Tech.*, Case No.01-20-0005-1541) at
196:2–3.
[224] Pudipeddi Dep. Tran. January 7, 2022 (*SDC Financial LLC v. Align Tech.*, Case No.01-20-0005-1541) at
196:8–17.
[225] ALIGNAT-SNOW00652585 ("When I asked him the needed price he mentioned they use a ▮▮▮▮▮ ratio

in an April 2020 meeting discussing Invisalign Swift, Align modeled
Invisalign final retail price under the assumption of a ▮ markup[226]:

**(458)** When introducing new products, Align decided to price its products to
dentists at one third to one fourth of the price intended for end consumers.
Indeed, Align knew that orthodontists would apply their standard 3–4x
markup to those products before selling the treatment to patients. In Section
L.5.4 of my opening report, I specifically refer to the relevant documents
discussing pricing strategy for Align's new and potential products.

**(459)** As an example, when developing Invisalign Swift, research by Align with
dentists found that a 3x markup was crucial. Accordingly, CEO Joseph Hogan
pointed out that, to sell to patients at $2600, dentists would likely have
accepted a price of $800–$850. This implied a markup of 3–3.25x[227]:

Success in the ADAPT program gives us some hope but in the end we can see how this is just not adopted in
the market readily and we have to spend a lot of resources at the doctors' offices to push the rock up a hill
that will come right back down if not constantly attended to.▮
▮$800-$850▮

**(460)** Looking at the extensive evidence presented in Section L.5.4 of the opening
report, it is reasonable to conclude that orthodontics practices pass on the
overcharge to consumers. Similarly, cost savings would be reflected in end-
payer prices. Neither Dr. Stiroh nor Dr. Snyder address this evidence or
present any contrary evidence in their reports.

### G.3. Dr. Snyder and Dr. Stiroh Do Not Address My Multi-Provider Panel Regression Finding Statistically Significant Pass-Through

**(461)** Dr. Snyder and Dr. Stiroh's reports do not address my Panel Regression using
five sufficiently informative non-party datasets: Smile Brands, OrthoFi, Aspen
Dental, PepperPointe and D4C.

**(462)** In my opening report, I created a panel including all the providers' data

---

of our price to them and then what the resultant price would be to the patient. We have heard this ratio before
so it was no surprise. If the moderate we are offering them does not hit this window then we will have an
issue.").
[226] ALIGNAT-SNOW00280038.
[227] ALIGNAT-SNOW00525192 at -193 (highlighting added for emphasis).

combined (but aggregated). To ensure the same level of granularity among the datasets, I take the median of the national patient price and lab fee per month as observations. With this dataset, I regress the patient price on the lab fee and find a pass-through rate in the range of 88% to 91%, depending on whether I consider a Within or a Pooled estimator. This result is consistent with both the other quantitative approaches presented in Section L.5.5 and the qualitative evidence discussed in Sections L.5.1 to L.5.4 of my opening report.

**(463)** Combining all relevant datasets into a panel provides another axis on which to observe the relationship between the Invisalign lab fee and the end patient price. Comparing DSOs that have negotiated a lower Invisalign lab fee and therefore charge a lower patient price such as Aspen with other dentists and orthodontists who have higher Invisalign lab fees and higher patient prices, while accounting for area and time effects, indicates the positive relationship between these. I investigate this further in the next section.

### G.4.   The OrthoFi Data Shows Statistically Significant Pass-Through



**(465)** Specifically, in my opening report, I used volume as an instrument for

---

228 *See* Vogt Report § L.5.5.
229 Vogt Report ¶¶ 850–51.
230 Snyder Report ¶ 279 ("Dr. Vogt finds that higher-volume doctors tend to pay lower prices to Align for Comprehensive [treatment] and to charge their patients lower prices for Comprehensive [treatment].").
231 *See* Vogt Report ¶¶ 849–60.

Invisalign lab fee due to the inability to match transactions between the data sets. As I explained there, the transactional data produced by ███ at the time I submitted that report data included patient price and transaction date, but not (1) the lab fee that the doctor paid Align for Invisalign or (2) data sufficient to match individual doctors (who are identified by anonymized "Practice IDs"). Thus, while there is "noise" in the data that volume cannot explain, I use a widely accepted form of regression analysis to calculate my pass-through rate of 99.8%.

**(466)** Dr. Snyder argues that, because my original ███ analysis relies on an average relationship between prices and costs, this does not provide a sufficient basis "to infer average pass-on rates for changes in costs or to infer that costs are passed on in a common manner."[232] To demonstrate his point, Dr. Snyder cherry-picks just two practice IDs in the ███ which, he claims, do not show pass-through. Specifically, he identifies two practices that do not appear to charge patients consistently less when their volume of sales was less.[233]

**(467)** Notably, however, Dr. Snyder does not directly contest that a formal econometric model performed on this data finds statistically significant pass-through. Instead, he argues only that these two examples call into question whether the "average relationship" I observe is borne out in the price-making decisions of individual dentists.

**(468)** A key point here, however, is that neither Dr. Snyder nor I, at the time I submitted my opening report, were able to match the two practice IDs at issue with the Invisalign transactional data. In other words, neither of us was able to reasonably estimate how much these two practices were paying for Invisalign in the quarters shown in Figure 44. Consequently, it is not possible to tell from Figure 44 whether or not these two specific practices passed on cost increases. This is because there is variation in Invisalign pricing that volume, as a good but imperfect instrument, cannot solely explain.

**(469)** In other words, Dr. Snyder points out that volume is an imperfect instrument of price; he does not demonstrate that these two practices *did not* pass-on Invisalign lab fees.

**(470)** On June 16, 2023, ███ produced an amended transaction data set containing re-anonymized practice ids and a mapping file linking new practice ids to zip codes. This data set covered the same population of transactions as the data set originally produced and analyzed in my opening

---

[232] Snyder Report ¶¶ 280–81.
[233] Snyder Report ¶¶ 280–81.

report. However, the June 16 production lacked information on the date of each transaction. I have used the original transaction dates (which match this range), and merge these into the June 16th production (by matching patient ids and prices) to avail of the newly added zip code information.[234]

**(471)** The addition of this practice zip code information is significant because it allows me to reasonably match the zip codes of these practices with the Invisalign invoice data to directly assess if they passed-on Invisalign lab fees to their customers. Doing so, I find that they did.

**(472)** Below, I use the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to affirm the results of my opening report—specifically, my finding that dentists/orthodontists pass-on Invisalign lab fees to patients at a statistically significant rate of 86–100%. First, however, I use the new data to evaluate whether the two practices Dr. Snyder identifies in his Figure 44 in fact passed on price increases.

**(473)** Figure 24 below graphs the indexed average quarterly prices for Dr. Snyder's two cherry-picked practices from the ▮▮▮▮▮▮ against the fisher indexed overall price line for Invisalign lab fees filtered to the ▮▮▮▮ zip codes. Consistent with positive and significant pass-through, I observe that in the two years between 2018 and 2020, average patient prices from ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ follow the same path as Invisalign lab fees. I observe a common upward sloping trend among the three pricing lines, and by 2020 both practices had increased prices as much or more than Align increased lab fees—consistent with near 100% pass-through.

---

[234] ▮▮▮▮▮▮ produced an additional, amended file on June 26th, 2023, that contains the same information as the June 16 production, but re-adds a transaction date field. One flaw in the June 26th production is that, while it covers the same population of data as the original ▮▮▮▮▮▮▮▮, approximately 3.5% of the transaction dates do not match the original production. In particular, the amended production shows a relatively small number of transactions dating back to 2014, whereas the ▮▮▮▮▮▮▮▮▮▮ begins in mid-2017. Ultimately, having less than a week to analyze the data, I have not had the opportunity to fully explore the discrepancy in dates between the two files. Because the class period in this case is May 4, 2017 through the present, for the results presented in this report, I use the June 16, 2023 data set (with mapped dates), though I also re-calculated my results using the June 26th data in backup and find that pass-through is robust regardless of which dataset I use.







Table 7: ███████████████████████████████████
███████████

███████████████████████████████████████████████████

**(477)** In the updated ███████, which allows a more granular merge with the Invisalign invoice data, I find that even the cherry-picked practices Dr. Snyder points to in his opposition in fact have statistically significant pass-through at rate of 99%—almost exactly the same result as in my opening report. This occurs because (as noted above) there was variation in pricing that volume, as a good but imperfect instrument, could not explain.

**(478)** As stated previously, Dr. Snyder demonstrates, at most, that using an instrumental variable cannot explain all variation in a data set. Given the recently amended production, I can directly address this critique with new econometric analysis. Therefore, I next perform a similar model across the entirety of the new ████████ and affirm the results in my opening report.

**(479)** Specifically, using the updated production from ███████ I construct a new multi-provider panel showing average Invisalign lab fees and patient prices for each zip code/quarter combination in the data from ███████████████ ███████████████.

**(480)** Visually, in this data there is a clear positive relationship between Invisalign lab fee and patient price, as shown below in Figure 26:



As shown below in Table 8, I find statistically significant pass-through largely between 80−90%, consistent with the results in my opening report:

## Table 8: Multi-Provider Panel of Pass-Through

| | All Data[1] | | Within 5 Practices[2] | | Within 10% or 10 Treatments[3] | |
|---|---|---|---|---|---|---|
| | Quarterly 1 | Yearly 1 | Quarterly 2 | Yearly 2 | Quarterly 3 | Yearly 3 |
| Invisalign Lab Fee Pass-Through Rate | 83%*** | 87%*** | 70%*** | 75%*** | 84%*** | 89%*** |
| | (4%) | (4%) | (4%) | (4%) | (5%) | (5%) |
| Num.Obs. | 12347 | 12347 | 10501 | 10501 | 11000 | 11000 |
| R2 | 0.033 | 0.036 | 0.028 | 0.031 | 0.030 | 0.033 |
| R2 Adj. | -0.086 | -0.081 | -0.105 | -0.100 | -0.101 | -0.095 |

All Models Include ZipCode and Either Quaterly or Yearly Fixed Effects
[1] All Data
[2] Filtering For Observations Where the Number of Practices Is Within 5 Between OrthoFi and Invisalign
[3] Filtering For Observations Where the Number of Orders Is Within 10% or 10 Absolute Orders Between OrthoFi and Invisalign
+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

(484) Unlike other data sets, such as Smile Brands, I cannot identify ██████ practices by name in the Invisalign invoice data; instead, I can only merge by zip code. For many zip codes, this works well. However, for some densely populated zip codes, such as one in New York City, there are many dental/orthodontic practices and only one or two may use ██████ Therefore, there are more observations in the Invisalign invoice data that are not accounted for in the ██████ data. To account for this, I repeat my regression, but filter for zip codes based on quality of the match between the ██████ and Invisalign data. Specifically, I apply two filters where I:

- Keep only zip code/quarter combinations where the difference between the number of practices in the Invisalign and ██████ data are within five; and

- Keep only zip code/quarter combinations where the order volume is either within 10% or within 10 orders between the

___

necessary because I could not previously identify zip codes in the ██████. I do not include both zip code and provider fixed effects because they are highly collinear, and multi-collinearity is well understood to introduce bias to regression results.

███████ and Invisalign data.

**(485)** I find that, even when filtering for zip codes with strong matches, pass-through remains statistically significant above 70%. In fact, I find the highest estimate of pass-through, 89%, looking at observations with a 10%/10 order difference or less between the ██████ and Invisalign data.

**(486)** In the back-up materials to this report, I repeat all these regressions with Newey-West standard errors to account for autocorrelation and heteroskedasticity and find that pass-through remains statistically significant when accounting for both.

**(487)** I note that, ██████████████████████, I have had less than two weeks to analyze this data. Even with this severe time limitation, I have:

- Combined this data with all other sufficiently granular data sets produced to me.[236]

- Identified statistically significant pass-through in the range of 80–90%.

- Tested for robustness with respect to heteroskedasticity and autocorrelation.

- Ultimately found further evidence corroborating the pass-through analysis in my opening report.

### G.5.  Dr. Snyder's Smile Brands Analysis is Flawed

**(488)** In my opening report, I analyze transactional data from the DSO Smile Brands to calculate the rate at which dentists and orthodontists pass on their Invisalign lab fees to patients. The results from my pass-through model show that dentists and orthodontists passed through the costs of Invisalign at a rate of 86%.

**(489)** Dr. Snyder argues that this analysis is flawed because it does not account for "changing product mix," *i.e.*, differences in products being ordered by Smile Brands' dental practices over time.[237] Specifically, Dr. Snyder's criticism turns on the fact that there is no column in the Smile Brands data defining the variant purchased—that is, whether a consumer purchased, for instance, Invisalign "Comprehensive" or "Moderate." Dr. Snyder therefore claims that my pass-through analysis is flawed in that it fails to account for a potentially

---

[236] Save for D4C, which I understood is separately represented in the ████████. I excluded it to avoid "double" counting those observations.
[237] Snyder Report ¶¶ 283–92.

changing product mix, and thus finds "significant pass-on of costs even where none exists."[238]

(490) As a threshold matter, I disagree with Dr. Snyder's contention that pass-through of differences in prices within Align's offerings must be ignored. The fact that dentists/orthodontists charge patients different prices for Invisalign versions that have different lab fees is consistent with substantial pass-through and indeed expected from the qualitative evidence that doctors charge a 2–3x multiple on lab fees. Ultimately, these are all versions of Invisalign treatment via the same distribution channel.

(491) To illustrate his point, Dr. Snyder cherry picks one dentist in the Smile Brands and Invisalign data that sells *approximately one treatment per year* from 2018 to 2020: a practice in Wilmington, CA (identified by zip code 90744).[239] Dr. Snyder concludes there is a 0% rate of pass-through for this practice because the end patient price for Comprehensive treatments is the same in 2018 and 2020 ($4000), while the Invisalign lab fee decreases by 2.7%.[240]

(492) Dr. Snyder then proxies treatment type by looking at "contract length" and concludes that my pass-through results do not hold. Specifically, Dr. Snyder attempts to replicate my regression by limiting it only to "Comprehensive" cases in the Smile Brands data. However, because the Smile Brands data does not define product subtype, Dr. Snyder classifies all treatments with a "contract length" of 12 months or greater as "Comprehensive" treatments – that is, he assumes that any patient contract 12 months or more in length is a "Comprehensive" product rather than some other product type, like Lite, Moderate, Teen, or Express. In the resulting analysis, Dr. Snyder finds a pass-on rate of "less than" 30 percent that is not statistically significant.[241]

(493) Dr. Snyder's analysis suffers from two basic flaws. *First*, looking at one stylized and cherrypicked example—in Dr. Snyder's case, a practice in Wilmington, CA that sells approximately 1 treatment a year—is not best practice in econometrics. Typically, economists consider the totality of the data to the best extent that is possible, using regression analysis—as is a common standard.[242] In any given data set, there are outliers; this is precisely why (among other reasons) economists use regression analyses rather than

---

[238] Snyder Report ¶ 288.

[239] Snyder Report Fig. 45.

[240] Snyder Report ¶¶ 284–88 & Fig. 45.

[241] Snyder Report ¶¶ 290–92.

[242] David H. Kaye and David A. Freedman, "Reference Guide on Statistics", June 9, 2011, *Reference Manual on Scientific Evidence*, 3d ed. 2011, pp. 211–302, Washington DC: National Academy Press, available at https://ssrn.com/abstract=2705655, Section V.

looking at a few examples.

**(494)** *Second*, and more important, Dr. Snyder fails to evaluate whether his proxy, *i.e.*, his attempt to identify all Comprehensive treatments in the Smile Brands data, actually works or is accurate. Doing so, I find that Dr. Snyder misidentifies a substantial portion of the data and in fact creates the very problem he is attempting to fix.[243]

**(495)** Specifically, as noted above, Dr. Snyder attempts to identify comprehensive Invisalign treatments in the Smile Brands data by classifying all treatments that have a contract length of 12 months or greater as comprehensive treatments.[244] This cutoff is arbitrary, and does not withstand simple scrutiny, for two reasons:

**(496)** First, Dr. Snyder confuses contract length (the length of a patient's contract) with treatment length (the length of a patient's Invisalign treatment). Indeed, he does no analysis to show that treatment length matches the length of time it takes patients to pay for a treatment. Nor is there any basis for assuming this is true, For example, LendingPoint, a financing partner for Invisalign, presents a patient with options for the length of their contract based on which monthly payment the patient wants.[245] In other words, Dr. Snyder fails to consider that much variation in contract length has little to do with the Invisalign variant, as is evident in the data I discuss below, and thus that many patients with a contract length of 12 months or greater did not actually buy Comprehensive treatment.

**(497)** Second, and consistent with this, Dr. Snyder's approximation of comprehensive treatments in the Smile Brands contradicts the distribution of treatments in the Invisalign data. In other words, the Invisalign data shows his approximation is wrong. In Figure 27 below, I plot the distribution of Dr. Snyder's Comprehensive products in the Smile brands data and the distribution of all products in the Invisalign invoice data (*i.e.*, the data showing Align's sales to Smile Brands):

---

[243] By contrast, Dr. Stiroh and I agree that it is not possible to identify the product effects in the Smile Brands data. *See* Stiroh Report ¶ 160 n.319.

[244] Snyder Report ¶ 290 ("The number of months in the contract can be used to approximate the type of product. Specifically, I estimate Dr. Vogt's Smile Brands regression after limiting to Align invoices that Dr. Vogt identifies as Invisalign Comprehensive and patient contracts with a duration of 12+ months . . . .").

[245] *See* LendingPoint 0017. Additionally, SmilePay, the financing program available with SmileDirectClub, advertises that patients can pay over the course of 26 months where the majority of treatments last between 4 and 6 months. See SmileDirectClubAligners FAQs ("Do you offer an affordable payment plan?", "How long is the typical treatment process?", SmileDirectClub, accessed June 15, 2023, available at https://smiledirectclub.com/faq/#treatment-process.

Figure 27: Testing Dr. Snyder's Attempted Comprehensive Composition



**(498)** In the Invisalign invoice data, Comprehensive treatment accounts for about 64% of sales to Smile Brands. However, Dr. Snyder's approximation misidentifies 91% of sales as being "Comprehensive" in the Smile Brands data, establishing that many Invisalign variants are being mischaracterized.[246] As a result, Dr. Snyder arbitrarily deletes 9% of the data without any accurate reference to Invisalign variant.

**(499)** The consequence of this is that Dr. Snyder's approximation does not accurately identify Comprehensive products in the Smile Brands data, and instead likely misclassifies a substantial number of non-Comprehensive

---

[246] In all likelihood, Dr. Snyder could be misidentifying more. For example, some of the 9% of transactions he dropped could be patients who received Comprehensive treatment but had a short (less than 12 month) contract length.

treatments as "Comprehensive." Therefore, the regressions he runs with these datasets necessarily produce incorrect results and are not informative.

**(500)** I maintain that the analysis of Smile Brands data set forth in my opening report is relevant for the purposes of assessing pass-through. After considering zip code and quarterly fixed effects, there was a positive and statistically significant relationship between Invisalign lab fee and patient price in the SmileBrands data. This is direct evidence of pass-through.

**(501)** Furthermore, to account for product effects in the regression, I re-examined the PepperPointe data below and find that pass-through is robust to product mix.

## G.6.    The PepperPointe Data Shows Statistically Significant Pass-Through, Consistent with My Original Findings

**(502)** As noted above, in my opening report, I use data from PepperPointe (as well as data from SmileBrands, ████, and Aspen Dental) to create a combined dataset, then build a multi-practice pass-through model using that data. I calculate that dentists and orthodontists pass on the costs of Invisalign lab fees to their end patients at a rate of 86–99.8%, *i.e.*, they increase the fees they charge patients $0.86–0.998 for every $1 fee increase in Invisalign fees.[247]

**(503)** Notably, both Dr. Snyder and Dr. Stiroh confirm that the PepperPointe data is adequate for assessing pass-through using a regression analysis accounting for mix of Invisalign variants. Indeed, Dr. Stiroh states that the "data produced by the DSO PepperPointe" is "the only one of the four datasets used in Dr. Vogt's pass-through analyses that contains sufficient information on the Invisalign product sold, the price paid to Align, and the price charged to end-users to even allow such an investigation."[248] Similarly, in his own report, Dr. Snyder is silent on whether the PepperPointe data is adequate for purposes of performing a regression, and in fact concedes that "[d]ata from PepperPointe contains information on both the cost of each Invisalign treatment to the dental practice and the price changed [sic] to the customer for that treatment."[249]

**(504)** Rather than criticize my econometrics, Dr. Stiroh and Dr. Snyder argue generally that the PepperPointe data shows that PepperPointe doctors do not

---

[247] Vogt Report ¶¶ 866–71. I discuss the PepperPointe data separately at Appendix 11.5 of my opening report.
[248] Stiroh Report ¶ 22 at Section VI.a.
[249] *See* Snyder Report ¶ 294.

"mak[e] pass-on decisions that [I] would have expected."[250] In an attempt to prove this point, they each present incomplete and misleading charts.



These visualizations are misleading for two reasons.

**(505)** **First**, the price change Dr. Snyder analyzes is transient. Dental practices may be more inclined to pass-on long-run cost changes than short-term promotions. This is the same logic underpinning a small but significant <u>non-transitory</u> increase in price (SSNIP) test—people react differently to short-run price changes than long-run changes.

**(506)** Whether doctors pass-on short-term, transitory, discount programs is not directly relevant to assessing pass-through of classwide overcharge. Economic antitrust analysis has long recognized that buyers may react differently to transitory vs non-transitory price changes—this is why a SSNIP test looks at non-transitory increases in price. As I show in my opening report, overcharge was non-transitory and indeed growing during the relevant period—to analyze pass-through I am therefore more concerned with how doctors change patient prices given a "non-transitory" change in the Invisalign lab fee. In other words, if doctors know a discount program is short in duration, they may be unlikely to adjust pricing because they know they will revert to their original pricing soon. If a price increase is 'non-transitory', they will have to amend patient prices or swallow a permanent loss.

**(507)** **Second**, by only looking at simple charts, Dr. Stiroh and Dr. Snyder fail to account for potentially confounding factors. For example, they fail to consider geographic and/or time based fixed effects—as is best practice in econometrics and something Dr. Stiroh herself claims is important to

---

[250] *See* Snyder Report ¶ 297; Stiroh Report ¶¶ 160–61.

address.[251] For example, if a doctor in New York charges $6000 for Comprehensive treatment, and a doctor in Kansas charges $4500 for the same, but both pay the same amount to Invisalign in lab fees, this—standing alone—says nothing about whether and to what extent both doctors pass on price increases. Similarly, the time fixed effects will account for shocks that affect all transactions at specific times, such as COVID-19.

**(508)** 

**(509)** Similarly, robust analysis would also typically need to consider any time effects in the data. For example, if the general level of pricing increases over time (*i.e.*, there is inflation) then economists would remove these effects before analyzing pass-through. The monthly, quarterly, and annual fixed effects in my econometric results—variants of which I employ in my regression analysis in analyzing pass-through—account for this.

**(510)** In other words, the visualizations Dr. Snyder and Dr. Stiroh show are cherry-picked examples of a single short-term discount program. To assess pass-on, one cares about how dentists and orthodontists pass-on the long term, non-transient price., *i.e.*, what a dentist does when Align permanently increases/decreases its price, for example by 10–15%. When assessing end-payor patient prices in the but-for world, this is the kind of price change an economist is primarily concerned about.

**(511)** 

**(512)**

---

[251] Stiroh Report ¶ 157 ("Dr. Vogt does not assess how, and to what extent, dental professionals' pricing of Invisalign varies across different geographic areas and, thus, his analysis contains an improper assumption and is incapable of establishing a common impact on the proposed IPP Class").



Table 9: ██████████ █████████

**(513)** The results of the model show a positive and statistically significant relationship between the patient price and the Invisalign lab fee. When I look at all the data, I see a 55% pass through rate. When I remove the treatments with a lab fee less than $200, I see a 73% pass-through rate.[252] When I am

---

[252] I remove treatments with lab fees less than $200 to deal with measurement error that Dr. Stiroh indicates. Given Dr. Stiroh only looks at comprehensive treatments, I also apply her filter to all treatments in a version of the results presented.

most conservative and only remove the Comprehensive treatments that cost less than $200, as Dr. Stiroh suggests,[253] I see a pass-through rate of 57%. All are statistically significant and robust to heteroskedasticity and autocorrelation.

**(514)** Further, when aggregating the data by month, I find even larger pass-through rates in the range of 75–89%, fully in keeping with my analysis of the ███ and SmileBrands data. There are two reasons to aggregate the data by month:

- Measurement error in the explanatory variable is well understood to bias regression estimates downward. In this case, Dr. Stiroh explicitly testifies that measurement error is present in the Invisalign lab fee data for ████e. One method to address this is deleting incorrect data, while another widely accepted method is aggregation – which makes individually incorrect measurements less important.[254] In short, I aggregate the data to correct for measurement error which Dr. Stiroh herself acknowledges.

- Consistency with my other pass-through models, which aggregate to merge with the Invisalign Invoice data. When addressing that measurement error, I find virtually the same >80% pass-through rate in ████████ even after accounting for product effects, as I find in ██████ and SmileBrands.

**(515)** Thus, using the PepperPointe data, which both Dr. Stiroh and Dr. Snyder opine is an appropriate dataset with which to analyze pass-through, I find statistically significant pass-through robust to product and geographic effects in keeping with my original findings.

**(516)** While Dr. Stiroh presents no formal econometrics models in her report, she does cite to models in her backup materials. There, Dr. Stiroh claims to "re-implement" my multi-practice pass-through model (from my opening report) and, doing so, finds no evidence of pass-through. This is a somewhat misleading statement because the data underlying the multi-practice pass-through model *in my opening report* was aggregated to allow the combining of all relevant data sets.

---

[253] *See* Stiroh Report ¶ 160 n.320 ("Five transactions in the data produced by ██████ for the Invisalign Comprehensive product have a "Lab Fee" below ████ However, Align did not sell any Comprehensive products to ██████ at an amount less than ████ from June 2017 through March 2022. I treat those five observations as outliers and exclude them from my analysis.").

[254] Gary Solon, :Intergenerational Income Mobility in the United States," American Economic Review, American Economic Association, vol. 82(3), pages 393-408, June 1992, available at https://www.jstor.org/stable/2117312.

**(517)** To be abundantly clear, the multi-practice panel model presented above in Section G.4 is more granular than that presented in my opening report (█████████████████████████████████████), and not subject to the limitations I explain the following paragraphs.

**(518)** In comparison to the panel data in my opening report, the ████████████ ████████████████████████████ This both facilitates and necessitates a different model specification. For example, the multi-provider panel (from my opening report) cannot consider geographic fixed effects due to its aggregation, but the ████████████████ both can and should.

**(519)** I therefore repeat the same specification I performed on ████████████ and supplemented panel data on ████████████, this time adding product fixed effects (since the ████████████ allows it). Doing so, I find statistically significant pass-through in keeping with my original results. For this reason, Dr. Stiroh's statement that she "re-implements" my model is misleading, as she in fact selected a model designed for fundamentally different data constraints—and meanwhile ignores the model I performed on more granular data.

**(520)** Accounting for factors that Dr. Stiroh and Dr. Snyder criticize my original models for lacking, my ████████████ show there is still a positive and statistically significant rate of pass-through from dentists to end patients.

### G.7. Insurance Does Not Constrain Pass-Through to End-Payer Patients

**(521)** Dr. Stiroh presumes that the proposed class includes both insurers and end patients,[255] and devotes Section IX.B of her report to demonstrating that impact varies between patients and insurers. However, the proposed class definition consists of "all persons or entities in the United States that purchased, paid and/or provided reimbursement for some or all of the purchase price for Invisalign aligners acquired for personal use," and, consistent with that class definition, I have been instructed by counsel that the class consists only of individuals who purchased Invisalign for their own personal use. Therefore, while I show that much of Dr. Stiroh's analysis on insurance is internally contradictory, we agree that insurers do not bear the brunt of damages. Instead, patients do.

**(522)** Dr. Stiroh argues that it is impossible to disentangle the harm caused to

---

[255] The ████████████████ had enough granularity to also include an effect of being an orthodontist or a general practitioner.
[256] Stiroh Report ¶ 22.

consumers from the harm caused to insurers - claiming that consumers may not be harmed by the overcharge because their copayment would have remained the same in both the real world and the but-for world. Dr. Stiroh then goes on to argue that insurers would not have been harmed in the but-for world because dental insurance lifetime maximums limit how much they would pay. She argues in relevant part: "In cases in which the cost of a patient's Invisalign treatment exceeded the maximum lifetime benefit in the actual and but-for worlds, the insurer's payments would have been the same in both contexts and the insurer would not have paid any overcharge on that treatment."[257]

**(523)** Dr. Stiroh is arguing that both insurers and end-patients may not be harmed in the but-for world. Critically, Dr. Stiroh makes no attempt to quantify how common particular insurance contracts are, or how that relates to common-impact.

**(524)** In my opening report, I used the ███████ to show that most patients received no insurance benefit and that "[o]f those [patients] that did receive [insurance], roughly half received a benefit of $1,500 or $2,000 dollars."[258] I also showed, using the ███████ that coinsurance rates declined as patient prices increased.[259] Thus, for the vast majority of end-patients, insurance will not shield them from being harmed by the overcharges. Dr. Stiroh does not address or acknowledge this analysis.

**(525)** I agree with Dr. Stiroh that lifetime and annual maximums do indeed mean that most insurers are not harmed. ████████████████████████ ███████████████ I note that this data was produced after my opening report was submitted; Dr. Stiroh did not analyze it.

### G.7.1.  The ████████████████████████ ███████

**(526)**



---

[257] *See, e.g.*, Stiroh Report ¶ 162 ("The proposed IPP Class includes patients and insurers who pay for orthodontic treatments.").
[258] Vogt Report ¶ 891.
[259] Vogt Report ¶¶ 892–93.



Figure 28: Share of ██████████ with Either Annual or Lifetime Maximums



**(527)** This data was produced in April 2023, after my opening report was submitted but more than a month before Dr. Stiroh submitted her report. Dr. Stiroh claims, without any quantitative analysis, it is impossible to disentangle harm to consumers and insurers but made no attempt to analyze this data.

**(528)**





**(529)** In short, Dr. Stiroh points to only two insurance plans with a co-pay (rather than co-insurance) and no maximum benefits. She makes no attempt to quantify how common these plans are, despite having adequate data to do so.

**(530)** Having now received an opportunity to analyze the ████████████, I find that it supports my previous conclusions that more than 98% of end-payer patients would bear the full harm of an end-price increase.

**G.7.2.** ████████████████████████



**(531)** ██████████████████████████

**(532)** ██████████████████████████

**(533)** ██████████████████████████

**(534)** ██████████████████████████

---



Figure 29: 



**(535)**

Figure 30: 



**(536)**

Figure 31: 



(537) 

(538)

Figure 32: 



**(539)** 

increase.

**(540)** 



**(541)**

**(542)**

## G.8.  Summary of Pass-Through Evidence

**(543)** Between my opening report and this rebuttal report, I have used 4 different data sets to present multiple pass-through regressions. All find statistically significant pass-through north of 50% (robust to heteroskedasticity and autocorrelation), and the majority find statistically significant pass-through above 80% (also robust to heteroskedasticity and autocorrelation) – even when considering geographic, product, and time-based effects.

**(544)** Between Dr. Stiroh and Dr. Snyder's reports and associated back-up materials, they perform only four regressions evaluating pass-through. Half of these fail to account for geographic or time-based fixed effects – which Dr. Stiroh herself opines are important to control for – while the remainder arbitrarily delete data. Neither engages with, much less disputes, the substantial qualitative evidence of pass-through, including testimony by direct purchaser plaintiffs.

**(545)** In addition, Dr. Stiroh's claims that insurance undermines commonality and pass-through are unfounded and in fact contradicted by the available data. I find that more than two-thirds of end-payer patients received no insurance benefit whatsoever for their aligner treatment. Moreover, of the remaining third that had some orthodontic insurance, more than 97% had a lifetime maximum – as a result of which the patient would bear the full overcharge. This means, in total, that only approximately 0.8% of patients would share the harm with their insurer. Of this 0.8%, many would still be harmed by an amount determined by their coinsurance rate.

---

[261] Stiroh Report ¶ 164.

### G.9.   Damages for Named Indirect Purchaser Plaintiffs

## Table 10: Estimated Lab Fee and Damages by Named Plaintiff

| Named IPP (a) | Provider's Location (b) | Invisalign Product (c) | Total Amount Paid by Named IPP (incl. Discount) (g') (d) + (f) | Estimated Lab Fee (1) | Quantum (%) (2) | Pass-on (%) (3) | IPP Overcharge (4) (1)*(2)*(3) | Counterfactual Price (5) |
|---|---|---|---|---|---|---|---|---|
| Campbell, Katie | Prince Frederick, MD | n.a. | $ 6,000 | $ 1,859 | 11.37% | 86.1% | $ 182 | 5,818 |
| Carnaghi, Angela | Royal Oak, MI | n.a. | $ 4,742 | $ 927 | 10.97% | 86.1% | $ 88 | 4,654 |
| Ezzio, Jennifer | Westford, MA | n.a. | $ 5,440 | $ 1,169 | 11.37% | 86.1% | $ 114 | 5,326 |
| Garay, Cecilia | Las Vegas, NV | n.a. | $ 5,949 | $ 1,165 | 10.39% | 86.1% | $ 104 | 5,845 |
| Gooch, Jaime | Fresno, CA | Comprehensive | $ 5,189 | $ 1,052 | 15.28% | 86.1% | $ 138 | 5,051 |
| Hamilton, Celeste | Mesa, AZ | Limited | $ 4,000 | $ 1,279 | 15.28% | 86.1% | $ 168 | 3,832 |
| Hansen, Justin | Lincoln, NE | Comprehensive | $ 4,920 | $ 1,237 | 12.03% | 86.1% | $ 128 | 4,792 |
| Mound, Tracy | Valencia, CA | Comprehensive | $ 5,162 | $ 1,107 | 10.97% | 86.1% | $ 104 | 5,058 |
| Rickenbaker, Stephanie | Charlotte, NC | n.a. | $ 6,880 | $ 1,087 | 8.17% | 86.1% | $ 76 | 6,804 |
| Skibba, Elisabeth | Eagan, MN | n.a. | $ 6,820 | $ 964 | 0.14% | 86.1% | $ 1 | 6,819 |
| Snow, Misty | Salem, OR | Comprehensive | $ 5,350 | $ 1,829 | 8.17% | 86.1% | $ 129 | 5,221 |

(546) Table 10 replicates part of Table 25 from Dr. Stiroh's Report. I omit columns (d), (e), (f) and (g) from the original table, which report, respectively, "Amount Paid by Named IPP", "Promotion/Discount Received", "Insurer Paid" and the "Total", amounting to the sum of the other three items. I instead show the Amount paid by the plaintiff, net of the discount, in column (g').

(547) Note that I drop the information for Darlena Strong, since Florida is outside of the considered class, as well as for Adelaide Liedl, since her date of purchase (*i.e.*, January 2017) precedes the class date considered to estimate damages (January 2018). I also excluded Emily Vo, as her claims are for injunctive relief only.

(548) In the right portion of the table, I estimate for each plaintiff their respective provider's lab fee as precisely as the data allows. I then apply the overcharge percentage based on the quarter of purchase[262], and the 86.1% pass-on[263].

(549) To quantify each IPP's provider lab fee from transactional data, I average the "Invoice Amount" across orders that match the IPP's available purchase details, *i.e.*, product type, provider's name and location, and month of purchase. For plaintiff Celeste Hamilton, no orders for the "Limited" Invisalign product appear in the data, so I average the Invoice Amount across orders for the "Lite" product.

---

[262] See Vogt Report Table 20.
[263] This is estimated in Section L.5.5 of my opening report.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 30, 2023.

_____

William B. Vogt

# Materials Cited

## 1.    Published Literature

Y-D Cho, W-J Kim, H-M Ryoo, Y Ku, "Patent landscape report on dental implants: A technical analysis." Clin Implant Dent Relat Res. 2021 ; 23(6): 857–63, 2021, available at https://onlinelibrary.wiley.com/doi/full/10.1111/cid.13048

Zvi Griliches and Iain Cockburn, "Generics and New Goods in Pharmaceutical Price Indexes", The American Economic Review, vol. 84, no. 5, 1994, pp. 1213–32, available at http://www.jstor.org/stable/2117769

Luis Kaplow and Carl Shapiro, "Antitrust", Handbook of Law and Economics, 2007, Vol. 2, available at https://faculty.haas.berkeley.edu/shapiro/antitrust2007.pdf

David H. Kaye and David A. Freedman, "Reference Guide on Statistics", June 9, 2011, Reference Manual on Scientific Evidence, 3d ed. 2011, pp. 211–302, Washington DC: National Academy Press, available at https://ssrn.com/abstract=2705655

David E. Lebow and Jeremy B. Rudd, "Measurement Error in the Consumer Price Index: Where Do We Stand?", Journal of Economic Literature, 41 (1): 159–201, 2003, available at https://www.aeaweb.org/articles?id=10.1257/002205103321544729

Kevin M. Murphy, Edward A. Snyder, and Robert H. Topel, "Chapter 5: Competitive Discounts and Antitrust Policy," The Oxford Handbook of International Antitrust Economics, Volume 2,Oxford University Press, 2015, available at https://www.econstor.eu/bitstream/10419/262652/1/wp250.pdf

Gary Solon, "Intergenerational Income Mobility in the United States," American Economic Review, American Economic Association, vol. 82(3), pages 393-408, June 1992, available at https://www.jstor.org/stable/2117312.

Yan Song and Douglas Barthold, 2018, "The effects of state-level pharmacist regulations on generic substitution of prescription drugs", Health economics, 27(11), 1717–1737, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6172151/

Frank Verboven and Theon van Dijk, "Cartel Damages Claims and the Passing-On Defense," J. Indus. Econ. 57, Sept. 2009, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1486869

## 2.    Depositions

| |
|---|
| Pudipeddi Deposition Transcript January 7, 2022 (SDC Financial LLC v. Align Tech., Case No.01-20-0005-1541) |
| January 8, 2023 Deposition of Sherwin Matian, DDS |
| See January 20, 2023 Deposition of William Simon, DMD |
| February 28, 2023 Deposition of Christopher Puco |
| February 28, 2023 Deposition of Christopher Puco |
| June 7, 2023 Deposition of Lauren Stiroh |
| June 27, 2023 Deposition of Edward Snyder |

### 3.    Other Documents/Websites

| |
|---|
| 'Consumer Price Index', U.S. Bureau of Labor Statistics,  accessed June 23, 2023,  available at https://www.bls.gov/cpi/#:~:text=The%20Consumer%20Price%20Index%20(CPI,U.S.%20and%20various%20geographic%20areas |
| SmileDirectClubAligners FAQs ("Do you offer an affordable payment plan?", "How long is the typical treatment process?", SmileDirectClub, accessed June 15, 2023, available at https://smiledirectclub.com/faq/#treatment-process |
| 'SmileDirectClub vs. Invisalign: What's the difference?', SmileDirectClub, accessed February 21, 2022, available at https://smiledirectclub.com/blog/smiledirectclub-vs-invisalign/ |

## 4. Bates Stamped Documents

| |
|---|
| ALGN_SWFT0093276 |
| ALIGN0061048 |
| ALIGNAT-PURCH00109211 |
| ALIGNAT-PURCH00401847 |
| ALIGNAT-PURCH00503263 |
| ALIGNAT-PURCH00932992 |
| ALIGNAT-PURCH00932993 |
| ALIGNAT-PURCH01493848 |
| ALIGNAT-PURCH01551611 |
| ALIGNAT-PURCH01603659 |
| ALIGNAT-PURCH01603661 |
| ALIGNAT-PURCH01603664 |
| ALIGNAT-PURCH01798923 |
| ALIGNAT-PURCH01968912 |
| ALIGNAT-PURCH01968976 |
| ALIGNAT-SNOW00001915 |
| ALIGNAT-SNOW00037768 |
| ALIGNAT-SNOW00037774 |
| ALIGNAT-SNOW00037797 |
| ALIGNAT-SNOW00037798 |
| ALIGNAT-SNOW00037820 |
| ALIGNAT-SNOW00037848 |
| ALIGNAT-SNOW00037856 |
| ALIGNAT-SNOW00043790 |
| ALIGNAT-SNOW00043791 |
| ALIGNAT-SNOW00043798 |
| ALIGNAT-SNOW00043818 |
| ALIGNAT-SNOW00043825 |
| ALIGNAT-SNOW00043828 |
| ALIGNAT-SNOW00043831 |
| ALIGNAT-SNOW00136018 |
| ALIGNAT-SNOW00486389 |
| ALIGNAT-SNOW00640833 |
| ALIGNAT-SNOW00739990 |
| ALIGNAT-SNOW00869077 |
| LendingPoint 0001 |