Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br> v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>         Defendant. | Case No. 3:21-cv-03269-VC<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT WITH ALIGN TECHNOLOGY, INC.**<br><br>Date:  May 22, 2025<br>Time:  10:00 AM<br>Judge:  Hon. Vince Chhabria<br>Location: Courtroom 4 – 17th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 22, 2025, at 10:00 AM or as soon thereafter as the matter may be heard by the Honorable Vince Chhabria of the United States District Court for the Northern District of California, located in Courtroom 4, at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order:

1)    preliminarily approving the proposed class action settlement with Align Technology, Inc.;

2)    certifying the settlement class;

3)    appointing Hagens Berman Sobol Shapiro LLP as Settlement Class Counsel; and

4)    approving the manner and form of notice and proposed plan of allocation to class members.

This motion is based on this Notice of Motion and Renewed Motion for Preliminary Approval of Class Action Settlement with Align Technology Inc., the following memorandum of points and authorities, the accompanying settlement agreement, the pleadings and the papers on file in this action, and such other matters as the Court may consider.

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   BACKGROUND ........................................................................................ 2

    A.    Settlement Negotiation ................................................................... 2

    B.    The Settlement Consideration and Release of Claims ..................... 2

        1.    Monetary Relief .................................................................... 2

        2.    Settlement Release ................................................................ 3

    C.    Settlement Administration .............................................................. 3

        1.    Plan of Allocation ................................................................ 4

        2.    Notice and Implementation of Settlement ............................ 7

III.  THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL ............... 9

    A.    Legal Standard ............................................................................... 9

    B.    The Settlement is Fair, Reasonable, and Adequate. ......................... 9

        1.    The Class Has Been Zealously Represented. ......................... 9

        2.    The Settlement Agreement Resulted from Arm's-Length
            Negotiations. ...................................................................... 10

        3.    The Settlement Represents Substantial Relief for the Class. ......... 10

        4.    The Settlement Treats Class Members Equitably. ................ 17

        5.    The Settlement Satisfies the Remaining Factors Set Forth in
            the Northern District's Procedural Guidance ...................... 18

    C.    The Settlement Class Merits Certification. .................................... 22

        1.    Rule 23(a)(1): Numerosity .................................................. 22

        2.    Rule 23(a)(2): The Case Involves Questions of Law or Fact
            Common to the Class. ......................................................... 22

        3.    Rule 23(a)(3): Plaintiffs' Claims Are Typical of the Claims
            of the Class. ........................................................................ 22

        4.    Rule 23(a)(4): Plaintiffs Will Fairly Represent the Interests of
            the Class. ............................................................................ 23

        5.    Rule 23(b)(3): Common Questions of Fact or Law
            Predominate. ...................................................................... 23

6.    Rule 23(b)(3): A Class Action is the Superior Method for Resolving this Litigation.................................................................. 23

D.    The Proposed Notice Program Satisfies Rule 23.................................................... 24

E.    The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel. .................................................................................................................. 25

F.    Proposed Schedule for Notice and Final Approval ................................................ 25

IV.    CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591 (1997) .................................................................................................... 23, 24

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
9 F.4th 1102 (9th Cir. 2021) .............................................................................................. 13

*B.K. by next Friend Tinsley v. Snyder,*
922 F.3d 957 (9th Cir. 2019) ............................................................................................. 22

*Bolton v. U.S. Nursing Corp.,*
2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) .................................................................. 21

*In re Cardizem CD Antitrust Litig.,*
218 F.R.D. 508 (E.D. Mich. 2003) ...................................................................................... 6

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
2015 WL 9266493 (N.D. Cal. Dec. 17, 2015).................................................................. 17

*Churchill Vill., LLC v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004) ............................................................................................. 24

*In re Citric Acid Antitrust Litig.,*
145 F.Supp.2d 1152 (N.D. Cal. 2001) ............................................................................... 17

*de Mira v. Heartland Emp't Serv., LLC,*
2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) .................................................................. 19

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) ........................................................................................... 23

*Hesse v. Sprint Corp.,*
598 F.3d 581 (9th Cir. 2010) ............................................................................................. 18

*In re High-Tech Emp. Antitrust Litig.,*
2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ................................................................... 11

*Hubbard v. RCM Techs. (USA), Inc.,*
2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) .................................................................. 22

*In re Lithium Ion Batteries Antitrust Litig.,*
2020 WL 7264559 (N.D. Cal. Dec. 10, 2020).................................................................. 11

*In re Mexico Money Transfer Litig. (W. Union & Orlandi Valuta),*
164 F. Supp. 2d 1002 (N.D. Ill. 2000) .............................................................................. 17

*In re Namenda Direct Purchaser Antitrust Litig.*,
    462 F. Supp. 3d 307 (S.D.N.Y. 2020) ........................................................................ 6

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ............................................................... 9

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ............................................................................ 5, 6, 19

*In re Online DVD-Rental Antitrust Litig.*,
    Case No. 4:09-md-02029-PJH (N.D. Cal. Dec. 23, 2010) ........................................... 6

*In re Static Random Access (SRAM) Antitrust Litig.*,
    2008 WL 4447592 (N. D. Cal. Sept. 29, 2008) ......................................................... 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    229 F. Supp. 3d 1052 (N.D. Cal. 2017) .................................................................... 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................................................. 22

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................................................ 6

**Statutes**

28 U.S.C. § 1715(b) (2024) ................................................................................................ 19

**Other Authorities**

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................................. 24

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................... 9, 24

Fed. R. Civ. P. 23(e)(1)(B)(ii) ........................................................................................... 22

Fed. R. Civ. P. 23(e)(2)(C) ................................................................................................ 10

Fed. R. Civ. P. 23(e)(2)(C)(iii) .......................................................................................... 19

## I.    PRELIMINARY STATEMENT

Plaintiffs and Align have entered into an amended settlement agreement in response to the Court's February 27, 2025 Order denying the Renewed Motion for Preliminary Approval. The revised settlement is for $31,750,000 in cash, an increase of approximately 15% over the prior cash settlement amount. The settlement (1) is all cash and does not contain any coupon element and thus does not raise any concerns that the settlement may reinforce Align's alleged monopoly position; and (2) represents a meaningful increase in cash over the prior settlement.[1] The settlement is also for a higher cash amount than Plaintiffs were prepared to settle the case for during prior negotiations, where Plaintiffs were targeting an all-cash settlement of $29-$30 million. In total, the Settlement Fund represents up to 17.5% of single damages for the proposed nationwide class, which is comparable with the range of settlements in antitrust cases approved in this district. Plaintiffs submit that this is a fair and reasonable settlement considering the strengths and weaknesses of the litigation.

Plaintiffs also propose a notice and claims process that is responsive to the concerns previously raised by the Court in its prior order of September 18, 2024. Plaintiffs intend to make direct *pro rata* payments to approximately 230,000 class members for whom reliable contact information has been identified. Plaintiffs have contact information for millions of individuals who may be class members.[2] Plaintiffs will engage in a thorough notice campaign to contact those class members, including both direct notice and an advertising campaign. Class members who make a valid claim will receive a proportional payment. All class members with valid claims will ultimately receive the same payment amount.

Plaintiffs respectfully request an Order that: (1) preliminarily approves the proposed Settlement;

---

[1] Align disputes that it has a monopoly position in the relevant market for orthodontic case starts.

[2] The records from SDC contain contact information for significantly more individuals than are in the actual class. The trustee for the estate of SDC represented that this contact information likely contained a mix of actual class members and non-class members (such as individuals who provided their e-mail address to SDC at some point but did not end up purchasing the product.)

(2) certifies the Settlement Class; (3) appoints Hagens Berman Sobol Shapiro LLP as Settlement Class Counsel; and (4) approves the manner and form of notice and proposed plan of distribution to Settlement Class Members.

## II.    BACKGROUND

The Court is well-versed in the history of this case. Plaintiffs therefore briefly summarize the proceedings since the Renewed Motion for Preliminary Approval.

### A.    Settlement Negotiation

The parties began negotiating a revised settlement agreement after the preliminary approval hearing on December 12, 2024. *See* Declaration of Rio S. Pierce ¶ 4 ("Pierce Dec.") (filed concurrently herewith). The parties negotiated over a period of several months in a dedicated effort to address the Court's concerns. They engaged in numerous direct telephone calls, then held a mediation via Zoom on March 7, 2025, which was led by Greg Lindstrom and his team. Mr. Lindstrom had worked extensively with the parties during the prior settlement negotiations. The parties reached agreement on the principal terms of the revised settlement during the mediation held on March 7. *See id.* ¶ 4.   The parties subsequently executed a revised settlement agreement on March 28, 2025. *See id.* ¶ 5.

### B.    The Settlement Consideration and Release of Claims

The proposed Settlement provides monetary relief in exchange for a release of claims. The proposed settlement includes no coupon relief. The elements of the Settlement are addressed in turn below.

#### 1.    Monetary Relief

Align has committed to pay $31,750,000 into a Settlement Fund for the benefit of the Settlement Class. *See id.*, Ex. A ¶ 16. The Settlement Fund is non-reversionary, meaning that no portion of the fund will ever return to Align. *See id.*, Ex. A ¶ 34. The Settlement Fund represents up to 17.5% of the estimated single damages for the nationwide Settlement Class.

### 2.    Settlement Release

In exchange for the monetary relief just described, the Settlement Class would release Align from "all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged" in this case. *See* Pierce Decl., Ex. A ¶ 8. The scope of the release is limited to claims based on the case's "identical factual predicate," and thus excludes unrelated claims, such as for personal injury, that class members may have against Align. The proposed Release also does not relinquish any claims that any SDC purchaser may have against the estate of SDC. The proposed Release does not relinquish the claims of any SDC purchaser not within the Settlement Class. *See* Standing Order for Civil Cases Before J. Vince Chhabria at 14.

### C.    Settlement Administration

After extensive negotiations with the bankruptcy trustee for SDC, Plaintiffs obtained two primary sources of class member contact information.[3] First, Plaintiffs obtained a file that contains 232,782 class member records for actual class members provided by SDC. The data in this file appears to be comprehensive and complete, and includes the approximate date of purchase, the type of purchase, and both physical and digital addresses for these class members. However, this data source is incomplete because the total number of class transactions is approximately 1,400,000.

Second, Plaintiffs obtained numerous additional electronic files from the estate of SDC that were maintained on Salesforce. The bankruptcy trustee for SDC represented that these files contain a large amount of contact information for potential customers and other sales leads who are not actually class members. Plaintiffs' settlement administrator, Epiq, has completed an analysis of this information and found that, in total, the files contain over 20 million e-mail addresses. Declaration of Cameron A. Azari ¶¶ 14-16 ("Azari Decl.") (filed concurrently herewith). These files generally do not provide specific

---

[3] These negotiations were complicated because SDC is in Chapter 7 bankruptcy and no longer has functioning business operations. Plaintiffs had to engage in additional discussions with consultants retained by the trustee for SDC, as well as Salesforce, the vendor for SDC.

details on any transactions associated with an e-mail address or mailing address. This contact information significantly exceeds the total number of class transactions.

Third, Plaintiffs have obtained from Apple and Google contact information for individuals who downloaded the SDC app from either Apple's App Store or Google's Play Store. Google produced information on 51,754 potential customers, Apple produced information on approximately 56,726 potential class members. Azari Decl. ¶ 16. Plaintiffs will incorporate this contact information in the electronic notice they provide.

### 1. Plan of Allocation

Plaintiffs propose using the same basic claims process that was set forth in the revised motion for preliminary approval. The approximately 230,000 class members with reliable contact information from SDC (which indicates they have a valid claim) will receive an automatic payment. After further discussions with Epiq, Plaintiffs propose that the 230,000 class members receive a single automatic payment that represents their pro rata share of the net Settlement Fund after accounting for fees and expenses. In other words, these class members will be assumed to have a valid Claim, and will be paid accordingly. Plaintiffs submit that this method will best maximize the number of class members who are paid their full share of the available settlement funds. This method will also avoid burdening and potentially confusing Class members, because they will not have to submit additional paperwork in order to receive their claim.[4]

Potential class members will also have the opportunity to submit claim forms. Class members who submit valid claims will then receive payments.

All class members with valid claims will ultimately receive the same payment amount, regardless of whether they are assumed to have a valid claim based on the information from SDC or submit a valid

---

[4] Plaintiffs anticipate that this distribution will result in at least some class members not cashing the check payments that they receive. Plaintiffs intend to redistribute on a pro rata basis any unclaimed funds to class members who do redeem the payment they receive.

claim form. Plaintiffs estimate that these direct payments for class members who submit claims will likely range between $40 to $60, based on standard claims rates in comparable cases.[5] In order to incentivize claims rates, Plaintiffs will state on the various notice forms that each class member who submits a valid claim will receive at least $10.[6] Plaintiffs propose that each class member who submits a claim receive the same payment, regardless of whether that class member is eligible for direct payments or submits a claims form.

Plaintiffs also propose that all class members who submit claims receive an equal pro rata share of the settlement fund, regardless of whether they paid for their aligners using SmilePay or FullPay. Plaintiffs submit that this is the most equitable approach to distributing funds for three reasons.

*First*, all settlement class members (1) suffered the same economic injury, (2) allege their injury arises from the same course of conduct, and (3) had equally strong claims on the merits. Further, (4) the maximum difference in overcharges paid between Settlement Class members was less than $150.[7] In similar circumstances, courts have approved similar equal, pro rata distribution plans.[8]

*Second*, even the most detailed customer contact information from SDC does not generally record each customer's method of payment. Therefore, Plaintiffs will not be able to determine a Settlement Class member's method of payment until the Settlement Class member submits a claims form. Because of this fact, Plaintiffs have not identified any way to reliably issue direct payments to class members who have not submitted claims forms that differentiates based on their method of payment. The Court

---

[5] After accounting for the maximum possible fees and expenses, as well as estimated notice costs of approximately $1 million, Plaintiffs estimate that the total available settlement funds will be approximately $19.75 million. Plaintiffs estimate a total class size of approximately 1.4 million class members. Under the current proposal, at least 230,000 class members will be considered to have valid claims. For example, if an additional 100,000 class members may make claims, then each individual class member would receive approximately $60.

[6] Plaintiffs are able to guarantee a payment of at least $10 because that is less than the pro rata share that each class member would receive if all class members submitted claims.

[7] Pls.' Unopposed Mot. for Prelim. Approval of Class Action Settlement with Align Technology, Inc., ("Unopposed Mot.") ECF No. 612 at 6, 11–12.

[8] *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 945 (9th Cir. 2015).

encouraged Plaintiffs to determine a methodology for making payments to class members, even if they do not submit a claims form. Distributing equal pro rata shares to Settlement Class members will allow for direct payments to be made without the submission of a claims form.

*Third*, counsel for Plaintiffs respectfully submit that the relatively small differences in both overcharge and estimated payment between SmilePay and FullPay militate in favor of a pro rata distribution across all class members, particularly considering the fact that significantly more class members selected SDC's "SmilePay" (rather than "FullPay") option. On an individual class member basis, the maximum percentage difference is approximately 42% between the highest overcharge and lowest overcharge.[9]  This is a significantly smaller percentage difference than other antitrust cases in which courts have approved an equal pro rata plan of allocation.[10]

Further, as Plaintiffs previously explained in their Renewed Motion for Preliminary Approval, although FullPay damages are higher on an individual basis, on a collective basis, SmilePay damages were higher because more class members used that payment option. Therefore, the difference in proportional damages between the two groups of class members is small. And equally dividing the settlement fund also prevents any inequitable outcomes if there is a significantly greater percentage of settlement participation among SmilePay or FullPay customers.[11]

---

[9] The maximum overcharge suffered by a class member was $352 and the minimum overcharge was $230. Pls.' Mot. for Class Certification, ECF No. 540 (Ex. 6), Rebuttal Report of William B. Vogt, Ph.D. at 100. So, $(352\text{-}230) / ((352 + 230) * 0.5) = 0.41924$.

[10] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 940(equally apportioning a settlement fund among class members where some class members paid for a Netflix subscription for more than six years and some for a significantly shorter period); Pls.' Mot. for Class Certification, ECF No. 128, at 8, *In re Online DVD-Rental Antitrust Litig.*, Case No. 4:09-md-02029-PJH (N.D. Cal. Dec. 23, 2010) (showing Netflix subscription prices ranging between $8.99 and $16.99 during the class period, which is a 62% difference); *see In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable).

[11] Pls.' Renewed Mot. For Prelim. Approval of Class Action Settlement With Align Tech., Inc. ("Renewed Mot."), ECF No. 628 at 10-12.

For these reasons, Plaintiffs respectfully submit that an equal pro rata allocation plan is appropriate.

### 2. Notice and Implementation of Settlement

Plaintiffs have attached to this motion a declaration from the Settlement Administrator, Epiq LLC ("Epiq"), that proposes a comprehensive notice program and includes a proposed Long Form Notice and Summary Notice (both email and postcard). *See* Azari Decl. ¶¶ 14-34, Pierce Decl., Exs. B-D. The proposed notice program provides direct notice to all reasonably identifiable Settlement Class Members, combined with a state-of-the-art digital notice campaign, and the implementation of a dedicated website and a toll-free telephone line where Settlement Class Members can learn more about the Settlement and their options. *See* Azari Decl. ¶¶ 35-37.

The proposed notices will provide general information about the lawsuit and Settlement, while informing Settlement Class Members of the options available to them, including the options of objecting to, or opting out of, the Settlement. *See* Azari Decl. ¶¶ 14-34, Pierce Decl. Exs. B, C, D. The notice will instruct class members who wish to opt out of the settlement to send a letter to Epiq, setting forth their name and information needed to be properly identified. *Id.*, Pierce Decl. Ex. B. There will also be an opt out form on the case-specific website that will allow class members to opt out of the Settlement Class. *Id.*, Pierce Decl. Ex. B. The notice clearly advises class members of the deadline, methods to opt out, and the consequences of opting out. *Id.*, Pierce Decl. Ex. B. The notice will also provide class members with information about the cash payment they are guaranteed to receive if they do make a claim.

Epiq will establish a case-specific toll-free hotline and a case-specific website, with the domain reserved as www.SDCAlignerSettlement.com. *See* Azari Decl. ¶ 35. On the settlement website, Settlement Class members will be able to view general information about this class action, read relevant Court documents, and review important dates and deadlines pertinent to the Settlement. For example, the detailed Long Form Notice will be available for download on the website. *See id.* The settlement

website will be designed to be user-friendly and enable Settlement Class Members to easily find information about the Settlement.

The direct notice campaign will be supplemented with a robust digital campaign to ensure that all potential Settlement Class Members receive notice. Epiq will utilize a form of internet advertising known as targeted digital advertising. Digital notice will be targeted to selected audiences and are designed to encourage participation by Settlement Class members. *Id.* ¶ 32. The digital notice campaign will also include a social media campaign utilizing Facebook and Reddit. *Id.* ¶¶ 27-29. The plan will likewise include a paid search campaign on Google, Yahoo!, and Bing to help drive Class Members who are actively searching for information about the Settlement to the settlement website. *Id.* ¶ 32. The digital notice campaign will target a nationwide audience and run for approximately six weeks. *Id.* ¶ 31. The costs of notice and administration will be paid from the Settlement Fund. *See* Pierce Decl., Ex. A ¶ 31.

Plaintiffs propose two primary notice methods, based on the contact information that they have obtained to date.

*First*, Plaintiffs intend to provide notice (both mailed and electronic) to the approximately 230,000 class members for whom Plaintiffs have reliable contact information. This notice will state that these class members are assumed to have a valid claim and will receive a payment reflecting their pro rata share of the net Settlement Fund after final approval regardless of whether they submit a claim. These proposed electronic and postcard notice forms are attached as Exhibits C and D.[12]

Second, Plaintiffs will send electronic notice to all potential class members that they can identify from the files produced by SDC, Apple, and Google. *See* Azari Decl. ¶¶ 20-21. This notice will state that valid members of the class will receive a payment if they submit a claim. This proposed electronic notice form is attached as Exhibit C. Plaintiffs will also provide mailed notice to potential class members

---

[12] Plaintiffs also attach a long form notice, claims form, and electronic opt out form as Exhibits B, E and F.

identified in the files of Apple.[13] If an eligible Settlement Class member who is not going to receive a direct payment fills out a claims form, she will be entitled to the full amount of her pro rata share of the settlement fund. The pro rata share to which each class member is entitled will be determined after final approval of the settlement is granted, once Plaintiffs have received and validated all claims.

Under this approach, all Settlement Class Members will ultimately receive the same payment amount, regardless of whether they have been identified as possessing valid claims or because they submit validated claim forms.

### III.    THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

**A.    Legal Standard**

Federal Rule of Civil Procedure 23(c) requires judicial approval of any compromise or settlement of class action claims. Preliminary approval establishes an "initial presumption of fairness, such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response." *Nitsch v. DreamWorks Animation SKG Inc*., 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017). A settlement may preliminarily be approved upon a "showing that the court will likely be able to (i) approve the proposal under Rule 23(c)(2); and (ii) certify the class for purposes of judgement on the proposal." Fed. R. Civ. P. 23(e)(1)(B). "[T]he Court's scrutiny of the proposed settlement will be as rigorous at the preliminary approval stage as at the final approval stage[.]"[14]  All preliminary approval requirements are met here.

**B.    The Settlement is Fair, Reasonable, and Adequate.**

**1.    The Class Has Been Zealously Represented.**

As set forth in the prior Motion for Preliminary Approval, Plaintiffs' counsel has thoroughly litigated this case for a number of years. Plaintiffs defeated multiple motions to dismiss. Counsel engaged

---

[13] The files produced by Google do not contain mailing addresses. *See* Azari Decl. ¶ 22.

[14] *See* Standing Order for Civil Cases Before J. Vince Chhabria at 13 (requiring that "[a]ny motion for preliminary approval should explain why the settlement survives this level of scrutiny");

in extensive discovery, including bringing multiple motions to compel and conducting more than 20 depositions specific to their Section 1 claim. Plaintiffs' counsel also fully briefed class certification, including preparing four separate expert reports that covered both merits and class certification issues.[15] Named Plaintiffs likewise have furthered the interests of the class by reviewing submissions, conferring with Counsel, producing documents, and sitting for depositions. *See* Bozian Decl. ¶ 4 (ECF No. 615); Casad Decl. ¶ 4 (ECF No. 616); Eaton Decl. ¶ 4 (ECF No. 617). The Settlement Class has been adequately represented.

### 2.    The Settlement Agreement Resulted from Arm's-Length Negotiations.

The revised Settlement is the product of sustained arms-length negotiations over a period of several months, including a mediation held before one of the nation's leading mediators.

### 3.    The Settlement Represents Substantial Relief for the Class.

Preliminary approval requires consideration of whether the "relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C). It is here.

The $31.75 million Settlement Fund is substantial and adequate relief. Plaintiffs have presented damages models that estimate damages of between $181 million to $485 million in single damages. *See* Pls.' Mot. for Class Certification, ECF No. 540 (Ex. 5) Expert Report of William B. Vogt, Ph.D, ("Vogt Report") at 380-82. Because Plaintiffs' higher end damage models faced additional litigation challenges before they would be permitted to be presented to the jury, Plaintiffs believe that the most conservative assessment of the Settlement Fund is to compare it to its $181 million damages model, which would represent a 17.5 percent recovery of claimed single damages.[16] This is consistent with the recovery in

---

[15] *See* Declaration of Steve W. Berman in Support of Pls.' Unopposed Mot. for Prelim. Approval of Class Action Settlement with Align Technology, Inc., ECF No. 613 ¶ 5 ("Berman Decl.).

[16] Align indicated that it intended to move to *Daubert* plaintiffs' damages expert at the summary judgment stage to exclude three of his four damages models because they were before-after models that improperly failed to account for the expiration of the restrictive covenant in August 2022 and thus that those models are unreliable and must not be presented to a jury. If Align were to prevail on its challenge to Dr. Vogt's methodologies, only his alternative "Model 4" damages of $181 million, which

other large antitrust settlements in this district. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd*, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (approving a settlement fund that comprised 11.7 percent of single damages); *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) (approving of a settlement fund that comprised 14.2 percent of single damages).

Furthermore, this estimate of single damages assumes that the Plaintiffs were able to certify a nationwide class. At class certification, Align raised various arguments, based on undisputed arbitration agreements between all class members and SDC, that Align, as a third-party beneficiary, would be able to compel arbitration against class members from at least certain states. Apart from waiver, Plaintiffs' primary response to this argument was that Align should make those arguments after the class was certified by bringing a motion to compel arbitration. If the class was certified, then Plaintiffs anticipate Align would have brought such motions and may have been successful in reducing the size of the class by removing class members from certain states. This would have significantly reduced the total damages available to the class; thus, the 6.5 to 17.5 percent figure above represents the highest possible estimate of the total damages that would have been available to the class at trial, while actual damages available may have been significantly less.

This settlement is appropriate in light of the strengths and weaknesses of the case. Plaintiffs discuss the strengths and weaknesses of the case that have emerged during discovery.[17]

First, in many antitrust cases involving per se agreements, the existence and scope of the challenged agreement is a heavily disputed factual matter. Here, by contrast, the existence of a written agreement between Align and SDC that explicitly restrained Align's ability to compete in the DTC

---

incorporated SDC sales data after the August 2022 expiration of the restrictive covenant, would be presented to jury, which decision would significantly reduce the amount of damages the class received.

[17] Plaintiffs draw this discussion from their Renewed Motion for Preliminary Approval and summarize it here for the Court's convenience. *See* ECF No. 628 at 12-21. The strengths and weaknesses of the case are unchanged since that motion was filed.

aligner market is undisputed.

Second, the developed factual record shows that the restrictive covenant was not reasonably necessary to other aspects of the business relationship between Align and SDC. Plaintiffs conducted extensive discovery related to the negotiations over the business relationship between Align and SDC. That negotiating history revealed a clear lack of connection between the supply agreement between Align and SDC and the restrictive covenant.[18]

Third, the developed factual record shows that the restrictive covenant had an actual effect on competition. After Align attempted to enter the DTC aligner market by opening retail stores, SDC invoked the restrictive covenant to obtain an injunction from an arbitrator that forced Align to close all of its retail stores. The factual record also shows the significant economic value that SDC placed solely on restricting competition. By 2018, SDC was able to manufacture aligners at significantly cheaper prices than it would cost to purchase them from Align. Nevertheless, SDC still purchased the minimum volumes of aligners necessary to extend the restrictive covenant.

Fourth, the economic data shows a clear and obvious price effect. Starting in July 2016, when Align and SDC entered into the restrictive covenant, SDC increased its prices substantially even though its costs per treatment were rapidly decreasing. *See* Renewed Mot. at 15. This change in pricing behavior was unusual and represented a statistically significant break from SDC's prior pricing practices.

Fifth, the facts of the economic transactions at issue make this a strong case for class certification. The case involves a single product sold by a single defendant at two established price points (one for SmilePay and one for FullPay). Although SDC sometimes offered individual discounts, SDC executives explained at deposition that these were always set in relation to the list prices for FullPay and SmilePay. Consistent with these facts, in negotiating the settlement, Plaintiffs placed a reasonably high likelihood

---

[18] Renewed Mot., (ECF No. 628) at 13-14.

on the class ultimately being certified.[19]

The case also has significant risks that make a settlement ultimately in the best interests of the class. Plaintiffs enumerate the most significant risks that they considered in determining the settlement represented a fair and reasonable result for the class.

*First*, it is uncertain whether the restraint at issue—the restrictive covenant—will ultimately be analyzed under the per se or rule of reason standard. Align has indicated that it would move for summary judgment on Plaintiffs' per se claim, arguing that its overall agreement with SDC was an "output enhancing deal, centered around a vertical supply agreement," and thus that the agreement "is manifestly not within the 'small group of restraints are unreasonable *per se* because they always or almost always restrict competition and decrease output.'"[20] The key question in resolving this issue is whether the restrictive covenant was "reasonably necessary" for the overall business relationship between Align and SDC.[21] Align will rely on testimony from senior executives at both Align and SDC that they would not have executed the agreements if not for the restrictive covenant.

Plaintiffs have responses. As discussed above, the testimony of Align and SDC executives is inconsistent with the negotiating history, as well as deposition testimony from other executives at both Align and SDC.[22] Nevertheless, a finder of fact may credit the testimony from senior decisionmakers at both Align and SDC regarding their business reasons for entering into a deal and determine that the Restrictive Covenant was an ancillary restraint—one that should be analyzed under the rule of reason. If the rule of reason applies, then the settlement value of the case decreases, as the rule of reason is a more favorable standard for antitrust defendants than the per se standard.

---

[19] Align disputes each of these points other than the first.

[20] Def. Align Technology Inc.'s Opp. to Mot. for Class Certification and *Daubert* Mot. to Preclude Expert Testimony ("Class Cert. Opp."), ECF No. 562 at 9, n.47 (quoting *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021)).

[21] *Aya Healthcare Servs.,* 9 F.4th at 1109 (explaining that a horizontal restraint is ancillary if it is "subordinate and collateral to a separate, legitimate transaction" and "reasonably necessary to achieving that transaction's pro-competitive purpose.").

[22] Vogt Report at 50–52.

*Second*, if the restraint is evaluated under the rule of reason, then the finder of fact will have to weigh the anticompetitive effects against the procompetitive benefits of the business relationship between Align and SDC. Align has presented evidence that it was uniquely situated to provide the manufacturing capacity, funding, and access to its patents necessary for SDC to scale the first-ever DTC aligner company,[23] and that these Align contributions to SDC made possible by the Align-SDC relationship caused SDC's subsequent exponential sales growth, with SDC's aligner output increasing by 3,000 percent per month."[24] Under the rule of reason, a finder of fact could credit the evidence relied upon by Align to find that the procompetitive benefits of the Align-SDC deal outweighed its alleged anticompetitive harms and that the restrictive covenant had no effect on the prices of SDC aligners.

*Third*, SDC filed for bankruptcy in the fall of 2023. The bankruptcy ultimately became a Chapter 7 liquidation and SDC has now shuttered its business operations. Align has seized on this fact to advance several arguments related to key economic questions in the case. In particular, Align has argued that SDC's eventual bankruptcy makes Plaintiffs' modelled overcharges unrealistic because SDC could not have afforded to charge lower prices in the but for world than it charged in the actual world.[25]  Plaintiffs' position is that this argument is meritless because (1) SDC's unprofitability was directly related to its decision to invest (ultimately excessively) its revenues into marketing expenses in order to obtain a first mover advantage; and (2) SDC could and did adjust its marketing expenses if it wanted to, such as in the period around its initial public offering.[26] Nevertheless, Plaintiffs understand that this argument may have an appeal that strengthened certain of Align's challenges to Plaintiffs' economic modeling.

*Fourth*, it is undisputed that at least the bulk of the proposed class entered into agreements with SDC that contained arbitration and class waiver provisions. Align has argued that "[t]he proposed class

---

[23] Class Cert. Opp., ECF No. 562 at 7–9.

[24] *Id.* at 9, n.46.

[25] *Id.* at 20–21.

[26] Pls.' Reply in Supp. of Mot. for Class Certification ("Class Cert Reply"), ECF No. 582 at 12–13.

members each signed arbitration agreements and most also signed class-waiver agreements that make certifying a Rule 23 class impractical and unworkable."[27] As Plaintiffs have explained in the class certification briefing, Align has waived its right to invoke the agreements, Align has not demonstrated that it could successfully invoke the agreements against any member of the proposed Settlement Class, and this issue could readily be resolved through a motion to compel or modify the class definition.[28] However, even if the Court were to adopt Plaintiffs' position and certify the class, it is possible that Align would nevertheless bring motions to compel arbitration or modify the class definition for at least some states.[29] If Align succeeded in bringing those motions (e.g., by successfully compelling arbitration as to purchases by class members in certain states), this would significantly affect the likely settlement value that the class could obtain and would narrow the number of class members entitled to relief.

*Fifth*, the economic modeling of overcharges is complicated, and there is a significant range in the potential damages that a finder of fact could find based on the economic models provided by the expert witnesses. Align indicated that it intended to move to *Daubert* plaintiffs' damages expert at the summary judgment stage to exclude three of his four damages models because they were before-after models that improperly failed to account for the expiration of the Restrictive Covenant in August 2022. If Align were to prevail on its challenge to Dr. Vogt's methodologies, only his alternative "Model 4" damages of $209 million, which incorporated SDC sales data after the August 2022 expiration of the restrictive covenant, would be presented to the jury. Plaintiffs submit that their economic models are reliable and precisely consistent with the price effect that would be expected from an anticompetitive restraint that allocated a market between the two primary competitors in that market. Nonetheless, even if liability is proven, it is difficult to reliably predict how the ultimate finder of fact would ultimately determine which model is reliable for use in estimating damages. Therefore, there is a wide range of potential damages that could

---

[27] Class Cert. Opp., ECF No. 562 at 23.

[28] Class Cert. Reply, ECF No. 582 at 15–17.

[29] *Id.* at 18–19.

be awarded even if Plaintiffs establish liability.

The $31.75 million settlement fund has been increased by $4.25 million over the prior proposed settlement fund of $27.5 million primarily to compensate for the removal of the coupon component from the prior settlement fund. Plaintiffs submit that this increase is fair and reasonable considering the negotiating history between the parties over the prior proposed settlement. Before the concept of coupons was introduced into the settlement process, the parties were relatively close on the cash value of the settlement with Align offering $27.5 million to settle, and Plaintiffs offering $32.5 million to settle. Pierce Decl. ¶ 3.  Plaintiffs understood that the mediator was likely to make a mediator's proposal of approximately $29-$30 million in cash, without any coupon component, which Plaintiffs were prepared to accept. *Id*. As an alternative, Align then introduced the concept of a coupon component, which Plaintiffs accepted as a way of bridging the relatively small gap between the parties over the cash value of the settlement. Therefore, the revised all-cash settlement of $31.75 million represents more than Plaintiffs were previously prepared to accept to settle the case, without any coupon component, at the same stage of the litigation. *Id*.

Plaintiffs acknowledge that the potential nominal value of the Coupons that were included in the prior settlement is higher than the increase in the monetary value of the settlement from the Prior Settlement to this Settlement. However, as Plaintiffs have previously stated, the number of class members who would have claimed the Coupons if they were offered was highly uncertain. In particular, the nature of the product at issue—an expensive course of aligners that are generally meant to be a one-time treatment—meant that many class members would likely not have any interest in coupons to obtain aligner treatment again. Plaintiffs and Align estimated that potentially between 5-10% of the class, at most, would have likely claimed the coupons for aligners, meaning that this aspect of the settlement agreement would have benefitted only a minority of the class. Align's expert estimated that the number would be far less than 6.6%. (ECF No. 631-1 ¶¶ 20-22.) Moreover, courts recognize that cash settlements

are likely to be lower in value than the potential face value of coupon relief, because coupon settlements "can provide class members with more value than a cash settlement because the defendant is likely to be much more generous in its coupon offer." *In re Mexico Money Transfer Litig. (W. Union & Orlandi Valuta)*, 164 F. Supp. 2d 1002, 1018–19 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748–49 (7th Cir. 2001). By contrast, the increase in the monetary value of the settlement benefits all class members. And the Court outlined significant concerns with the potential anticompetitive effect of the coupons.[30] The current cash settlement raises no such concerns, and therefore provides class members with significant relief without any of the countervailing potential harm that previously concerned the Court and led it to deny settlement.

Therefore, Plaintiffs submit that the revised settlement represents adequate relief for the class considering the strengths and weaknesses of the litigation.

### 4.    The Settlement Treats Class Members Equitably.

A plan of allocation is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015). And, "[a] plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable." *In re Citric Acid Antitrust Litig.*, 145 F.Supp.2d 1152, 1154 (N.D. Cal. 2001). As set forth in detail above, Plaintiffs propose an equitable allocation plan where each class member who submits a claims form will receive the same payment. Plaintiffs submit that this plan of allocation is consistent with the theory of liability, which does not vary between class members, and the relatively small differences in overcharges

---

[30] While the Court made statements in its February 27, 2025 order that could be misinterpreted as if the Court had previously ruled on the issue of whether Align is a "monopolist", Align notes that the Plaintiffs' allegations of Align being a monopolist were in connection with the separate, bifurcated Section 2 part of the case that was the subject of summary judgment for Align and were not proven with evidence.   Plaintiffs agree that their allegations of Align being a monopolist in the separate doctor-provided aligner market at issue in the Section 2 case were not adjudicated before the case was decided on summary judgment.

between class members, regardless of the method of payment they used.

In addition, following guidance from this Court, Plaintiffs have proposed that reasonably identifiable class members receive a direct payment, regardless of whether they submit a claims form. Plaintiffs believe that this additional form of payment will be fair, reasonable, and adequate because it will significantly increase the number of class members who receive funds as a result of the settlement. Settlement Class Members will still be incentivized to submit claims forms, because Settlement Class Members who submit claims forms will receive significantly greater payments than Settlement Class Members who receive a direct payment but choose not to submit a claims form. Therefore, Settlement Class Counsel believe that this proposed allocation plan is fair, reasonable, and adequate

### 5. The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance

This District's Procedural Guidance for Class Action Settlements instructs parties to address certain additional factors in any motion to preliminarily approve a class settlement. Plaintiffs previously addressed these factors in detail as part of the first Motion for Preliminary Approval.[31] Plaintiffs summarize these factors again briefly. First, the Settlement Class definition is the same as the proposed class definition in the operative complaint.[32] Second, the Settlement release narrowly extends beyond the specific claims asserted, but only to encompass potential claims "based on any or all of the same factual predicates for the claims alleged" here. Pierce Decl., Ex. A ¶ 8. The scope of this release is consistent with Ninth Circuit law.[33] Third, Epiq was selected as the notice and claims administrator as part of a competitive bidding process. Fourth, Epiq will mail notice of the proposed revised Settlement and Release to the United States Attorney General, all 50 States' Attorney General, the Attorney General

---

[31] Unopposed Mot., ECF No. 612 at 12-18.

[32] *See* Procedural Guidance for Class Action Settlements §1(a) (Sept. 5, 2024), https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ ("Procedural Guidance"). (stating that a motion for preliminary approval must address "any differences between the settlement class and the class proposed in the operative complaint . . . and [provide] an explanation as to why the differences are appropriate in the instant case.").

[33] *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

of the District of Columbia, and the Attorney General of all five major U.S. Territories, within ten days of the filing of this proposed Settlement. *See* 28 U.S.C. § 1715(b) (2024); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017).

### a.    Plaintiffs have worked to maximize the potential claims rate.

Under the proposed allocation plan, approximately 15% of the class will receive direct payment without making a separate claim. In addition, Plaintiffs have proposed a notice campaign that will result in at least 80% of class members receiving notice. *See* Azari Decl. ¶ 42. Plaintiffs have also structured the notice campaign to incentivize class members to submit claims by providing a guaranteed payment amount for all class members who submit a claim. Therefore, Plaintiffs have worked to take all reasonable steps to maximize the number of class members who submit claims.

### b.    Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs.

In evaluating the adequacy of a proposed settlement, the Court also looks to the potentially requested attorney's fees. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). Plaintiffs will make a request for attorneys' fees of up to 25% of the sum of the cash Settlement Fund. The proposed notice advises the Settlement Class of counsel's potential fee request and Align reserves all rights to oppose any fee application made. *See* Pearce Decl., Ex. B.

Counsel's potential fee request is reasonable. When applying the percentage-of-the fund method, the Ninth Circuit has established a benchmark percentage of 25 percent to be used as the "starting point" for analysis. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 949, 955. "That percentage amount can then be adjusted upward or downward depending on the circumstances of the case." *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014). Courts in this district have recognized that "in most common fund cases, the award *exceeds* th[e] benchmark." *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1047) (emphasis added).

Through the end of July 2024, Plaintiffs have invested approximately 9,520 hours and $4.23

million in attorneys' fees in this litigation specifically for the Section 1 claim. *See* Berman Decl. ¶ 8.[34] A $7.9375 million attorneys' fee award (25% of $31.75 million)—would therefore result in a lodestar multiplier of 1.87 (not counting hours after July 2024). That is well within the range of awards in other class action settlements. *Vizcaino v. Microsoft Corp.*, a leading Ninth Circuit case on attorneys' fees, the Court affirmed a fee award with a 3.66 multiplier. *See* 290 F.3d 1043, 1050-51 (9th Cir. 2002); *see id.* at 1051 n.6 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998)) (cleaned up).

Apart from the costs of class notice, Plaintiffs will also request reimbursement of certain costs and expenses, not to exceed $3 million. *See* Procedural Guidance § 6 (instructing class counsel to "include information about the fees and costs (including expert fees) they intend to request"). Those expenses are primarily driven by approximately $2.7 million in expert costs. *See* Berman Decl. ¶ 9. Plaintiffs will also exclude all costs solely associated with the Section 2 claim (such as expert fees for experts solely on that claim) from their attorney fee motion and will equally divide costs shared between the two claims (such as costs associated with document storage). *Id.*

      **c.**    **Plaintiffs Intend to Request Reasonable Service Awards for Named Plaintiffs.**

Pursuant to § 7 of the Procedural Guidance, Plaintiffs intend to request Service Awards of $7,500 for each of the three Named Plaintiffs. These service awards are warranted.

The Named Plaintiffs have been actively involved in the litigation. Each Named Plaintiff reviewed pleadings and consulted with Counsel regarding case developments. The Named Plaintiffs responded to 168 document requests each, and two responded to an additional nineteen interrogatories while the third responded to twenty. *See id.* ¶ 3. All were deposed and devoted numerous hours to preparing for

---

[34] Plaintiffs have not yet calculated the Section 1 specific fees from July 2024 through March 2025, but do not anticipate that they will add particularly significant amounts, as the Section 1 claim has been stayed, except for time spent on the approval process.

deposition. All conducted document searches and collected materials, producing hundreds of documents in total. *See* Berman Decl. ¶ 11; Casad Decl. ¶ 4 (ECF No. 616); Eaton Decl. ¶ 4 (ECF No. 617); Bozian Decl. ¶ 4 (ECF No. 615). No Named Plaintiff derived a personal benefit beyond any recovery to the Settlement Class. In addition, a $7,500 service award represents just 0.03 percent of the Settlement Fund, such that Named Plaintiffs do not stand to recover substantially more than other Settlement Class Members. *See Bolton v. U.S. Nursing Corp*., 2013 WL 5700403, at *6 (N.D. Cal. Oct. 18, 2013). The Named Plaintiffs have also reviewed and approved the terms of the revised settlement. Pierce Decl. ¶ 4.

### d.    Plaintiffs have addressed each point in the Court's Standing Order related to Preliminary Approval.

Plaintiffs briefly summarize certain points that the Court's Standing Order specifically instructs should be addressed in any Preliminary Approval motion.

*First*, as discussed in Section IV.A.3, this settlement survives rigorous scrutiny. Plaintiffs faced significant risks in continuing to litigate, settled on favorable financial terms, and ensured monetary recovery for all class members.

*Second*, the release language clearly states that class members are only releasing claims based on the factual predicate that gave rise to the litigation. Class members are not releasing any claims against SDC, not named as a defendant in this litigation, nor does the settlement release any claims that Class members may have related to the ongoing Section 2 claim against Align.

*Third*, Plaintiffs are not asking the Court to enjoin current or future litigation in other courts based on the conduct covered by the release.

*Fourth*, Plaintiffs have also prepared proposed notices, claims forms, and other documents that are mindful of the Court's standing order. Plaintiffs have included a proposed opt-out form in the documents provided to the Court. The long and short form notice states that Class members who do not timely object will still be able to attend the Final Approval Hearing to object, provided that they show good cause for their failure to timely object. And, as discussed above, Plaintiffs have proposed an allocation process

that provides direct payments, without a claims form, to class members for whom there is reliable class contact information.

**C.    The Settlement Class Merits Certification.**

Preliminary approval also requires the Court to determine whether it is likely to "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii).[35]

**1.    Rule 23(a)(1): Numerosity**

The numerosity requirement is generally satisfied if the class contains 40 members. *See Hubbard v. RCM Techs. (USA), Inc.,* 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20, 2020). The Settlement Class here has nearly 1.45 million members. *See* Vogt Report at Table 12. This satisfies the numerosity requirement.

**2.    Rule 23(a)(2): The Case Involves Questions of Law or Fact Common to the Class.**

"Even a single [common] question" will satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Here, there are numerous common questions, including (1) whether the agreement violated the antitrust laws; (2) whether the agreement raised prices for clear aligners; (3) whether members of the Settlement Class paid overcharges as a result of the conduct. These questions establish commonality.

**3.    Rule 23(a)(3): Plaintiffs' Claims Are Typical of the Claims of the Class.**

Typicality requires that the Named Plaintiffs' claims be "reasonably coextensive with those of absent class members; they need not be substantially identical." *B.K. by next Friend Tinsley v. Snyder*, 922 F.3d 957, 969-70 (9th Cir. 2019). Here, typicality is satisfied because the Named Plaintiffs all challenge the same antitrust conspiracy, based on the same legal theory, and allege that they have suffered the same type of injury as that suffered by all class members. Therefore, the Named Plaintiffs'

---

[35] The following discussion is drawn from Plaintiffs' initial motion for preliminary approval. *See* ECF No. 612 at 18-21. Plaintiffs provide it again for the Court's convenience. The discussion remains equally applicable to this renewed motion.

claims are typical of the Class.

### 4.    Rule 23(a)(4): Plaintiffs Will Fairly Represent the Interests of the Class.

The adequacy requirement of Rule 23(a) tests (a) whether the class representatives have interests that are antagonistic to or in conflict with the interests of the class and (b) whether the representatives are represented by counsel of sufficient diligence and competence to fully litigate the case. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Both requirements are met here.

*First*, Named Plaintiffs have been actively involved at each step of this litigation, as already addressed. They have no conflict of interest with the Settlement Class because they have suffered the same alleged injury as all Settlement Class Members.

*Second,* Class Counsel have extensive experience in antitrust and complex litigation, including in this Court, and have zealously advanced the Settlement Class's interests. Rule 23(a)(4)'s requirements are met.

### 5.    Rule 23(b)(3): Common Questions of Fact or Law Predominate.

Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Establishing liability in this action requires resolution of a series of threshold issues that are common to the Settlement Class, including liability, impact, and damages. The predominance requirement is met.

### 6.    Rule 23(b)(3): A Class Action is the Superior Method for Resolving this Litigation.

The superiority inquiry requires assessment of whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requires assessment of whether the settlement will "achieve economies of time, effort, and expense, and promote

. . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. Here, it would be inefficient to litigate the common issues in countless individual proceedings because the Settlement Class is comprised only of SDC clear aligner purchasers with damages that are too small to justify individual litigation. Class treatment is superior to ensure that these Settlement Class Members have "the opportunity for meaningful redress." *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 WL 4447592, at *7 (N. D. Cal. Sept. 29, 2008).

**D.    The Proposed Notice Program Satisfies Rule 23.**

Rule 23(e)(1)(B) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal." In addition, for a Rule 23(b)(3) class, the court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific information to be included in the notice).

As discussed in detail above, Plaintiffs have proposed a detailed notice plan that includes direct notice to millions of potential class members. All forms of notice will contain the information required by Rule 23(c)(2)(B) and the Procedural Guidance. *See* Procedural Guidance § 3 (Notice); Pierce Decl. Exs. B-D. Therefore, the notice plan proposed here is the best practicable plan under the circumstances and, given the contact information available, should reach an unusually large segment of the Settlement Class. These notice provisions satisfy Rule 23 and will provide the Settlement Class with a fair opportunity to review and respond to the proposed Settlement.

**E.    The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel.**

Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action . . . must appoint class counsel under Rule 23(g). All Rule 23(g) factors weigh in favor of appointing Hagens Berman Sobol Shapiro LLP as Settlement Class Counsel. If appointed, counsel will devote all necessary resources toward administering the proposed Settlement for the benefit of the Settlement Class.

**F.    Proposed Schedule for Notice and Final Approval**

| Event | Proposed Deadline |
|---|---|
| Entry of Order Granting Preliminary Approval and Directing Notice | Subject to Court's Discretion |
| Notice Campaign and Claims Period Begins ("Notice Date") | 30 Days from Order Granting Preliminary Approval |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 35 Days from Notice Date |
| Exclusion and Objection Deadline | 65 Days from Notice Date |
| Motion for Final Approval and Response to Objections | 85 Days from Notice Date |
| Claims Period Closes | 120 Days from Notice Date |
| Final Approval Hearing | At least 135 Days from Notice Date (at the convenience of the Court) |

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court approve the proposed Settlement Class, enter the accompanying Proposed Order preliminarily approving the Settlement and directing notice to the Settlement Class, appoint Hagens Berman Sobol Shapiro LLP as Class Counsel, and set a date for a hearing on the final approval of the Settlement.

DATED: April 24, 2025                                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/  Steve W. Berman*
Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
Joseph M. Kingerski (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: riop@hbsslaw.com

*Counsel for Plaintiffs*

'