Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MISTY SNOW, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiffs,<br><br>   v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>                                    Defendant. | Case No. 3:21-cv-03269-VC<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>Date:      November 20, 2025]<br>Time:      2:00 PM<br>Judge:    Hon. Vince Chhabria<br>Location: Videoconference |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on November 20, 2025, at 2:00 p.m., or as soon thereafter as the matter can be heard by the above-titled court, via videoconference with the courtroom of the Honorable Vince Chhabria located at the Phillip Burton Federal Building and United States Courthouse, Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23, for final settlement approval. Plaintiffs' Motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities in Support of Motion, declarations filed in support thereof, the complete records and files of this action, all other matters of which the Court may take judicial notice, and any other such evidence and oral argument as may be made at the hearing of this matter.

Dated: October 16, 2025

Respectfully submitted,

By   */s/ Steve W. Berman*
       Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | PRELIMINARY STATEMENT | | 1 |
| II. | ARGUMENT | | 2 |
| | A. | The Settlement Is Fair, Reasonable, and Adequate | 2 |
| | | 1. The Approved Notice Plan Was Successfully Implemented | 3 |
| | |    a. Direct Notice | 3 |
| | |    b. Media Notice | 5 |
| | |    c. Settlement Website and Telephone Number | 6 |
| | | 2. The Notice Campaign Satisfied Rule 23 and Due Process | 7 |
| | | 3. The Reaction of the Settlement Class Has Been Overwhelmingly Positive. | 9 |
| | B. | The Objections Provide No Basis to Deny Final Approval | 10 |
| | C. | The Proposed Settlement Class Satisfies Rule 23. | 13 |
| III. | CONCLUSION | | 14 |

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. 2018) .................................................................................... 7, 9

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ...................................................................................... 12

*Churchill Vill., LLC v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) .............................................................................................. 2, 9

*Class Pls. v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ................................................................................................ 2

*In re Facebook Internet Tracking Litig.*,
  2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) .................................................................... 8

*Free Range Content, Inc. v. Google, LLC*,
  2019 WL 1299504 (N.D. Cal. Mar. 21, 2019) ........................................................ 1, 8, 10, 11

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .............................................................................................. 13

*Hernandez v. Immortal Rise, Inc.*,
  306 F.R.D. 91 (E.D.N.Y. 2015) .......................................................................................... 2, 9

*In re High-Tech Emp. Antitrust Litig.*,
  2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ...................................................................... 10

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) .......................................................................................... 9

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) .............................................................................................. 10

*In re Namenda Direct Purchaser Antitrust Litig.*,
  462 F. Supp. 3d 307 (S.D.N.Y. 2020) .................................................................................. 12

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................................... 9

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) .................................................................................................. 7

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ................................................................................................ 12

*In re Online DVD-Rental Antitrust Litig.*,
   2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) .......................................................................... 12

*Silber v. Mabon*,
   18 F.3d 1449 (9th Cir. 1994) ...................................................................................................... 7

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ...................................................................................................... 3

*Theodore Broomfield v. Craft Brew All., Inc.*,
   2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ........................................................................ 2, 8

*In re TikTok, Inc., Consumer Privacy Litig.*,
   617 F. Supp. 3d 904 (N.D. Ill. 2022) ......................................................................................... 8

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...................................................................................... 12

*In re Yahoo! Inc. Consumer Data Security Breach Litig.*,
   2020 WL 4212811 (N.D. Cal. July 22, 2020) ........................................................................... 8

*In re Zoom Video Commn's, Inc. Privacy Litig.*,
   2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) ........................................................................... 8

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

I.       PRELIMINARY STATEMENT

On May 28, 2025, this Court preliminarily approved Plaintiffs' settlement with Align. *See* ECF No. 675. Pursuant to the Settlement, purchasers of SmileDirectClub ("SDC") treatment are entitled to distributions from a $31,750,000 million non-reversionary cash fund. The fund represents a substantial portion (up to 17.5% percent) of the Settlement Class's single damages. Plaintiffs project that at least 230,000 – or at least 17% of the approximately 1.4 million Settlement Class Members – will receive a digital payment or traditional paper check.

The Court found the Settlement likely to be "fair, reasonable, and adequate" pursuant to Rule 23(e)(2), ECF No. 675 at 3, and the events since preliminary approval have confirmed as much.

*First*, the Settlement Administrator ("Epiq") has executed the approved notice campaign and reached approximately 80.9% of the Settlement Class via direct notice, which is well within the range accepted by courts in this district, in addition to administering a multi-pronged media notice campaign. *See* Declaration of Cameron Azari Regarding Implementation and Adequacy of Notice Plan ("Azari Decl.") ¶¶ 8, 19, 39 (filed concurrently herewith)[1]; *Free Range Content, Inc. v. Google, LLC*, No. 14-CV-02329-BLF, 2019 WL 1299504, at *6 (N.D. Cal. Mar. 21, 2019) ("Notice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23.") (brackets and internal quotation marks omitted)). Altogether, Epiq sent 286,771 postcard notices and more than 15 million email notices, and implemented a thorough media plan that, among other things, delivered 192 million impressions across sites like Facebook and Reddit. Azari Decl. ¶ 15. As of October 14, 2025, Epiq has received 289,966 claim forms, which equates to approximately 20.7% of all class members. Azari Decl. ¶ 37.

After accounting for those 232,782 class members for whom they already have reliable contact information (and who thus do not need to file claims in order to receive payment)[2],

---

[1] Epiq estimates that there was an average frequency of approximately two times for each Settlement Class member between individual notice via email or mail and the digital and social media notice program. Azari Decl. ¶ 8.

[2] As explained in the Motion for Preliminary Approval, Plaintiffs have reliable contact information for approximately 232,782 SDC customers; these Settlement Class members that

Plaintiffs estimate that at least 17% of the Settlement Class will receive payment after Plaintiffs' fraud review is complete. This is "well above average in class action settlements," *Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 100 (E.D.N.Y. 2015) (20% participation rate "well above average in class action settlements") (citing 2 McLaughlin on Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10–15 percent range.")), and well in line with rates commonly approved in this district. *See, e.g.*, *Theodore Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2020 WL 1972505, at *7 (N.D. Cal. Feb. 5, 2020) (approving settlement with response rate of "about two percent").

*Second*, and most critically, the Settlement Class's response has been remarkably positive. As of October 14, 2025, Epiq has received four objections – three of which are addressed to product quality, which is not the subject of this lawsuit[3] – and approximately 2,000 opt-out requests, constituting 0.14% of the approximately 1,400,000 member Settlement Class. Azari Decl. ¶ 35, Attachment 13 (copies of objections). This is a powerful indication that the Settlement's terms are fair and reasonable.

Plaintiffs respectfully request that the Court certify the proposed Settlement Class and grant final approval.

## II.    ARGUMENT

### A.    The Settlement Is Fair, Reasonable, and Adequate

The law favors the settlement of class action lawsuits. *See, e.g., Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Pls. v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992). And "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [the trial judge] is exposed to the litigants, and their strategies, positions and

---

purchased in the United States will receive an automatic payment. ECF No. 668 at 4; Azari Decl. ¶ 11. Plaintiffs intend to have the Settlement Administrator take steps to confirm whether Settlement Class Members with addresses outside the United States purchased the product while in the United States before providing them with an automatic payment.

[3] For the reasons explained in more detail below, these objections do not provide a basis to deny final approval. Further, by participating in the settlement, class members do not release the right to bring claims against SDC or any other un-named defendant based on harms related to their treatment.

proof." *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

To grant final approval, Rule 23(e) requires the district court to determine whether the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Plaintiffs' Preliminary Approval Motion (ECF No. 668) addressed all factors courts consider in making this determination, including the factors listed in the Northern District of California's Procedural Guidance for Class Action Settlements and this Court's standing order. Because the relevant facts generally have not changed since preliminary approval, Plaintiffs will not burden the Court with a repetitive discussion of the settlement terms and applicable fairness criteria. For a comprehensive discussion of those issues, Plaintiffs respectfully refer the Court to their Preliminary Approval Motion. *See* ECF No. 668.

The remainder of this submission instead addresses the execution of the notice plan and the principal factor that could not be assessed at preliminary approval – the reaction of the Settlement Class.

1. **The Approved Notice Plan Was Successfully Implemented**

The multifaceted notice program was implemented in accordance with the notice plan preliminarily approved by the Court. There were, in essence, three components to it: direct notice, media notice, and the Settlement Website.

   a. **Direct Notice**

To effectively deliver direct notice, Epiq first compiled a "Class List" using data and contact information supplied by Class Counsel. *See* Azari Decl. ¶¶ 11–12[4]; *see* ECF No. 668 at 3. Specifically, this list consisted of 66 data files containing 21,240,772 potential Settlement Class Member records, some (but not all) of which contained contact information, including names, addresses, email addresses, purchase order information, and dates of birth. *Id.* ¶ 11; *see* ECF No.

---

[4] As explained in their Motion for Preliminary Approval, Plaintiffs also obtained from SDC's bankruptcy trustee a file that contains 232,782 class member records. ECF No. 668 at 3. These class members will receive an automatic payment without any need to file a claim if they have a U.S.-based address. *Id.* at 4. However, this data source is incomplete because the total number of class transactions is approximately 1,400,000.

668 at 3-4. As explained in Plaintiffs' Motion for Preliminary Approval, these files were a combination of (1) electronic files obtained from the bankruptcy estate of SDC containing approximately 20 million email addresses, including addresses for potential SDC customers and other sales leads that were not actually SDC customers; and (2) contact information obtained (via subpoena) from Apple and Google for customers who downloaded the SDC app from either Apple's App Store or Google's Play Store. *See* ECF No. 668 at 3-4; Azari Decl. ¶ 11.

Epiq then combined the data received, removed duplicate records, and loaded the unique, identified Settlement Class Members and potential Settlement Class Members into a database created for the Settlement. These efforts resulted in a total of 19,736,471 unique, identified Settlement Class Member and potential Settlement Class Member records (of these, only 59,692 records did not contain a valid email address or associated physical address and were thus not sent Notice). Azari Decl. ¶ 12.

Using this list, Epiq delivered direct notice through both email and physical mail. Beginning with email, on June 20, 2025, Epiq sent 19,676,779 email notices to all identified Settlement Class Members and potential Settlement Class Members for whom a valid email address was available, using a variety of best practices to ensure successful delivery. *See id.* ¶¶ 12–14.

Epiq also delivered direct notice by physical mail ("Postcard Notice"). On June 27, 2025, after employing several checks to confirm the accuracy of address information, Epiq commenced sending 286,771 Postcard Notices: (a) 232,011 to identified, known Settlement Class Members, and (b) 54,760 to potential, identified Settlement Class Members with an associated mailing address contained in the Apple data.[5] *See id.* ¶¶ 15–16. As of October 14, 2025, Epiq has remailed

---

[5] Approximately 30,000 were mailed to foreign residents (primarily in Australia) by using addresses provided by SDC's bankruptcy trustee. Plaintiffs do not intend to send payment automatically to those individuals with foreign addresses because it is likely that many are not class members (i.e., because they purchased outside of the United States). However, to the extent these class members did purchase in the United States and file valid claims, they will be entitled to payment.

23,196 Postcard Notices and received a total of 35,835 undeliverable Postcard Notices (after employing best practices in attempted remailing). *See id.* ¶ 17.

All told, Epiq estimates that it delivered email or mail notice to 15,973,275 – or approximately 80.9% – of the 19,736,471 unique, identified Settlement Class Members and potential Settlement Class Members records available to them. *See id.* ¶ 19.

### b.  Media Notice

Epiq's notice campaign also featured media notice designed to reach those Settlement Class Members that may not have received direct notice by email or mail. This campaign had several components.

**Internet digital notice campaign**

First, between June 27, 2025 and August 7, 2025, Epiq targeted digital advertising ("Digital Notices") on the Google Display Network, which represents thousands of digital properties across all major content categories, as well as Facebook and Reddit. Digital Notices were targeted to selected audiences and designed to encourage participation by Settlement Class Members—specifically, by linking directly to the settlement website, thus allowing visitors easy access to relevant information and documents. Azari Decl. ¶¶ 21–26.

Consistent with best practices, the Digital Notices used language from the headline of the Long Form Notice, which allowed users to identify themselves as potential Settlement Class Members. *Id.* ¶ 21. The Notices were also distributed to a variety of target audiences, appeared on desktop, mobile, and tablet devices, and were targeted nationwide to reach Settlement Class members. *Id.* ¶ 24.

Altogether, approximately 192 million targeted "impressions"[6] were generated by the Digital Notices. *Id.* ¶¶ 25–26.

**Sponsored search listings**

Second, between June 27, 2025 and August 7, 2025, Epiq acquired search listings on Google, Bing, and Yahoo!, the three most highly visited internet search engines. When visitors

---

[6] Each time an ad appears on a platform, it is an "impression."

searched for selected common keyword combinations related to the Settlement, a sponsored search listing was displayed at the top of the page prior to the search results or in the upper right-hand column. Representative search terms included word and phrase variations related to the Settlement. The sponsored search listings began on June 27, 2025, and ran through August 7, 2025. The sponsored listings were displayed 55,703 times, which resulted in 2,928 clicks that displayed the settlement website. *See* Azari Decl. ¶¶ 27–28.[7]

**Informational release**

Third, on June 27, 2025, Epiq issued an informational release regarding the Settlement that included the settlement website address and toll-free telephone number. *See* Azari Decl. ¶¶ 29-31, Attachment 11. This release was issued over PR Newswire's "U.S. Newsline" and "Hispanic Newsline" to approximately 13,000 general media outlets (both print and broadcast), including local newspapers, magazines, national wire services, television and radio broadcast media, as well as approximately 4,000 websites, online databases, internet networks and social networking media. The Hispanic Newsline reached over 1,900 Hispanic US general media contacts as well as up to 4,840 additional industry-specific Hispanic media contacts, and included a guaranteed placement on more than 40 Hispanic websites and/or news portals. *Id.*

c. **Settlement Website and Telephone Number**

All forms of notice directed interested parties to the Settlement Website, which contained the Long-Form Notice, contact information for Epiq (including a toll-free number) and other pertinent details related to the Settlement. Through the website, Settlement Class Members could view details about the Settlement, review key documents, obtain contact information for the Settlement Administrator, and file a claim. The Settlement Website (like the notice documents) also included detailed instructions both for opting out of the Settlement and lodging objections. *See id.* ¶ 32. In addition, Epiq established a toll-free telephone number for the Settlement that allowed Settlement Class Members to hear an introductory message and learn more about the Settlement in

---

[7] Lists of sponsored search terms and examples of the sponsored search listing displayed to to visitors are included as Attachments 9 and 10 to the Azari Declaration.

the form of recorded answers to FAQs, and to request that a Claim Package be mailed to them. *Id.* ¶ 33.

As of October 14, 2025, there have been 508,537 unique visitor sessions to the settlement website and 2,065,162 total web pages presented to users; there have been 3,755 calls to the toll-free telephone number. *Id.* ¶¶ 32–33.

### 2. The Notice Campaign Satisfied Rule 23 and Due Process

To satisfy Rule 23 and Due Process, notice "must be the best practicable, reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 329 (N.D. Cal. 2018) (internal quotation marks omitted). This does not require "actual notice to each individual class member." *Id.* (internal quotation marks omitted); *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994); *see* Fed. R. Civ. P. 23(c)(2)(B), (e)(1)(B). Rather, the test is whether notice was reasonably calculated so as to "not systematically leave any group without notice." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982).

The notice campaign executed by Epiq comfortably meets this standard. As explained in Plaintiffs' Motion for Preliminary Approval, the provision of notice here was complicated by SDC's bankruptcy, which prevented Plaintiffs from obtaining complete customer contact data from SDC. Notwithstanding that, Plaintiffs were ultimately able to obtain (1) a file containing 232,782 class member records; and (2) data from (a) SDC's bankruptcy trustee, (b) Google, and (c) Apple spanning (after Epiq's deduplication) 19,736,471 unique, identified records for potential Settlement Class members. *See* ECF No. 668 at 3-4; Azari Decl. ¶¶ 11–12.

Epiq estimates that its individual notice efforts reached approximately 80.9% of these 19 million records via direct notice, with an estimated average frequency (after accounting for digital and social media notice) of approximately two times each. *Id.* ¶¶ 8, 19. Given that the Settlement Class consists of approximately 1.4 million members, and in light of the media campaign Epiq administered in addition to direct notice (which generated, among other things, approximately 192 million impressions), this is likely a conservative estimate of the true percentage of the class that

received notice. And it falls comfortably within the ranges that courts in this district have recognized meet the requirements of Rule 23. *See, e.g.*, *Free Range Content*, 2019 WL 1299504, at *6 ("[N]otice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23.") (quoting *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3623734, at *4 (N.D. Cal. June 26, 2017)); Federal Judicial Center, Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide 2010 ("The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%.").

Plaintiffs' preliminary claims rate corroborates this. As of October 14, 2025, Epiq has received 289,966 claims forms, which represents (if all claims are valid) 20.7% of all class members. Azari Decl. ¶ 37. In addition, Plaintiffs have reliable contact information for approximately 230,000 potential class members, the vast majority of whom Plaintiffs anticipate will receive direct payment.[8] As set forth in the Azari declaration, there is minimal overlap between the individuals who filed claims and the individuals who received direct notice that they were automatically eligible for a payment.[9]

Therefore, even if there is a high rate of fraudulent claims,[10] Plaintiffs anticipate that, conservatively, at least 17% of the class will receive payment from the Settlement. This claims rate

---

[8] Plaintiffs anticipate that certain individuals in this group who purchased the product while not residing in the United States will not receive payment because they are not a member of the Settlement Class.

[9] As of October 14, 2025, 10,877 individuals who received postcard notice separately filed claims. Azari Decl. ¶ 38.

[10] After the close of the claims period, Epiq will conduct an analysis of all claims forms to detect fraud using various best practices. Azari Decl. ¶ 39. While Plaintiffs are reluctant to predict what percentage of claims will ultimately be determined to be non-fraudulent, even if just 10% are ultimately valid, this would be an approximately 2.1% claims rate even before considering the class members who will receive direct payments automatically —which is well within the range approved by courts in this district. *See Broomfield*, 2020 WL 1972505, at *7 (approving settlement with response rate of "about two percent"); *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD, 2022 WL 16902426, at *8 (N.D. Cal. Nov. 10, 2022) (approving settlement with a claims rate "approaching 2%"); *In re Zoom Video Commn's, Inc. Privacy Litig.*, No. 3:20-cv-02155-LB, 2022 WL 1593389, at *4 (N.D. Cal. Apr. 21, 2022) (approving settlement with a claims rate of approximately 1%); *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 921 (N.D. Ill. 2022) (approving settlement with 1.4% claims rate for national subclass); *In re Yahoo! Inc. Consumer Data Security Breach Litig.*, No. 16-md-02752-LHK, 2020 WL 4212811, at *20

is "well above average in class action settlements." *Hernandez*, 306 F.R.D. at 100 (20% participation rate "well above average in class action settlements") (citing 2 McLaughlin on Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10–15 percent range.")).

The Settlement Class received adequate notice.

### 3. The Reaction of the Settlement Class Has Been Overwhelmingly Positive.

In approving class action settlements, courts often gauge the reaction of the class by looking at the number of objections and opt-outs as compared to the overall size of the class. *See*, *e.g.*, *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval."); *Churchill*, 361 F.3d at 577 (affirming settlement where 45 of approximately 90,000 class members objected).

Here, Epiq delivered notice to approximately 15,973,275 potential Settlement Class Members. After the extensive notice campaign outlined above, as of October 14, 2025, only four Settlement Class members have objected and approximately 2,000 have requested to opt out, constituting 0.14% of the approximately 1,400,000 member Settlement Class.[11] Azari Decl. ¶ 35.

By any standard, this is a positive response, and it serves to confirm that Settlement Class Members perceive the Settlement to be fair and reasonable. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

---

(N.D. Cal. July 22, 2020) (approving settlement with 0.6% claims rate); *Anthem*, 327 F.R.D. at 329 (approving settlement with a 1.8% claims rate).

[11] Because the claims deadline and deadlines for objections and exclusion do not fall until October 27 and October 30, 2025 (respectively), Plaintiffs intend to submit by November 10, 2025, or ten days before the November 20 final approval hearing, (1) a supplemental declaration from Epiq specifying the final number of claims, objections, and opt-outs, as well as (2) an amended proposed order that clearly specifies all Settlement Class members who have opted out of the Settlement. To the extent there are any additional objections filed in advance of the hearing, Plaintiffs will also submit those objections and their responses to them by November 10.

B.     **The Objections Provide No Basis to Deny Final Approval**

Plaintiffs have received four objections, which are included as Attachment 13 to the Azari Declaration. These do not provide a basis to deny final approval.

**<u>Scott St. John</u>**

Mr. St. John objects that the Settlement does not adequately compensate class members for their damages and asserts that Settlement Class members should be entitled to recover "the full amount of all monies paid" to SDC for their treatment. *See* Azari Decl., Attachment 13 (Objection #1). Based on Mr. St. John's reference to his "specific damages and injuries … contained in [his] client and patient records," it appears that he seeks compensation for physical harms suffered from SDC treatment. While Plaintiffs are sympathetic to these harms, Mr. St. John's objections do not provide a basis to deny final approval, as they appear to be grounded in alleged injuries unrelated to Plaintiffs' antitrust claims.[12] Further, as explained in Plaintiffs' Motion for Preliminary Approval, the release language clearly states that class members are only releasing claims based on the factual predicate that gave rise to this litigation; therefore, neither Mr. St. John nor any other Settlement Class Member is releasing any claims against SDC nor against any defendant not named in this litigation. *See* ECF No. 668 at 21.

Mr. St. John also objects to Plaintiffs' request for an attorneys' fee award in the amount of 25% of the total recovery. Plaintiffs respectfully submit that this is not a basis to deny final approval. As set forth in their motion for attorneys' fees, Plaintiffs' requested award is in line with this Circuit's 25% benchmark and comparable fee awards in similar cases; it is also supported by

---

[12] In addition, "given the costs and risks of continued litigation and the nature of settlements generally," courts in this district reject similar objections that "100% recovery is warranted." *See Free Range Content*, 2019 WL 1299504, at *9. As Plaintiffs previously explained, this case presented both strengths and weaknesses that make settlement appropriate here. ECF No. 668 at 11-15; ECF No. 628 at 12-21; *see In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5159441, at *5 (N.D. Cal. Sept. 2, 2015) ("That certain Class Members evaluate the risks differently, or would prefer to go to trial despite those risks, does not prevent the Court from granting final approval to the Settlement."); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (quoting *Officers for Just.*, 688 F.2d at 624).

the extensive work undertaken by class counsel in prosecuting this action. *See* ECF No. 677; *Free Range Content*, 2019 WL 1299504, at *8 (rejecting similar objection).

### Tiara Lindsey

Ms. Lindsey objects that the Settlement is inadequate because her SDC clear aligner treatment—which was abruptly discontinued after SDC's bankruptcy—has caused her pain and physical discomfort. *See* Azari Decl., Attachment 13 (Objection #2). Ms. Lindsey also objects on the grounds that (1) SDC failed to provide her with paid retainers; (2) her treatment caused her both financial loss (due to the need for corrective re-treatment) and emotional harm; and (3) her personal information was shared with a third-party "who attempted to solicit further treatment" after SDC's bankruptcy. As compensation, Ms. Lindsey requests $20,000 and either an individualized review process for Settlement Class members or a "tiered compensation model based on severity of impact."

As with Mr. St. John, while Plaintiffs are sympathetic to the harm Ms. Lindsey may have suffered from SDC treatment, these objections do not provide a basis to deny final approval, nor does the Settlement release any of Ms. Lindsey's claims against SDC or non-named defendants.

### Crisvely Soto Martinez

Crisvely Soto Martinez objects to Plaintiffs' distribution of equal payments to Settlement Class Members and requests that the Court instead "consider tiered or purchase-based compensation" "proportional to how much each [Settlement Class member] spent." *See* Azari Decl., Attachment 13 (Objection #3)

For the reasons set forth in their motion for preliminary approval, *see* ECF No. 668 at 5–7, Plaintiffs respectfully submit that this is not a basis to deny final approval. Plaintiffs briefly restate the reasons for this.

*First*, contrary to Ms. Martinez's assertion that some Settlement Class members paid "far less" than others, the differences in the prices paid by Settlement Class members for SDC treatment are modest: for the entirety of the class period, SDC's "SmilePay" (financed) option was at most approximately $200 more expensive than its "FullPay" (non-financed) option. *See* ECF No. 540-5 at p.20 (expert report of Dr. Vogt showing difference between FullPay and SmilePay prices over

time was between $0-200). Counsel for Plaintiffs respectfully submit that the relatively small differences in both overcharge and estimated payment between SmilePay and FullPay militate in favor of a pro rata distribution across all class members, particularly considering the fact that significantly more class members selected SDC's "SmilePay" (rather than "FullPay") option. On an individual class member basis, the maximum percentage difference is approximately 42% between the highest overcharge and lowest overcharge. This is a significantly smaller percentage difference than other antitrust cases in which courts have approved an equal pro rata plan of allocation.[13] *See* ECF No. 668 at 6.

*Second*, all settlement class members (1) suffered the same economic injury, (2) allege their injury arises from the same course of conduct, and (3) had equally strong claims on the merits. Further, (4) the maximum difference in overcharges paid between Settlement Class members was less than $150. *See* ECF No. 612 at 6, 11–12. In similar circumstances, courts have approved similar equal, pro rata distribution plans.[14] *See* ECF No. 668 at 5.

*Third*, even the most detailed customer contact information from SDC does not generally record each customer's method of payment. Therefore, Plaintiffs are unable to determine a Settlement Class member's method of payment until the Settlement Class member submits a claims form. Because of this fact, Plaintiffs have not identified any way to reliably issue direct payments to class members who have not submitted claims forms (i.e., the approximately 230,000 Settlement Class members for whom Plaintiffs have reliable contact information) that differentiates

---

[13] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 940 (9th Cir. 2015) (equally apportioning a settlement fund among class members where some class members paid for a Netflix subscription for more than six years and some for a significantly shorter period); Pls.' Mot. for Class Certification, ECF No. 128, at 8, *In re Online DVD-Rental Antitrust Litig.*, Case No. 4:09-md-02029-PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) (showing Netflix subscription prices ranging between $8.99 and $16.99 during the class period, which is a 62% difference); *see In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a pro rata basis."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving pro rata distribution of settlement fund as fair and reasonable).

[14] *See Online DVD-Rental*, 779 F.3d 934 at 945.

based on their method of payment—that is, between "FullPay" and "SmilePay" purchasers. The Court previously encouraged Plaintiffs to determine a methodology for making payments to class members, even if they do not submit a claims form. Distributing equal pro rata shares to Settlement Class members will allow for direct payments to be made to approximately 230,000 Settlement Class members without the submission of a claims form. *See* ECF No. 668 at 5–6.

Finally, as Plaintiffs previously explained in their Renewed Motion for Preliminary Approval, although FullPay damages are higher on an individual basis, on a collective basis, SmilePay damages were higher because more class members used that payment option. Therefore, the difference in proportional damages between the two groups of class members is small. And equally dividing the settlement fund also prevents any inequitable outcomes if there is a significantly greater percentage of settlement participation among SmilePay or FullPay customers. *See* ECF No. 668 at 6; ECF No. 628 at 10–12.

### Candy Araiza

Ms. Araiza objects that she "purchased all of the required aligners and there were many [aligners] missing, causing unnecessary pain;" she states that she was "told that [she] could get a final retainer for a low price" and that she "paid full price knowing that I was going to get support for my unaligned teeth." Azari Decl., Attachment 13 (Objection #4).

Although Ms. Araiza does not make any specific requests regarding the Settlement, it appears that she seeks relief from SDC based on treatment-related harms and the discontinuation of her SDC treatment following SDC's bankruptcy. As with Mr. St. John and Ms. Lindsey, while Plaintiffs are sympathetic to the treatment- and bankruptcy-related harms Ms. Araiza may have suffered, these objections do not provide a basis to deny final approval, nor does the Settlement release any of Ms. Araiza's claims against SDC or non-named defendants.

C.  **The Proposed Settlement Class Satisfies Rule 23.**

For final approval of a class action settlement, the proposed settlement class also must satisfy the Rule 23(a) requirements referred to as numerosity, commonality, typicality, and adequacy of representation. Additionally, the proposed class must meet one of the Rule 23(b) requirements. *See Hanlon*, 150 F.3d at 1019-1022. Plaintiffs seek certification of the proposed

Settlement Class pursuant to Rule 23(b)(3). In the Preliminary Approval Motion, Plaintiffs discussed at length why the Settlement Class should be certified. *See* ECF No. 668. Because the facts relevant to certification have not changed, and no Settlement Class Member has objected to certification of the proposed Settlement Class, Plaintiffs do not repeat that discussion here.

### III.     CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court certify the proposed Settlement Class and approve the Settlement.

DATED: October 16, 2025                          HAGENS BERMAN SOBOL SHAPIRO LLP


By      */s/ Steve W. Berman*
       Steve W. Berman (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: joeyk@hbsslaw.com

Rio Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: riop@hbsslaw.com